UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

WILLIE T. DONALD,                          )
          Plaintiff,                    )
                                        )
      v.                                )     CAUSE NO.: 2:17-CV-32-TLS-JPK
                                        )
BRUCE OUTLAW, *et al.*,                    )
          Defendants.                   )

**OPINION AND ORDER**

This matter is before the Court on Defendants' Motion to Compel Disclosure/In Camera Inspection of Northwestern University Documents [DE 146], filed by Defendants City of Gary, Bruce Outlaw, and Carla K. Pyle (as special administrator of the estate of John E. Jelks, Jr.) on July 24, 2019. This motion seeks an order compelling Plaintiff Willie T. Donald to produce approximately 5,000 pages withheld from an 11,000-page production subpoenaed from Northwestern's Medill School of Journalism under claims of attorney-client privilege and/or the work product doctrine, or, alternatively, for the Court to review the withheld documents in camera to determine whether any privilege or work product protection applies. The motion also seeks an order compelling Donald to obtain "authentication" forms from Northwestern authenticating the documents it produced, and for Donald to confirm that all documents received from Northwestern have been produced or listed on the privilege log at issue. Donald filed an Opposition to Defendants' Motion to Compel on August 7, 2019, and Defendants filed a Reply on August 14, 2019. With the Court's leave, Donald then filed a Sur-Response on September 16, 2019, and the City of Gary filed a Sur-Reply on September 30, 2019. Donald then filed a Motion for Leave to File Notice of New Evidence on February 12, 2020, attaching excerpts from a deposition of his post-conviction counsel (Thomas Vanes) and a supplement addressing them.

Also pending before the Court is the City's Motion for Relief from the Court's Order on Plaintiff's Motion to File Sur-Response to Defendants' Motion to Compel Disclosure/In Camera Inspection of Northwestern University Documents Under Seal [DE 173], filed on September 30, 2019. This motion asks the Court to reconsider its September 16, 2019 Order [169] allowing Donald to file portions of his Sur-Response in opposition to Defendant's Motion to Compel and exhibits thereto under seal for the Court's ex parte review. Donald filed an Opposition to the Motion for Relief on October 14, 2019, and the City of Gary filed a Reply on October 21, 2019.

For the reasons stated below, the Court grants in part and denies without prejudice in part Defendants' Motion to Compel [146]. Specifically, the Court grants Defendants' request to compel production of the vast majority of the documents withheld as privileged and/or work product, but denies without prejudice Defendants' request to compel Donald to provide the requested authentication forms pending the parties' further efforts to resolve that dispute. The Court also grants Defendants' Motion for Relief [173] and orders Donald to file his Sur-Response [170] and all exhibits thereto on the electronic case docket so that all parties to this litigation can view those filings, but the Court also grants Donald leave to file those materials provisionally under seal from the public if he contemporaneously files a motion to seal explaining why any specific portions of those materials should be sealed from public view.

## FACTUAL AND PROCEDURAL BACKGROUND

Donald brought this action in January 2017, asserting claims under 28 U.S.C. § 1983 for violations of his due process rights, conspiracy to deprive his constitutional rights, failure to intervene, and malicious prosecution, and state law claims for malicious prosecution, intentional and negligent infliction of emotional distress, *respondeat superior*, and indemnification. (Compl., ECF No. 1). According to his complaint, Donald was wrongfully convicted of murder and robbery

in June 1992, after Defendants "developed information which conclusively established that Mr. Donald was not the perpetrator seen by one of the eyewitnesses" and "deliberately suppressed this exculpatory evidence and focused singularly on Mr. Donald, causing his wrongful conviction." (*Id*. at ¶¶ 3, 73). As a result, Donald alleges, he served nearly 24 years of a 60-year sentence before his convictions were ultimately vacated on January 25, 2016. (*Id*. at ¶¶ 4, 73).

Donald obtained this result following a reinvestigation of his conviction beginning in or about 2007 by the Innocence Project operated through Northwestern's Medill School of Journalism. At that time, Medill was one of two journalism schools affiliated with the Innocence Network (a group of organizations that reinvestigated the convictions of certain individuals who claimed to be innocent of the crimes for which they were convicted), and the investigators for Medill's Innocence Project "were mostly students at Northwestern's journalism school." (Pl.'s Sur-Resp. 1-3, 6 n.4, ECF No. 171). The documents at issue in the instant motions relate to Medill's reinvestigation of Donald's conviction, and include among other documents the files of Donald's criminal defense and post-conviction attorneys. (Pl.'s Sur-Resp. 9, 16, ECF No. 171). As Donald's exhibits demonstrate, he released these files to Medill pursuant to "Client Waiver of Attorney-Client Privilege" forms he signed in 2007 at Medill's request, in order to allow the Innocence Project to consider whether to take his case as one of its next projects. (*Id*. at 3-5 and n.3; Pl.'s Exs. 1, 5-8, ECF Nos. 170-1, 170-5 to 170-8).

Donald argues in opposition to the instant motions not only that he waived no privilege when he signed these waivers, but also that Defendants should not be allowed to see the correspondence from Medill requesting the waivers, or even the waivers themselves, which expressly acknowledge Donald's understanding that any information disclosed to Medill "may be subject to re-disclosure by the Northwestern students" and "may not be subject to federal

confidentiality rules." (*Id.*).[1] Donald also contends that materials later shared with or generated by Medill Innocence Project students and staff are also privileged and/or protected work product, because "the Innocence Project provided assistance to Mr. Donald's attorney as he worked to exonerate Mr. Donald." (Pl.'s Sur-Resp. 13, ECF No. 171). The instant motions thus raise the same issues: whether the attorney-client privilege or work protect doctrine now protect the attorney files that Donald released to Northwestern journalism students and staff involved in Medill's Innocence Project pursuant to express privilege waivers allowing redisclosure of that information, and whether such privileges also apply to documents shared with or generated by the Innocence Project during its reinvestigation of Donald's conviction. To resolve these issues, it is necessary first to consider the facts surrounding Donald's decision to provide Medill with the privilege waivers it requested, the content of those waivers, and the work that the Innocence Project performed.

## I.     Medill's Request that Donald Waive the Attorney-Client Privilege

Donald explains that he reached out to "various organizations with the Innocence Network" to "secure his exoneration." (Sur-Resp. 3, ECF No. 171). As discussed above, one of these organizations was the Medill Innocence Project, which "solely worked through the investigative journalism class at the Medill School of Journalism" taught by (now former) Professor David Protess. (Wanger Dep. 20, ECF No. 174-6; Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8). In a letter dated January 8, 2007, the Innocence Project's Program Assistant, Ms. Rebekah Wanger, informed Donald that his case was "in the final stages of review" in the process for choosing the Project's

---

[1] As discussed below, Donald has failed to demonstrate that any portion of theses waiver forms or any other exhibits to his Sur-Response contain any privileged information or protected work product. The Court therefore orders those materials to be produced to Defendants within twenty-eight (28) days, and correspondingly discusses portions of them throughout this Opinion for all parties' viewing. Because the Court has nevertheless allowed Donald to seek to seal those materials from public view, however, the Court will maintain this Opinion under seal from public view for a period of seven (7) days, pending any motion by Donald to seal any specific portions of his Sur-Response and exhibits from public view, which should also identify any specific portions of this Opinion that he contends should be sealed from public view as well.

"next case to take for 2007." (Pl.'s Ex. 1, ECF No. 170-1). To complete this review, however, Ms.

Wanger explained that the Innocence Project needed Donald "to waive the attorney-client

privilege," in order to allow Innocence Project staff and/or students to speak freely with his

attorneys about his case and obtain copies of their files. (*Id*.). Ms. Wanger thus enclosed "waiver

forms" requiring Donald's signature for this purpose, which she explained as follows:

> The waiver forms explain in detail what information we would require for
> these attorneys and what effect this waiver has on you. Basically, however,
> we would like all documents on your case, including discovery, trial
> transcripts, and letters from both attorneys. We would also like to be able
> to talk with them about your case in total. *This means that you would be
> giving them permission to give us all this information and that this
> information would no longer be between you and the attorneys only*.

(Pl.'s Ex. 1, ECF No. 170-1 (emphasis added)). Ms. Wanger's January 8 letter was also careful to

explain how the Innocence Project operated and who would be reinvestigating Donald's case: "I

also need to make sure that you understand how our investigation would proceed. Seniors in the

Investigative Journalism class at Medill, Northwestern University's journalism school, would be

the actual investigators on your case, guided of course by Professor Protess. Because of this,

investigation would only take place during the school year." (*Id*.).

Having explained these conditions, Ms. Wanger asked Donald to sign and return "the

enclosed client waiver forms" if he was "still interested" in having Medill's Innocence Project

"investigate" his case. (*Id*.). Consistent with Ms. Wanger's explanation, each "waiver" authorized

Donald's attorneys to provide "any and all documents, exhibits and knowledge regarding

[Donald's] case to Northwestern University students in David Protess' investigative journalism

class and representatives of the Medill Innocence Project," "to prepare any reports that may be

requested by Northwestern students in the class," and "to discuss any aspect of the case with the

students or representatives of the Medill Innocence Project." (Pl.'s Exs. 5-8, ECF Nos. 170-5 to

170-8). Notably, the waivers also recited Donald's understanding that any information so disclosed

5

"may be subject to re-disclosure by the Northwestern students" and "may not be protected by federal confidentiality rules." (*Id.*). The waivers also stated Donald's understanding that his "decision to sign this form and authorize this use and disclosure of legal information about [his] case" was "entirely voluntary," and that he was free to "refuse to sign this form." (*Id.*).

## II.    Donald's Decision to Waive the Attorney-Client Privilege

While there is no dispute that Donald signed the waiver forms Ms. Wanger sent him, he claims he was "unable to fully comprehend" them, and therefore "sought legal advice from his attorney, Thomas Vanes" before doing so. (Pl.'s Sur-Resp. 4, ECF No. 171).[2] To support that claim, Donald points to a letter he sent to Mr. Vanes enclosing Ms. Wanger's correspondence, in which Donald stated that he did not "have a clear understanding about the waiver form," and asked if it was "feasible" for Vanes and the University to "work together" on his case, or whether he had to "choose between" them. (Pl.'s Sur-Resp. 4, ECF No. 170 (quoting Pl.'s Ex. 2, ECF No. 170-2)).[3] But while this letter stated Donald's "wish" that Vanes continue to work on his case along with Medill's Innocence Project, he voiced no confusion about Medill's request that he waive the attorney-client privilege in order to allow Innocence Project students and staff to speak freely with his attorneys and obtain copies of their files. Nor did Donald express any concern over the admonitions in Ms. Wanger's letter and the waiver forms she forwarded warning that: (a) any information his lawyers provided to the Innocence Project would no longer be confidential

---

[2] Donald explains that Mr. Vanes "eventually took over" for his criminal trial lawyer, Mr. Scott King, and later acted as his post-conviction counsel (Pl.'s Sur-Resp. 3, ECF No. 171), but the record is unclear as to when Mr. Vanes' representation commenced and whether there was any relevant time period in which that representation lapsed. The Court nevertheless assumes for purposes of the instant motions that Mr. Vanes was representing Donald at this time.

[3] Like the other documents now at issue, there is no dispute that this letter and Mr. Vanes' responsive letters were among those provided to the Innocence Project pursuant to Donald's privilege waivers, and were thus among those produced by Northwestern in response to the subpoena served in this case. (*See* Pl.'s Opp. 6 n.2, ECF No. 157 (explaining the Bates Stamp prefixes used for Northwestern's productions); Ds' Reply 6 n.4, ECF No. 159 (same)). Thus, while Donald claims a privilege over this correspondence, the Court is addressing its terms because it was disclosed to the Innocence Project and subject to further disclosure by its students and staff after, as the Court is finding in this Opinion, Donald waived the privilege.

between Donald and his attorneys, (b) the information "may be subject to re-disclosure by the Northwestern students," and (c) it "may not be protected by federal confidentiality rules." (Pl.'s Exs. 1, 5-8, ECF Nos. 170-1, 170-5 to 170-8).

Mr. Vanes responded to Donald's inquiry by letter dated January 22, 2007. (Pl.'s Ex. 3, ECF No. 170-3). Referring to Ms. Wanger's letter and the waiver forms she had sent to Donald, Vanes responded to Donald's inquiry as follows: "Received your letter and the enclosed letter from the Medill Innocence Project. This is good news! Yes, you should sign and send these two forms back to them as soon as possible." (*Id.*). Vanes also explained that he had only part of the file kept by Donald's prior counsel (Mr. King) and was arranging for additional materials to be gathered from King's office. (*Id.*). As for Donald's question regarding whether Mr. Vanes would continue to work on Donald's case, Vanes added: "I'd be glad to help Medill if they take your case." (*Id.*). Two days later, Vanes again wrote to Donald to relay that the Innocence Project was "very, very close to accepting [his] case," that Vanes would be forwarding his files to Medill in the next week, and that he "volunteered to assist them in any way [he] could." (Pl.'s Ex. 4, ECF No. 170-4).

Donald ultimately executed four Client Waiver of Attorney-Client Privilege forms to enable the Medill Innocence Project to obtain files from his attorneys (Thomas Vanes, Charles E. Stewart, Doug Essex, and J. Jeffreys Merryman). (ECF Nos, 170-5 to 170-8). The first two (for Vanes and Stewart) were signed in January 2007 around the time of Mr. Vanes' letters to Donald. (Pl.'s Exs. 5-6, ECF Nos. 170-5 and 170-6). Although dated January 18, 2007 (several days before Mr. Vanes' letters to Donald on January 22 and 24, 2007), Donald asserts that he "did not submit these waivers to the Innocence Project until after he received Mr. Vanes' legal advice." (Pl.'s Sur-Resp. 5 n.3, ECF No. 170). Donald then executed the latter two waivers (for Essex and Merryman) in December 2007. (Pl.'s Exs. 7-8, ECF Nos. 170-7 and 170-8).

### III.    Medill's Reinvestigation of Donald's Conviction

According to Donald's Sur-Response, the Innocence Project began investigating Donald's case in the fall of 2007, about nine months after he provided privilege waivers for attorneys Vanes and Stewart. (Pl.'s Sur-Resp. 5, ECF No. 171 (citing Pl.'s Ex. 9 (Oct-Nov 2007 email chain), ECF No. 170-9)). Donald claims the role of Medill's Innocence Project was "to assist Mr. Vanes' legal efforts to exonerate Mr. Donald," and thus, "the Innocence Project rendered assistance to Mr. Vanes in his provision of legal services." (Pl.'s Sur-Resp. 6, 10, ECF No. 171). But while there is no dispute that Medill's Innocence Project sought to reinvestigate his conviction, the record contradicts Donald's claim that the Innocence Project took Donald's case to secure his exoneration. As Ms. Wanger explained, Medill's Innocence Project was "journalism based." (Wanger Dep. 128, ECF No. 174-6). This distinguished it from the "vast majority" of Innocence Network affiliates, all but two of which were law schools. (*Id.*). Whereas the law-school-based programs "were looking at a very much legal exoneration," Medill's Innocence Project focused on "finding truth," even if that meant "proof of guilt." (*Id.* at 99, 128-29 ("Results were finding truth. And we found that even when we found proof – proof of guilt to us – it was the fact-finding mission, not the exoneration mission.")). "The whole idea was to have the students learn how to investigate." (*Id.* at 54).

The Innocence Project's affiliation with the Journalism School had other ramifications as well. Because it operated "solely" through Professor Protess' investigative journalism class (*id.* at 20), the students discussed their strategies and reported the results of their investigation – including their conversations with Mr. Vanes – *in class* with no apparent confidentiality restrictions. (*See*, *e.g.* Pl.'s Ex. 10 ("we had strategized it in class"), ECF No. 170-10; Pl.'s Ex. 17 (reporting that students proceeded "to share the findings during class" following their meeting with Vanes), ECF

No. 170-17). Moreover, because Donald's privilege waivers authorized "re-disclosure" of any information gathered from his lawyers (Pl.'s Exs. 5-8; ECF Nos. 170-5 to 170-8), the students also had free rein to reveal any previously privileged information to any witnesses and offices they contacted (some of whom were Donald's potential adversaries), such as the police department and prosecutor's office, potentially hostile witnesses, and one of the defendants in this case, John Jelks. (Pl.'s Ex. 9, at 2-6, ECF No. 170-9; Pl.'s Ex 15, ECF No. 170-15).

The record also contradicts Donald's claim that from the beginning of Donald's relationship with Medill's Innocence Project, "the Innocence Project rendered assistance to Mr. Vanes in his provision of legal services." (Pl.'s Sur-Resp. 5-6, 10, ECF No. 171). As discussed above, Vanes' letters to Donald offered "to help Medill" and "assist them in any way [he] could," not that the Innocence Project would "assist Mr. Vanes' legal efforts." (*Id.*; Pl.'s Exs. 3-4, ECF Nos. 170-3 to 170-4). And while Vanes did provide assistance to the Innocence Project with areas of inquiry and the filing of a post-conviction petition "when formal legal action was necessary" (Pl.'s Sur-Resp. 10-11, ECF No. 171), the students were nevertheless mindful of their ethical obligations "as journalists" not to "get involved with his attorney client-relationship." (Pl.'s Ex. 20, at 2, ECF No. 170-20 ("that is not our responsibility; in fact, it is unethical for us as journalists to get involved with the legal agreements between an attorney and his client. . . . Tom Vanes expects us to be the middlemen in his attorney-client relationship with [Donald] . . . Tell Tom that we cannot get involved with his attorney-client relationship with Donald.").

Juxtaposed with these contemporaneous documents is Donald's recent Notice of New Evidence submitting excerpts of Mr. Vanes' January 2020 deposition. (ECF No. 220). In this testimony, Mr. Vanes agreed with the proposition that he "viewed" Medill's Innocence Project as providing "pro bono investigative and paralegal services in connection with [his] representation of

Mr. Donald in the post- conviction proceeding." (Vanes Dep. 185-86, ECF No. 220). From this, Donald correspondingly argues that "the pro bono investigative and paralegal services provided by the Innocence Project directly related to Mr. Vanes' representation of Plaintiff in his post-conviction proceeding." (Pl.'s Notice of New Evidence 2, ECF No. 220). Perhaps the Medill students started to work in this fashion at some point, or at least that was how Mr. Vanes saw things. But Donald's Sur-Response and exhibits confirm that his post-conviction petition was filed in March 2008 (Pl.'s Ex. 14, ECF No. 170-14), and Mr. Vanes' first discussion of such a petition with the Medill students was only weeks before. (Pl.'s Sur-Resp. 6, ECF No. 170; Pl.'s Ex. 10, ECF No. 170-10). (Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8). So if the students stepped beyond their role as journalists for some limited period of time, it was well after Donald signed his privilege waivers in 2007, authorizing not only the disclosure of his attorney files and information to Medill, but also the students' redisclosure of that information. Moreover, as noted above, less than a year later in January 2009, the Medill students were still mindful of their ethical obligations "as journalists" not to "get involved" in Mr. Vanes' attorney-client relationship with Donald, and were unwilling to step out of that role. (Pl.'s Ex. 20, ECF No. 170-20).

Thus, while Mr. Vanes' recent testimony indicates that he viewed the Medill students as "investigators and paralegals" doing work for him in connection with Donald's post-conviction proceeding at some point (Pl.'s Notice 2-3, ECF No. 220), the students' statements at the time indicate that they viewed themselves – and were functioning – "as journalists." (Pl.'s Ex. 20, ECF No. 170-20). So taking Mr. Vanes testimony as true, at least from his point of view, the current record still lacks clarity as to whether for some limited time the Medill students stepped outside of their role as journalists and acted as investigators or paralegals for Mr. Vanes in connection with Donald's post-conviction proceeding. Perhaps more importantly, even assuming the journalism

10

students picked up that mantle, Plaintiff has offered only conclusory statements about whether any documents generated from their work as such might be subject to work product protection. Given this ambiguity, as discussed further below, the Court reserves ruling on whether there is some small subset of documents generated for the claim(s) raised or anticipated in Donald's post-conviction proceeding that may be subject to work product protection. *See infra* Analysis, Part III.[4] That said, as also discussed below, Donald's prior waivers of the attorney-client privilege are clear, as is his failure to demonstrate the applicability of the attorney-client privilege to any of the documents covered by the waivers. *See infra* Analysis, Part I.

## IV.    Defendants' Attempts to Subpoena Medill's Records

The City of Gary first sought to obtain Medill's records regarding the Innocence Project's investigation of Donald's criminal case by proposing to serve a nonparty subpoena on Northwestern University in November 2017. (Pl.'s Ex. 1, ECF No. 157-1). Donald objected on privilege grounds, and the parties thereafter reached an agreement whereby Donald would serve a subpoena incorporating the same document requests that the City had sought to propound. (Ds' Ex. 4, ECF No. 159-1). The parties further agreed that Donald's counsel would then provide Defendants copies of any non-privileged discovery produced by Northwestern along with a privilege log for any documents withheld, with any privilege disputes to be decided in this litigation. (Pl.'s Ex 4, 157-4). Another condition of this agreement required Donald's counsel also to obtain from Northwestern "a completed authentication page" reciting "the number of pages of records produced" by Northwestern to Donald's counsel. (Ds' Ex. 4, ECF No. 159-1).

---

[4] While it was Donald's burden to establish work product protection and he failed to do so on the current record, the Court will exercise its discretion in a manner that allows Donald to make such an argument in the future and withhold a small subset of documents, as discussed more fully below. *See infra* Analysis, Part III

Following a stay of discovery in December 2017 (ECF No. 54), Donald's counsel served the subpoena on Northwestern in August 2018, after which Northwestern produced approximately 11,600 pages of documents to Donald's counsel, who in turn produced approximately 6,000 pages of documents to Defendants. (Ds' Mot. 2, ECF No. 146; Pl.'s Opp. 5, ECF No. 157). Donald's counsel thereafter produced a privilege log to which Defendants objected, followed by a revised privilege log which resolved only some of the parties' disputes (unlike the earlier version, Donald's revised privilege log abandoned any claim of a "joint defense" or "common interest" privilege, but retained assertions of the attorney-client privilege and work product doctrine). (Ds' Mot. 2-3, ECF No. 146; Pl.'s Opp. 6, ECF No. 157). Unable to reach agreement, Defendants filed their Motion to Compel challenging Donald's assertions of attorney-client privilege and work product protection as to the documents produced by Northwestern. (ECF No. 146).

**V.    Proceedings on the Pending Motions**

In addition to arguing that the documents produced by Northwestern failed to meet the requirements for the attorney-client privilege and work product doctrine in various specific respects, Defendants also pointed to the "Waiver of Attorney-Client Privilege" documents listed on Donald's privilege log and argued that "the attorney-client privilege has likely been waived." (Ds' Mot. 2-3, ECF No. 146). Donald initially addressed this assertion only in a footnote, claiming that the reference to a "Client Waiver of Attorney-Client Privilege" in these "document-sharing authorizations" was a "misnomer" because "no privilege was waived by the sharing of documents amongst members of [Donald's] exoneration team." (Pl.'s Opp. 3 n.1, ECF No. 157).

Recognizing the importance of the attorney-client privilege and faced with only a footnote acknowledging that Donald had signed multiple documents entitled "Client Waiver of Attorney-Client Privilege," the Court allowed him to file a sur-response explaining his privilege and work

product claims, and especially how the waiver documents themselves were privileged. Donald did so, attaching the following exhibits: (1) Ms. Wanger's correspondence explaining that his case would be investigated by Northwestern journalism students and requesting Donald to waive the privilege to allow them to speak with his attorneys and obtain their files; (2) Donald's letter to Vanes forwarding that correspondence; (3) Vanes' letters to Donald approving the privilege waivers and agreeing to assist Medill; (4) the four privilege waiver forms Donald signed; and (5) various emails, memos, and other documents relating to the Medill students' work on the case. (Pl.'s Exs. 1-13 and 15-20, ECF Nos. 170-1 to 170-13, 170-15 to 170-20).

Despite the actual waiver documents attached to his Sur-Response, Donald argues that Defendants' waiver claim is based "on rank speculation." (ECF No. 171, at 2). Defendants have so far been unable to respond fully to that accusation, because Donald preceded his Sur-Response and exhibits with a motion to seal, arguing that the foregoing materials "are protected from public disclosure and disclosure to Defendants by the attorney-client and work product privileges." (ECF No. 168, ¶ 4). The Court therefore allowed those materials to be filed under seal and *ex parte* pending its consideration of Donald's privilege and work product claims (ECF No. 169), after which Defendants filed their Motion for Relief asking the Court to reconsider its Order allowing the sealed filing. (ECF No. 173). Now having considered the parties' briefing and exhibits, the Court grants Defendants' Motion for Relief and partially grants their Motion to Compel.

## ANALYSIS

It has long been settled that the party withholding discovery under a claim of attorney-client privilege or work product protection bears the burden of demonstrating that the materials are privileged or protected from discovery. *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 480 (N.D. Ind. 2009) (citing *U.S. v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2013) (attorney-

client privilege); *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983) (work product doctrine)). While such showings ordinarily must be made "on a document-by-document basis" as opposed to a "blanket privilege claim" *id*., Donald's privilege and work product assertions fail for overarching reasons: neither the attorney-client privilege nor the work product doctrine protects documents or information shared with third parties, such as the aspiring journalists who Donald asked to reinvestigate his conviction, with no confidentiality restrictions, and in fact, explicit warning that the information "may be subject to re-disclosure."

## I.    The Attorney-Client Privilege

"Put simply, in order for the attorney-client privilege to attach, the communication must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship." *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). As indicated by the first requirement, confidentiality "is a touchstone of the privilege," and thus, "a communication between client and lawyer that is shared with persons outside the attorney-client relationship (unless a common interest privilege is established) expressly waives the privilege." *Am. Senior Cmtys., L.L.C. v. Burkhart*, No. 1:17-cv-3273, 2019 WL 6170064, at *4 (S.D. Ind. Nov. 19, 2019) (citing *BDO Seidman*, 492 F.3d at 815). The same is true of attorney-client communications made in the presence of a third party in the first instance. *U.S. ex rel. Leveski v. ITT Educ. Servs., Inc.*, No. 1:07-cv-867, 2015 WL 10892071, at *2 (S.D. Ind. Mar. 27, 2015) ("Confidentiality is essential. Thus, ordinarily, if the communication is made in the presence of or shared with a third person, there is no privilege" (citing *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007)). The proponent of the privilege must therefore show "not only that the original communication was made with the expectation of confidentiality, but also that the confidential nature of the communication was not compromised by disclosure to individuals

14

outside the attorney-client relationship." *Barton v. Zimmer, Inc.*, No. 1:06-CV-208, 2008 WL 80647, at *5 (N.D. Ind. Jan. 7, 2008) (citing *Jenkins*)); *Am. Senior Cmtys.*, 2019 WL 6170064, at *5 ("Because confidentiality is an essential element of the privilege, it is anathema to the privilege to permit [a party] to assert its protections when confidentiality has been destroyed").

Donald does not dispute these principles. (*See* Pl.'s Sur-Resp. 9, ECF No. 171 ("Statements made by a client to his attorney in the presence of a third party ordinarily fall outside of the privilege.")). Nor does he claim any joint defense or common interest privilege with Medill's Innocence Project that might protect disclosures involving its students and staff. (*Id*. at 11). Instead, citing the Seventh Circuit's decision in *Jenkins v. Bartlett*, Donald asserts "an exception to the general rule that the presence of a third party will defeat a claim of privilege when that third party is present to assist the attorney in the rendering of legal services." (*Id*. at 9 (quoting *Jenkins*, 487 F.3d at 490-91)). According to Donald, *Jenkins*' exception applies here because Medill's Innocence project was not a "third party" when Donald signed his privilege waivers and turned over his attorney files and other privileged information to its students and staff, but rather, "an investigative organization that was going to assist Mr. Vanes and the legal effort to obtain Mr. Donald's exoneration." (*Id*. at 10). And later communications involving Innocence Project students and staff are similarly privileged, he says, because "the Innocence Project rendered assistance to Mr. Vanes in his provision of legal services." (*Id*.).

Because the attorney-client privilege requires "the withholding of relevant information" from parties and courts "in derogation of the search for truth," the Seventh Circuit has repeatedly cautioned that both the privilege and any exceptions to its requirements "must be strictly confined." *BDO Seidman*, 492 F.3d at 815 (quoting *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000)); *Jenkins*, 487 F.3d at 491 ("Because the privilege is in derogation of the search for the

truth, it is construed narrowly." (brackets omitted, quoting *U.S. v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997)). *Jenkins* thus stressed "the narrowness" of the exception it applied: where "a third party is present during conversations between an attorney and a client in preparation for an investigatory interview and *the third party is present solely to assist the attorney in rendering legal services to the client*, the third party's presence will not defeat a claim of privilege." *Jenkins*, 487 F.3d at 491 n.6 (emphasis added). Outside of this limited context, the attorney-client privilege protects only "communications made in confidence by a client to his attorney in the attorney's professional capacity for the purpose of obtaining legal advice," and "statements made by a client to his attorney in the presence of a third person do not fall within the privilege, even when the client wishes the communication to remain confidential." *Id.* at 491.

Thus, for *Jenkins*' exception to apply, the communication must be "made *in confidence*" and "for the purpose of obtaining *legal advice from the lawyer*." *U.S. v. Neuroscience, Inc.*, No. 14-mc-003, 2015 WL 7731475, at *8 (W.D. Wis. Feb. 10, 2015) (emphasis in original) (citing *Jenkins* and quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)); *see also In re Grand Jury*, 220 F.3d at 571 (material transmitted to a third party may fall under the privilege if the third party "is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice. 'What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal advice from the lawyer*.'" (emphasis in original, brackets omitted, quoting *United States v. Brown*, 478 F.2d 1039, 1040 (7th Cir. 1973) (also quoting *Kovel*)). As explained below, Donald has failed to demonstrate either of these criteria.

A.      **Whether the Communications were Made in Confidence**

To establish the requisite confidentiality, Donald must demonstrate that his disclosures of privileged information to Medill's Innocence Project were "made in confidence," *id.*, and that "the

confidential nature" of that information "was not compromised by disclosure to individuals outside the attorney-client relationship." *Barton*, 2008 WL 80647, at *5. But the waivers that Donald signed explicitly warned that any information he disclosed to the Innocence Project "may be subject to re-disclosure by the Northwestern students" and "may not be protected by federal confidentiality rules." (Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8). On this record, it can hardly be said that Donald's disclosures to the Innocence Project were "made in confidence" or that he had any legitimate expectation that the "confidential nature" of the information would be maintained. This by itself is sufficient to defeat Donald's privilege claim, since information imparted "without any expectation of confidentiality" is not privileged. *McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 252 (N.D. Ill. 2000) (quoting *U.S. v. White*, 950 F.2d 426, 431 (7th Cir. 1991)).[5]

The record also shows that the Medill students' redisclosure of Donald's previously confidential and privileged information was more than merely theoretical. Memos written by the journalism students reinvestigating Donald's conviction show that they recounted their conversations with his lawyer (Mr. Vanes) and the strategies discussed with him during their journalism class. (*See* Pl.'s Ex. 10, ECF No. 170-10; Pl.'s Ex. 17, ECF No. 170-17). And Donald makes no attempt to show that those class discussions or the memos the students wrote were maintained in confidence. Nor is there any indication in the record that the class discussions were in fact kept in confidence, or that that the information Donald and his attorneys disclosed to

---

[5] This principle has long been applied by the Seventh Circuit and district courts to find the privileged destroyed by sharing information with no assurance of confidentiality and the knowledge that it *might* be redisclosed in the future (such as in a tax return, patent filing, or bankruptcy petition), even if the information "was not actually" redisclosed. *See, e.g., McCook Metals*, 192 F.R.D. at 252 (applying Seventh Circuit holdings that privilege was destroyed by disclosure of information for potential use in tax return or bankruptcy filing to hold that materials disclosed for use in patent filings were not privileged: "If the client transmitted the information so that it *might* be used on the tax return, such a transmission destroys any expectation of confidentiality which might have otherwise existed." (quoting *U.S. v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)); *National Graphics, Inc. v. Brax Ltd.*, No. 12 C 1119, 2015 WL 13029361, at *1 (E.D. Wis. Jan. 8, 2015) (same); *Barton*, 2008 WL 80647, at *3 ("when information is transmitted to an attorney with the intent that the information will be transmitted to a third party, such information is not confidential" (brackets, ellipsis omitted, quoting *Lawless*, 709 F.2d at 487)).

Medill's Innocence Project was subject to any protection from redisclosure. To the contrary, the Medill students retained the explicit right under Donald's privilege waivers to redisclose that information, consistent with their role as *journalists*, who typically seek to develop a set of facts that will be published and thereby redisclosed. *See, e.g.*, *Montesa v. Schwartz*, No. 12 Civ. 6057, 2016 WL 3476431, at *9 (S.D.N.Y. June 20, 2016) ("Plaintiffs cannot argue that their adversaries in this litigation were not substantially more likely to obtain this information by virtue of its disclosure to a journalist, who very well could have published this entire e-mail exchange."). Attorneys, by contrast, have confidentiality obligations to their clients, and typically shield adverse facts from disclosure absent a legal or ethical obligation to disclose them.[6]ǃ

Given the Medill students' right to disclose the information shared with them (Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8), the waiver forms Donald signed also allowed the students to share strategies and other information they received from or discussed with his attorneys when contacting various offices and interviewing witnesses, several of whom were Donald's potential (if not actual) adversaries, such as the police department, the prosecutor's office, and one of the current defendants. (*See* Pl.'s Ex. 9, at 2-6, ECF No. 170-9). In fact, one student memo documents their decision to share a strategy they had discussed with Vanes with the unwilling witness to whom it pertained. (*See* Pl.'s Exs. 15, 18; ECF Nos. 170-15, 170-18). And again, Donald makes no attempt to show that any other information he or his lawyers shared with Medill's Innocence Project was protected from redisclosure during such contacts. Nor can he, since his written privilege waivers allowed precisely that.[7]

---

[6] As the instant dispute over the discovery process illustrates, the Federal Rules of Civil Procedure allow opposing parties to impose such an obligation, absent any privilege.

[7] Although Donald fails to show that the information at issue has been maintained in confidence, he argues that his waivers expired on their own terms a year after they were executed, and thus, any communications he had with attorney Vanes after the waiver pertaining to him expired in January 2008 "are privileged under any scenario." (Pl.'s Sur-Resp. 5, 11, ECF No. 170). But this argument ignores language in the waiver forms correctly stating that any revocation

Rather than confront these facts, Donald argues that he "did not knowingly waive the attorney-client privilege or knowingly disclose confidential information to a third party" because he did not "fully comprehend the 'waiver' documents." (Pl.'s Sur-Resp. 4-5, 10, ECF No. 171). These claims are unconvincing, since the record shows that Donald signed four "Client Waiver of Attorney-Client Privilege" forms agreeing to release privileged files and information from four of his lawyers to Medill's Innocence Project; each of those forms stated that his decision to do so was "entirely voluntary" and that he was free to "refuse to sign this form"; each waiver further warned that the information he was disclosing "may be subject to re-disclosure" and "may not be protected by federal confidentiality rules"; and Donald consulted his lawyer (Mr. Vanes) before signing at least the first two of these waivers. (Pl.'s Exs. 2-8, ECF Nos. 170-2 to 170-8).

The record thus documents Donald's "entirely voluntary" decision to waive the privilege after being told that his privileged information would be subject to redisclosure and consulting his lawyer about the waiver form. But as importantly, Donald's claim of a different subjective intention is not dispositive. As *Jenkins* and its progeny have made equally clear, unprotected disclosures to a third party destroy the privilege "even when the client wishes the communication to remain confidential," *Jenkins*, 487 F.3d at 490-91, and "despite the client's subjective intention not to waive the privilege."[8] What matters is Donald chose to share his privileged information with

---

"will not apply to information that has already been released in response to this waiver" (Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8), and Donald has identified no communications involving information released only after expiration of the waiver. Moreover, regardless of whether or when any of the waivers expired (notably, the last two waivers Donald signed did not expire until December 2008), it is Donald's burden to show that the information he claims is privileged was maintained in confidence. Not only has he failed to make such a showing, as explained above, the record indicates that the Innocence Project students and staff with whom Donald and his lawyers shared that information were in turn free to share it openly in a classroom setting and with offices and witness they contacted, thereby compromising its "confidential nature" and destroying the privilege. *See Barton*, 2008 WL 80647, at *5.

[8] *Towne Place Condo. Ass'n v. Phil. Indem. Ins. Co.*, 284 F. Supp. 3d 889, 896 (N.D. Ill. 2018) (citing *Jenkins*); *Motorola Solutions, Inc. v. Hytera Comms. Corp.*, No. 17 C 1973, 2018 WL 1804350, at *4 (N.D. Ill. Apr. 17, 2018) (same); *McCullough v. Fraternal Order of Police, Chicago Lodge 7*, 304 F.R.D. 232, 237 and n.5 (N.D. Ill. 2014) (same: "Plaintiff's claim that there was an 'understanding that her communications with Ms. Marrero would 'be privileged' . . . is thus unavailing."); *Domanus v. Lewicki*, No. 08 C 4922, 2012 WL 6568227, at *3 (N.D. Ill. Dec.

no assurance of confidentiality, not his later-stated belief that he nevertheless maintained the privilege while doing so.

**B.     Whether the Communications Were for the Purpose of Obtaining Legal Advice**

Wholly apart from the requisite confidentiality of the information at issue, Donald must also show that any communications of that information were made "solely to assist the attorney in rendering legal services to the client." *Jenkins*, 487 F.3d at 491.n6. Such communications with a consultant or investigator are thus protected only if made "for the purpose of obtaining legal advice from the lawyer." *In re Grand Jury*, 220 F.3d at 571 (communications with third party must be "made *in confidence* for the purpose of obtaining *legal advice from the lawyer*" to retain the privilege (quoting *Brown*, 478 F.2d at 1040)). "If what is sought is not legal advice but only consulting service, or if the advice sought is the consultant's rather than the lawyer's, no privilege exists." *Neuroscience*, 2015 WL 7731475, at *8 (brackets omitted, quoting *Kovel*, 296 F.2d at 922); *accord In re Grand Jury*, 220 F.3d at 571 (same, quoting *Brown*); *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, No. 1:14-cv-06, 2017 WL 1361308, at *7 (N.D. Ind. April 14, 2017) (same, quoting *In re Grand Jury*). This limitation is consistent with the requirement that communications between attorney and client also must be "for the purpose of obtaining legal advice" to fall within the privilege. *Jenkins*, 487 F.3d at 490. "Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam." *Neuroscience*, 2015 WL 7731475, at *8 (quoting *Kovel*, 296 F.2d at 921).

---

14, 2012) ("This is so despite the client's subjective intention not to waive the privilege." (quoting *Pampered Chef v. Alexanian*, 737 F. Supp. 2d 958, 964 (N.D. Ill. 2010)); "the presence of a third party defeats the privilege 'even when the client wishes the communication to remain confidential'" (quoting *Jenkins*, 487 F.3d at 490)).

Even Donald does not argue that the disclosures of his attorney files to Medill's Innocence Project were "solely to assist the attorney in rendering legal services," as *Jenkins* requires. 487 F.3d at 491.n6. Rather, he claims to have had an "agreement" that "Mr. Vanes and the Innocence Project would jointly investigate Donald's case in pursuit of his exoneration," and thus, "to Mr. Donald it was an investigative organization that was going to assist Mr. Vanes and the legal effort to obtain Mr. Donald's exoneration," rather than "a third party." (Pl.'s Sur-Resp. 5, 10, ECF No. 171). But even these assertions are belied by Ms. Wanger's letter to Donald explaining that his waiver of the privilege and delivery of attorney files and information to the Innocence Project were needed to allow for the completion of its own review of Donald's case in order to determine whether to accept it for the Journalism Class's next project, not to assist his lawyer in in a legal effort to exonerate him. (Pl.'s Ex. 1, ECF No. 170-1). The record also contradicts Donald's claim that the Innocence Project "was going to assist Mr. Vanes" in any endeavor, let alone a legal one. Ms. Wanger's letter to Donald emphasized ("I also need to make sure you understand") that senior students in Medill's Investigative Journalism class "would be the actual investigators on your case, guided of course by Professor Protess." (*Id.*). And Mr. Vanes' letters to Donald merely offered "to help Medill if they take your case" and "assist them in any way [he] could," not to retain the Innocence Project to assist him for any purpose. (Pl.'s Exs. 3-4, ECF Nos. 170-3, 170-4). Perhaps some of these dynamics shifted as the students' investigation progressed (though that remains to be seen). But even assuming a later change in the relationship, that cannot be used to negate the express terms of a previously executed waiver.

Donald's claim that the students sought to exonerate him (Pl.'s Sur-Resp. 6, ECF No. 171) similarly overlooks contrary evidence. As Ms. Wanger explained, the students were on a "fact-finding mission," not an "exoneration mission," even if that meant finding "proof of guilt."

(Ds' Ex. 6, at 99, ECF No. 174-6). "The whole idea was to have the students learn how to investigate." (*Id.* at 54). The students' memos show they were also mindful of their ethical obligations "as journalists" *not* to "to get involved with the legal agreements between an attorney and his client," and therefore "cannot get involved with his attorney-client relationship." (Pl.'s Ex. 20, at 3, ECF No. 170-20). Donald's assertions that his lawyer "guided" and "directed" the Medill students' efforts (Pl.'s Sur-Resp. 6-7, 10, ECF No. 170) also fall short of demonstrating that such communications were for the purpose of rendering legal advice to Donald. *See Anderson v. SoftwareONE, Inc.*, No. 16-CV-1181, 2018 WL 3626434, at *2-3 (E.D. Wis. July 30, 2018) (party's assertion that its counsel "provided legal advice and direction so as to ensure that the [consultant's] investigation moved forward in an adequate way" failed to show "that this investigation was undertaken, and the relevant documents produced, for the purpose of obtaining legal advice from its counsel"). Indeed, several documents indicate Mr. Vanes' understanding that he was assisting the students, not the opposite. (*See* Pl.'s Ex. 3-4, 10-12; ECF Nos. 170-3 to 170-4, 170-10 to 170-12). And again, any later involvement by the students with Donald's post-conviction petition or use of their work in his post-conviction proceeding does nothing to retract Donald's prior waivers of the privilege months beforehand as to the vast majority of documents at issue in the instant motions, *i.e.*, the attorney files he released to Medill's Innocence Project.

In sum, none of the student memos or emails to which Donald now points suggest anything other than the arrangement originally described in Ms. Wanger's letter to Donald and the privilege waivers that he signed: Donald waived the attorney-client privilege to allow aspiring journalism students to conduct their own investigation of his conviction and with full knowledge that any communications with them (not surprisingly, given their interest as journalists) may be subject to

22

redisclosure. (Pl.'s Exs. 1, 5-8, ECF Nos. 170-1 and 170-5 to 170-8). At most, Donald has demonstrated that the students' "fact-finding mission" was useful to him insofar as it pursued evidence that he too wished to pursue, so much so that his lawyer was willing to help the students pursue it. But the importance of a third party's work to a legal effort is not enough to render it privileged: "a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Rao v. Bd. of Trs. of the Univ. of Ill.*, No. 14-cv-66, 2016 WL 6124436, at *3 (N.D. Ill. Oct. 20, 2016) (quoting *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 961 (N.D. Ill. 2009)). Rather, to fall within the scope of *Jenkins*' exception, Donald was required to show that the allegedly privileged communications involving Medill Innocence Project students and staff were both "made in confidence" and "for the purpose of obtaining legal advice." *Jenkins*, 487 F.3d at 490; *In re Grand Jury*, 220 F.3d at 571. For all of the reasons explained above, he has demonstrated neither.

Accordingly, given Donald's failure to meet his burden under *Jenkins*, and the Seventh Circuit's admonitions that the attorney-client privilege and any exceptions to its requirements must be construed narrowly, this Court is unable to conclude that any communications with Innocence Project students and staff, or materials provided to or generated by them, are privileged. *See Rao*, 2015 WL 6124436, at *4 (finding no privilege for communications in the presence of a third party given the proponent's failure to demonstrate *Jenkins*' requirements and "the Seventh Circuit's admonition that the attorney-client privilege should be construed narrowly"). "Whether such disclosures are viewed as indicating an intention to waive the privilege, to abandon confidentiality, or to use the communications for purposes other than seeking legal advice, the communications so disclosed cannot be withheld based on the attorney-client privilege." *In re*

*Consol. Lit. Concerning Int'l Harvester's Disposition of Wis. Steel*, 666 F. Supp. 1148, 1156-57 (N.D. Ill. 1987). That leaves only the work product doctrine as a basis to withhold them, to which the Court now turns.

## II.    Work Product

The requirements for work product protection are similarly well settled. Federal Rule of Civil Procedure 26(b)(3)(A) provides: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Work-product protection thus applies to documents "prepared or obtained because of the prospect of litigation." *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010) (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996)). That is, "the primary motivating purpose behind creation of the document or investigative report must be to aid in possible future litigation." *Valley Forge*, 2017 WL 1361308, at *9 (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)). As with the attorney-client privilege, the party seeking work product protection bears the burden of establishing its requirements. *Valley Forge*, 2017 WL 1361308, at *8. A party seeking to withhold materials as protected work product must therefore demonstrate "some articulable claim, likely to lead to litigation" at the time the documents were created, and "a clear description of the connection" between the documents and the anticipated litigation." *Finnegan v. Myers*, No. 3:08-cv-503, 2014 WL 12789809, at *5 (N.D. Ind. Feb. 18, 2014) (quoting *Binks*, 709 F.2d at 1119).

Also like the attorney-client privilege, work product protection can be waived. "A waiver occurs 'when the protected communications are disclosed in a manner that substantially increases the opportunity for potential adversaries to obtain the information.'" *Towne Place Condo.*, 284 F.

Supp. 3d at 898 (brackets omitted, quoting *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1025 (7th Cir. 2012)); *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 736 (N.D. Ill. 2014) (same). "The question is whether the particular disclosure was of such a nature as to enable an adversary to gain access to the information." *Behnia v. Shapiro*, 176 F.R.D. 277, 279-80 (N.D. Ill. 1997) (citing *Union Pacific Resources Co. v. Natural Gas Co. of America*, No. 90 C 5378, 1993 WL 278526, at *3 (N.D. Ill. July 20, 1993)). Courts also consider "whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential." *Miller UK*, 17 F. Supp. 3d at 738. Although the proponent of work product protection bears the burden of demonstrating its requirements, the party asserting waiver of such protection bears the burden on that issue. *Towne Place Condo.*, 284 F. Supp. 3d at 899. As explained below, Donald has failed to meet his burden to demonstrate the requirements for work product protection for any of the materials at issue, and, regardless of the burden, the current record indicates that any such protection has been waived.

### A.    Whether the Materials were Prepared in Anticipation of Litigation

Donald's work product assertions falter at the outset due to his failure to explain what legal claim or claims motivated the creation of the materials at issue, particularly those relating to the Innocence Project's investigation. While the Court appreciates that obtaining his release from prison was expected to require a legal determination at some point, Donald must nevertheless demonstrate that "some articulable claim, likely to lead to litigation had arisen" by the time the documents were created. *Tellabs Ops., Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 388 (N.D. Ill. 2012) (brackets omitted, quoting *Binks*, 709 F.2d at 1120)). A "remote prospect of litigation" is not enough. *RBS Citizens N.A. v. Husain*, 291 F.R.D. 209, 219 (N.D. Ill. 2013) (quoting *Binks*, 709 F.2d at 1120). Nor is the fact that litigation eventually did occur. *Id.* at 217 ("The mere fact that

litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney" (quoting *Binks*, 709 F.2d at 1118); *Finnegan*, 2014 WL 12789809, at *5 (same); *Neuroscience*, 2015 WL 7731475, at *5 (same). Rather, for a party to show that materials were prepared in anticipation of litigation, it must first identify the "specific claims" for which the materials were created. *RBS Citizens*, 291 F.R.D. at 217 (work product doctrine requires "an identifiable prospect of litigation because of specific claims that have arisen" (quoting *Baxter Travenol Labs., Inc. v. Abbott Labs.*, No. 84 C 5103, 1987 WL 12919, at *10 (N.D. Ill. June 19, 1987))); *see also F.D.I.C. v. Fid. & Deposit Co. of Md.*, No. 3:11-cv-19, 2013 WL 3989140, at *3 (S.D. Ind. Aug. 2, 2013) (party asserting work product must demonstrate "a claim, likely to lead to litigation, had arisen at the time those documents were prepared; litigation was probable and imminent; or there existed impending litigation when the materials were made").

    This requirement is no mere formality. Work product protection "requires causation in the sense of the purpose or motivation for the creation of the documents–*i.e.*, the intended use to which the documents were to be put." *Valley Forge*, 2017 WL 1361308, at *10 (quoting *Stout v. Ill. Farmers Ins. Co.*, 150 F.R.D. 594, 598 (S.D. Ind. 1993)). So here, for example, while it may be reasonable to infer that the files of Donald's criminal defense, appellate, and post-conviction counsel contained work product for use in those proceedings (subject to any waiver of that protection, as discussed in Part B below), the Court is unable to assume that everything later provided to or generated by the Innocence Project also contained work product merely because Donald was in prison and seeking release, or merely because he later filed a post-conviction petition while the Innocence Project's investigation was underway. "Materials may be prepared before or when litigation is pending without necessarily having been prepared 'in anticipation of litigation' from a motivational point of view." *Rockies Express Pipeline LLC v. 58.6 Acres*, No.

1:08-cv-751, 2009 WL 5219025, at *5 (S.D. Ind. Dec. 31, 2009) (quoting *Amway Corp. v. Procter & Gamble Co.*, 1:98-cv-726, 2001 WL 1818698, *6 (W.D. Mich. Apr. 3, 2001)); *Valley Forge*, 2017 WL 1361308, at *10 ("the fact that the communications were prepared in the midst of litigation is not necessarily determinative"). At the very least, Donald must identify the claim or claims for which the materials were prepared in order to identify the "connection" between the materials and those claims. *Finnegan*, 2014 WL 12789809, at *5.

And that raises the second problem with Donald's work product assertions – his related failure to provide "a clear description of the connection between" the documents at issue and the legal claim(s) that prompted their generation. *Id*. Instead, Donald points generally to the "nature of the documents and the fact that the Innocence Project's files are primarily comprised of the files of Mr. Donald's attorneys and the Innocence Project's investigation." (Pl.'s Sur-Resp. 9, 15, ECF No. 171). Once again putting aside the threshold problem that work product claims should not be asserted or resolved in such "blanket" fashion, *Towne Place Condo*, 284 F. Supp. 3d at 899, this generic description fails on multiple levels. Even if the Court were to assume that everything in the attorney files that Donald released to the Innocence Project for its initial review was protected work product (again, subject to any waiver), Donald's blanket assertion that later-generated materials relate to "the Innocence Project's Investigation" provides no "clear description of the connection between" those materials and any legal claim.

Instead, Donald argues that Medill's Innocence Project was akin to "an independently retained investigation firm" working for his attorney. (Pl.'s Sur-Resp. 13, ECF No. 171). But the record shows that – at least initially – the Medill students conducted their investigation for their Investigative Journalism class "guided by" their professor, not Donald's attorney, and they were still unwilling to "get involved with his attorney-client relationship" over a year later. (*See supra*

Part I, B). And even if the students were involved in some "attorney-led investigation" at some point, Donald still must show that the documents relating to it were "prepared or obtained because of the prospect of litigation." *Sandra E. Tate*, 600 F.3d at 622. But here, Medill's Innocence Project had its own "journalism based" purposes for its "fact-finding mission." (Ds' Ex 6, at 99, 128-29, ECF No. 174-6). *See Rockies Express*, 2009 WL 5219025, at *5 ("When it is clear documents would have been prepared regardless of any anticipation of use in litigation, no work product privilege can attach.").

Thus, the most that Donald has shown is that his post-conviction counsel (Mr. Vanes) "viewed" the Medill Innocence Project as providing pro bono investigative or paralegal services "in connection with" Donald's post-conviction proceeding. (Notice of New Evidence 2-3, ECF No. 220; Pl.'s Sur-Resp. 6, 10, ECF No. 170 (citing Pl.'s Exs. 10-13, ECF Nos. 170-10 to 170-13)). To the extent Donald claims work product protection for any documents related to this proceeding, he must identify the documents (presumably the foregoing Exhibits, but any others as well), and show with appropriate record evidence (not merely the arguments of his current counsel) that the petition was "the primary motivating purpose" behind their creation. *Finnegan*, 2014 WL 12789809, at *5 (quoting *Binks*, 709 F.2d at 1119); *Tellabs Ops.*, 283 F.R.D. at 388 (same).[9] While it is perhaps conceivable that the students' investigation morphed at some point into an effort to help Donald's lawyer prepare for this or some other legal claim (for example, the ineffective

---

[9] *See also F.D.I.C.*, 2013 WL 3989140, at *4 (the party seeking protection "must demonstrate, through affidavits or other record evidence, that it reasonably anticipated litigation" before the documents at issue were created, and fails to meet this burden absent "evidence that shows when [it] began to reasonably anticipate litigation"); *SoftwareONE*, 2018 WL 3626434, at *4-5 (rejecting work product claim where proponent failed to "support its motion with an affidavit or declaration from its in-house counsel, or anyone else for that matter, stating that [the consultant] was hired in anticipation of litigation" and "failed to support its claim of work-product with the sorts of relevant details the court would expect–such as the nature and scope of [the consultant's] engagement; details as to the actual investigation; a detailed description of the documents that were allegedly created in anticipation of litigation; details as to [the consultant's] policies and procedures for conducting internal investigations of complaints of discrimination, etc.").

assistance of counsel claim on which the post-conviction petition was based (Pl.'s Ex. 14, at 2-3, ECF No. 171-14) or any other legal claims then contemplated), it is Donald's burden to show "through affidavits or other record evidence" (*F.D.I.C.*, 2013 WL 3989140, at *4) that the documents he claims as protected work product were generated *because* of that claim, and not merely the fact-finding mission in which the students were already engaged. The arguments of Donald's current counsel in the briefing on the instant motions are insufficient to sustain this burden. *See SoftwareONE*, 2018 WL 3626434, at *4-5 (party's assertion without "evidentiary support" that a consultant was hired in anticipation of litigation "falls far short of showing the requisite causation between the prospect of litigation and the investigation").[10]

**B.    Waiver**

Even if Donald had sustained his burden to show that any of the materials or information provided to Medill's Innocence Project were otherwise subject to work product protection, the current record compels the conclusion that any such protection was waived. As noted above, waiver occurs when work product is "disclosed in a manner that substantially increases the opportunity for potential adversaries to obtain the information." *Towne Place Condo.*, 284 F. Supp. 3d at 898 (brackets omitted, quoting *Appleton Papers*, 702 F.3d at 1025); *Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000) (same). When determining whether work product was disclosed under such circumstances, courts consider whether any confidentiality or other

---

[10] The Court has considered Donald's recent Notice of New Evidence in Support of His Opposition to Defendant's Motion to Compel. (ECF No. 220). As noted above, the Notice attaches excerpts from the deposition of Donald's post-conviction attorney (Mr. Vanes) stating that Vanes "viewed" the Innocence Project "as providing pro bono investigative and paralegal services in connection with [his] representation of Mr. Donald in the post-conviction proceeding." (Notice 2-3, ECF No. 220 (citing Vanes Dep. 185-86)). Apart from its untimeliness, this submission provides none of the foregoing detail needed to support a work product claim, such as the nature, scope, and timing of that engagement, the documents allegedly protected by it, the legal claim(s) for which they were prepared, or when such litigation was anticipated. *See supra* note 9. Once again, if Donald seeks to assert a claim of work product protection for *specific materials related to his post-conviction petition*, he must identify those materials and submit appropriate record evidence of such facts in support.

measures were taken to protect the information, *Miller UK*, 17 F. Supp. 3d at 736; *Blanchard*, 192 F.R.D. at 237, and whether the recipient had its own "self-interested reasons" for keeping the information confidential. *Doe v. Soc'y of Missionaries of Sacred Heart*, No. 11-cv-2518, 2014 WL 1715376, at *4 (N.D. Ill. May 1, 2014). Also relevant is "whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential." *Miller UK*, 17 F. Supp. 3d at 738; *Behnia*, 176 F.R.D. at 280 (disclosing party had "no reasonable basis" to believe recipient "would not disclose the document to potential adversaries").

Here, although Donald's waiver forms mention only the attorney-client privilege and do not refer specifically to work product protection, they explicitly acknowledge his understanding that any information he or his lawyers disclosed to Medill's Innocence Project (including "any and all documents" regarding his criminal case, "knowledge" relayed by his counsel, "consultation reports," and "any reports that may be requested by Northwestern students") "may be subject to re-disclosure by the Northwestern students" and "may not be protected by federal confidentiality rules." (Sur-Resp. Exs. 5-8, ECF Nos. 170-5 to 170-8). Thus, rather than taking measures to protect these materials, Donald expressly authorized their redisclosure. Moreover, given that the students were going to investigate whether Donald was rightly or wrongly convicted, both he and his lawyer had every reason to expect they would be contacting his adversaries (*e.g.*, prosecutors, police, hostile witnesses) as their memos and emails now show they did (*e.g.*, Pl.'s Exs. 9, and 15, ECF Nos. 170-9, 170-15) with nothing to prevent their redisclosure of Donald's confidential information during such contacts. Because the students were conducting this investigation for their Investigative Journalism class as part of their training as journalists, Donald and his counsel also should have known they would report their findings at least in class, which the record also shows they did. (Pl.'s Exs. 10 and 17, ECF Nos. 170-10 and 170-17). And since they were on a "fact-

finding mission" to uncover the "truth" about the crime for which Donald was convicted, even if that meant finding "proof of guilt" (Ds' Ex. 6, at 99, ECF No. 174-6), there was also reason to believe they would report their findings elsewhere, as journalists would be expected to do. *See Montesa*, 2016 WL 3476431, at *9.

Under these circumstances, Donald and his counsel had no reasonable basis to believe any information they provided Medill's Innocence Project would be maintained in confidence, and instead every reason to expect it could be redisclosed to others, including Donald's potential adversaries. The current record therefore compels the conclusion that any work product protection to which that information was ever entitled has since been waived. Notably, this includes any materials generated with or by the Medill students for the post-conviction proceeding (even accepting Mr. Vanes' recent testimony that he viewed the Medill students as providing pro bono investigative and paralegal services in connection with that proceeding), since Donald has failed to show that the students maintained any sense of confidentiality regarding such materials, and the record indicates precisely the opposite. (*See*, *e.g.* Pl.'s Exs. 10 and 17, ECF Nos. 170-10, 170-17 (noting class discussions of strategies and information discussed with Vanes)).

## III.    Rulings on the Pending Motions

For all of the reasons explained above, the Court finds none of the documents at issue protected under the attorney-client privilege or work product doctrine, but the Court will leave open the possibility that there is an as-yet unidentified subset of documents generated for one or more legal claims made or anticipated in Donald's post-conviction proceeding, and therefore reserves ruling on that issue. The Court notes that it was Donald's burden to make that showing here (*Valley Forge*, 2017 WL 1361308, at *8), and he has failed to do so on the current record. Nevertheless, given the equities at stake, and considering the recently provided deposition

31

testimony of Donald's post-conviction counsel, the Court will allow Donald another chance to do so. To be clear, however, the Court finds that Donald has failed to demonstrate any privilege for the attorney files that he agreed to provide to Medill pursuant to his privilege waivers. Regardless of whether the Medill students later acted in any paralegal or investigator capacity for Donald's post-conviction counsel (a point on which the Court will allow Defendants to respond in the future, if necessary), Donald unequivocally waived the privilege as to the attorney files and information that he agreed to give Medill with no assurance of confidentiality. (Pl.'s Exs. 5-8, ECF Nos. 170-5 to 170-8). The Court therefore grants Defendants' Motion to Compel (ECF No. 146) to the extent it seeks an order compelling production of all such documents listed on Donald's revised privilege log. (Ds' Ex. 3, ECF No. 146-3). The Court is merely allowing Donald to assert a work product claim as to any documents later generated for specific claim(s) made or anticipated in the post-conviction proceeding (which Donald has yet to identify), provided all other requirements for work product protection are also met. Donald may withhold any such documents from his production to Defendants, but insofar as the documents address other subject matter, he must produce redacted versions that excise only claimed work product. Donald must also identify all such documents that are withheld or redacted under this work product claim on a new privilege log, along with all other information required to substantiate his work product claim with respect to them.

While the Court partially grants Defendants' Motion to Compel to this extent, it denies Defendants' further request in the briefing on that motion to compel Donald's counsel to provide "completed authentication pages" for productions made by Northwestern and two other non-parties at the present time. (Ds' Reply 5, ECF No. 159). Defendants claim to require these "authentication pages" both for use as certifications under Federal Rule of Evidence 803(6) sufficient to obviate any needless hearsay objections, and because "Defendants are concerned

whether they have a complete set of the documents from Northwestern." (Ds' Reply 5-6). Neither argument is persuasive at the present time. As to Defendants' desire to authenticate the documents to fend off hearsay objections, Donald explains that his counsel attempted to obtain completed certifications from the non-parties at issue but were unable to do so, and "Northwestern has directly informed Defendants that it cannot authenticate all of the documents in the Innocence Project's files because it did not create all of those documents." (Sur-Resp. 16, ECF No. 171). The Court also appreciates the difficulty Donald's counsel would have authenticating documents produced by Northwestern and other non-parties for the same reason, and therefore declines to order them to do so. Whether this leads to needless hearsay objections is an issue for another time, perhaps after Defendants have received the documents and obtain a better sense of possible alternative sources to authenticate them. As to Defendants' additional concern that they have not received the complete production from Northwestern, Donald represents that no documents provided by Northwestern in response to the subpoena have been withheld other than those listed on its revised privilege log (*id*. at 16-17), and presumably will confirm the same after the documents listed on that log are produced pursuant to this Order.

The Court also grants the City of Gary's Motion for Relief from the Court's Order granting leave to file Donald's Sur-Response under seal. (ECF No. 173). The Court is mindful, however, that different standards govern whether discovery must be shared with a party and whether documents must be filed publicly. Donald is therefore ordered to file his Sur-Response and Exhibits (ECF Nos. 170 to 170-23) on the electronic case docket so that all parties to this litigation can view those materials, but the Court grants Donald leave to file them provisionally under seal from the public with a contemporaneous motion to seal providing legal argument supporting the sealing of any specific portion(s) of his Sur-Response and/or Exhibits from public view.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES without prejudice in part** Defendants' Motion to Compel Disclosure/In Camera Inspection of Northwestern University Documents [DE 146] and **GRANTS** the City's Motion for Relief from the Court's Order on Plaintiff's Motion to File Sur-Response to Defendants' Motion to Compel Disclosure/In Camera Inspection of Northwestern University Documents Under Seal [DE 173].

The Court **ORDERS** Donald to turn over the withheld documents on or before **March 17, 2020**. The Court further **ORDERS** Donald to file by **February 25, 2020** an unredacted copy of his Sur-Response and the Exhibits thereto so that all parties to this litigation may view them. The Court **GRANTS LEAVE** for Donald to file the foregoing materials provisionally under seal from public view under the circumstances described above. Additionally, to the extent the Sur-Response and/or Exhibits contain any information for which Donald continues to claim work product protection as allowed by this Opinion, he may also redact any such content from the Sur-Response and/or Exhibits filed.

This Opinion will remain sealed from public view for seven (7) days, pending any motion by Plaintiff to seal any specific portions of this Opinion that Plaintiff contends should be sealed from public view.

So ORDERED this 18th day of February, 2020.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT