**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

WILLIE T. DONALD,

                Plaintiff,

           v.

BRUCE OUTLAW, CARLA K. PYLE, as
special administrator of the estate of John E.
Jelks, Jr., AS-YET-UNKNOWN
EMPLOYEES OF THE CITY OF GARY,
and THE CITY OF GARY,

                Defendants.

CAUSE NO.: 2:17-CV-32-TLS

**OPINION AND ORDER**

This matter is before the Court on Defendant Bruce Outlaw's Motion for Partial
Summary Judgment [ECF No. 295], filed on June 16, 2022, Defendant Outlaw's Motion for
Summary Judgment as to Counts I and III of Plaintiff's Complaint [ECF No. 298], filed on June
17, 2022, Defendant's, City of Gary, Motion for Summary Judgment [ECF No. 296], filed on
June 17, 2022, and Defendant's, Carla K. Pyle as Special Administrator of the Estate of John E.
Jelks, Jr. Motion to Join City of Gary's and Bruce Outlaw's Motions for Summary Judgment
[ECF No. 303], filed on June 18, 2022. The motions are fully briefed and ripe for ruling. For the
reasons set forth below, the Court denies the motions for summary judgment.

**PROCEDURAL BACKGROUND**

On January 24, 2017, Plaintiff Willie T. Donald filed a Complaint [ECF No. 1] against
Defendants Bruce Outlaw, Carla K. Pyle, as special administrator of the estate of John E. Jelks,

Jr.,[1] as-yet unknown employees of the City of Gary, and the City of Gary. The Plaintiff claims he served nearly twenty-four years in prison for crimes he did not commit because Defendants Outlaw and Jelks (the Defendant Officers) violated his civil rights while investigating the crimes of conviction.

In Count I of his Complaint, the Plaintiff claims due process violations under 42 U.S.C. § 1983. Compl. 14, ECF No. 1. He alleges that the Defendant Officers deprived him of his constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments and that the Defendant City of Gary's policy and practice of pursuing wrongful convictions by withholding exculpatory information, conducting unduly suggestive identification procedures, and fabricating inculpatory evidence were the moving forces behind the constitutional violations. *Id.* at 14–16. The Plaintiff brings Count II under § 1983 as well, claiming the Defendant Officers conspired to deprive the Plaintiff of his constitutional rights, pursuant to the Defendant City of Gary's policy and practice. *Id.* at 17–18. In Count III, the Plaintiff claims under § 1983 that the Defendant Officers failed to intervene in each other's violations of the Plaintiff's constitutional rights, pursuant to the Defendant City of Gary's policy and practice. *Id.* at 18. In Count IV, the Plaintiff claims malicious prosecution under § 1983, alleging that the Defendant Officers initiated proceedings against the Plaintiff without probable cause, pursuant to the Defendant City of Gary's policy and practice. *Id.* at 19–20. In Count V, the Plaintiff claims malicious prosecution under Indiana law. *Id.* at 20–21. In Counts VI and VII, the Plaintiff brings state law claims of intentional and negligent infliction of emotional distress against the Defendant Officers. *Id.* at 21–22. And in Counts VIII and IX, the Plaintiff brings state law claims for respondeat superior and indemnification against the Defendant City of Gary. *Id.* at 22–23.

---

[1] For purposes of this Opinion and Order, the Court will refer to Carla K. Pyle, as special administrator of the estate of John E. Jelks, Jr., as "Defendant Jelks."

Defendants Outlaw, Jelks, and the City of Gary previously filed separate motions to dismiss the Plaintiff's claims. *See* ECF Nos. 22, 27, 29. The Court granted in part and denied in part the motions. ECF No. 55. It dismissed Count IV for malicious prosecution under § 1983 as to Defendant Jelks because, under Indiana law, actions for malicious prosecution may not be brought against the representative of a deceased party. *Id.* at 6 (citing Ind. Code § 34-9-3-1). The Court dismissed Count V for malicious prosecution under Indiana law as to all defendants because the Indiana Tort Claims Act precludes liability for governmental entities or employees acting within the scope of their employment for a loss that results from the initiation of a judicial proceeding. *Id.* (citing Ind. Code § 34-13-3-3(6)). The Court also dismissed Counts VI and VII for intentional and negligent infliction of emotional distress against the Defendant Officers because Indiana Code § 34-13-3-5(b) provides that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars any action by the claimant against the employee personally." *Id.* at 7.

The parties completed discovery on March 7, 2022. Defendant Outlaw filed his Motion for Partial Summary Judgment [ECF No. 295] and Motion for Summary Judgment as to Counts I and III of Plaintiff's Complaint [ECF No. 298] on June 16 and June 17, 2022, respectively. The Defendant's, City of Gary, Motion for Summary Judgment [ECF No. 296] was filed on June 17, 2022. And Defendant's, Carla K. Pyle as Special Administrator of the Estate of John E. Jelks, Jr. Motion to Join City of Gary's and Bruce Outlaw's Motions for Summary Judgment [ECF No. 303] was filed on June 18, 2022. The Plaintiff responded to all four motions for summary judgment on October 20, 2022. ECF No. 320. Defendants Outlaw and the City of Gary filed separate replies on December 9, 2022. ECF Nos. 329, 330.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). The court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## EVIDENTIARY OBJECTIONS

The Material Facts are taken from the Defendant's, City of Gary, Statement of Material Facts in Support of Motion for Summary Judgment [ECF No. 297] and Plaintiff's Statement of Additional Material Facts [ECF No. 315 at 35–69].[2] Whether the subject of a party's objection or

---

[2] The Plaintiff's Ex. 1 was refiled at ECF No. 332.

on the Court's own review, the Court disregards substantive arguments and characterization of evidence in the fact statements and considers the facts only as supported by the cited evidence of record. However, the Court addresses the parties' evidentiary objections. *See* Fed. R. Civ. P. 56(c)(2); *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020).

The Court overrules the Defendant City of Gary's hearsay objection to Defendant Jelks' testimony cited in Plaintiff's ¶ 41, "she verified she had seen the robber at the [sic] in front of her house shortly after noon earlier that day," to the extent it shows the effect on the listener. The Court overrules the Defendant City of Gary's hearsay objection to Plaintiff's Exhibit 22, the declaration of Sharon Cummings cited in support of Plaintiff's ¶¶ 56, 58, and 60, apart from the statements in ¶ 6 of the declaration that "Rhonda . . . stated words to the effect of she thought the person in the photo might be the person who robbed her," and "[a]fter Rhonda made this statement, the Other Victim looked at the photo Rhonda had selected, nodded her head and began to cry." The remainder of the declaration contains a combination of Cummings' observations and statements directly from Cummings. The Court also overrules the Defendant City of Gary's hearsay objection to Plaintiff's Exhibit 21, the Belinsky Photobook Identification Form, cited in support of Plaintiff's ¶ 61. The document and its contents may be admissible as a recorded recollection under Rule 803(5) or as a record of a regularly conducted activity under Rule 803(6) of the Federal Rules of Evidence.

The Court sustains the Defendant City of Gary's hearsay objection to the Post-Tribune Article, Ex. 2, cited in support of Plaintiff's ¶¶ 5–7, 10, and 29–30. The article is offered as proof of the crimes and investigation it reports on. The Court also sustains the Defendant City of Gary's hearsay objections as to the following statements: Plaintiff's ¶ 16, "the dispatcher told her that 'he just shot someone'"; ¶ 39, "Williams told Hightower that she had just seen the man who

had robbed her on the 27th in front of her house, and asked for a squad car to be sent to try to catch him"; ¶ 60, "Belinsky looked over at the photograph and started crying"; ¶ 61, to the extent Williams' testimony is offered to prove that the woman viewing photos with her was unsure of her identification; ¶ 86, to the extent it uses Carolyn Beeler's statement in her declaration, Plaintiff's Exhibit 26, to prove that Mary Banks did not identify her assailant in an in-person lineup; and ¶ 120, "Banks told King that she was being pressured by GPD."

The Court sustains the Defendant City of Gary's hearsay objection to ¶ 99 in part, to the extent it is offered to prove that the Plaintiff ate lunch with his colleagues during his lunch break on March 2, and overrules the objection in part, to the extent it shows the effect on the listeners, Defendants Outlaw and Jelks.

## MATERIAL FACTS

### A.    Robberies and Homicide

On February 27, 1992, there was a string of five robberies in Gary, Indiana. *See* Pl. Ex. 4 at 208:16–22; Pl. Ex. 5 at 541:14–542:10. At approximately 8:20 p.m., a man robbed Tisa Johnson in front of her home at 3973 Virginia Street. Pl. Ex. 5 at 542:2–4. At approximately 8:30 p.m., a man robbed Christina Cullum on the same block. *Id.* at 541:24–542:2. Between 8:30 p.m. and 9:00 p.m., a man robbed Rhonda Williams at her 4409 Connecticut Street home. Pl. Ex. 7; Pl. Ex. 8 at 10:9–16:13, 85:25–86:8. At approximately 9:15 p.m., Bernard Jimenez and his fiancé Kimerly Belinsky were returning to Belinsky's home at 4660 Massachusetts Street when they were accosted by a man who attempted to rob them. Pl. Ex. 9 at 2. Jimenez fought back, and the robber shot and killed him. *See id.* at 2–3. At approximately 9:20 p.m., Mary Banks, a Gary Police Department (GPD) officer, and her daughter Sonya Thomas were approached by a man who robbed them in front of their home at 4821 Pennsylvania Street. Pl. Ex. 5 at 542:4–10.

According to Williams, the robbery of her home began when Williams was woken by a noise outside her window, then heard a knock at her front door—when she opened the door there was a man pointing a gun in her face who forced her back inside her house. Pl. Ex. 8 at 10:9–12:15. The robber was a black man with medium complexion wearing a black jacket, a black Kangol cap, and dark jeans, with a slender build and bump-like scars on his face. *Id.* at 91:18–92:23. The robber was not wearing gloves. *Id.* at 17:9–11. The robber demanded money, and Williams began to gather money while the robber searched her home. *Id.* at 12:16–13:10. The robber ransacked Williams's bedroom, going through drawers and flipping over the mattress, then moved on to the kitchen, taking the lids off kitchen canisters and going into the refrigerator searching for money that might be hidden. *Id.* at 15:7–11, 16:23–17:8. Eventually the robber left, telling Williams to get on the floor and stay down. *Id.* at 15:12–16:8. After some time had passed, Williams got up and called the police. *Id.* at 16:8–13. The 911 dispatcher asked if the robber had a red bandana, which he did have. *Id.* at 32:15–33:4.

Belinsky, her fiancé Jimenez, and her three children were returning to Belinsky's home when they were accosted by a man with a gun. Pl. Ex. 10 at 14:1–16:14, 82:21–24. Jimenez tried to calm the robber down, Belinsky's children screamed, and Belinsky laid on the porch holding her baby. *Id.* at 20:11–21:1, 85:11–20. At one point, the robber grabbed one of Belinsky's children and placed his hand over her mouth. *Id.* at 78:5–79:6. At another point, the robber pressed the gun up against Belinsky's one-year-old child's head. *Id.* at 85:12–20. Belinsky was scared, and her primary focus was on protecting her children. *Id.* at 19:19–25, 79:20–23, 130:3–131:14. Jimenez picked up a picnic table and began to scuffle with the robber, which allowed Belinsky and her children to run inside the house. *Id.* at 23:4–20, 24:14–17. Shortly after Belinsky ran inside there were gunshots, and Jimenez collapsed on the porch of the house across

the street. *Id.* at 28:1–18. Jimenez was rushed to the hospital but did not survive. Pl. Ex. 11 at

377:12–378:2, 387:3–13.

**B.       Defendants Outlaw and Jelks Investigate**

The Defendant Officers were the GPD detectives assigned to investigate the robberies—

Defendant Outlaw primarily handled the Jimenez homicide, and Defendant Jelks the Williams

robbery. Pl. Ex. 4 at 164:3–9, 195:7–16; Pl. Ex. 16 at 128:2–11. Defendant Outlaw joined the

Detective Bureau in "1990, beginning of 1991." Pl. Ex. 4 at 76:21–77:13. Defendant Jelks was a

new officer in the Detective Bureau at the time of the crimes in question—he had been assigned

to the Bureau on February 15, 1992, and had been directed to ride along with and assist

Defendant Outlaw for a brief period while his regularly assigned supervisor was unexpectedly

out of the office. Pl. Ex. 13 at 3:17–5:1. The Defendant Officers investigated the robberies as if

each had been committed by the same suspect. *See* Pl. Ex. 17, DONALD 000613 (explaining, in

a search warrant affidavit, that items stolen in each of the five robberies may be found in the

same location).

The Defendant Officers arrived at Belinsky's home within a half hour of the shooting. Pl.

Ex. 12 at DONALD 001552; Pl. Ex. 4 at 186:23–187:1, 188:8–22. While testifying about his

investigation of this shooting in 2021, Defendant Outlaw stated that upon arrival at a crime

scene, he would usually speak to the GPD officers who had already arrived to get information

about what happened. Ex. 4 at 190:9–191:1, 195:23–196:7. He testified that the officers who

arrived before him would have shared with him the information that was recorded in a report of

the crime scene—specifically, that the suspect of the Jimenez shooting also had committed

numerous robberies throughout the day, working his way north. *Id.* at 198:2–21; Pl. Ex. 12 at

DONALD 001554.

Defendant Outlaw spoke with Belinsky on the night of the shooting, within a short period of time after the crime, and Belinsky was only able to give him a "vague description" of what the perpetrator looked like. Pl. Ex. 11 at 376:8–377:4, 377:13–381:19. It was common for GPD officers to carry notebooks to take notes, Pl. Ex. 13 at 31:13–19, but Defendant Outlaw did not take notes of this interview. Pl. Ex. 11 at 379:9–20. The day after the robberies, Defendant Outlaw spoke with Williams and obtained information about the circumstances of the robbery of her home. Pl. Ex. 11 at 392:22–396:11.

For the first few days after the robbery, Williams did not stay at her home where she had been robbed, and instead stayed at her mother's house, also in the same neighborhood. Pl. Ex. 8 at 20:24–21:7. On March 2, 1992, Williams decided to return home. *Id.* at 21:8–15. As she drove up to her house shortly after 12:00 p.m., she saw a group of men on the streetcorner outside her house. *Id.* at 21:8–20, 22:4–18; Pl. Ex. 13 at 22:15–21. Williams looked at one of the men "dead in his face" and immediately recognized him as the man who had robbed her on February 27; she was 100% certain it was the same man. Pl. Ex. 8 at 214:9–24, 220:5–17. She recognized him by his build, height, skin color, deep eyes, and facial scarring. *Id.* at 22:23–23:1. Williams abandoned her plan to move back into her home and returned to her mother's house. *Id.* at 23:2–7.

Williams immediately called 911 to let police know she had just seen the robber again, on the street outside her home, and identified herself as the victim of the February 27 armed robbery. *Id.* at 21:16–22, 23:11–24:6. She asked to speak with Defendant Outlaw but was not able to do so on that call. *Id.* at 25:7–21. Instead, the call was transferred to the detective bureau, and she spoke to Sergeant Clarence Hightower. Pl. Ex. 13 at 17:17–18:5. Around 4:00 p.m. the same day, Sergeant Hightower told Defendant Jelks about his conversation with Williams. *Id.* at

15:10–18:15, 20:23–21:9. Jelks immediately called Williams back. *Id.* at 21:24–22:21. Later, Defendant Jelks told Defendant Outlaw about Williams' sighting of the robber. *Id.* at 23:24–24:4.

### C.      Two Victims Identify the Plaintiff

The Defendant Officers arranged for Williams and Belinsky to come to the police station on March 3, 1993, to look through books of mugshots to see if they recognized their assailant. Pl. Ex. 8 at 203:6–204:11; Pl. Ex. 10 at 29:5–12; Pl. Ex. 20; Pl. Ex. 21. Belinsky later testified that Defendant Outlaw put her in the room where she browsed the photobooks. Pl. Ex. 10 at 31:8–32:25. Williams viewed photobooks in a room with her mother and another woman. Pl. Ex. 8 at 28:3–20, 31:18–32:10; Pl. Ex. 22, ¶ 5.[3]

Williams was instructed to "[p]ick the guy that looks like the person that robbed" you. Pl. Ex. 8 at 28:3–6, 28:23–29:11. When Williams came across a photo that resembled the perpetrator, she picked it out, stating out loud that "this looks like him" and this "might be" the person who robbed her. *Id.* at 34:11–19, 34:23–35:1. The photograph Williams picked was of the Plaintiff. Pl. Ex. 8 at 34:23–35:4. Belinsky picked the same photo. *Compare* Pl. Ex. 20, *with* Pl. Ex. 21. Neither Williams nor Belinsky was sure that the person in the chosen photograph was the same person who had committed the crimes against them. Pl. Ex. 60, ¶ 6; Ex. 21.

---

[3] Whether Belinsky and Williams viewed photobooks in the same room is a question of material fact. Williams testified that when she went to the GPD to view photos, there was another woman placed in the room with her and her mother. Pl. Ex. 8 at 27:20–30:1. Belinsky, however, testified that when she viewed the photobooks, there was no one else in the room with her other than a woman police officer. Pl. Ex. 10 at 33:15–19. Belinsky also testified that she went to the GPD for identification purposes on multiple, separate occasions. *Id.* at 31:8–14 ("There was – I want to say – because it was twice that I had went back."), 33:23–34:2 (responding that she viewed a lineup several days after viewing photobooks).

The photo identification forms accompanying Williams' and Belinsky's identifications are both dated March 3, 1992, and are both signed by the same officer. *See* Pl. Ex. 20; Pl. Ex. 21. Williams' form was recorded at 12:30 p.m., Pl. Ex. 20, and Belinsky's form at 12:45 p.m., Pl. Ex. 21. Additionally, the officer supervising the viewings wrote on Belinsky's photo identification form that Belinsky picked out the same person who Williams picked out, which supports a reasonable inference that Belinsky and Williams viewed the photos at the same time. *Id.*

The Plaintiff was arrested at his sister's house. Pl. Ex. 1 at 48:24–49:7. When GPD officers arrived, they told the Plaintiff they needed him at the police station to deal with outstanding traffic tickets. *Id.* at 198:1–8. At the police station, Defendant Outlaw questioned the Plaintiff in a small office. *Id.* at 199:25–200:18. The Plaintiff does not recall receiving his Miranda rights prior to or while inside the room. *Id.* at 200:22–201:4.

Defendant Outlaw began the interrogation by asking the Plaintiff about his whereabouts on February 27, 1992. *Id.* at 201:6–13. The Plaintiff told Defendant Outlaw that he had left work, grabbed dinner, gone to his sister's house, then left to go car shopping with his sister for the rest of the evening. *Id.* at 203:16–204:1. After questioning the Plaintiff about his whereabouts, Defendant Outlaw told the Plaintiff that he was being questioned about a murder and a robbery, and that his photograph had been picked out by two witnesses. *Id.* at 202:7–20. The Plaintiff told police, "I don't have any reason to rob anybody. I just got paid." Pl. Ex. 13 at 25:24–26:1.

The same day Williams and Belinsky viewed the photobooks—March 3, 1992, Defendant Outlaw facilitated for them and the other victims a physical lineup of suspects. Pl. Ex. 25; Pl. Ex. 4 at 40:4–10, 41:18–42:3. The form documenting Belinsky's viewing of the lineup shows that both Defendant Outlaw and Defendant Jelks were the "officers conducting [the] line-up." Pl. Ex. 25. During the Plaintiff's criminal appeal in 1997, Defendant Outlaw testified that while Williams viewed the lineup, he asked her if she recognized anyone, then escorted her from the viewing area to the waiting area. Pl. Ex. 34 at 910:10–911:13. During a 2021 deposition related to the instant case, however, Defendant Outlaw testified that while the lineup was happening, he would have stood at the end of the entrance opposite to where the victims stood, that the victims would tell one of the sergeants assisting him that day who they identified, and that he would not know anything until the lineup was completed. Pl. Ex. 4 at 98:8–99:22.

11

When Williams saw the lineup, she recognized the Plaintiff as the person whose photo she had picked from the photobook, but she thought he looked bigger than the man who had robbed her. Pl. Ex. 8 at 43:3–18, 44:21–45:5. At some point, Williams told Defendant Outlaw that the man in the lineup had a bigger build than the man who robbed her. *Id.* at 45:6–14. In response, while talking "a little later," Defendant Outlaw told Williams that "he believed" the person she picked from the lineup "was the guy that robbed [her]." *Id.* at 45:9–22, 48:17–20. Defendant Outlaw told Williams that the Plaintiff had been arrested across the street from her house. *Id.* at 46:5–18. Williams testified that Defendant Outlaw told her, "That is the guy. We picked him up around where you was robbed in your own home." *Id.* at 129:5–12. Williams also testified that "some other guy" was with Defendant Outlaw when they had this conversation. *Id.* at 153:19–154:13. In reference to her choosing the Plaintiff during the lineup, Williams "felt like [Defendant Outlaw] was assuring me that it was him." *Id.* at 129:13–17. Williams interpreted Defendant Outlaw's comments to mean that he had more information and that he knew for a fact that the Plaintiff was the robber. *Id.* at 251:15–252:10. Williams trusted Defendant Outlaw and believed him when he told her that she had picked the guy who robbed her. *Id.* at 263:7–10. Williams testified that if Defendant Outlaw had not made those comments to her, she would not have identified the Plaintiff at the lineup. *Id.* at 296:1–13.

Belinsky also picked the Plaintiff out from the lineup. Pl. Ex. 10 at 35:9–21. The other four victims of the Glen Park robberies—Johnson, Cullum, Banks, and Thomas—were unable to identify their assailant in the lineup, and Banks stated that the man who attacked her was not in the lineup. Pl. Ex. 5 at 544:10–545:9; Pl. Ex. 14 at 108:2–22, 110:23–112:24, 186:1–14.

In an identification procedure separate from the photobooks originally viewed, the Defendant Officers showed Williams and Belinsky each a "photo array" that included the

Plaintiff's photo. Pl. Ex. 4 at 56:19–57:16, 63:2–5, 80:20–81:21. Whether Williams and Belinsky were shown the photo array before or after the lineup is a dispute of material fact. During the Plaintiff's 1997 criminal appeal, Defendant Outlaw testified that he showed Williams the photo array after the physical lineup. Pl. Ex. 34 at 914:11–915:5. During his 2021 deposition, however, Defendant Outlaw testified that he showed Williams the photo array before the physical lineup. Pl. Ex. 4 at 85:10–15. In Williams' official "Statement" to Defendant Outlaw, taken on March 3, 1992, she states that she viewed a lineup at 7:30 p.m., and there is a question recorded at 11:00 p.m. that states, "I will *now* show you a photographic array of pictures number 1–6." Pl. Ex. 31 at 4 (emphasis added). The photo array consisted of a cropped version of the photo of the Plaintiff that Williams and Belinsky had picked out earlier, arrayed in a 3 x 2 configuration with five other cropped photos. Pl. Ex. 4 at 63:16–25, 69:14–70:5, 71:11–19, 80:20–81:21; Pl. Ex. 18; Pl. Ex. 19. Defendant Outlaw testified that he thinks he would not have shown Williams and Belinsky the same photo array. Pl. Ex. 4 at 80:20–81:12. Before Defendant Outlaw showed the photo array to Williams, he instructed her, "You tell me if you recognize anyone in these photographs, and if so from where." *Id.* at 64:3–17. Defendant Outlaw testified that the procedure of using the same photo the witness previously picked to conduct a subsequent identification was an official GPD method of conducting photo identifications, taught to GPD officers by their supervisors. *Id.* at 71:11–72:10.

**D.    Evidence the Plaintiff Alleges He Did Not Receive in Advance of His 1992 Criminal Trial**

On March 4 or 5, 1992, the Defendant Officers visited the Plaintiff's place of work, Goldblatt's, to verify the Plaintiff's employment. Pl. Ex. 13 at 25:14–26:1. The Plaintiff's supervisor gave the Defendant Officers access to the Plaintiff's timecards. *Id.* at 27:4–29:14. Defendant Jelks made notes of the Plaintiff's work schedule from February 27 to March 2 or 3.

13

*Id.* at 28:22–29:14. The Plaintiff's timecard for March 2, 1992, when Williams saw the robber outside her home just after noon, reflected that the Plaintiff clocked out for lunch at 12:02 p.m. and back in at 12:32 p.m. Pl. Ex. 13 at 22:15–21, 49:22–50:3; Ex. 28. Defendant Jelks showed Defendant Outlaw the timecard for March 2, and they investigated the possibility of whether the Plaintiff could have walked past Williams' house at that time. Pl. Ex. 13 at 62:7–17. The Defendant Officers then spoke to the Plaintiff's supervisor and learned that, during the Plaintiff's lunch break on March 2, she and other colleagues ate lunch in the lunchroom with the Plaintiff. *Id.* at 62:17–63:15. Defendant Jelks did not report or document what he and Defendant Outlaw learned at Goldblatt's beyond what was written in Defendant Jelks' notebook. *Id.* at 65:2–15. Defendant Outlaw asked Defendant Jelks to report his conversations with the Goldblatt's witnesses, but Defendant Jelks did not create a written report. Pl. Ex. 4 at 156:11–157:22. Defendant Outlaw repeatedly asked Defendant Jelks to create a written report, and doing so was a "standard part of the investigation." *Id.* at 157:1–22.

During Defendant Jelks' 1993 testimony in connection with post-conviction proceedings, he testified that the GPD communications division no longer had the tape for the time period when Williams called 911 to report her sighting of the robber outside her home. Pl. Ex. 13 at 76:7–78:7. He testified that after inquiring with the patrol commander's office, there was "nothing in the radio as far as the tape." *Id.* Defendant Jelks testified that any activity sheets for cars dispatched in response to Williams' call would have been kept for one year and then destroyed. *Id.*

During the Plaintiff's criminal trial, the prosecution argued that Williams and Belinsky each selected the Plaintiff's photo out of several photos and that Williams testified she looked at hundreds. Pl. Ex. 32 at 1480:18–1481:2. The prosecution presented Williams's testimony that

she identified the Plaintiff from the photobook, photo array, and lineup. Pl. Ex. 34 at 779:19–783:4. The Plaintiff's defense attorney, Scott King, testified that "if [he] had adequate evidence to show an unduly suggestive show-up, lineup, photograph or live," he would have filed a "motion to suppress," but that "[he] did not [file one] because [he] didn't have the evidence at that time." Pl. Ex. 33 at 111:8–112:7.

Williams' official "Statement," which included questions asked by and answers typed up by Defendant Outlaw, did not mention what Williams testified she told Defendant Outlaw, that she thought the Plaintiff looked bigger than the person who robbed her. Pl. Ex. 8 at 45:6–14; Pl. Ex. 31. It was common practice for GPD officers to have notebooks to document their investigations, and Defendant Jelks testified that as he disposed of his cases, his "notes were taken out and included with [his] cases." Pl. Ex. 13 at 31:13–19. Defendant Jelks testified that in this case, he did not take out his notes because he wasn't involved in the case all the way to the end, *id.* at 31:13–22, 45:6–12, and Defendant Outlaw testified that his notes were lost in a fire, Pl. Ex. 4 at 126:12–22.

On March 3, 1993, Williams told Defendant Outlaw that the robber was not wearing gloves. Pl. Ex. 34 at 825:5–827:4. Williams testified that Defendant Outlaw "said something . . . about checking for fingerprints." *Id.* at 827:11–14. No one from the GPD checked Williams's home for fingerprints. *Id.* at 827:15–19; Pl. Ex. 8 at 18:15–18.

Defendant Outlaw prepared the probable cause affidavits for the Jimenez homicide and the Williams robbery. Pl. Ex. 4 at 164:10–14. He testified that Defendant Jelks had additional information and that Jelks told him, "Just do the probable [cause] affidavit for the robbery against Williams, I will follow up with a prosecutor with my additional information." *Id.* at 164:10–165:6; 176:10–177:13. Defendant Outlaw told his supervisors in writing that he "didn't

have all necessary information. I wanted to further investigation until we had all necessary information." *Id.* at 161:11–22. The Commander of the GPD Detective Division directed Defendant Outlaw to file the case, despite that Defendant Outlaw insisted he did not have enough evidence, expressed his desire to check out more leads, and intended to release the suspect. Pl. Ex. 15 at 127:5–128:9; Pl. Ex. 36.

**E.     The Plaintiff Is Convicted**

The Plaintiff's criminal trial took place from June 8 to 12, 1992. Pl. Ex. 1 at 62:1–7. Williams and Belinsky each identified the Plaintiff in court as her attacker. *Id.* at 69:9–12; Pl. Ex. 5 at 640:3–15. Williams testified that when she went to court for the Plaintiff's 1992 criminal trial, "and talking to the detectives and things, they were saying that this was the right guy," referring to the Plaintiff. Pl. Ex. 8 at 114:17–24. She testified that before going to trial, Defendant Outlaw coached her on what to say and "convinced me that this was the guy." Pl. Ex. 37 at 44:22–48:5. Williams testified that she felt "pressured and intimidated" by Defendant Outlaw. *Id.* at 46:19–48:15. She did not express reservations to prosecutors or the people in court. *Id.* at 48:16–21. The State's case at the Plaintiff's criminal trial was almost entirely based on the identifications by Williams and Belinsky. Pl. Ex. 27 at 12:20–13:1; Pl. Ex. 24 at 96:15–18.

On June 11, 1992, the Plaintiff was convicted of murder and robbery. Pl. Ex. 6 at 67. He was sentenced to 60 years in prison. *Id.* at 116. He served 24 years until his convictions were vacated on January 25, 2016. Pl. Ex. 35 at 1, 4. On January 27, 2016, the State of Indiana moved to dismiss all charges against the Plaintiff related to this incident, conceding that there was "insufficient evidence to prove the charges." Pl. Ex. 38.

F.      **Training and Supervision at the Gary Police Department**

Defendant Outlaw stated that during the early 1990s, the city was "very hectic as far as crime's concerned, fighting crime is concerned. So it was like a all-hands-on-deck process." Pl. Ex. 4 at 78:20–79:10. During the investigation into the robberies in question, he was "overloaded," and he had other cases "coming at" him. *Id.* at 176:25–177:3.

Defendant Outlaw testified that new detectives did not receive training when they transferred into the detective bureau and were expected to "learn[] on the run." *Id.* at 79:3–10. Clarence Hightower, a former GPD officer, testified that GPD officers "were consistently monitored" and that "a great portion of the training received to officers is the shadowing where you work alongside a senior officer who has expertise in certain areas. . . . It's a continuous effort to make sure that everybody gets something other than what's mandated by the state." Pl. Ex. 16 at 31:14–17; Pl. Ex. 44 at 124:1–16. David Wade, who served as GPD Chief of Police from 1991 to 1994, testified that supervising officers "would have taken courses in supervision within the training division [and] outside of the police department at Indiana University Northwest . . . or other entities." Pl. Ex. 15 at 18:11–25, 20:18–20; Def. Ex. 20 at 24:17–25:4. Wade also testified that upon being appointed to the Detective Division, detectives would receive in-house training from a division supervisor. Def. Ex. 19 at 139:17–22. Wade testified that while he was Chief of Police or Deputy Chief, "each and every" officer would attend seminars on eyewitness identification procedures. *Id.* at 98:1–12. He added that the "Training Division" would train officers in the procedures for their area of service and that field training officers would evaluate new officers. *Id.* at 41:19–42:21, 136:13–137:11.

When asked whether GPD officer evaluations were "just proforma," Wade testified that "[s]ome of them was, some of them wasn't," and elaborated that "[i]f your friend was your

evaluator, he gave you a ten," but "[i]f you're an individual he might not like, he'll look at everything that . . . the policy says . . . you evaluate. And you might get a six." Pl. Ex. 15 at 142:12–15, 144:3–13. Wade also testified that he "changed that," so the average officer received a five or six, and anything above required written reasoning. *Id.* at 144:13–18. Hightower testified that he served as an officer from 1977 to 2009, that there was an evaluation process conducted in 1987 or 1988, the results of which were overturned, and that after that year, he did not go through any other formal evaluation process. Pl. Ex. 16 at 31:14–32:3. When the GPD conducted evaluations in 1988, Hightower complained that his supervisor had not been trained to evaluate and had no documentation to support the low scores he gave Hightower, and the police commissioner "threw out all the scores and gave everybody a ten." *Id.* at 23:13–25:16, 27:15–20. From 1989 to 1996, Hightower, serving as supervisor or coordinator of the detective division, did not conduct any evaluations, and he did not know of anyone who had that job responsibility. *Id.* at 36:24–37:1, 40:6–16, 45:3–10, 62:10–14.

  Wade could not recall receiving training on how to supervise officers under his command when he became a sergeant, nor when he became a lieutenant or a commander. Pl. Ex. 15 at 134:18–135:7. The only supervision training he recalled receiving was when he became the Deputy Chief and when he became Chief of Police. *Id.* at 135:19–25.

  In the late 1980s and early 1990s, supervisors in the detective division were primarily tasked with administrative duties—assigning cases, keeping records on how many cases an officer has, answering division supervisors' phone calls for information or assistance. Pl. Ex. 16 at 73:5–74:11. Hightower remembered the "[t]elephone constantly ringing," and described the job as "[t]he highest degree of stress you could imagine." *Id.* at 73:10–74:3. As a supervisor in the detective bureau, Hightower was not responsible for participating in witness interviews or

identification procedures. *Id.* at 74:20–75:1. He stated that one of the criteria for a detective is that "he's able to stand alone, makes own decisions." *Id.* at 76:10–77:5.

 In 1992, GPD operations were governed by the GPD Manual of Procedures. Pl. Ex. 4 at 72:16–73:23; Pl. Ex. 15 at 73:19–74:23, 75:22–78:16; Pl. Ex. 40. The Manual did not include a policy related to eyewitness identification. *See* Pl. Ex. 15 at 68:15–69:8; Pl. Ex. 40 at 6–12; Pl. Ex. 43, p. 64:10–20. The Manual did not include a policy on disclosing exculpatory information to prosecutors and defense attorneys. Pl. Ex. 40 at 6–12. It did not include a policy regarding note taking, report writing, or memorializing witness statements. *Id.* It did not include a policy on recovering forensic evidence. *Id.* And it did not include a policy regarding investigating a suspect's alibi. *Id.*[4]

 Defendant Outlaw testified that to review the manual, officers "had to go review it at the set location, which is usually the supervisor's office." Pl. Ex. 4 at 73:10–23. He also testified that detectives like him would refer to the manual if there was a dispute about terminology, if clarification was needed, or if some specific procedure was disputed. *Id.* at 73:24–74:10. Defendant Outlaw testified that "pretty much everything was taught to us through supervision." *Id.* at 75:12–25. GPD officers were responsible for verifying their own training hours, and whether officers met their minimum training hours was verified only if an officer asked the head of the training department how many hours he or she had left to complete. Pl. Ex. 44 at 119:2–120:2.

---

[4] The Plaintiff cites to a review of the GPD Manual of Procedures conducted by the International Association of Chiefs of Police (IACP) as evidence in support of his *Monell* claim. The Defendant City of Gary does not object as to the existence of this report but moves to strike it as inadmissible hearsay. The Court does not reach the Defendant City of Gary's motion because the IACP review, cited as Plaintiff's Exhibit 41, is not in the record. Notwithstanding the absence in the record of the IACP review, the Plaintiff's *Monell* claim survives for the reasons stated below.

**ANALYSIS**

**A.      Federal Claims—42 U.S.C. § 1983**

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state

law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff

must show that the defendant deprived him of a federal constitutional right and that the

defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

*1.      Due Process Violation*

The Plaintiff complains that the Defendant Officers deliberately withheld material

exculpatory and impeachment evidence, conducted unduly suggestive identification procedures,

and knowingly fabricated false evidence, all of which deprived the Plaintiff of his constitutional

right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. The Court finds the

Plaintiff has designated evidence sufficient to create a genuine dispute of material fact on this

claim.

The Defendant Officers argue on summary judgment that the Plaintiff has made

allegations about rules that are only prophylactic and that he has failed to show how any alleged

flaws in their investigation prejudiced the Plaintiff's criminal trial. *See* ECF No. 300, 3 ("The

*Alexander* [*v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006),] Court further drew a

distinction between 'prophylactic rules' such as unduly suggestive identification procedures and

the like, and core constitutional rights such as the right to a fair trial."). The Defendant Officers'

argument is misplaced. The "prophylactic rule" referred to in *Alexander* was not a police

procedure nor any duty to disclose exculpatory evidence, conduct sound identification

procedures, or report the details of an investigation. Instead, the "prophylactic rule" identified in *Alexander* was an evidentiary rule explained in *Manson v. Brathwaite*, 432 U.S. 98 (1977), which bars the admission of unreliable eyewitness identifications to protect a defendant's right to a fair trial. *See Alexander*, 433 F.3d at 555 ("Thus, we recognized . . . that the *Brathwaite* rule regarding unduly suggestive identification procedures 'is a prophylactic rule designed to protect a core right . . . .'" (quoting *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987))); *see also Hensley*, 818 F.2d at 649 ("The court correctly stated that *Stovall* and *Brathwaite* simply establish a prophylactic rule that protects a defendant's right to a fair trial by barring the admission of unreliable eyewitness identifications." (quotation marks and citation omitted)).

Even though the Defendant Officers do not succeed on summary judgment by arguing that police procedures are prophylactic, the Plaintiff must still show how flaws in those procedures tainted the Plaintiff's criminal trial. *See Alexander*, 433 F.3d at 555 ("South Bend cannot be liable under § 1983 unless Alexander shows how the flaws in South Bend's identification techniques made his trial unfair."). The Defendant Officers contend that any facts cited by the Plaintiff regarding withheld evidence are immaterial because, as the Seventh Circuit stated in *Alexander*, the Constitution does not require that police lineups, photo arrays, and witness interviews meet a certain standard of quality. 433 F.3d at 555. The Plaintiff responds that he has met *Alexander*'s required showing, namely, that the alleged "unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial." *Id.* at 556.

Viewing the facts in the light most favorable to the Plaintiff, the Plaintiff has shown that Defendant Outlaw arranged for Williams and Belinsky to view photobooks together. When Williams picked the photo she thought looked like the man who robbed her, she stated out loud

that "this looks like him" and this "might be" the person who robbed her. The Court has no way of knowing whether Belinsky would have independently identified the Plaintiff's photo. When Williams told Defendant Outlaw, after viewing the Plaintiff in the in-person lineup, that the Plaintiff looked bigger than the perpetrator, Defendant Outlaw told Williams he was sure the Plaintiff was the man who robbed her. Even though the Plaintiff had been arrested at his sister's house, Defendant Outlaw told Williams that the Plaintiff had been arrested across the street from her house, where she had spotted her assailant a few days earlier. Williams "felt like [Defendant Outlaw] was assuring [her] that it was him." Additionally, the Defendant Officers showed Williams and Belinsky a photo array, which included the same photo of the Plaintiff, on the same day as the previous two identifications (the photobook and the in-person lineup). Given the repeated viewings, the witnesses may have been picking out their recollection of previous identifications rather than their recollections of the person who robbed them.

In the Plaintiff's state criminal trial, both Williams and Belinsky testified as to their prior identifications and identified the Plaintiff in open court. The State's case at the Plaintiff's criminal trial was almost entirely based on the identifications by Williams and Belinsky. Since the circumstances of the faulty procedures had not been disclosed to the prosecutor or the Plaintiff's criminal counsel, they could not be used to impeach Williams' or Belinsky's testimony. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (explaining that a "*Brady* violation occurs when the *government* fails to disclose evidence materially favorable to the accused . . . even evidence that is known only to police investigators," (citation omitted), and that

"[p]olice officers have a duty to disclose under *Brady*"). Considering this initial showing that the Defendant Officers' conduct may have undermined the fairness of the Plaintiff's 1992 criminal trial, the Defendant Officers are not entitled to summary judgment on Count I, the Plaintiff's due process claim.

2.    *Conspiracy*

The Plaintiff claims that the Defendant Officers conspired to subject the Plaintiff to prosecution without probable cause, to conduct unduly suggestive identification procedures, to withhold material exculpatory and impeachment evidence, to fabricate inculpatory evidence, to inflict emotional distress upon the Plaintiff, and to protect one another from liability for depriving the Plaintiff of his rights. The Defendant Officers argue that "the undisputed evidence before the court evinces that Officer Outlaw did not conspire or agree with anyone whatsoever to injure the Plaintiff in any manner at any time." They argue that evidence of working with others to investigate a crime does not support a claim for conspiracy.

To establish a conspiracy under § 1983, the Plaintiff must show "that an actual conspiracy existed (in other words, that people agreed to injure him), that its purpose was to deprive [the Plaintiff] of his constitutional rights, that an act was committed in furtherance of the conspiracy, and that he was injured." *Alexander*, 433 F.3d at 556–57. "A conspiratorial agreement may be established by circumstantial evidence . . . if a reasonable jury could conclude that the conspirators had, in fact, reached an understanding that they sought to injure" the Plaintiff. *Id.* The Court finds there is circumstantial evidence sufficient to create a genuine dispute as to whether the Defendant Officers conspired to violate the Plaintiff's constitutional rights.

Preliminarily, the evidence does not support a finding that the Defendant Officers conspired to withhold evidence of what could have been the Plaintiff's alibi for the time period when Williams says she saw the perpetrator in front of her house. Both officers were involved in the investigation that showed the Plaintiff was eating lunch with his colleagues at Goldblatt's, which was substantiated by his timecards and witness testimony, during the date and time when Williams saw a group of men on the streetcorner outside her house, looked at one of the men "dead in his face," and immediately recognized him as the man who had robbed her. Williams testified that she was 100% certain the man she saw was the man who robbed her. Even though neither officer reported the evidence of the Plaintiff's timecards and the testimony showing that he was eating lunch at work at the time the man was near Williams' home, Defendant Outlaw testified that he asked Defendant Jelks to report his conversations with the Goldblatt's witnesses and repeatedly asked Defendant Jelks to create a written report, as it was a "standard part of the investigation." Yet, Defendant Jelks did not create a written report. And although he made notes of the Plaintiff's work schedule, Defendant Jelks testified that for this case, he did not take his notes out of his notebook and include them with the case file. Although neither officer reported this aspect of the investigation, Defendant Outlaw's testimony that he repeatedly asked Defendant Jelks to report it is evidence that undermines the possibility of a conspiracy between the two.

The Plaintiff's conspiracy claim nonetheless survives because, viewing the facts in the light most favorable to the Plaintiff, the Defendant Officers conducted unduly suggestive identification procedures and failed to report them to the prosecutor and the Plaintiff's criminal defense counsel. Even though the Plaintiff has not produced evidence of the exact role Defendant Jelks played in showing Williams and Belinsky the photobooks, lineup, and photo array,

24

Defendant Jelks testified that he had been directed to ride along with and assist Defendant Outlaw, and the lineup form shows that both Defendant Officers were the "officers conducting [the] lineup." The Court can thereby infer that Defendant Jelks knew, as Defendant Outlaw did, that Williams and Belinsky viewed photobooks together and that they were shown a photo array including the Plaintiff on the same day they had seen the Plaintiff in a photobook and a lineup. Further, when Williams viewed the photo array, the third identification procedure of the day, Defendant Outlaw instructed her, "You tell me if you recognize anyone in these photographs, and if so from where." Neither of the Defendant Officers reported that Williams and Belinsky viewed the photobooks together or that they had seen the Plaintiff's photo from the photobooks on the same day as the photo array and lineup. In light of this circumstantial evidence, the Defendant Officers are not entitled to summary judgment on Count II, the Plaintiff's conspiracy claim.

3.    *Failure to Intervene*

The Plaintiff claims that the Defendant Officers failed to intervene in each other's violations of the Plaintiff's constitutional rights. To succeed on his failure to intervene claim, the Plaintiff must show that the Defendant Officers "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

The Defendant Officers argue that the Plaintiff has shown neither a constitutional violation nor that they were involved in or aware of any unlawful activity. The Court has determined that the alleged violations of the Plaintiff's Fifth and Fourteenth Amendment right to a fair trial are supported by evidence sufficient to survive summary judgment. The Plaintiff's

failure to intervene claim is thereby supported by underlying constitutional violations caused by the Defendant Officers.

To support his contention that the Defendant Officers could have prevented one another from committing the constitutional violations, the Plaintiff argues they "[a]t a minimum . . . could have called for a backup, called for help, or at least cautioned [the other officer] to stop." *Yang*, 37 F.3d at 285. The questions whether the Defendant Officers could have been more diligent in reporting the results of their investigation, separated the witnesses before they viewed photobooks, encouraged one another to wait before showing the witnesses the photo arrays, or taken some other action to prevent the constitutional violations are better left for the jury. *See Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."). Based on the underlying constitutional violations and the issue of fact as to whether the Defendant Officers could have prevented the constitutional violations, the Defendant Officers are not entitled to summary judgment on Count III, the Plaintiff's claim for failure to intervene.

4.    *Pretrial Detention Without Probable Cause*

In opposition to Count IV, which the Plaintiff labels in the Complaint as a claim for "malicious prosecution," Defendant Outlaw argues that, because he was not on fair notice in 1992 that his conduct violated a clearly established constitutional right, he is entitled to qualified immunity. To support his argument, Defendant Outlaw cites *Barnhouse v. City of Muncie*, , in which a police officer succeeded on a qualified immunity defense to malicious prosecution because "[t]here is no 'constitutional right not to be prosecuted without probable cause.'" 499 F.

Supp. 3d 578, 593(S.D. Ind. 2020) (quoting *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018)).

However, as the Court stated in its May 31, 2018 Opinion and Order, the Plaintiff previously clarified that Count IV "is a Fourth Amendment claim for unlawful seizure." ECF No. 55 at 3. And, in response to the instant motion for summary judgment, the Plaintiff reasserts that Count IV is a Fourth Amendment claim for deprivation of liberty without probable cause. That is consistent with the Plaintiff's Complaint, which alleges that the "Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment," and that "[i]n so doing, these Defendants caused Plaintiff to be unreasonably seized." Compl. 19. The Plaintiff's position is also consistent with the Seventh Circuit's opinion in *Manuel*, in which the court wrote that "Fourth Amendment malicious prosecution is the wrong characterization [for a claim of wrongful custody]. There is only a Fourth Amendment claim—the absence of probable cause that would justify the detention." 903 F.3d at 670 (quotation marks omitted). Defendant Outlaw's assertion of qualified immunity to a claim of malicious prosecution is therefore inapplicable to Count IV, and the Plaintiff's Fourth Amendment unlawful seizure claim in Count IV survives summary judgment.

*5.*    Monell *Liability Against Defendant City of Gary*

a.    Policy or Custom

In Count I, the Plaintiff claims the Defendant Officers violated his due process rights pursuant to the policy and practice of the GPD and Defendant City of Gary of pursuing wrongful convictions by conducting flawed investigations, including by withholding exculpatory information, conducting unduly suggestive identification procedures, and fabricating inculpatory

evidence. And, in Count IV, the Plaintiff claims the Defendant Officers violated his Fourth Amendment right not to be unlawfully seized. A municipality like the City of Gary can only be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). This requires a plaintiff to prove that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by [the city's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Here, the Plaintiff has designated evidence sufficient to create a genuine dispute as to whether the GPD had an official policy that led to the violation of the Plaintiff's constitutional rights.

The Defendant City of Gary argues that the Plaintiff has provided no evidence of any policy or practice that violated the Plaintiff's constitutional rights. It cites testimony by the Defendant City of Gary's 1992 Mayor and 1992 Chief of Police that neither knew of any policy, procedure, or practice in which GPD officers would create false evidence, engage in unduly suggestive identification procedures, or frame individuals for crimes they did not commit. The Plaintiff responds that there is evidence the GPD had an official policy of conducting unnecessary and highly suggestive identification procedures. He argues that it was GPD policy to have witnesses identify a suspect from a photobook and later show them the photo they chose as part of a subsequent photo array, which would lead the witnesses to confirm and have artificially inflated confidence in their earlier choice.

28

Defendant Outlaw testified that it was GPD policy to have witnesses identify a suspect from a photobook, then show them the same photo in a subsequent photo array. *See Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (explaining that "a municipality can be held liable under § 1983" if there is "an express policy that would cause a constitutional deprivation if enforced"). The Defendant City of Gary responds this testimony is insufficient to demonstrate a policy or practice because Defendant Outlaw had no final policy-making authority, and no other officers corroborated his testimony. Regardless of Defendant Outlaw's authority or corroboration of his testimony, he served as a detective at the time in question and as the detective investigating the crimes in question. The Court therefore finds his testimony is sufficient on summary judgment to create a genuine dispute regarding the required showing of a policy or practice by the GPD.

Defendant City of Gary also argues there is no causal link between that identification procedure and the Plaintiff's alleged constitutional deprivation. It argues that, based on the Seventh Circuit's opinion in *Stewart v. Duckworth*, 93 F.3d 262 (7th Cir. 1996), the photo array conducted by Defendant Outlaw did not violate the Plaintiff's constitutional rights.

In *Stewart*, the Seventh Circuit evaluated the constitutionality of a pretrial identification procedure in which detectives showed the victim three photo arrays of six photos, with the criminal defendant's photo being the only photo common to each of the three arrays. *Id.* at 264–65. The first two arrays were the same and included an old photo of the criminal defendant. *Id.* at 264. The victim did not identify the criminal defendant's photo from the first two arrays. *Id.* The third array, shown eleven days after the first two, included a more recent photo of the criminal defendant. *Id.* The victim identified the criminal defendant's more recent photo as depicting his assailant. *Id.* Evaluating the procedure, the Seventh Circuit explained that "[t]he constitutionality

of a challenged pretrial identification procedure is analyzed in two steps." *Id.* at 265. First, the court determines whether the procedure was "unnecessarily suggestive." *Id.* If the court finds the procedure was "unnecessarily suggestive," then it considers whether the identification was nonetheless reliable under the totality of the circumstances. *Id.*

The Seventh Circuit in *Stewart* held that the challenged identification procedure was not unduly suggestive because the criminal defendant's photo did not stand out among the photos selected for each array, eleven days passed between the victim's viewings of the photo arrays, the criminal defendant's photo in the first group looked very different from his photo in the second, and the second photo, which the victim identified, had been taken much more recently than the first. *Id.* at 265–66. The Seventh Circuit found it made a difference that the detectives showed the victim two different photos of the criminal defendant. *Id.* at 266. It noted that "[i]t would be a different matter had [the victim] been shown the recent photos twice before making an identification." *Id.*

The Defendant City of Gary argues that, like the procedure in *Stewart*, the identification procedure conducted by defendant Outlaw was not unduly suggestive. It argues that, unlike the first showing in the *Stewart* procedure, which included only six photos, the first showing in the instant procedure required Williams and Belinsky to look through hundreds of photos. It also argues that, similar to the fact in *Stewart* that the Seventh Circuit found persuasive, the Plaintiff did not stand out in the photo array provided to Williams and Belinsky. The Plaintiff, in contrast, argues that whereas the *Stewart* procedure included photo arrays shown eleven days apart, the instant procedure had Williams and Belinsky view the same photo of the Plaintiff only hours apart. The Plaintiff also argues that in *Stewart*, the "critical factor," *id.* at 265, demonstrating the procedure was not unduly suggestive was that the photo of the suspect in the second array looked

"very different," *id.*, from the photo of the suspect in the first array, but here, Williams and Belinsky were shown the same photo of the Plaintiff in both the photobook and the photo array.

The Court agrees with the Plaintiff and finds that the instant photo identification procedures were unduly suggestive. Williams and Belinsky picked the Plaintiff's photo out of the photo array only hours after they had picked it out of the photobook. Unlike in *Stewart*, there were not eleven, or any, days between showings that would suggest Williams' and Belinsky's second photo choice was independent from the first. And unlike in *Stewart*, where the victim looked at two distinct photos of the criminal defendant, Williams and Belinsky saw the same photo of the Plaintiff that they had seen only hours before. Further, when Defendant Outlaw showed Williams and Belinsky the photo array, he asked whether they "recognize[d] anyone in these photographs, and if so from where." Williams and Belinsky would have recognized the Plaintiff's photo from earlier that day.

The Court also finds that the totality of the circumstances did not make the procedures nonetheless reliable. During the first identification procedure, Williams picked the Plaintiff's photo but said "this looks like him" and this "might be him." It is unclear whether Belinsky, being in the room with Williams when she made her choice, would have independently chosen the Plaintiff's photo. After Williams and Belinsky identified the Plaintiff's photo the first time, they were shown a lineup. During the lineup, Williams recognized the Plaintiff as the person whose photo she had picked from the photobook, but she thought he looked bigger than the man who had robbed her. Belinsky also identified the Plaintiff from the lineup, but none of the other four victims did. One victim, Banks, affirmatively stated that the perpetrator was not in the lineup. During the third identification procedure, Defendant Outlaw asked Williams and Belinsky to identify anyone they recognized from a six-photo array that included the Plaintiff's

photo, only a short time after they had picked out the same photo and Defendant Outlaw had told

Williams "he believed" the person she picked from the lineup "was the guy that robbed [her]." In

*Stewart*, where the Seventh Circuit found the procedures were not unduly suggestive, the court

noted that "[i]t would be a different matter had [the victim] been shown the recent photos twice

before making an identification." *Id.* at 266. Here, Williams and Belinsky were shown the

Plaintiff's face twice, on the same day, before they identified him during the third identification

procedure.

   The Plaintiff has presented evidence sufficient to show that the identification procedures

used in this case were unduly suggestive and may have been the moving force behind the

deprivation of his constitutional rights. Defendant Outlaw's testimony that he conducted this

procedure pursuant to GPD policy and training is enough to raise a genuine dispute of material

fact as to whether the procedure was indeed GPD policy or a widespread custom or practice. The

Defendant City of Gary is thus not entitled to summary judgment on the *Monell* claims in Count

I and IV, the Plaintiff's § 1983 claims for the violation of his Fourth and Fourteenth Amendment

rights.

b.  Failure to Train

   The Court finds that the Defendant City of Gary is not entitled to summary judgment on

the Plaintiff's *Monell* claim based on a failure to train. In addition to establishing liability under

§ 1983 by showing a constitutional violation caused by the municipality's policy or custom, the

Plaintiff may establish liability under § 1983 by showing that the municipality's failure to train

its officers amounted to deliberate indifference to the Plaintiff's rights. *See City of Canton v.*

*Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis

for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights

of persons with whom the police come into contact."); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("A municipality will be held liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact."). To prove deliberate indifference, the Plaintiff must show either a "need for more or different training [that] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," or a "repeated pattern of constitutional violations that makes the need for further training . . . plainly obvious to the city's policymakers." *Id.* (quotation marks omitted).

The Plaintiff has not alleged or presented evidence of a repeated pattern of constitutional violations. However, the Plaintiff does argue there is evidence of a widespread practice of deficient supervision, training, and policies that posed a risk of detectives "run[ning] roughshod over the constitutional rights of citizens." Pl. Br. 20, ECF No. 320. The Defendant City of Gary argues that the Plaintiff ignores the on-the-job training and supervision provided by the GPD and argues there are no material facts showing a need for more or different training so obvious that it amounted to deliberate indifference.

The Court finds there is a genuine dispute of material fact as to whether it was obvious the GPD's lack of training and supervision would lead to officers conducting unduly suggestive identification procedures and unlawfully detaining individuals without probable cause. On one hand, David Wade, who served as GPD Chief of Police from 1991 to 1994, testified that supervising officers "would have taken courses in supervision within the training division [and] outside of the police department at Indiana University Northwest . . . or other entities." Wade also testified that upon being appointed to the Detective Division, detectives would receive in-house training from a division supervisor and that "each and every" officer would attend

seminars on eyewitness identification procedures. He added that the "Training Division" would train officers in the procedures for their area of service, and that certified field training officers would evaluate new officers. Further, former GPD officer Clarence Hightower testified that officers "were consistently monitored" and that "a great portion of the training received to officers is . . . shadowing."

On the other hand, Wade could not recall receiving training on how to supervise officers under his command when he became a sergeant, nor when he became a lieutenant and commander. Defendant Outlaw, who investigated the crimes in question, testified that the early 90's were "hectic" for the GPD "as far as crime's concerned," so fighting crime was an "all-hands-on-deck" process. Hightower remembered that while a supervisor, the "[t]elephone [was] constantly ringing," and he described the job as "[t]he highest degree of stress you could imagine." He testified that one of the criteria for detectives is that "he's able to stand alone, makes own decisions." Meanwhile, Defendant Outlaw, who was a new detective between 1990 and 1991, testified that new detectives did not receive training when they transferred into the detective bureau and were expected to "learn[] on the run." Defendant Jelks joined the detective bureau on February 15, 1992. These facts permit the inference that during their investigation into these February 27, 1992 crimes, the Defendant Officers were operating in a "hectic" or "high[] stress" police department with little training other than what they learned "on the run." Detective Jelks had such limited training for only 12 days prior to the crimes in question.

In 1992, GPD operations were governed by a GPD Manual of Procedures, but the Manual lacked written policies on the procedures being challenged here, namely, disclosing exculpatory information, note taking, and investigating a suspect's alibi. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (citing *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012)

(explaining that where a municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction")). Detectives would only view the Manual if there was a dispute about terminology, if clarification was needed, or if some specific procedure was disputed. Otherwise, "pretty much everything was taught . . . through supervision."

Additionally, Hightower testified that some GPD officer evaluations were "just proforma," and "[i]f your friend was your evaluator, he gave you a ten." Hightower testified that during his time as an officer with the GPD from 1977 to 2009, there was an evaluation process in 1987 or 1988, the results of which were overturned, and otherwise he did not go through any formal evaluation process.

While the GPD's sense of urgency persisted, the GPD brought in new detectives such as Defendants Outlaw and Jelks, taught them the job "on the run" without written policies on eyewitness identification, documenting investigative steps, or disclosing exculpatory evidence. Given Hightower's testimony that no evaluations were conducted between 1990 and 1992, the Court may infer that neither of the Defendant Officers were evaluated as detectives prior to the investigation in question. A memo from Defendant Outlaw's supervisor shows that Defendant Outlaw was pressured to file the case file for the crimes in question even though Defendant Outlaw insisted that he did not have enough evidence to file, expressed his desire to check out more leads, and intended to release the suspect. These practices evince a desire by the GPD to quickly resolve cases without concern for detectives' training, the accuracy of identification procedures or failures to disclose evidence caused by an absence of training, or the sufficiency of probable cause directly related to their detectives' investigatory practices. This evidence is sufficient to create a genuine dispute as to whether the Defendant City of Gary had a "need for

more or different training [that] is so obvious" that it amounted to deliberate indifference to the rights of individuals with whom the detectives came into contact, such as the Plaintiff. *Jenkins*, 487 F.3d at 492. Accordingly, the Defendant City of Gary is not entitled to summary judgment on the *Monell* claims based on a failure to train.

**B.     State Law Claims against the City of Gary**

*1.     Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Respondeat Superior*

In Counts VI, VII, and VIII, the Plaintiff sues Defendant City of Gary for Intentional Infliction of Emotional Distress (IIED), Negligent Infliction of Emotional Distress (NIED), and respondeat superior. Defendant City of Gary argues that it is entitled to summary judgment on these claims because the Defendant Officers are immune from suit on the Plaintiff's state law claims, and the corresponding claims against it are based solely on a theory of respondeat superior.

In a previous opinion, the Court dismissed the Plaintiff's claims for IIED and NIED as to the Defendant Officers because the Officers are immune under Indiana Code § 34-13-3-5(b). *See* ECF No. 55 at 7. As the Court stated in that opinion, however, even though the Defendant Officers are immune from suit, the Plaintiff may proceed on a respondeat superior theory against Defendant City of Gary. *Id.*; *see also Lessley v. City of Madison*, 654 F. Supp. 2d 877, 902 (S.D. Ind. 2009) ("Plaintiffs cannot sue Royce personally for state torts, but they may be able to hold the City of Madison liable for any state torts that Royce committed."); *Laffoon v. City of Portage*, No. 2:09-CV-13, 2011 WL 2293331, at *10 (N.D. Ind. June 8, 2011) ("Thus, because it is undisputed that Officer Peele was acting within the scope of his employment, the City of Portage is the sole defendant on the state law claim under respondeat superior."); *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006) (recognizing that the officers were

immune under the Indiana Code § 34-13-3-5(b) but that the plaintiff "may still pursue his state tort claims against the City of Indianapolis stemming from the defendants' alleged use of excessive force in apprehending and arresting him"); *Bowens v. City of Indianapolis*, No. 1:13-CV-72, 2014 WL 4680662, at *5 (S.D. Ind. Sept. 19, 2014) (recognizing the officer's immunity from suit but allowing the plaintiff to proceed against the city under a respondeat superior theory). Defendant City of Gary is therefore not entitled to summary judgment on Counts VI, VII, and VIII based on its argument that the Plaintiff may not proceed on a theory of respondeat superior.

The Defendant City of Gary also argues that it may not be held liable for the acts or omissions of third parties, such as the prosecutor in the Plaintiff's 1992 criminal trial and the eyewitnesses who identified the Plaintiff. As explained above, the Plaintiff has presented evidence that Defendants Outlaw and Jelks, the GPD officers who investigated the crimes in question pursuant to GPD policies and practices, failed to report the Plaintiff's alibi for the Williams sighting and inflated the eyewitnesses' confidence in their identifications by conducting unduly suggestive identification procedures and suggesting to Williams that "this was the right guy." The Plaintiff's claims, therefore, are based not on the actions or inaction of third parties, but on the actions of the Defendant City of Gary and the Defendant Officers. *See Witco Corp. v. City of Indianapolis*, 762 F. Supp. 834, 838 (S.D. Ind. 1991) ("Where the government's conduct creates the conditions that foreseeably lead to a loss, so as to be a proximate cause of that loss, the government is not immune under the acts-of-others exception to liability." (citing *Maroon v. State Dep't of Mental Health*, 411 N.E.2d 404, 417 (Ind. Ct. App. 1980)).

2.    *Indemnification*

The Plaintiff's final claim is a state law claim for indemnification, alleging that Indiana law requires public entities to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. Defendant City of Gary argues this claim is premature because a duty to indemnify is not ripe until liability has been established. In response, the Plaintiff concedes that no judgment has yet triggered a duty to indemnify but argues there is no basis for summary judgment on a claim that cannot yet be adjudicated. As recognized by Defendant City of Gary in its brief and reply, "decisions about indemnity should be postponed until the underlying liability has been established." *Lear Corp v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003). Underlying liability has not been established or disproved, so the Court denies summary judgment on Count IX, the Plaintiff's claim for indemnification.

**C.    Collateral Estoppel**

The Defendant City of Gary argues that the Plaintiff may not relitigate the issue of Williams' sighting of the perpetrator outside of her home (the Williams sighting). "Issue preclusion, or collateral estoppel, bars subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former lawsuit and that same fact or issue is presented in a subsequent suit." *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012). Collateral estoppel "applies to § 1983 plaintiffs who attempt to relitigate issues adjudicated in state court." *Jones v. York*, 34 F.4th 550, 560 (7th Cir. 2022). However, "[a] vacated judgment is not a permissible basis for collateral estoppel." *Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005).

In a June 12, 1998 opinion affirming the denial of the Plaintiff's petition for postconviction relief, the Indiana Court of Appeals considered whether the Defendant Officers' failure to disclose their investigation into the Plaintiff's whereabouts at the time of Williams' sighting violated the Plaintiff's due process rights, the same question raised by the Plaintiff's instant complaint. *See* Def. Ex. 5 at 6–8. That decision nonetheless does not have preclusive effect on the Plaintiff's claim because the Lake County Superior Court vacated the underlying conviction on January 25, 2016. *See* Def. Ex. 15 at 4; *see also Korczak*, 427 F.3d at 422; *Jones*, 34 F.4th at 560 (declining to give a prior, vacated ruling on exculpatory evidence preclusive effect because "[a]dhering to a vacated judgment would circumvent collateral estoppel's finality element by giving force to a void ruling"). Further, the issue in both the 1998 and 2016 decisions was whether the Defendant Officers' failure to disclose entitled the Plaintiff to a new criminal trial, not whether the Defendant Officers were civilly liable to the Plaintiff for their failure to disclose. *See Glenn v. City of Hammond*, No. 2:18-CV-150, 2021 WL 4078063, at *8 (Sept. 7, 2021) ("Indiana issue preclusion requires . . . identity of the issues." (citing *Nat'l Wine & Spirits, Inc.*, 976 N.E.2d at 704)). Accordingly, the Plaintiff's litigation of the issues regarding the Williams sighting is not precluded under collateral estoppel.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant Bruce Outlaw's Motion for Partial Summary Judgment [ECF No. 295] and Motion for Summary Judgment as to Counts I and III of Plaintiff's Complaint [ECF No. 298], Defendant's, City of Gary, Motion for Summary Judgment [ECF No. 296], and Defendant's, Carla K. Pyle as Special Administrator of the Estate of John E. Jelks, Jr. Motion to Join City of Gary's and Bruce Outlaw's Motions for

Summary Judgment [ECF No. 303]. This matter will be set for a scheduling conference by separate order.

SO ORDERED on March 3, 2022.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT