## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-CV-00032-TLS |
| | ) | |
| BRUCE OUTLAW, et al., | ) | Hon. Theresa L. Springmann |
| | ) | District Judge |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S DESIGNATION OF EVIDENCE
## IN OPPOSITION TO SUMMARY JUDGMENT

Plaintiff respectfully submits the following designation of evidence for exhibits referenced in Plaintiff's Responses to Defendants' Statements of Material Facts, and in Plaintiff's Statement of Additional Material Facts:

Ex. 1—Willie T. Donald Deposition Transcript

Ex. 2—Post-Tribune Article

Ex. 3—Wade Letter

Ex. 4—Bruce Outlaw Deposition Transcript

Ex. 5—Record of Proceedings Vol. III

Ex. 6—Record of Proceedings Vol. I

Ex. 7—Rhonda Williams Offense Report

Ex. 8—Rhonda Williams Deposition Transcript

Ex. 9—Kim Belinsky Statement

Ex. 10—Kim Belinsky Deposition Transcript

Ex. 11—Record of Proceedings Vol. II

Ex. 12—Bernard Jimenez Death Report

Ex. 13—1993 Post-Conviction Hearing Transcript

Ex. 14—Mary Banks Deposition Transcript

Ex. 15—David Wade Deposition Transcript

Ex. 16—Clarence Hightower Deposition Transcript Vol. I

Ex. 17—Search Warrant and Affidavit

Ex. 18—Donald 1989 Booking Photo

Ex. 19—Photo Array

Ex. 20—Rhonda Williams Photobook Identification Form

Ex. 21—Kim Belinsky Photobook Identification Form

Ex. 22—Sharon Cummings Affidavit

Ex. 23—Bench Warrant

Ex. 24—Scott King Deposition Transcript Vol. II

Ex. 25—Physical Line-Up Form

Ex. 26—Carolyn Beeler Affidavit

Ex. 27—2014 Post-Conviction Hearing Transcript

Ex. 28—Goldblatt's Timecards

Ex. 29—City of Gary Responses to Requests for Admission

Ex. 30—Outlaw Responses to Requests for Admission

Ex. 31—Rhonda Williams Statement

Ex. 32—Record of Proceedings Vol. VI

Ex. 33—Scott King Deposition Transcript Vol. I

Ex. 34—Record of Proceedings Vol. IV

Ex. 35—Order vacating Plaintiff's convictions

Ex. 36—Mitchell Memo

Ex. 37—Williams Criminal Deposition Transcript

Ex. 38—Order dismissing charges

Ex. 39—Bruce Outlaw Supplemental Responses to Interrogatories

Ex. 40—GPD Manual of Procedures

Ex. 41—IACP Review of GPD

Ex. 42—Brian Evans (30(b)(6)) Deposition Transcript

Ex. 43—Toni Dudley Deposition Transcript

Ex. 44—Clarence Hightower Deposition Transcript Vol. II

Ex. 45—FBI File on GPD

Ex. 46—Jelks Complaint

Ex. 47—Fazekas GCSC file

Ex. 48—Papadakis GCSC file

Ex. 49—Escalante GCSC file

Ex. 50—Duncan GCSC file

Ex. 51—Bell GCSC file

Ex. 52—Gault GCSC file

Ex. 53—Gordon GCSC file

Ex. 54—McKinney GCSC file

Ex. 55—Wilson GCSC file

Ex. 56—Branson GCSC file

Ex. 57—Franklin GCSC file

Ex. 58—ISP Technical Assessment

Ex. 59—Sonya Thomas Deposition Transcript

Ex. 60—Williams Affidavit

Ex. 61—Jimenez Death Report

Ex. 62—Jimenez Offense Report

Ex. 63—Arrest Report

RESPECTFULLY SUBMITTED,

/s/ Sam Heppell
Attorney for Plaintiff

Sam Heppell
Jon Loevy
Loevy & Loevy
311 N. Aberdeen St. 3rd Floor
Chicago, IL 60607
(312) 243-5900
Sam@loevy.com
Jon@loevy.com

## **CERTIFICATE OF SERVICE**

I, Sam Heppell, an attorney, certify that on October 19, 2022 I filed a true, correct and complete copy of the foregoing via the Court's CM/ECF system thereby serving a copy on all counsel of record.

/s/ Sam Heppell
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 32

## Plaintiff's Summary Judgment Response

# IN THE
## INDIANA COURT OF APPEALS
### CAUSE NO. _____

45A039705CR00179

| | |
|---|---|
| **WILLIE T. DONALD,** ) | Appeal from the Superior |
| Appellant (Defendant Below) ) | Court of Lake County |
| ) | |
| **V.** ) | **#45G01-9203-CF-00065** |
| ) | |
| **STATE OF INDIANA,** ) | The Honorable |
| Appellee (Plaintiff Below) ) | Richard Maroc, Judge |

## RECORD OF PROCEEDINGS

| | |
|---|---|
| CHARLES E. STEWART, JR.  473-45 ) | JEFF MODISETT |
| LAKE SUPERIOR COURT ) | STATE OF INDIANA |
| APPELLATE PUBLIC DEFENDER ) | ATTORNEY GENERAL |
| 2293 NORTH MAIN STREET ) | 219 STATE HOUSE |
| CROWN POINT, IN   46307 ) | INDIANAPOLIS, IN   46204 |
| TEL:  (219) 755-3500 ) | TEL:  (317) 232-6249 |
| ATTORNEY FOR APPELLANT ) | ATTORNEY FOR APPELLEE |

### VOL. VI OF VII
### PAGES 1251 - 1500

VANES 001259

```
 1    Q    Did you ever go down to the station and give a
 2         statement to the effect of this conversation?
 3    A       No.
 4    Q    Did anyone ever tell you that you shouldn't or
 5         that you couldn't?
 6    A       No.
 7    Q    And isn't it true that the first time you told
 8         Detective Outlaw -- strike that, please.  When
 9         was the first time you told Detective Outlaw
10         about this car dealership business?
11    A       On the 4th.
12    Q    On the 4th?
13    A       When he came with the search warrant.
14    Q    After you had met with your brother's defense
15         attorney, correct?
16    A       Yes.
17    Q    And after you and other family members had
18         been in that house for seventeen hours after
19         the arrest of your brother prior to the
20         execution of the search warrant, correct?
21    A       Correct.
22    Q    The week of February 27th, how many times were
23         you out shopping for vehicles that week alone?
24    A       Twice.
25
```

720

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

1251

VANES 001260

```
 1    BY MR. BENSON:
 2             Thank you very much.
 3                    REDIRECT EXAMINATION
 4                          BY
 5                       MR. KING
 6    Q    When you were in my office with other family
 7         members and telling me about your brother
 8         being arrested, did I at any point pull out a
 9         bag or some kind of device and say let's use
10         the old car-buying alibi?
11    BY MR. BENSON:
12                    I'd object, Judge.  Could we
13                    approach, please?
14    BY THE COURT:
15         Well, you can't do that or you're getting
16         into Mr. King being a witness in the case.
17    BY MS. LAKE:
18             It's also a leading question, Judge.
19    BY THE COURT:
20             And I would sustain the objection.
21    BY MR. KING:
22             No, no, the prosecution did that and I'm
23         going to present the entire set of facts.
24    BY MR. BENSON:
25             I would object and ask to approach, Judge.
```



721

VANES 001261

1    BY THE COURT:

2          I don't think we need to.

3    BY MR. BENSON:

4          I'd ask Mr. King to approach the bench,

5    please.

6    BY THE COURT:

7          All right; all right; all right.

8

9          WHEREUPON THE FOLLOWING DISCUSSION WAS

10   HELD AT THE BENCH OUTSIDE OF THE HEARING OF

11   THE JURY:

12

13   BY THE COURT:

14         What door do you think has been opened

15   here?

16   BY MR. KING:

17         You came up with this "seventeen hours

18   after you had been to the defense attorney,"

19   now, I am entitled to ask this woman if in any

20   way, shape or form the testimony she has given

21   has been manufactured.  That's the clear

22   import of what the prosecutor for whatever

23   reason is trying to come up with, and I'm

24   entitled to --

25   BY THE COURT:

                              722

VANES 001262

```
 1              If it is, I missed it.  But we can't get
 2         into specifics of conversations you may have
 3         had with the --
 4    BY MR. KING:
 5              Then he shouldn't go into these areas.  He
 6         should think.
 7    BY THE COURT:
 8              But he did it without attributing any
 9         statements to you.  Can't you just ask her in
10         general whether she received any motivation to
11         do anything from the visit to your office, vis
12         a vis this alibi?
13    BY MR. KING:
14              All right, let me rephrase it.
15    BY MR. BENSON:
16              Judge, the defense is calling for an
17         answer based on --
18    BY THE COURT:
19              He's asking her, "Did you get any
20         information?"
21    BY MS. LAKE:
22              He's going to be making himself a witness
23         in this case when he starts asking about the
24         conversations.
25    BY THE COURT:
```

723

1254

VANES 001263

```
 1              Well, I thought we were going to avoid
 2         conversations; that's what I just said.
 3    BY MR. BENSON:
 4              Well, he just asked if she received any
 5         information; that calls directly for the
 6         essence of the conversation.
 7    BY MR. KING:
 8              Then he shouldn't have gone into the area.
 9    BY MR. BENSON:
10              When he talked about coming to the office
11         on direct examination, he started that.
12    BY THE COURT:
13              And then you talked about her being in the
14         office.
15    BY MR. BENSON:
16              That's because he opened the door; I never
17         could have got into it.
18    BY THE COURT:
19              Who gets the last word then is the
20         question.
21    BY MR. KING:
22              By the way, let's have one lawyer for the
23         State in the future here per witness on
24         objections and such.
25    BY MR. BENSON:
```

                                724

                        1255

VANES 001264

```
1              You can't let him talk about a
2       conversation he had.  I never talked about a
3       conversation, I never referred to any
4       statements that Attorney King said do this or
5       do that.
6   BY THE COURT:
7              What you have got a right to get into here
8       is her motivation, this witness's motivation
9       and the fact of whether or not this alibi that
10      you point out she didn't think of to tell
11      Outlaw was derived from some external source,
12      that somebody put the idea in her mind.
13  BY MR. BENSON:
14             I'm not saying Attorney King told her to
15      make this up at all.
16  BY THE COURT:
17             Well, then if you permit him to disclaim
18      her, it shouldn't be changing anything then.
19  BY MR. BENSON:
20             Well, as to the conversation, our
21      objection is on the record.
22  BY MR. KING:
23             Then we'll stipulate to that right here
24      that the State is not making any contention
25      that counsel for the defense suggested the
```

725

1256

VANES 001265

```
1        alibi or put this witness up to the alibi.

2        Make that stipulation right now and have the

3        Court read it to the jury.

4   BY MR. BENSON:

5        I'm not going to stipulate to that.  I

6        don't know what she inferred from your

7        conversations, but you cannot inject yourself

8        as a witness and you did that by bringing up

9        the content.

10  BY THE COURT:

11       I'm telling him to do it without him

12       injecting himself as a witness in the case.

13  BY MR. KING:

14       Fine.

15

16       WHEREUPON THE FOLLOWING PROCEEDINGS WERE

17  ONCE AGAIN HELD IN THE HEARING OF THE JURY:

18

19  BY MR. KING:

20  Q    The prosecutor asked you about your and your

21       family's visit to my office on the morning of

22       March the 4th seeking legal help for your

23       brother.  Do you recall that question?

24  A         Yes.

25  Q    Now, at any point in that meeting, did I or
```

726

VANES 001266

```
 1          any other person by any description whatsoever
 2          tell you what you were doing on February 27th,
 3          1992?
 4   A      No.
 5   Q      Was there a discussion about what you were
 6          doing on February 27th, 1992?
 7   A          No, only we talked about fees and
 8              different kinds of --
 9   BY THE COURT:
10              Well, if the answer is no, let's just cut
11          it off at that point.
12   BY THE WITNESS:
13              Okay.
14   BY MR. KING:
15   Q      So has anyone suggested to you to come up with
16          some false story about car shopping on
17          February 27th?
18   A          No.
19   Q      Now, the prosecutor asked you about not
20          telling Detective Outlaw the night of the 3rd
21          when you're down there, having learned your
22          brother had been arrested, about where you
23          were on February 27th, and you have indicated
24          you didn't tell him until March 4th, 1992.  Do
25          you recall that?
```

727

1258

VANES 001267

```
 1    A        Yes.

 2    Q    Do you recall him asking you, "Didn't you

 3         think it would help your brother to tell the

 4         police on March 3rd, 1992 where you and Timmy

 5         and your fiance had been?"  Do you recall that

 6         question to you?

 7    A        Yes.

 8    Q    When you did tell the police on March 4th,

 9         1992 when they were searching your home, has

10         it done your brother, Timmy, one lick of good?

11    BY MR. BENSON:

12                    Objection, Your Honor.  That's

13                    calling for a conclusion on this

14                    witness's part.

15    BY MR. KING:

16         One she's more than capable of making.

17    BY THE COURT:

18         Well, as to whether or not it has done him

19         any good, I would sustain the objection.

20         We're still in trial here on the issues.

21    BY MR. KING:

22    Q    To your knowledge, have the police ever, ever

23         done anything to verify and check out what you

24         told them on March 4th, 1992, to your

25         knowledge?
```

728

1259

VANES 001268

```
1      A        No.

2      Q    Now, when you did tell Detective Outlaw on

3           March 4th, 1992, the very day after your

4           brother had been arrested, what you and he and

5           your fiance were doing on the previous

6           Thursday, were you sure of your recollection--

7      BY MR. BENSON:

8                     Objection.  Leading.  Move to

9                     strike.

10     BY THE COURT:

11                    Overruled.  You may answer that.

12     BY THE WITNESS:

13     A        Yes, I was sure.

14     BY MR. KING:

15     Q    Were you confident when you told him on March

16          4th that if they go and check it out, you

17          would be proven right?

18     A        Yes.

19     Q    Would you try and do anything to hurt your

20          brother.

21     BY MR. BENSON:

22                    Objection, Your Honor.  Self-

23                    serving statement by this

24                    witness.

25     BY MR. KING:
```

729

1269

```
 1                    I don't know that that's a legal basis.
 2      BY THE COURT:
 3                    "Would you do anything to try to hurt your
 4              brother?"
 5      BY MR. KING:
 6                    Yes.
 7      BY THE COURT:
 8                    You may ask that.
 9      BY MR. KING:
10      Q    Would you do anything to hurt your brother?
11      A         No.  I felt telling the truth would help
12              him more.
13      Q    From your point of view and your frame of mind
14              when you're talking to Detective Outlaw on
15              March 4th, would telling him that you were car
16              shopping when he was accused of committing
17              these acts and it later be found out that that
18              wasn't so, would that hurt your brother if the
19              police were to have gone out on March 4th and
20              gone to these car dealers and found out that
21              this never happened, this car trip never
22              happened?  Would that hurt your brother?
23      BY MR. BENSON:
24                    Objection, Judge, it's a compound
25                    question and it's speculation on
```

730

1261

VANES 001270

```
 1                          this witness's part.
 2      BY THE COURT:
 3              I would sustain it as hypothetical as
 4          well.
 5      BY MR. KING:
 6      Q   On March 4th, 1992, did you tell Detective
 7          Outlaw what you told this jury here today?
 8      BY MR. BENSON:
 9                      Objection.  Asked and answered.
10      BY MR. KING:
11              Well, we're on redirect.  The prosecution
12          went into it on cross-exam.
13      BY THE COURT:
14              One more time; you may ask.
15      BY MR. KING:
16      Q   Did you tell Detective Outlaw on March 4th,
17          1992 what you told this jury here today?
18      A       Yes.
19      Q   Now, the prosecutor asked questions about in
20          the seventeen-hour period between Timmy's
21          arrest and the search of the house, about who
22          was home, what people were doing.  Do you
23          recall that question?
24      A       Yes.
25      Q   And you were indicating for his benefit that
```

731

1262

VANES 001271

```
1            in addition to your sisters and in addition to
2            your fiance and, of course, yourself, two
3            nephews were in the house, is that correct?
4    A       Yes.
5    Q    How old are your nephews?
6    A       One is four and one is ten.
7    Q    Now, from the time you left that police
8            station on March 3rd, 1992, and after your two
9            discussions with Outlaw, up to and including
10           the time they came and served the search
11           warrant -- and I'm including in there your
12           visit to my office -- did you have any hint
13           from anybody as to what might have been taken
14           in the robbery your brother was accused of?
15   A       No.
16   Q    Did you have any hint from anybody what
17           clothing --
18   BY MR. BENSON:
19                   Objection. Leading.
20   BY THE COURT:
21           I'm not seeing it as leading at this
22           point.  You may finish.
23   BY MR. KING:
24   Q    Did you hear any clue from anybody as to what
25           clothing the perpetrator of these crimes was
```

732

VANES 001272

```
 1          supposed to have been wearing?

 2     A         No.

 3     Q    Did you have any clue from anybody about any

 4          type of weapon, specific type of gun had been

 5          used?

 6     A         No.

 7     Q    Would you have had any basis whatsoever to

 8          know what the police might come and be looking

 9          for when they served the warrant?

10     A         No.

11     BY MR. BENSON:

12                    Objection, Judge.  Move to

13                    strike.

14     BY THE COURT:

15          Overruled.

16     BY MR. KING:

17     Q    Now, you have shared with us from December

18          through February Willie's girlfriend, Chandra

19          -- well, he had a girlfriend, in fact,

20          correct?

21     A         Yes.

22     Q    And you said her nickname is Speedy, correct?

23     A         Yes.

24     Q    If you know, why is she nicknamed Speedy?

25     A         She's a track star.
```

733

1264

VANES 001273

1    Q    To your knowledge, even today, are they still
2         boyfriend and girlfriend?
3    A         Yes.
4    BY MR. KING:
5              That's all I have.  Thank you.
6                    RECROSS-EXAMINATION
7                         BY
8                    MR. BENSON
9    Q    Now, you testified on direct that you had no
10        discussion about the incidents on February
11        27th when you went and talked to Attorney
12        King, is that correct?
13   A         I just discussed about my brother being
14             accused of something he didn't do.
15   Q    Well, when you were asked the question, you
16        said, "All we talked about was the fees."
17        Now, is that not an accurate answer?
18   BY THE COURT:
19             I believe I cut the answer off at that
20        point because I wanted her simply to respond
21        to the particular question she was asked about
22        whether or not anything was suggested.  The
23        witness was about to go on, but I cut her off.
24   BY MR. BENSON:
25   Q    It's your testimony then that you did talk

                         734

                        1265

```
 1            about other things?
 2     A         Yes.
 3     Q    Now, defense counsel asked you the question
 4          that you're not aware of anything the Gary
 5          Police Department did to try and verify the
 6          alibi of your brother, correct?
 7     A         Correct.
 8     Q    And you felt that telling them would have done
 9          no good, correct?
10     A         Correct.
11     Q    And you feel to this day nobody has done
12          anything to verify that alibi to your brother?
13     A         Correct.
14     Q    Are you aware that this man sitting right here
15          (indicating), Ron Fleming, went out and showed
16          your brother's picture to all these car
17          salesmen?  Are you aware of that?
18     A         Yes.
19     Q    Then why are you saying that you feel no one
20          has done anything to try and investigate the
21          information you gave the Gary Police
22          Department?
23     A         I said it because Outlaw was the
24               investigator.
25     Q    Pardon?
```

735

1266

VANES 001275

```
 1    A        Outlaw was investigating the case; he
 2             didn't do anything.
 3    Q   No, but, ma'am, I just asked you a second ago
 4        that you feel that no one has done anything to
 5        investigate this case.
 6    A        As far as the investigation is Outlaw and
 7             the Gary police; I wasn't talking about
 8             this investigator.
 9    Q   So you're not aware that this individual right
10        here (indicating) went out and showed your
11        brother's picture to those car dealers that
12        you gave -- those names you gave to Bruce
13        Outlaw?
14    A        I'm aware an investigator went out, yes.
15    Q   Are you aware an investigator from the
16        prosecutorial side of this case went out, not
17        from the defense side?
18    A        No, I -- I'm not sure who went out; I just
19             know someone went out.
20    Q   Well, then, ma'am, if you don't know who's
21        doing what, how can you sit up there and make
22        a blanket statement that you don't feel anyone
23        has investigated the allegations of an alibi
24        that you made?  What do you possibly base that
25        on?
```

736

VANES 001276

1    A        Because I felt it would have -- I told him
2             that right then and there; there should
3             have been some kind of results what I told
4             him.
5    Q    Ma'am, you testified on redirect that as of
6         right this moment, you don't feel anyone has
7         done anything to attempt to verify your story,
8         isn't that what you said?
9    BY MR. KING:
10                    I'm going to object.  Counsel is
11                    misrepresenting; that was in
12                    response to a question he just
13                    posed on recross.  That is not
14                    what was said on redirect.
15   BY THE COURT:
16            Yes, recross.
17   BY MR. BENSON:
18            I believe I was reiterating what was said
19        on redirect, Your Honor.
20   BY THE COURT:
21            I think he was referring to the Gary
22        police in his questioning, but on recross you
23        said "anyone."
24   BY MR. BENSON:
25   Q    So as of this moment, you feel no one has done

737

1268

VANES 001277

```
 1          anything to attempt to verify the alibi of
 2          your brother, is that correct?
 3     A        As far as the Gary police.
 4     Q    So you're unaware of anything else that has
 5          been done to attempt to verify the facts which
 6          you gave to Detective Outlaw?
 7     A        I know one other investigator; I was told
 8             an investigator has been out there.
 9     Q    But you don't know whether that was an
10          investigator from Scott King's office or this
11          gentleman sitting right here at the
12          prosecutor's table?
13     A        From Scott King' office.
14     Q    And you're unaware whether or not this man
15          right here (indicating), Ron Fleming, ever
16          went out and talked to the car dealership?
17     A        No, I'm not.
18     Q    And that would be new knowledge to you if I
19          told you that that man did go out and show
20          your brother's pictures to those car dealers?
21     A        Correct.
22     Q    And you testified that you met with Attorney
23          King.  What day was that on?
24     A        On the 4th.
25     Q    The 4th of March, right?
```

738

1269

VANES 001278

```
 1   ║   A      Yes.
 2   ║   Q   And that you knew nothing about these
 3   ║       incidents, correct, these robberies which had
 4   ║       occurred on February 27th of which your
 5   ║       brother was accused?
 6   ║   A      No.
 7   ║   Q   Isn't it true that an article was published in
 8   ║       the Post Tribune on February 29th before you
 9   ║       met with him?
10   ║   A      Yes.
11   ║   Q   Isn't it true, ma'am, that you were car
12   ║       shopping an awful lot that month and you are
13   ║       mistaken as to what day you went --
14   ║   A      No.
15   ║   Q   Are you going to answer already or are you
16   ║       going to let me finish the question?
17   ║   A      I'm sorry.
18   ║   Q   -- as to what day you went to the car
19   ║       dealerships?
20   ║   A      No, I'm not mistaken.
21   ║   Q   You're not at all?
22   ║   A      No.
23   ║   Q   At a prior hearing, you testified that you
24   ║       were shopping "constantly," that is your word,
25   ║       and yet you're telling the ladies and
```

739

1270

VANES 001279

```
 1              gentlemen of the jury that you can still
 2              distinguish that day from any other day?
 3      A         Yes.
 4      BY MR. BENSON:
 5              Nothing further.  Thank you very much.
 6                   RE REDIRECT EXAMINATION
 7                          BY
 8                       MR. KING
 9      Q    The prosecutor is representing to you about
10           their investigator going out and checking this
11           out.  Have you been informed the first time
12           they did that was approximately two weeks ago?
13      BY MR. BENSON:
14                   Objection.  Relevancy, Judge.
15      BY THE COURT:
16           Well, I think the State did raise this
17           issue.
18      BY MR. KING:
                   Yes, they did, Your Honor, and I'm just
             trying to complete some factors relevant to
21           it.
22      Q    Were you told that that was the first time,
23           two weeks ago?
24      A         Yes.
25      Q    And do you recall that you personally, under
```

                               740

VANES 001280

1    oath, the same oath you took today, told that
2    man there (indicating) what you're telling the
3    jury here today April 6th, 1992?  Do you
4    remember telling him that in that previous
5    hearing?
6    A        Yes.
7    BY MR. KING:
8             That's all I have.
9    BY MR. BENSON:
10            No recross, Your Honor.
11   BY THE COURT:
12            You may step down, ma'am.  I think you may
13       remain in court unless there's a
14       representation she would be recalled.
15   BY MR. BENSON:
16            Yes, Your Honor, the State may.
     BY THE COURT:
             Until we have time to talk about that,
         please remain outside the courtroom.
     BY MR. KING:
21            Mr. Hopkins, Dan Hopkins.
22                 DAN HOPKINS,
23       having been first duly sworn upon his oath,
24       testifies as follows:
25

Filed in Clerk's Office

741          MAY 23 1997

1272         Anna M. Anton
             CLERK LAKE SUPERIOR COURT

VANES 001281

```
 1                        DIRECT EXAMINATION
 2                              BY
 3                           MR. KING
 4     BY MR. KING:
 5     Q    Would you state your name and spell your last
 6          name for the court reporter, please?
 7     A         Dan B. Hopkins, H-o-p-k-i-n-s.
 8     Q    Mr. Hopkins, how old are you, sir?
 9     A         Thirty-one.
10     Q    Where do you live, sir?
11     A         3866 Connecticut Street.
12     Q    And how long have you been living at that
13          address?
14     A         Approximately three years.
15     Q    And with whom do you live at that address?
       A         Well, my fiance, which name is Sheila
                 Donald, and her two sister and her brother
                 and her sister' two kids.
       Q    And by brother, do you recognize the person
            over here at this table?
21     A         Willie Donald, which I call Timmy, yes, I
22               do.
23     Q    And how long have you lived there?
24     A         Three years.
25     Q    Are you employed?
```

742

VANES 001282

```
1    A        Yes, sir, I am.
2    Q   Where do you work at?
3    A        I work at Phar-Mor, which is located on
4             Halstead, Homewood, Illinois.
5    Q   And how long have you worked for Phar-Mor?
6    A        Approximately three years.
7    Q   What's your job description there at the Phar-
8    Mor Drug Store?
9    A        I'm assistant store manager, which mean I
10            take care of the entire store.
11   Q   And how long have you had that position with
12   Phar-Mor
13   A        Originally, I started out as a warehouse
14            manager; I was a warehouse manager for two
15            months, so it would be close to two years
16            -- almost three years in that position.
17   Q    Now, did there come a time in early March of
18   1992 when you learned that Sheila's brother,
19   Timmy, had been arrested by officers of the
20   Gary Police Department?
21   A        Yes.
22   Q   And did there come a time when you learned
23   what day he was accused of having committed
24   the crimes?
25   A        It was on the 3rd.
```

743

VANES 001283

```
1    Q   The 3rd is what, the day he was arrested?
2    A       I learned on the 3rd, the day he was
3            arrested, yes.
4    Q   And did there come a time when you learned
5        that the accusation was based on the acts of
6        the previous Thursday?
7    A       Yes, sir.
8    Q   Now, did you have occasion to recall what, if
9        anything, you were doing the Thursday before
10       March the 3rd?
11   A       Well, when they arrested Timmy, I was not
12           there; on my arrival home from work on
13           that evening, my fiance said, "I'm going
14           to the police station," I said, "Why?" she
15           said, "My brother had been arrested," and
16           I said, "Why?"  Her little sister then
17           said that they got him on a bench warrant,
             so I said, "Well, by the time you get
             there, he should be out."  She then called
             me back later on that night, and they
21           didn't get really no true feed back.  The
22           following day, there still wasn't any
23           charge, so they really didn't know
24           anything at this point.  So the following
25           day at about noon, I was preparing to get
```

744

1375

VANES 001284

```
 1                    dressed for work, and I believe Officer
 2                    Outlaw came to the house with a search
 3                    warrant, and he told me he had a search
 4                    warrant to search the house.  So I asked
 5                    to read the search warrant, which I did.
 6      Q    Let me interrupt for a moment.  I'm going to
 7           show you what's been admitted into evidence as
 8           Defendant's Exhibit 2.  Do you recognize that
 9           as the search warrant that you read when the
10           policemen came?
11      A         Yes.
12      Q    Now, did the policemen search the house?
13      A         Yes, sir.
14      Q    Did you observe anybody else or did you
15           yourself try and stop them from doing that?
16      A         No, I did not try to stop them.  I
17                    questioned them, but the fact was, "Why
18                    did he need to search a house for a man
19                    locked up just for a traffic ticket?" and
20                    after I read this as stated the date at
21                    the top, and whatever the problem was on
22                    the 27th, I recall on the 27th that Timmy
23                    was with me car shopping.  So once he told
24                    me the date, I said, "Proceed to search
25                    the house, because that day, whatever
```

745

VANES 001285

```
 1              happened at a certain time on here, it
 2              could not be.  He was with us."  So I
 3              proceeded to continue on to get dressed.
 4   Q    What do you remember about you and Timmy on
 5        the 27th?
 6   A         On the 27th, I arrived home at 4:30 that
 7              evening.  I had planned to take Sheila, my
 8              fiance, car shopping.  Sheila arrived home
 9              at about 5:30, she talked to her sister,
10              Sharon, in the bedroom, I came up front
11              and asked her was she ready to go.  So we
12              stayed in the house approximately about
13              fifteen minutes.  So a quarter till, we
14              head out the door; as we was going out the
15              door, Timmy was coming in the door.  He
16              asked his sister where was she going, and
17              she said car shopping; he asked could he
18              come along, she said, "Sure."
19   Q    Now, have you had occasion -- and we'll
20        continue in a minute -- but have you had
21        occasion prior to today to testify to these
22        facts by way of a deposition where you were
23        questioned by this gentleman here
24        (indicating)?
25   A         Yes, sir, I was.
```

746

1277

VANES 001286

| | | |
|---|---|---|
| 1 | Q | About how long ago was that? |
| 2 | A | Three days. |
| 3 | Q | Now, do you remember the name of the car |
| 4 | | dealership that and Timmy and his sister went |
| 5 | | to? |
| 6 | A | Yes, I do.  The first stop was at Paul |
| 7 | | Sur. |
| 8 | Q | Do you have any recollection, sir, as to what |
| 9 | | time you would have arrived over at Paul Sur |
| 10 | | Pontiac? |
| 11 | A | Yes,  I do.  I took Ridge Road to I65, I |
| 12 | | took I65 to 61st Avenue, I then took a |
| 13 | | left off 61st Avenue and arrived at Paul |
| 14 | | Sur, so it was like 6:15 at that time. |
| 15 | Q | And what did you guys do when you got there? |
| 16 | A | I parked the car, Sheila and Timmy |
| 17 | | proceeded to go to the show room.  I |
| 18 | | noticed they had a hot rod in the used |
| 19 | | parking lot, so I took a quick peek at |
| 20 | | that and I rejoined them in the show room. |
| 21 | Q | What sort of -- what was prompting the car |
| 22 | | shopping?  Who wanted a car? |
| 23 | A | We were shopping for Sheila. |
| 24 | Q | Did you have occasion to talk to any car |
| 25 | | salesmen there? |

747

VANES 001287

```
 1    A        Well, first we got there, it was really
 2             busy at the time, so we got a chance to
 3             tour the whole show room, meaning that we
 4             got a chance to look at all the show room
 5             cars that was there and got to look
 6             inside.  And we was arrived back to the
 7             doorway -- they had a chart posted on the
 8             wall saying about an auto show you can
 9             enter, an auto show, free ticket, so I was
10             reading over that.  At this time a
11             salesman approached us and asked us if he
12             could do us any service.
13    Q   What do you remember about this salesman in
14        terms of description?
15    A        The salesman, he was Caucasian,
16             approximately five ten to five eleven, he
17             wore glasses, mustache, his hair was -- he
18             got kind of like a bald spot here
19             (indicating), kind of gray, and he combed
20             it to the back.
21    Q   Now, was there any particular model or make of
22        car to your knowledge that Sheila was
23        interested in looking at and finding out
24        about?
25    A        Yes, it was a Grand Am and Grand Prix she
```

748

VANES 001288

```
 1              heard about on the commercial, so we want
 2              to go to the Pontiac place because they
 3              sell the Grand Am and the Grand Prix.
 4    Q    Did you get some pricing information from the
 5         salesman?
 6    A         As he came up and approached, he asked how
 7              could he serve us.  We told him we was
 8              interested in the Grand Prix and the Grand
 9              Am, and he told us the special he had
10              running, and he talked about two point
11              nine (2.9) and four point nine (4.9) and
12              six point nine (6.9) and eight point nine
13              (8.9).
14    Q    Now, who was present during this conversation?
15    A         It was Timmy, Sheila and myself and the
16              car salesman.
17    Q    Now, did there come a time at Paul Sur Pontiac
18         where you had a conversation with anybody
           working there other than the salesman?
      A         Yes.  When we was done talking to the
21              salesman, the guy came out the auto shop.
22              I needed an engine for my car or it needed
23              to be rebuilt so I asked him how much to
24              rebuild my engine or how much it would
25              cost me for a new engine, and he gave me a
```

749

1280

VANES 001289

```
 1  ||            rough estimate of how much it would cost.
 2  || Q   Do you recall, first of all, what estimate he
 3  ||     gave you?
 4  || A        For a rebuild -- he said for that type of
 5  ||          motor, it would be best if you just bought
 6  ||          a new one, and he said about twenty-six
 7  ||          hundred would take care of it.
 8  || Q   Did he give you any other figures about the
 9  ||     engine?
10  || A        He did not.
11  || Q   Did he give you anything in writing about the
12  ||     engine?
13  || A        The salesman gave me a card with the six
14  ||          point nine (6.9); he wrote up a card
15  ||          stating the amount the car payment would
16  ||          be and the kind of sale that was running
17  ||          if we took a certain deal, so the car
    ||          salesman that was serving us, he did give
    ||          us a card.
    || Q   All right, did you get anything on the price
21  ||     of the engine for your car, if you can recall?
22  || A        No, sir, I didn't.
23  || Q   I'm going to hand you what's been marked for
24  ||     identification previously as Defendant's
25  ||     Exhibit Number 6.  Would you take just a
```

750

VANES 001290

```
 1           second and look at those three -- two cards
 2           and a little piece of paper on both sides?
 3           And I'm going to ask you then if your memory
 4           is refreshed as to whether you had any sort of
 5           written estimate on the engine?
 6    A       Okay.
 7    Q    Is your memory refreshed as to whether you
 8           were given anything in writing about the
 9           engine cost?
10    A       Twenty-six hundred, yes.
11    Q    These documents I've handed you, have you seen
12           them before, any of them?
13    A       Yes, sir.
14    Q    And when did you first see these?
15    A       I first saw those after leaving the car
16           lot, as we were leaving.
17    Q    On the night you told us about, are those the
18           papers you were given?
      A       Yes, sir.
      Q    Now, did there come a time when you left Paul
      Sur Pontiac and went somewhere else?
22    A       Yes.  After receiving the card from the
23           salesman, I felt that it wasn't the best
24           deal I can get, so I shook his hand and I
25           told him I'd shop around a bit, and if I
```

751

VANES 001291

```
 1                    don't find a better deal, I'll get back
 2                    with him.  We then proceed to leave,
 3                    Sheila, Timmy and myself, we got into the
 4                    car, took Broadway to US 30, US 30 to Main
 5                    Street and down to Bob Anderson.
 6      Q     And that's another Pontiac dealer?
 7      A          And that's another Pontiac dealer, yes,
 8                    sir.
 9      Q     Now, do you have any recall as you sit here
10            today as to approximately what time you
11            arrived at Bob Anderson Pontiac?
12      A          We get out the car, and because Sheila is
13                    a very slow shopper, so we looked around
14                    for a little while, and I asked about the
15                    time.  So she said it was like 8:00
16                    o'clock.
17      Q     Now, once you got to Bob Anderson, can you
18            tell us what you recall happening there?
19      A          There was two Sunbird in the parking lot,
20                    both '92; we looked at the '92 Sunbird and
21                    one had a sun roof and one did not.  We
22                    then proceed to walk towards the door
23                    where there was a van sitting out.  We
24                    started looking at the van and walked
25                    around the van -- I thought it was a very
```

752

1283

VANES 001292

```
 1              nice van -- but Sheila really wanted a
 2              car, but I said a van would be more
 3              basically what we really needed because
 4              they have a large family.  But she really
 5              wanted a car, so I tried to persuade her
 6              into talking about the van, so it took me
 7              a little while at that, and at this point,
 8              a salesman came up.
 9      Q  Now, did there come a time when you and Sheila
10         and Timmy test drove any vehicle?
11      A      Yes.
12      Q  What vehicle was test driven?
13      A      We test drove the van and the '92 Sunbird.
14      Q  Which one did you test drive first, if you can
15         recall?
16      A      The van.
17      Q  And who did the driving?
18      A      Sheila.
19      Q  Who all went on the ride on the test drive?
20      A      Sheila, Timmy and myself.
21      Q  Now, after the test drive of the van, what
22         happened next?
23      A      After we test drove the van, came back to
24              the parking lot, parked the van on the
25              light, got a very good look at the van,
```

753

1284

VANES 001293

```
 1                    but yet still Sheila really didn't want
 2                    the van.  So then we asked the salesman --
 3                    we started to look at the Sunbird, we
 4                    asked could we test drive the Sunbird, the
 5                    one with the sun roof; he said, "Sure."
 6    Q    Did you do so?
 7    A        Yes, sir, we did.
 8    Q    And who all went on that test drive?
 9    A        Me, Sheila and Timmy.
10    Q    Who drove?
11    A        Sheila drove down to, I believe the street
12             is 93rd, went down about six blocks, and
13             then I drove it back.
14    Q    When you got back to the dealership, what is
15         the next thing you recall happening?
16    A        We went inside, the sales manager said did
17             we like the car, we said, "Yes."  I
18             started to talk to the salesman, Timmy and
19             Sheila started looking around the show
20             room.  So as I was talking to the salesman
21             about the van and about the Sunbird,
22             Sheila started questioning -- he walked
23             over, she still liked the Grand Am, and
24             she proceed to ask him about the Grand Am
25             and the Grand Prix.  And I told him we was
```

754

1285

VANES 001294

```
 1              at Paul Sur and I told him about the deal,
 2              and he also told about the special that he
 3              had on there, which basically was the same
 4              but he could work on the price.  So I sit
 5              down with him and I said, "If I could buy
 6              the car tonight, what kind of deal could
 7              you give us?"  He sat down and drew up a
 8              card to the amount the car would be if we
 9              took it tonight.
10    Q   What happened next after you go through this
11        pricing thing?
12    A       Well, we sit there, and my knowledge, it
13            was getting late, so Sheila was still
14            unsure, and I kind of like said, "Make
15            your mind up, they'll be closing," and the
16            salesman say, "No, you're inside the
17            place.  As long as you're here, we'll take
18            care of you," which he did.
19    Q   Do you have any recall of the time we're
20        talking about here after the test drives and
21        after you're talking pricing and what have
22        you?
23    A       I would say roughly maybe an hour and a
24            half.
25    Q   In terms of how long you had been there?
```

755

VANES 001295

```
 1  ║  A      Yeah.

 2  ║  Q   Now, how long after that did you leave Bob

 3  ║      Anderson?

 4  ║  A      After he writ (sic) up the car to us, we

 5  ║         basically proceed to walk out and then we

 6  ║         left.

 7  ║  Q   And where did you go from there?

 8  ║  A      I took Main Street back to US 30,  US 30

 9  ║         back to Broadway, down Broadway to 41st

10  ║         Avenue; at the E-Z Go gas station, I

11  ║         stopped and purchased some gas.

12  ║  Q   Where did you go from there?

13  ║  A      Home.

14  ║  Q   Now, when you got to the house, you're still

15  ║      with Timmy and your fiance?

16  ║  A      Timmy and Sheila, yes, sir.

17  ║  Q   And what do you all do when you get to the

18  ║      house?

19  ║  A      Well, I get to the house, began to unwind.

20  ║         I had to write the work schedule, so --

21  ║  Q   What do you mean the work schedule?  Real

22  ║      quick, what's that?

23  ║  A      It's my stockers' schedule that I had to

24  ║         write.

25  ║  Q   Your what schedule?
```

756

1287

VANES 001296

```
 1    A         Stockers, the employee, I call them
 2              stocker; so I had to write their schedule
 3              for work.
 4    Q    Who was going to work what day, what hours?
 5    A         Right, yes.
 6    Q    Now, in this period -- where are you doing
 7         that work at, the stocking schedule?
 8    A         I started to do the schedule in the
 9              bedroom and the phone rang.
10    Q    Now, where was Sheila at this time?
11    A         Sheila had turned in already.
12    Q    What about Timmy or Willie?
13    A         Timmy -- Willie, when we got home, he kind
14              of like really turn in; he said he was
15              very tired, he laid down.
16    Q    From the time you left the house to go car
17         shopping until the time you got back home from
18         car shopping, was Willie or Timmy ever away
19         from you, ever away from your presence?
20    A         No.
21    Q    Do you have any recall -- if you don't that's
22         fine -- but do you have any recall as to what
23         time you and Timmy and Sheila walked in the
24         door of your house getting back from car
25         shopping?
```

757

1288

VANES 001297

```
 1    A      I would have to say approximately either
 2           10:00 or just before 10:00, in that area.
 3    Q    Okay, why do you say that?
 4    A      Why do I say just before 10:00?
 5    Q    Yeah, I mean are you estimating the time, did
 6         you look at a watch?  How do you come up with
 7         the time?
 8    A      Well, I'm estimating the time I walked in;
 9           it was kind of late.  It was after 9:00;
10           it could have been before 10:00, it could
11           have been after 10:00 but no later than
12           that.
13    Q    And you had been living in this household for
14         how long a period of time as of March of 1992?
15    A      Approximately three years.
16    Q    When you do your stocking schedules, are those
17         times to a particular date?  You know what I
18         mean, do they have the dates on the schedule?
19    A      Yes.
20    Q    Is that something you do on a weekly basis?
21    A      Yes.
22    Q    Now, one last question:  On this car shopping
23         trip, are you sure it was Thursday, February
24         27th as opposed to some other Thursday?
25    A      Yes, sir, I do -- I'm sure.
```

758

1289

VANES 001298

1    BY MR. KING:

2            I'll pass the witness.

3                    CROSS-EXAMINATION

4                        BY

5                    MR. BENSON

6    Q    Now, you testified that when you came home

7         after going car shopping on the 27th that you

8         went to your bedroom to fill out the schedule

9         and Sheila turned in, correct?

10   A         Yes, sir.

11   Q    Now, were you in the same room with her as you

12        were doing the schedule or was she in a

13        different room?

14   A         Same.

15   Q    Same room.  When you were in that room, then

16        you heard the phone ring, correct?

17   A         The phone is in the bedroom also, yes.

18   Q    Correct me if I'm wrong, but you're in your
          bedroom and you're working on your schedule
          and Sheila is in bed trying to fall to sleep,
          right, and the phone is in there and it rings,

22        right?

23   A         Correct.

24   Q    And what do you do when you hear the phone

25        ring?

759

VANES 001299

```
 1    A      Answer it.
 2    Q   And who was the call for?
 3    A      Timmy.
 4    Q   And what did you do?
 5    A      Asked who was calling, first of all, and
 6           the person said, "Speedy."
 7    Q   And you know Speedy as who?
 8    A      Speedy.
 9    Q   In what relation to the defendant?
10    A      Someone he's dating.
11    Q   And what did you do?
12    A      I goes up front to Timmy, "You have a
13         phone call," he say, "Dan, I'm very tired.
14         I really don't feel like talking."  I goes
15         back to the phone, say, "Speedy, he turned
16         in."
17    Q   And the defendant never did talk to Speedy
18       that night, or did he?
19    A      Between the time I walked to the bedroom
20         and by the time I hung the phone up, I
21         didn't really -- when I said that, he
22         could have picked it up 'cause he knew it
23         was her, but to my recollection, I just
24         hung the phone up.  Whether he picked it
25         up or not, possibility.
```

760

1291

VANES 001300

```
 1      Q    Do you have another phone in the living room?
 2      A         Yes, sir.
 3      Q    And where is the bedroom in relation to the
 4           living room?
 5      A         My bedroom is in the back.
 6      Q    It's in the back?
 7      A         Yes.
 8      Q    So you can't see the living room, right --
 9      A         Right.
10      Q    -- from your bedroom?
11      A         Right.
12      Q    So if Sheila were to testify that she saw the
13           defendant talking on the phone, that would be
14           impossible, wouldn't it?
15      BY MR. KING:
16                         Objection.  Once again, that
17                         is argumentative, comparing
18                         testimony between witnesses.
19      BY THE COURT:
20              Sustained.
21      BY MR. BENSON:
22      Q    Based upon your observation, would she have
23           seen the defendant talk on the phone?
24      A         Based on my observation, it all depends on
25                what time he was talking.  Was it talking
```

761

VANES 001301

```
 1              about the time that I answered the phone
 2              or was it before I answered the phone?
 3              What time are we talking about, after the
 4              fact that I answered the phone or before?
 5       Q   Well, let's back up a second.  You were in the
 6           room with Sheila, correct?
 7       A     Yes.
 8       Q   The phone rings, you answer it, correct?
 9       A     Correct.
10       Q   You get up and you go to the defendant, right?
11       A     Correct.
12       Q   Sheila's still in the room, right?
13       A     Correct.
14       Q   You talk with the defendant and tell him who
15           it is and he says, "I don't want to talk,"
16           correct?
17       A     Correct.
18       Q   You come back to the room, right, the bedroom?
19       A     Uh-huh.
20       Q   Sheila was still in the room, right?
21       A     Correct.
22       Q   And you tell Speedy that, "He doesn't want to
23           talk to you.  He's sleeping"?
24       A     Correct.
25       Q   On that scenario, based upon what you
```

762

VANES 001302

```
 1          observed, how is it possible she could have
 2          seen the defendant talking on the phone?
 3     A       Right.
 4     Q   It would have been impossible, correct?
 5     A       At that time, yes.
 6     Q   Well, what other time are you talking about?
 7     A       She could have seen him after, she could
 8             have seen him before.
 9     Q   Well, weren't you in the bedroom with her?
10     A       Yes.
11     Q   So how could she have seen him?  You just said
12          you can't see from the bedroom to the living
13          room.
14     A       Okay, we have what we call a three-way
15             phone call, a hold call, so the phone that
16             rang -- let's say that I answer the phone
17             that rang -- if someone else is on the
                phone, I would not hear the phone.  Sheila
                could have went to the bathroom and saw
                him on the phone, but this phone call, she
21             did not see him on the phone, correct.
22     Q   Well, was there more than one phone call that
23          evening after 10:30?
24     A       Okay, I stated that I got a phone call,
25             meaning if someone is on the phone, you
```

763

1204

VANES 001303

1          cannot hear the phone ring, so possibly if

2          somebody called, someone else could answer

3          it because they were already on the phone

4          and I would not hear it ring.

5     Q    Now, was Speedy's call what you call a hold

6          call where you were talking already on the

7          phone?

8     A    Speedy's call was not a hold call.

9     Q    Okay, so Speedy calls, and you're in the

10         bedroom with your fiance, right?

11    A    Correct.

12    Q    And you cannot see the living room from your

13         bedroom, correct?

14    A    Correct.

15    Q    And you go into the living room and tell the

16         defendant that it's Speedy, he says, "I'm

17         sleepy; I don't want to talk," correct?

18    A    He said, "I'm tired; I'm trying to sleep,"

19         correct.

20    Q    And you come back into the bedroom and Sheila

21         is still in the bedroom, right?

22    A    Yes.

23    Q    Did she look like she had left?

24    A    No.

25    Q    Was she still under the blanket in Clerk's Office

764

MAY 23 1997

Anna N. Anton
CLERK LAKE SUPERIOR COURT

1205

VANES 001304

```
1    A        Just in the bedroom.

2    Q    I mean she wasn't up walking about the room,

3         correct?

4    A        Correct.

5    Q    And you tell Speedy, "He doesn't want to talk.

6         He's sleeping," and you hang up, right?

7    A        Correct.

8    Q    Did you ever see Sheila leave the room when

9         you were walking over to the defendant?

10   A        No.

11   Q    So from what you observed, it would be

12        impossible for her to observe the defendant

13        talking on the phone, correct?

14   A        Correct.

15   Q    Based upon what you saw, if she said she did

16        see the defendant talking on the phone that

17        evening, that would be inaccurate, wouldn't

18        it?

19   A        At the time, I said 10:00, probably 10:00

20             when I got home, if she's talking another

21             time, correct (sic).

22   Q    Well, did you hear the phone ring any other

23        time that night before you went to sleep?

24   A        No.

25   Q    So that had to be the only phone call, right?
```

765

VANES 001305

```
 1    A       Wrong.  I have a waiting-call system; if
 2            somebody has picked the phone up, if they
 3            call out, someone can call out, if the
 4            phone rang while you're on the phone, I
 5            cannot hear it.
 6    Q   Okay, well, let's back up then.  You were in
 7        the room making out your schedule, right?
 8    A       Correct.
 9    Q   And you were in there when Speedy called,
10        right?
11    A       Correct.
12    Q   And the defendant was sleeping, you tell
13        Speedy, "He's sleeping," you hang up the
14        phone, right?
15    A       "Trying to sleep," correct.
16    Q   And you went back to making your schedule out
17        then, correct?
18    A       Correct.
19    Q   Did you ever see Sheila leave the bedroom at
      all until you went to sleep?
      A       She left.
22    Q   Where did she go?
23    A       The bathroom, to see how her sister done.
24    Q   Well, wasn't she sleeping?
25    A       She wasn't sleeping, she turned in, not
```

766

```
 1              meaning you sleep.  The t.v. is there
 2              also.
 3    Q    Okay.  So she "turned in" but she didn't go to
 4         sleep, is that what you're saying?
 5    A         Correct.
 6    Q    Did she ever leave the room?
 7    A         Yes.
 8    Q    How many times?
 9    A         Approximately -- maybe two.
10    Q    Pardon?
11    A         Maybe two.
12    Q    Isn't it true that that was the only time that
13         Speedy called the residence that night that
14         you're aware of?
15    A         Yes.
16    Q    And that is the only call that was received at
17         that residence that night that you heard?
18    A         That I heard, yes.
      Q    What day did you testify you first became
           aware of the fact the defendant was arrested?
21    A         The next day.
22    Q    The next day.  What day would that have been?
23    A         The day after I testified that he got
24              arrested.
25    Q    Now, I'm asking you what day did you become
```

767

VANES 001307

```
 1              aware of the fact the defendant had been
 2              arrested?
 3      A          He got arrested the same -- on the 3rd, I
 4              was aware of it when I got home from work.
 5      Q   Okay, and what day of the week was that?
 6      A       Tuesday.
 7      Q   You were aware on Tuesday, the 3rd.  And did
 8              you go down to the police station also with
 9              Sheila?
10      A       No.
11      Q   That night they went?
12      A       Yes.
13      Q   Had they left before you had gotten home?
14      A          They was leaving out the door when I
15              arrived.
16      Q   Were you there when they came back?
17      A          They came back very late.
        Q   My question was:  Were you there?
        A       Yes.
        Q   Did they talk to you?
        A       Yes.
22      Q   This was March 3rd, right?
23      A       Right.
24      Q   They came back from the police station on
25              March 3rd.  And you said they talked to you
```

768

(299)

VANES 001308

1  about what happened, right, that he had been

2  arrested?

3  A     He had been arrested.

4  Q  And you testified on direct exam the first

5  time that you knew what this was all about was

6  when the search warrant was delivered to the

7  residence, correct?

8  A     Correct.

9  Q  You didn't know anything about it.  And that's

10  when you recognized the date as the 27th as

11  the day you went out car shopping, right?

12  A     Right.

13  Q  That's what you testified to.

14  A     I said -- I testified to he went down to

15       the police station for a traffic ticket --

16  Q  Uh-huh.

17  A     -- and nothing had been charged.

   Q  That's correct.

   A     Okay.

   Q  I don't want to misquote you.  And that was

      approximately what time?

22  A     What time?  What are we talking about?

23  Q  That would have been on March 3rd, right?

24  A     Yes.

25  Q  Approximately what time did you become aware

769

1330

```
 1  ||        of the arrest of the defendant?
 2  || A        I stated when I got home from work.
 3  || Q    Approximately.
 4  || A        7:00.
 5  || Q    At 7:00 o'clock, you become aware that the
 6  ||        defendant had been arrested, correct?
 7  || A        Correct.
 8  || Q    And you also became aware that Sheila and some
 9  ||        of the other family members had went down to
10  ||        the police station, correct?
11  || A        Correct.
12  || Q    And they came back late, correct?
13  || A        Correct.
14  || Q    Approximately what time?
15  || A        Maybe after 10:00.
16  || Q    That's on 3-3, correct?
17  || A        Correct.
    || Q    That's Tuesday, right?
    || A        Correct.
    || Q    And then you testified that on the next day
    ||        when the warrant came to your house --
22  || A        Correct.
23  || Q    -- that would have been approximately what
24  ||        time?
25  || A        Noon.
```

770

1301

VANES 001310

1      Q    That's when the warrant was served, 12:00 noon

2            on March 4th, right, and you were there?

3      A       Yes.

4      Q    Let's back up to the 3rd at 10:00 o'clock when

5            Sheila and them came home.  Were you awake?

6      A       Right.

7      Q    Did you have any conversation with them?

8      A       Very little.

9      Q    Very little.  Oh, come on, now.  Her brother

10           was just charged with murder and you didn't

11           have any conversation?

12     A       Okay, let's back up.

13  BY MR. KING:

14               Objection.  He answered he had

15                conversation, very little.

16  BY THE COURT:

17         Well, is there an objection to this

        question?

BY MR. KING:

       Yes, it's mis-stating the previous

21         response of the witness.  He said, "You're

22         saying she got home and you didn't have any

23         conversation?"

24  BY MR. BENSON:

25         I'll rephrase that.

              771

1302

VANES 001311

```
 1     BY THE COURT:
 2              All right, let's start over.
 3     BY MR. BENSON:
 4     Q    Did you question her about what was going on
 5          at the police station?
 6     A        I testified that when I got home --
 7     Q    I'm not asking you what you testified, I'm
 8          asking you what happened.
 9     A        Okay, what happened was when I got home on
10              this day -- the 3rd you're talking about?
11     Q    Yes, that evening.  You came home from work,
12          correct?
13     A        Her brother had been arrested but no
14              charges.
15     Q    No charges?
16     A        No charges.
       Q    She didn't tell you --  she told there were no
            charges?
       A        She didn't know.
       Q    She didn't know?
21     A        He's going to the police station because
22              of an outstanding ticket.
23     Q    This is at 10:00 o'clock at night, right?
24     A        Correct.
25     Q    So if she testified that she had a
```

772

1303

VANES 001312

```
 1  ║    conversation with Bruce Outlaw and that
 2  ║    Detective Outlaw told --
 3  ║ BY MR. KING:
 4  ║              Objection. Argumentative.  Again,
 5  ║              he's trying to compare the
 6  ║              testimony of two witnesses.
 7  ║ BY THE COURT:
 8  ║         Sustained.
 9  ║ BY MR. BENSON:
10  ║ Q   She didn't tell you anything -- that her
11  ║     brother had been identified in a line-up for
12  ║     murder?
13  ║ A       Not that night, no.
14  ║ Q   She didn't tell you that night?
15  ║ A       No.
16  ║ Q   And it's your testimony that -- would you
17  ║     please turn around and look at the chart, sir?
    ║     On Wednesday, March 4th at 12:00 noon, or
    ║     approximately then, and you received a warrant
    ║     and that date up there of the crime of 2-27,
    ║     and that triggered in your mind that, "Hey, we
22  ║     were car shopping," correct?
23  ║ A       Exactly.
24  ║ Q   But when Sheila came home the night before,
25  ║     you never talked to her about the fact that
```

773

1304

VANES 001313

1    you had been car shopping on the 27th?

2    A    Correct.

3    Q    She never mentioned that?

4    A    Correct.

5    Q    Did she tell you that she was at the police

6         station, and that as she was driving home from

7         the police station that night that her brother

8         was charged with a crime that occurred the

9         27th and that you were car shopping?

10   BY MR. KING:

11                   Objection.  The charges in this

12                   case were not filed until March

13                   the 5th, 1992, as counsel is well

14                   aware.

15   BY MR. BENSON:

16        I'll rephrase that question then.

17   Q    Did Sheila tell you when she got home on March

          3rd at 10:00 o'clock that she had been at the

          police station and that Detective Outlaw had

          told her that her brother was in a line-up and

          identified for murder, and that driving home,

22        she remembered that on the day that this crime

23        occurred, you were car shopping?

24   A    No.

25   Q    She didn't tell you that night?

774

1305

VANES 001314

```
 1    A        No.

 2    Q    It's your testimony that the first time you

 3         ever equated the date of this incident with

 4         the fact that you were car shopping was when

 5         the warrant was served, correct?

 6    A        Correct.

 7    Q    And Sheila never said anything to you when she

 8         got home on the 3rd?

 9    A        To the best of my knowledge, he was

10            arrested for an outstanding ticket.  That

11            didn't really concern me, so, no.

12    Q    I'm not asking you about what he was arrested

13         for, I'm asking you about a conversation you

14         would have had with your fiance, the person

15         you were going to marry, about the arrest and

16         the charges, that he had been identified?

17    A        I stated a ticket; it didn't really

             concern me, I really didn't get involved

             what it was based on at this time.

      Q    So that evening of the 3rd, you were totally

21         unaware the defendant had been picked out of a

22         line-up by two individuals for murder?

23    A        Correct.

24    Q    Do you think that's something Sheila would

25         have told you if she had known it?
```

775

1306

VANES 001315

```
 1      BY MR. KING:
 2                          Objection.  This witness is not
 3                          competent to testify to that.
 4      BY THE COURT:
 5              Sustained.
 6      BY MR. BENSON:
 7      Q   How many people from the residence where you
 8          reside at went down to the police station on
 9          the 3rd that you're aware of?
10      A       Two.
11      Q   Two.  Who was that?
12      A       Sheila and her sister.
13      Q   Did Sheila's sister tell you anything about
14          what happened at the police station the night
15          of the 3rd?
16      A       They really didn't know anything.
17      Q   They both told you they didn't know anything?
18      A       When they came back, I was in the bedroom.
19          I was really unconcerned because I felt it
20          was just a ticket.
21      Q   I'm not asking you -- maybe you misunderstand
22          my question.  I apologize for not being more
23          articulate.  I understand that your concern
24          was that you thought it was a ticket, but I'm
25          asking you what Sheila told you about what
```

776

1307

VANES 001316

```
 1              transpired at the police station.  And am I
 2              correct that it's your testimony that she
 3              really didn't say anything?
 4      A          Correct.
 5      Q       Going back to February 27th, the day of this
 6              car shopping, what time did you get home from
 7              work that day?
 8      A          Car shopping?
 9      Q       Yes.
10      A          I was off that day.
11      Q       Off.  Did you ever talk to Speedy that day,
12              the defendant's girlfriend?
13      A          No.
14      Q       Do you ever remember seeing the defendant talk
15              with her on the phone?
16      A          That day?
17      Q       Yes.
18      A          No.
19      Q       So you thought the arrest was for a traffic
20              offense?
21      A          Correct.
22      Q       Didn't you find it unusual when Sheila came
23              home that they kept him overnight?
24      A          Yes.
25      Q       Did you make any inquiry to Sheila about that?
```

777

VANES 001317

| | | |
|---|---|---|
| 1 | A | I believe she said they had to keep him |
| 2 | | seventy-two hours after the arrest, |
| 3 | | something in that line. |
| 4 | Q | She told you that? |
| 5 | A | Yes. |
| 6 | Q | She didn't tell you he had been picked out of |
| 7 | | a line-up for murder? |
| 8 | A | No. |
| 9 | Q | She didn't tell you she talked to Bruce |
| 10 | | Outlaw? |
| 11 | A | No, sir. |
| 12 | Q | During the course of February, how many times |
| 13 | | did you go out car shopping that month? |
| 14 | A | Actually, the first day we went out, we |
| 15 | | went out the week before that to |
| 16 | | Indianapolis Boulevard, but everything was |
| 17 | | closed so we didn't really shop, we was |
| 18 | | getting some idea. |
| 19 | Q | Was that the week before that you went out and |
| 20 | | all the places were closed? |
| 21 | A | It could have been two weeks before, but |
| 22 | | it was before. |
| 23 | Q | Was it, in fact, the Tuesday of that week, the |
| 24 | | 27th that you went out and the places were |
| 25 | | closed? |

778

VANES 001318

```
 1    A      I'm not sure.
 2    Q      You're not sure what day you went out before,
 3           correct?
 4    A         Correct.
 5    Q      How many times would you estimate that you
 6           were out car shopping that month of February?
 7           Over half a dozen?
 8    A         I would say -- the car place was closed
 9              when Sheila went, that was once.
10    Q      Your testimony is you only went out one time?
11    A         With Sheila?
12    Q      Uh-huh.
13    A         Correct.
14    Q      Isn't it true that during that month, you and
15           her were constantly out car shopping?
16    A         Not constantly, no, sir.
17    Q      No?
18    A         No.
19    Q      So to the best of your recollection, you were
20           not out four, five or six times shopping for a
21           vehicle?
22    A         Right.
23    BY MR. BENSON:
24           Thank you very much.  I have nothing
25           further, Judge.
```

779

1310

VANES 001319

```
1                    REDIRECT EXAMINATION
2                           BY
3                       MR. KING
4    Q    Could Sheila go out car shopping by herself?
5    A        Yes.
6    Q    And was it Sheila who was looking for a new
7         car?
8    A        Correct.
9    Q    What was -- if you can recall, what do you
10        remember Timmy wearing when you all were out
11        car shopping on February 27th?
12   BY MR. BENSON:
13                    Objection.  This is outside the
14                    scope of cross.  This was asked
15                    and answered on direct.
16   BY THE COURT:
17        Well, I believe the issue of car shopping
18        did come up.  You may answer.
19   BY THE WITNESS:
20        Thank you.
21   A        Timmy was wearing a pair of blue jeans,
22        I'm not sure what type of top he was
23        wearing, but he did have on some type of
24        sport jacket; he also was wearing a hat,
25        multiple color.
```

780

VANES 001320

```
 1      Q    Can you describe the term "sport jacket" as
 2           you used it?  Like this (indicating)?
 3      A         No, it was a short jacket with a zipper,
 4                one type of a team jacket.
 5      Q    Okay, kind of an athletic kind of jacket?
 6      A         Yes.
 7      Q    Okay, what about the hat with different
 8           colors, how would you describe that?
 9      A         It's a skull cap; we'll just call it a
10                knit hat.
11    BY MR. KING:
12           That's all I have, Mr. Hopkins.  Thank
13      you.
14    BY MR. BENSON:
15           No recross, Your Honor.
16    BY THE COURT:
17           All right, Mr. Hopkins, let me make you
18      aware there's a separation of witness order in
        this case and you must not discuss your
        testimony with anyone who has not yet
        testified in this case.
22    BY THE WITNESS:
23           Yes, sir.
24    BY THE COURT:
25           Counsel, could I see you at the bench
```

781

1312

VANES 001321

```
 1          here?

 2

 3                  WHEREUPON A DISCUSSION WAS HELD AT THE

 4          BENCH OUTSIDE OF THE HEARING OF THE JURY AND

 5          OFF THE RECORD REGARDING SCHEDULING.

 6

 7     BY THE COURT:

 8                  We have two witnesses who are yet under

 9          subpoena for today who are yet to testify, so

10          following our usual format, we'll give you a

11          break at this point.  And if you need to call

12          to say that we'll be in session until about

13          5:00, please do.  There are also witnesses

14          subpoenaed to testify tomorrow who will not

15          have testified today.  We're still working

16          toward getting the matter completed tomorrow.

17                  So with that, we'll let you break under

18          the usual admonition.

19

20                  WHEREUPON THE COURT RECESSED AND

21          RECONVENED AND THE FOLLOWING PROCEEDINGS WERE

22          HELD IN THE PRESENCE AND HEARING OF THE JURY:

23

24     BY MR. KING:

25                  We'll call Richard Sesson, please.
```

VANES 001322

```
 1                          RICHARD SISSON,
 2        having been first duly sworn upon his oath,
 3        testifies as follows:
 4                        DIRECT EXAMINATION
 5                              BY
 6                           MR. KING
 7   Q   Would you state your name and spell your last
 8       name for the record, please?
 9   A        Richard Sisson, S-i-s-s-o-n.
10   Q   And what is your occupation, sir?
11   A        I'm the business manager for Paul Sur
12            Pontiac in Merrillville.
13   Q   And how long have you been so employed?
14   A        Approximately four years.
15   Q   As business manager, can you briefly describe
16       your duties there at Paul Sur Pontiac?
17   A        Well, it's a combination at the -- what I
18            do is try to secure financing for vehicles
19            that are being purchased through the
20            different banks and GMAC sources and so
21            on, do all the legal paperwork for
22            delivery.
23   Q   Do you have occasion periodically or have you
24       in the past had occasion when you have been
25       working that job to also help out in sales?
```

783

1314

VANES 001323

|    |   |                                                    |
|----|---|----------------------------------------------------|
| 1  | A | Yes.                                               |
| 2  | Q | I would like to hand you what's previously         |
| 3  |   | been marked for identification as Defendant's      |
| 4  |   | Exhibit 6, it's a series of two business cards     |
| 5  |   | and a small slip of paper.  And I'll ask you       |
| 6  |   | to take a moment, and real quick look at both      |
| 7  |   | sides of each one of those little documents        |
| 8  |   | and tell me if you recognize all or any of         |
| 9  |   | them?                                              |
| 10 | A | Well, the business cards are for one of            |
| 11 |   | our salesmen, our service manager, and the         |
| 12 |   | prices on the piece of paper are in my             |
| 13 |   | writing.                                           |
| 14 | Q | All right, do you recognize it as your             |
| 15 |   | handwriting?                                       |
| 16 | A | Yes, I do.                                         |
| 17 | Q | Now, do you recall the circumstances under         |
| 18 |   | which you had occasion to prepare that small       |
|    |   | piece of paper with the writing?                   |
|    | A | Yes, I do.                                         |
|    | Q | And, first of all, let me ask you as you sit       |
| 22 |   | here today, do you have a specific                 |
| 23 |   | recollection of the date you prepared that?        |
| 24 | A | No.                                                |
| 25 | Q | Do you have a recollection as to the day of        |

784

1315

VANES 001324

1    the week you prepared that little piece of

2    paper?

3    A     Yes, I do.

4    Q     What day of the week did you prepare the piece

5    of paper in Defendant's 6?

6    A     That was a Thursday.

7    Q     How do you know it was a Thursday as opposed

8    to some other day?

9    A     Thursday is the only evening that our

10         service department is open after 5:00

11         o'clock, and I recall the scenario, and

12         our service department was open, so it

13         would have been a Thursday evening.

14   Q     What time is your agency, your car dealership

15   open until on Thursdays?

16   A     8:00 o'clock.

17   Q     Now, do you work habitually until the 8:00

18   o'clock time?

19   A     Yes, it's policy.

20   Q     Were you on that schedule in February of 1992?

21   A     Yes, I was.

22   Q     Now, you indicated you recall, you recognize

23   that piece of paper, you recall it was written

24   by you and a Thursday, and you said you recall

25   the scenario under which you wrote that, is

785

VANES 001325

```
 1          that correct, sir?
 2     A       Yes.
 3     Q   For the benefit of the ladies and gentlemen of
 4         the jury, can you share with us what you
 5         recall about writing up that piece of paper?
 6     A       Well, I remember it was on a Thursday
 7             evening because I see our service
 8             department was open, it was approximately
 9             I would imagine about 6:30 in the evening
10             that I quoted a couple of prices on a
11             couple different cars, there were three
12             people in the dealership, two men and a
13             woman.
14     Q   Okay, let's stop for a second and ask you as
15         best you can recall to give us a description
16         of the two men and a woman that you saw on
17         that Thursday.
18     A       I really can't describe them.  They were
19             three black individuals, but it's hard to
20             describe them, and I couldn't.
21     Q   All right, and tell us what you recall about
22         these three people on that Thursday in your
23         presence.  Do you recall what time?
24     A       Yes, approximately --
25
```

786

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

1317

1    BY MR. BENSON:

2                          Judge, I would object on the

3                          grounds of relevancy unless a

4                          time and date for this

5                          conversation and occurrence can

6                          be articulated.

7    BY MR. KING:

8            Well, we're about to do the time.  He has

9        indicated what day.

10   BY MR. BENSON:

11           What month?

12   BY THE COURT:

13           Well, are you moving toward that, trying

14       to get some identification of that?

15   BY MR. KING:

16           No, he's saying that he cannot recall the

17       month, but we have had previously identified

18       by other witnesses the date in question.

19   BY THE COURT:

20           Well, can we approximate from this witness

21       that we're talking about 1992 or some period

22       of time?

23   BY MR. KING:

24           Certainly.

25   Q    What is your best recall of when this

787

VANES 001327

```
 1  ||        happened?
 2  ||   A        I would recall it being in the February-
 3  ||            March time.
 4  ||   Q   All right.
 5  ||   A        Still wintertime.
 6  ||   Q   1992?
 7  ||   A        Yes.
 8  ||   BY THE COURT:
 9  ||            You may go on with the question now.
10  ||   BY MR. KING:
11  ||   Q   And, again, on a Thursday?
12  ||   A        Yes.
13  ||   Q   Okay, you were about to share with us your
14  ||            recollection as to the time of day or night
15  ||            that this happened.  What's your recollection?
16  ||   A        As I say, it was approximately around
17  ||            6:30, between 6:30 and 7:00.  I quoted a
18  ||            few prices on a couple different cars; the
19  ||            customers didn't want to take a test ride
20  ||            in the vehicle.  I had given them prices;
21  ||            I was in and out of my office as far as
22  ||            giving them prices and interest rates.  I
23  ||            do recall giving them a price on a vehicle
24  ||            and they talked amongst themselves about
25  ||            going to a competitor dealership, Anderson
```

788

```
 1              Pontiac, so I imagine they left around
 2              7:00 o'clock because I do recall that
 3              there was enough time that they could go
 4              to this other dealership, get a price, and
 5              if mine was good enough that they would
 6              still have time to get back before we
 7              close at 8:00 o'clock.
 8    Q    Did they mention the name of the competitor
 9         whose dealership they were going to go to?
10    A         Yes, they did.
11    Q    And what name was given to you, sir?
12    A         Anderson Pontiac in Crown Point.
13    Q    Did they, in fact, leave, to your knowledge,
14         with those pieces of paper marked as
15         Defendant's Exhibit 6?
16    A         As far as I know, yes.
17    Q    And what is your best recollection as to the
18         approximate time the three individuals would
19         have left your dealership?
20    A         I would have to say it would be no later
21              than 7:00 o'clock in the evening because,
22              again, I'd say that that would have given
23              them time to get to the other dealership,
24              get some prices on a car and still return
25              to our dealership before we closed.
```

789

1320

VANES 001329

```
1    Q   Did they ever return?
2    A      No.
3    Q   Now, did there come a time in the recent past
4        where the gentleman here at this table came to
5        your dealership to talk to you?
6    A      Yes.
7    Q   And can you recall for us as best you can when
8        that would have been, sir?
9    A      It would have been Tuesday of last week.
10   Q   And in the course of talking with you, did he
11       give you a series of photographs to look at?
12   A      Yes, he did.
13   Q   Were you able to identify anyone in those
14       photographs?
15   A      I was able to identify somebody in the
16          group of pictures that I had previously
17          seen in the dealership, yes.
18   Q   Were you able to identify any of these people
19       as people in this transaction you told us
20       about with the card on the Thursday evening?
21   A      As best as I recall, yes.
22   Q   All right, now, are you sure about your
23       identification?
24   A      I could not be exactly one hundred percent
25          sure, no.
```

790

1321

VANES 001330

```
 1    Q   All right, did you tell the gentleman that
 2        this person to your recall looked like one of
 3        the people in this group?
 4    A      Yes.
 5    Q   Are you able to pinpoint -- was it a male or a
 6        female that you picked out?
 7    A      Male.
 8    Q   And were you able to pinpoint -- were you
 9        talking to one or both of the males?
10    A      Basically just one.
11    Q   And would this be the male you were talking to
12        or the male you were not talking to?
13    A      This is the one that struck memory as the
14        one I was talking to.
15  BY MR. KING:
16        Could I have, please, the State produce --
17        thank you.
18    Q   Okay, Mr. Sisson, I'm going to put before you
19        three sets of photographs.  One of them is
20        marked Defendant's Exhibit 7 for
21        identification, one of them is marked
22        Defendant's Exhibit 8 for identification and
23        one of them is marked State's Exhibit 17 as
24        admitted into the evidence.  Do you recognize
25        those as the photo spreads you were shown a
```

791

VANES 001331

```
 1              week ago Tuesday by the investigator for the
 2              prosecutor?
 3       A          Yes, these are.
 4       BY MR. BENSON:
 5                      Objection.  That was not shown to
 6                      him by myself, the prosecutor.
 7       BY MR. KING:
 8       Q    The investigator for the prosecutor?
 9       A          Yes.
10       Q    They were shown to you by this fellow here
11            (indicating)?
12       A          Yes.
13       Q    Now, do they appear to be the same as when you
14            saw them except for the little stickers on
15            them now?
16       A          Yes.
17       Q    And can you share with us which photograph you
18            picked out as the person you recall, one of
19            the males in this group of two men and one
20            woman that you were talking with as opposed to
21            the fellow that wasn't part of the discussion?
22       A          I picked the gentleman number three.
23       Q    All right, just so we're sure here, are you
24            talking about the photograph noted number
25            three on Defendant's Exhibit Number 8?
```

792

VANES 001332

1  A        Yes.

2  BY MR. BENSON:

3          May I please take a look and see which

4      picture he has been --  thank you.

5  BY MR. KING:

6  Q   That's the photograph you selected -- you're

7      not sure but you think that's the photograph

8      of the man in this group that was talking to

9      you, is that correct, sir, about the purchase

10     of the car?

11  A        Yes, as I recall.

12  Q   How long did you spend with the people that

13      were shopping about for cars on this Thursday?

14  A        Oh, I would imagine fifteen to twenty

15         minutes.

16  Q   All right, and would this be on the interior

17      of the Pontiac dealership?

18  A        Yes, in the show room.

19  Q   In the show room area?

20  A        Uh-huh.

21  Q   Can you describe the lighting for us in the

22      show room area?  Is it dimly lit, brightly

23      lit?

24  A        It's quite well lit, especially at night

25         we have a lot of lighting on the cars.

793

1324

```
1    Q    All right, you had a good occasion to observe?
2    A         Yes.
3    Q    All right.  Beside what you've told us, can
4         you share with us anything else by way of
5         description of the three people that you dealt
6         with that evening, that Thursday evening?
7    A         Not offhand, no.
8    Q    Can you give us a sense on average in a given
9         work week for you how many new customers you
10        come in contact with when you're working in
11        the sales capacity?
12   A         Sales end of it, you could see probably
13            two dozen or so.
14   Q    Per week?
15   A         Yes, uh-huh.
16   Q    Now, did you ever obtain the names of these
17        people?
18   A         No, I did not.
19   Q    Is there a reason for that?
20   A         The only time that -- I have a bad memory;
21            if I would ask their name, it would be an
22            insult when I forget it, so I usually only
23            ask it when there's an order being written
24            or if the people want to take a test
25            drive, I'll take a photocopy of their
```

794

1325

VANES 001334

```
 1              driver's license.
 2    Q    Did the people in this instance want to test
 3         drive?
 4    A        No.
 5    Q    And were you to the point of writing up an
 6         actual sales order?
 7    A        No.
 8    Q    For that reason, if you can recall, did you
 9         ever inquire of them what their names were,
10         any of them?
11    A        No.
12    Q    And your recollection is that you recall
13         February or March of 1992, but you're sure it
14         was a Thursday?
15    A        Yes.
16    Q    And you're sure about the times you shared
17         here with the jury?
      A        As close to as possible, yes.
      Q    All right.  And one of your recollections is
           feeling that someone could go from your
           dealership, get to Bob Anderson, and still
           have a chance to get back with you before the
22         8:00 o'clock closing time, is that correct?
23
24    A        Yes.
25    Q    Do you recall -- and if I asked you this, tell
```

795

1326

```
 1            me so we don't repeat -- do you recall what
 2            vehicles these shoppers were inquiring about?
 3     A           As I recall, they were a bright blue Grand
 4            Am SA coupe.
 5     Q     A Grand Am automobile?
 6     A           Yes, Pontiac Grand Am.
 7     Q     Do you recall who in this group of three was
 8            actually the one going to be getting the car
 9            and driving the car?
10     A           No, I really couldn't.
11     BY MR. KING:
12                 All right, thank you, sir.  Pass the
13            witness.
14                      CROSS-EXAMINATION
15                            BY
16                       MR. BENSON
17     Q     Mr. Sisson, you testified here in court today
18            that you believe that it was either the month
19            of February or March these people came in,
20            correct?
21     A           Yes, uh-huh.
22     Q     Now, you haven't always said that, have you?
23     A           It would -- the dates have been told to
24            me, but the timing, as I recall, it was
25            winter months.  And we had somebody come
```

796

1327

VANES 001336

```
 1                    into my office and see me approximately
 2                    six or seven weeks ago talking about
 3                    something that happened about five or six
 4                    weeks before, so --
 5      Q     Let's back up a second.  You said someone came
 6            into your office and started talking about
 7            this case, correct?
 8      A        Yes, uh-huh.
 9      Q     And where is that person from if you recall?
10      A        As I recall, it was the investigator for
11               the defense attorney.
12      Q     And at that time, you were informed of an
13            incident that happened in February, correct?
14      A        I don't recall that he told me the date
15               that it was, he just asked me if I
16               recalled -- if I recognized my notes and
17               if I could remember anything of the
                 evening.
        Q     Okay.  I'd like to ask if you recall your
              prior deposition in which we took a sworn
              statement from you?
22      A        Yes.
23      Q     And you took an oath in that statement,
24            correct, before you gave that?
25      A        Yes.
```

797

VANES 001337

```
1    Q    And you were asked the question about when the
2         investigator came out from the defense
3         attorney's office to your office, and I asked
4         you --
5    BY MR. BENSON:
6              And this is page 11, counsel, line 13.
7    Q    -- and I was asking you about this situation
8         where these people came out to buy a car, and
9         I asked you, "Why don't you tell me about that
10        situation?  Do you recall that day, first of
11        all?" and your response was, "It was a
12        Thursday."  Do you recall that?
13   A         Yes.
14   Q    And my question was, "Thursday?  What date?"
15        Do you recall that question?
16   A         Yes.
17   Q    Do you recall your answer being, "I don't know
          a specific date.  I know it was Thursday
          though because our service department is open
          late on Thursday.  And it was in the evening;
21        I would have to assume around 6:00 or 6:30."
22        Do you recall that answer?
23   A         Okay.
24   Q    And my question was to you, "What month are
25        you talking about?" and your answer was, "I
```

798

1329

VANES 001338

```
 1  ||       would assume February because that's the month
 2  ||       everyone said it was."  Do you recall that
 3  ||       answer?
 4  || A        I assume, yes.
 5  || Q   Now, when you said it's the month everyone was
 6  ||       telling you it was, who were you referring to
 7  ||       the "everyone"?  Was it the investigator that
 8  ||       came out from the defense attorney's office?
 9  || A        Yes, I would imagine.
10  || Q   Well, I'm not asking you to imagine.
11  || A        It would have to be, because nobody else,
12  ||           you know, I haven't talked to anybody else
13  ||           about it; that would have had to have been
14  ||           where I heard it.
15  || Q   So it was based upon your conversation with
16  ||       defense counsel's investigator that led you to
17  ||       think that it was in February?
    || A        No, it wouldn't have been the defense
    ||           counsel; it would have been last Tuesday
    ||           where I probably heard the dates.
21  || Q   Well, let's back up a second though.  When you
22  ||       talked with the defense counsel's
23  ||       investigator, didn't he ask you about February
24  ||       27th?
25  || A        I don't recall that he asked me about a
```

799

1339

```
 1              specific date, no.
 2    Q    Did he ask you if some people had been in
 3         there?
 4    A         Yes, and showed me my notes.
 5    Q    Let's move on now.  Let's go to line 24; the
 6         question was, "I'm not asking what everyone
 7         else is telling you. I'm asking you what you
 8         recall when this group of people came in."  Do
 9         you recall giving the answer, "I really can't
10         recall what month; all I know, it was
11         Thursday"?  And isn't it fair to say that you
12         really don't know whether it was January,
13         February or March when this group of people
14         came in?
15    A         Yes.
16    Q    Let me show you what has been marked as
17         Defendant's Exhibits 7, 8, and State's Exhibit
           17 and ask you if those are the three sets of
           photographs that you looked at when our
           investigator was out there and then later in
21         the deposition, correct?
22    A         Yes.
23    Q    And do you see the defendant's picture in
24         there?
25    A         Yes.
```

800

1331

```
1     Q    Where is that at?

2     A         Exhibit Number 17.

3     Q    And when I asked you the question in that

4          deposition about whether you recognized any of

5          these people being out there, you did not pick

6          the defendant's picture, correct?

7     A         Correct.

8     Q    You picked an individual, number three, in

9          Defense Exhibit Number 8, correct?

10    A         Yes.

11    BY MR. BENSON:

12              For the record, that is the name of

13         Arister Thompkins.

14    Q    Now, it's not your testimony that Arister

15         Thompkins was out there but someone who looked

16         like him was?

17    A         Yes.

      Q    Or possibly him?

      A         Possibly.

      Q    But you did not pick the defendant as the

21         person who was out there on that unknown

22         Thursday in that unknown month at the

23         beginning of this year?

24    A         Correct.

25    Q    Is it unusual if somebody were coming from
```

801

1332

VANES 001341

1      Gary to look at Pontiacs that they would first

2      stop at your place and then want to comparison

3      shop and go some place else?

4   A      Sure, that happens quite often.

5   Q   So when someone tells you, "Well, we're going

6      to go check Bob Anderson," you don't find that

7      extremely unusual if they're coming from Gary

8      and going in that direction?

9   A      No.   It is unusual that they'll mention

10      that they're going to go off -- usually,

11      they don't voluntarily tell you that

12      they're going to go off shopping, yes.

13   Q   But you do have people tell you that on

14      occasion that they're going to comparison

15      shop, correct?

16   A      Oh, yes, uh-huh.

17   Q   Are there any other Pontiac dealerships close

18      by other than Bob Anderson?

    A      There's one in Highland, Terry Shaver

         Pontiac, and there's one in Valparaiso.

    Q   And the closest one would be Bob Anderson,

22      correct?

23   A      I imagine it would be, yes.

24   Q   I believe you testified also on direct exam in

25      response to one of counsel's questions that

                    802

                 1333

VANES 001342

1       the reason you don't ask for names is because

2       you have a bad memory.

3     A       As far as recalling names, yes.

4     Q     And it's your testimony that you do not

5           recognize the defendant as ever being out at

6           your dealership, correct?

7     A       I can't say that I recall him being in

8             there.

9     BY MR. BENSON:

10          At this time, Your Honor, I move to admit

11       Defendant's Exhibit Number 7 and have it

12       renamed as a State's exhibit into evidence.

13    BY THE COURT:

14          Well, you would have to have it remarked

15       as a State's exhibit, or the defense could

16       move.

17    BY MR. KING:

          Exhibits 7 and 8, we'll stipulate to its

       admission.

    BY THE COURT:

21          Okay, they can be admitted as marked then.

22       Show them each admitted at this time.  They do

23       bear a State's Exhibit sticker.

24    BY MR. BENSON:

25          That was from the previous deposition.  I

803

1324

VANES 001343

```
 1            don't know if the Court wants to cross that
 2            out.
 3       BY THE COURT:
 4            We could, but it's admitted as Defendant's
 5            Exhibits 7 and 8.
 6
 7            WHEREUPON DEFENDANT'S EXHIBIT NUMBERS 7
 8            AND 8 ARE ADMITTED INTO EVIDENCE.
 9
10       BY MR. BENSON:
11       Q    You really have no idea what night this group
12            of people were out there other than it was a
13            Thursday, correct?
14       A       Correct.
15       Q    And you cannot say that this defendant was
16            ever there?
17       A       No, I can't.
         BY MR. BENSON:
              Thank you very much.  I would like those
              exhibits shown to the jury whenever defense
21            counsel is done with his examination.
22       BY MR. KING:
23            No, we're in my case and displays to the
24            jury will be as appropriate.  I have one more
25            witness today, and we can do the displays it
```

804

VANES 001344

```
 1  ║        seems to me tomorrow morning because of the
 2  ║        time.
 3  ║  BY MR. BENSON:
 4  ║            Well, we can do it at the end of the other
 5  ║        witness; I have no problem with that.
 6  ║  BY THE COURT:
 7  ║            Well, or tomorrow morning since the hour
 8  ║        is late.   All right.
 9  ║                REDIRECT EXAMINATION
10  ║                        BY
11  ║                    MR. KING
12  ║  Q   The prosecutor's question was, "So you can't
13  ║      say this fellow was in your dealership?"  You
14  ║      can't say that he wasn't either?
15  ║  A       True.
16  ║  Q   You can't say that he wasn't one of the two
17  ║      gentlemen in this group?
    ║  A       Correct.
    ║  Q   And your focus now -- correct me if I'm wrong
    ║      -- you want to sell a car, am I right?
21  ║  A       Yes.
22  ║  Q   I mean that's what you're there for and that's
23  ║      what puts food on your family's table,
24  ║      correct?
25  ║  A       Yes.
```

805

1336

VANES 001345

```
 1      Q    Now, the way this group -- the way you figured
 2           this group out -- correct me if I'm wrong --
 3           there was one fellow and the lady that were
 4           the serious buyers, is that correct?
 5      A        Yes.
 6      Q    And there was one fellow not really part of
 7           this transaction, am I correct?
 8      A        Yes, that's how I recall them.
 9      Q    Now, as a salesman whose job is to sell a car,
10           are you going to be focused on the folks
11           wanting to buy the car or are you going to be
12           focused on somebody they brought along for the
13           ride?
14      A        On the people that are generating interest
15                in the car.
16      Q    All right.  And, again, you're not saying that
17           Arister Thompkins was the fellow, you're
18           saying that photograph out of what you were
             shown, out of what you looked at, is your
             closest and best recall of the fellow that was
             doing some of the talking?
        A        Negotiating.
23      Q    Negotiating, is that correct?
24      A        Yes.
25      BY MR. KING:
```

806

1337

VANES 001346

```
 1               Can I have one moment, Your Honor?
 2     BY THE COURT:
 3               All right.
 4     BY MR. KING:
 5               For the record, could the record reflect
 6          that I am walking in the court, the well of
 7          the court, with a prior witness in this case?
 8     BY THE COURT:
 9               Yes.
10     BY MR. KING:
11     Q    Why don't you take a minute and look at the
12          gentleman here on my right, Mr. Sisson?   Have
13          you had a chance to look at him?
14     A         Yes.
15     Q    Did you have a chance to look at that man?
16     A         Yes.
17     Q    Could he have been the fellow in this
18          transaction?
19     A         Possibly.
20     Q    Does he kind of resemble that fellow in --
21     BY MR. BENSON:
22                    Objection.   That's leading, and
23                    this question has been asked and
24                    answered.
25     BY THE COURT:
```

807

1338

```
 1                         Sustained.
 2    BY MR. KING:
 3    Q    What, if any, relationship does his appearance
 4         bear to the picture you selected?
 5    BY MR. BENSON:
 6                         Objection, that's argumentative,
 7                    Judge.
 8    BY MR. KING:
 9              It's not argumentative, Your Honor.
10    BY THE COURT:
11              Overruled.  You may answer that, Mr.
12         Sisson.
13    BY THE WITNESS:
14    A         Just, you know, complexion and generally
15              the way he looks.  They're similar, yes.
16    BY MR. KING:
17    Q    Okay.  So you're given some pictures by the
18         gentleman for the State and you're doing your
19         level best, am I correct, to pick out a
 0         picture, what you can look at, of this person
 1         from February, from this Thursday, and that
22         picture is selected, right?
23    A         Yes.
24    Q    I mean and you're doing your best to try and
25         identify somebody, am I correct?
```

808

1339

VANES 001348

1    A      Yes.

2    BY MR. KING:

That's all I have.   Thank you, Mr. Sisson.

BY MR. BENSON:

No further questions.

BY MR. KING:

The defense calls Ronald Moos.

RONALD MOOS,

having been first duly sworn upon his oath,

testifies as follows:

DIRECT EXAMINATION

BY

MR. KING

Q  Could you please state your name for the record and spell your last name for the benefit of the court reporter?

A    First name is Ron, last name is Moos, M-o-o-s.

Q  And what is your occupation, sir?

A    Salesman for Bob Anderson Pontiac.

Q  And how long have you been so employed?

A    At Bob Anderson, it's about a year.

23  Q  All right, were you employed there in February

24    of 1992?

25  A    Yes, sir.

809

1340

VANES 001349

```
1    Q   Now, I ask you to direct your attention --
2        Thursday evenings, is that a regular work time
3        for you?
4    A       Well, our schedule changes every week.
5    Q   In February of 1992.
6    A       Well, it does all the time; we change our
7            way we'll work; you work one Thursday
8            night and then the next one you work a
9            different.  We work a different shift
10           every week.
11   Q   All right.  Now, let me ask you if there came
12       a time when you had occasion to meet with two
13       young African-American men and one young
14       African-American woman interested in
15       purchasing a car from your dealership?
16   A       Yes.
17   Q   Do you have a recollection of approximately
18       when that was?
19   A       February.
20   Q   Of what year?
21   A       This year.
22   Q   1992?
23   A       Yes, sir.
24   Q   And do you have a recollection of what day of
25       the week it would have been?  And if you
```

810

VANES 001350

| | | |
|---|---|---|
| 1 | | don't, that's fine. |
| 2 | A | No, I don't remember exactly. |
| 3 | Q | Do you have a recollection of the time of day |
| 4 | | or night it would have been? |
| 5 | A | It was in the evening. |
| 6 | Q | What time does your dealership close in the |
| 7 | | evening? |
| 8 | A | 8:30. |
| 9 | Q | Do you have any recollection of when in |
| 10 | | relationship to the 8:30 closing time? |
| 11 | A | Yeah, I remember 'cause I had to stay late |
| 12 | | and they didn't buy nothin'. |
| 13 | Q | All right. |
| 14 | A | They were there a long time. |
| 15 | Q | Can you tell us from your first contact with |
| 16 | | these three people what you remember happening |
| 17 | | that evening? |
| 18 | A | They came in -- it had to have been right |
| 19 | | around the 7:00 o'clock, 7:30 hour, |
| 20 | | somewhere in there.  And they looked at -- |
| 21 | | they saw a van they said. |
| 22 | Q | A van? |
| 23 | A | A van we had just got in. |
| 24 | Q | Let me ask you a little bit about this van if |
| 25 | | I may.  What do you recall in terms of the |

811

1342

VANES 001351

```
 1  ║      description of the van?
 2  ║  A      It's a black and gray GMC trick van.
 3  ║  Q   Do you recall the year?
 4  ║  A      '88.
 5  ║  Q   Now, you said a trick van.  What is a trick
 6  ║      van?
 7  ║  A      Like a conversion van where they got the
 8  ║          fancy seats and the bed in the back and
 9  ║          the curtains on the windows and the
10  ║          running boards and the lights and stuff.
11  ║  Q   Now, do you recall this group of people, these
12  ║      two African-American men, African-American
13  ║      woman first being interested in looking in
14  ║      that van, is that correct?
15  ║  A      Yes, sir.
16  ║  Q   Are you sure it's that van?
17  ║  A      Right, it's the only one I had.
18  ║  Q   Now, do you know when Bob Anderson Pontiac got
19  ║      that van into their stock?
20  ║  A      The 26th of February of this year, '92.
21  ║  Q   February 26th, 1992?
22  ║  A      Yes, sir.
23  ║  Q   In stock for the first time?
24  ║  A      Yes, that's when it come in trade.
25  ║  Q   It was traded in by someone?
```

Filed in Clerk's Office

2

MAY 23 1997

Anna M. Anton

CLERK LAKE SUPERIOR COURT

1343

VANES 001352

```
1    A        Yes, sir.
2    Q    February 26th, 1992 is the first day Bob
3         Anderson Pontiac had possession of that van,
4         is that correct, sir?
5    A        Yes, sir.
6    Q    Now, you say these folks were interested in
7         checking it out and looking at it.  Tell us
8         what you remember with respect to them looking
9         at this van.
10   A        They were looking for something that -- it
11            sounded like they had a big family, a lot
12            of people to put in it, and the lady was
13            the buyer, and I couldn't figure out -- I
14            couldn't get the seat up in the van, and
15            she's a short lady, and I finally had to
16            ask somebody, because they had so many
17            levers on the thing, how to get the seat
18            up because she couldn't see like over the
19            nose in the front.
20   Q    And what, if anything, did you do to remedy
21        that?
22   A        Well, I finally got the right lever to get
23            the seat up; I asked somebody and got the
24            seat moved up and then they took it for a
25            ride.
```

813

1344

VANES 001353

```
 1    Q   Now, when you say "they," who do you mean?
 2    A       There was a lady and two gentlemen.
 3    Q   The best you can recall, what do you remember
 4        about these three folks in terms of a
 5        description?
 6    A       Three black people, two short and one
 7            taller.  The lady was short and the man
 8            was short, and then there was a taller
 9            fellow.
10    Q   What about relative shade of skin color?  Was
11        it all the same, one lighter or darker?
12    A       No, everybody was different.
13    Q   Now, after -- you say they went for a test
14        drive?
15    A       Yes.
16    Q   In the van, is that correct?
17    A       Yes.
18    Q   And did they return to the dealership?
19    A       They came back and we talked about price,
20            and then they asked about -- we had
21            finance rates on, so they wanted to see --
22            I knew they had been to another dealership
23            when they started talking about rates, so
24            I put them in a Sunbird, which is a small
25            car.  They took that out for a ride, and
```

814

1345

VANES 001354

```
 1                           then the lady said it was just too small
 2                           and so did the fellow with her.
 3       Q    Now, you say the fellow with her.  And you
 4            told us earlier there was two men and a woman.
 5       A        Right.
 6       Q    Did you focus on one fellow over the other?
 7       A        Yeah, he was like -- I call him the maven.
 8       Q    The what?
 9       A        The maven.  You know, he was trying to
10            help her out and impress me that he knew a
11            lot of stuff about buying cars.
12       Q    How long have you been selling cars for?
13       A        Twenty-five years.
14       Q    Do you try to size up customers as you start
15            trying to work a deal?
16       A        Yeah, it's normal.
17       Q    All right.  Now, what did you size up about
18            this situation as you began talking with them?
19       A        Well, she was the lady that seemed like
20            she was going to buy it but she wasn't
21            going to do anything unless the fellow
22            said that, you know, it was all right.
23            That's the way it seemed to me.
24       Q    And how do you as a salesman work that
25            situation?
```

815

1346

VANES 001355

| | | |
|---|---|---|
| 1 | A | Well, you concentrate more on him and try |
| 2 | | not to make him out to be dumb in front of |
| 3 | | somebody else, you know; you don't want to |
| 4 | | do that, and then they'll get mad at you |
| 5 | | and leave. |
| 6 | Q | And is that how you approached these |
| 7 | | prospective buyers? |
| 8 | A | Yeah, after you get the drift of what's |
| 9 | | going on. |
| 10 | Q | All right. So was your focus on this one |
| 11 | | fellow as opposed to the other fellow? |
| 12 | A | I didn't pay much attention to the other |
| 13 | | fellow. |
| 14 | Q | He didn't seem to be a part of the buying |
| 15 | | group? |
| 16 | A | No, he was just there, you know. |
| 17 | Q | Do you recollect anything about this other |
| 18 | | fellow, you know, what he was dressed like, |
| 19 | | anything like that? |
| 20 | A | I just remember he was tall, probably as |
| 21 | | tall as I am, and he had on -- I think it |
| 22 | | was a knit -- I call them a navy hat or |
| 23 | | ski hat. |
| 24 / | Q | Do you remember what color that was? |
| 25 | A | It was just like multi-color. |

816

1347

```
 1   Q   Multi-colored?

 2   A       Yeah, and I think he had like a three-

 3           quarter length jacket on.  He was always

 4           in there playing with the radio and other

 5           stuff, you know, inside the van.

 6   Q   Now, did these folks drive anything besides

 7       the van?

 8   A       Yes, well, they drove --  I said they

 9           drove a Sunbird, and then they came back

10           and then they drove a Grand Am.

11   Q   Now, by the time they returned from the third

12       test drive, did you spend time with them from

13       that point forward?

14   A       Oh, yeah, then we sat in my office for --

15           well, we was past closing time.

16   Q   Past closing time you say?

17   A       Yes, sir.

18   Q   Do you have a recall as you sit here today how

19       far past closing time?

20   A       Somewhere between 8:30 and 9:00, you know,

21           a quarter till or something like that,

22           because when I left, they were still

23           sitting there.

24   Q   You say when they left, they were still

25       sitting where, sir?
```

817

1343

VANES 001357

```
 1   A        Well, in the car they came in.  I thought
 2            they were going to check out the van some
 3            more 'cause I couldn't pin them down to,
 4            you know, one unit.  A lot of people do
 5            that.
 6   Q    Now, did they ever come back?
 7   A        No, sir.
 8   Q    Have you ever seen any of these three people
 9        again up to and including today?
10   A        Yes, sir.
11   Q    When?
12   A        When I was standing outside there.
13   Q    Outside of this courtroom in the hall?
14   A        Yeah, where the bailiff there told me to
15            stay.  I recognized the lady and the short
16            fellow out there.
17   Q    Well, do you remember what the lady was
18        wearing today?
19   A        She's got a nice little blue dress on.
20   Q    What about the gentleman?
21   A        Brown, red, some kind of suit -- maroon.
22            I can't tell that color too good.
23   BY MR. KING:
24        May I have a moment again, Your Honor?
25   BY THE COURT:
```

818

1349

VANES 001358

```
 1                          Yes.
 2        BY MR. KING:
 3               For the record, I have entered the room
 4           with the same gentleman I did the previous
 5           witness together with a young lady.
 6        BY THE COURT:
 7               Yes.
 8        BY MR. KING:
 9     Q    Mr. Moos, to my left are two people.  Are
10           these the people you recognized?
11     A        Yes, sir.
12     Q    Are these the people that were there that
13           night?
14     A        Yes, sir.
15     Q    With the van and the other things you told us
16           about?
17     A        Yes, sir.
18     Q    Are you sure?
19     A        Yes.
20     Q    Now, what about this fellow over here
21           (indicating)?  Do you recognize him?
22     A        Not really, sir.
23     Q    Could he be the third man?
24     A        It was wintertime and everybody had coats
25               and looked different.
```

819

1350

VANES 001359

```
 1    Q    Would it be fair to say you don't know?
 2    A         Yes, sir; I'm not sure.
 3    Q    Now, when was it that you informed me that you
 4         recognized somebody out in that hall?
 5    A         Right now when you asked me.
 6    Q    During when I was out in the hall during
 7         recess?
 8    A         Yes, sir.
 9    Q    You had just walked in and seen these people,
10         is that correct?
11    A         Well, when I walked in, they weren't
12            there.
13    Q    Okay, when did you see them?
14    A         Well, I was sitting out there and there
15            was another fellow out there, and then the
16            lady come out first, and then I recognized
17            her when she come out; and it was quite
18            some time later that the fellow came out.
19    Q    I see.  They came out this door here, the
20         courtroom door?
21    A         Yes, sir, because I was back over there.
22    Q    All right, they came out separately some time
23         apart?
24    A         Yes, sir.
25    Q    Now, do you recollect meeting this gentleman
```

820

1351

VANES 001360

```
 1          here that I'm pointing to seated at the
 2          prosecution table?
 3     A        Yeah.
 4     Q    And do you recall when you had occasion to
 5          meet with him?
 6     A        A few days ago or a week ago.
 7     Q    Okay.  Now, I'm guessing that the show room
 8          over at Bob Anderson's has got some lighting
 9          in it.  How would you describe the lighting?
10     A        It's old and bad.
11     Q    Old and bad.  You don't like it?
12     A        No -- it's no good.
13     Q    Are you able to see inside?  How would you
14          compare it to here?
15     A        Well, it's real bright in here; it's not
16             there.
17     Q    Not as bright there?
18     A        No.
19     Q    Okay.  And how long did you spend with these
20          folks, the three individuals on the van and
21          all this other business?
22     A        Better than an hour.
23     Q    Okay.  When you saw this gentleman, do you
24          recollect when that would have been?
25     A        Yeah, I remember, because his name is the
```

821

VANES 001361

```
 1                    same as mine; it was about a week ago.
 2   Q   Okay, did he show you some pictures?
 3   A       Yes.
 4   Q   Asked you to pick somebody out?
 5   A       Yes.
 6   Q   Were you able to pick anybody out?
 7   A       Yes.
 8   Q   Okay, now, were you sure when you picked out
 9       the picture?
10   A       Yeah.
11   Q   I'm going to put in front of you Defendant's
12       7, Defendant's 8 and State's 17.  Did you ever
13       see those pictures before?
14   A       Yeah, that's the ones he showed me.
15   Q   Do you remember which picture you picked out?
16   A       That one (indicating).
17   Q   You're pointing to number three on Defendant's
18       Exhibit 8, is that correct?
19   A       I don't have my glasses but, yes, this one
20           here, yes, sir (indicating).
21   Q   Would that be the maven you told us about, the
22       fellow that was with the young lady?
23   A       Yeah, he was the boss.
24   Q   He was the boss?
25   A       Yeah.
```

822

1353

VANES 001362

```
 1    Q    Okay.   And the fellow that walked in here a
 2         minute ago in the reddish suit --
 3    A       Uh-huh.
 4    Q    -- is that the maven?
 5    A       Yeah.
 6    Q    Is that his picture?
 7    A       I don't know -- yeah, it looks like him.
 8    Q    Okay, the picture you picked out looks like
 9         the fellow that just walked in here, is that
10         right?
11    A       Yeah.
12    Q    And the picture we're talking about is Arister
13         Thompkins, at least according to what is
14         written on the back, is that right?
15    A       Right.
16   BY MR. KING:
17            Thank you, sir.  No further questions.
18         The prosecutor may have some.
19                    CROSS-EXAMINATION
20                         BY
21                      MR. BENSON
22    Q    Mr. Moos, did you have glasses on when these
23         people came in that evening?
24    A       I only wear them for something that is
25         little like that.
```

823

1354

VANES 001363

```
 1      Q    But you can see my face fine and her face?
 2      A        Yeah, I can see fine; I just can't see
 3               little things.
 4      Q    Do you wear contacts or glasses at all?
 5      A        No, just for regular reading glasses when
 6               I need to read something.
 7      Q    Now, you stated that this third party who you
 8           can't identify was in the van, that trick van,
 9           correct?
10      A        Yes.
11      Q    What was he doing in the van?
12      A        Tuning in the radio.  It had a fancy radio
13               in it, because I was talking to the other
14               people and he was --
15      Q    Did you have a chance to observe him?
16      A        Well, you're concentrating on these
17               people, you know, over here; I could see
18               somebody was in there.
19      Q    What was his demeanor?  How would you
20           summarize his demeanor from what you observed?
21      A        I thought he had a few drinks or
22               something; he was goofing around with the
23               radio.
24      Q    Well, why would you think he had something to
25           drink?
```

824

1355

VANES 001364

```
 1     A          I don't know.  People act different, and
 2                maybe I do it when I have a few drinks,
 3                you know.
 4     Q     Okay, you thought the person had been drinking
 5           who was playing with the radio?
 6     A          Yeah.
 7     Q     It's your testimony that you recognize two
 8           people that were in there but do not recognize
 9           the third person, just that there was a third
10           person?
11     A          Yes, sir.
12     Q     This van, when did you find out that
13           information about when you received that van
14           into your dealership?
15     A          The other day when I was with you and --
16                I'm sorry, I forgot your name.  You asked
17                me if I could look up some records to find
18                out when we get stuff in; and you asked me
19                today, and I didn't have that record and I
20                made a call and asked when the van was
21                there and they looked in the police book
22                and it was in the police book.
23     Q     What is a police book?
24     A          Well, everybody has to have a police book
25                who you take something in from and then
```

825

1356

VANES 001365

```
 1              who it goes out to, and it's required by
 2              the state.  It's called a police book.
 3    Q    And this van was brought in the dealership you
 4         say when?
 5    A         The 26th of February.
 6    Q    Okay, and that was a trade-in?
 7    A         Yes, sir.  See, we don't get a lot of
 8              vans.
 9    Q    Okay, so the van is brought in as a trade-in
10         and you guys take time to wax it or to clean
11         it out.  You just don't put it out there like
12         it comes in, do you?
13    A         Yes.  I remember this van, because it
14              hadn't been detailed, but it come in, it
15              was just -- it was nice.
16    Q    So you guys, just as it comes in, you put it
17         right on the show room floor?
18    A         Well, no, it was sitting outside for
19              people to see because, as I say, it was so
20              clean.  We were going to send it out, but
21              as I say, it was so clean; we were going
22              to send it out, but you could show it to
23              people.  You know, you get something like
24              that once in a while.
25    Q    How many vans did you have in the dealership
```

826

1357

VANES 001366

```
 1              at that time, if you recall?
 2    A             That one.
 3    Q     No other vans in the dealership?
 4    A             No, sir.  See, we don't have no trucks so
 5                  it's very seldom we get one in.
 6    Q     How long have you been there for?
 7    A             Going on a year, just about a year.
 8    Q     About a year?
 9    A             Yeah.
10    Q     Have you ever seen any other vans in the
11          dealership during that year?
12    A             We just had two just last month.
13    Q     You had two last month?
14    A             Yes, sir.
15    Q     Which kind were those?
16    A             One was a GMC and the other was a Astro
17                  Chevy.
18    Q     Now, your previous testimony in a deposition
19          was that you don't even recall what month
20          these people came into the dealership,
21          correct?
22    A             Yeah -- I said January or February.
23    Q     Just that it was cold, right?
24    A             Right.
25    Q     Is that unusual to have a couple come in with
```

827

VANES 001367

```
 1          a male and a female?  Strike that, and let me
 2          rephrase it.  Do people normally come in by
 3          themselves to shop for a car, or are the
 4          majority of your customers male and female
 5          that come in together as a couple?
 6    A          It's probably fifty-fifty.
 7    Q     So this third person could have been anybody?
 8    A          I said I didn't remember him.
 9    Q     And it's your testimony today that you cannot
10          recognize the defendant as the third person
11          who was in the dealership?
12    A          No, sir, not really.
13    Q     Now, an investigator came out from the defense
14          attorney's office to speak with you quite a
15          while ago, didn't he?
16    A          Yeah, it was a long time ago.
17    Q     Do you recall when that was, approximately?
18    A          March.
19    Q     Are you asking me or --
20    A          Oh, just March came into my mind.
21    Q     And did he ask you about this incident that
22          you testified to?
23    A          Yes, sir.
24    Q     Did he ask you what these people did when they
25          were at the dealership?
```

828

VANES 001368

```
 1  ||  A        Yes.
 2  ||  Q    What did you tell him?
 3  ||  A        Well, at the time, see, I still had some
 4  ||           of the figures when he was there on a
 5  ||           paper, you know.  We were going with
 6  ||           payments so I had on the van, and then I
 7  ||           think we had three point nine (3.9)
 8  ||           financing on the Sunbird, so I still had
 9  ||           that at the time but it's just, you know,
10  ||           that I don't keep that stuff that long.
11  ||  Q    Did you tell him though about what they had
12  ||       looked at?
13  ||  A        I think we went over the same thing we
14  ||           just talked about now.
15  ||  Q    Okay, the same thing?
16  ||  A        Yeah, because it's hard, you know, you get
17  ||           people in and they drive so many different
18  ||           things -- it's really a pain -- but it's
19  ||           part of the job, you know.  They switch
20  ||           from like a truck to a little car and back
21  ||           to a bigger car, so --
22  ||  Q    And at that time though, you did talk with the
23  ||       defense attorney's investigator about what
24  ||       these people had driven, correct?
25  ||  A        Yes, sir.
```

829

1360

VANES 001369

1    Q    And you did tell them that it was this van,
2         right?
3    A        Yes, sir.
4    Q    And it wasn't until after your deposition this
5         last week that you then were able to obtain
6         this information about this van?
7    A        Well, I didn't even think of it until that
8             fellow asked me when we were sitting there
9             to look up the records.
10   Q    But you had spoke to his investigator almost
11        -- March, April, May -- twelve weeks ago, and
12        you had basically the same conversation,
13        correct, about what these people drove?
14   A        Yeah.
15   Q    And it never crossed your mind then to look up
16        any record of this car?
17   A        No, as I said, I told you I had the dates
18            down that they were in, but I have thrown
19            that away since then; I figured that guy
20            had it, I didn't need to keep that stuff
21            any more.
22   Q    But it is just since that deposition that your
23        testimony is that this car came into the
24        dealership's possession on 2-26-92, correct?
25   A        I wasn't asked before when it came in.

830

1361

```
 1    Q    Okay, but you were asked about what vehicles
 2         were driven?
 3    A         Right, but not when it came in.
 4    Q    The figures that you gave to who you referred
 5         to I believe as a maven and the female that
 6         was with him, there are no dates on those
 7         figures, are there?
 8    A         I don't have them any more.
 9    Q    All right, did you write anything down and
10         give it to them though?
11    A         I gave them my card; I don't remember if I
12              put any prices on the back or not.
13    Q    And you talked a little bit about your work
14         schedule.  You said that your schedule changes
15         every month or so?
16    A         Yeah, every week.  Like today is a
17              Thursday; I only work from 1:00 o'clock to
18              7:00.  Like last Thursday, I worked a
19              twelve-hour day, so it changes; you don't
20              have the same twelve-hour day like every
21              Thursday.  It would be a different day.
22    Q    Every other Thursday?
23    A         Yeah, so I think like next Thursday like I
24              work 9:00 to 6:00 or something.
25    Q    How late is the dealership open today?
```

831

```
 1    A        Today, 8:30.
 2    Q    And you work until 7:00 o'clock on Thursday?
 3    A        No, today my schedule is I work until
 4             8:30, until we close.
 5    Q    And that changes on a monthly or weekly basis?
 6    A        Every month you get a -- a calendar with
 7             your name on it and what days you work.
 8             In fact, I still have the one from then.
 9    Q    To the best of your recollection, you cannot
10         ever recall seeing this defendant before,
11         correct?
12    A        I'm sorry, sir, no.
13    BY MR. BENSON:
14             Thank you very much, Mr. Moos.
15                   REDIRECT EXAMINATION
16                          BY
17                     MR. KING
18    Q    When these folks looked at that van, it was
19         right after that van had come in, is that
20         correct?
21    A        Yes, sir.
22    Q    Because it hadn't -- when you say "detailed,"
23         that means the kind of cleaning you guys do at
24         dealerships to really make that vehicle look
25         its best, is that correct?
```

832

1363

```
1    A        Right.
2    Q   And it was still in the condition it was in
3        when it was traded in, is that correct?
4    A        Correct.
5    Q   And you hadn't even figured how to work the
6        seat at that point, is that correct?
7    A        No.  I hadn't really looked in the thing.
8    Q   All right.  And, again, you're saying you
9        can't identify him as the third man but you
10       can't eliminate him as the third person?
11   A        Right.
12   BY MR. KING:
13           Thank you.
14   BY THE COURT:
15           Mr. Benson, anything further?
16   BY MR. BENSON:
17           No.  Thank you.
18   BY MR. KING:
19           Move for the admission into evidence of
20       what's previously been marked for
21       identification as Defendant's Exhibit 6.  For
22       the record, I'm showing it to counsel for the
23       State.
24   BY MR. BENSON:
25           The State has no objection.
```

833

1364

VANES 001373

```
 1    BY THE COURT:
 2             Admitted.
 3
 4             WHEREUPON DEFENDANT'S EXHIBIT NUMBER 6 IS
 5        ADMITTED INTO EVIDENCE.
 6
 7    BY MR. KING:
 8             The defense moves for preservation on the
 9        writing of the blackboard if that's possible
10        between now and the conclusion of this case,
11        Your Honor.
12    BY THE COURT:
13             Well, unless it's pre-empted by something
14        else.  Counsel might want it for something
15        else; I don't know.
16             Ladies and gentlemen of the jury, we'll
17        excuse you for the day now and order you back
18        in tomorrow again at 10:00.  My secretary kind
19        of fooled me this morning and put something
20        else on the court call that involved a matter
21        not only in Indiana but Florida; it took some
22        time and we had a little bit later start than
23        I said we would since she didn't think I'd
24        mind, but it did hold us up a bit.  I hope
25        that tomorrow we're able to start on time.
```

834

VANES 001374

1       Let me also tell you that if we're unable

2   to finish tomorrow -- we're still working

3   toward that -- but if we're unable to finish

4   tomorrow, all things being equal, our schedule

5   would be to finish on Monday. Now, when that

6   happens, when a case goes over the weekend

7   like that and you have to come back on a

8   Monday, of course, we have to admonish you

9   strongly about the time gap in there between

10  hearing evidence and so forth, but it would

11  mean that you wouldn't be eligible for

12  selection on another jury next week, you would

13  just be faithful to this case and complete

14  this one, you wouldn't be part of the regular

15  jury panel to be selected for other cases.

16      I don't know if that's going to happen,

17  but I brought it up now in case it does; it's

18  something to think about.

19      But for now, we'll just admonish you again

20  not to converse about the case, not to consult

21  any media accounts of these proceedings, and

22  not to form or express any opinion on the

23  evidence presented up to this point.

24      The jury is excused until 10:00 tomorrow,

25  June 12th.

835

1366

VANES 001375

```
 1              WHEREUPON THE JURY WAS EXCUSED FROM THE

 2         COURTROOM AND THE FOLLOWING PROCEEDINGS WERE

 3         HELD OUTSIDE OF THEIR PRESENCE AND HEARING.

 4

 5    BY THE COURT:

 6              What is the envelope you were asking me

 7         about?

 8    BY MR. BENSON:

 9              I was just informed by the family that the

10         defendant's sister gave Mr. King an envelope

11         and they were concerned because then he walked

12         back there, and I just told them I'd ask.

13    BY MR. KING:

14              Yeah, I was given an envelope which I

15         looked at, and I never -- what are they

16         saying, I gave it to the Judge?

17    BY MR. BENSON:

18              No, they just said they saw you walk back

19         there with it.

20    BY THE COURT:

21              They were concerned about that apparently.

22    BY MR. KING:

23              Yeah, she did take it out of her purse

24         too.  It was a communique.

25    BY MR. BENSON:
```

                                   836

VANES 001376

```
 1              You had walked off the bench; it was
 2         during a break and you walked out and then he
 3         did, and they're saying, "Hey, what's going
 4         on?"
 5   BY THE COURT:
 6              Thanks a lot.
 7   BY MR. KING:
 8              I'm sorry.  What it was, I walked out that
 9         door.
10   BY MR. BENSON:
11              I told them you were above reproach.
12   BY MR. KING:
13              No, she gave me some an envelope with some
14         documents in there; in fact, I still have it
15         (indicating).
16   BY MR. BENSON:
17              Well, I told her I'd ask, so --
18   BY THE COURT:
19              Well, I'll tell you, this is not my week,
20         but rest assured --
21   BY MR. BENSON:
22              Judge, in regard to Monday, I have another
23         murder trial that's supposed to start Monday
24         in Judge Letsinger's court.  I anticipate us
25         being done or working Saturday.
```

837

VANES 001377

1    BY THE COURT:

2         Things are tough all over, you know.  My

3         court reporter's immediate reaction would

4         probably be the reaction of many people to

5         have that word mentioned.  Well, we'll see.

6

7         WHEREUPON THE COURT ADJOURNED FOR THE DAY.

8

9         WHEREUPON THE COURT RECONVENED AND THE

10        FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE

11        PRESENCE AND HEARING OF THE JURY ON JUNE 12,

12        1992:

13

14   BY THE COURT:

15        Mr. King, you had something you wanted to

16        put on the record?

17   BY MR. KING:

18        Yes, I intend to at this point in the

19        proceedings move for the Court to take

20        judicial notice of certain demographic data

21        obtained from the 1990 census.  I previously

22        provided the State with a copy of the data

23        obtained from the Lake County Public Library.

24        And supportive of our request, I would

25        cite the Court to, and in terms of the Court's

838

1369

VANES 001378

1        authority to take judicial notice of census

2        information, a series of cases.  If you want

3        to look here rather than have me reading off

4        the cites, that's fine.

5    BY THE COURT:

6        Well, I know that there's a section in

7        Indiana Practice, Indiana Evidence, Miller's

8        section 201.203 which talks about this and

9        says the courts will take judicial notice of

10       population figures of a city, county as shown

11       by a state or federal census, so that's

12       probably what your cases say.  There's a

13       series in Miller also, so that's what the law

14       is on it, but there might be some special

15       objection in this case.

16   BY MR. BENSON:

17       Just two, Judge: One of our objections is

18       relevancy.  I guess tangentially it's related

19       if you want to say that there's "X" amount of

20       people out there in the population who are

21       black males.  Maybe somewhere along the road

22       there's a hint of relevancy but I don't think

23       it's at least probative at all on this point.

24       As well as the document itself is two years

25       old; I can't cite anything, but I believe the

839

VANES 001379

```
 1              population has been declining.
 2      BY MR. KING:
 3              The problem is that Constitutionally the
 4              census is only conducted every ten years, so
 5              whether we like it or not, we will be forced
 6              to live with this data until the year 2000.
 7      BY THE COURT:
 8              And that includes for aid that the city
 9              gets and all the rest.
10      BY MR. KING:
11              Exactly.  They only do it every ten years
12              and that dictates how many congressmen, how
13              much money and all these other factors are
14              based on this data.  And, you know, frankly,
15              had the case been tried prior to the census of
16              '90, we would be dealing with dramatically
17              different figures that really were much less
18              reflective of the true state of affairs in the
19              late '80s, but that's how they do it.
20              The relevance I think in a mis-
21              identification case is fairly evident.  It
22              allows the jury to hear as best as data will
23              permit the number of people fitting a generic
24              classification in terms of age, in terms of
25              sex and in terms of race rather than engaging
```

840

1371

VANES 001380

```
 1          in guess work, and I think that it is
 2          certainly relevant, which I think the State
 3          even conceded that tangentially it certainly
 4          is relevant.
 5               But I believe I am entitled rather than
 6          sitting up here and speculating or having
 7          jurors engage in speculation as to how many
 8          young black males there are in the city of
 9          Gary, we have some basis to cite that data to
10          support that.
11     BY MR. BENSON:
12               I would just argue that's overly broad
13          because, number one, it doesn't say how many
14          of these black males have bad skin or it
15          doesn't say how many of them are over five
16          seven, which is the smallest height given.
17     BY MR. KING:
18               Again, counsel is indicating arguments he
19          can well make, but we have to start with
20          whatever data is available.  They break it
21          down according to age and race and sex, and
22          that's as far as they go.
23     BY THE COURT:
24               Well, the case law says that it's the
25          accepted thing to do, and I think you have
```

841

VANES 001381

```
 1              developed it in your case that this is the
 2              defense you're pursuing.
 3        BY MR. KING:
 4              Yes.
 5        BY THE COURT:
 6              So I would permit it.  There is nothing in
 7              the law of physics to say this crime couldn't
 8              have been committed by someone who didn't live
 9              in the city of Gary.
10              Are you going to offer this blank document
11              with nothing but the figures on it and ask me
12              to take notice and pass it to the members of
13              the jury?  Is that what is being done here?
14        BY MR. KING:
15              I'm not necessarily asking for
16              publication; I'm just asking that it be
17              admitted into the evidence after having been
18              judicially noticed and be available for
19              closing and go back in the jury room for
20              deliberations.
21        BY MR. BENSON:
22              I would just ask that the amounts -- since
23              there is nobody has said this person was a
24              teenager, that from nineteen years on up,
25              twelve and thirteen years old, those numbers
```

842

1373

VANES 001382

```
 1          not be referred to, and since nobody said that
 2          this person was in their thirties that the
 3          last number not be referred to.
 4     BY MR. KING:
 5          Well, I would say that I'm certainly not
 6          going to argue that all the numbers are
 7          applicable, but to arbitrarily draw a line
 8          there between twenty and nineteen because the
 9          best description we have is mid twenties and
10          so forth.  So the point being that there's no
11          prejudice to the State, the jury is going to
12          rely upon their recollection of the testimony
13          and they're not to limit their view of which
14          columns they're going to be looking at.  It's
15          inappropriate.
16     BY MR. BENSON:
17          I would just argue that anybody nineteen
18          years or younger have never been referred to
19          and it would be irrelevant.
20     BY THE COURT:
21          I think it's a matter of argument.  I'll
22          admit it as it is.
23
24          WHEREUPON DEFENDANT'S EXHIBIT NUMBER 9 IS
25          ADMITTED INTO EVIDENCE.
```

843

1374

VANES 001383

```
 1    BY THE COURT:
 2            Anything else before we go on?
 3    BY MR. KING:
 4            Yes, after we handle that procedurally --
 5        and what I'll do is go ahead and mark this as
 6        a defense exhibit -- I'm going to ask leave of
 7        Court by way of demonstration to permit myself
 8        and my client to approach the jury box and
 9        permit the jury to get a closer look at the
10        physical appearance of my client than they
11        have been able to do given the layout of the
12        courtroom here, that we're on the other side
13        of the courtroom from the jury box, and then I
14        would intend to rest.
15    BY MR. BENSON:
16            I would just ask when the defendant is
17        displayed to the jury at close range that
18        there's no comment or any indication from
19        counsel where to look, what to look at,
20        anything like that.
21    BY MR. KING:
22            No, absolutely not.  I intend to walk up
23        there with him and --
24    BY THE COURT:
25            That's certainly well taken, yes.
```

844

1375

VANES 001384

```
 1   BY MR. KING:
 2          And I would ask it just be myself and my
 3       client to walk up there, to walk on one side
 4       or the other, come back and sit down and not
 5       say anything.
 6   BY THE COURT:
 7          And the purpose is to give the jury as
 8       close a look at the defendant as possible, is
 9       that right?
10   BY MR. KING:
11          Yes.
12   BY THE COURT:
13          All right.  I have prepared a list of
14       instructions here.  And I don't know if you
15       have any to tender, either side.
16   BY MR. KING:
17          I'm going to look at one of them with
18       respect to -- it seems to me the pattern on
19       alibi defense, at least the ones I'm familiar
20       with, or somewhere in the instructions,
21       reiterate to the jury that even though a
22       defense such as alibi has been presented and
23       evidence to that effect, that it does not in
24       any way, shape or form shift the burden of
25       proof.
```

845

1376

VANES 001385

```
 1    BY THE COURT:
 2          I think this instruction says that.  But
 3       at the present time, why don't we give you
 4       each a copy of the whole panoply of
 5       instructions, and you can then when we're done
 6       with the evidence or at any time take a chance
 7       to look them over, make your objections,
 8       deletions, requests.
 9    BY MR. KING:
10          Now, I've been informed by the State that
11       -- and I don't know if this has changed since
12       a half hour ago -- that they intend to present
13       in rebuttal a records custodian of the
14       telephone company with reference to telephone
15       bills from my client's residence.
16          And if I understand it correctly, I
17       respectfully submit that that is improper
18       rebuttal.  They are attempting to show the
19       absence of any call from that residence to a
20       Michigan number.
21          I would point out to the Court that the
22       unrefuted testimony is any such phone call
23       would have been an hour past, after the time
24       of the offenses charged in Counts I through IV
25       of the information of this case; therefore, it
```

846

1377

VANES 001386

```
 1          is irrelevant and improper rebuttal.
 2              Secondarily, I would point out to the
 3          Court that the defense did not elicit any
 4          testimony regarding a telephone conversation;
 5          that was elicited by the State itself.
 6              And, finally, I would submit to this Court
 7          that if the State's argument is this is
 8          impeachment evidence of the testimony of
 9          Sheila Donald, this is collateral and
10          extrinsic proof is not permitted to impeach on
11          a collateral matter.
12              So for all these reasons, I respectfully
13          move in limine to prohibit the State from
14          eliciting that evidence in rebuttal if it
15          remains their intent to do so.
16     BY MR. BENSON:
17              Well, the State would prefer to reserve
18          their argument until defense counsel has
19          rested their case.
20     BY THE COURT:
21              All right.  You may bring in the jury.
22
23              WHEREUPON THE JURY WAS BROUGHT INTO OPEN
24          COURT AND THE FOLLOWING PROCEEDINGS WERE HELD
25          IN THEIR PRESENCE AND JURY:
```

847

1378

VANES 001387

```
 1   BY THE COURT:

 2        Defense may proceed.

 3   BY MR. KING:

 4        Thank you, Your Honor.  Your Honor, the

 5   defense would respectfully ask the Court to

 6   judicially notice certain data obtained as a

 7   result of the 1990 census of the population

 8   and housing conducted by the United States

 9   Bureau of Census.

10        I would cite as authority for this in re

11   Roden v. State, 1968 143 Indiana Appellate,

12   537 241 N.E.2D 800, Swain v. State, 1939 215

13   Indiana 259, 18 N.E. 921, and several other

14   cases if the Court would please I would share

15   with it.

16        I would respectfully at this point have

17   the record reflect that I'm tendering what's

18   been marked for identification as Defendant's

19   Exhibit 9, which is the print-out of a section

20   of that data I would not tender to the Court

21   and ask the Court to take judicial notice.

22   BY MR. BENSON:

23        No objection to that census report.

24   BY THE COURT:

25        All right, based upon that case law and
```

848

1379

VANES 001388

```
 1              others I could mention, the Court will take
 2              judicial notice and admit into evidence what
 3              has been marked as Defendant's Exhibit Number
 4              9, which is entitled "1990 Census of
 5              Population and Housing" for the state of
 6              Indiana, city of Gary in Lake County.
 7                   Counsel, are you asking that this be
 8              published at this time or be available to the
 9              jury?
10    BY MR. KING:
11                   I would ask that it be available,
12              obviously, for counsel during summation, and
13              further that it be remitted to the jury room
14              during the course of their deliberations.
15    BY THE COURT:
16                   Granted.
17    BY MR. KING:
18                   At this point, the defense would move for
19              the leave of Court to permit by way of
20              demonstration an approach to the jury box by
21              my client and myself without any comment so as
22              to permit an opportunity for the jury to view
23              my client at a closer distance than is
24              permitted by the layout of the Court.
25
```

849

VANES 001389

```
 1    BY THE COURT:
 2         Under the procedure that we approved in a
 3         hearing outside the presence of the jury, that
 4         motion is granted.
 5
 6         WHEREUPON DEFENSE COUNSEL AND THE
 7         DEFENDANT WALKED FROM THE OUTER FAR END OF THE
 8         JURY BOX TO THE OPPOSITE END.
 9
10    BY MR. KING:
11         Your Honor, the defense rests.
12    BY THE COURT:
13         Members of the jury, the defense has
14         rested and at this point, counsel have asked
15         me to hear some matters outside your presence,
16         and we'll do so.  We'll excuse you for a few
17         minutes.
18         The jury is excused and admonished not to
19         converse about the case.
20
21         WHEREUPON THE JURY WAS EXCUSED FROM THE
22         COURTROOM AND THE FOLLOWING PROCEEDINGS WERE
23         HELD OUTSIDE THEIR PRESENCE AND HEARING:
24
25
```

850

1381

VANES 001390

```
 1    BY MR. BENSON:
 2            Let me identify the other witness too.
 3    BY THE COURT:
 4            All right.
 5    BY MR. BENSON:
 6            We also intend to call Chandra Goodman,
 7        the girlfriend of the defendant.  And those
 8        witnesses are going to be called to rebut the
 9        testimony of -- as counsel stated, but I
10        disagree with him; it's not ancillary to this
11        issue -- of Sheila Donald and Don Hopkins.
12        And I want to show the Court in writing why
13        we're doing this.
14    BY THE COURT:
15            All right.
16    BY MR. BENSON:
17            Judge, the testimony of Sheila Donald and
18        Dan Hopkins: Sheila Donald testified, okay,
19        that as to two things in particular that we're
20        calling rebuttal witnesses, and the first one
21        is that she saw her brother on the phone
22        talking.  Okay, Dan Hopkins testified that,
23        one, the defendant never talked on the phone
24        that he saw; okay, number two, that there was
25        a phone call, and there might have been
```

851

VANES 001391

```
 1              another one, okay, a second call.   Because he
 2              said that's when Sheila could have seen him on
 3              the phone.
 4      BY THE COURT:
 5              He testified there was an incoming call
 6              from Chandra.
 7      BY MR. BENSON:
 8              Well, that's the first call.
 9      BY THE COURT:
10              Right.
11      BY MR. BENSON:
12              He said he answered it but the defendant
13              didn't speak to Chandra Goodman.
14      BY THE COURT:
15              Right.
16      BY MR. BENSON:
17              The second call, or he says there might
18              have been a second call, because I asked him,
19              "Was Sheila in the room with you when you went
20              to go get the defendant?" and he said, "Yes,
21              she never left."  And then I asked, "Well,
22              based upon your observations, is it possible
23              that she could have seen the defendant talking
24              on the phone?" and his response was, "There
25              might have been another call," because he said
```

852

VANES 001392

```
 1        she left the room two or three times, went to
 2        the bathroom, went to the other bedroom.
 3            We are offering the testimony of the AT&T
 4        -- I'm sorry, the Indiana Bell keeper of the
 5        records and Chandra Goodman to show that there
 6        were no other calls and that Sheila Donald is
 7        lying, that she did not see her brother on the
 8        phone.
 9            And that is imperative testimony to
10        impeach that witness.  Because if she's lying
11        about that crucial point at a time so close
12        when these robberies would have just finished,
13        she's lying about something else, Judge.
14   BY THE COURT:
15            Well, what is it she said, that she saw
16        him on the phone?
17   BY MR. BENSON:
18            "I saw him talking on the phone," and that
19        is in the deposition also.  In the deposition,
20        she said, "I saw him call."
21   BY MR. KING:
22            Well, objection to the deposition.
23        Counsel made no effort under any appropriate
24        procedure to get that deposition or a portion
25        thereof into the evidence.
```

VANES 001393

```
1    BY MR. BENSON:

2            Judge, I asked her about it.   When she

3         said, "I saw him on the phone," I said, "Isn't

4         it true that you previously said that you saw

5         him call his girlfriend?" and she goes, "Well,

6         I'm not sure, but he was on the phone."  She

7         was steadfast in saying, "I saw him on the

8         phone."

9            And under this scenario with the keeper of

10        the records from Indiana Bell and Chandra

11        Goodman testifying, that will show that there

12        was only one phone call.  And Dan Hopkins

13        testified there's no way that Sheila Donald

14        could have seen him on the phone because she

15        was in the bedroom the whole time during that

16        call.  But he did leave open the door that

17        there might have been another call.

18           And we're proving that there wasn't any

19        other call made in which the defendant was

20        talking to his girlfriend other than that one.

21   BY MR. KING:

22           Your Honor --

23   BY MR. BENSON:

24           And that door is open now, and we're

25        attempting to close it.
```

854

VANES 001394

```
1    BY MR. KING:
2           Your Honor, they, first of all, they are
3       the ones that elicited the testimony; this was
4       not presented by the defense, number one.
5    BY THE COURT:
6           Is there some problem with that vis a vis
7       rebuttal that it came out during cross-
8       examination?
9    BY MR. KING:
10          Yes, I believe so.
11   BY THE COURT:
12          Why?
13   BY MR. KING:
14          In rebuttal, you are responding to
15      evidence that was generated by the defense;
16      they generated the evidence themselves at a
17      time not related to any of the offenses
18      charged.
19   BY THE COURT:
20          Well, what time was it then?
21   BY MR. KING:
22          After the return to the home which was
23      described and unrefuted as some time after
24      9:45.
25   BY THE COURT:
```

855

1386

VANES 001395

```
 1              So it doesn't have anything directly to do
 2         with the alibi.
 3    BY MR. KING:
 4              Exactly.
 5    BY THE COURT:
 6              But it's part of the State's theory of the
 7         case.
 8    BY MR. KING:
 9              Well, Judge, we have heard theories in
10         this case which, you know, the fact that they
11         theorize something does not make it germane.
12         This is completely collateral.
13              The other point, and I don't know if
14         counsel was intentionally being misleading
15         when he keeps pounding on the witness box and
16         saying, "There were no calls," that's not what
17         the evidence would be; there weren't any long
18         distance calls made from Gary, from the
19         residence in Gary out.  There is going to be
20         no testimony as I understand it about local
21         calls.  And it's just -- it's not rebuttal.
22              Whether or not my client talked to his
23         girlfriend on the telephone is completely
24         collateral.
25    BY THE COURT:
```

856

1387

VANES 001396

```
 1              Well, that depends on what was said.  In
 2         some cases, I've had admissions on the
 3         telephone.
 4    BY MR. KING:
 5              I understand but, Judge, they're talking
 6         about rebuttal.  I just rested.  The defense
 7         has not in any way, shape or form, nor has the
 8         State in their cross-examination put on any
 9         evidence of the content of the conversation.
10              So, if the Court is asking, "Well, it
11         depends on what was said," fine.  No evidence
12         has been presented in the defense case about
13         the conversation or about, certainly, what was
14         said.
15              So how is this rebuttal?  If there was
16         evidence presented, there was conversation
17         here of what was said, maybe the State would
18         have an argument.  But they don't.  That
19         wasn't the case.  The defense never put this
20         on.
21              Now, if they chose, they could have in
22         their case in chief presented evidence of a
23         phone call; obviously I would have relevance
24         objections at that point which could be
25         considered.
```

857

1328

VANES 001397

```
 1              But the point is rebuttal is limited to
 2         responding to evidence presented by the
 3         defense; we didn't present this evidence.
 4         Even if we had, it is collateral and extrinsic
 5         proof, and an impeachment of a collateral
 6         matter is not permitted under Indiana law.
 7    BY THE COURT:
 8              Forgetting about the collateral matter for
 9         a while, was it not Donald's testimony that
10         she saw her brother talking on the telephone?
11    BY MR. BENSON:
12              She said she saw him and heard him talking
13         to his girlfriend.  His girlfriend.
14    BY THE COURT:
15              And if you are able to prove with your
16         records that only one phone call took place,
17         and your witness will say that she initiated
18         the call I take it, and did or did not talk to
19         the defendant --
20    BY MR. BENSON:
21              Well, she may say something different from
22         Dan Hopkins also, which impeaches his
23         testimony.  I'm impeaching the testimony that
24         was elicited during their time on the witness
25         stand.  It shows they're both lying about the
```

858

1320

VANES 001398

```
 1              incident, Judge.
 2    BY THE COURT:
 3              But the purpose of rebuttal isn't
 4         impeachment, it's to rebut evidence presented
 5         by the defense.
 6    BY MR. BENSON:
 7              Correct.
 8    BY THE COURT:
 9              Now, are you saying that you should be
10         entitled to get into the conversation held
11         between Chandra and the defendant on rebuttal?
12    BY MR. BENSON:
13              I believe I should be allowed to because
14         Dan Hopkins said that she never talked to him.
15    BY THE COURT:
16              That he knew of.
17    BY MR. BENSON:
18              Well, yeah, see, that's what we're
19         guessing, that he knew of.  But by introducing
20         the keeper of the records, then we don't have
21         to guess.  The jury can sit here, Judge, and
22         now speculate that, "Well, maybe there was
23         another call that Sheila could have seen him
24         talking on," but we know that's not true if
25         I'm allowed to put on the evidence of the
```

859

1399

```
1        phone records.  It's an area that is now pure
2        speculation.
3             How could I possibly -- there's no way --
4        even counsel admitted he had relevancy
5        objections if I had called Sheila Donald in my
6        case in chief.
7    BY MR. KING:
8             No, I think the record will reveal I said
9        I would challenge the relevance of it in the
10       case in chief, but you could have at least
11       attempted to do it then.
12            This is not rebuttal of anything the
13       defense presented.  Nothing.  It rebuts
14       nothing and is completely collateral to the
15       issues in this case.  Completely.
16   BY THE COURT:
17            Let's get on to the collateral business.
18       If all of what you say is true, what
19       difference does it make?
20   BY MR. BENSON:
21            Where someone is at -- it goes to the
22       alibi, Judge.  If these witnesses are lying
23       about whether or not the defendant spoke to
24       someone on the phone and who they were talking
25       to -- they're trying to create an alibi by
```

860

1391

```
 1              their testimony, that, "He was talking to his
 2              girlfriend," and Sheila Donald says, "I saw
 3              him."
 4                   Now, we have proof -- Dan Hopkins says,
 5              "She didn't unless there was another phone
 6              call," -- and now we have proof to show there
 7              wasn't.  And if we are not allowed to present
 8              that to the jury, now the jury is left with
 9              the impression thinking that this defendant
10              was talking on the phone to someone at --
11              what? -- thirty minutes after the crimes?
12
13      BY THE COURT:
14                   Well, is your rebuttal witness going to
15              say that he was talking on the phone to her?
16      BY MR. BENSON:
17                   Well, I believe she's going to.
18      BY THE COURT:
19                   Well, what does that rebut?  Then he was
20              talking to her.
21      BY MR. BENSON:
22                   I'm not calling her for what was said, and
23              I probably could stay away from that part of
24              the conversation.  I'm calling her --
25      BY THE COURT:
```

861

1302

VANES 001401

```
1              But you say he was talking to her?
2    BY MR. BENSON:
3              That's what she's going to say.
4    BY THE COURT:
5              Well, what does that rebut?
6    BY MR. BENSON:
7              I'm not calling her for that purpose,
8         Judge; I'm calling her for the purpose of the
9         phone bill that shows it was only one call
10        made to the residence that evening, and Sheila
11        Donald could not have seen him talking on the
12        phone like she has testified.
13   BY MR. KING:
14             You cannot use the phone bill from Chandra
15        Goodman's phone; that is complete hearsay.
16        She didn't generate that document.  You don't
17        have anybody here --
18   BY THE COURT:
19             He has somebody from the Bell system he
20        said.
21   BY MR. KING:
22             He's got somebody here from Indiana Bell;
23        you don't have anybody here from MCI, do you?
24        If you don't --
25   BY THE COURT:
```

                              862

VANES 001402

```
 1                    He has got Chandra.
 2      BY MR. BENSON:
 3              I certainly can ask her about that phone
 4          bill; if she has adopted it, paid it, it's
 5          fair game.
 6      BY MR. KING:
 7              No, it's not fair game.
 8      BY MR. BENSON:
 9              I can ask her if she made the call.
10      BY MR. KING:
11              But the point is, and the Court is asking
12          -- he's the proponent of this evidence; he
13          can't even answer the Court's question what it
14          rebuts.  He cannot even answer that question.
15              And what they are doing is attempting to
16          -- you know, we have been focused on one issue
17          throughout this case, one issue, the identity;
18          that's where the alibi has relevance.  It's
19          relevant on that issue.  And the times of the
20          offenses in question predate the unrefuted
21          testimony as to the time of the arrival at the
22          home.  So what he's talking about in any event
23          happens after the offenses.
24      BY THE COURT:
25              It must or you wouldn't want to put it on
```

1304

VANES 001403

 1          because you would be establishing his alibi.
 2     BY MR. BENSON:
 3          Judge, this Court is going to give the
 4     jury instruction on the credibility of the
 5     witnesses, yet now the State isn't having the
 6     opportunity to fulfill their burden of helping
 7     the jury determine the credibility of the
 8     witnesses because we're being prohibited from
 9     offering evidence that will show that Sheila
10     Donald is lying.
11     BY MR. KING:
12          Well, I mean a lot of times lawyers on
13     either side get prohibited from offering
14     things they want to offer.  I mean that
15     doesn't relate to anything; it's not germane
16     to anything.
17          My point is this is not rebuttal.  This is
18     not rebuttal at all; it's not even close.  And
19     he's contending, "Well, we're going to attack
20     the credibility of Hopkins vis a vis Donald,"
21     he's got -- and you noted my objections at the
22     time -- well, he does; he has Hopkins saying
23     one thing.
24          You know, he can make that argument on
25     what he's got through cross-examination about

                              864


                           1395

1    the difference between Sheila's recollection

2    and Dan Hopkin's recollection.  This does

3    nothing to aid, if that's their goal in this

4    -- again, they're the proponent of the

5    evidence.

6          It's their obligation to establish to this

7    Court some basis for the admission of this

8    evidence as rebuttal evidence, and to this

9    minute they have not articulated a basis for

10   either its relevance, its nature as rebuttal

11   or, finally, they have never addressed the

12   collateral aspect of this.

13         And this is what that evidence is.  This

14   is extrinsic proof of impeachment, which is

15   not permitted where the matter is collateral.

16   BY THE COURT:

17         Well, you're saying it doesn't harm you in

18   any way so what difference would it make?

19   BY MR. KING:

20         Because I'm objecting.  Because I'm

21   objecting.

22   BY THE COURT:

23         What harm would it do the defendant?

24   BY MR. KING:

25         Here's what the harm does:  The defense

865

1396

VANES 001405

```
 1        from the time of selecting this jury has done
 2        their level best to have a focus on what the
 3        issue in this case is, focus on the issue of
 4        this case.  This is the diversion from that
 5        focus.  That is potential harm.  And potential
 6        harm is never a basis for the propriety of an
 7        objection.
 8             They are the proponent.  They have the
 9        burden of establishing its admissibility; it's
10        not the other way around.  And the objections
11        I have noted, beginning with my comments
12        before the jury was even brought in, the State
13        has not met their burden as proponent of this
14        evidence and I respectfully ask that the Court
15        grant our Motion in Limine to prohibit the
16        introduction of this evidence for all the
17        reasons noted.
18             And they have yet -- yet to show that
19        counsel for the defense is in error on any of
20        these objections; they cannot articulate their
21        basis for seeking the admission of this
22        evidence insofar as it fits Indiana case law.
23   BY MR. BENSON:
24             Judge --
25   BY MR. KING:
```

866

MAY 23 1997

1397   Anna M. Anton

Filed in Clerk's Office

CLERK LAKE SUPERIOR COURT

VANES 001406

```
 1              Their simply saying in their view or in
 2         the Court's view or whatever, it doesn't harm
 3         the defendant just doesn't address the issue.
 4         They have to show that this is, in fact,
 5         admissible evidence, and they haven't done it.
 6    BY MR. BENSON:
 7              Judge, it directly reflects the testimony
 8         of Dan Hopkins when he says Sheila Donald
 9         could have seen the defendant on the phone
10         talking to his girlfriend when another call
11         came in.
12
13    BY THE COURT:
14              Well, I've never had in all the years I've
15         been here somebody rebutted on what could have
16         happened.  I've never had that experience.
17    BY MR. BENSON:
18              Well, but Sheila Donald testified she did
19         see, not that she could have seen, Sheila
20         Donald then testifies, "I did see him on the
21         phone talking to his girlfriend."  And we want
22         to rebut that.
23    BY THE COURT:
24              And then your rebuttal witness would
25         corroborate that by saying, "I did talk to him
```

867

VANES 001407

```
 1              on the telephone."
 2    BY MR. BENSON:
 3              No.  She's going to say there was one
 4         phone call.  Someone is lying out of these
 5         three people, and that's what we want to show.
 6    BY MR. KING:
 7              You only have two people at this point.
 8         Again, see, he's --
 9    BY THE COURT:
10              You're saying that Chandra may be the one
11         that's lying who has not even been presented
12         yet too.
13    BY MR. BENSON:
14              Well, I believe she's going to testify --
15         she may be mistaken.  I don't believe she's
16         lying because she has seen the phone bill.  It
17         was defense counsel's witness he chose not to
18         call.  So she has seen the phone bill; this
19         isn't any big surprise.  She's going to know
20         what the phone bill says;  I'm sure she has
21         looked at it.  Defense counsel has tendered
22         that to us.
23    BY THE COURT:
24              Well, the call was made from her to this
25         number?
```

868

VANES 001408

```
 1    BY MR. BENSON:
 2              Yes.
 3    BY THE COURT:
 4              And the number of minutes on the bill is
 5         how many?
 6    BY MR. BENSON:
 7              One, as if the defendant wasn't there.
 8    BY THE COURT:
 9              One minute could be anything from one down
10         to zero.
11    BY MR. BENSON:
12              You're charged one minute no matter what;
13         that's what the testimony will be.
14    BY MR. KING:
15              Again, hey, how are we rebutting anything?
16    BY THE COURT:
17              We don't even know from that if she talked
18         to anyone.
19    BY MR. BENSON:
20              It rebuts their direct testimony about who
21         saw who on the phone.  And I don't care
22         whether that comes out in direct or cross;
23         that's not the criteria.  Their witness said
24         it.  How else do you ever impeach the
25         testimony of someone who is lying on cross-
```

869

1100

VANES 001409

```
 1           exam?  You know, if she had got up there and
 2           said, "The sun sets in the east," I can't call
 3           someone to verify that?
 4    BY THE COURT:
 5           But I'm not sure this does that.  All of
 6           it could be true and the phone bills shows the
 7           call made from that number to this one.
 8    BY MR. BENSON:
 9           It can't be true because of what Dan
10           Hopkins said.
11    BY MR. KING:
12           But he has already got that argument.  He
13           can already argue he's got two different bits
14           of testimony on, again, a completely
15           collateral issue.   That's the point.
16           You know, he wants to take up jury time
17           not talking about anything close to the issue
18           in this case, not talking about a time germane
19           to the elements of the offenses charged in
20           this case.
21           Hey, he's the proponent of this evidence.
22           He has yet to articulate any basis for the
23           admission of this testimony in the State's
24           rebuttal case of any of this.
25    BY MR. BENSON:
```

870

1401

VANES 001410

1           The witness -- Sheila Donald and Dan
2      Hopkins is lying, and that's what this
3      testimony will show.
4   BY MR. KING:
5           Well, no.
6   BY MR. BENSON:
7           And I agree, counsel shouldn't want that
8      in.   But the State believes it's relevant and
9      it's proper rebuttal.
10  BY MR. KING:
11          Well, that's counsel's view of it.
12
13  BY MR. BENSON:
14          That's part of this entire alibi --
15  BY MR. KING:
16          He's making his closing argument.
17  BY MR. BENSON:
18      -- that they went to a car dealership, what
19      time they got home, that everyone saw
20      everybody else, and everyone is telling a
21      different story.
22  BY MR. KING:
23          Well, Judge, he's got an excellent closing
24      argument I'm sure we'll all be thrilled to
25      hear, but that doesn't permit them to, under

                         871


                      1402


VANES 001411

```
 1         the guise of rebuttal, present this collateral
 2         irrelevant evidence in an effort to simply
 3         muddy the waters over what the issue in this
 4         case is.  And that's exactly what he's trying
 5         to do.
 6              Now, he wants to -- you know, he's so
 7         convinced that Mr. Hopkins and Ms. Donald are
 8         lying.  Let him bring perjury charges against
 9         them and litigate it that way.  The truth of
10         the matter is he couldn't even do that because
11         the testimony in respect to the phone call
12         isn't material to anything in this case.
13    BY MR. BENSON:
14              Whether or not one of the witnesses
15         observes a crucial fact is not relevant,
16         Judge?  Places the defendant talking on the
17         phone?
18    BY MR. KING:
19              Because Mr. Benson says somehow in his
20         mind this is a crucial fact doesn't make it
21         so.  It is not a crucial fact to this case.
22    BY THE COURT:
23              What difference would it make, Mr. Benson,
24         all things being equal, if this guy got on the
25         phone with his girlfriend at that particular
```

872

VANES 001412

```
 1              time or not?  He still may or may not have
 2              committed this crime.
 3      BY MR. BENSON:
 4              It shows his alibi witnesses are lying.
 5      BY MR. KING:
 6              Your Honor --
 7      BY MR. BENSON:
 8              And they may have lied about something
 9              else.  He may have not went with them; no one
10              has IDd this defendant as being at the car
11              dealership.
12
13      BY MR. KING:
14              Yes, isn't that appropriate?  This is
15              ludicrous; this is ridiculous.  He is not
16              entitled to present this; he hasn't yet
17              answered one of your questions.  He has not
18              answered one of your questions, Judge.
19      BY MR. BENSON:
20              I don't know who defense counsel has been
21              listening to, Judge, but I told you that it is
22              to rebut what Dan Hopkins said and what Sheila
23              Donald said.  She said she observed him
24              talking to his girlfriend.
25              When you combine the testimony of Chandra
```

873

VANES 001413

```
 1              Goodman, the Indiana Bell keeper of the
 2              records and Dan Hopkins, she has proved that
 3              she is lying; and it rebuts her testimony that
 4              she saw her brother talking on the phone.
 5                   That's what it rebuts.  I don't know how
 6              much more articulate defense counsel wants me
 7              to be so he can understand it.
 8       BY MR. KING:
 9                   Put it at a time relevant to the case for
10              heavens sake.
11       BY THE COURT:
12                   What if she saw him talking on the phone
13              to somebody in Gary?
14       BY MR. BENSON:
15                   She didn't say that; she said I saw him
16              and I heard him talking to his girlfriend.
17              That's what she said, and we can go back and
18              look at that because I specifically wrote that
19              down.  She said it in her deposition too.  I
20              assumed that was going to be the alibi, but as
21              it turned out now, it's a one-minute phone
22              conversation that I want to get into.
23       BY MR. KING:
24                   At a time after any of these incidents --
25       BY THE COURT:
```

874

1405

VANES 001414

```
 1              The only thing he brought up is does it
 2          impeach your witnesses?
 3     BY MR. KING:
 4              No.
 5     BY THE COURT:
 6              Why not?
 7     BY MR. KING:
 8              What he has already in is the two
 9          witnesses different recollections; he has
10          already accomplished an impeachment.  He has
11          already accomplished an impeachment between
12          the two.  That is in the record; that is in
13          the evidence.
14              Now, I don't agree on the significance of
15          it, but that's there.  Now, even by what he
16          has said --
17     BY THE COURT:
18              Except that you've got Hopkins saying
19          there may have been a second call, right?  He
20          doesn't know.
21     BY MR. KING:
22              Exactly.  From who?  All he said is maybe
23          the phone rang again because of the call
24          waiting; it doesn't mean a long distance call,
25          it could be a local call.
```

875

1406

VANES 001415

```
 1              But, again, Judge, it's at a time that is

 2         not relevant to anything.  That's why the rule

 3         exists.  He's saying that's proving they're a

 4         liar.  If it is germane to the issue in the

 5         case, then it is not collateral.

 6              This is the old example, you know, of an

 7         eye witness offhandedly saying, "Well, this

 8         one car that's not particularly relevant to

 9         anything was red," and then there's some

10         extrinsic proof, "Well, the car was blue."

11         The color of the car doesn't matter in the

12         case.  You cannot bring in extrinsic proof to

13         prove the car was blue as opposed to red; it's

14         elementary law.

15              And that's exactly what this is, and the

16         danger -- the danger is one of the things

17         where it looks linked to the conditions of the

18         time and all this is confusion of the issues,

19         misleading of the jury.  And that's exactly

20         what this evidence is designed by the State to

21         do.  They don't want to deal with the issues;

22         they want to go off on this tangent at a time

23         that is not relevant to the issues are in this

24         case.  It is their burden to establish its

25         admissibility; they have failed.
```

1427

VANES 001416

```
 1              And on all the grounds previously noted, I
 2         respectfully ask this Court to grant my Motion
 3         in Limine and prohibit the State from doing
 4         this.
 5    BY MR. BENSON:
 6              But doing that, the Court has ruled that
 7         credibility is not an issue.  That's what they
 8         do if they grant the Motion in Limine, because
 9         it goes to this witness's ability to
10         recollect.
11              Maybe they're wrong about the night they
12         went to the car dealership.  Obviously they're
13         wrong about these phone conversations, and if
14         not, it's not a mistake, then it's a lie and
15         it's a credibility matter, and that's
16         relevant, Judge.
17    BY THE COURT:
18              Well, on the issue of the car dealer, they
19         did present some corroboration, not as to the
20         defendant but as to Hopkins and Sheila Donald.
21              Well, it seems to me -- it's an
22         interesting question, but you must remember,
23         we're not talking about just anything here but
24         rebuttal; and rebuttal has got rules, very
25         strict rules.  If you have evidence you
```

877

1408

```
1          present.  If there is something that the

2          defense develops that you know very specially

3          and very limitedly, you can do that; and

4          that's what we're talking about.

5    BY MR. BENSON:

6              I don't know how I could have done this in

7          the case in chief, Judge.  Maybe it's my lack

8          of ignorance (sic), but I don't think that

9          would have been available.

10   BY THE COURT:

11             No, it wouldn't; you're right.  I don't

12         think you could have done this in your case in

13         chief; you could have offered it but I don't

14         think you could have done it.  It would have

15         been premature.

16   BY MR. KING:

17             But he's the one that went into the phone

18         calls.

19   BY THE COURT:

20             Unless you have something in the

21         conversation with Chandra Goodman and the

22         defendant that you could use against the

23         defendant.

24   BY MR. KING:

25             Which he cannot do.
```

878

1409

VANES 001418

```
 1    BY MR. BENSON:
 2            That was argued against.
 3    BY THE COURT:
 4            Well, you could if you have something.  I
 5        mean there are admissions made by individuals,
 6        and if it's done, they're admissible.  But
 7        that's not what we're talking about here.
 8            So on balance, I believe as I have heard
 9        all the evidence and weighed it, I agree with
10        the defense that it not be presented; I don't
11        think it qualifies under the very strict rules
12        of rebuttal that Indiana requires.  And I
13        think I would be found in error to admit it.
14    BY MR. BENSON:
15            Okay, then, Judge, we have three other
16        rebuttal witnesses to deal with at this time.
17    BY THE COURT:
18            Let's hear about that.
19    BY MR. BENSON:
20            We want to introduce Cherie Cunningham and
21        Ron Fleming.  Cherie Cunningham -- there has
22        been some talk as well as --
23    BY MR. KING:
24            Who is Cherie Cunningham?
25    BY MR. BENSON:
```

879

1410

VANES 001419

```
 1              She's a victim-witness assistant.  If I
 2         could explain: In these State's exhibits, the
 3         line-ups that were shown to the car
 4         dealerships, Defendant's Exhibits 7 and 8 and
 5         State's Exhibit 17, one of the pictures
 6         appears of Lavelle Thompson, a name that was
 7         injected by defense counsel through I believe
 8         Bruce Outlaw.
 9    BY THE COURT:
10              The deceased person?
11    BY MR. BENSON:
12              A person who supposedly was --
13    BY MR. KING:
14              Your Honor, could we correct the record
15         right now?  The State introduced the name of
16         Lavelle Thompson in these proceedings in
17         direct examination or redirect examination of
18         Bruce Outlaw.
19              And with all due respect to counsel, I
20         would ask if there's any question here, that
21         record be reviewed.  He's the one that brought
22         it up, not the defense.
23    BY THE COURT:
24              You did talk about it.
25    BY MR. KING:
```

880

1411

VANES 001420

```
 1              After the State injected it.  And I just
 2         wanted to correct that portion.
 3    BY MR. BENSON:
 4              I'm not saying it's true but I don't
 5         contest it.
 6    BY THE COURT:
 7              All right.  I'm not sure how dispositive
 8         that is of anything, but all right.
 9    BY MR. BENSON:
10              When Ms. Donald testified, she said that
11         she felt there was no investigation done in
12         this matter and that no one tried to do
13         anything to find out if the defendant's alibi
14         was true.  And we want to call Ron Fleming as
15         well as Cherie Cunningham to show that, in
16         fact, something was done.
17              Okay, and that picture of Lavelle
18         Thompson, a name given to us and brought up in
19         the State's case in chief, but I don't think
20         we could have went any further with it because
21         we didn't have the car dealership guys at that
22         time.
23              And Cherie Cunningham obtained a picture
24         of this man given to us by defense counsel,
25         and in good faith, we had that picture cut, we
```

881

1412

VANES 001421

```
 1        had it redacted, we had it put into this line-
 2        up and this line-up was shown to the car
 3        dealers as well as Ms. Belinsky in an effort
 4        to attempt to either confer or deny the
 5        identification of this individual and to show
 6        that an investigation was conducted into this
 7        matter.
 8            And for the witness to sit up there and
 9        blanketly say that, "Well, no one tried to do
10        anything to check this out," leaves a very bad
11        impression with the jury that the State sat on
12        its hands and did garbage.  And that's simply
13        not true.
14   BY MR. KING:
15            You have the unrefuted testimony of both
16        gentlemen from the car dealerships that -- I
17        believe both of them said a week ago Tuesday
18        they met with Ron Fleming and looked at those
19        pictures.  So that evidence is already in
20        there.
21            Now, this Lavelle Thompson business is
22        absolutely not rebuttal of anything.  They
23        injected his name into the proceedings -- and
24        a review of the record will verify what I'm
25        telling you.  They injected the name in the
```

882

1413

VANES 001422

```
1        proceedings.  Now, to come out and say, "This
2        is who this guy's picture is," doesn't, again,
3        rebut anything that has been put on by the
4        defense.  Nothing.  And unless he's going to
5        say that these car guys were wrong, that it
6        was another time or an additional time -- but
7        it's unrefuted, they said, "A week ago Tuesday
8        we looked at these things and the gentleman
9        from the State is the one that brought them up
10       to us."
11            So, again -- who is the third witness?
12  BY THE COURT:
13            I was wondering that too.  You mentioned
14       three additional witnesses, Cunningham,
15       Fleming and?
16  BY MR. BENSON:
17            Kim Belinsky.  We would like to recall her
18       to show the Court and the ladies and the
19       gentlemen of the jury that -- and I'm sure
20       that they're going to refer to it in closing
21       arguments there was this Lavelle Thompson guy
22       running around out there.  She viewed that
23       line-up after this case had been filed and
24       everything else, after we get all this work
25       through Ron Fleming and Cherie Cunningham, and
```

883

1414

VANES 001423

```
 1          to relieve any doubt in her mind as to who the
 2          perpetrator was.
 3              And this is being brought up now because
 4          they want to contend -- Ms. Donald wants to
 5          contend that nothing was done.  She made that
 6          statement several times on cross-exam.
 7          Certainly, she has left the jury with the
 8          impression that, "Hey, they had a guy, they
 9          thought they had him and they're not going to
10          do a damn thing to do anything else," and
11          that's not the case.
12     BY THE COURT:
13              But didn't she admit that she didn't know
14          what the prosecutor's office had done, she was
15          talking about the police.
16     BY MR. BENSON:
17              She didn't, and we'd like to show that.
18          Our efforts in this case were not challenged
19          until she took the stand about us never
20          investigating the alibi.
21     BY MR. KING:
22              She was talking about the Gary police;
23          that's clear.  I mean you asked her about the
24          State, and she said, "I don't know what, if
25          anything, you did."  And, again, they're the
```

884

1415

VANES 001424

```
 1              ones -- they generated this.  They bring it in
 2              about Lavelle, you know.  Again, if the
 3              defense put this in, yes; but they did it.  I
 4              don't know why, but they did it.
 5      BY THE COURT:
 6              Well, because you raised the issue of the
 7              alleged robberies to Tisa Johnson, Christina
 8              Cullum, Rhonda Williams, the Bernard Jiminez
 9              matter and Sonya and Mary, that there were a
10              series of robberies that were committed in
11              this area at that particular time, and I think
12              it's a simple issue to your defense.
13      BY MR. KING:
14              So how does this rebut anything there?
15      BY THE COURT:
16              Now, after that, I believe the name of a
17              Lavelle Thompson came in.
18      BY MR. KING:
19              From the State; they injected it.
20      BY THE COURT:
21              Now, what was it that you asked about
22              Lavelle Thompson?
23      BY MR. KING:
24              What I asked about Lavelle Thompson is how
25              Outlaw learned he died at 4330 Massachusetts,
```

885

1416

VANES 001425

```
 1              after they injected the name Lavelle Thompson.
 2     BY THE COURT:
 3              Well, my notes indicate that on redirect
 4         the issue of the name came up, the State's
 5         redirect, as a name given by defense counsel
 6         as a possible suspect and that he's dead.  So
 7         he talked to Outlaw on the stand; Outlaw
 8         testified as to this Thompson on redirect, and
 9         then you questioned about Lavelle Thompson on
10         recross.
11     BY MR. KING:
12              Yes, after they had brought it up.  The
13         final point I would raise is I do not believe
14         that they have listed any witness who can
15         authenticate the picture as being of Lavelle
16         Thompson.  I have heard no evidence whatsoever
17         that they are able to authenticate that.  I
18         believe that the answer of any of those people
19         as to the identity of that person would be
20         based solely upon hearsay and would be
21         inadmissible for that reason.
22              I really believe, Your Honor, if you look
23         at the state of affairs in this case that
24         they're the ones, once again, that have
25         generated this and now they're trying to set
```

886

1417          VANES 001426

```
 1              up a straw man to knock him down.  Whatever
 2              their tactics, it does not justify this as
 3              rebuttal evidence; it just doesn't.
 4                   And, again, I don't think that what
 5              they're trying to accomplish is what he said;
 6              I don't think they can do it over a hearsay
 7              objection in any event.
 8                   Now, I don't mind Mr. Fleming if there's
 9              anything in dispute from what the car salesmen
10              said about what they know about Mr. Fleming's
11              efforts that's any different, you know, other
12              than what they said, "A week ago Tuesday," you
13              know; that's a different matter.  If Mr.
14              Fleming went out there on more occasions or
15              whatever like that, that's a different story.
16              But everything he wants here, it's not
17              rebuttal.
18      BY THE COURT:
19                   Okay, what would Cunningham testify to?
20      BY MR. BENSON:
21                   Cherie Cunningham will testify that she
22              requested a picture of Lavelle Thompson from
23              his mother, his mother or sister, and that the
24              picture in that exhibit is the picture she
25              received.
```

887

1418

VANES 001427

```
 1    BY MR. KING:
 2            Hearsay.  Cherie Cunningham has no basis,
 3        is not competent, and cannot identify that as
 4        a picture of Lavelle Thompson.  Cannot.
 5    BY MR. BENSON:
 6            The testimony I just reiterated is not
 7        hearsay, Judge.  And that picture is already
 8        in evidence, so it can't be said it's
 9        irrelevant.
10    BY THE COURT:
11            But as to who it is, wouldn't she have to
12        base it on what somebody told her?
13    BY MR. BENSON:
14            She'll testify what she said.  I said I'll
15        ask her, "Did you attempt to obtain a picture
16        of Lavelle Thompson?"  Her answer will be,
17        "Yes."  "What did you do?"  "I called the
18        mom."  "Did you get any pictures from the
19        mom?"
20    BY MR. KING:
21            Declarative answer; hearsay.
22    BY MR. BENSON:
23            Tendering of pictures is not a declarative
24        act.
25    BY MR. KING:
```

888

Filed In Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

1419

```
 1                It is a declarative act.
 2    BY MR. BENSON:
 3                It's not.
 4    BY MR. KING:
 5                An offer to prove the truth of the matter
 6          asserted, i.e., this is a picture of Lavelle
 7          Thompson.
 8    BY MR. BENSON:
 9                It's a response to a command; it's not
10          hearsay.
11    BY MR. KING:
12                Well, counsel ought to research hearsay.
13          That is a declarative act.  It further
14          violates this defendant's right to confront.
15    BY THE COURT:
16                Confront who?
17    BY MR. KING:
18                Confront the declarant, the only one who's
19          not a witness in this case that says that is a
20          picture.
21    BY MR. BENSON:
22                It goes to the weight of that testimony.
23    BY MR. KING:
24                It does not.  I'm talking relevancy, I'm
25          talking competency, we're talking hearsay,
```

                              889


                          1420

```
 1          we're talking confrontation, none of which
 2          they meet with what they're offering.
 3    BY MR. BENSON:
 4          Cherie Cunningham could further testify --
 5          even if Judge thinks defense counsel's
 6          argument is good, which I don't think it is a
 7          valid argument -- Cherie Cunningham will
 8          testify that she looked at the coroner's
 9          photos for Lavelle Thompson and that's the
10          same person.
11    BY MR. KING:
12          Again, to identify it to a name would be
13          an out-of-court assertion.
14    BY THE COURT:
15          Don't we do that all the time with
16          photographs?
17    BY MR. KING:
18          We might.  I'm objecting to it here.  I've
19          yet to hear anybody say that this isn't
20          hearsay.
21    BY THE COURT:
22          What did the defense do in this case to
23          indicate that Lavelle Thompson's picture
24          wasn't in these photographs?  Did they in some
25          way generate the belief that Thompson's
```

890

1421

```
 1              picture wasn't included in here?
 2      BY MR. BENSON:
 3              Well, they talked about how this guy was
 4          killed, shot in the back of the head with a 9
 5          millimeter in a crack house on 4300
 6          Massachusetts.  We just want to bring up the
 7          fact that this guy isn't a suspect because
 8          nobody picked him out.  Kim Belinsky looked at
 9          it and said, "No, that's not him," in a proper
10          line-up form.
11      BY MR. KING:
12              Judge, they brought his name into the
13          proceedings, not me; they did it.  They did
14          it; having done it, I asked Outlaw if he knew
15          that he had been killed -- nothing about a 9
16          millimeter -- where his body was found, 4340
17          Massachusetts.  And then asking about the dope
18          house, that was stricken on motion by the
19          State.  So that's what I did after he injected
20          the name.  This is not rebuttal of anything.
21      BY MR. BENSON:
22              It goes to rebut the testimony in addition
23          of Sheila Donald.
24      BY MR. KING:
25              What this is is trying to create an
```

891

1422

VANES 001431

1       artificial basis to bring Ms. Belinsky back up

2       here under the false notion that it's

3       rebuttal.  It's not.   That's what they're

4       trying to do here, Your Honor; it is not

5       rebuttal.

6    BY MR. BENSON:

7           If you take that argument, Judge, then

8       defense counsel's witnesses can say anything

9       on cross-exam about the manner in which the

10      State conducted the case, their lack of

11      effort, and we don't have a chance to show

12      that, in fact --

13   BY MR. KING:

14          To reiterate, if they want to put Mr.

15      Fleming on to say anything other than --

16      anything that he did in addition to what the

17      car salesmen said he did, which is not

18      disputed by the defense, I'm happy to listen.

19      And if that's what he's going to say, then I

20      have a different position.  I've yet to hear

21      the State say anything about that.

22   BY MR. BENSON:

23          That's not why Fleming would be called.

24      How do we rebut the fact that Sheila Donald

25      made the statement that she thinks nobody did

892

1423

VANES 001432

```
 1          anything.
 2     BY MR. KING:
 3          Read the record.  She specifically limited
 4          that statement, certainly during cross by the
 5          State, to the Gary Police Department.  And,
 6          quite frankly, you couldn't possibly rebut
 7          that, because that is true; the Gary Police
 8          Department didn't do a thing.
 9     BY THE COURT:
10          What were the circumstances then of Kim
11          Belinsky being shown the photograph supposedly
12          of this Thompson?
13     BY MR. BENSON:
14          On defense counsel's persistence, as this
15          person is a possible suspect, by sheer
16          accident, we found out that a person had been
17          murdered and that he was in the coroner's
18          office, pictures of him were.
19          We obtained an address, which I think
20          defense counsel had previously given to us,
21          but Cherie Cunningham contacted the mother and
22          got a picture of him so we could put it in a
23          line-up, because if that information had come
24          in -- and in all likelihood it would have
25          somehow -- that door would have been opened.
```

893

1424

VANES 001433

```
 1            Defense counsel would have stood up in closing
 2            and said, "Hey," you know, "look at this guy,
 3            Lavelle Thompson.  He looks like my guy, he
 4            looks like my client."  If counsel is
 5            introducing the census to show possible
 6            misidentification, surely he would have
 7            attempted to introduce the picture of a person
 8            who lived in that immediate area to show the
 9            confusion.
10       BY MR. KING:
11            Judge, I will state for the record I have
12            absolutely no intent whatsoever to argue, to
13            mention the name of Lavelle Thompson at any
14            point in closing arguments -- at any point in
15            closing arguments or, you know, describe him
16            just without using a name.  I'm not going into
17            that.
18            I am not going to take the position that a
19            particular other person rather than my client
20            committed these acts.  I'm not going to do it.
21            Frankly, even if I were, they have yet to
22            articulate this is rebuttal or get around
23            hearsay or the other objections made.  But
24            just so that we can conserve some time here,
25            that is not an argument I'm going to make to
```

894

VANES 001434

```
 1              this jury.  It is not, even though they
 2              brought it into the proceedings.
 3         BY MR. BENSON:
 4              That's because defense counsel already got
 5              in the comment about "crack house and a guy
 6              being shot in the back of the head with a 9
 7              millimeter."
 8         BY MR. KING:
 9              You're the one that brought out the guy's
10              name; then we asked when he was found dead.
11              This 9 millimeter business, I don't know where
12              you're coming up with that from because I, you
13              know, I have no idea what caliber weapon was
14              used to kill Mr. Thompson.  And the address
15              and then the reference to a dope house, which
16              the Court struck from the record -- that was
17              stricken from the record and the jury
18              admonished.
19         BY THE COURT:
20              After the issue of his name came up in the
21              State's case in chief, could the State have
22              recalled Belinsky and put that picture in
23              through a police officer and then say, "Have
24              you had an opportunity to look at this
25              individual and, if so, when?" you know, when
```

895

1426

VANES 001435

1                she was given that opportunity.

2   BY MR. BENSON:

3                We don't base our right to recall Kim

4         Belinsky solely upon the comments of Bruce

5         Outlaw; we base it upon that, tied with the

6         statement of Sheila Donald saying that, "You

7         guys didn't do anything to try and find out

8         the alibi in this case."

9   BY MR. KING:

10             He keeps ignoring what the testimony was;

11        he keeps misrepresenting what the testimony

12        was.

13   BY THE COURT:

14             Well, I'm not in doubt at all in this case

15        after listening to the evidence that Fleming

16        went around to these car dealers with these

17        photographs; they have said that, and I don't

18        know how he could rebut what has already been

19        said.  The defense has not challenged the fact

20        that -- the defense witness Moos here

21        yesterday said, "He came around with these

22        photos and he showed them to me."

23   BY MR. KING:

24             So did Mr. Sisson.

25   BY MR. BENSON:

VANES 001436

```
 1              Well, there's testimony that he went to
 2         two other people too.  But, see, now the jury
 3         doesn't know how much investigation we've
 4         done.  But Sheila Donald made that comment.
 5    BY THE COURT:
 6              They know you did something because they
 7         know you took these photographs around and
 8         offered them to the defense witnesses.
 9    BY MR. BENSON:
10              If she had never made that comment, Judge,
11         we wouldn't be sitting here right now.  But
12         she said she was under the impression --
13    BY MR. KING:
14              She said Outlaw --
15    BY THE COURT:
16              One at a time.
17    BY MR. BENSON:
18         -- that the Gary Police Department did
19         nothing, but she didn't feel anybody was doing
20         something.  She said specifically the Gary
21         Police Department, and I asked her if she knew
22         of anything else that was being done; she
23         said, "No."
24    BY THE COURT:
25              You asked her why she didn't tell Outlaw
```

VANES/001437

```
 1        about the alibi, and she said Outlaw was not
 2        doing anything to cooperate, he said parts of
 3        this investigation were confidential, he
 4        couldn't discuss them with her and he wasn't
 5        acting on anything that she was saying anyway
 6        so she didn't do it.
 7   BY MR. BENSON:
 8        Well, and upon more detail, I asked her if
 9        she knew if our office was doing anything and
10        she said, "No."
11   BY THE COURT:
12        She didn't know.
13   BY MR. BENSON:
14        She didn't know.
15   BY MR. KING:
16        She didn't say you weren't; she said she
17        didn't know.  And then it has been presented,
18        without challenge, that, in fact, your office
19        did.
20   BY MR. BENSON:
21        Well, I don't think the full extent of
22        what we did was brought out.  And but for
23        Sheila Donald's comment, we wouldn't need to
24        clear that up.
25   BY MR. KING:
```

898

1429

VANES 001438

```
 1              But her comment is, "I don't know what you
 2         did," and she didn't know what you did.  And
 3         two other witnesses have been presented by the
 4         defense who established what you did.
 5    BY THE COURT:
 6              Now, the one thing that in my mind
 7         certainly hasn't come out is that Belinsky may
 8         have been shown a picture of this person that
 9         we've talked about during the trial, no matter
10         how his name came up.
11    BY MR. KING:
12              I understand, but that is not rebuttal of
13         anything; that's not rebutting anything.
14    BY THE COURT:
15              Well, isn't your defense that someone else
16         may have committed this crime?
17    BY MR. KING:
18              Someone else, not this other person.
19         Someone else.
20    BY THE COURT:
21              Well, that's arguable, but this is one of
22         the someones that was talked about.
23    BY MR. KING:
24              Well, Judge, they've got in a picture.  I
25         mean there's six people at a line-up; they've
```

899

1430

VANES 001439

```
 1          got in the testimony for looking at all these
 2          other pictures.  I mean for heaven's sake.
 3     BY THE COURT:
 4              We don't know who all those other pictures
 5          were of.
 6     BY MR. KING:
 7              I understand.  And we don't know that this
 8          is going to be through any competent evidence
 9          that this is a picture of Lavelle Thompson.
10          We don't know; they have not yet offered to
11          this Court a proffer showing they have anybody
12          that can establish the identity of that person
13          in the picture without relying upon hearsay.
14     BY THE COURT:
15              How about looking at the name on a death
16          certificate?  That's an indicia of
17          reliability.
18     BY MR. KING:
19              The death certificate itself though would
20          be hearsay unless by certification or
21          otherwise they admit it.  You heard how
22          they're planning to do this.  It's hearsay.
23     BY THE COURT:
24              Well, there's two ways:  Number one, she
25          requested that the family supply a photograph;
```

900

1431

VANES 001440

```
1        she got a photograph.  And, secondly, Benson
2        says that Cherie Cunningham could testify that
3        she looked at documents at the coroner's
4        office and felt that this was the same person.
5   BY MR. KING:
6        Hearsay.
7   BY THE COURT:
8        Why are coroner's records hearsay?  I mean
9        doesn't a death certificate have some indicia
10       of reliability?
11  BY MR. KING:
12       Not in and of itself.  They can certify;
13       he could certify.  That's how you get around
14       hearsay; that's how you do it, not just
15       because it has the coroner's name on it.
16       We're losing focus of what the issue is
17       here.  This is not rebutting anything.  Nobody
18       said -- they're trying to say -- their guise
19       here is, "Ms. Donald said we didn't do
20       anything."  No, she didn't.  She said, "I
21       don't know.  All I know is Outlaw."  And she's
22       absolutely correct; they can't rebut that.
23       She doesn't know if they did.
24       Then we have, in the defense case for
25       heaven's sake, evidence of what they did.
```

901

1432

VANES 001441

1        Now, yes, nothing was presented that Ms.

2        Belinsky was shown these photos, but the

3        probative value of one other person being

4        shown the same photo arrays in terms of

5        saying, "Here's what the State did," simply

6        does not make this admissible evidence here

7        since my witnesses in my case have not

8        attacked the prosecuting attorney's office in

9        terms of what they did or did not do with

10       regard to the notice of alibi given.  It just

11       isn't rebuttal of anything we presented; it

12       simply is not.  And, again, it's improper to

13       present it.  As you know, the rules are

14       strict.

15  BY MR. BENSON:

16        Judge, someone's impression of what they

17       perceive is not hearsay.  That would be -- if

18       a witness came in here and said, "I saw the

19       car skid," well, that would be hearsay

20       according to Mr. King's analysis.  Cherie

21       Cunningham is saying that, "I looked at a

22       picture, and I compared it to this one and I

23       think it's the same person."  We introduce the

24       death certificate.  That's a perception; that

25       is not hearsay.

902

1433

```
 1    BY MR. KING:
 2           But she can't testify to either of the
 3        pictures of Lavelle Thompson.  It is hearsay.
 4        It is hearsay.
 5    BY MR. BENSON:
 6           The death certificate will do that.
 7    BY MR. KING:
 8           It is hearsay.
 9    BY MR. BENSON:
10           We'll get a certified one; you can do that
11        in two minutes.  I mean if defense counsel is
12        going to challenge --
13    BY MR. KING:
14           This isn't rebuttal; it doesn't rebut.  I
15        don't know what else to say.
16    BY THE COURT:
17           Well, it certainly rebuts the idea that
18        there was this suspect floating around out
19        here that no one had anything to do with in
20        this case.
21    BY MR. KING:
22           Which -- who brought that up?  Who brought
23        that up?  Did the defense?
24    BY THE COURT:
25           The State will say you did, and you'll say
```

903

1434

VANES 001443

```
1          the State did.
2     BY MR. KING:
3               Well, let's read the record.  You already
4          read your notes and you found out it was
5          Benson's redirect on Outlaw.
6     BY THE COURT:
7               But that was after your cross.
8     BY MR. KING:
9               My going into Thompson is after he brought
10         that up.  And if we have to take a moment here
11         and look at the transcript, let's do it.
12    BY THE COURT:
13              I agree that the name was not mentioned
14         first by the defense; there is no question
15         about that.
16    BY MR. KING:
17              That's not rebutting what the defense case
18         is.  We just simply are not.  It's the same
19         situation as before with the phone
20         conversations in that respect.  He brings it
21         out and now he wants to rebut what he brought
22         out into the evidence.  It doesn't work like tha

23    BY MR. BENSON:
24              You have to link that to what Sheila
25         Donald says.
```

```
 1    BY THE COURT:
 2         You're the one that pointed out that he
 3         was killed in that neighborhood by --
 4    BY MR. KING:
 5         After he brings his name up for heaven's
 6         sake.
 7    BY MR. BENSON:
 8         He testified off the death certificate.
 9         Now, he wants to challenge its authenticity.
10    BY THE COURT:
11         What do you mean he testified off the
12         death certificate?
13    BY MR. BENSON:
14         Oh, he was reading right off of it when,
15         "Do you know that the guy was shot?" and read
16         the address off and everything else.  Now he
17         has the nerve to challenge the authenticity.
18         We'll get it certified if that's what he
19         wants, but he read it practically right off
20         there.  He stood in front of the jury and
21         waved that document.
22    BY MR. KING:
23         If counsel could possibly explain, what
24         possessed him to inject the man's name in the
25         first place?  What did he expect?
```

905



Filed in Clerk's Office

MAY 23 1997

1436

CLERK LAKE SUPERIOR COURT
VANES 001445

```
 1      BY MR. BENSON:
 2              It was defense counsel who gave us that
 3          name.  And if I hadn't, who do I know who
 4          would have walked up there from his side and
 5          said, "Yeah, we had this name Lavelle
 6          Thompson," blah, blah, blah, blah.
 7      BY MR. KING:
 8              Did anybody do that?
 9      BY THE COURT:
10              If he had, he had injected it first.  You
11          knew that you had already done something,
12          right?  You knew that you could rebut that if
13          he had said you didn't do anything.
14      BY MR. BENSON:
15              That's right.
16      BY MR. KING:
17              And, once again, I would ask for the
18          record to reflect -- I've already stated we
19          are not making that argument to this jury
20          about Lavelle Thompson.  We are not.
21      BY MR. BENSON:
22              But the comment is in.
23      BY MR. KING:
24              By you.  You brought it in.
25      BY MR. BENSON:
```

906

1437

VANES 001446

```
 1              No, your comment about some --
 2    BY MR. KING:
 3              You're hoisted by your own petard.
 4    BY THE COURT:
 5              No, the killing of the man was brought in
 6         by the defense.
 7    BY MR. BENSON:
 8              A crack house, a bullet in the back of the
 9         head and who lives right in that neighborhood.
10         If counsel wasn't trying to imply this guy did
11         it, what was he trying to do by that comment?
12         Two days after the murder, he got that in too.
13         You know, if that doesn't practically -- and I
14         know the judge struck that, but I believe some
15         damage was done by that, Judge, and that's why
16         we want to put this evidence on just to clear
17         up the fact that in no way, shape or form was
18         this guy ever a suspect.
19    BY THE COURT:
20              Well, what I'm going to do:  You've given
21         me your arguments on this, and since it's
22         11:30, I'm going to call the jury in and send
23         them to lunch, I'm going to listen to the tape
24         of pertinent portions of Outlaw's testimony,
25         and --
```

907

1438

VANES 001447

```
 1    BY MR. BENSON:
 2          As well as Sheila Donald's, please, what
 3       she said about our office.
 4    BY THE COURT:
 5          Well, perhaps.  I think she was pretty
 6       neutral about that, but I'll listen to it.
 7    BY MR. BENSON:
 8          I think the first time it was a blanket
 9       statement, "Nobody did anything."
10    BY MR. KING:
11          Judge, let's listen to what all she said;
12       because, counsel, there's no wrong on the
13       record.
14    BY THE COURT:
15          Would you bring in the jury, please?
16    BY MR. KING:
17          Now, Judge, whatever you end up ruling on
18       this, can we take a little bit of lunch break
19       here and be prepared to go right into closing
20       arguments?
21    BY THE COURT:
22          What are you asking for on the lunch
23       break?
24    BY MR. KING:
25          Well, I'm thinking it's 11:30, if we
```

908

1439

VANES 001448

```
 1            reconvene maybe at 1:15, that will give us

 2            time for an instruction conference, counsel

 3            time to prepare for closing, and then a brief

 4            period of time to either have further argument

 5            or simply have the Court's ruling on this

 6            issue that is presented.  I think that's

 7            reasonable; I don't know what the State

 8            thinks.

 9     BY THE COURT:

10            Well, but we may also need time for

11            rebuttal if I rule in their favor.

12     BY MR. KING:

13            Well, we're just talking about what time

14            the jury is going to come back from lunch.  So

15            they're either going to come back and hear

16            rebuttal or they're going to come back and

17            hear closings.

18     BY THE COURT:

19            Right.

20

21            WHEREUPON THE JURY WAS BROUGHT INTO OPEN

22            COURT AND THE FOLLOWING PROCEEDINGS WERE HELD

23            IN THEIR PRESENCE AND HEARING:

24

25     BY THE COURT:
```

909

1440

VANES 001449

```
 1              Counsel, if you would approach the bench
 2         one moment so we can finish that thought.
 3
 4              WHEREUPON A DISCUSSION WAS HELD AT THE
 5         BENCH OUTSIDE OF THE HEARING OF THE JURY AND
 6         OFF THE RECORD REGARDING SCHEDULING:
 7
 8    BY THE COURT:
 9              Members of the jury, I cannot go into
10         detail at all with you about the matters that
11         we're conducting outside the presence of the
12         jury or it wouldn't have been proper to
13         conduct them outside your presence in the
14         first place.
15              But it continues and right now we're going
16         to send you ladies and gentlemen of the jury
17         to lunch.  I don't think there's any question
18         any more about this case extending into next
19         week; we are going to finish today, and you're
20         going to hear arguments.  But at the present
21         time, we're going to escort you to lunch and
22         again admonish you not to converse about the
23         case while you're away at lunch.
24              The jury is excused.
25
```

910

1441

VANES 001450

```
 1        jury or it wouldn't have been proper to
 2        conduct them outside your presence in the
 3        first place.
 4             But it continues and right now we're going
 5        to send you ladies and gentlemen of the jury
 6        to lunch.  I don't think there's any question
 7        any more about this case extending into next
 8        week; we are going to finish today, and you're
 9        going to hear arguments.  But at the present
10        time, we're going to escort you to lunch and
11        again admonish you not to converse about the
12        case while you're away at lunch.
13             The jury is excused.
14
15             WHEREUPON THE COURT RECESSED AND
16        RECONVENED AND THE FOLLOWING PROCEEDINGS WERE
17        HELD OUTSIDE OF THE PRESENCE AND HEARING OF
18        THE JURY:
19
20   BY THE COURT:
21             Okay, I'm prepared to rule, and I would
22        find that the two witnesses offered may
23        testify, Cunningham and Belinsky, as to the
24        issue that was raised by the State on
25        rebuttal.
```

911

VANES 001451

```
 1    BY MR. KING:
 2          Which issue?
 3    BY THE COURT:
 4          The issue of the photograph that is
 5       contained in that which is in evidence, and as
 6       I understand it, the limited issue from
 7       Belinsky that she has been shown that
 8       photograph, has seen it.
 9    BY MR. KING:
10          We ask if the Court is overruling the
11       hearsay objections.
12    BY THE COURT:
13          We will if you have a reliable copy of the
14       death certificate and connect what you said
15       you could connect, Cunningham and the
16       photograph.
17    BY MR. BENSON:
18          Mr. Fleming went to Gary to get that; that
19       was at the Gary branch.  He should be back; he
20       left at 12:00 o'clock.  He should be getting
21       back momentarily.
22    BY THE COURT:
23          What's he getting?
24    BY MS. LAKE:
25          The certified copy of the death
```

912

VANES 001452

```
 1  ||          certificate.
 2  || BY THE COURT:
 3  ||          All right.  Well, then we're not ready to
 4  ||     begin because there is an objection.
 5  || BY MR. KING:
 6  ||          And I demand the production by the State
 7  ||     to the defense, which hasn't been done to
 8  ||     date, and these photographs they're talking
 9  ||     about are in the coroner's office that's the
10  ||     bases of those comparisons.
11  || BY THE COURT:
12  ||          Well, that's one of the bases.
13  || BY MR. KING:
14  ||          So I demand production by the State under
15  ||     the continuing discovery order of those
16  ||     photographs.
17  || BY MR. BENSON:
18  ||          I think defense counsel has been aware of
19  ||     those and he was free to look at them at any
20  ||     moment.  And we will tender those at this
21  ||     time.
22  || BY THE COURT:
23  ||          You can take care of that at this time.
24  ||     We can't begin until that document gets here.
25  || BY MR. KING:
```

913

1444

VANES 001453

1          Right, and what I will do is I will ask
2      this Court as we begin to state a continuing
3      objection and reiterate all the grounds
4      previously made.
5  BY THE COURT:
6          Sure.
7  BY MR. KING:
8          And now I am assuming this Court is
9      limiting the scope, particularly the
10     examination of Ms. Belinsky, on the issue they
11     have proffered.  I mean we're not going to get
12     back into a rehash of the direct examination.
13 BY THE COURT:
14         It has to be limited by definition in
15     rebuttal, but I think one of the keys in the
16     cases I read over the noon hour is this
17     evidence is not only there to potentially
18     contradict something at trial but also be
19     explanatory of something at trial.  And I
20     think it could be both on rebuttal, and that's
21     why it's permitted.
22         Okay, we'll recess until the State is
23     ready to go.
24
25

                       914


                    1445

VANES 001454

```
 1              WHEREUPON THE COURT RECESSED AND
 2        RECONVENED AND THE FOLLOWING PROCEEDINGS WERE
 3        HELD IN THE PRESENCE AND HEARING OF THE JURY:
 4
 5     BY THE COURT:
 6              The State will be proceeding with some
 7         rebuttal evidence at this point.
 8     BY MR. BENSON:
 9              Thank you, Judge.  At this time, the State
10         would call Cherie Cunningham to the witness
11         stand.
                    Cherie CUNNINGHAM,
           having been first duly sworn upon her oath,
14         testifies as follows:
15                   DIRECT EXAMINATION
16                          BY
                         MR. BENSON
18     Q    Ms. Cunningham, would you please state your
19          full name and spell it for the court reporter,
20          please?
21     A         Cherie Cunningham, C-h-e-r-i-e C-u-n-n-i-
22               n-g-h-a-m.
23     Q    Where are you employed, Ms. Cunningham?
24     A         Lake County prosecutor's office.
25     Q    And how long have you been employed there for?
```

915

1446

VANES 001455

```
 1    A        Almost two years.
 2    Q    And what are your general duties with that
 3         office?
 4    A        I'm in the victim-witness division.
 5    Q    Would you please tell the ladies and gentlemen
 6         of the jury what you do in the victim-witness
 7         division?
 8    A        I open files, I work with victims of
 9             crimes, witnesses, I work with the trial
10             deputies, anything they need, typing,
11             anything like that.
12    Q    I would like to direct your attention
13         specifically to this case and ask you if you
14         happened to become involved in attempting to
15         ascertain a picture of a Lavelle Thompson?
16    A        Yes, I did.
17    Q    And how did you do that?
18    A        I called his mother on the telephone and
             asked her to bring some pictures down of
             Lavelle, which was done.
      BY MR. KING:
22             Objection.  Hearsay.
23    BY THE COURT:
24             Overruled at this point.  You may go on.
25    BY MR. BENSON:
```

916

1447

VANES 001456

```
 1    Q    You received pictures from who?
 2    A       From his sister.
 3    Q    And after you received these pictures, what
 4         did you do?
 5    A       I gave them to you and had one picture
 6         blown up.
 7    Q    Did you contact anyone or attempt to try to
 8         have any laboratories to do that ?
 9    A       Purrell Color Lab in Crown Point -- yes, I
10         did.
11    Q    And after that was accomplished, did you have
12         occasion to do anything else with those
13         pictures?
14    A       No, I gave them to you.
15    Q    And were those subsequently returned?
16    A       Yes, they were.
17    Q    Who were those returned to?
18    A       I still have them in my office; no one
           picked them up yet.
      Q    I would like to show you what's been admitted
           into evidence as Defendant's Exhibit 7 and ask
           you if out of those six photographs, do you
23         recognize the picture which you received from
24         Lavelle Thompson's family?
25    A       Yes, I do.
```

917

1448

VANES 001457

```
 1  ║  Q    And which picture is that?
 2  ║  A        Number four.
 3  ║  BY MR. BENSON:
 4  ║         I have no further questions.  Thank you,
 5  ║     Ms. Cunningham.
 6  ║  BY MR. KING:
 7  ║         I have no questions.
 8  ║  BY THE COURT:
 9  ║         You may step down.  Counsel, could I see
10  ║     you at the bench here for a moment?
11  ║
    ║         WHEREUPON THE FOLLOWING DISCUSSION WAS
    ║     HELD AT THE BENCH OUTSIDE OF THE HEARING OF
    ║     THE JURY:
    ║
16  ║  BY THE COURT:
17  ║         Did I understand you to indicate that you
18  ║     had some sort of certificate of death?
19  ║  BY MR. BENSON:
20  ║         Yes, we received that.  I was going to
21  ║     move to admit that and then call Kim Belinsky
22  ║     just to say she looked at that picture along
23  ║     with the other ones and it wasn't him.  That's
24  ║     all.
25  ║  BY THE COURT:
```

918

1449

VANES 001458

```
 1              All right.
 2      BY MR. KING:
 3              Well, they don't need to put that
 4          certificate in at this point.  You overruled
 5          my hearsay objection.
 6      BY THE COURT:
 7              I anticipated that would be coming in
 8          through Cunningham.
 9      BY MR. KING:
10              I understand, but there is no basis to
11          admit the certificate into the evidence and,
12          certainly, no basis to admit that certificate
13          into the evidence for the purposes of the
14          jury, and I absolutely object to it.
15              I object.  I made my hearsay grounds, the
16          Court overruled, and I accept that and I will
17          live with it.  Now, there is no relevance for
18          the admission of that document.  None.
19      BY THE COURT:
20              Other than the fact that it was brought
21          out at trial that he was dead.  I understand
22          you were arguing to indicate that Cherie
23          Cunningham somehow was able to recognize the
24          photo because of the coroner's file.
25      BY MR. BENSON:
```

919

1450

VANES 001459

```
 1              She could do that too.
 2    BY MR. KING:
 3              But the point is it's irrelevant, the
 4         death certificate.  There is no basis --
 5    BY THE COURT:
 6              That's the only reason I thought that
 7         anything from the coroner's office was
 8         relevant because it somehow tied in to
 9         Cunningham 's ability to identify. It
10         certainly would corroborate what she said so
11         far.
12    BY MR. BENSON:
13              I'll recall her if it's the Court's
14         pleasure.
15    BY MR. KING:
16              Why am I up here?
17    BY THE COURT:
18              Because you're to be included in
19         everything.
20    BY MR. KING:
21              But my point is that my objections were
22         overruled and I live with it, and now I had to
23         listen to --
24    BY THE COURT:
25              Well, I have a point of view too.
```

920

Filed in Clerk's Office

MAY 23 1997

1451   Anna N. Anton
CLERK LAKE SUPERIOR COURT

VANES 001460

1      expected that that would be corroborated by

2      something from the coroner's file.

3   BY MR. BENSON:

4          I believe it's relevant because defense

5      counsel testified through one of his questions

6      that this guy was shot and killed, and so now

7      we have his testimony and it's in the record.

8   BY THE COURT:

9          The only thing that I thought the

10     coroner's file was relevant for was for the

11     purpose of identifying who Lavelle Thompson

12     is, because that's what you said during your

13     argument.

14  BY MR. BENSON:

15         Well, I thought there would be an

16     objection from defense counsel in terms of

17     foundation for that picture.

18  BY THE COURT:

19         There was.

20  BY MR. KING:

21         There was an objection on the basis of

22     hearsay.

23  BY THE COURT:

24         There was; there was an objection on the

25     basis of hearsay.

921

1452

1    BY MR. BENSON:

2            I'll recall her.

3    BY THE COURT:

4            Certainly, I think that -- that's what I

5        indicated I would admit and still will admit

6        whatever rebuttal I expected, which is more

7        evidence than what she gave.

8    BY MR. BENSON:

9            I'll recall her; no problem.

10   BY MR. KING:

11           I object to recalling; I object to the

12       admission of the exhibit on the grounds --

13   BY THE COURT:

14           The only reason I do it is it's consistent

15       with our hearing outside the presence of the

16       jury.

17   BY MR. KING:

18           I know, but the State's the proponent of

19       the evidence. They chose not to follow that.

20       I made my objection in a timely fashion, you

21       know, the Court wasn't conditional about it,

22       the Court overruled it, so there is no basis

23       to admit this document. Now, if they want to

24       admit it and they want to make a part of the

25       record, that; but what I'm saying, it doesn't

                        922

VANES 001462

```
1              go back to the jury.  It has no bases, it has
2              no impact on the trier of fact in this case.
3       BY THE COURT:
4              But the purpose of the death certificate
5              is identification.
6       BY MR. KING:
7              But she didn't tie her testimony in in
8              terms of the picture in any way, shape or form
9              to the certificate.  And we can't undo what's
10             happened here.
11      BY THE COURT:
12             Well, it's not over yet.
13      BY MR. KING:
14             You admitted the exhibit, Your Honor.
15      BY THE COURT:
16             The exhibit was already admitted; I didn't
17             admit it through her.
18      BY MR. KING:
19             You admitted the testimony.
20      BY THE COURT:
21             I admitted her testimony.
22      BY MR. KING:
23             I understand.
24      BY THE COURT:
25             Well, you have stated your objection.  You
```

923

1454

1          may recall Ms. Cunningham.

2     BY MR. BENSON:

3          Would the Court allow me to just put the

4          exhibit in or do they want testimony from Ms.

5          Cunningham?

6     BY THE COURT:

7          Well, I thought the very purpose of that -

8          - I don't think the exhibit alone is rebuttal.

9          The only thing that made it valid was that it

10         bolstered Cunningham's identification.

11    BY MR. BENSON:

12         We'll recall.

13

14         WHEREUPON THE FOLLOWING PROCEEDINGS WERE

15    ONCE AGAIN HELD IN THE HEARING OF THE JURY:

16

17    BY MR. BENSON:

18         We would ask that Ms. Cunningham be

           recalled to the witness stand, please.

                DIRECT EXAMINATION CONTINUED

                          BY

                     MR. BENSON

23    Q    Ms. Cunningham, you're the same Ms. Cunningham

24         that just finished testifying, correct?

25    A         Yes, I am.


                          924

VANES 001464

```
 1    Q    After you received the picture of this Lavelle
 2         Thompson from his family, did you have
 3         occasion to view any coroner's photographs?
 4    A         Yes, I did.
 5    Q    And how did that occur?
 6    A         I went over to see if there were any
 7              pictures available from the coroner's
 8              office.
 9    Q    How did you become aware the coroner would
10         have any?
11    A         I had worked with his family filling --
12    Q    Whose family?
13    A         Lavelle Thompson's family -- filling out a
14              violent crime application.  When there's a
15              murder victim, they're entitled to that,
16              so I helped them.  And I knew the name
17              Lavelle Thompson.
18    BY MR. KING:

                    Move to strike, again, on the
                    grounds of hearsay.

      BY THE COURT:

                    Yes, if you're attempting to put in
23              anything from that by way of evidence in the
24              case, I would --
25    BY MR. BENSON:
```

925

1456

VANES 001465

```
 1              No, it's only being offered to show the
 2         effect that it had on Ms. Cunningham in terms
 3         of where she went to go look.
 4    BY THE COURT:
 5              All right, for that purpose, its effect on
 6         this witness, I would admit it; but any
 7         statements from the family are hearsay at this
 8         point.
 9    BY MR. BENSON:
10    Q    And you looked at those coroner photographs?
11    A         Yes, I did.
12    Q    And the coroner's pictures, did they match the
13         pictures you received from the family?
14    A         Yes.
15    BY MR. BENSON:
16              No further questions.   Thank you very
17         much.
18    BY MR. KING:
19              No questions.
      BY THE COURT:
                That's all.
22    BY MR. BENSON:
23              At this time, the State of Indiana would
24         move to admit State's Exhibit 22, the death
25         certificate of Lavelle Clay Thompson.
```

926

1457

```
 1   ║   BY MR. KING:
 2   ║           I renew my objection on the grounds
 3   ║       previously noted of relevance.
 4   ║   BY THE COURT:
 5   ║           Okay.   Admit for the limited purpose which
 6   ║       we discussed here outside the presence of the
 7   ║       jury.
 8   ║
 9   ║           WHEREUPON STATE'S EXHIBIT NUMBER 22 IS
10   ║       ADMITTED INTO EVIDENCE.
11   ║
12   ║   BY MR. BENSON:
13   ║           The State would recall to the witness
14   ║       stand at this time Ms. Kimerly Belinsky.
15   ║   BY THE COURT:
16   ║           All right.
17   ║                   KIMERLY BELINSKY,
18   ║       having been previously sworn upon her oath,
19   ║       testifies as follows:
20   ║                   DIRECT EXAMINATION
                                 BY
                            MR. BENSON
23   ║   Q   Kimerly, you're the same Kimerly Belinsky that
24   ║       testified previously in this matter, correct?
25   ║   A       Yes.
```

927

1458

VANES 001467

```
 1    Q   Do you understand that you're still under oath
 2        from your previous testimony?
 3    A      Yes.
 4    Q   You were under a separation of witness order
 5        when you were outside the courtroom.  Did you
 6        speak to anybody about this case while you
 7        were out there the last three or four days?
 8    A      No.
 9    Q   Kim, I would like to direct your attention to
10        approximately three weeks ago and ask you if
11        you had occasion to view eighteen photographs?
12    A      Yes.
13    Q   I would like to show you what's been marked as
14        State's Exhibit 17, Defense Exhibit 7, Defense
15        Exhibit 8 and ask you if those were the
16        eighteen photographs that you viewed?
17    A      Yes.
18    Q   And prior to that time, had you ever seen any
19        of the pictures from Defense Exhibit 7 and
          Defense Exhibit 8?
      A      On the day that I looked at it?
22    Q   Prior to that date.
23    A      No.
24    Q   And please tell the ladies and gentlemen of
25        the jury what happened when you were shown
```

928

1459

VANES 001468

```
 1           those photographs.  How did that occur?
 2    A         You called me and we went upstairs and--
 3    Q    Was there anyone else present?
 4    A         And another man.
 5    Q    Nestor Melendez, the investigator?
 6    A         Yes.
 7    Q    And what happened when those photographs were
 8         put in front of you?
 9    A         I looked at them.
10    Q    And that was including State's Exhibit 17
11         also?
12    A         Yes.
13    Q    And after viewing all those photographs, were
14         you able to identify the person who robbed and
15         murdered your fiance, Bernard Jiminez?
16    A         Yes.
17    Q    And who was that person as depicted in those
18         photographs?
      A         Number two.
      Q    Pardon?
21    A         Number two.
22    BY MR. BENSON:
23            I would like the record to reflect the
24         witness has identified number two in State's
25         Exhibit 17.
```

VANES 001469

```
 1    Q    And isn't that the same person that you had
 2         previously identified?
 3    A       Yes.
 4    Q    I would like to direct your attention
 5         specifically to Defendant's Exhibit Number 7
 6         and picture number four, the picture of
 7         Lavelle Thompson.  Does that picture in any
 8         way, shape or form coincide with the person
 9         you saw murder your fiance February 27th,
10         1992?
11    A       No.
12    Q    Are you in your mind positive it is not that
13         person?
14    A       Yes.
15  BY MR. BENSON:
16           Thank you very much.  No further
17         questions.
18                    CROSS-EXAMINATION
19                         BY
20                       MR. KING
21    Q    Mr. Belinsky, just one question:  The picture
           you did pick out is, of course, the very same
           picture you had picked out back on March the
           3rd, 1992, is that correct?
25    A       Yes.
```

930

VANES 001470

```
 1   ║  BY MR. KING:
 2   ║          Thank you very much. No further questions.
 3   ║  BY THE COURT:
 4   ║          I don't believe I caught the day that you
 5   ║       saw these photos.  Would you state that?
 6   ║  BY MR. KING:
 7   ║          Two weeks ago I think the testimony was.
 8   ║  BY THE COURT:
 9   ║          What did you say, Ms. Belinsky, as to when
10   ║       you saw these photos?
11   ║  BY THE WITNESS:
12   ║          A couple of weeks ago.
13   ║  BY THE COURT:
14   ║          All right.
15   ║  BY MR. BENSON:
16   ║          At this time, we would ask that Ms.
17   ║       Belinsky be allowed to remain in the
18   ║       courtroom.
19   ║  BY MR. KING:
20   ║          Yes, there's no objection.  I assume this
21   ║       is the end of the State's case?
22   ║  BY THE COURT:
23   ║          Right.  The State is resting its rebuttal.
24   ║  BY MR. BENSON:
25   ║          At this time, the State of Indiana would
```

931

1462

VANES 001471

```
 1              rest, Your Honor.
 2      BY THE COURT:
 3              Counsel, you have had an opportunity to
 4         look at the instructions.  Do you wish a
 5         further conference on those?
 6      BY MR. BENSON:
 7              Nothing by the State.
 8      BY MR. KING:
 9              No, Your Honor.  For the record, there's
10         nothing further to tender on behalf of the
11         defense nor does the defense object to any of
12         the proposed final instructions of the Court
13         numbered one through twenty-two.  I would note
14         for the record I have not yet had the
15         opportunity to see the proposed form of
16         verdicts.  I anticipate I will be shown those
17         before submission to the jury.
18      BY THE COURT:
19              Could we do that right now without
20         breaking?
21
22              WHEREUPON THE FOLLOWING DISCUSSION WAS
23         HELD AT THE BENCH OUTSIDE OF THE HEARING OF
24         THE JURY:
25
```

932

1463

VANES 001472

```
 1    BY THE COURT:
 2          Since there are no lessors, Mr. King, Mr.
 3      Benson and Ms. Lake, I just have verdicts of
 4      guilty and not guilty covering each count.  I
 5      didn't look at them; I'm relying on my court
 6      reporter.  I don't find any gross errors in
 7      there.  Okay?
 8    BY MR. KING:
 9          Yes.
10    BY THE COURT:
11          All right, counsel has seen the verdict
12      forms.
13    BY MR. BENSON:
14          Will they have a copy of the charging
15      information back there also?
16    BY THE COURT:
17          As part of instruction number one.
18    BY MR. BENSON:
19          I would only request that the name of the
20      victim be put into the different counts
21      because we do have two different robbery
22      counts.  I believe that one of them is Class A
23      and one of them is Class B, but it might be
24      more articulate to have the name.
25    BY THE COURT:
```

933

1464

VANES 001473

```
 1              They're in here, in the instructions.
 2     BY MR. BENSON:
 3              I'm just -- that was my objection.
 4     BY THE COURT:
 5              Well, they're in the instructions.
 6     BY MR. BENSON:
 7              Well, note my objection.
 8     BY THE COURT:
 9              All right.
10
11          WHEREUPON THE FOLLOWING PROCEEDINGS WERE
12       ONCE AGAIN HELD IN THE HEARING OF THE JURY:
13
14     BY THE COURT:
15              We're prepared at this point for final
16       arguments.  Did you want to talk from the
17       podium out there as well, Mr. Benson?  I think
18       Mr. King does.
19     BY MR. BENSON:
20              I believe Ms. Lake Will.
21     BY THE COURT:
22              All right, how much time are you
23       requesting for final arguments?
24     BY MR. BENSON:
25              May we approach, please?
```

934

VANES 001474

```
 1    BY THE COURT:
 2            All right.
 3
 4            WHEREUPON THE FOLLOWING DISCUSSION WAS
 5         HELD AT THE BENCH OUTSIDE OF THE HEARING OF
 6         THE JURY:
 7
 8    BY MR. BENSON:
 9            We would request forty minutes.
10    BY MR. KING:
11            An hour.
12    BY THE COURT:
13            An hour?  You're requesting an hour?
14    BY MS. LAKE:
15            About forty-five minutes.
16    BY MR. KING:
17            I have been in trial all week here.
18    BY THE COURT:
19            How about fifty minutes?
20    BY MS. LAKE:
21            That's good.
22    BY THE COURT:
23            We might have to break with that much
24         time.
25    BY MR. BENSON:
```

935

VANES 001475

```
 1          Forty minutes.
 2     BY THE COURT:
 3          Let's see if you can even make it for
 4          fifty; I'll give you fifty.  But if you need a
 5          couple minutes to close up after that much
 6          time, you can summarize; I won't cut you off
 7          in an instant.
 8
 9          WHEREUPON THE FOLLOWING PROCEEDINGS WERE
10          ONCE AGAIN HELD IN THE HEARING OF THE JURY:
11     BY THE COURT:
12          The State and the defendant will make
13          their final arguments to the jury at this
14          point, ladies and gentlemen.  Remember -- you
15          have been jurors before, you understand that
16          what the attorneys now say is not evidence in
17          the case; that is completed.
18          However, it's an important part of the
19          proceedings; you should pay close attention to
20          the arguments.  It's up to the jury to
21          evaluate the arguments.
22          The parties are now permitted to be
23          argumentative.  You may have heard objections
24          during the trial that some question was
25          argumentative and it would be sustained if I
```

936

1467

VANES 001476

```
 1        felt it was.  Now, they can be argumentative;
 2        they cannot attempt to mislead you, and will
 3        not, but if at any point the attorneys'
 4        recollection of the admissible evidence in the
 5        case differs from your own, then you must
 6        follow your own recollection as to what you
 7        saw and what you heard by way of admissible
 8        evidence.  That goes for testimony and the
 9        exhibits as well.
10            The State has the right under our code of
11        procedure to both open and close at the final
12        argumennt stage because the State has the
13        burden of proof in the case.  However, each
14        side is allotted the same amount of time for
15        making their arguments to you.
16            Ms. Lake, you're going to give the State's
17        opening portion of the argument?
18    BY MS. LAKE:
19            Yes, Judge.
20    BY THE COURT:
21            All right.  You may start.
22    BY MS. LAKE:
23            Thank you, Judge.  Counsel, ladies and
24        gentlemen of the jury:  First of all, Mr.
25        Benson and I would like to thank you very much
```

937

VANES 001477

1   for your close attention.  We know it has been

2   a long week and jury selection was very

3   tedious, and I know there are a lot of times

4   that you had to wait as we had arguments at

5   the bench.  We would both like to thank you,

6   Mr. Benson and myself, for your close

7   attention in this case.

8        Ladies and gentlemen of the jury, the

9   evidence in this case is overwhelming that

10   this defendant, Willie Donald did murder

11   Bernard Jiminez as well as rob Bernard Jiminez

12   and that he robbed Rhonda Williams, both on

13   February 27th, 1992.

14        You will recall Rhonda Williams testifying

15   that she resided at 4409 Connecticut Street on

16   the night that this happened.  She told you

17   that evening she was asleep, she was in bed.

18   She had to work midnights; she worked as

19   assistant manager at White Castle.  And she

20   told you that she was awoken by a sound that

21   came from her window in her bedroom; she told

22   you that when she heard that sound that she

23   estimated the time to be 8:45 p.m.

24        She immediately turned on all the lights

25   in her house and she went to look at the

938

1469

VANES 001478

1    window to see who was out there.  When she did
2    not see anyone out there, she laid back down
3    in the bed and was going to go back to sleep
4    when she heard a knock at her door.  She went
5    to the door and she heard a male voice say,
6    "It's your neighbor."  She told you, ladies
7    and gentlemen, that she didn't recognize that
8    male voice but she believed the person at the
9    other side of that door, that it was, indeed,
10   the neighbor.

11        So Rhonda went to the door; she opened the
12   door.  It was at this point Rhonda told you,
13   ladies and gentlemen, that it was this man on
14   the other side of that door with a gun pointed
15   at her face.  She told you she looked straight
16   at him; she was focused on his face.

17        She told you, ladies and gentlemen, that
18   she and the defendant began to tussle for the
19   gun and she put her hands up to try to get the
20   gun out of her face.  It was at this point,
21   the defendant had control of the gun and made
22   her back up into her house.  She was backing
23   up into her house and she was watching the
24   defendant; she was looking at his face and she
25   was looking at that gun.

939

1470

VANES 001479

1   She got back in the house, and at that
2   point, she was held with the gun, and she had
3   the defendant instructing her to go throughout
4   the house and the gun was at her back.   The
5   defendant was at that point behind her.
6       The defendant demanded money from her.
7   She said, "I have money on my dresser," in her
8   bedroom.   They went to the bedroom; she gave
9   the defendant the fifty dollars.   The
10  defendant, she told you, became a little
11  irritated and said, "Is this all you have?  I
12  want more money."   She said that was all she
13  had.
14      At that point, this defendant instructed
15  her to lie on the ground, and as she was lying
16  on the ground, this man took a pillow, put it
17  back behind her head, held the gun to her
18  skull, and Rhonda told you the only thing
19  going through her mind was, "I'm going to
20  die."
21      He started to count, and he said, "If you
22  don't come up with more money, I'm going to
23  blow your head off."   She told you she thought
24  it was over; and she told you it seemed like
25  forever.

940

1471

VANES 001480

1    The defendant took the gun off her head

2    and started to go around her house.   Rhonda

3    told you he started to go through canisters in

4    her house, he went through her coat pockets;

5    he first of all started with her purse,

6    started throwing things out of her purse onto

7    the ground looking for more money.

8    She told you this defendant said to her,

9    quote, "I hate to rob blacks," but he

10   continued to look through her items and tried

11   to find more money.   She told you she was on

12   the ground and she continued to try to watch

13   the defendant.

14   During this altercation, during the

15   defendant's search for more money, her alarm

16   clock went off.   Rhonda told you, laides and

17   gentlemen, that she knew it was at 9:00

18   o'clock when that alarm went off because she

19   had to get up to go to work.   The alarm went

20   off, she was going to turn off the alarm, and

21   she heard the defendant say, "I'd better get

22   out of here."

23   At one point during the time that this

24   defendant was in her house, she told you he

25   began to leave; and it was at that point, she

941

VANES 001481

1    started to crawl to the front door to try to

2    close the door and lock it when this defendant

3    re-entered the house.

4         She told you that he finally left, but

5    before he left, he made her stand outside on

6    the porch because there were neighbors outside

7    and the neighbors were getting a little

8    suspicious, so he had Rhonda stand outside on

9    the porch to look at the neighbors with the

10   gun pointed in her back.

11        After coming back inside from the porch,

12   she was instructed to lie back down.  She did.

13   And before lying down, the defendant said, "Do

14   you have a screwdriver?"  She said they went

15   to the kitchen, she gave him a screwdriver, he

16   threw the screwdriver in her face over her

17   head.  She told you she was looking at his

18   face when he threw that screwdriver.

19        Again, she was instructed to lie down, and

20   she does; and she told you she estimated it to

21   be about 9:20, 9:25 when this defendant

22   finally left her house that evening.

23        Ladies and gentlemen, think of all the

24   times, think of all of her opportunities to

25   observe this defendant, Willie Donald.  She

942

1473

VANES 001482

```
 1        told you her porch light was on; she told you
 2        she was focused on the defendant's face and
 3        the gun as they were tussling on the porch.
 4        She told you her hallway lights were on, she
 5        told you her bedroom lights were on, her
 6        living room lights were on.  She turned all
 7        the lights on in her house when she heard that
 8        noise at the bedroom window.
 9            She told you this defendant was in her
10        house for half an hour to forty minutes that
11        evening.  She said she got a good look at his
12        face from the time she was on the porch,
13        during the struggle, and later when he threw
14        the screwdriver over her head.
15            When Officer Faulkner arrived at the scene
16        later that evening after she had called the
17        police, she told them that she thought this
18        defendant was wearing gloves.  We learned
19        later, ladies and gentlemen, that was not
20        true.  The crime lab did not take fingerprints
21        as they had thought at the time that this
22        perpetrator was wearing gloves.
23            Later on that evening, right down the
24        street, at 4660 Massachusetts Street, the
25        Jiminez family: Kim Belinsky, she's with her
```

943

1474

VANES 001483

1    three children, she's with her fiance, Mr.

2    Jiminez.  She told you she was just coming

3    home with the family and her fiance; they had

4    been to McDonalds, they didn't like the dinner

5    she prepared that evening.  They went to Toys

6    R Us to get gifts for the kids for their good

7    report cards; they went to her aunt's house in

8    Hobart, and they were hurrying home to get

9    home to watch Knots Landing, which was on at

10   9:00 o'clock that evening.

11       When they got home that evening, they had

12   a lot of packages and the three children in

13   the vehicle.  Kim told you that she was

14   getting out of the vehicle, she was holding

15   one of the children, she was grabbing packages

16   and grabbing Bernard's work clothes.

17       The first thing Kim noticed was the dog

18   was off the leash.  She told you as she was

19   getting to the porch and she saw the dog was

20   off the leash, she yelled to her fiance, she

21   yelled to Barnard, "Where's the dog?  He's off

22   the leash."   She was getting to her porch.

23       In the meantime, Mr. Jiminez was locking

24   up the car; it was parked on the street she

25   told you, and he was starting to come up the

944

1475

VANES 001484

1    walkway.  As she's yelling about the dog, she

2    heard Mr. Jiminez yell, "Get in the house."

3        It was at that point she saw this

4    defendant moving through the inside of the

5    yard; it was at that point that she saw

6    Bernard run past the defendant yelling, "Get

7    in the house.  Get in the house."  Mr. Jiminez

8    was doing what any man would do, ladies and

9    gentlemen, who was trying to protect the

10   family that he loved and he cared about.  He

11   ran to the porch where they were, yelling for

12   them to, "Get in the house," as this defendant

13   continues to approach with a gun.

14       This defendant demanded Mr. Jiminez to

15   give him money.  Mr. Jiminez responded, he

16   took money out of his pocket and he threw it

17   on the sidewalk.  You saw the pictures, ladies

18   and gentlemen.  They were inside the yard

19   right by the sidewalk.  Mr. Jiminez threw

20   money on the sidewalk, and the defendant said

21   to him after picking up the money, "You don't

22   value your family, do you?  Don't fuck up."

23       At that point, he approached Kim, he

24   approached that family.  He pointed a gun on

25   the baby's forehead and said, "You're fucking

945

1476

VANES 001485

1    up, man.  You must not value your family.  You

2    had better come up with more money."

3        He saw Kim's purse.  Kim told you she was

4    about two and a half feet from this defendant,

5    she's looking straight at him; she gives him

6    her purse.  He doesn't even look inside the

7    purse, he puts it right under his arm, still

8    holding the gun on her face, still holding the

9    gun at other times on the different children.

10       It was at that point Mr. Jiminez comes up

11   on the porch.  Kim told you he kicked her a

12   little bit so she would scoot back, so he

13   could try to attack him.  He threw a bench

14   that was close by at the defendant.

15       Kim told you she was somehow able to kick

16   that door in, and she got her children inside.

17   And the only thing she could think of was to

18   get the children in the bedroom and run to get

19   the gun that she knew was in the house.  She

20   was in the house for a few seconds, she got

21   the kids in the bedroom, she ran to get the

22   gun but she couldn't figure out how to work it

23   in her panicked state.

24       She heard four shots.  She ran outside,

25   and she saw her fiance running with his arms

946

1477

VANES 001486

1    in the air, and she thought to herself, "Oh,
2    my God, he's safe.  He made it."  She saw him
3    running next door.
4        It was at that point she got a phone call
5    from the neighbor; it was at that point she
6    called the police.  And she learned that her
7    fiance was dying on the porch next door across
8    the street.
9        Think of all the ways, think of all the
10   times that Kim Belinsky had an opportunity to
11   observe that man (indicating).  They were
12   looking at each other face to face, and she
13   told you her porch light was on; she told you
14   they had a dome light that was over the porch.
15       She told you the robbery only took a few
16   minutes and she was only about two and a half
17   feet from this man looking at his face.  And I
18   would submit to you, ladies and gentlemen, if
19   a person had a gun to your baby's head and if
20   a person had a gun in your face and he was
21   yelling at your fiance, you're not going to
22   forget what he looks like.
23       Rodney Gray testified that he heard an
24   argument for about five minutes.  He heard
25   someone say, "Give me your damn money."  He

                        947

Filed In Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

VANES 001487

1    heard someone say, "I'm going to kill you."

2    He looked over at the Jiminez residence and he

3    saw Kim facing a person, a male black in his

4    twenties; that's how he describes him.  And

5    Mr. Gray said they were facing each other;

6    they were about five feet apart at the point

7    that he looked.

8        You heard from the evidence, you heard

9    from the stipulation of Doctor Gross that Mr.

10   Jiminez died at 10:35 that evening from a

11   gunshot wound to his head and his left chest,

12   that there was a .22 caliber bullet that was

13   removed from his body and from his Cubs jacket

14   that was recovered at the hospital by the

15   crime lab.

16       Ladies and gentlemen, I'm asking you to

17   focus on their opportunities to observe.

18   There is no doubt in their minds that this is

19   the man who committed these horrendous crimes.

20       And I ask you to recall the clothing

21   descriptions, the facial descriptions that

22   both Kim gave you and Rhonda gave you and how

23   closely they match.

24       Rhonda told you the defendant was wearing

25   a black leather jacket, black clothing; Kim

948

1473

VANES 001488

1    told you dark clothes, she told you a black

2    jacket.  Rhonda said he had a black Kangol

3    cap; Kim said he had a black hat with

4    something sticking out from underneath the

5    cap.  Rhonda told you that in her mind was a

6    red bandanna.  And if you recall when Kim was

7    asked, she said, "It could have been a red

8    bandanna."  Rhonda said he was five nine or

9    five ten; Kim said he was five ten.  Both said

10   he had a medium complexion; both said he had

11   bump-like acne scars, whatever you will, on

12   his face, on his cheeks.

13       Look at him, ladies and gentlemen.  You

14   had a chance to look at him as he walked in

15   front of you.  There is no question that the

16   defendant is the person that committed these

17   crimes.

18       Also consider, ladies and gentlemen, that

19   both Kim and Rhonda picked this defendant out

20   of a photo, out of several photos.  Rhonda

21   testified she looked at hundreds of photos and

22   she was positive; she told you she was postive

23   when she got to number two.  Kim told you the

24   lighting was a little bit off, she couldn't be

25   sure, she wanted to see a line-up, but she

949

1480

VANES 001489

1    thought number two was the man that did these

2    things.

3        And, ladies and gentlemen, you can see how

4    the lighting is a little different; it has a

5    little bit of a greenish tone (indicating).

6        Thank God there was a line-up.  And if you

7    recall, both Rhonda and Kim identified number

8    four in the line-up.  You heard Bruce Outlaw

9    testify when Kim viewed that line-up, before

10   they even moved forward, before they turned to

11   the left, before they turned to the right, she

12   had her finger up and she was shaking and she

13   was pointing.  And he told her to wait until

14   they had finished the line-up procedure.  And

15   Kim pointed him out at her first opportunity,

16   "That's him. I'm sure."

17       Bruce Outlaw told you Kim was shaking, Kim

18   started to cry, Kim ran to the bathroom and

19   threw up after seeing him in the line-up.

20       Bruce Outlaw told you also Rhonda, when

21   she saw this defendant in that line-up, she

22   was shaking.  She was very upset; she said she

23   was sure.

24       When the search warrant was conducted,

25   ladies and gentlemen, the next day, some

950

1481

VANES 001490

1    sixteen hours after this defendant had been

2    arrested and the rest of the family is around

3    by the residence, ask yourselves is it so

4    surprising that the police aren't able to find

5    the evidence.  The search warrant is

6    conducted, nothing turns up, but sixteen hours

7    go by.

8        And Sheila Donald told you that they knew

9    that this defendant had been picked out of a

10   line-up, she knew that her brother, this

11   defendant, had been picked out of the photos

12   with a possible murder charge coming and

13   robbery charges.  And ask yourselves and use

14   your common sense.  Is it that unlikely

15   nothing is found?

16       I'm asking you to consider very closely

17   the instruction on the credibility of

18   witnesses.  There are several factors as I

19   told you during jury selection that you can

20   consider as to which witness you should

21   believe and which witness you may question.

22       You have to use your common sense from

23   everyday life, but there are certain factors

24   to consider with their credibility, such as

25   ask yourselves when you think of the witnesses

951

1432

```
 1        that testified for the State of Indiana, when
 2        you think about the defense witnesses, ask
 3        yourselves who had an interest in this case.
 4        Ask yourselves who is biased in this case.
 5        Who has a stake in the outcome of this case?
 6            I submit to you, it's not the State of
 7        Indiana's witnesses; it's the defendant's
 8        alibi witnesses, the defendant's sister,
 9        Sheila Donald, the defendant's sister's
10        fiance, Dan Hopkins.   Who had interest of
11        seeing that this alibi is believed?   The
12        family members.
13            Ask yourselves whose testimony is really
14        reasonable when taken together with all the
15        evidence.  I think you will agree after
16        careful consideration that it's the State's
17        witnesses, the victims in this case.
18            I do want you to think about the alibi
19        witnesses and consider what each of them said
20        and how their stories just do not match up.
21            Consider Barbara Price, one of the
22        employers at the defendant's place of
23        employment.   She told you he makes a hundred
24        and fifty dollars a week.   Now, this
25        defendant wants you to believe -- and we're
```

952

1483

VANES 001492

1    not contesting at all the defendant worked

2    that day; we stipulated to those records.  We

3    know the defendant worked February 27th.

4         It's when the defendant left work that we

5    reached our disagreement.  This defendant

6    wants you to believe, ladies and gentlemen,

7    that he went car shopping with his sister,

8    Sheila, and her fiance, Dan, that he was car

9    shopping from the time he left work at about

10   5:30 until approximately 10:00 that evening.

11        Now, if you remember, Sheila Donald told

12   you that they had been car shopping constantly

13   not only that week, she told you they had been

14   car shopping twice the week of this crime.

15   And she also told you she had been shopping

16   that month for a car, at least four times.

17        Could they have gotten the day mistaken?

18   Is it really true that this defendant was with

19   them car shopping?  Ask yourselves that

20   question.

21        Sheila's testimony is that when she's at

22   the police station, when she finds out from

23   Bruce Outlaw that her brother is being held

24   and going to be charged with murder, going to

25   be charged with robbery, she doesn't think of

                         953

                    VANES 001498

1    the alibi.  She finds out the date; she told

2    you she had read the newspaper accounts.  She

3    knows about the date, but she doesn't say

4    anything to Bruce Outlaw, and she knows Bruce

5    is investigating the case.

6        She drives home.  She's telling you it

7    hits her.  She's driving home; on the way

8    home, she realized, "Oh, that's the day I was

9    with the defendant car shopping."  Does she

10   drive back to the police station?  No.  She

11   goes back home.  She doesn't tell Detective

12   Outlaw she says until he's searching the house

13   some seventeen hours later.

14       Dan Hopkins tells you that he didn't even

15   know the defendant was being held overnight

16   for a possible murder charge; he thought it

17   was a traffic offense.  He didn't find it

18   unusual that he was being held overnight for a

19   traffic offense.

20       And he wants you to believe, ladies and

21   gentlemen, that Sheila came home from the

22   police station and didn't share the

23   information with him, that it was not until

24   the search warrant Dan put together the dates,

25   and Dan did not tell the police officer at

                        954

VANES 001494

1        that time about this supposed alibi.

2             I submit to you, ladies and gentlemen,

3        that Sheila Donald and Dan really did go car

4        shopping, but it's our contention that this

5        defendant wasn't the third person that was

6        there.  And they may even be wrong on the

7        date.

8             Both car dealers have testified for the

9        defense; Ron Moos and Richard Sisson recall an

10       incident.  They recall meeting both Sheila and

11       Dan.   Did you find it so surprising when they

12       testified neither one could identify him as

13       that third person?

14            Richard Sisson told you he didn't know

15       when this incident had occurred that he had

16       given them prices on the different vehicles

17       that they test drove.  He told you it could

18       have happened in January, it could have

19       happened in February, it could have happened

20       in March,  a span of three months; and he saw

21       Sheila and he saw Dan, and he couldn't

22       identify him (indicating).

23            Ron Moos told you that they had gotten a

24       van in, that's how he knew it was February

25       26th, not the 27th.  And he knew that he had

                         955

                        1426

VANES 001495

```
 1        met Sheila, he knew that he had met Dan.   But
 2        remember what he said about the third person.
 3        Not only could he not identify the defendant,
 4        he told you that that third person had been
 5        drinking.   He was sitting in that van and he
 6        had the music all the way up, and in his
 7        opinion, he thought he was drunk.
 8   BY MR. KING:
 9                      Your Honor, now, I have been
10                      patient, but that is just a mis-
11                      statement.   The word "drunk" was
12                      never issued in this courtroom.
13   BY MR. BENSON:
14        Could we approach, Judge, if there's going
15        to be an argument and objection?
16   BY THE COURT:
17         I'll sustain the objection that the word
18        "drunk" was not used, "drinking."
19   BY MS. LAKE:
20        Drinking -- excuse me, counsel -- that he
21        had been drinking.
22        Now, ladies and gentlemen, has there been
23        any evidence -- and we have stipulated to the
24        fact that the defendant was working that day
25        --has there been any evidence whatsoever that
```

1487

VANES 001496

```
 1            the defendant had been drinking?   I submit to
 2            you the third person wasn't the defendant.
 3                 Ladies and gentlemen, I ask you to
 4            carefully consider all the witnesses that
 5            testified and this alibi.  And after careful,
 6            close consideration, close scrutiny of the
 7            witnesses' testimony, you will all agree with
 8            me, and I'm very confident you will agree with
 9            me, that this defendant is the one that
10            committed that murder, this defendant is the
11            one that robbed Bernard Jiminez and killed him
12            on February 27th, and this defendant is the
13            person is the one that robbed Rhonda Williams.
14                 After considering all the evidence very
15            carefully, you will convict him, find him
16            guilty of all three counts.  Thank you.
17      BY MR. KING:
18                 May it please the Court, counsel for the
19            State, ladies and gentlemen of the jury:  Good
20            afteroon.
21                 I want to thank you for paying careful
22            attention; notbody is going to be able to read
23            another person's mind, but watching you, we
24            asked and sort of stressed even how important
25            it is at trial that you keep attentive and
```

957

1488

VANES 001497

```
1    keep an open mind until you have heard
2    everything, and I want to thank you for doing
3    that.  I want to thank you for not pre-
4    judging, and pre-judging is so very easy to
5    do.
6         More than two hundred years ago, it was
7    established that in the United States of
8    America if you charge someone, if you as
9    representatives of government of the state or
10   the United States, if you charge someone,
11   anyone, no matter who they are or where they
12   come from with a crime, you are obliged,
13   obligated, required to prove that charge
14   beyond a reasonable doubt.  Possibilities,
15   probabilities just don't cut it. Beyond a
16   reasonable doubt.
17        And even longer, even before we were a
18   country, the doctrine of law developed that a
19   person, any person, no matter who you are or
20   where you come from, is presumed by law to be
21   innocent.  That presumption was with this kid
22   at the beginning of this case, it is with him
23   now, and it will follow him with you into the
24   jury room as you begin to deliberate and
25   evaluate.  You are dealing with an innocent
```

958

1433

VANES 001498

1    man.   That is what the law says.

2         And as I go through with you what this

3    case has shown us and what this case has not

4    shown us, I believe you will agree with me

5    that not only does the law say Willie Timothy

6    Donald is innocent and presumed innocent, but

7    so does the evidence and the lack of evidence

8    in this case.

9         I don't know how many times in this case

10   we heard excuses.  "We have budgetary

11   problems; that's why the crime lab can only do

12   certain things.  We have budgetary problems in

13   the city of Gary, and that's why the police

14   can only do certain things."  Take those

15   excuses and throw them out of the door of that

16   courtroom and don't ever let them walk into a

17   courtroom again.

18        What kind of miserable bologna is that?

19   You, on the one hand, as the State of Indiana,

20   are going to accuse one of your citizens of

21   murder; and then you're going to say, "Gee,

22   the budget is tight.  It's going to be tough,

23   you know, to check this out.  It's going to be

24   tough to look for fingerprints.  We don't have

25   the money to do it."  But, hey, it does not

959

1490

VANES 001499

 1          work like that.  It does not work like that.

 2              The evidence in this case I submit to you

 3          -- if you reflect back on jury selection, if

 4          you reflect back on opening statements, I

 5          believe you'll agree with me -- the evidence

 6          in this case has been what we said it would

 7          be, what the defense said it would be.

 8              There are two witnesses in terms of the

 9          issue in this case, and let's be clear on the

10          issue, the issue was not and is not was there

11          a murder committed, not were there robberies

12          committed; it's who committed them.

13              I ask you to reflect that -- I asked you

14          to do that in opening -- which witnesses had

15          anything to say about who did these crimes.

16          And I submit if you review everything in this

17          case, you're going to agree with me.  Who?

18          Ms. Williams and Ms. Belinsky.  Now, there has

19          been nothing more offered in this case I

20          submit to you on the issue of who committed

21          the crimes but the testimony of those two

22          women.

23              Now, I would like to at this point make

24          something clear to everyone in this court.  I

25          am not now, nor have I ever during the course

                              960

VANES 001500

1    of these proceedings, suggested that either of

2    those two women lied.  I don't know if the

3    State will accuse me of that or not; I don't

4    care.  I'm telling you folks that if you

5    reflect back to when I questioned both those

6    women, I submit to you they didn't lie.

7         What's a lie?  What is a lie?  I submit to

8    you that a lie is if you know something is a

9    particular way.  If I know that these ear

10   phones are white and when somebody asks me,

11   "What color are the ear phones?" and I say,

12   "Black," I have lied.  I intentionally mis-

13   stated what the truth is.

14        But since we have been kids, we are

15   familiar with the phrase and the concept of

16   honest mistake.  Honest mistake.  And we've

17   all had that happen to us.  Either we've

18   committed an honest mistake or somebody has

19   done that to us.  That's not a lie, but it

20   doesn't make it the way it happened.  And

21   that's the distinction with a difference here.

22        I will not say a bad word about either of

23   those two young ladies, but I will say to you

24   that they are mistaken, honestly, to be sure.

25   We have to go back in time and evaluate how

961

1492

VANES 001501

```
 1        Ms. Williams and Ms. Belinsky came to point
 2        the accusing finger at Willie Donald.
 3            We first of all have to go back and
 4        reflect upon the commission of the crimes, and
 5        we have to evaluate the timing and the
 6        circumstances involved in the commission of
 7        these crimes, the time and the circumstances
 8        involved in the contact they had with the
 9        robber.
10            It is not enough, as the State would have
11        you do, to just throw out blanket assertions
12        of the times without a closer analysis.
13        Nobody can do justice in this case without
14        going back and looking at these times
15        precisely.  First of all, we have to look at
16        the times the best we can off what was
17        reported initially to the police; we have to
18        look at those times.
19            Now, let's start with one thing that was
20        even mentioned in closing by the State.  The
21        State says Ms. Williams testified that the
22        person that robbed her left her home at about
23        9:25.   Well, if that's so, then the person
24        who robbed and shot and killed Mr. Jiminez
25        couldn't have gotten there by a quarter after
```

962

1493

VANES 001502

1      9:00, which is the time Ms. Belinsky recalls.

2      It's not possible.

3            Again, does that mean these ladies are

4      lying?  No.  Let's remember and look at some

5      of the things she told us.  Let's look at one

6      phrase Ms. Williams in particular said -- and

7      I think Ms. Lake even mentioned it, "It seemed

8      like a long time.  It seemed like an eternity

9      how long this person was there."  I'm sure it

10     did; that doesn't mean it was.  Her perception

11     of time, of necessity, is affected by what's

12     going on.

13           Now, I think she has a couple of ties to

14     the time, one of which when she woke up at

15     8:45 because she checked her clock.  The

16     second one is the alarm going off.

17           Routinely -- I don't know about you, but

18     my alarm has been set at 5:30 in the morning

19     for as long as I can remember, and that is the

20     time the alarm goes off during a work week --

21     and she recalls 9:00 o'clock is the time for

22     her.  And she recalls the alarm going off

23     during the period of time the robber is there,

24     so we know he's there at 9:00 o'clock.

25           But I submit to you she cannot -- and I

963

1494

VANES 001503

1    don't think she particularly was -- she cannot

2    be precise with how long it was before the

3    person left.

4         Now, the State tells us, "Well, you're in

5    this situation, there's a fellow with a gun,

6    and it's a terrifying situation," and then

7    they're going to explain to us, "Well, this is

8    how you're going to think, and this is how

9    it's going to affect you."

10        Now, with all due respect to both

11   prosecutors in this case, I don't think

12   anybody is really equipped to tell anybody

13   else how they're going to react in that

14   situation unless they've been through it

15   themselves, unless they've experienced it

16   themselves.  How can anybody really know what

17   effect a situation, a traumatic situation,

18   like this would have on you if you haven't

19   gone through it yourself?

20        It is absolutely your worst nightmare.

21   Your worst nightmare.  Somebody with a gun has

22   invaded your space, your home, your yard in

23   one case, is threatening you, your safety.

24        You are face to face with the prospect of

25   dying.  Mortal man's greatest fear, fear of

964







VANES-001504

```
 1        dying.  And it's not something you're watching
 2        in a movie, it's not something you're watching
 3        on a television program, it's not something
 4        you're watching on a news reel, it's something
 5        you are watching inches away from the business
 6        end of a gun.
 7             And for the State to simply tell us,
 8        "Well, this, then, is how you're going to
 9        react --" and I hope it never happens to them
10        -- but I don't think they're in a position to
11        tell us that.
12             We have to recall, yes, there is a period
13        of time the robber is with both these women.
14        So we have to look at the facts.
15             You remember Ms. Williams' testimony.  The
16        first thing she describes is the gun in her
17        face.  This is a person who comes in the door
18        when she has opened it thinking it's the
19        neighbor.  Then what did we hear in terms of
20        the most, the biggest chunk of time this
21        robber is with her?  The fellow has got her
22        turned around with the gun in her back, laying
23        on the floor with a pillow over the head at
24        the one time where he's apparently trying to
25        force some money out of her.
```

965

1496

VANES 001505

```
1        Now, I'm not saying Ms. Williams during
2   the period of time this robber is here didn't
3   see the man's face.   I'm not saying that at
4   all.   But unlike what the State would have you
5   believe, it was not the majority of the time
6   given what she described happened.
7        And how the fear she had to have affected
8   her perceptions is something that we can only
9   guess at.   But to say that that means you're
10  going to be better at being sure about what
11  you're seeing is no more fair than for me to
12  tell you automatically it means you're going
13  to be worse at it.   We just don't know how the
14  human mind and senses are going to react to
15  that.
16        With Ms. Belinsky, the same thing.   It's a
17  relatively short period of time this robber is
18  right up at the porch.   And here this poor
19  woman is trying to shield her kids, she's
20  trying to keep track of what this guy is doing
21  with her fiance, the threat to herself.   At
22  one point, she did indicate there was a
23  turning away; we can fully understand that.
24  She's on this porch.
25        Now, ladies and gentlemen, once again, I'm
```

966

1497

VANES 001506

1    not saying she didn't see the face but, again,

2    she was terrified when she did, and she wasn't

3    in a position to just sit there making the

4    sort of observations we can commonly make here

5    in a courtroom.

6        I can't say, in looking at all of you

7    right now, that in five days from now --

8    because we've been together for a week, and

9    nobody has been pointing a gun at any of us --

10   if I see you in five days in a mall or out

11   shopping I will recognize you and you will

12   recognize me.

13       But that does not mean if our contact was

14   of the sort described by Ms. Williams and Ms.

15   Belinsky that that would be so.  I'm not

16   saying it isn't, but don't let the State tell

17   you it is so.  There is just no evidence that

18   we can use to come to that sort of decision.

19       We have to of necessity look at the

20   descriptions given every time we have a record

21   of Ms. Williams and Ms. Belinsky giving a

22   description, we have got to explore it.

23       Now, number one, let's talk about the

24   height.  We heard this rather thoroughly

25   presented, and we did find out there is on

                    967


                  1498

VANES 001507

1    record both these young laidies at one point

2    very early when the police were checking out

3    what happened said that the fellow that did

4    this was five feet seven inches tall; and both

5    these ladies at a later point said the man

6    that did this was five feet ten inches.

7         Now, I know Ms. Williams denies telling

8    that to Officer Faulkner, and I know Officer

9    Faulkner said, "Well, she said, 'about,'" but

10   ladies and gentlemen, you saw in this court,

11   you heard it, what was written on the offense

12   report by the officer -- who I'm assuming was

13   trying to write down as accurately as he can

14   -- was five feet seven inches.

15        And in the statement given on February

16   28th by Ms. Belinsky to Detective Outlaw, she

17   said five foot seven inches.  Now, it later

18   went to five foot ten inches.  It's a curious

19   coincidence that both of the different heights

20   with both of the witnesses are the same, five

21   seven and five ten.

22        There's a question there.  There is a

23   question there.  It doesn't make them liars

24   but, again, we get a glimpse, at least, maybe

25   this is the impact and effect of going through

VANES 001508

1     trauma like this, a scary thing like this.

2          Then we have to look at when you recall

3     that, even here on the stand and when we

4     looked at the other descriptions given, once

5     we got past the height, what was the single

6     most noted feature about the robber by both

7     these women and later the policewoman and her

8     daughter?  Scars on the face; scars on the

9     face.  Not pimples, not blackheads, not acne.

10    Ms. Williams described it as "bump-like scars.

11    Mr. Belinsky, "as though pimples had been

12    scratched away and scars left behind."

13         That is, and was, in terms of the face,

14    the single description, the single most

15    important and noted description by both these

16    young ladies and, again, the policewoman and

17    her daughter, Sonya.

18         Now, Ms. Belinsky and Ms. Williams also

19    talked about eyes, the style and shape of

20    eyes, and then, of course, we have the

21    clothing which, rather universally, was

22    described by all of the people that night.

23    Now, this is what we have as of 9:30,

24    Thursday, February 27th, 1992.

25         Now, we have to jump ahead five days in

969

1500

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 33

# Plaintiff's Summary Judgment Response

# In The Matter Of:

*WILLIE T. DONALD vs*
*BRUCE OUTLAW, CARLA K. PYLE et al*

---

*Videotaped Deposition of: SCOTT L. KING*
*July 17, 2019*
*Case No. 2:17-CV-00032*

---

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 07-17-19 Scott King.txt
**Min-U-Script® with Word Index**

```
 1                UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION

 3

 4    WILLIE T. DONALD,              )
                                     )
 5             Plaintiff,            )
                                     )
 6    vs.                            )   Case No.
                                     )   2:17-CV-00032
 7    BRUCE OUTLAW, CARLA K. PYLE,   )
      as Special Administrator of    )
 8    the ESTATE OF JOHN E. JELKS,   )
      JR., CITY OF GARY, and other   )
 9    as-yet unknown Employees of    )
      the City of Gary,              )
10                                   )
               Defendants.           )
11    _____)

12

13            The Videotaped Deposition of SCOTT L. KING

14            Date:      Wednesday, July 17, 2019

15            Time:      1:21 o'clock p.m.

16            Place:     1085 Broadway, Suite B
                         Gary, Indiana
17

18            Called as a witness, by the Defendants, in
              accordance with the Federal Rules of Civil
19            Procedure, pursuant to Notice.

20    Before Beth A. Barnette, CSR,
      Illinois License No. 084-004727
21    Notary Public, State of Indiana

22

23                    BOSS REPORTERS
                    & VIDEOCONFERENCING
24       GARY * MERRILLVILLE * VALPARAISO, INDIANA
                    (219) 769-9090
25
```

```
1    APPEARANCES:

2    SCOTT R. DRURY, ESQ.
               Loevy & Loevy
3              311 North Aberdeen Street, 3rd Floor
               Chicago, Illinois  60607
4              PHONE:  (312) 243-5900
               FAX:    (312) 243-5902
5              drury@loevy.com

6    On Behalf of the Plaintiff;

7

8    MICHAEL E. TOLBERT, ESQ.
               Tolbert & Tolbert, LLC
9              1085 Broadway, Suite B
               Gary, Indiana  46402
10             PHONE:  (219) 427-0094
               FAX:    (219) 427-0783
11             mtolbert@tolbertlegal.com

12   On Behalf of Defendant City of Gary;

13

14   RICARDO A. HALL, ESQ.
               Kopka Pinkus Dolin, P.C.
15             9801 Connecticut Drive
               Crown Point, Indiana  46307
16             PHONE:  (219) 794-1888
               FAX:    (219) 794-1892
17             rahall@kopkalaw.com

18   On Behalf of Defendant Bruce Outlaw;

19

20   TONY WALKER, ESQ.
               The Walker Law Group
21             363 South Lake Street
               Gary, Indiana  46403
22             PHONE:  (800) 889-3689
               tony@walkerlawgroup.biz
23
     On Behalf of Defendant Estate of John E. Jelks, Jr.
24

25   ALSO PRESENT:  Marvin Oltman, Videographer
```

USDC IN/ND case 2:17-cv-00032-TLS document 89-32 filed 02/06/22 page 261 of 940

```
 1        THE VIDEOTAPED DEPOSITION OF SCOTT L. KING

 2    DIRECT EXAMINATION
         By Mr. Tolbert........................ Page   5
 3

 4

 5                 E   X   H   I   B   I   T   S

 6    DEFENDANT'S          MARKED      IDENTIFIED

 7    Exhibit No. 1          27           27

 8    Exhibit No. 2          46           47

 9    Exhibit No. 3          58           58

10    Exhibit No. 4          63           63

11    Exhibit No. 5          68           69

12    Exhibit No. 6          70           71

13    Exhibit No. 7          72           72

14    Exhibit No. 8          90           90

15    Exhibit No. 9          92           92

16    Exhibit No. 10        115          115

17    Exhibit No. 11        127          127

18

19                         *   *   *
20

21

22

23

24

25
```

**BOSS REPORTERS**
**(219) 769-9090**

USSDC INND Case 2:17-cv-00032-TLS document 369-32 filed 02/06/22 page 262 of 940

```
 1                    VIDEOGRAPHER:  We are now on the

 2         record in the matter of Willie T. Donald

 3         versus Bruce Outlaw, et. al., in the United

 4         States District Court, for the Northern

 5         District of Indiana.  The case number is

 6         2:17-CV-32.  Today's date is July 17th, 2019.

 7         The time is now 1:21 p.m.  This is the

 8         video-recorded deposition of Scott King.  We

 9         are located at 1085 Broadway, Suite B, in

10         Gary, Indiana.

11                    My name is Marvin Oltman.  I'm the

12         legal video specialist representing Levidco.

13         The court reporter is Beth Barnette with Boss

14         Reporters.  For the record will counsel please

15         identify themselves, starting with the party

16         noticing these proceedings.

17                    MR. TOLBERT:  My name is Michael

18         Tolbert and I represent the City of Gary.

19                    MR. HALL:  Ricardo Hall for Bruce

20         Outlaw.

21                    MR. WALKER:  Tony Walker

22         representing the Estate of John Jelks.

23                    MR. DRURY:  Scott Drury on behalf

24         of the plaintiff, Willie T. Donald.

25                    VIDEOGRAPHER:  Would the court
```

USSDC IN WD Case 2:17-cv-00032-TLS document 869-32 filed 02/08/22 page 263 of 940

```
 1           reporter please swear in the witness.

 2                      SCOTT L. KING,

 3    called as a witness, by the Defendants, having first

 4    been duly sworn, was examined and testified as

 5    follows:

 6                      THE WITNESS:  I do.

 7                      COURT REPORTER:  Thank you.

 8                      DIRECT EXAMINATION

 9    BY MR. TOLBERT:

10    Q     Okay.  Attorney King, my name is Michael

11          Tolbert.  I know we know each other outside of

12          the professional setting, but you're here

13          today to be deposed in the matter of Willie

14          Donald versus Outlaw, Jelks, et. al., City of

15          Gary, and the lawyers in this case have

16          questions about your representation of a

17          Mr. Willie Donald in, I believe, in the

18          earlier part of 1992.  I know that is a long

19          time ago and there could be some things that

20          you might not necessarily remember, but we'll

21          try to do the best we can with some documents

22          to kind of put in front of you and hopefully

23          that might jog our memory on some things.

24          Okay?

25                 I am going to go through your
```

1    deposition, try do this in an organized

2    fashion so we don't waste your time and the

3    lawyers that are present, as well as the court

4    reporter and videographer's time.  So I'm

5    going to go over your background, I'm going to

6    go over your education, your professional

7    experience, your representation of Mr. Donald

8    in 1992, and your contact or any dealings that

9    you had related to Mr. Donald after his

10   conviction in 1992.  All right?  So those are

11   going to be the areas that I'm going to go

12   over and I'll try to go over those as quickly

13   as possible.

14        If -- I know you're a lawyer.  You've

15   been practicing for a number years and you've

16   probably taken a number of depositions, but

17   just try to remember to answer the questions

18   out loud because the court reporter can't take

19   down grunts or nods of heads, and try to let

20   me finish my question before I get it out so

21   the court reporter can actually get the

22   question and answer.  All right?

23        If you need to take a break, let us

24   know, or if there's some pressing obligation

25   or professional obligation or something that

USDC IN/ND Case 2:17-cv-00032-TLS document 869-32 filed 02/08/22 page 265 of 940

```
 1          requires that you leave immediately, let us
 2          know and we can obviously accommodate that as
 3          well, or at least try to.  All right?
 4              So why didn't we start off with your
 5          full legal name for the record.
 6   A    Scott, middle name Louis, last name King.
 7   Q    And where do you reside?
 8   A    Gary, Indiana.
 9   Q    If we needed to subpoena you for trial
10          testimony, where would you accept the
11          subpoena?
12   A    It would be best served at my office, 9211
13          Broadway, Merrillville, Indiana, 46410.
14   Q    And how long have you been at that location?
15   A    Well, a number of years.
16   Q    And what is your highest educational
17          attainment?  What's your highest degree that
18          you have?
19   A    Highest earned degree is a jurist doctorate.
20          I had a doctor of law conferred on me by my
21          undergraduate university.
22   Q    Okay.  And where are you originally from?  Are
23          you from --
24   A    Chicago, Illinois.
25   Q    Okay.  And where did you go to undergraduate?
```

```
 1   A    Concordia University, River Forest, Illinois.

 2   Q    And what did you study?

 3   A    It was a general program.  Education was in

 4        there, speech.  I think those were the two

 5        majors.

 6   Q    And what years were you at Concordia

 7        University?

 8   A    I think '70 to '73.

 9   Q    And did you get a degree from Concordia?

10   A    Yeah, I got a bachelors degree in '73.

11   Q    And did you go to law school right after?

12   A    I did.

13   Q    Okay.  And where did you go to law school?

14   A    Valparaiso University.

15   Q    And what years did you go to Valpo law?

16   A    I think '73, graduated in '76.

17   Q    After you graduated from Valpo law in 1976,

18        did you begin practicing immediately?

19   A    Well, I had to take a bar exam first.

20   Q    Uh-huh.

21   A    But after I took and passed my first bar exam,

22        I began practicing.

23   Q    All right.  So you would have began practicing

24        in maybe the fall of 1996 -- 1976, I mean?

25   A    Yeah, very late fall.
```

```
 1   Q    Do you remember what your first legal job was?
 2   A    I worked for a -- as a -- well, when I was in
 3        law school, I had a clerking position.
 4   Q    Who did you clerk for?
 5   A    Well, actually, Tabor, Bozik & Hartman in
 6        Valparaiso.
 7   Q    Okay.  And once you passed the bar exam and
 8        became a licensed practitioner, a lawyer,
 9        where did you start practicing law?
10   A    Yeah, I was -- I can't remember the nature of
11        the relationship, if I -- but I worked with an
12        attorney named John Morse, as in the code.
13   Q    And where was John Morse located?
14   A    Ellicott City, Maryland.
15   Q    And was that a solo -- was he a solo
16        practitioner or was that a law firm?
17   A    A solo practitioner.
18   Q    Okay.  So it would have just been the two of
19        you in his practice?
20   A    There was some -- there was another fellow who
21        was semi-retired.  I have no idea what his
22        name was.
23   Q    And how long did you work in Maryland with
24        Mr. Morse?
25   A    I'm estimating a year, maybe a little bit more
```

1       than a year.

2  Q   Did you have a specific area of focus during

3       that time?

4  A   It was a general practice.  So, no, I didn't.

5  Q   Did that general practice include criminal

6       work?

7  A   It did.

8  Q   Okay.  Do you have an idea of what percentage

9       of criminal work that you would have done in

10      that general practice?

11  A   No.

12  Q   Okay.  And when you left Mr. Morse, where did

13      you go?

14  A   I was hired by -- there was a union, a trade

15      union, quartered in Washington, D.C. that

16      offered, as part of their benefits plan for

17      their members, offered legal representation,

18      and I have no idea what the name of the union

19      was.  So I went -- I was there, and then I was

20      also associated with another attorney in the

21      Ellicott City area, whose name escapes me.  So

22      I was doing both of those.

23  Q   Okay.  So your work with the trade union would

24      have been sort of like an in-house counsel

25      position or --

```
 1   A    Well, it was -- there were attorneys,
 2        District, Maryland, and Virginia, you know,
 3        depending on where their client was from, or
 4        wherever the case was.
 5   Q    Right.
 6   A    And I was one of the -- one of two, I think,
 7        attorneys from Maryland.
 8   Q    Okay.
 9   A    If memory serves me.
10   Q    When did you start that position, if you
11        recall?
12   A    I have no idea.
13   Q    Okay.  Do you know how long you would have
14        practiced there?
15   A    I think I was there until I -- I don't, no, I
16        don't recall.
17   Q    Was the practice area focus, was it labor work
18        or --
19   A    No, no.  This was handling all sorts of, you
20        know, routine legal matters for the members.
21        So it ranged from -- there was some criminal,
22        some domestic, some general, civil.  It was a
23        mix of things.
24   Q    Okay.  You don't recall how long you stayed
25        there, but --
```

```
 1   A     I don't.

 2   Q     -- where was the next position that you --

 3   A     After that I think I was hired by the

 4         newly-elected Lake County, Indiana Prosecutor.

 5   Q     And who was that?

 6   A     Jack Crawford.

 7   Q     Do you remember when that was?

 8   A     '78.

 9   Q     And what was your position?

10   A     A deputy prosecutor.

11   Q     And did you start off immediately in a

12         specific division of the prosecutor's office?

13   A     You started off -- everybody started off, as

14         did I, in the misdemeanor division, county, I

15         think -- I don't think it was county courts

16         back then.  Maybe it was.  Misdemeanor

17         division.  Then I transitioned into the felony

18         division.

19   Q     Do you remember how long you stayed in

20         misdemeanor before you transitioned to felony

21         division?

22   A     Not very long.

23   Q     Okay.

24   A     But I don't recall how long.

25   Q     Okay.  That's fair enough.  All right.  And
```

```
 1              how long did you stay in the felony division,

 2              if you recall?

 3    A    Well, I started in '79.  Somewhere around '81.

 4    Q    All right.

 5    A    '81, or so.  Then I was hired as an associate

 6              by a firm in Merrillville, Conan & Thiros.

 7    Q    When was that?

 8    A    Well, as near as I can recollect, sometime in

 9              1981.

10    Q    How many -- go ahead, I'm sorry.

11    A    Then I was offered back a position with the

12              prosecutor's office in '82.  I was there for

13              less than a year and I was hired as an

14              Assistant U.S. Attorney for the Northern

15              District of Indiana in '83.

16    Q    Okay.  So you went back to the prosecutor's

17              office in 1982 after a stint with Conan &

18              Thiros.

19    A    Yes.

20    Q    And Conan & Thiros is a -- they did a lot of

21              criminal defense; is that right?

22    A    Yeah, they did.  I mean, they did a variety,

23              but the biggest part of their case load was

24              criminal defense.

25    Q    And is that what you did when you were at
```

```
 1          Conan & Thiros?
 2    A     Principally, yes.
 3    Q     Okay.  And then you went back to the
 4          prosecutor's office in 1982 and --
 5    A     Yeah.
 6    Q     -- how long did you stay?
 7    A     Not long.  Six months, eight months for -- you
 8          know, did some felony trials and then got
 9          offered a position as an A-USA.
10    Q     Okay.  So you took that position and became a
11          U.S. attorney?
12    A     An assistant U.S. attorney, yeah.
13    Q     Okay.  Do you remember when that would have
14          been?
15    A     Sometime in '83.
16    Q     And how long did you stay?
17    A     Little more than a year.
18    Q     And then where did you go?
19    A     I went into private practice.
20    Q     So you opened your own law -- own firm?
21    A     I did.
22    Q     Okay.  And when you opened your own firm --
23          well, what type of cases did you handle at the
24          U.S. Attorney's Office?
25    A     Criminal cases.
```

```
 1   Q    Okay.  Any -- go ahead, I'm sorry.
 2   A    My specific assignment was the Organized Crime
 3        and Drug Enforcement Task Force attorney.  So,
 4        I think there was some other cases, but
 5        principally larger scale organized crime and
 6        drug enforcement.  The bulk of the case load
 7        for that year period was drug cases.
 8   Q    And when you opened up your own firm -- in
 9        what year was that again?
10   A    1984.
11   Q    -- did you have a specific area of focus that
12        you marketed?
13   A    No, we did -- in the '80s -- I'm forgetting
14        this certainly, at best, more circumspect than
15        it is now, you didn't -- there were a lot of
16        prohibitions regarding marketing that don't
17        exist now.  But my focus, my desire for
18        practice was criminal defense.  That had been
19        most of my experience with government to date.
20   Q    Now, when you moved back -- it sounds like
21        when you moved back to the area, which is Lake
22        County, Indiana, in about 1978, where did you
23        pick up your residence?
24   A    Initially, in the lovely town of Cedar Lake,
25        and then -- that didn't last long, then to
```

| | | |
|---|---|---|
| 1 | | Crown Point for a couple of years, and then in |
| 2 | | 1980 moved to Gary. |
| 3 | Q | And where you reside today. |
| 4 | A | No. |
| 5 | Q | Okay. |
| 6 | A | Around the corner from where I reside today, |
| 7 | | but -- |
| 8 | Q | Okay.  Oh, right.  But I'm saying you still -- |
| 9 | A | Oh, in Gary, yes. |
| 10 | Q | -- live in Gary? |
| 11 | A | I still live in Gary, Indiana. |
| 12 | Q | Okay.  So you've been living in Gary since |
| 13 | | about 1980? |
| 14 | A | Since 1980. |
| 15 | Q | Okay.  And when you opened your own practice, |
| 16 | | I'm assuming that a component of that would |
| 17 | | have been criminal work? |
| 18 | A | Yes. |
| 19 | Q | All right.  And where are you employed now? |
| 20 | | What is your -- where are you at now? |
| 21 | A | I am employed by King, Brown & Murdaugh, LLC. |
| 22 | Q | So you're the principal of that firm or |
| 23 | | partner? |
| 24 | A | Well, I'm a partner.  We have equal |
| 25 | | partnerships.  We have varying shares of the |

```
 1        equity, but the compensation is the same among
 2        all three partners.
 3   Q    When did you open up King, Brown & Murdock
 4        (sic)?
 5   A    January of -- January 1st of 2018.
 6   Q    And before this partnership, King, Brown &
 7        Murdock --
 8   A    Murdaugh.
 9   Q    Murdo?
10   A    Daugh, D-A-U-G-H.
11   Q    Oh, daugh, okay.  Where -- were you with a
12        group of other partners before that?
13   A    Before that I was with the same attorneys, but
14        as a solo practitioner.
15   Q    Okay.
16   A    For -- I don't know how long.
17   Q    Okay.  And it's my understanding you were at a
18        firm Meyer, Wyatt & Gottshall?  Do you
19        remember that?
20   A    I was -- in '86, Jim Meyer left the U.S.
21        Attorney's Office -- he was an A-USA as well,
22        and he and I formed a partnership.  I think a
23        professional corporation, if memory serves me.
24        And then over the years, in the early '90s,
25        early to mid '90s, we brought in -- actually,
```

```
 1           I think when I left that firm to take office
 2           as mayor in '96, I think that's when Meyer,
 3           Wyatt, Lyles, and Gottshall, or however they
 4           called it, I think that's when they formed.  I
 5           sold my interest in King & Meyer to them.  I
 6           don't remember the details of it.
 7    Q      Okay.  So the period of time that I want to
 8           focus on is 1992.  What -- who are you with in
 9           1992?  Were you a solo practitioner or --
10    A      No, I think it would have been King & Meyer.
11    Q      Okay.  And how many lawyers did you have at
12           King & Meyer?
13    A      I don't remember.
14    Q      Okay.  It would have at least been two, you
15           and --
16    A      Yeah, it was two, but whether we had any
17           associates at that time, I think -- I assume
18           we did, two or three associates.
19    Q      And what did you -- what practice area did you
20           primarily focus on in 1992?
21    A      Did I personally?
22    Q      Yes.
23    A      Criminal.
24    Q      Okay.  Criminal defense?
25    A      Yes.
```

```
 1    Q    Okay.  Any specific types of crimes or --

 2    A    No.

 3    Q    Okay.

 4    A    No.

 5    Q    All right.  In 1992, how many jury trials

 6         would you have said you -- would you say you

 7         would have probably had?

 8    A    I have no idea.

 9    Q    Okay.  How long have you been practicing?

10    A    Well, since December of 1976.  I was inactive

11         from January of '96 till sometime in 2006 when

12         I was in public office.

13    Q    Okay.  Have you ever had your license

14         suspended?

15    A    No.

16    Q    Do you have any certifications?

17                MR. DRURY:  Object to form.

18    BY MR. TOLBERT:

19    Q    Do you understand the question?

20    A    No.

21    Q    Okay.  They have trial lawyer certifications,

22         criminal law, specialty certifications.

23                MR. DRURY:  Same objection.

24    BY MR. TOLBERT:

25    Q    Do you have any specialization or
```

```
 1        certifications that would --
 2  A     No.
 3  Q     -- allow you to hold yourself out as a
 4        specialist?
 5  A     No.
 6  Q     Okay.  Are you a -- do you have any other
 7        licenses outside of an Indiana law license?
 8  A     Maryland.
 9  Q     Okay.  That's it, Maryland and Indiana.
10  A     Well, and then state -- those are the two
11        states.  Then I have admission to the Federal
12        Bars in the Southern and Northern District of
13        Indiana, the Northern District of Illinois,
14        the Trial Bar of the Northern District of
15        Illinois, the Court of Appeals for the 7th
16        Circuit, the U.S. Supreme Court, and currently
17        I'm pro hac vice in the Western District of
18        North Carolina, and that's it.
19  Q     Okay.  Do you have any independent
20        recollection as you sit here today regarding
21        the Willie Donald case that you were involved
22        in in 1992?
23  A     Yes.
24  Q     Okay.  What, what recollection do you have
25        about that case?
```

```
 1   A    Well, I have the recollection that --

 2                   MR. DRURY:  I'll just object to

 3             the form, vague, calls for a narrative.

 4   A    I have the recollection of when I was hired by

 5             his mother and sisters.  That's my recall.  I

 6             remember, obviously, Mr. Donald, meeting with

 7             him.  I remember being fairly well-convinced

 8             that he was innocent of what he was accused

 9             of.

10   Q    Okay.

11   A    You know, and then moving forward and

12             preparing his defense, everything that that

13             entails.

14   Q    So you were hired by his mother and his

15             sister?

16   A    That's who came into my office, yes.

17   Q    Do you remember their names?

18   A    I do.  Sheila is one of them.

19   Q    That's the sister or the mother?

20   A    Yeah.  I don't know.

21   Q    Okay.

22   A    I remember the name Sheila.

23   Q    Okay.

24   A    Past that, I can't remember their names.

25   Q    So you remember Sheila, but that's the only
```

| 1  |   | name you remember.                               |
|----|---|--------------------------------------------------|
| 2  | A | Yeah.                                            |
| 3  | Q | All right.  And before coming here today, did    |
| 4  |   | you review any documents that might help you     |
| 5  |   | refresh your recollection regarding              |
| 6  |   | handling -- the handling of Mr. Donald's case?   |
| 7  | A | Yes.                                             |
| 8  | Q | What did you review?                             |
| 9  | A | I don't remember.  Earlier today I met the       |
| 10 |   | plaintiff's counsel for the first time for       |
| 11 |   | about 20 minutes in my office, and during the    |
| 12 |   | course of that I was shown various excerpts      |
| 13 |   | from -- not excerpts, I was shown the whole      |
| 14 |   | transcript, but directed to particular          |
| 15 |   | portions; some, I think, of testimony at the    |
| 16 |   | post conviction relief proceeding regarding     |
| 17 |   | Mr. Donald, some from the trial, one or more    |
| 18 |   | from the trial, but motions, either pre or      |
| 19 |   | post trial motions, some reports, police       |
| 20 |   | reports.                                         |
| 21 | Q | Okay.                                            |
| 22 | A | That's about it.                                 |
| 23 | Q | Okay.  Now when you say you met with the        |
| 24 |   | plaintiff's attorney, are you talking about     |
| 25 |   | Mr. Scott Drury --                               |

```
 1    A      Yes.

 2    Q      -- who's in the room today?

 3    A      Yes.

 4    Q      Okay.  And how was it that you came to meet

 5           him?

 6    A      Somebody -- I think a partner of his called me

 7           about a week or so ago and indicating, you

 8           know, the deposition was coming up and that he

 9           wanted -- she was calling for him.  He was out

10           of town, or some darn thing.  She wanted to

11           see if it would be okay if they set up a

12           meeting with me, and I said sure.  So they

13           did.  They set it -- they happened to set it

14           up for today.

15    Q      Okay.

16    A      And -- at 11:00.

17    Q      Okay.  And you said that meeting lasted 20

18           minutes?  What --

19    A      Yeah, about.

20    Q      What did you go over with Mr. Drury?

21    A      I just told you.

22    Q      What did you -- what was the exchanges?  What

23           were the conversations that you had?

24    A      He would ask me similar to what you just asked

25           about what present memory I had and then
```

```
 1         would -- if I said I didn't remember, then he
 2         would show me -- he showed me a couple of
 3         these documents.  Some of them he asked if I
 4         had ever -- if I recall ever having seen them
 5         before; the reports mainly, not the
 6         transcripts.  There were two or three of
 7         those.  That's about it.
 8   Q     Did he, did he ask you any opinions, any of
 9         your opinions that you had?
10   A     No.
11   Q     Okay.  And when you met with Mr. Donald's, his
12         mother and his sister, do you remember around
13         the period of time that meeting would have
14         taken place?
15   A     I'm -- well, no.  I mean, at the outset of the
16         case.  I mean, that's typically -- you know,
17         usually 90 plus percent of the time it's after
18         the person's been charged, arrested.  That's
19         typically what kicks it off.
20   Q     Now you said that --
21   A     I don't recall.  I assume that's when it was,
22         about the time of his arrest.
23   Q     Okay.
24   A     So --
25   Q     Now the jury trial and the criminal trial
```

```
 1            occurred in June of 1992.  Does that sound
 2            about right or do you know?
 3   A    I don't know.
 4   Q    Okay.  And I think that you testified earlier
 5            that once you met Mr. Donald's, his mother and
 6            his sister, you began working on his case?
 7   A    As soon as I got hired, yeah.
 8   Q    Okay.  And do you remember the first thing
 9            that you did?
10   A    No.
11   Q    Okay.
12   A    Well, the first thing I would do is read the
13            charge, the probable cause affidavit and the
14            information.  Shortly after that I would meet
15            with the client.  I mean, this is just kind of
16            a protocol.  Then usually, in a murder case, I
17            will -- in an Indiana murder case, will file a
18            petition for habeas corpus to address the bond
19            issue.  I don't recall if I did or not in this
20            case, but that's the usual in a murder case.
21            Then wait for discovery to start coming in.
22   Q    Okay.  From the time that you spoke to
23            Mr. Donald, his sister, and his mother until
24            the time the jury trial occurred sometime in
25            1992, do you feel that you did pretty much all
```

```
 1         you could to get Mr. Donald's case ready for

 2         trial?

 3  A      Yes.

 4  Q      Okay.  Do you feel that you were ineffective

 5         in preparing for Mr. Donald's case?

 6  A      No.

 7                    MR. DRURY:  Objection to form.

 8  BY MR. TOLBERT:

 9  Q      Do you know what I mean by ineffective?

10  A      Yes.

11                    MR. DRURY:  Same objection.

12  BY MR. TOLBERT:

13  Q      Okay.  What, what do you -- what is your

14         understanding of ineffective?

15  A      As defined by Strickland versus Washington,

16         that -- did not perform up to the standard

17         commonly existing in the jurisdiction.

18  Q      During the jury trial of Mr. Donald, do you

19         feel that you were ineffective?

20  A      No.

21  Q      Okay.  And do you feel that you did everything

22         that you could to attempt to secure Mr. Donald

23         an acquittal?

24  A      Yes.

25                    MR. DRURY:  Object to the form.
```

```
 1   BY MR. TOLBERT:

 2   Q     That's a yes?

 3   A     Yes.

 4                    MR. DRURY:  Same objection.

 5                    (Defendant's Exhibit No. 1 marked

 6              for identification.)

 7   BY MR. TOLBERT:

 8   Q     Let me show you what has been marked as

 9         Defendant's Exhibit 1.  I'm going to state for

10         the record what I've just handed you marked as

11         Defendant's Exhibit 1 is a petition for post

12         conviction relief that was prepared by

13         Mr. Donald, and also towards the end there's

14         a -- starting at Bates stamp which is

15         identified as DON 702, starts a memorandum

16         granting post conviction relief, and then the

17         last page is the last page of that memorandum,

18         identified as DON 283.

19   A     DON 2 what?

20   Q     283, the last page.

21   A     Okay.

22   Q     Okay.  When you met with Mr. Drury earlier

23         today, did he go over this document with you?

24   A     No.

25   Q     Okay.  Did he ask you about anything related
```

1        to Mr. Donald's post conviction relief plea?

2  A    Did what?

3  Q    Did he ask you about anything related to

4        Mr. Donald's request for post conviction

5        relief?

6  A    The only reference would have been in the

7        context of me having testified at the petition

8        and in the context of the proceeding when

9        Mr. Donald was represented by counsel, which

10       he was not at the time of this exhibit.

11 Q    Okay.

12 A    Petitioner's -- Defendant's 1.

13 Q    And this petition for post conviction relief

14       was filed on May 10, 2004?  Do you see the

15       first page?

16 A    I do.

17 Q    And then if you look at the second to the last

18       page, which is the memorandum.

19 A    Which now?  The second to the last?

20 Q    Second to the last page.  Do you see where it

21       says Roman numeral 6?

22 A    Yes.

23 Q    And do you see where the last page it has

24       Mr. Donald's signature signing off on the

25       memorandum?

1             MR. DRURY:  Objection, foundation.

2   A    I see a signature that's legible and says

3       Willie Donald.  Now I don't necessarily

4       recognize it as his.

5   BY MR. TOLBERT:

6   Q    Okay.  And do you see where it alleges in the

7       memorandum, the second to the last page, that

8       part of Mr. Donald's request for relief from

9       his conviction was your ineffective assistance

10      of counsel?

11            MR. DRURY:  Object to the form and

12      foundation.

13   BY MR. TOLBERT:

14   Q    You can answer the question.

15   A    Yes.

16   Q    Okay.  Were you aware that Mr. Donald claimed

17      that you were ineffective?

18            MR. DRURY:  Object to -- objection

19      to the foundation.

20   A    I don't recall if I was ever specifically

21      aware.  I would have to say from experience

22      that a pro se -- well, many times an attorney,

23      post conviction relief attorneys, but

24      certainly pro se, almost automatically

25      includes allegations of ineffective assistance

```
 1          of either trial or appellate or both counsel.
 2   BY MR. TOLBERT:
 3   Q    Okay.  So are you saying that they allege
 4        ineffective assistance of counsel and not --
 5        and it not necessarily be true?
 6                 MR. DRURY:  Objection to form,
 7        foundation, especially as it relates to this
 8        specific case.
 9   A    The alle -- in this case the allegation of
10        ineffective assistance of counsel, in my view,
11        is not true.  It is part of a formula,
12        particularly among pro se litigants, that is,
13        in my experience, the norm rather than the
14        exception.
15   BY MR. TOLBERT:
16   Q    Okay.  So it's a claim that a pro se person
17        would make without there necessarily being any
18        basis to it.
19                 MR. DRURY:  Object to the form.
20        It's vague, calls for speculation.
21   BY MR. TOLBERT:
22   Q    You can answer the question.
23   A    It would -- yes, because I believe the, I
24        believe the thinking behind it is to maximize
25        the opportunity -- well, to win their
```

```
 1            petition, but to maximize their opportunity
 2            for hearing and, you know, for their benefit.
 3            So I -- it's -- you know, there's a colloquial
 4            term the writ room, and this would appear to
 5            me, based on my recollection of Mr. Donald,
 6            this would appear to me to have been not
 7            directly prepared, personally prepared by
 8            Mr. Donald, but with the assistance of, for
 9            want of a better term, a lay advocate within
10            the Department of Corrections.
11    Q    Okay.  But we can agree that the last page of
12            the document appears to have the signature of
13            Willie Donald.
14                    MR. DRURY:  Objection, foundation.
15    A    Well, as I said earlier, I can read that it
16            says Willie T. Donald.
17    BY MR. TOLBERT:
18    Q    Okay.
19    A    But again, is that his signature or not --
20    Q    Right.
21    A    -- I don't know.
22    Q    And we can agree that you don't know whether
23            he prepared this document himself.
24    A    I don't know.  I -- well, I don't know.
25    Q    Okay.  And can we agree that Mr. Donald's
```

```
1         claim that you were ineffective in your

2         assistance -- you ineffectively assisted him

3         during the preparation of his case and trial

4         in June of 1992, that that's not true?

5                   MR. DRURY:  Object to the form,

6         foundation, calls for an opinion.

7    A    The allegation of ineffective assistance of

8         counsel during the course of trial, pretrial,

9         both trials, I maintain he was provided

10        effective assistance of counsel.

11   BY MR. TOLBERT:

12   Q    Okay.  So if --

13   A    All those phases by myself.

14   Q    So if Mr. Donald filed something with the

15        court and state -- and is stating that you

16        provided ineffective assistance of counsel,

17        that would not be true.

18                  MR. DRURY:  Object to the form,

19        foundations, calls for an opinion.

20   A    He would be making an allegation that I am

21        denying here.

22   BY MR. TOLBERT:

23   Q    Okay.  All right.  And one of the allegations

24        that were made in the ineffective assistance

25        of counsel charge by Mr. Donald was that -- if
```

 1          you look at the second to the last page, you

 2          see under subsection -- Roman numeral 6,

 3          Subsection C, second paragraph, do you see

 4          where it says:  Here Trial Attorney King

 5          failed to object to the lack of elements

 6          instruction for felony murder and for robbery.

 7          Is that true or false?

 8    A     I have no recollection.

 9                    MR. DRURY:  Object to the form,

10          foundation.

11    BY MR. TOLBERT:

12    Q     Excuse me?

13    A     I have no recollection.

14    Q     Okay.  And you see the next sentence where

15          Mr. Donald says that an attorney's performance

16          is deficient where he fails to object to an

17          instruction when the objection would have been

18          sustained.  He goes on to say that you failed

19          to object to a general murder verdict form.

20              Do you recall whether or not that was,

21          in fact, true?

22    A     I don't even know --

23                    MR. DRURY:  Object to the form.

24                    COURT REPORTER:  Wait.  You need

25          to let him object first and then answer.  I

```
 1            can't take two people talking at the same
 2            time.  I didn't get your objection, sir.  I'm
 3            sorry.
 4                       MR. DRURY:  Form and foundation.
 5                       COURT REPORTER:  Thank you.
 6   BY MR. TOLBERT:
 7   Q    You were at the trial; right?  You -- there
 8        was nobody else that tried this case for
 9        you --
10   A    Right.
11   Q    -- involving Mr. Donald; correct?
12   A    Correct.
13   Q    Okay.  And you did not have a second chair.
14   A    No.
15   Q    Okay.  So any objections that would have been
16        made would have been made by you; correct?
17   A    Yes.
18   Q    Okay.
19   A    My statement was, I don't know what a general
20        murder verdict form is.
21   Q    Okay.
22   A    I've never heard that.
23   Q    And I'm not trying to be facetious, Attorney
24        King.  I'm just trying to lay the foundation
25        to show that --
```

```
 1   A     No, I understand.  I'm just trying to answer
 2         the question.
 3   Q     Okay.  And was part of your representation of
 4         Mr. Donald, when you met with him, his sister,
 5         and his mother, you requested a speedy trial;
 6         is that correct?
 7   A     I don't recall.
 8   Q     Okay.  Would you normally -- well, first, what
 9         do you recall Mr. Donald being tried --
10         charged with, if you recall?
11   A     Murder, robbery.
12   Q     What would be your habit and practice or is --
13         do you have a habit or practice -- whenever
14         you have a person that is charged with murder
15         and robbery, would it be your practice and
16         habit to request for a speedy trial?
17               MR. DRURY:  Object to the form and
18         relevance.
19   A     There's no -- every case is different.
20   BY MR. TOLBERT:
21   Q     When would you in your practice ask for a
22         speedy trial?
23   A     The first --
24               MR. DRURY:  Object to relevance.
25   A     The first consideration would be whether or
```

```
1        not the defendant was granted bond or not, is
2        he in custody or not.  The -- and everything
3        attendant to that.  The second would be an
4        assessment of the relative strength or
5        weakness of the state's case.  A third would
6        be whether or not I think that the passage of
7        time is likely to be of benefit for the
8        defendant in terms of negatively impacting
9        questions of credibility of particularly key
10       state's witnesses.  So there's a variety of
11       factors that go into consideration on that.
12  BY MR. TOLBERT:
13  Q    Okay.  And if you ask for a speedy trial,
14       would it shorten the time for you to be able
15       to gather information?
16             MR. DRURY:  Objection, calls for
17       speculation.
18  A    Probably not if -- if you have -- I mean, you
19       have to do it by trial.  So if you've asked
20       for a speedy trial, you have to build in that
21       you're going to have to work more diligently
22       within a shorter period of time to obtain the
23       same amount of information.
24  BY MR. TOLBERT:
25  Q    Right.  So when one -- when a person asks for
```

1          a speedy trial, typically what does that mean

2          in terms of when the trial would -- is

3          required to take place by law?

4    A     Under Indiana Rule 4, Criminal Rule 4, if a

5          person's in custody and they make a demand for

6          they call it an early trial, then it has to be

7          brought to trial within 70 days of the demand.

8          There are limited, but there are some

9          exceptions to that.  For example, the state

10         has a right to ask -- make one request to

11         continue the case based on witness

12         unavailability.

13              There's a counter to that the defense

14         can do by way of stipulating to what their

15         testimony would be, so that obviates the state

16         being able to get that delayed, so.  But if

17         you're in custody, the basic rule is, when you

18         demand an early trial, 70 days from the date

19         of the demand.

20   Q     Okay.  And would -- how much time normally

21         would you have to conduct discovery under a

22         speedy trial scenario?

23                   MR. DRURY:  Object to the form,

24         vague.

25   A     Yeah, there's no normal to it.  It's --

```
 1            criminal is much different from civil.
 2   BY MR. TOLBERT:
 3   Q    Okay.
 4   A    Both sides do not operate under -- you know,
 5        candidly, even if they purport to an issue of
 6        discovery cutoff, it's never honored.  I mean,
 7        just discovery in criminal cases is ongoing
 8        and fluid up to and including and sometimes,
 9        sadly, during the course of a trial.  So it's
10        a much different animal than the civil
11        practice.
12   Q    But you have 70 days from the speedy trial
13        request in order to have the criminal
14        defendant tried; correct?
15   A    We don't have --
16                 MR. DRURY:  Objection, asked and
17        answered.
18   A    If you make the demand, the trial's got to
19        commence within 70 days -- some exceptions to
20        it, or there's a remedy.  The remedy can range
21        from a release on one's own recognizance,
22        regardless of the offense charged, or it can
23        end up with discharge of the defendant.
24        Discharge as used in the rule basically is
25        dismissal with prejudice.
```

 1   BY MR. TOLBERT:

 2   Q    And if I understand what you're saying

 3        correctly, within that period you have to

 4        basically get all the discovery that you're

 5        going to get as a criminal defense lawyer in

 6        before that jury trial in order to adequately

 7        represent your client.

 8                    MR. DRURY:  Object to form.

 9   A    I don't know what you mean by getting

10        discovery in, I'm sorry.

11   BY MR. TOLBERT:

12   Q    What I mean is, whatever depositions that you

13        need of witnesses, whatever statements you

14        need of witnesses, you would have to

15        definitely make sure that you got those things

16        accomplished before the trial, wouldn't you?

17   A    You'd have to get done what you needed to get

18        done before the trial, whether or not

19        depositions, whether or not formal witness

20        statements, that's -- that varies rather

21        significantly from case to case if you're

22        going to utilize those vehicles.

23   Q    What tool did you use in the Donald case to

24        get ready for his trial in June of 1992?

25                    MR. DRURY:  Object to form and

```
 1        foundation as to "tool".

 2   A    I don't have --

 3   BY MR. TOLBERT:

 4   Q    Do you know what I mean by "tool"?

 5   A    -- specific recall.

 6   Q    Do you know what I will mean by "tool"?

 7   A    Well, like a deposition, I mean, for example,

 8        but I don't have a specific recall of what

 9        I -- what tools, to use your word, I utilized.

10        I have a recollection of some of the things I

11        did.

12   Q    I'll rephrase the question.  What discovery

13        methods did you use to get ready for

14        Mr. Donald's trial in June of 1992?

15   A    I don't recall if I used any discovery

16        methods.  I investigated the case.  I spoke to

17        witnesses.

18   Q    Deposition --

19   A    Probably --

20   Q    Deposition -- go ahead.

21   A    I can't recall any depositions.  It's

22        relatively, in my practice and my strategy,

23        it's relatively unusual.  It varies case to

24        case, but --

25   Q    What are depositions?
```

```
 1   A     Sworn statements under oath pursuant to notice

 2         and subpoena of either a state's witness or a

 3         third-party, a nonparty witness.

 4   Q     Like what you're doing today.

 5   A     Like what you're doing today.

 6   Q     Okay.  And depositions, you would agree with

 7         me, are a helpful tool in getting information

 8         that is relevant in a case to allow you to

 9         represent your client.

10                   MR. DRURY:  Object to the form,

11         foundation.

12   BY MR. TOLBERT:

13   Q     Do you understand the question?

14                   MR. DRURY:  Calls for an opinion.

15   A     They can be.

16   BY MR. TOLBERT:

17   Q     Okay.

18   A     They're not always.

19   Q     Okay.  And when would a deposition not be

20         helpful?

21   A     Well, one example would be a deposition where

22         I can obtain the same information without

23         letting my opponent, opposing counsel, know

24         that I'm getting the information.

25   Q     Okay.
```

1   A     Another can be, it's not helpful if I take a

2         deposition of a witness that I, based on my

3         investigation, believe to be flighty, shall we

4         say, or engaging in a high-risk lifestyle,

5         that may not be around by the time the trial

6         comes.  If I've taken their deposition, then

7         I've opened it up for that to be prior

8         recorded testimony available if it turns out

9         they'd be unavailable at trial.  You know,

10        those are examples in the criminal practice.

11              You don't do -- even though you can, you

12        don't do depositions or if you do, the danger

13        is -- and you think the witness may not be

14        around come trial time, then at your peril you

15        have to conduct your deposition in a complete

16        manner as though you have to anticipate, well,

17        if this comes in at trial, I would have -- you

18        know, I'd have to explore everything, which,

19        in which case, you're giving up in front of

20        your opponent, as well as to the witness, what

21        your strategy and tactics are going to be in

22        conducting a cross-examination of a state's

23        witness.

24              So it's, it's case by case, who is the

25        witness.  Another example is with police

```
 1          officers in a criminal practice.  Police
 2          officers are -- with very, very few
 3          exceptions, are wedded to their reports.  And
 4          so in many cases, not all, but in many cases
 5          you are going to have the benefit of being
 6          very restraining in what an officer is going
 7          to say or not say based upon their reports.
 8              So you may -- and then I frequently will
 9          not take a deposition of a police officer in a
10          criminal defense case, again, in that
11          particular case.  I'm not worried about the
12          officer taking off, but I am worried about
13          them going to school on what the questions in
14          the deposition are and making adjustments
15          accordingly come to trial testimony.
16   Q   When would a deposition be helpful for you
17          when you're preparing for a criminal defense
18          trial?
19                  MR. DRURY:  Object to the form as
20          vague, calls for speculation.
21   BY MR. TOLBERT:
22   Q   You can answer the question.
23   A   In the case of an expert, for example, a
24          high -- relatively high frequency, in a case
25          where the cause of death is of some question,
```

USDC IN/ND case 2:17-cv-00032-TLS document 36-2 filed 02/26/22 page 302 of 940

1          a pathologist, you know, will frequently, in a

2          murder case, will frequently have their

3          testimony at the petition to lift the bail and

4          have the transcript of that and then

5          subsequently take a deposition of the

6          pathologist.

7               We sometimes take a deposition to -- if

8          we think the witness is particularly weak, in

9          an effort to get the prosecutor that's

10          assigned to the case to sit there and look and

11          listen to how bad their witness is in order to

12          drive a dismissal of the case or concessions

13          for a plea agreement.  You know, so there's

14          all sorts of different vehicles.

15               The other is, another vehicle we have is

16          getting transcripts.  If we do a petition to

17          lift the bail for example, those are fairly

18          complete transcripts, you know, fairly early

19          in the case that lock people in, lay witness

20          and police officer alike.  Any -- if you do

21          pretrial motions, most notably motions to

22          suppress, you'll get those transcripts as

23          well.

24     Q    When you say a witness is weak, what do you

25          mean if the witness is weak, you would take a

USDC IN/ND case 2:17-cv-00032-TLS document 369-2 filed 02/26/22 page 303 of 940

```
 1        deposition?

 2   A    Well, they're a bad witness.  You know, you

 3        can tell from, you can tell from -- a lot of

 4        times you read the account first given to the

 5        first responding officer, then you look at the

 6        more formal statement that they made to a

 7        detective, you can already see discrepancies

 8        or incongruities between those two.  You get

 9        input sometimes from either your client or

10        people from the client's family that know, you

11        know, that witness, or you'll get information

12        that will lead you to conclude this is -- this

13        witness is a shaky witness for the state.

14   Q    So depositions can be used when you have a

15        weak witness to flush out maybe

16        inconsistencies in their story.

17               MR. DRURY:  Object to the form,

18        misstates his testimony.

19   A    Well, can it be?  Yes, it can be.  But, again,

20        part of the -- part of the reality of criminal

21        defense compared to civil work is, you know,

22        the whole case isn't scripted the way I

23        perceive civil cases are, and part of that is

24        to the advantage of the defense.  You don't --

25        you want to, where you can and ethically
```

```
 1          certainly, you don't want to -- if you have a
 2          case that you believe is likely, reasonably
 3          likely to go to trial, you do not want to give
 4          away any more indication of your strategy than
 5          you have to for the benefit of your client.
 6   Q    And that trial strategy that you just
 7          described, would you agree with me that the
 8          drawback of that could be potentially not
 9          discovering information that could help you?
10                   MR. DRURY:  Object to the form.
11   BY MR. TOLBERT:
12   Q    You can answer the question.
13                   MR. DRURY:  Calls for speculation.
14   A    Could it be?  Yes, it could be.
15   BY MR. TOLBERT:
16   Q    What was that?
17   A    It could be.
18   Q    Okay.  And I'm going to show you what's been
19          marked as Defendant's Exhibit 2.
20                   (Defendant's Exhibit No. 2 marked
21              for identification.)
22   BY MR. TOLBERT:
23   Q    Defendant's Exhibit 2, Attorney King, could
24          you identify Defendant's Exhibit 2 for the
25          record, please?
```

```
 1  A    It's --

 2                  MR. DRURY:  Object to foundation.

 3  A    It's a three-page copy of a motion of a notice

 4       of alibi, a motion to compel discovery,

 5       production of Brady material, and supplemental

 6       discovery response.

 7  BY MR. TOLBERT:

 8  Q    Okay.  And did you file this and when?

 9  A    It looks like my signature, and the file stamp

10       says May 27th, 1992.

11  Q    Okay.  Do you have any -- well, first, is this

12       one of the documents that Attorney Drury went

13       over with you when you met with him today?

14  A    I don't know.  I don't remember.

15  Q    Okay.  And do you recall, have any independent

16       recollection, not if you reviewed this

17       document, of filing this?

18  A    No.

19  Q    Okay.  When would you file a -- I mean, what

20       is the purpose of a notice of alibi filing?

21  A    Well, you --

22                  MR. DRURY:  Object to the form.

23  A    If you're going to offer -- I'm sorry.

24  BY MR. TOLBERT:

25  Q    Go ahead, you can answer the question.
```

```
 1   A     If you're going to offer an defensive alibi,

 2         you have to give notice.

 3   BY MR. TOLBERT:

 4   Q     Okay.  What is an alibi?

 5   A     An alibi is presenting evidence that the

 6         defendant was at a place other than the place

 7         indicated in the state's evidence at the time

 8         of the crime.

 9   Q     And in laymen's terms, you would agree with me

10         that, basically, that means that he couldn't

11         have -- he couldn't have done the crime that

12         he's being charged with because he was

13         somewhere else.

14   A     Yeah.  Yes.

15   Q     Okay.  All right.  And would you agree with me

16         that that was one of the defenses, one of the

17         main defenses that you raised for Mr. Donald

18         during his trial in 1992?

19                   MR. DRURY:  Object to the form.

20   BY MR. TOLBERT:

21   Q     You can answer the question.

22   A     As to at least one of the allegations against

23         him, yes.

24   Q     And which allegation did the alibi defense go

25         to?
```

```
 1   A    I don't know, whichever one was covered by the

 2        time he was out shopping for cars with his

 3        sisters and his brother-in-law or her

 4        boyfriend, or whatever it was.

 5   Q    And based off of what you recall, was that

 6        part of the alibi defense that Mr. Donald at

 7        the time that the crimes that he was charged

 8        with were committed, that he was actually out

 9        shopping for cars?

10   A    I don't recall the --

11              MR. DRURY:  Object to the form.

12   A    I'm sorry.

13   BY MR. TOLBERT:

14   Q    You can answer the question.

15   A    I don't recall that it was crimes, plural, as

16        opposed to crime.

17   Q    Okay.

18   A    But at least with respect to one of the

19        allegations against him, he and his sisters

20        indicated that he was shopping for a car with

21        them.

22   Q    Okay.  And I know I'm asking some very basic

23        lined up questions, but I'm trying to make

24        sure the record is clear.

25              So when you file a notice of alibi, that
```

```
1          is putting the prosecution on notice that your
2          defense is that your client could not have
3          been the person that committed the crime
4          because he was somewhere else.
5    A     Yes, that's the purpose --
6    Q     Okay.
7    A     -- of the notice, but it triggers under
8          Indiana law, and probably under other states
9          too, that the state then has a right to amend
10         its charge.
11   Q     Okay.
12   A     They can even change the date and time based
13         upon that notice.  You know, so you can get
14         into kind of a tug-o-war over that.
15   Q     Okay.
16   A     Because otherwise -- but that does require
17         then the state -- a general allegation that is
18         within the statute of limations is, in a
19         typical case, fine.
20   Q     I'm sorry, I didn't get that last part.
21   A     I said in a typical case, that's fine, that's
22         appropriate.
23   Q     Okay, got you.
24   A     Unless a notice of alibi.  That triggers a
25         requirement on the part of the state to be
```

```
 1          more precise as to their allegation.
 2    Q     Okay.  And based off of this Exhibit 2, which
 3          was your notice of alibi defense to the
 4          prosecutor's office filed on May 27th, 1992,
 5          you would agree with me that one of, one of
 6          the defenses that you were raising for
 7          Mr. Donald was that, basically, he was, he was
 8          another place --
 9    A     Yes.
10    Q     -- at the time the crimes occurred.
11    A     Again, crime.
12    Q     Or crime.
13    A     Yes.
14                MR. DRURY:  Object, asked and
15          answered.
16    BY MR. TOLBERT:
17    Q     And if you look at page 2 of your notice of
18          alibi, do you see paragraph 2 here where it
19          says:  The defendant believes that there
20          exists the following evidence which tends to
21          exculpate the defendant.  And then you go
22          through a couple of --
23    A     Uh-huh.
24    Q     -- things.  Do you see that?
25    A     Yes.
```

 1  Q      Okay.  And one of the items that you mention

 2         was that a person -- the person of one Loren

 3         Thompson, an individual known to the state, is

 4         a person fitting the description of the

 5         perpetrator of the offenses here at issue.

 6                  Was it part of your defense of

 7         Mr. Donald in 1992 that not only was he not --

 8         could not have committed the crimes because he

 9         had, quote-unquote, an alibi defense, but that

10         there was another person that committed the

11         crime, being this Mr. Thompson?

12                  MR. DRURY:  Object to the form.

13  A      Yes.

14  BY MR. TOLBERT:

15  Q      Okay.  And that was a theory that you were

16         allowed to present to the jury once this

17         matter was tried in 1992?

18  A      I don't recall that.

19  Q      Okay.  Now, do you recall ever offering

20         evidence that conclusively established in 1992

21         that Mr. Thompson was, in fact, the individual

22         that committed the crimes of which Mr. Donald

23         was charged with?

24  A      I don't have a recollection, but I would

25         caution that me conclusively proofing anything

```
 1        as a defense attorney is probably not going to

 2        happen.

 3  Q     Okay.  All right.

 4  A     It's not our burden.

 5  Q     Okay.  Well, I'll rephrase the question then.

 6        Do you remember it being shown in 1992 when

 7        the jury trial of Mr. Donald took place that

 8        Mr. Thompson actually was the perpetrator of

 9        the crimes of which Mr. Donald was charged?

10                    MR. DRURY:  Object to the form.

11  BY MR. TOLBERT:

12  Q     You can answer the question.

13  A     Yeah, I don't know.  Shown to whom?

14  Q     To the jury.

15  A     I don't recall.

16                    MR. DRURY:  Objection.

17  A     I don't recall the trial.

18  BY MR. TOLBERT:

19  Q     You don't recall?

20  A     No, I don't know what --

21  Q     Okay.

22  A     -- what was or was not put in during the

23        course of the trial.

24  Q     Now, would you normally put down -- we already

25        talked about the alibi defense and this
```

```
 1          notice, and now we've talked about

 2          Mr. Thompson.

 3               Would you put down something that you

 4          don't offer at trial?

 5                    MR. DRURY:  Object to the form.

 6   A    Yes.

 7   BY MR. TOLBERT:

 8   Q    Excuse me?

 9   A    Yes.

10   Q    Okay.  And why would you do that?

11   A    In order to -- in order to, in part, to set up

12          the prosecutor.  If I believe the prosecutor

13          is sandbagging Brady material, I want to be on

14          record so there's no question, as much as

15          possible, that that's what -- that's what

16          happened, and to build in for my client,

17          whether during the course of the trial -- or

18          if the outcome is not successful, after the

19          trial -- a means and manner by which to get

20          the conviction set aside.  In this particular

21          case, the prosecutor assigned to the case had

22          a reputation for -- had a reputation for

23          engaging in that kind of -- he wasn't

24          well-trusted.

25   Q    What do you mean by that?
```

```
 1   A    In terms of honoring his obligation to turn

 2        over exculpatory material.

 3   Q    Okay.  And do you see on page 2 of Exhibit 2,

 4        Subsection B, where it says that the defendant

 5        believes that there exists the following

 6        evidence which tends to exculpate the

 7        defendant, and you have fingerprint evidence

 8        and/or other physical evidence negating the

 9        defendant's involvement in these offenses.

10             Do you remember that being a part of

11        your defense that you presented for Mr. Donald

12        in 1992?

13   A    I don't remember, but I'm assuming that the

14        absence of fingerprints would have been

15        mentioned at some juncture to the jury.

16   Q    Okay.

17   A    In an identification case.

18   Q    Okay.  So the fact that this was listed as

19        your maybe habit and practice, that this would

20        have gone -- would have been something that

21        most likely would have come up if there was an

22        absence of fingerprints.

23   A    Well, if there were no fingerprints, if there

24        was no evidence of fingerprints presented,

25        then in an identification case, as a general
```

```
 1          proposition, that would be something that,

 2          yes, I believe would be pointed out at some

 3          point in the proceedings.

 4  Q       Okay.

 5  A       Perhaps not until closing argument.  But, I

 6          mean, the absence of any kind of corroborating

 7          physical evidence to eyewitness testimony

 8          would be something that would factor into the

 9          trial strategy and I assume -- and I would

10          think typically the execution.  I don't have a

11          specific recall here, but --

12  Q       Okay.  And just so we're clear, when you say

13          pointed out -- whenever we're talking about

14          this I want to make sure we're not talking in

15          a vacuum.

16               When you're saying pointed out and when

17          I'm saying showing, is it fair -- can we agree

18          that what we're talking about is being shown

19          or pointed out to a jury?

20  A       Could.

21                        MR. DRURY:  Object to the form.

22  BY MR. TOLBERT:

23  Q       Okay.

24  A       But not necessarily exclusively.  It may be

25          relevant for the judge, you know, so.
```

```
 1   Q     Okay.  But it would be used at trial.

 2   A     Maybe.

 3   Q     Okay.  Or if you decide not to use it.

 4               MR. DRURY:  Object to the form.

 5   A     Yeah, I can't follow you on that form.

 6   BY MR. TOLBERT:

 7   Q     Okay.  I'm sorry, I didn't get that last part.

 8   A     I can't follow you on that.

 9   Q     Well, you're saying the lack of

10         fingerprinting.

11   A     Yeah.

12   Q     And you're saying you could use that as a

13         theory.

14   A     Could.

15   Q     Or not, you said, or possibly not.

16   A     Yes.

17   Q     And you said that maybe it wouldn't be put

18         before a jury.  It would be put before a

19         judge.

20   A     Could be.

21   Q     But all of that would take place in the

22         concept of a trial; correct?

23   A     It could.

24   Q     Okay.  And if you look at the last part of

25         page 2, you have defendant's additional
```

```
1            witnesses, and you have a Barbara Price listed

2            and an Ethel Crouch.

3                    And do you have any independent

4            recollection of what those two witnesses

5            were -- what you believe that they were going

6            to offer in your trial in which you defended

7            Mr. Donald in 1992?

8    A       I don't.  I mean, I recall that Mr. Donald at

9            the time of the offenses alleged was -- he was

10           employed by the Goldblatt's.  I think that was

11           open then in the Village Shopping Center.

12   Q       Okay.

13   A       But specifically what these witnesses would

14           say or not, I -- I don't know.

15   Q       Okay.  I'm going to show you what's been

16           marked as Defendant's Exhibit 3.

17                       (Defendant's Exhibit No. 3 marked

18                for identification.)

19   BY MR. TOLBERT:

20   Q       Defendant's Exhibit 3 appears to be a filing

21           that you made, would have been on June 1st,

22           1992, a pleading marked Defendant's Additional

23           Witnesses.  Do you see that?

24   A       Yes.

25   Q       Okay.  And is this a document that you -- that
```

1        is your signature, is it not, sir?

2   A    Yes.

3   Q    And is this a document that you would

4        typically file with the court to provide the

5        court and the prosecutor information about the

6        witnesses that you potentially might call at

7        trial?

8   A    Yes.  You have to make sure that by the time

9        you're prepared to engage in jury selection

10       that, and so far is known, the names of

11       everybody that's there so the court can read

12       off those names to the potential jurors.

13  Q    Do you have any recollection as you sit here

14       today of what these witnesses -- what you

15       planned on having these witnesses testify to

16       in your trial in 1992?

17                    MR. DRURY:  Objection, foundation,

18       assumes facts not in evidence.

19  A    No, I see references to car dealerships, so

20       I'm guessing to the alibi.

21  BY MR. TOLBERT:

22  Q    Okay.

23  A    The Chandra Goodman, I don't know who that --

24       the name kind of rings a bell, but I don't

25       know who that is.

```
 1   Q     Okay.  And I know, as far as a lot of

 2         documents in front of you, the last document

 3         that we went over that would have had your

 4         notice of alibi, that document was filed on

 5         May 27th, 1992.  That's Exhibit 2.  And then

 6         Exhibit 3 was your defendant's additional

 7         witness -- witnesses filing where you listed

 8         five additional witnesses.  That would have

 9         been filed on June 1st, 1992.

10              Do you recall what, if anything, would

11         have happened in terms of what your firm would

12         have done to provide any investigative

13         measures to get your case ready for Mister --

14         to defend Mr. Donald in 1992?

15   A     You have to repeat that question.  I don't

16         know what --

17   Q     I'll see if I can rephrase it.  Between the

18         time you filed your notice of alibi until when

19         you filed your additional witnesses list, do

20         you recall taking any steps in between those

21         two periods, investigative steps, that would

22         help you get ready for the trial involving

23         Mr. Donald?

24                   MR. DRURY:  Object to the form.

25   A     Do I recall specifically?  No.  But you're
```

```
  1              getting ready for trial, so you're preparing
  2              the case for trial.
  3    BY MR. TOLBERT:
  4    Q     Okay.  What --
  5    A     Now what specifically I was doing I don't
  6              know, but you're getting ready for trial.
  7    Q     Okay.  And what normally is your habit?  What
  8              would you normally do?
  9    A     It depends on the case.
 10                      MR. DRURY:  Object to the form.
 11    BY MR. TOLBERT:
 12    Q     Excuse me?
 13    A     It depends on the case, you know, what needs
 14              to be done.
 15    Q     In a murder case like Mr. Donald's case, what
 16              would you do?
 17    A     Murder cases --
 18                      MR. DRURY:  Object to the form,
 19              calls for speculation.
 20    A     Murder cases are as varied as any other cases.
 21              I mean, it depends on what the case is.
 22    BY MR. TOLBERT:
 23    Q     Would you talk to the victims?
 24                      MR. DRURY:  Object to the form.
 25    A     Well, I did talk to the -- at least one
```

USDC IN/ND case 2:17-cv-00032-TLS document 369-2 filed 02/26/22 page 320 of 940

```
 1            alleged victim.
 2   BY MR. TOLBERT:
 3   Q    Which one did you talk to?
 4   A    The female police officer.
 5   Q    Okay.  Did you talk to any other of the other
 6        victims?
 7   A    I don't recall.
 8   Q    Okay.  Would that be something that you would
 9        do to properly prepare for trial?
10               MR. DRURY:  Objection, calls for
11        speculation, foundation.
12   A    It depends on what information I already had,
13        was there a need to do so.
14   BY MR. TOLBERT:
15   Q    Okay.  Do you recall talking to a Rhonda
16        Williams before trial?
17   A    I don't recall.
18   Q    Do you know who Rhonda Williams is?
19   A    I believe she's one of the complaining
20        witnesses in the case.
21   Q    All right.  Do you recall Rhonda Williams --
22        you don't recall talking to her.
23               MR. DRURY:  Objection.
24   A    I don't recall.
25               MR. DRURY:  Misstates his
```

```
 1        testimony.
 2  BY MR. TOLBERT:
 3  Q    Okay.  I'm sorry, I didn't get that.
 4  A    I don't recall.
 5  Q    Okay.  I'm going to show you what has been
 6        marked as Defendant's Exhibit 4.
 7               (Defendant's Exhibit No. 4 marked
 8            for identification.)
 9  BY MR. TOLBERT:
10  Q    Defendant's Exhibit 4, which I've just handed
11        you, is a motion for order directing release
12        of information that you would have filed on
13        June 24th, 1992.  Do you see that?
14  A    Yes.
15  Q    Okay.  And this appears to be a request for
16        release of information regarding the death of
17        LaVelle Thompson, and you see paragraph 1
18        where it says, counsel -- that is your
19        signature; right?  Correct?
20  A    Yes.
21  Q    On this document?  Okay.  And you see in
22        paragraph 1 of the motion for order directing
23        release of information, it states that counsel
24        is investigating the circumstances of the
25        death of LaVelle Thompson in so far as it may
```

```
 1          reveal evidence of exculpatory as to the
 2          defendant herein.  Do you see that?
 3    A     Yes.
 4    Q     Okay.  And if you look at the last page of
 5          this exhibit, there's an order that grants
 6          your motion, and it directs the Lake County
 7          Coroner's Office to release to you information
 8          within its care and custody and control
 9          pertaining to the death of LaVelle Thompson.
10    A     Yes.
11    Q     Okay?  Now, in light of this filing, would you
12          agree with me that you would have had -- the
13          court would have ordered information to be
14          produced to you regarding, from the coroner's
15          office, regarding LaVelle Thompson before your
16          jury trial?
17                    MR. DRURY:  Object to the form.
18    A     Well, I don't know if this is before or after
19          the jury trial.
20    BY MR. TOLBERT:
21    Q     Well, why would you file a motion for release
22          of information after, after the jury trial?
23    A     For a related motion to correct errors, a
24          timely motion to correct errors, a motion for
25          a new trial.
```

```
 1   Q    Do you recall whether or not that was part of
 2        any motion to correct error that you would
 3        have filed on behalf of Mr. Donald?
 4   A    I don't recall.
 5   Q    Okay.  Do you recall having information from
 6        the coroner's office regarding LaVelle
 7        Thompson as part of your defense of Mr. Donald
 8        in June of 1992?
 9                 MR. DRURY:  Objection, asked and
10        answered.
11   A    From the coroner's office?
12   BY MR. TOLBERT:
13   Q    Yes.
14   A    I don't recall.
15   Q    Would you agree with me that there was
16        nothing, based on the exhibit that I just
17        handed you, there was -- well, I'll ask it
18        this way:  Is there anything that you can
19        recall that the City of Gary Police Department
20        that -- what they -- that they did anything
21        that would have made it difficult for you to
22        get any information regarding LaVelle
23        Thompson?
24                 MR. DRURY:  Object to the form,
25        foundation, calls for speculation, incomplete
```

| | | |
|---|---|---|
| 1 | | hypothetical. |
| 2 | A | That they would have made it difficult for me |
| 3 | | to get? |
| 4 | BY MR. TOLBERT: | |
| 5 | Q | Uh-huh. |
| 6 | A | Well, if they didn't comply with -- if they |
| 7 | | didn't comply with the earlier request as an |
| 8 | | agent of the state to provide information |
| 9 | | regarding other suspects for any offenses |
| 10 | | alleged against Mr. Donald, that would be |
| 11 | | making it difficult. |
| 12 | Q | Okay. |
| 13 | A | I'm not saying they did or didn't. |
| 14 | Q | Okay.  That's my question. |
| 15 | A | You're asking me to -- do I -- yes, if they |
| 16 | | were covering up, if they weren't -- if they |
| 17 | | had an indication of him as a suspect, this |
| 18 | | LaVelle Thompson -- I think in an earlier |
| 19 | | document, probably my bad, I had the name |
| 20 | | Loren Thompson. |
| 21 | Q | That's right. |
| 22 | A | I got that information from somewhere. |
| 23 | Q | Right. |
| 24 | A | And I -- just thinking back, you know, in |
| 25 | | general, right, I -- there's a reasonable |

```
 1            likelihood that I may have gotten that from

 2            some source inside the police department.  I

 3            didn't just make the name up.  So if they

 4            were -- if they weren't providing that, yeah,

 5            then they did something to -- they didn't do

 6            something they had an obligation to do.

 7   Q    Did you -- do you have any independent

 8            knowledge as you sit here today that that was,

 9            in fact, the case?

10   A    The independent knowledge as I sit here today

11            regarding this fellow Thompson was having a

12            grainy black and white photograph purportedly

13            of him that I recall being interested in terms

14            of its comparison to, A, my client and, B, the

15            physical descriptions given by one or more of

16            the complaining witnesses in these various

17            robberies.  Where I got the photo or the name,

18            I have no recollection, but I do remember

19            there being a photograph purportedly of this

20            Thompson person.

21   Q    Okay.  When this case was tried, when you

22            defended Mr. Donald in 1992 for the crimes of

23            which he was charged with, do you recall

24            whether or not you were able to show, based on

25            the information that the court would have
```

```
 1        ordered be produced to you by the coroner's
 2        office, that LaVelle Thompson was, in fact,
 3        the person that committed the crimes?
 4                  MR. DRURY:  I'll object to the
 5        form, foundation, misstates his testimony
 6        about the court's order.
 7   BY MR. TOLBERT:
 8   Q    You can answer the question.
 9   A    No, I don't.
10   Q    No, you don't what?
11   A    No, I don't in response to your question.  No,
12        I don't remember.
13   Q    Okay.  Do you use -- I'm assuming you use
14        subpoenas when you get ready for trial as well
15        to secure witness trial testimony?
16   A    I do.
17   Q    Okay.  Do you remember, before I show you some
18        documents, independently who you would have
19        subpoenaed before Mr. Donald's trial?
20   A    No.
21                  (Defendant's Exhibit No. 5 marked
22             for identification.)
23   BY MR. TOLBERT:
24   Q    I'm going to show you what has been marked as
25        Defendant's Exhibit 5.  There you go, sir.
```

```
 1          Defendant's Exhibit 5 is a subpoena duces
 2          tecum that would have been sent by your office
 3          to the Department of Bureau of Identification,
 4          at 2293 North Main Street in Crown Point,
 5          Indiana.
 6               It requests the production of any
 7          photographs in their possession of an Ivory
 8          Maxwell.  Do you remember who Ivory Maxwell
 9          is?
10     A    No.
11     Q    Do you remember why you would have been
12          requesting this information from the Bureau of
13          Identification?
14                    MR. DRURY:  Just object to the
15          form and foundation.
16     A    I don't remember.
17     BY MR. TOLBERT:
18     Q    Do you recall requesting, outside of this
19          subpoena, any other records or information
20          that you would have subpoenaed from a
21          nonparty?
22                    MR. DRURY:  Object to the
23          foundation.
24     BY MR. TOLBERT:
25     Q    You can answer the question.
```

```
 1   A   Well, I mean, I don't know -- in the course of
 2       questioning somebody or investigating, might
 3       part of the investigation have been asking
 4       them if they had any material or photographs,
 5       or whatever.  I -- I mean, I don't have a
 6       recollection of it, but I could envision that
 7       would be, that would be possible.
 8   Q   And I think we talked about the use -- the
 9       helpfulness of depositions.  We can agree that
10       subpoenas are a discovery mechanism that
11       allows for you to gather information that
12       could help your client.
13   A   It can be.
14   Q   Okay.  And as you sit here today, you don't
15       recall what documents, if any, you subpoenaed
16       on behalf of Mr. Donald before his trial?
17   A   No.
18   Q   Do you even recall this subpoena?
19   A   No.
20                   (Defendant's Exhibit No. 6 marked
21           for identification.)
22   BY MR. TOLBERT:
23   Q   I'm going to show you what has been marked as
24       Defendants's Exhibit 6.  There you go, sir.
25       Defendant's Exhibit 6 appears to be
```

```
 1          information that would have been sent from
 2          your office to a Sonya Thompson (sic), a
 3          subpoena, if you look at the last -- about the
 4          third from the last page?
 5   A      You want me to look at the subpoena itself?
 6   Q      Yes.
 7   A      Okay.
 8   Q      Do you recall sending this subpoena?
 9   A      No.
10   Q      Okay.  Do you know who Sonya Thomas is?
11   A      No.
12   Q      Okay.  Do you see the last, the last -- second
13          to the last page?
14   A      Yes.
15   Q      And do you know whose handwriting that is?
16   A      No.
17   Q      Okay.  Is that your address that would have --
18          that would have been your address at the time
19          of your practice?
20   A      Yeah.  South Lake Street, but, yeah, close
21          enough.
22   Q      And what I'm talking about is, this is -- the
23          Bates stamp is DON 000110.
24   A      Yeah.
25   Q      Okay.  Do you recall talking to a Sonya Thomas
```

```
 1          before the -- Mr. Donald's trial in

 2          preparation?

 3   A      No.

 4   Q      Do you recall paying the requisite subpoena

 5          fees to secure Mrs. Thomas's appearance at

 6          Mr. Donald's trial?

 7   A      I don't.  I mean, I'm looking at the exhibit.

 8          There appears to be a copy of a check from our

 9          firm.

10   Q      Okay.

11                   (Defendant's Exhibit No. 7 marked

12               for identification.)

13   BY MR. TOLBERT:

14   Q      I hand you what has been marked as Defendant's

15          Exhibit 7.  Defendant's Exhibit 7 is a

16          subpoena sent by your office to a Mary Banks.

17          Do you see that?

18   A      Yes.

19   Q      Do you recall -- you talked about Mary Banks

20          before.  I think you called her Corporal

21          Banks.

22   A      I don't think -- I think I talked about

23          speaking to a Gary policewoman.

24   Q      Right.  Okay.  What do you recall -- do you

25          recall whether or not Mary Banks was that Gary
```

```
 1        policewoman that you spoke to?
 2   A    The name rings a bell.  It could well be.
 3   Q    Okay.  And what is your recollection of what
 4        information that Mary Banks would have had
 5        that would have assisted you in defending
 6        Mr. Donald?
 7   A    She and/or her daughter were, as memory serves
 8        me, victims in an uncharged case, but that was
 9        occurring in the same locale at the same time,
10        and she -- I recall interviewing her at the
11        police department.  And in that -- in the
12        course of that discussion she was somewhere
13        between not identifying or being extremely --
14        it had to do with a -- her statement suggested
15        my client was not the person that perpetrated
16        that.  Now, how precise that recollection is I
17        don't know, but that's what I recall when I
18        interviewed her at the police station and
19        that's what, my best recollection is, would
20        have prompted me to put her under subpoena.
21   Q    So calling her would have, essentially, helped
22        the defense of Mr. Donald.
23   A    Yes.
24   Q    Okay.  And do you recall whether or not she
25        testified?
```

```
 1   A    I recall that she did not testify.
 2   Q    Okay.  And did you release her from her
 3        subpoena?
 4   A    I did.
 5   Q    Okay.  And when did you do that?
 6   A    The morning of -- the morning she appeared at
 7        the courthouse in response to the subpoena.
 8   Q    Now when you said you talked to her at the
 9        police station, do you remember when that was
10        in relation to the trial?
11   A    No.  During preparation.
12   Q    Okay.  And at that time she told you that --
13        she gave you information that would have been
14        helpful to Mr. Donald.
15   A    Yes.
16   Q    Okay.  And then you released her from her
17        subpoena right at the trial or before the
18        trial?
19   A    I believe the trial was in -- during the
20        trial.
21   Q    Okay.  And why did --
22   A    She appeared and -- she appeared on whatever
23        date she was responding to the subpoena.
24   Q    Why did you release her?
25   A    Because she wanted to speak with me.  We went
```

```
 1              into one of the conference rooms, and she
 2              proceeded to inform me that she was getting
 3              pressure from the department, I know for sure.
 4              Whether or not it was from Bruce Outlaw in
 5              particular, I'm, I'm -- I don't know, but from
 6              the department, and that she -- she just told
 7              me, she goes, I'm, you know, I'm not going to
 8              help you on the stand.  I mean, that's what
 9              she conveyed to me.  I can't -- that's not a
10              quote.  And so I, rather than run the risk of,
11              you know, God knows what she was going to say
12              and getting it in the prosecutor's hands, I
13              released her from the subpoena and sent her on
14              her way.
15    Q    Okay.  Did you -- would you agree with me that
16         had you -- you could have taken her deposition
17         when you met her at the police station;
18         correct?
19    A    No, actually, I couldn't.
20    Q    Why not?
21    A    Because we would have to -- in a criminal case
22         under local rules, we have to do depositions
23         at the prosecutor's office.
24    Q    Right.  But my point is, you could have taken
25         that deposition, no matter where it would have
```

```
 1        taken place; correct?

 2   A    I could have taken her deposition.

 3   Q    Okay.  And if you would have taken her

 4        deposition, at the time you talked to her and

 5        she gave you that information that would have

 6        been favorable, her testimony would have been

 7        locked in; correct?

 8   A    No.

 9   Q    Okay.  And why not?

10   A    She could recant.

11   Q    Right.  And then you could have impeached her

12        with her deposition; correct?

13   A    Could have impeached her, but at the time, if

14        memory serves me, that wouldn't have come in

15        as substantive evidence, and she's a -- she's

16        an experienced police officer.  You know,

17        candidly, God knows what else she would say.

18   Q    And --

19   A    If she was put off -- if she was -- given what

20        was motivating her to back away from what she

21        had told me and if she, in fact, was fronted

22        off in any kind of public setting, including a

23        trial, that in fact she had given me that

24        information before, given what she was doing

25        already, I, you know, I shutter to think of
```

```
 1          what else she might have said or done in the
 2          presence of the jury.  I mean --
 3   Q      You would have gotten in front of the --
 4   A      It was a problem.
 5   Q      You would have gotten in front of the jury
 6          that the City of Gary police was putting
 7          pressure on her not to testify, wouldn't you?
 8   A      No, no, I wouldn't have.  You think she'd
 9          testify to that?
10   Q      Well --
11   A      Do you think she would sit there in front of
12          the prosecutors and the case officer in an
13          open court and say that they -- she was
14          pressured for that?
15   Q      Well, she --
16   A      That's what she told me privately.  She would
17          never, in my opinion, she would never have
18          said that --
19   Q      Well, did you tell --
20   A      -- in the courtroom.
21   Q      Did you tell anybody when she told you that
22          the City of Gary -- that's a, that's a
23          serious --
24   A      I'm sure I did.
25   Q      That's a serious violation, isn't it?
```

| 1 | A | What is? |
|---|---|---|
| 2 | Q | That the police department is basically |
| 3 | | witness tampering. |
| 4 | A | Did I tell anybody during the trial? |
| 5 | Q | Yeah. |
| 6 | A | No. |
| 7 | Q | Okay.  And when was, when was the first time |
| 8 | | you ever told anybody what you just told us |
| 9 | | today? |
| 10 | A | Oh, I'm sure I had conversations with my |
| 11 | | partner. |
| 12 | Q | You never reported it? |
| 13 | A | No.  Report it to who? |
| 14 | Q | To the police department. |
| 15 | A | To the police department that -- |
| 16 | Q | Yeah. |
| 17 | A | -- existed then? |
| 18 | Q | Uh-huh.  Or the prosecutor? |
| 19 | A | To the -- |
| 20 | Q | Isn't that a crime? |
| 21 | A | To Mr. Benson? |
| 22 | Q | Isn't, isn't witness tampering a -- |
| 23 | A | It is. |
| 24 | Q | -- crime, sir?  Okay. |
| 25 | A | It is. |

```
 1   Q    So you could have reported it to the
 2        prosecutor, couldn't you?
 3   A    I could have.
 4                 MR. DRURY:  Objection, calls for
 5        speculation.
 6   A    I could have.
 7   BY MR. TOLBERT:
 8   Q    And did you?
 9   A    I did not.
10   Q    Okay.  And when -- who specifically did you --
11        what you just told us, that Mrs. Banks said
12        that she was getting pressured by somebody at
13        the police station, outside of your partner,
14        who else did you tell that to?
15   A    I'm sure over --
16                 MR. DRURY:  Objection to the --
17        object to the form, calls for hearsay.
18   A    I'm sure over time several of my colleagues,
19        probably Mr. Vanes, who later handled the PCR
20        for Mr. Donald.
21   BY MR. TOLBERT:
22   Q    Did you testify at the post conviction relief
23        hearing?
24   A    I did.
25   Q    Did you -- do you recall telling -- testifying
```

```
 1        at the post conviction relief hearing that you

 2        don't know why she ended up changing her

 3        testimony?

 4   A    I don't recall that.

 5   Q    Is it possible that you could have said that?

 6   A    Sure.  Anything is --

 7   Q    Okay.

 8   A    -- possible.

 9   Q    Okay.  So are you for certain whether or not

10        she actually told you that or are you --

11   A    That she told me that she was --

12   Q    Yeah.

13   A    -- being pressured?  I'm sure of it, because

14        she was backing out of a conversation she had

15        had at the police station with me.  That's

16        what prompted me to subpoena her --

17   Q    Okay.

18   A    -- as a police officer from the same

19        department.

20   Q    So when you testified at the post conviction

21        relief hearing that you didn't know why she

22        backed out, you were not testifying truthfully

23        under oath?

24            MR. DRURY:  Objection, assumes

25        facts not in evidence.  You haven't shown him
```

BOSS REPORTERS
(219) 769-9090

```
 1        anything --

 2                    MR. TOLBERT:  I will.

 3                    MR. DRURY:  -- that he testified

 4        to.

 5                    MR. TOLBERT:  I will.

 6   A    No, I mean, I --

 7                    MR. DRURY:  It's improper

 8        impeachment.

 9                    MR. TOLBERT:  Well, I'm asking him

10        the question because he said it's possible.

11   A    I would always do my best in any setting of

12        telling the truth.

13   BY MR. TOLBERT:

14   Q    So it's possible you could have said under

15        oath that you don't know why Mary Banks

16        decided not to testify and that's inconsistent

17        with what you're saying today.

18   A    Sure.

19                    MR. DRURY:  Object to the form.

20   BY MR. TOLBERT:

21   Q    So you're being inconsistent.

22                    MR. DRURY:  Object to the form.

23   A    It's, it's entirely possible, except that

24        what's transpired since my testimony in the

25        post conviction -- PCR proceeding, has been
```

```
 1          more reflection on my part of back to that
 2          case, also the fact that the PCR was granted.
 3          And I have read, independent of my meeting
 4          with him today, I mean back when it was
 5          granted, I read the opinion that the
 6          magistrate judge issued because I was
 7          interested in it.
 8   Q      Would you ever be a part of any group or
 9          organization that would witness tamper?
10                    MR. DRURY:  Object to the form.
11   BY MR. TOLBERT:
12   Q      You can answer the question.
13                    MR. DRURY:  Relevance.
14   A      No.  Would I engage in witness tampering?
15   BY MR. TOLBERT:
16   Q      No.  Would you ever be a part of any
17          organization or group that would witness
18          tamper.
19                    MR. DRURY:  Same objections.
20   A      Yeah, I don't understand your question.
21   BY MR. TOLBERT:
22   Q      My question is, would you affiliate with any
23          group or organization or entity that would
24          witness tamper?
25                    MR. DRURY:  Same objections.
```

```
 1   BY MR. TOLBERT:

 2   Q     You can answer the question.

 3   A     I wouldn't intentionally do any of that.

 4   Q     That wasn't my question, Attorney King.  My

 5         question is, would you affiliate or align

 6         yourself with any group or entity that would

 7         witness tamper?

 8                   MR. DRURY:  Object to the form.

 9   BY MR. TOLBERT:

10   Q     You can answer the question.

11   A     That would in the future witness --

12   Q     No, that --

13   A     -- tamper or that I believe was engaged in --

14   Q     Yes.

15   A     -- witness tampering?

16   Q     Yes.

17   A     No, I wouldn't.

18   Q     Okay.  And you became the mayor of the City of

19         Gary, didn't you, after this case?

20   A     I did.

21                   MR. DRURY:  Object to the form and

22         relevance.

23   BY MR. TOLBERT:

24   Q     Okay.  And that would have been after the

25         wit -- after the City of Gary would have
```

```
 1              witness tampered; right?

 2                        MR. DRURY:  Object to the form,

 3         foundation.

 4    BY MR. TOLBERT:

 5    Q    Correct?

 6    A    It would have been after the --

 7                        MR. DRURY:  Calls for a legal

 8         conclusion.

 9    A    It would have been after, based on the

10         information I had, one or more members of the

11         police department witness tampered, yes.

12    BY MR. TOLBERT:

13    Q    And what did you do once you became the mayor?

14         Did you try to -- did you, did you report

15         since now -- now, what is the mayor?  Aren't

16         you the chief executive of the city?

17    A    You are.

18                        MR. DRURY:  Object to the form and

19         relevance.

20    BY MR. TOLBERT:

21    Q    Okay.  And now you have the power to talk to

22         the chief and to disclose that information and

23         try to get it corrected.

24                        MR. DRURY:  Object to the form.

25
```

```
 1   BY MR. TOLBERT:

 2   Q    True?

 3   A    Do I have the power?

 4   Q    Yeah.

 5   A    Yes.

 6   Q    Okay.  Did you do it?

 7   A    On that particular --

 8   Q    Yeah.

 9   A    Well, no.

10   Q    Okay.  So, let me get this right.  You became

11        the mayor of the city whose police department

12        you're saying witness tampered and you did

13        nothing.

14                 MR. DRURY:  Object to the form.

15   A    Not this police department.  That's not fair.

16                 MR. DRURY:  Hold on.  Let me make

17        my objection.  Object to the form, foundation,

18        relevance.

19   BY MR. TOLBERT:

20   Q    You can answer the question.

21   A    A member -- one or more members of the police

22        department.

23   Q    Did you call for any internal investigation?

24   A    Of that incident?

25   Q    Yeah.
```

```
 1   A     No.

 2   Q     Okay.  So you knew about this incident once

 3         you became the CEO of the city and you did

 4         nothing.

 5                   MR. DRURY:  Object to the form.

 6   A     You're asking now if I did anything?

 7   BY MR. TOLBERT:

 8   Q     Yeah.

 9   A     I replaced the police chief, brand-new police

10         chief.

11   Q     When did you do that, sir?

12   A     Upon taking office --

13   Q     And did you --

14   A     -- January 1st of 1996.

15   Q     And did you replace him for this incident?

16   A     No.

17   Q     Okay.  So again --

18   A     There were others.

19   Q     Okay.  Again, what did you do as it relates to

20         this incident --

21                   MR. DRURY:  Object to the form.

22   BY MR. TOLBERT:

23   Q     -- that you -- where you're saying there was

24         witness tampering?

25                   MR. DRURY:  Object to the form and
```

```
 1          relevance.
 2   A      To form part of my knowledge of what the
 3          police department was engage -- what members,
 4          different members of the police department
 5          were periodically engaging in and helped
 6          direct remedial steps that I took when I took
 7          office.
 8   BY MR. TOLBERT:
 9   Q      So you said some police.
10   A      Some, yeah.
11   Q      Okay.  So it wasn't a widespread practice
12          then.
13                  MR. DRURY:  Object to the form and
14          foundation.
15   A      Was what a widespread practice?
16   BY MR. TOLBERT:
17   Q      This, the -- what you're describing as witness
18          tampering.
19   A      Well --
20                  MR. DRURY:  Object to the form and
21          foundation.
22   BY MR. TOLBERT:
23   Q      You can answer the question.
24   A      The facts are this officer --
25
```

```
 1   BY MR. TOLBERT:

 2   Q    Isolated.

 3   A    -- this officer telling me that she was being

 4        pressured by others in her department is an

 5        isolated incident.

 6   Q    So --

 7   A    It is isolated.

 8   Q    So once you became the mayor in 1996; correct?

 9   A    Yes.

10   Q    You didn't find a widespread practice of

11        coercing or tampering of witnesses, did you?

12   A    No.

13             MR. DRURY:  Object to the form and

14        foundation, assumes facts not in evidence.

15   A    No.

16   BY MR. TOLBERT:

17   Q    All right.  And had you taken over the City of

18        Gary and realized that was there a custom,

19        policy, or procedure, or practice of witness

20        tampering or engaging in inappropriate conduct

21        with witnesses, you would have done something

22        about it, wouldn't you?

23             MR. DRURY:  Objection, calls for

24        speculation.

25   A    Yes.
```

```
 1                    MR. TOLBERT:  Okay.  I think this
 2          is a good time to take a break.  I don't want
 3          to wear Attorney King out.
 4                    THE WITNESS:  Yeah, Attorney King
 5          will be here until 4:00 and then Attorney King
 6          will be going.
 7                    MR. TOLBERT:  Okay.
 8                    VIDEOGRAPHER:  We are going off
 9          the record at 2:56 p.m.
10                    MR. TOLBERT:  All right.  Why
11          don't we take a few minutes.
12                    (Brief recess.)
13                    VIDEOGRAPHER:  We are now going
14          back on the record at 3:04 p.m.
15   BY MR. TOLBERT:
16   Q    Okay.  We're back on the record.  Attorney
17        King, it's my understanding you have some time
18        constraints?
19   A    Yes, I do.
20   Q    So we're going to stop this deposition at 4:00
21        and then we'll just have to show it continuing
22        and we'll have to bring you back.  All right.
23        It's my understanding you can't come back
24        until September; right?
25   A    It would be challenging.
```

```
 1   Q     Okay.  We'll figure out a way to work around

 2         that schedule.  Okay?

 3   A     Okay.

 4   Q     I'm going to show you what has been marked as

 5         Defendant's Exhibit 8.

 6                   (Defendant's Exhibit No. 8 marked

 7               for identification.)

 8   BY MR. TOLBERT:

 9   Q     All right.  What I've handed you, Attorney

10         King, marked as Defendant's Exhibit 8 is parts

11         of the trial transcript involving Willie T.

12         Donald versus the State of Indiana, and I'm

13         going to go through parts of this transcript

14         and ask you some questions about what you

15         recall, if any, about the witnesses and

16         evidence that you would have put on at trial.

17               So if you turn towards the back of

18         Exhibit 8, there's a section that goes through

19         the witnesses that you would have called at

20         trial?  It's like the third to the last page.

21         At the top of the page where it has

22         defendant -- Defense Witnesses?

23   A     Uh-huh.

24   Q     Do you see that, sir?

25   A     Yes, I do.
```

```
 1   Q    Okay.  And it indicates that these were the
 2        witnesses that were called at trial, the trial
 3        in which you represented Mr. Donald.  It shows
 4        that you called Barbara Price, Sheila Donald,
 5        Dan Hopkins, Richard Sisson, and Ronald Moos.
 6        Do you see that?
 7   A    Yes.
 8   Q    Okay.  Do you recall actually calling those
 9        witnesses in the trial involving Mr. Donald?
10   A    No.  I mean, the name Sheila Donald.  Dan
11        Hopkins, I think, is the brother-in-law.  But,
12        no, I don't have a recollection of -- even
13        though I recognize their names, I'm not -- I
14        don't have a recollection of them testifying.
15   Q    Now, we went through two subpoenas.  There was
16        one that you would have sent for a Sonya -- I
17        think it was Mary Banks and Sonya Thomas.  I
18        don't see them on the list.  And we already
19        established that you did not call Mary Banks;
20        correct?
21   A    Correct.
22   Q    Do you recall what happened with Sonya Thomas,
23        why you did not call her?
24   A    I do not.
25   Q    Okay.  But we can agree that she was not
```

```
 1           called, as referenced in Exhibit 8.

 2   A    As referenced in Exhibit 8, yes.

 3   Q    Okay.  Okay.  I'm going to show you what has

 4        been marked as Defendant's Exhibit 9.

 5                 (Defendant's Exhibit No. 9 marked

 6              for identification.)

 7   BY MR. TOLBERT:

 8   Q    All right.  Defendant's Exhibit 9 is a part of

 9        the trial transcript involving Willie T.

10        Donald versus the State of Indiana, in which

11        you would have given your closing -- or not

12        closing, but your opening statement.

13             Can you peruse through it?  It starts at

14        page 555 and ends at 71.

15                 MR. DRURY:  I'll just object to

16        the exhibit.  There's nothing to indicate,

17        other than Mr. Tolbert's narrative, what this

18        exhibit is.

19                 MR. TOLBERT:  All right.

20                 MR. DRURY:  So it's foundation.

21   BY MR. TOLBERT:

22   Q    Let me know when you're done kind of looking

23        at it, Attorney King.

24   A    Uh-huh.  (Witness reviewing document.)  Okay.

25   Q    Okay.  Do you see on the first page of
```

```
 1        Exhibit 9, about three-quarters of the way
 2        down, where it says, By The Court?  It's line
 3        21 through 23, where it says, By The Court:
 4        The defense has the option of making an
 5        opening statement.  Do you see that?
 6   A    Yes.
 7   Q    Do you recall not giving an opening statement
 8        in the case involving Mr. Donald?
 9   A    Do I recall not giving it?
10   Q    Yes.
11   A    No.
12   Q    Okay.  So you would have given one; correct?
13   A    Yeah, this says I did.
14   Q    Okay.
15   A    I don't recall one way or the other if I did
16        or didn't.
17   Q    Okay.  Normally would your habit be not to
18        give an opening statement?
19   A    No, not normally.
20   Q    Okay.  And if you look at Exhibit 9, one of
21        the things -- I'm going to talk to you about
22        some of the comments that you made in your
23        opening statement.
24            If you look at page 56, and you see
25        page 56, Lines -- this would be Lines 3
```

```
 1        through 8.  After you say, you know, counsel,
 2        ladies and gentlemen of the jury, good
 3        morning, you say:  A few -- a few asides
 4        before we discuss your jobs in any case that
 5        you sit as jurors on.  This case it is going
 6        to be particularly tough.
 7              What, what did you mean by that?  Why
 8        did you say that?
 9  A     Because --
10                 MR. DRURY:  Object to the
11        relevance.
12  A     Yeah.  Again, I don't have an independent
13        recall, but if you go down a sentence, I say:
14        In this case it's going to be particularly
15        tough.  People already -- you already saw
16        emotion from the victim's family even during
17        opening remarks.
18  BY MR. TOLBERT:
19  Q     Yeah, that's what I was asking.
20  A     So that must have -- I mean, I -- and I have
21        to say that is an incredibly unusual
22        experience for me.  I mean --
23  Q     What do you mean?
24  A     During opening statements for there to have
25        been a victim's family outburst that would
```

```
 1          have caused me to comment on this, that's
 2          incredibly unusual.
 3   Q      Do you recall --
 4   A      In fact, I don't have any recall of that ever
 5          having happened before or since.
 6   Q      Okay.  Do you recall in particular what the
 7          wit -- what the victim outburst would have
 8          been?
 9   A      No, just -- it was obviously enough -- in my
10          view, it was enough for me to make at least an
11          effort to try and defuse with the jury.
12   Q      Okay.
13   A      So it had to be significant.
14   Q      Okay.  Now, starting at Line 16 you state
15          that:  I told you yesterday there is no
16          question but that Mr. Jiminez was brutally
17          murdered as part of a terrifying one-man crime
18          spree the night of February 27th, 1992.
19              Do you recall making that statement in
20          front of the jury when --
21   A      No, I don't recall it.
22   Q      Okay.  Do you recall that being part of the
23          argument that you were making to the jury when
24          this case was defended on behalf of
25          Mr. Donald?  Was that --
```

1   A    No.

2   Q    Okay.  Do you remember the crime spree that

3        you might have been referring to?

4   A    Do I remember?  No.  It would have been based

5        on the anticipated evidence from the state

6        and, you know, in the context of whatever the

7        state's opening had been.

8   Q    Okay.  Do you have any reason to dispute that

9        that statement that you made -- you, in fact,

10       made this statement in opening, in your

11       opening statement.

12  A    No, if I assume this to be an accurate

13       transcript --

14  Q    Okay.

15  A    -- of the opening statement, no.

16  Q    Okay.  And it looks like you go on to outline

17       what the evidence will show, and looks like it

18       starts on page 58, Line 4.

19            Do you typically kind of outline for the

20       jury in opening statement what you plan on

21       showing them?

22  A    Yes, that's the purpose of an opening

23       statement.

24  Q    Okay.  Did you ever refer to Mr. Donald in

25       your opening statement as Timmy Donald?

 1   A     I don't.

 2   Q     Did you ever refer to him or heard people

 3         refer to him as Timmy Donald?

 4   A     Yeah.

 5   Q     Okay.

 6   A     That was his nickname from his family.

 7   Q     Okay.  And I notice that you didn't refer to

 8         him as Timmy Donald in your opening.  Is there

 9         a reason why you didn't do that?

10              MR. DRURY:  Object to the form and

11         foundation.

12   A     I don't --

13   BY MR. TOLBERT:

14   Q     Excuse me, I didn't hear that last part.

15   A     I don't know.

16   Q     Okay.  All right.  And part of the evidence

17         that you outlined on page 58, if you start at

18         Line 7, and tell me if there's a statement

19         that is -- that I say that you said in opening

20         that you don't -- that you believe wasn't

21         accurate or wasn't said.

22              It says on Line 7:  And you will hear in

23         this case that at 5:30 p.m. Willie Donald left

24         his job, the job he had held since 1998 --

25         1988 as a stock clerk at Goldblatt's where he

```
 1          was employed then and has been employed
 2          full-time since 1988.
 3                Do you recall making that statement?
 4    A     I don't.
 5                    MR. DRURY:  I object to the
 6          improper use.  It's unclear if you're
 7          impeaching or refreshing, but either way the
 8          use of the exhibit is improper.  I'll make a
 9          standing objection to that.
10    BY MR. TOLBERT:
11    Q     Do you recall making a statement in opening
12          statement that Willie Donald left his job on
13          February 27th, 1992 at about 5:30 p.m. where
14          he was a stock clerk at Goldblatt's?
15    A     No.
16    Q     Okay.  And you have the transcript in front of
17          you that appears to memorialize what your
18          opening statement would have been; correct?
19    A     I have what you've represented and what
20          appears to be a transcript of my opening
21          statement.
22    Q     Okay.  And you have no reason to dispute the
23          transcript as you have it before you.
24    A     I do not.
25                    MR. DRURY:  Same objection to
```

```
 1        foundation.
 2   BY MR. TOLBERT:
 3   Q    Excuse me, I didn't hear that last -- I didn't
 4        hear what you said.
 5   A    I was trying to obey the dictates of the court
 6        reporter and let his objection come in,
 7        however imperfectly I did that.  What's your
 8        question?
 9   Q    Well, my question is, do you have any reason
10        to dispute the accuracy of the transcript that
11        is --
12   A    No.
13   Q    -- before you?  Okay.
14             And it looks like you've indicated that:
15        Normally the evidence will be that he will
16        work until 4:30 at the Goldblatt's located in
17        the Village Shopping Center in Gary.
18             Is that what you -- your transcript
19        reflects that you said on this day?
20                  MR. DRURY:  Objection.
21   A    That's what the transcript reflects?  Yes,
22        that's what the transcript reflects.
23   BY MR. TOLBERT:
24   Q    Right.  You don't remember --
25   A    No, I don't.
```

```
 1   Q    -- right?  So, I got to, I got to go through

 2        this.  Okay?

 3   A    You don't have to, no.

 4   Q    Okay.  Well --

 5   A    You can just accept it as a transcript, get a

 6        certified copy.

 7   Q    Okay.  And it indicates that:  This day he

 8        worked an hour later and he got in his 1981

 9        Chevrolet and he drove home.

10             Isn't that what you stated in your

11        opening statement?

12                  MR. DRURY:  Same objections.

13   A    That's what's reported in Defendant's

14        Exhibit 9.

15   BY MR. TOLBERT:

16   Q    And you indicated in your opening statement

17        that -- starting at Line 19 the transcript

18        reflects that:  You're going to hear in this

19        case that home for Willie was a residence in

20        Glen Park that he shared with two sisters,

21        Sharon and Sheila.

22             I know you had indicated that his mother

23        and his sister hired you.  Could it have been

24        Sharon and Sheila?

25   A    No, I said sisters, plural.
```

```
 1   Q     Okay.  Sisters, and not mother?

 2   A     And the mother.

 3   Q     And the mother.

 4   A     And the mother.

 5   Q     Okay, got you.  Okay.  And if you look at

 6         page 59 of your -- the transcript of your

 7         opening, you mention a Dan Hopkins?

 8   A     Yes.

 9   Q     And you indicate -- and I think you talked

10         about this earlier, that part of the alibi

11         defense was that a -- it's my understanding

12         that Dan Hopkins, who worked for a dealership,

13         would testify that Mr. Donald had actually

14         stopped in to purchase, with his sister, to

15         purchase a car on February 27th, 1992?

16                    MR. DRURY:  Object to the form,

17         misstates evidence.

18   A     Did you say that Mr. Hopkins worked for a

19         dealership?

20   BY MR. TOLBERT:

21   Q     Yes.

22   A     No, I don't think that's accurate.

23   Q     Okay.  Well, you're right.  Mr. Hopkins was

24         the boyfriend of Mr. Donald's sister; is that

25         right?
```

```
 1   A    He was either boyfriend or fiance or husband

 2        of one of Mr. Donald's sisters.

 3   Q    Okay.  And you indicated in your opening

 4        statement that Mr. Hopkins is a meticulous guy

 5        and that he is the kind of guy that plans

 6        things out.

 7             Do you remember -- do you see that

 8        statement in the transcript?

 9                    MR. DRURY:  Same objection as to

10        form and relevance.

11   A    I see it.

12   BY MR. TOLBERT:

13   Q    Okay.  And is it your recollection that part

14        of the alibi defense was that Dan Hopkins,

15        Mr. Donald's sister, and Mr. Donald on the

16        night that these crimes involving Belinsky and

17        Mrs. Williams would have occurred, he would

18        have been out car shopping?

19                    MR. DRURY:  Same objections.

20   A    Yes.  That's why the alibi notice was given.

21   BY MR. TOLBERT:

22   Q    Okay.  And that was something, based on the

23        transcript after you reviewed it, that you

24        indicated to the jury in your opening

25        statement would be shown in evidence; correct?
```

```
 1   A     That they were shopping?

 2   Q     Yes, that Mr. Donald was part of the shopping

 3         at the time the robberies --

 4   A     Yes.

 5   Q     -- and the murder would have occurred.

 6   A     Uh-huh.

 7   Q     Okay.  And I believe that the dealership that

 8         you indicate in your opening statement that he

 9         would have been with his sister and the

10         sister's fiance would have been Paul Sur

11         Pontiac, at 6300 Broadway in Merrillville,

12         Indiana?  This is on page 60 of your -- of the

13         transcript of your opening statement.

14                   MR. DRURY:  Again, I'll object to

15         the improper use of the exhibit, relevance,

16         and form.

17   A     Yes, I said they went to the Paul Sur Pontiac,

18         6300 Broadway.

19   BY MR. TOLBERT:

20   Q     Okay.  And you indicated that the testimony

21         would show that a Rick Sisson, who was a

22         business manager at Paul Sur, would testify

23         that he remembered two African-American men

24         and one African-American woman came in looking

25         for cars.  This is at the end of page 60 and
```

```
 1           the beginning of page 61 of the transcript of

 2           your opening statement.  Do you see that?

 3    A      Yes.

 4                   MR. DRURY:  And I'll continue the

 5           objection.  Just to make sure it's clear what

 6           I'm objecting to, it's unclear to me, Mike, if

 7           you're asking if the transcript just says the

 8           words on the paper or if he remembers what he

 9           said during opening statement, and that's why

10           I'm continuing because --

11                   MR. TOLBERT:  No, I understand.

12                   MR. HUNTER:  -- I think it's if

13           it's the former, it's improper.  If it's the

14           latter, I'm unclear why he has the exhibit in

15           front of him.  Anyway, I just want to make

16           sure that the record is clear and you're clear

17           why I keep objecting.

18                   MR. TOLBERT:  I understand.  No, I

19           understand.  He says he doesn't remember.

20                   MR. DRURY:  Okay.

21                   MR. TOLBERT:  And so that's why

22           I'm going through the transcript with him to

23           see if the transcript would jog his memory, if

24           any, in terms of what he remembers saying in

25           his opening statement.  And when he says he
```

```
 1          doesn't remember, then I will just ask him is

 2          that what the transcript reflects he said.

 3   BY MR. TOLBERT:

 4   Q    So do you see at the bottom of page 60 of

 5          Exhibit 9, which is the transcript of your

 6          opening statement, do you see, starting at

 7          Line 20, on page 60, through 25 and then going

 8          over to page 61, Line 1 through 2, if you read

 9          those lines, tell me or not -- tell me whether

10          or not that refreshes your recollection in

11          terms of what you remember saying in opening

12          statement regarding Rick Sisson and

13          Mr. Donald's alibi defense.

14   A    No, it doesn't refresh my recollection.

15   Q    All right.  And it doesn't refresh your

16          recollection.  I believe we've already

17          established that you don't dispute that the

18          transcript as stated is -- you're not saying

19          it's inaccurate.

20   A    I'm not saying it's inaccurate or accurate.

21   Q    Okay.  Do you have any reason to dispute the

22          transcript that is before you?

23   A    I presently have no reason to dispute it.

24   Q    Okay.  And if you look at Line 20 on page 60

25          of the transcript, Line 20 through 25, you
```

1       state:  You're going to hear from Rick Sisson,

2       for example, you're going to hear he's the

3       business manager at Paul Sur.  You're going to

4       hear him recall, I remember Thursday night, I

5       remember the two African-American men and one

6       African-American woman came and they were

7       looking at cars.

8              And it goes over to page 61, Lines 1

9       through 2.  Is that what the transcript says?

10                    MR. DRURY:  Same objections.

11  A    Yes.

12  BY MR. TOLBERT:

13  Q    Okay.  And you see at the bottom of the

14       page 61 of your open -- this transcript of

15       your opening statement, on Line 21, it says:

16       And you're going to hear Thursday night at

17       Paul Sur Pontiac at this period of time were

18       one of the few nights of the week where they

19       stayed open late until 9:00.

20              First, do you recall making that

21       statement --

22  A    No.

23  Q    -- in opening statement?

24  A    No, I don't.

25  Q    Okay.  And this document doesn't help you --

```
 1   A     No, it doesn't.
 2   Q     -- refresh your -- okay.  And you have no
 3         reason to dispute this part of the transcript
 4         that I just read.
 5               MR. DRURY:  Asked and answered and
 6         misstates his testimony.
 7   A     No.
 8   BY MR. TOLBERT:
 9   Q     Excuse me?
10   A     No.
11   Q     Okay.  And if you look at page 62, Line 8,
12         I'll read it to you, it says, then -- this is
13         what you state as reflected by the transcript,
14         Attorney King:  Then you're going to hear they
15         traveled to Bob Anderson Pontiac and you're
16         going to hear testimony from personnel at Bob
17         Anderson Pontiac who are going to tell you
18         they recollect it's getting toward 9:00.  Why?
19         Because it's getting past their closing time,
20         but you're going to hear these salesmen tell
21         you that they want ahead -- they went ahead.
22         These folks were there and they remember they
23         test drove this van.  They remember they test
24         drove a Sunbird.  They remember talking to
25         them about the Grand Am.  I remember writing
```

```
 1          down some prices and giving them some prices

 2          explaining different finance options.

 3               I'm assuming you don't remember that

 4          statement made in your opening statement

 5          regarding the alibi defense, do you?

 6    A     I do not.

 7    Q     Okay.  And you would agree with me that's what

 8          the transcript reflects that you said in

 9          opening statement regarding the alibi defense.

10    A     Yes.

11    Q     Okay.  Okay.  Then on page 64 of your

12          transcript, of the opening statement of the

13          transcript, it -- if you look at Line 18,

14          Lines 18 through 25, and it carries over on

15          page 65, it indicates that you stated in your

16          opening, quote, now, you're going to hear sure

17          enough Rhonda Williams.  You're going to hear

18          Kimerly Belinsky testify in front of you that

19          that is the face they saw that night.  But

20          you're going to hear how they came to pick

21          that face.  You're going to hear in detail

22          every description they have ever given -- and

23          it carries over to page 65, the perpetrator of

24          these offenses.  You're going to hear in

25          detail what happened as the police began their
```

```
 1          investigation.  And what you're going to hear
 2          in this case is that on March 2nd and 3rd,
 3          days after these crimes were committed, both
 4          of these young ladies, looking through books
 5          of photographs, came upon a photograph of
 6          Willie.
 7               Does reading that jog your memory in
 8          terms of whether you said that or not?
 9    A     It does not.
10    Q     Okay.  And you would agree with me that the --
11          what I just stated is reflected in the trial
12          transcript of your opening statement.
13    A     Yes.
14    Q     Okay.  And you'll see on page 65, Line 9,
15          where it says:  And you're going to hear
16          Ms. Belinsky looked at photographs days after
17          this happened and said -- and this is what
18          you -- the transcript reflects that you said
19          in opening statement:  Well, that looks like
20          the person, but I can't be sure.  And then
21          you're going to hear Ms. Williams looked at
22          the photograph and said, yes, that's the
23          person off this photograph.
24               Again, does that -- reading this part of
25          the open -- transcript of your opening
```

```
 1        statement, does that refresh your recollection
 2        as to whether or not you said that in opening
 3        statement?
 4   A    It does not.
 5   Q    Okay.  And you would agree with me that the
 6        transcript reflects that that statement was
 7        made as it relates to Mrs. Belinsky's
 8        identification as well as Mrs. Williams'
 9        identification of Mr. Donald.
10                 MR. DRURY:  Object to the form.
11   A    Yeah, from Defendant's Exhibit 9 for
12        identification.
13   BY MR. TOLBERT:
14   Q    Okay.  Do you recall when you put this -- when
15        you tried this case for Mr. Donald, do you
16        recall what information or evidence that you
17        put before the jury that showed that there
18        were problems with the lineup procedure put on
19        by the Gary Police Department?
20   A    Did I what now?
21   Q    Did you remember putting on any evidence at
22        trial that would show that there were problems
23        with the way that the Gary Police Department
24        did physical lineups of suspects?
25   A    I don't have a recall.  I imagine, frankly, in
```

```
 1         part based on what you just read, that during
 2         cross-examination of either the complaining
 3         witnesses and/or the police pointing out the
 4         procedure that they engaged in, it looks like
 5         in the opening I was talking about how quickly
 6         after their looking at the photographs they
 7         then presented a lineup.
 8    Q    Do you have any independent recollection of
 9         putting any evidence forward that would show
10         that the lineup procedures that would have
11         been conducted by the Gary Police Department
12         in 1992 were in some way invalid or --
13    A    Well, that wouldn't be --
14                   MR. DRURY:  Object to the form.
15    A    -- in front of the jury.
16    BY MR. TOLBERT:
17    Q    Excuse me?
18                   MR. TOLBERT:  Go ahead.
19                   MR. DRURY:  Object to the form,
20         foundation, calls for an opinion.
21    A    That wouldn't be done in front of a jury.
22    BY MR. TOLBERT:
23    Q    Okay.  It would be done outside of the jury in
24         front of a, what, a judge on voir dire?  What,
25         what --
```

```
 1   A     If I had, if I had adequate evidence to show

 2         an unduly suggestive show-up, lineup,

 3         photographic or live, it would be a motion to

 4         suppress.

 5   Q     Did you file one of those in this case?

 6   A     I did not because I didn't have the evidence

 7         at that time.

 8   Q     Okay.  On page 67, it looks like you indicate

 9         in your opening statement, based on the

10         transcript we have before us, starting at

11         Line 14 -- well, starting at Line 8, you state

12         in opening:  And you're going to hear from the

13         police.  They searched that house looking for

14         clothing that fit the description of what the

15         guy that did this was wearing.  They looked

16         for a gun, they looked for purses, and other

17         things taken from folks during this night of

18         the crime -- of crime.  They looked high, they

19         looked low, and the evidence is going to be in

20         this case they didn't find one thing.  They

21         didn't -- they did not find one piece of

22         clothing remotely close to what the person

23         that did this was wearing.  They didn't find

24         any evidence whatsoever.  They didn't find a

25         gun.  They didn't find anything.  Nor did they
```

```
 1          find any evidence whatsoever of drug use by
 2          folks that live in this house.  They didn't --
 3          they didn't find anything.
 4               Does that refresh your recollection as
 5          to whether or not you made the argument in
 6          your opening statement that there was no
 7          physical evidence that would link Mr. Donald
 8          to the crimes that he was charged with?
 9                    MR. DRURY:  Object to the form.
10   A    Yeah.  It doesn't refresh my memory as to what
11        I said in the opening.  And you did read,
12        somewhere between accurately and inaccurately,
13        a paraphrase of what's in there.
14   BY MR. TOLBERT:
15   Q    I'm sorry, I didn't get that last part.  What
16        did you say?
17   A    Whether you read verbatim or not, you just
18        conveyed, yeah, I think accurately --
19   Q    Okay.
20   A    -- the sense of what's contained in
21        Defendant's Exhibit 9.
22   Q    Okay.
23   A    But it doesn't refresh my memory.
24   Q    Okay.  And then on page 68, starting at
25        Line 7, it looks like the transcript reflects
```

```
 1           that in your opening statement, starting at

 2           Line 7, you said:  Now, you're going to hear

 3           in this case that Rhonda Williams' robbery and

 4           the Jaminez robbery-murder are not the only

 5           crimes that happened in that neighborhood that

 6           night.  Not by a long shot.  You will hear --

 7           this will be presented to you by the

 8           defense -- other people in this neighborhood

 9           in this same period of time were robbed in a

10           remarkably similar fashion by a person

11           absolutely fitting the description given of

12           that killer of Mr. Jaminez and the robber of

13           Rhonda Williams.  I mean to a T.  It's going

14           to be the evidence in this case.

15                That -- based off of what your previous

16           testimony has been, that doesn't refresh your

17           recollection --

18   A       No.

19   Q       -- about whether you said that statement in

20           opening statement; correct?

21   A       Correct.

22   Q       But it is an accurate -- it's -- I accurately

23           stated what the transcript reflects you would

24           have said in opening statement related to

25           other robberies that would have taken place in
```

```
 1        the neighborhood.

 2   A    Yeah, you've accurately --

 3                   MR. DRURY:  Object to form.

 4   BY MR. TOLBERT:

 5   Q    What was that?

 6   A    You've accurately represented what's contained

 7        in Defendant's 9.

 8   Q    Okay.  I'm going to show you what has been

 9        marked as Defendant's Exhibit 10.

10                   (Defendant's Exhibit No. 10 marked

11              for identification.)

12   BY MR. TOLBERT:

13   Q    All right.  Defendant's Exhibit 10, Attorney

14        King, appears to be a cross-examination of a

15        Ron Moos from Bob Anderson Pontiac.

16             Do you see the first page that's

17        indicated as page 809, and under it says 1340,

18        which appears to be a Bates stamp of the

19        transcript?

20                   MR. DRURY:  Objection to the

21        mischaracterization of what the exhibit says.

22   A    This isn't a -- doesn't appear to be a

23        cross-examination.

24   BY MR. TOLBERT:

25   Q    Oh, I'm sorry, a direct examination of
```

```
 1        Mr. Moos by you?

 2   A    It appears -- I mean, that's what it says.

 3   Q    Okay.  Do you have any recollection of

 4        questioning Mr. Moos --

 5   A    No.

 6   Q    -- at the trial when you defended Mr. Donald?

 7   A    I do not.

 8   Q    Okay.  Now, if I understand it, Mr. Moos was

 9        one of your alibi witnesses that would have --

10        that would support your alibi defense for

11        Mr. Donald?

12                   MR. DRURY:  Object to the form.

13   A    From what I read, it appears.

14   BY MR. TOLBERT:

15   Q    Okay.  And based off of what you're reading in

16        front of you as Exhibit 10, what, what did you

17        intend to offer with Mr. Moos at trial?

18   A    That the defendant, criminal defendant,

19        plaintiff here, along with his sister and her

20        husband, brother-in-law, or fiance, whatever,

21        in fact were out shopping for cars.

22   Q    Okay.  And was Mr. Moos as the business

23        manager of Pontiac intended to be able to show

24        that Mr. Donald was, in fact, at Bob Pontiac

25        and not at the location where the crimes would
```

```
 1        have occurred.
 2   A    That was the alibi defense, yes.
 3   Q    Okay.  Did you take a deposition of or
 4        statement of Mr. Moos before trial?
 5   A    I did.
 6   Q    Okay.  Did you take a deposition or a
 7        statement?
 8   A    A statement.
 9   Q    Okay.  And based off of your review of the
10        transcript and maybe your independent
11        recollection of the statement that you would
12        have taken of Mr. Moos, do you recall what he
13        testified to at trial?
14                  MR. DRURY:  Object to the form.
15   A    No.
16   BY MR. TOLBERT:
17   Q    Okay.  Do you see on page 810 -- this is
18        you -- this transcript that's marked as
19        Exhibit 10 is a transcript that shows your
20        direct examination of Mr. Moos at trial;
21        correct?
22   A    Yes.
23   Q    Okay.  And if you look at page 810 of
24        Defendant's Exhibit 10, do you see the line
25        where it starts Line 11, your question is:
```

```
1          All right.  Now, let me ask you if there came
2          a time when you had an occasion to meet with
3          two young African-American men and one young
4          African-American woman interested in
5          purchasing a car from your dealership?
6          Mr. Moos's answer is:  Yes.  Your question is:
7          Do you have any recollection of approximately
8          when that was?  Mr. Moos's answer is:
9          February.
10             And then your question is:  Of what
11         year?  And then his answer is:  This year.
12         And then your question is:  1992?  And his
13         answer is:  Yes, sir.  Then the next question
14         by you is:  Do you have a recollection of what
15         day of the week that would have been?  And it
16         goes over to page 11:  And if you don't,
17         that's fine.  And the answer is:  No, I don't
18         remember exactly.
19             Do you remember that exchange, having
20         that exchange with Mr. Moos at trial in front
21         of the jury?
22                  MR. DRURY:  Objection to the
23         improper use of the exhibit for the reasons
24         stated previously.
25   A     I'm sorry, repeat just the last part, please.
```

1              MR. TOLBERT:  Could you read it

2       back for me, please.

3                  (Question read back by reporter.)

4   A    No, I don't.

5   BY MR. TOLBERT:

6   Q    Isn't it true that Mr. Moos, based on your

7       review of the transcript, could not remember

8       the day whether or not Mr. Donald came in to

9       the dealership exactly on February 27th, 1992?

10              MR. DRURY:  Object to the form.

11       The witness says he can't recall.

12  BY MR. TOLBERT:

13  Q    You can --

14  A    That's what it says in the transcript.  I

15       don't have any independent recollection.

16  Q    But you have no reason to doubt the

17       transcript; correct?

18              MR. DRURY:  Object to the form.

19  A    No, but --

20  BY MR. TOLBERT:

21  Q    Okay.  Do you -- you don't have any

22       independent recollection of any statement --

23       scratch that.

24          It looks like it indicates that, on

25       page 811, Mr. Moos testified that the

1          dealership closed at 8:30 p.m.

2                 Do you have any recollection that that

3          was the testimony by Mr. Moos at trial when

4          you were defending Willie Donald in 1992?

5    A     No.

6                      MR. DRURY:  Object to the form.

7    BY MR. TOLBERT:

8    Q     And isn't it true that Mr. Moos testified that

9          he didn't pay much attention to the men who

10         would have been in the dealership on

11         February 27th, 1992?

12                     MR. DRURY:  Object to the form.

13   A     Isn't it true --

14   BY MR. TOLBERT:

15   Q     He didn't --

16   A     -- that he said that?

17   Q     Yes.

18   A     I don't know.

19   Q     Okay.  If you turn to page 816 and Line 10,

20         your question was:  All right.  So was your

21         focus on this one fellow as opposed to the

22         other fellow?  The answer was:  I didn't pay

23         much attention to the other fellow.

24                 Do you recall that exchange taking place

25         in open court when you were doing a direct

```
 1        examination of Mr. Moos?

 2   A    No.

 3                  MR. DRURY:  Again, I'll object to

 4        the improper use of the exhibit.

 5   BY MR. TOLBERT:

 6   Q    Do you have any recollection whether or not

 7        Mr. Moos actually was able to establish that

 8        Mr. Donald was, in fact, at the dealership on

 9        February 27th, 1992, based on what you were

10        able to get out of him at trial?

11   A    I have no recollection.

12   Q    In fact, Mr. Moos was shown a picture of -- he

13        was shown a picture to see whether or not he

14        could identify Mr. Donald as the person at the

15        dealership, and isn't it true that he couldn't

16        pick Mr. Donald as the person that was at the

17        dealership on the day that these crimes

18        occurred?

19                  MR. DRURY:  Object to the form.

20   A    I don't recall.

21   BY MR. TOLBERT:

22   Q    Okay.  If you look at page 823.  All right.

23        If you look at Line 12, your question was:

24        And the picture we're talking about is that

25        Arister Thompkins, at least according to what
```

```
 1          is written on the back, is that right?  His

 2          answer is:  Right.

 3              Do you recall showing -- do you recall

 4          Mr. Moos identifying a person by the name of

 5          Arister Thompkins as the person that was at

 6          the dealership and not Mr. Donald on the day

 7          that the crimes would have occurred?

 8                  MR. DRURY:  Object to the form.

 9  A    No, and if you read ahead, that's not even

10          what the transcript says.

11  BY MR. TOLBERT:

12  Q    Okay.  Well, I just read it verbatim.

13  A    I understand.  But if you go back, he's not

14          talking about Mr. Donald.  He's talking about

15          Mr. Hopkins.

16  Q    Right, that's my point.  Do you have any --

17  A    I don't have any independent --

18  Q    Right.

19  A    -- recollection, no.

20  Q    Right.  And my point is, do you have any

21          independent recollection based on your review

22          of the transcript or what you recall, that

23          Mr. Moos was, in fact, able to say that

24          Mr. Donald was the person that was at the

25          dealership on the day that the crimes
```

```
 1          involving Belinsky and Williams would have
 2          taken place?
 3   A      No, I have no --
 4                    MR. DRURY:  Object to the form and
 5          foundation.
 6   A      I have no recollection.
 7   BY MR. TOLBERT:
 8   Q      Okay.  Even after reading the transcript.
 9   A      Right.
10   Q      Okay.
11                    MR. DRURY:  I'll object.  The
12          witness hasn't read the transcript.
13                    MR. TOLBERT:  Okay.  Well, he's
14          looking at it right knew.
15   BY MR. TOLBERT:
16   Q      And the answer is no?
17   A      That my memory is refreshed, no, it's not.
18   Q      Okay.  No, my question to you was, you don't
19          have -- you don't -- you're not -- as you sit
20          here today, you can't say that Mr. Moos
21          identified Mr. Donald as the person being in
22          the dealership on the day the crimes would
23          have taken place with Mrs. Belinsky and
24          Mrs. Williams.
25   A      I don't have any recall of Mr. Moos's
```

```
 1        testimony.
 2                    MR. TOLBERT:  Okay.  Could you
 3        read that question back for me, please.
 4                    (Question read back by reporter.)
 5   BY MR. TOLBERT:
 6   Q    Right, that's my question.
 7                    MR. DRURY:  Objection, asked and
 8        answered.
 9   BY MR. TOLBERT:
10   Q    You can answer the question.
11   A    I don't have any recall and my memory is not
12        refreshed.
13   Q    Okay.  So you don't have any recall that
14        Mr. Moos testified that Mr. Donald was at the
15        dealership on February 27th, 1992, when the
16        crimes involving Ms. Belinsky and
17        Mrs. Williams would have taken place.
18   A    No.
19                    MR. DRURY:  Object to the form and
20        asked and answered.
21   BY MR. TOLBERT:
22   Q    That's no?
23   A    (No immediate response.)
24   Q    Okay.  Was that a no, Attorney King?
25   A    It was no.
```

```
 1   Q    Okay.  And if you look at page 28 -- 828.

 2        Well, first, if you look at page 823, it looks

 3        like Attorney Phil Benson actually had the

 4        opportunity to cross, to do a

 5        cross-examination of Mr. Moos; is that

 6        correct?

 7   A    If I look at page 823 --

 8   Q    Uh-huh.

 9   A    -- it looks like Mr. Benson had an opportunity

10        for cross-examination.

11   Q    Okay.  And if you look at page 828 -- before I

12        go to the transcript, as you sit here today,

13        do you recall Mr. Moos testifying in open

14        court during your trial in which you were

15        defending Mr. Donald that he could not

16        recognize Mr. Donald as the third person in

17        the dealership on February 27th, 1992?

18   A    What's the question?

19   Q    Do you recall that Mr. Moos testified that he

20        could not recognize Mr. Donald as the third

21        person who was in the dealership on

22        February 27th, 1992?

23   A    No, I --

24              MR. DRURY:  Object to the form.

25   A    I don't recall.
```

```
 1   BY MR. TOLBERT:

 2   Q    Okay.  And if you look at page 828, Lines 9

 3        through 12, I'll read the question for

 4        Mr. Benson and the answer for Mr. Moos.  It

 5        says, question:  And it's your testimony today

 6        that you cannot recognize the defendant as the

 7        third person who was in the dealership.  His

 8        answer was:  No, sir, not really.

 9             Do you have any reason to dispute or

10        question that Mr. Moos, in fact, testified in

11        that fashion during the trial in which you

12        defended Mr. Donald --

13   A    No.

14   Q    -- in 1992?

15                 MR. DRURY:  Again, I'll object

16        that it's improper impeachment or refreshing a

17        recollection, whichever one you're trying to

18        do.

19   BY MR. TOLBERT:

20   Q    Okay.  So you have no reason to -- as you sit

21        here today, you don't have any recall or

22        knowledge that Mr. Moos, in fact, said that

23        Mr. Donald was the third person in the

24        dealership on February 27th, 1992, supporting

25        your alibi defense.
```

```
 1                    MR. DRURY:  Asked and answered.
 2   A     No.
 3   BY MR. TOLBERT:
 4   Q     Okay.  All right.  I'm going to show you what
 5         has been marked as Deposition Exhibit 11.
 6                    (Defendant's Exhibit No. 11 marked
 7             for identification.)
 8   BY MR. TOLBERT:
 9   Q     All right, sir.  What I handed you was a part
10         of the trial transcript where you did a direct
11         examination of a Richard Sisson, who is a
12         manager at Paul Sur Pontiac in Merrillville.
13             Do you see the first page of Exhibit 11
14         and tell me whether or not that appropriately
15         identifies what I just handed you?
16   A     On Exhibit 11 it says, Richard Sisson, Direct
17         Examination By Mr. King.
18   Q     Okay.  Now, Mr. Sisson was one of the people
19         you listed as a witness on your witness list,
20         correct, as a person that would support your
21         alibi defense?
22   A     According to a previous exhibit, he was
23         contained in a notice of additional witnesses
24         pleading that I recognize my signature on.
25   Q     Do you recall as you sit here today whether or
```

```
 1          not Mr. Sisson did, in fact, support your
 2          alibi defense?
 3                    MR. DRURY:  Object to the form.
 4   BY MR. TOLBERT:
 5   Q     Do you understand my question?
 6   A     As I sit here today, I've just read a portion
 7          of the exhibit you just gave me, Exhibit 11,
 8          and appears that he did.
 9   Q     Okay.  And where in the exhibit do you believe
10          that he supported your alibi defense?
11   A     It was --
12                    MR. DRURY:  Object to the form,
13          misstates his testimony.
14   BY MR. TOLBERT:
15   Q     How about I ask it this way:  On page 78 --
16          788, this is during your questioning of him.
17          When you're asking him about the date in which
18          Mr. Donald would have visited the dealership,
19          the question was this, it states:  What is
20          your best recall -- page 787 and it carries
21          over to 788 of Exhibit 11.
22              The question is:  What is your best
23          recall of when this happened?  And on page 788
24          your answer is -- the answer is, from
25          Mr. Sisson, is:  I would recall it being a
```

```
 1        February-March time.  Your question was:  All
 2        right.  And then answer is:  Still wintertime.
 3        And the question is:  1992?
 4             Do you remember Mr. Sisson giving a
 5        specific date upon which Mr. Donald would have
 6        been in the dealership in February?
 7   A    No, but --
 8   Q    Okay.
 9   A    -- that isn't the supportive evidence that
10        I've noted in the transcript.
11   Q    Okay.  Then if you look at page 801, this is
12        on cross-examination of Mr. Benson.  The
13        question is, for Mr. Benson, is:  And when I
14        asked you the question in that deposition
15        about whether you recognize any of these
16        people being out there, you did not pick the
17        defendant's picture, correct?  And the answer
18        is:  Correct.  And then the question from
19        Mr. Benson is:  You picked an individual,
20        number three, in Defense Exhibit Number 8,
21        correct?  And the answer is, his answer is:
22        Yes.  And then Mr. Benson states:  For the
23        record, that is the name of Arister Thompkins.
24             Do you recall -- do you have any
25        independent knowledge that Mr. Sisson, in
```

 1          support of your alibi defense during the jury

 2          trial of Mr. Donald, expressly and explicitly

 3          stated that Mr. Donald was, in fact, at the

 4          dealership at the time the crimes involving

 5          Ms. Belinsky and Mrs. Williams were -- took

 6          place?

 7    A     No.

 8                    MR. DRURY:  Object to the form.

 9    A     No.

10    BY MR. TOLBERT:

11    Q     You said no?

12    A     I did.

13    Q     Okay.  And this was -- like Mr. Moos, these

14          two, Mr. Moos and Mr. Sisson, were two people

15          in your opening statement that you advised the

16          jury would support your alibi defense; is that

17          correct?

18                    MR. DRURY:  Objection.  The

19          witness already testified he doesn't remember

20          his opening statement.

21    BY MR. TOLBERT:

22    Q     You can answer the question.

23    A     Based upon the representation of that previous

24          exhibit being a transcript of the opening

25          statement, both those names were mentioned.

| | |
|---|---|
| 1 | Q    And then you see on page 803, this is of |
| 2 |      Mr. Sisson and this is further |
| 3 |      cross-examination by Mr. Benson, and it says, |
| 4 |      question, Line 4:  And it's your testimony |
| 5 |      that you do not recognize the defendant as |
| 6 |      ever being out at your dealership, correct? |
| 7 |      And his answer was:  I can't say that I recall |
| 8 |      him being there.  Do you see that? |
| 9 | A    Yes. |
| 10 | Q    Okay.  And you would agree with me that that |
| 11 |      was testimony that was solicited from one of |
| 12 |      your alibi witnesses on cross-examination |
| 13 |      establishing that they could not testify that |
| 14 |      Mr. Donald was, in fact, at the dealership on |
| 15 |      the day the crimes involving Belinsky and |
| 16 |      Mrs. Williams would have occurred. |
| 17 |               MR. DRURY:  Object to the form and |
| 18 |      the improper use of the exhibit. |
| 19 | A    Yeah, and I'm -- what you've read is |
| 20 |      consistent with the Exhibit 11. |
| 21 | BY MR. TOLBERT: |
| 22 | Q    Okay. |
| 23 | A    On the page you referenced. |
| 24 | Q    Okay. |
| 25 | A    Past that, I can't help you. |

1  Q    And I guess my question again is, consistent

2       with my other questions is, as you sit here

3       today, do you recall emphatically showing

4       through testimony or through evidence that

5       Mr. Sisson was able to actually place

6       Mr. Donald in the dealership on the day the

7       crimes involving Mrs. Williams and

8       Mrs. Belinsky would have taken place?

9                 MR. DRURY:  Object to the form and

10      the use of "emphatically".

11 A    From the review of the transcripts, the

12      context of Mr. Moos, Mr. Sisson, coupled with

13      Miss -- with Mr. Donald's sister and

14      Mr. Hopkins, coupled with the admission into

15      the evidence, which is referenced in one of

16      these transcripts, of the note that I think

17      Mr. Sisson positively identified as having

18      come from him that, yes, it was demonstrated.

19 BY MR. TOLBERT:

20 Q    Okay.  So is your position that you did, in

21      fact, demonstrate effectively your alibi

22      defense?

23 A    Collect --

24                MR. DRURY:  Object to the form and

25      relevance.

1   BY MR. TOLBERT:

2   Q    You can answer the question.

3   A    Collectively, through the witnesses and the

4        exhibits just named, yes.

5   Q    Okay.

6   A    We presented the evidence that was available,

7        yes.

8   Q    And you would agree with me that Mr. Donald,

9        despite that, was still convicted.

10  A    Mr. Donald was convicted.

11  Q    Okay.  Do you have any explanation as to

12       why -- if your alibi defense, as you just

13       stated, was able to be put before the jury, do

14       you have any idea how there still was a

15       conviction arrived at?

16  A    Yeah.

17              MR. DRURY:  Objection, calls for

18       speculation.

19  A    Yes, I do.

20  BY MR. TOLBERT:

21  Q    How's that?

22  A    Studies demonstrate that the most believed

23       evidence in criminal prosecutions by juries is

24       eyewitness testimony.  Those studies also

25       indicate that the evidence most likely to be

```
 1        wrong is eyewitness testimony.  When you
 2        couple that reality with a lack of either
 3        corroborating or disproving physical evidence,
 4        which now we have the DNA -- back then I think
 5        we were still in the serology days,
 6        fingerprints, that sort of thing -- and you
 7        couple it in Mr. Donald's particular case with
 8        the intentional nondisclosure of exculpatory
 9        evidence, that's a recipe for a conviction, a
10        wrongful conviction.
11                    MR. TOLBERT:  Okay.  All right.  I
12        think it's 4:00, so I want to be respectful of
13        your time.
14                    THE WITNESS:  Thank you.  I
15        appreciate that.
16                    MR. HALL:  What, what was the last
17        part of that answer, please?
18                    VIDEOGRAPHER:  We are now going
19        off the video record at 4:01 p.m.
20                    (Brief discussion held off the
21          record.)
22                    MR. TOLBERT:  Let's go back on the
23        record.  I want to show on the record that
24        this deposition is continuing because he has
25        an obligation that I didn't necessarily know
```

1    about.  So we'll reschedule this with you,

2    Attorney King.

3              THE WITNESS:  Just through my

4    office, yes.

5              MR. TOLBERT:  Is everybody okay

6    with that?  Scott, you're all right with that?

7              MR. DRURY:  Uh-huh.

8              MR. TOLBERT:  Okay.  Then we're

9    good.  Show it continuing.  Thank you very

10   much, Mr. King.

11             (Proceedings concluded at

12             4:02 p.m. and continued to a later

13             date.)

14                  * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF INDIANA
 2                   HAMMOND DIVISION

 3

 4   WILLIE T. DONALD,            )
                                  )
 5            Plaintiff,          )
                                  )
 6   vs.                          )  Case No.
                                  )  2:17-CV-00032
 7   BRUCE OUTLAW, CARLA K. PYLE, )
     as Special Administrator of  )
 8   the ESTATE OF JOHN E. JELKS, )
     JR., CITY OF GARY, and other )
 9   as-yet unknown Employees of  )
     the City of Gary,            )
10                                )
              Defendants.         )
11   _____)

12

13              REPORTER'S CERTIFICATE

14          I, Beth A. Barnette, CSR, and Notary
     Public, do hereby certify that I reported in machine
15   shorthand the foregoing proceedings had in the
     above-entitled matter, at the time and place herein
16   before set forth; and I do further certify that the
     foregoing transcript, consisting of one hundred
17   thirty-five (135) typewritten pages, is a true and
     correct transcript of my said stenographic notes.
18                   Signed this 13th day of December,
     2019.
19

20

21

22

23   _____
24   BETH A. BARNETTE, CSR
     Notary Public
25   My Commission Expires:  6/13/22
```

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 02/26/24    page 395 of 940

## A

**able (9)**
36:14;37:16;67:24;
116:23;121:7,10;
122:23;132:5;133:13
**absence (3)**
55:14,22;56:6
**absolutely (1)**
114:11
**accept (2)**
7:10;100:5
**accommodate (1)**
7:2
**accomplished (1)**
39:16
**according (2)**
121:25;127:22
**accordingly (1)**
43:15
**account (1)**
45:4
**accuracy (1)**
99:10
**accurate (5)**
96:12;97:21;
101:22;105:20;
114:22
**accurately (5)**
113:12,18;114:22;
115:2,6
**accused (1)**
21:8
**acquittal (1)**
26:23
**actually (12)**
6:21;9:5;17:25;
49:8;53:8;75:19;
80:10;91:8;101:13;
121:7;125:3;132:5
**additional (6)**
57:25;58:22;60:6,
8,19;127:23
**address (3)**
25:18;71:17,18
**adequate (1)**
112:1
**adequately (1)**
39:6
**adjustments (1)**
43:14
**admission (2)**
20:11;132:14
**advantage (1)**
45:24
**advised (1)**
130:15
**advocate (1)**
31:9
**affidavit (1)**
25:13
**affiliate (2)**

82:22;83:5
**African-American (6)**
103:23,24;106:5,6;
118:3,4
**again (13)**
15:9;31:19;43:10;
45:19;51:11;86:17,
19;94:12;103:14;
109:24;121:3;
126:15;132:1
**against (3)**
48:22;49:19;66:10
**agent (1)**
66:8
**ago (2)**
5:19;23:7
**agree (19)**
31:11,22,25;41:6;
46:7;48:9,15;51:5;
56:17;64:12;65:15;
70:9;75:15;91:25;
108:7;109:10;110:5;
131:10;133:8
**agreement (1)**
44:13
**ahead (8)**
13:10;15:1;40:20;
47:25;107:21,21;
111:18;122:9
**al (2)**
4:3;5:14
**alibi (34)**
47:4,20;48:1,4,5,
24;49:6,25;50:24;
51:3,18;52:9;53:25;
59:20;60:4,18;
101:10;102:14,20;
105:13;108:5,9;
116:9,10;117:2;
126:25;127:21;
128:2,10;130:1,16;
131:12;132:21;
133:12
**align (1)**
83:5
**alike (1)**
44:20
**alle (1)**
30:9
**allegation (6)**
30:9;32:7,20;
48:24;50:17;51:1
**allegations (4)**
29:25;32:23;48:22;
49:19
**allege (1)**
30:3
**alleged (3)**
58:9;62:1;66:10
**alleges (1)**
29:6
**allow (2)**
20:3;41:8

**allowed (1)**
52:16
**allows (1)**
70:11
**almost (1)**
29:24
**along (1)**
116:19
**always (2)**
41:18;81:11
**amend (1)**
50:9
**among (2)**
17:1;30:12
**amount (1)**
36:23
**and/or (3)**
55:8;73:7;111:3
**Anderson (1)**
107:15,17;115:15
**animal (1)**
38:10
**answered (7)**
38:17;51:15;65:10;
107:5;124:8,20;
127:1
**anticipate (1)**
42:16
**anticipated (1)**
96:5
**Appeals (1)**
20:15
**appear (3)**
31:4,6;115:22
**appearance (1)**
72:5
**appeared (3)**
74:6,22,22
**appears (12)**
31:12;58:20;63:15;
70:25;72:8;98:17,20;
115:14,18;116:2,13;
128:8
**appellate (1)**
30:1
**appreciate (1)**
134:15
**appropriate (1)**
50:22
**appropriately (1)**
127:14
**approximately (1)**
118:7
**area (6)**
10:2,21;11:17;
15:11,21;18:19
**areas (1)**
6:11
**argument (3)**
56:5;95:23;113:5
**Arister (3)**
121:25;122:5;
129:23

**allowed (1)** _(second col)_
**around (6)**
13:3;16:6;24:12;
42:5,14;90:1
**arrest (1)**
24:22
**arrested (1)**
24:18
**arrived (1)**
133:15
**aside (1)**
54:20
**asides (1)**
94:3
**assessment (1)**
36:4
**assigned (2)**
44:10;54:21
**assignment (1)**
15:2
**assistance (10)**
29:9,25;30:4,10;
31:8;32:2,7,10,16,24
**Assistant (2)**
13:14;14:12
**assisted (2)**
32:2;73:5
**associate (1)**
13:5
**associated (1)**
10:20
**associates (2)**
18:17,18
**assume (4)**
18:17;24:21;56:9;
96:12
**assumes (3)**
59:18;80:24;88:14
**assuming (4)**
16:16;55:13;68:13;
108:3
**attainment (1)**
7:17
**attempt (1)**
26:22
**attendant (1)**
36:3
**attention (2)**
120:9,23
**Attorney (26)**
5:10;9:12;10:20;
13:14;14:11,12;15:3;
22:24;29:22;33:4;
34:23;46:23;47:12;
53:1;83:4;89:3,4,5,
16;90:9;92:23;
107:14;115:13;
124:24;125:3;135:2
**attorneys (4)**
11:1,7;17:13;29:23
**Attorney's (3)**
14:24;17:21;33:15
**A-USA (2)**
14:9;17:21

**automatically (1)**
29:24
**available (2)**
42:8;133:6
**aware (2)**
29:16,21
**away (2)**
46:4;76:20

## B

**bachelors (1)**
8:10
**back (23)**
12:16;13:11,16;
14:3;15:20,21;66:24;
76:20;82:1,4;89:14,
16,22,23;90:17;
119:2,3;122:1,13;
124:3,4;134:4,22
**backed (1)**
80:22
**background (1)**
6:5
**backing (1)**
80:14
**bad (3)**
44:11;45:2;66:19
**bail (2)**
44:3,17
**Banks (5)**
72:16,19,21,25;
73:4;79:11;81:15;
91:17,19
**bar (4)**
8:19,21;9:7;20:14
**Barbara (2)**
58:1;91:4
**Barnette (1)**
4:13
**Bars (1)**
20:12
**based (21)**
31:5;37:11;42:2;
43:7;49:5;50:12;
51:2;65:16;67:24;
84:9;96:4;102:22;
111:1;112:9;114:15;
116:15;117:9;119:6;
121:9;122:21;130:23
**basic (2)**
37:17;49:22
**basically (5)**
38:24;39:4;48:10;
51:7;78:2
**basis (1)**
30:18
**Bates (3)**
27:14;71:23;
115:18
**became (7)**
9:8;14:10;83:18;
84:13;85:10;86:3;

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 02/26/22    page 396 of 940

88:8
**began (4)**
8:22,23;25:6;
108:25
**begin (1)**
8:18
**beginning (1)**
104:1
**behalf (4)**
4:23;65:3;70:16;
95:24
**behind (1)**
30:24
**believes (2)**
51:19;55:5
**Belinsky (9)**
102:16;108:18;
109:16;123:1,23;
124:16;130:5;
131:15;132:8
**Belinsky's (1)**
110:7
**bell (2)**
59:24;73:2
**benefit (4)**
31:2;36:7;43:5;
46:5
**benefits (1)**
10:16
**Benson (9)**
78:21;125:3,9;
126:4;129:12,13,19,
22;131:3
**best (7)**
5:21;7:12;15:14;
73:19;81:11;128:20,
22
**Beth (1)**
4:13
**better (1)**
31:9
**biggest (1)**
13:23
**bit (1)**
9:25
**black (1)**
67:12
**Bob (4)**
107:15,16;115:15;
116:24
**bond (2)**
25:18;36:1
**books (1)**
109:4
**Boss (1)**
4:13
**both (6)**
10:22;30:1;32:9;
38:4;109:3;130:25
**bottom (2)**
105:4;106:13
**boyfriend (3)**
49:4;101:24;102:1

**Bozik (1)**
9:5
**Brady (2)**
47:5;54:13
**brand-new (1)**
86:9
**break (2)**
6:23;89:2
**Brief (2)**
89:12;134:20
**bring (1)**
89:22
**Broadway (4)**
4:9;7:13;103:11,18
**brother-in-law (3)**
49:3;91:11;116:20
**brought (2)**
17:25;37:7
**Brown (3)**
16:21;17:3,6
**Bruce (3)**
4:3,19;75:4
**brutally (1)**
95:16
**build (2)**
36:20;54:16
**bulk (1)**
15:6
**burden (1)**
53:4
**Bureau (2)**
69:3,12
**business (3)**
103:22;106:3;
116:22

**C**

**call (5)**
37:6;59:6;85:23;
91:19,23
**called (8)**
5:3;18:4;23:6;
72:20;90:19;91:2,4;
92:1
**calling (3)**
23:9;73:21;91:8
**calls (17)**
21:3;30:20;32:6,
19;36:16;41:14;
43:20;46:13;61:19;
62:10;65:25;79:4,17;
84:7;88:23;111:20;
133:17
**came (8)**
21:16;23:4;103:24;
106:6;108:20;109:5;
118:1;119:8
**can (52)**
5:21;6:21;7:2;
13:8;29:14;30:22;
31:11,15,22,25;
37:14;38:20,22;

41:15,22;42:1,11;
43:22;45:3,3,7,14,19,
19,25;46:12;47:25;
48:21;49:14;50:12,
13;53:12;56:17;
59:11;60:17;65:18;
68:8;69:25;70:9,13;
82:12;83:2,10;85:20;
87:23;91:25;92:13;
100:5;119:13;
124:10;130:22;133:2
**candidly (2)**
38:5;76:17
**car (5)**
49:20;59:19;
101:15;102:18;118:5
**care (1)**
64:8
**Carolina (1)**
20:18
**carries (3)**
108:14,23;128:20
**cars (5)**
49:2,9;103:25;
106:7;116:21
**case (78)**
4:5;5:15;11:4;
13:23;15:6;20:21,25;
22:6;24:16;25:6,16,
17,20,20;26:1,5;30:8,
9;32:3;34:8;35:19;
36:5;37:11;39:21,21,
23;40:16,23,24;41:8;
42:19,24,24;43:10,
11,23,24;44:2,10,12,
19;45:22;46:2;50:19,
21;54:21,21;55:17,
25;60:13;61:2,9,13,
15,15,21;62:20;67:9,
21;73:8;75:21;77:12;
82:2;83:19;85:3;
94:4,5,14;95:24;
97:23;100:19;109:2;
110:15;112:5,20;
114:3,14;134:7
**cases (11)**
14:23,25;15:4,7;
38:7;43:4,4;45:23;
61:17,20,20
**cause (2)**
25:13;43:25
**caused (1)**
95:1
**caution (1)**
52:25
**Cedar (1)**
15:24
**Center (2)**
58:11;99:17
**CEO (1)**
86:3
**certain (1)**
80:9

**certainly (3)**
15:14;29:24;46:1
**certifications (4)**
19:16,21,22;20:1
**certified (1)**
100:6
**chair (1)**
34:13
**challenging (1)**
89:25
**Chandra (1)**
59:23
**change (1)**
50:12
**changing (1)**
80:2
**charge (3)**
25:13;32:25;50:10
**charged (10)**
24:18;35:10,14;
38:22;48:12;49:7;
52:23;53:9;67:23;
113:8
**check (1)**
72:8
**Chevrolet (1)**
100:9
**Chicago (1)**
7:24
**chief (4)**
84:16,22;86:9,10
**Circuit (1)**
20:16
**circumspect (1)**
15:14
**circumstances (1)**
63:24
**City (13)**
4:18;5:14;9:14;
10:21;65:19;77:6,22;
83:18,25;84:16;
85:11;86:3;88:17
**civil (5)**
11:22;38:1,10;
45:21,23
**claim (2)**
30:16;32:1
**claimed (1)**
29:16
**clear (5)**
49:24;56:12;104:5,
16,16
**clerk (3)**
9:4;97:25;98:14
**clerking (1)**
9:3
**client (11)**
11:3;25:15;39:7;
41:9;45:9;46:5;50:2;
54:16;67:14;70:12;
73:15
**client's (1)**
45:10

**close (2)**
71:20;112:22
**closed (1)**
120:1
**closing (4)**
56:5;92:11,12;
107:19
**clothing (2)**
112:14,22
**code (1)**
9:12
**coercing (1)**
88:11
**colleagues (1)**
79:18
**Collect (1)**
132:23
**Collectively (1)**
133:3
**colloquial (1)**
31:3
**coming (3)**
22:3;23:8;25:21
**commence (1)**
38:19
**comment (1)**
95:1
**comments (1)**
93:22
**committed (7)**
49:8;50:3;52:8,10,
22;68:3;109:3
**commonly (1)**
26:17
**compared (1)**
45:21
**comparison (1)**
67:14
**compel (1)**
47:4
**compensation (1)**
17:1
**complaining (3)**
62:19;67:16;111:2
**complete (2)**
42:15;44:18
**comply (1)**
66:6,7
**component (1)**
16:16
**Conan (4)**
13:6,17,20;14:1
**concept (1)**
57:22
**concessions (1)**
44:12
**conclude (1)**
45:12
**concluded (1)**
135:11
**conclusion (1)**
84:8
**conclusively (2)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al
Case No. 2:17-CV-00032   Videotaped Deposition of: SCOTT L. KING
USDC IN/ND case 2:17-cv-00032-TLS   document 368-2   filed 02/26/22   page 397 of 940
July 17, 2019

52:20,25
**Concordia (3)**
8:1,6,9
**conduct (3)**
37:21;42:15;88:20
**conducted (1)**
111:11
**conducting (1)**
42:22
**conference (1)**
75:1
**conferred (1)**
7:20
**consideration (2)**
35:25;36:11
**consistent (2)**
131:20;132:1
**constraints (1)**
89:18
**contact (1)**
6:8
**contained (3)**
113:20;115:6;
127:23
**context (4)**
28:7;8;96:6;132:12
**continue (2)**
37:11;104:4
**continued (1)**
135:12
**continuing (3)**
89:21;104:10;
134:24;135:9
**control (1)**
64:8
**conversation (1)**
80:14
**conversations (2)**
23:23;78:10
**conveyed (2)**
75:9;113:18
**convicted (2)**
133:9,10
**conviction (17)**
6:10;22:16;27:12,
16;28:1,4,13;29:9,23;
54:20;79:22;80:1,20;
81:25;133:15;134:9,
10
**copy (3)**
47:3;72:8;100:6
**corner (1)**
16:6
**Coroner's (5)**
64:7,14;65:6,11;
68:1
**Corporal (1)**
72:20
**corporation (1)**
17:23
**corpus (1)**
25:18
**corrected (1)**

84:23
**Corrections (1)**
31:10
**correctly (1)**
39:3
**corroborating (2)**
56:6;134:3
**counsel (16)**
4:14;10:24;22:10;
28:9;29:10;30:1,4,
10;32:8,10,16,25;
41:23;63:18,23;94:1
**counter (1)**
37:13
**County (5)**
12:4,14,15;15:22;
64:6
**couple (5)**
16:1;24:2;51:22;
134:2,7
**coupled (2)**
132:12,14
**course (7)**
22:12;32:8;38:9;
53:23;54:17;70:1;
73:12
**Court (23)**
4:4,13,25;5:7;6:3,
18,21;20:15,16;
32:15;33:24;34:5;
59:4,5,11;64:13;
67:25;77:13;93:2,3;
99:5;120:25;125:14
**courthouse (1)**
74:7
**courtroom (1)**
77:20
**courts (1)**
12:15
**court's (1)**
68:6
**covered (1)**
49:1
**covering (1)**
66:16
**Crawford (1)**
12:6
**credibility (1)**
36:9
**Crime (15)**
15:2,5;48:8,11;
49:16;50:3;51:11,12;
52:11;78:20,24;
95:17;96:2;112:18,
18
**crimes (22)**
19:1;49:7,15;
51:10;52:8,22;53:9;
67:22;68:3;102:16;
109:3;113:8;114:5;
116:25;121:17;
122:7,25;123:22;
124:16;130:4;

131:15;132:7
**criminal (25)**
10:5,9;11:21;
13:21,24;14:25;
15:18;16:17;18:23,
24;19:22;24:25;37:4;
38:1,7,13;39:5;
42:10;43:1,10,17;
45:20;75:21;116:18;
133:23
**cross (1)**
125:4
**cross-examination (9)**
42:22;111:2;
115:14,23;125:5,10;
129:12;131:3,12
**Crouch (1)**
58:2
**Crown (2)**
16:1;69:4
**currently (1)**
20:16
**custody (4)**
36:2;37:5,17;64:8
**custom (1)**
88:18
**cutoff (1)**
38:6

# D

**Dan (5)**
91:5,10;101:7,12;
102:14
**danger (1)**
42:12
**darn (1)**
23:10
**date (8)**
4:6;15:19;37:18;
50:12;74:23;128:17;
129:5;135:13
**Daugh (2)**
17:10,11
**D-A-U-G-H (1)**
17:10
**daughter (1)**
73:7
**day (10)**
99:19;100:7;
118:15;119:8;
121:17;122:6,25;
123:22;131:15;132:6
**days (7)**
37:7,18;38:12,19;
109:3,16;134:5
**DC (1)**
10:15
**dealership (24)**
101:12,19;103:7;
118:5;119:9;120:1,
10;121:8,15,17;
122:6,25;123:22;

124:15;125:17,21;
126:7,24;128:18;
129:6;130:4;131:6,
14;132:6
**dealerships (1)**
59:19
**dealings (1)**
6:8
**death (4)**
43:25;63:16,25;
64:9
**December (1)**
19:10
**decide (1)**
57:3
**decided (1)**
81:16
**defend (1)**
60:14
**defendant (15)**
36:1,8;38:14,23;
48:6;51:19,21;55:4,
7;64:2;90:22;116:18,
18;126:6;131:5
**Defendants (1)**
5:3
**Defendant's (42)**
27:5,9,11;28:12;
46:19,20,23,24;55:9;
57:25;58:16,17,20,
22;60:6;63:6,7,10;
68:21,25;69:1;70:20,
25;72:11,14,15;90:5,
6,10;92:4,5,8;100:13;
110:11;113:21;
115:7,9,10,13;
117:24;127:6;129:17
**Defendants's (1)**
70:24
**defended (5)**
58:6;67:22;95:24;
116:6;126:12
**defending (3)**
73:5;120:4;125:15
**defense (41)**
13:21,24;15:18;
18:24;21:12;37:13;
39:5;43:10,17;45:21,
24;48:24;49:6;50:2;
51:3;52:6,9;53:1,25;
55:11;65:7;73:22;
90:22;93:4;101:11;
102:14;105:13;
108:5,9;114:8;
116:10;117:2;
126:25;127:21;
128:2,10;129:20;
130:1,16;132:22;
133:12
**defenses (3)**
48:16,17;51:6
**defensive (1)**
48:1

**deficient (1)**
33:16
**defined (1)**
26:15
**definitely (1)**
39:15
**defuse (1)**
95:11
**degree (4)**
7:17,19;8:9,10
**delayed (1)**
37:16
**demand (5)**
37:5,7,18,19;38:18
**demonstrate (2)**
132:21;133:22
**demonstrated (1)**
132:18
**denying (1)**
32:21
**Department (21)**
31:10;65:19;67:2;
69:3;73:11;75:3,6;
78:2,14,15;80:19;
84:11;85:11,15,22;
87:3,4;88:4;110:19,
23;111:11
**depending (1)**
11:3
**depends (4)**
61:9,13,21;62:12
**deposed (1)**
5:13
**deposition (28)**
4:8;6:1;23:8;40:7,
18,20;41:19,21;42:2,
6,15;43:9,14,16;44:5,
7;45:1;75:16,25;
76:2,4,12;89:20;
117:3,6;127:5;
129:14;134:24
**depositions (10)**
6:16;39:12,19;
40:21,25;41:6;42:12;
45:14;70:9;75:22
**deputy (1)**
12:10
**described (1)**
46:7
**describing (1)**
87:17
**description (4)**
52:4;108:22;
112:14;114:11
**descriptions (1)**
67:15
**desire (1)**
15:17
**despite (1)**
133:9
**detail (2)**
108:21,25
**details (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE, et al.

Case No. 2:17-CV-00032     Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS     document 368-2     filed 10/26/22     page 398 of 940

18:6
**detective (1)**
45:7
**dictates (1)**
99:5
**different (6)**
35:19;38:1,10;
44:14;87:4;108:2
**difficult (3)**
65:21;66:2,11
**diligently (1)**
36:21
**dire (1)**
111:24
**DIRECT (7)**
5:8;87:6;115:25;
117:20;120:25;
127:10,16
**directed (1)**
22:14
**directing (2)**
63:11,22
**directly (1)**
31:7
**directs (1)**
64:6
**discharge (2)**
38:23,24
**disclose (1)**
84:22
**discovering (1)**
46:9
**discovery (11)**
25:21;37:21;38:6,
7;39:4,10;40:12,15;
47:4,6;70:10
**discrepancies (1)**
45:7
**discuss (1)**
94:4
**discussion (2)**
73:12;134:20
**dismissal (2)**
38:25;44:12
**disproving (1)**
134:3
**dispute (8)**
96:8;98:22;99:10;
105:17,21,23;107:3;
126:9
**District (8)**
4:4,5;11:2;13:15;
20:12,13,14,17
**division (6)**
12:12,14,17,18,21;
13:1
**DNA (1)**
134:4
**doctor (1)**
7:20
**doctorate (1)**
7:19
**document (12)**

27:23;31:12,23;
47:17;58:25;59:3;
60:2,4;63:21;66:19;
92:24;106:25
**documents (7)**
5:21;22:4;24:3;
47:12;60:2;68:18;
70:15
**domestic (1)**
11:22
**DON (4)**
27:15,18,19;71:23
**Donald (94)**
4:2,24;5:14,17;6:7,
9;20:21;21:6;22:17;
25:23;26:18,22;
27:13;28:9;29:3,16;
31:5,8,13,16;32:14,
25;33:15;34:11;35:4,
9;39:23;48:17;49:6;
51:7;52:7,22;53:7,9;
55:11;58:7,8;60:14,
23;65:3,7;66:10;
67:22;70:16;73:6,22;
74:14;79:20;90:12;
91:3,4,9,10;92:10;
93:8;95:25;96:24,25;
97:3,8,23;98:12;
101:13;102:15;
103:2;110:9,15;
113:7;116:6,11,24;
119:8;120:4;121:8,
14,16;122:6,14,24;
123:21;124:14;
125:15,16,20;126:12,
23;128:18;129:5;
130:2,3;131:14;
132:6;133:8,10
**Donald's (21)**
22:6;24:11;25:5;
26:1,5;28:1,4,24;
29:8;31:25;40:14;
61:15;68:19;72:1,6;
101:24;102:2,15;
105:13;132:13;134:7
**done (11)**
10:9;39:17,18;
48:11;60:12;61:14;
77:1;88:21;92:22;
111:21,23
**doubt (1)**
119:16
**down (6)**
6:19;53:24;54:3;
93:2;94:13;108:1
**drawback (1)**
46:8
**drive (1)**
44:12
**drove (3)**
100:9;107:23,24
**Drug (4)**
15:3,6,7;113:1

**DRURY (136)**
4:23,23;19:17,23;
21:2;22:25;23:20;
26:7,11,25;27:4,22;
29:1,11,18;30:6,19;
31:14;32:5,18;33:9,
23;34:4;35:17,24;
36:16;37:23;38:16;
39:8,25;41:10,14;
43:19;45:17;46:10,
13;47:2,12,22;48:19;
49:11;51:14;52:12;
53:10,16;54:5;56:21;
57:4;59:17;60:24;
61:10,18,24;62:10,
23,25;64:17;65:9,24;
68:4;69:14,22;79:4,
16;80:24;81:3,7,19,
22;82:10,13,19,25;
83:8,21;84:2,7,18,24;
85:14,16;86:5,21,25;
87:13,20;88:13,23;
92:15,20;94:10;
97:10;98:5,25;99:20;
100:12;101:16;
102:9,19;103:14;
104:4,20;106:10;
107:5;110:10;
111:14,19;113:9;
115:3,20;116:12;
117:14;118:22;
119:10,18;120:6,12;
121:3,19;122:8;
123:4,11;124:7,19;
125:24;126:15;
127:1;128:3,12;
130:8,18;131:17;
132:9,24;133:17;
135:7
**duces (1)**
69:1
**duly (1)**
5:4
**during (21)**
10:2;22:11;26:18;
32:3,8;38:9;48:18;
53:22;54:17;74:11,
19;78:4;94:16,24;
104:9;111:1;112:17;
125:14;126:11;
128:16;130:1

### E

**earlier (8)**
5:18;22:9;25:4;
27:22;31:15;66:7,18;
101:10
**early (5)**
17:24,25;37:6,18;
44:18
**earned (1)**
7:19

**education (2)**
6:6;8:3
**educational (1)**
7:16
**effective (1)**
32:10
**effectively (1)**
132:21
**effort (1)**
44:9;95:11
**eight (1)**
14:7
**either (8)**
22:18;30:1;41:2;
45:9;98:7;102:1;
111:2;134:2
**elements (1)**
33:5
**Ellicott (2)**
9:14;10:21
**else (6)**
34:8;48:13;50:4;
76:17;77:1;79:14
**emotion (1)**
94:16
**emphatically (2)**
132:3,10
**employed (5)**
16:19,21;58:10;
98:1,1
**end (3)**
27:13;38:23;
103:25
**ended (1)**
80:2
**ends (1)**
92:14
**Enforcement (2)**
15:3,6
**engage (3)**
59:9;82:14;87:3
**engaged (2)**
83:13;111:4
**engaging (4)**
42:4;54:23;87:5;
88:20
**enough (5)**
12:25;71:21;95:9,
10;108:17
**entails (1)**
21:13
**entirely (1)**
81:23
**entity (2)**
82:23;83:6
**envision (1)**
70:6
**equal (1)**
16:24
**equity (1)**
17:1
**error (1)**
65:2

**errors (2)**
64:23,24
**escapes (1)**
10:21
**especially (1)**
30:7
**essentially (1)**
73:21
**establish (1)**
121:7
**established (3)**
52:20;91:19;
105:17
**establishing (1)**
131:13
**Estate (1)**
4:22
**estimating (1)**
9:25
**et (2)**
4:3;5:14
**Ethel (1)**
58:2
**ethically (1)**
45:25
**even (9)**
33:22;38:5;42:11;
50:12;70:18;91:12;
94:16;122:9;123:8
**everybody (3)**
12:13;59:11;135:5
**evidence (39)**
48:5,7;51:20;
52:20;55:6,7,8,24;
56:7;59:18;64:1;
76:15;80:25;88:14;
90:16;96:5,17;97:16;
99:15;101:17;
102:25;110:16,21;
111:9;112:1,6,19,24;
113:1,7;114:14;
129:9;132:4,15;
133:6,23,25;134:3,9
**exactly (1)**
118:18;119:9
**exam (1)**
8:19,21;9:7
**EXAMINATION (6)**
5:8;115:25;117:20;
121:1;127:11,17
**examined (1)**
5:4
**example (7)**
37:9;40:7;41:21;
42:25;43:23;44:17;
106:2
**examples (1)**
42:10
**except (1)**
81:23
**exception (1)**
30:14
**exceptions (3)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

USDC IN/ND case 2:17-cv-00032-TLS document 368-2 filed 02/26/22 page 399 of 940

Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019

37:9;38:19;43:3

**excerpts (2)**
22:12,13
**exchange (3)**
118:19,20;120:24
**exchanges (1)**
23:22
**exclusively (1)**
56:24
**exculpate (2)**
51:21;55:6
**exculpatory (3)**
55:2;64:1;134:8
**Excuse (7)**
33:12;54:8;61:12;
97:14;99:3;107:9;
111:17
**execution (1)**
56:10
**executive (1)**
84:16
**Exhibit (72)**
27:5,9,11;28:10;
46:19,20,23,24;51:2;
55:3;58:16,17,20;
60:5,6;63:6,7,10;
64:5;65:16;68:21,25;
69:1;70:20,24,25;
72:7,11,15,15;90:5,6,
10,18;92:1,2,4,5,8,16,
18;93:1,20;98:8;
100:14;103:15;
104:14;105:5;
110:11;113:21;
115:9,10,13,21;
116:16;117:19,24;
118:23;121:4;127:5,
6,13,16,22;128:7,7,9,
21;129:20;130:24;
131:18,20
**exhibits (1)**
133:4
**exist (1)**
15:17
**existed (1)**
78:17
**existing (1)**
26:17
**exists (2)**
51:20;55:5
**experience (5)**
6:7;15:19;29:21;
30:13;94:22
**experienced (1)**
76:16
**expert (1)**
43:23
**explaining (1)**
108:2
**explanation (1)**
133:11
**explicitly (1)**
130:2

**explore (1)**
42:18
**expressly (1)**
130:2
**extremely (1)**
73:13
**eyewitness (3)**
56:7;133:24;134:1

**F**

**face (2)**
108:19,21
**facetious (1)**
34:23
**fact (21)**
33:21;52:21;55:18;
67:9;68:2;76:21,23;
82:2;95:4;96:9;
116:21,24;121:8,12;
122:23;126:10,22;
128:1;130:3;131:14;
132:21
**factor (1)**
56:8
**factors (1)**
36:11
**facts (4)**
59:18;80:25;87:24;
88:14
**failed (2)**
33:5,18
**fails (1)**
33:16
**fair (3)**
12:25;56:17;85:15
**fairly (3)**
21:7;44:17,18
**fall (2)**
8:24,25
**false (1)**
33:7
**family (4)**
45:10;94:16,25;
97:6
**far (3)**
59:10;60:1;63:25
**fashion (3)**
6:2;114:10;126:11
**favorable (1)**
76:6
**February (12)**
95:18;98:13;
101:15;118:9;119:9;
120:11;121:9;
124:15;125:17,22;
126:24;129:6
**February-March (1)**
129:1
**Federal (1)**
20:11
**feel (4)**
25:25;26:4,19,21

**fees (1)**
72:5
**fellow (5)**
9:20;67:11;120:21,
22,23
**felony (5)**
12:17,20;13:1;
14:8;33:6
**female (1)**
62:4
**few (5)**
43:2;89:11;94:3,3;
106:18
**fiance (3)**
102:1;103:10;
116:20
**figure (1)**
90:1
**file (8)**
25:17;47:8,9,19;
49:25;59:4;64:21;
112:5
**filed (9)**
28:14;32:14;51:4;
60:4,9,18,19;63:12;
65:3
**filing (5)**
47:17,20;58:20;
60:7;64:11
**finance (1)**
108:2
**find (8)**
88:10;112:20,21,
23,24,25;113:1,3
**fine (3)**
50:19,21;118:17
**fingerprint (1)**
55:7
**fingerprinting (1)**
57:10
**fingerprints (5)**
55:14,22,23,24;
134:6
**finish (1)**
6:20
**firm (10)**
9:16;13:6;14:20,
22;15:8;16:22;17:18;
18:1;60:11;72:9
**first (21)**
5:3;8:19,21;9:1;
22:10;25:8,12;28:15;
33:25;35:8,23,25;
45:4,5;47:11;78:7;
92:25;106:20;
115:16;125:2;127:13
**fit (1)**
112:14
**fitting (1)**
52:4;114:11
**five (1)**
60:8
**flighty (1)**

42:3
**fluid (1)**
38:8
**flush (1)**
45:15
**focus (7)**
10:2;11:17;15:11,
17;18:8,20;120:21
**folks (3)**
107:22;112:17;
113:2
**follow (2)**
57:5,8
**following (2)**
51:20;55:5
**follows (1)**
5:5
**Force (1)**
15:3
**Forest (1)**
8:1
**forgetting (1)**
15:13
**form (83)**
19:17;21:3;26:7,
25;29:11;30:6,19;
32:5,18;33:9,19,23;
34:4,20;35:17;37:23;
39:8,25;41:10;43:19;
45:17;46:10;47:22;
48:19;49:11;52:12;
53:10;54:5;56:21;
57:4,5;60:24;61:10,
18,24;64:17;65:24;
68:5;69:15;79:17;
81:19,22;82:10;83:8,
21;84:2,18,24;85:14,
17;86:5,21,25;87:2,
13,20;88:13;97:10;
101:16;102:10;
103:16;110:10;
111:14,19;113:9;
115:3;116:12;
117:14;119:10,18;
120:6,12;121:19;
122:8;123:4;124:19;
125:24;128:3,12;
130:8;131:17;132:9,
24
**formal (2)**
39:19;45:6
**formed (1)**
17:22;18:4
**former (1)**
104:13
**formula (1)**
30:11
**forward (2)**
21:11;111:9
**foundation (28)**
29:1,12,19;30:7;
31:14;32:6;33:10;
34:4,24;40:1;41:11;

47:2;59:17;62:11;
65:25;68:5;69:15,23;
84:3;85:17;87:14,21;
88:14;92:20;97:11;
99:1;111:20;123:5
**foundations (1)**
32:19
**frankly (1)**
110:25
**frequency (1)**
43:24
**frequently (3)**
43:8;44:1,2
**front (15)**
5:22;42:19;60:2;
77:3,5,11;95:20;
98:16;104:15;
108:18;111:15,21,24;
116:16;118:20
**fronted (1)**
76:21
**full (1)**
7:5
**full-time (1)**
98:2
**further (1)**
131:2
**future (1)**
83:11

**G**

**Gary (21)**
4:10,18;5:15;7:8;
16:2,9,10,11,12;
65:19;72:23,25;77:6,
22;83:19,25;88:18;
99:17;110:19,23;
111:11
**gather (2)**
36:15;70:11
**gave (3)**
74:13;76:5;128:7
**general (10)**
8:3;10:4,5,10;
11:22;33:19;34:19;
50:17;55:25;66:25
**gentlemen (1)**
94:2
**given (10)**
45:4;67:15;76:19,
23,24;92:11;93:12;
102:20;108:22;
114:11
**giving (5)**
42:19;93:7,9;
108:1;129:4
**Glen (1)**
100:20
**God (2)**
75:11;76:17
**goes (5)**
33:18;75:7;90:18;

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE, et al

Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 02/26/24    page 400 of 940

106:8;118:16
**Goldblatt's (4)**
  58:10;97:25;98:14;
  99:16
**good (3)**
  89:2;94:2;135:9
**Goodman (1)**
  59:23
**Gottshall (2)**
  17:18;18:3
**government (1)**
  15:19
**graduated (2)**
  8:16,17
**grainy (1)**
  67:12
**Grand (1)**
  107:25
**granted (3)**
  36:1;82:2,5
**granting (1)**
  27:16
**grants (1)**
  64:5
**group (5)**
  17:12;82:8,17,23;
  83:6
**grunts (1)**
  6:19
**guess (1)**
  132:1
**guessing (1)**
  59:20
**gun (2)**
  112:16,25
**guy (3)**
  102:4,5;112:15

**H**

**habeas (1)**
  25:18
**habit (6)**
  35:12,13,16;55:19;
  61:7;93:17
**hac (1)**
  20:17
**HALL (3)**
  4:19,19;134:16
**hand (1)**
  72:14
**handed (6)**
  27:10;63:10;65:17;
  90:9;127:9,15
**handle (1)**
  14:23
**handled (1)**
  79:19
**handling (3)**
  11:19;22:6,6
**hands (1)**
  75:12
**handwriting (1)**

71:15
**happen (1)**
  53:2
**happened (9)**
  23:13;54:16;60:11;
  91:22;95:5;108:25;
  109:17;114:5;128:23
**Hartman (1)**
  9:5
**heads (1)**
  6:19
**hear (23)**
  97:14,22;99:3,4;
  100:18;106:1,2,4,16;
  107:14,16,20;108:16,
  17,20,21,24;109:1,
  15,21;112:12;114:2,6
**heard (2)**
  34:22;97:2
**hearing (4)**
  31:2;79:23;80:1,21
**hearsay (1)**
  79:17
**held (2)**
  97:24;134:20
**help (7)**
  22:4;46:9;60:22;
  70:12;75:8;106:25;
  131:25
**helped (2)**
  73:21;87:5
**helpful (5)**
  41:7,20;42:1;
  43:16;74:14
**helpfulness (1)**
  70:9
**herein (1)**
  64:2
**high (3)**
  43:24,24;112:18
**highest (3)**
  7:16,17,19
**high-risk (1)**
  42:4
**himself (1)**
  31:23
**hired (8)**
  10:14;12:3;13:5,
  13;21:4,14;25:7;
  100:23
**hold (2)**
  20:3;85:16
**home (2)**
  100:9,19
**honored (1)**
  38:6
**honoring (1)**
  55:1
**hopefully (1)**
  5:22
**Hopkins (10)**
  91:5,11;101:7,12,
  18,23;102:4,14;

122:15;132:14
**hour (1)**
  100:8
**house (2)**
  112:13;113:2
**How's (1)**
  133:21
**HUNTER (1)**
  104:12
**husband (2)**
  102:1;116:20
**hypothetical (1)**
  66:1

**I**

**idea (6)**
  9:21;10:8,18;
  11:12;19:8;133:14
**identification (18)**
  27:6;46:21;55:17,
  25;58:18;63:8;68:22;
  69:3,13;70:21;72:12;
  90:7;92:6;110:8,9,
  12;115:11;127:7
**identified (4)**
  27:15,18;123:21;
  132:17
**identifies (1)**
  127:15
**identify (3)**
  4:15;46:24;121:14
**identifying (2)**
  73:13;122:4
**Illinois (4)**
  7:24;8:1;20:13,15
**imagine (1)**
  110:25
**immediate (1)**
  124:23
**immediately (3)**
  7:1;8:18;12:11
**impacting (1)**
  36:8
**impeached (2)**
  76:11,13
**impeaching (1)**
  98:7
**impeachment (2)**
  81:8;126:16
**imperfectly (1)**
  99:7
**improper (9)**
  81:7;98:6,8;
  103:15;104:13;
  118:23;121:4;
  126:16;131:18
**inaccurate (2)**
  105:19,20
**inaccurately (1)**
  113:12
**inactive (1)**
  19:10

**inappropriate (1)**
  88:20
**incident (5)**
  85:24;86:2,15,20;
  88:5
**include (1)**
  10:5
**includes (1)**
  29:25
**including (2)**
  38:8;76:22
**incomplete (1)**
  65:25
**incongruities (1)**
  45:8
**inconsistencies (1)**
  45:16
**inconsistent (2)**
  81:16,21
**incredibly (2)**
  94:21;95:2
**independent (14)**
  20:19;47:15;58:3;
  67:7,10;82:3;94:12;
  111:8;117:10;
  119:15,22;122:17,21;
  129:25
**independently (1)**
  68:18
**Indiana (18)**
  4:5,10;7:8,13;12:4;
  13:15;15:22;16:11;
  20:7,9,13;25:17;
  37:4;50:8;69:5;
  90:12;92:10;103:12
**indicate (5)**
  92:16;101:9;103:8;
  112:8;133:25
**indicated (9)**
  48:7;49:20;99:14;
  100:16,22;102:3,24;
  103:20;115:17
**indicates (4)**
  91:1;100:7;108:15;
  119:24
**indicating (1)**
  23:7
**indication (2)**
  46:4;66:17
**individual (3)**
  52:3,21;129:19
**ineffective (13)**
  26:4,9,14,19;29:9,
  17,25;30:4,10;32:1,7,
  16,24
**ineffectively (1)**
  32:2
**inform (1)**
  75:2
**information (32)**
  25:14;36:15,23;
  41:7,22,24;45:11;
  46:9;59:5;62:12;

63:12,16,23;64:7,13,
  22;65:5,22;66:8,22;
  67:25;69:12,19;
  70:11;71:1;73:4;
  74:13;76:5,24;84:10,
  22;110:16
**in-house (1)**
  10:24
**Initially (1)**
  15:24
**innocent (1)**
  21:8
**input (1)**
  45:9
**inside (1)**
  67:2
**instruction (2)**
  33:6,17
**intend (1)**
  116:17
**intended (1)**
  116:23
**intentional (1)**
  134:8
**intentionally (1)**
  83:3
**interest (1)**
  18:5
**interested (3)**
  67:13;82:7;118:4
**internal (1)**
  85:23
**interviewed (1)**
  73:18
**interviewing (1)**
  73:10
**into (8)**
  12:17;14:19;21:16;
  36:11;50:14;56:8;
  75:1;132:14
**invalid (1)**
  111:12
**investigated (1)**
  40:16
**investigating (2)**
  63:24;70:2
**investigation (4)**
  42:3;70:3;85:23;
  109:1
**investigative (2)**
  60:12,21
**involved (1)**
  20:21
**involvement (1)**
  55:9
**involving (12)**
  34:11;60:22;90:11;
  91:9;92:9;93:8;
  102:16;123:1;
  124:16;130:4;
  131:15;132:7
**Isolated (3)**
  88:2,5,7

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

Case No. 2:17-CV-00032     Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS     document 368-2     filed 10/20/22     page 401 of 940

**issue (3)**
25:19;38:5;52:5
**issued (1)**
82:6
**items (1)**
52:1
**Ivory (2)**
69:7,8

**J**

**Jack (1)**
12:6
**Jaminez (2)**
114:4,12
**January (4)**
17:5,5;19:11;86:14
**Jelks (2)**
4:22;5:14
**Jim (1)**
17:20
**Jiminez (1)**
95:16
**job (4)**
9:1;97:24,24;98:12
**jobs (1)**
94:4
**jog (3)**
5:23;104:23;109:7
**John (3)**
4:22;9:12,13
**judge (4)**
56:25;57:19;82:6;
111:24
**July (1)**
4:6
**juncture (1)**
55:15
**June (8)**
25:1;32:4;39:24;
40:14;58:21;60:9;
63:13;65:8
**juries (1)**
133:23
**jurisdiction (1)**
26:17
**jurist (1)**
7:19
**jurors (2)**
59:12;94:5
**jury (31)**
19:5;24:25;25:24;
26:18;39:6;52:16;
53:7,14;55:15;56:19;
57:18;59:9;64:16,19,
22;77:2,5;94:2;
95:11,20,23;96:20;
102:24;110:17;
111:15,21,23;118:21;
130:1,16;133:13

**K**

**keep (1)**
104:17
**key (1)**
36:9
**kicks (1)**
24:19
**killer (1)**
114:12
**Kimerly (1)**
108:18
**kind (6)**
5:22;25:15;50:14;
54:23;56:6;59:24;
76:22;92:22;96:19;
102:5
**King (26)**
4:8;5:2,10;7:6;
16:21;17:3,6;18:5,10,
12;33:4;34:24;46:23;
83:4;89:3,4,5,17;
90:10;92:23;107:14;
115:14;124:24;
127:17;135:2,10
**knew (2)**
86:2;123:14
**knowledge (5)**
67:8,10;87:2;
126:22;129:25
**known (2)**
52:3;59:10
**knows (2)**
75:11;76:17

**L**

**labor (1)**
11:17
**lack (3)**
33:5;57:9;134:2
**ladies (2)**
94:2;109:4
**Lake (5)**
12:4;15:21,24;
64:6;71:20
**larger (1)**
15:5
**last (28)**
7:6;15:25;27:17,
17,20;28:17,19,20,
23;29:7;31:11;33:1;
50:20;57:7,24;60:2;
64:4;71:3,4,12,12,13;
90:20;97:14;99:3;
113:15;118:25;
134:16
**lasted (1)**
23:17
**late (2)**
8:25;106:19
**later (3)**
79:19;100:8;
135:12
**latter (1)**

104:14
**LaVelle (8)**
63:17,25;64:9,15;
65:6,22;66:18;68:2
**law (13)**
7:20;8:11,13,15,
17;9:3,9,16;14:20;
19:22;20:7;37:3;50:8
**lawyer (4)**
6:14;9:8;19:21;
39:5
**lawyers (3)**
5:15;6:3;18:11
**lay (3)**
31:9;34:24;44:19
**laymen's (1)**
48:9
**lead (1)**
45:12
**least (7)**
7:3;18:14;48:22;
49:18;61:25;95:10;
121:25
**leave (1)**
7:1
**left (5)**
10:12;17:20;18:1;
97:23;98:12
**legal (6)**
4:12;7:5;9:1;
10:17;11:20;84:7
**legible (1)**
29:2
**less (1)**
13:13
**letting (1)**
41:23
**Levidco (1)**
4:12
**license (2)**
19:13;20:7
**licensed (1)**
9:8
**licenses (1)**
20:7
**lifestyle (1)**
42:4
**lift (2)**
44:3,17
**light (1)**
64:11
**likelihood (1)**
67:1
**likely (5)**
36:7;46:2,3;55:21;
133:25
**limations (1)**
50:18
**limited (1)**
37:8
**line (23)**
93:2;95:14;96:18;
97:18,22;100:17;

105:7,8,24,25;
106:15;107:11;
108:13;109:14;
112:11,11;113:25;
114:2;117:24,25;
120:19;121:23;131:4
**lined (1)**
49:23
**Lines (1)**
93:25,25;105:9;
106:8;108:14;126:2
**lineup (4)**
110:18;111:7,10;
112:2
**lineups (1)**
110:24
**link (1)**
113:7
**list (3)**
60:19;91:18;
127:19
**listed (4)**
55:18;58:1;60:7;
127:19
**listen (1)**
44:11
**litigants (1)**
30:12
**little (2)**
9:25;14:17
**live (4)**
16:10,11;112:3;
113:2
**living (1)**
16:12
**LLC (1)**
16:21
**load (2)**
13:23;15:6
**local (1)**
75:22
**locale (1)**
73:9
**located (3)**
4:9;9:13;99:16
**location (2)**
7:14;116:25
**lock (1)**
44:19
**locked (1)**
76:7
**long (16)**
5:18;7:14;9:23;
11:13,24;12:19,22,
24;13:1;14:6,7,16;
15:25;17:16;19:9;
114:6
**look (24)**
28:17;33:1;44:10;
45:5;51:17;57:24;
64:4;71:3,5;93:20,
24;101:5;105:24;
107:11;108:13;

117:23;121:22,23;
125:1,2,7,11;126:2;
129:11
**looked (6)**
109:16,21;112:15,
16,18,19
**looking (8)**
72:7;92:22;103:24;
106:7;109:4;111:6;
112:13;123:14
**looks (11)**
47:9;96:16,17;
99:14;109:19;111:4;
112:8;113:25;
119:24;125:2,9
**Loren (2)**
52:2;66:20
**lot (4)**
13:20;15:15;45:3;
60:1
**loud (1)**
6:18
**Louis (1)**
7:6
**lovely (1)**
15:24
**low (1)**
112:19
**Lyles (1)**
18:3

**M**

**magistrate (1)**
82:6
**main (2)**
48:17;69:4
**mainly (1)**
24:5
**maintain (1)**
32:9
**majors (1)**
8:5
**making (9)**
32:20;43:14;66:11;
93:4;95:19,23;98:3,
11;106:20
**manager (4)**
103:22;106:3;
116:23;127:12
**manner (2)**
42:16;54:19
**many (6)**
3:10;18:11;19:5;
29:22;43:4,4
**March (1)**
109:2
**marked (26)**
27:5,8,10;46:19,
20;58:16,17,22;63:6,
7;68:21,24;70:20,23;
72:11,14;90:4,6,10;
92:4,5;115:9,10;

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE, et al

Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING

USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 00/26/22    page 402 of 940

July 17, 2019

117:18;127:5,6
**marketed (1)**
  15:12
**marketing (1)**
  15:16
**Marvin (1)**
  4:11
**Mary (7)**
  72:16,19,25;73:4;
  81:15;91:17,19
**Maryland (6)**
  9:14,23;11:2,7;
  20:8,9
**material (4)**
  47:5;54:13;55:2;
  70:4
**matter (4)**
  4:2;5:13;52:17;
  75:25
**matters (1)**
  11:20
**maximize (2)**
  30:24;31:1
**Maxwell (2)**
  69:8,8
**May (10)**
  28:14;42:5,13;
  43:8;47:10;51:4;
  56:24;60:5;63:25;
  67:1
**maybe (8)**
  8:24;9:25;12:16;
  45:15;55:19;57:2,17;
  117:10
**mayor (6)**
  18:2;83:18;84:13,
  15;85:11;88:8
**mean (34)**
  8:24;13:22;24:15,
  16;25:15;26:9;36:18;
  37:1;38:6;39:9,12;
  40:4,6,7;44:25;
  47:19;54:25;56:6;
  58:8;61:21;70:1,5;
  72:7;75:8;77:2;81:6;
  82:4;91:10;94:7,20,
  22,23;114:13;116:2
**means (2)**
  48:10;54:19
**measures (1)**
  60:13
**mechanism (1)**
  70:10
**meet (3)**
  23:4;25:14;118:2
**meeting (5)**
  21:6;23:12,17;
  24:13;82:3
**member (1)**
  85:21
**members (6)**
  10:17;11:20;84:10;
  85:21;87:3,4

**memorandum (5)**
  27:15,17;28:18,25;
  29:7
**memorialize (1)**
  98:17
**memory (12)**
  5:23;11:9;17:23;
  23:25;73:7;76:14;
  104:23;109:7;
  113:10,23;123:17;
  124:11
**men (4)**
  103:23;106:5;
  118:3;120:9
**mention (2)**
  52:1;101:7
**mentioned (2)**
  55:15;130:25
**Merrillville (4)**
  7:13;13:6;103:11;
  127:12
**met (8)**
  22:9,23;24:11;
  25:5;27:22;35:4;
  47:13;75:17
**methods (2)**
  40:13,16
**meticulous (1)**
  102:4
**Meyer (6)**
  17:18,20;18:2,5,10,
  12
**Michael (2)**
  4:17;5:10
**mid (1)**
  17:25
**middle (1)**
  7:6
**might (7)**
  5:20,23;22:4;59:6;
  70:2;77:1;96:3
**Mike (1)**
  104:6
**minutes (3)**
  22:11;23:18;89:11
**mischaracterization (1)**
  115:21
**misdemeanor (3)**
  12:14,16,20
**Miss (1)**
  132:13
**misstates (6)**
  45:18;62:25;68:5;
  101:17;107:6;128:13
**Mister (1)**
  60:13
**mix (1)**
  11:23
**months (2)**
  14:7,7
**Moos (31)**
  91:5;115:15;116:1,
  4,8,17,22;117:4,12,

20;118:20;119:6,25;
120:3,8;121:1,7,12;
122:4,23;123:20;
124:14;125:5,13,19;
126:4,10,22;130:13,
14;132:12
**Moos's (3)**
  118:6,8;123:25
**more (12)**
  9:25;14:17;15:14;
  22:17;36:21;45:6;
  46:4;51:1;67:15;
  82:1;84:10;85:21
**morning (3)**
  74:6,6;94:3
**Morse (4)**
  9:12,13,24;10:12
**most (5)**
  15:19;44:21;55:21;
  133:22,25
**mother (12)**
  21:5,14,19;24:12;
  25:5,23;35:5;100:22;
  101:1,2,3,4
**motion (11)**
  47:3,4;63:11,22;
  64:6,21,23,24,24;
  65:2;112:3
**motions (4)**
  22:18,19;44:21,21
**motivating (1)**
  76:20
**moved (3)**
  15:20,21;16:2
**moving (1)**
  21:11
**Mrs (12)**
  72:5;79:11;102:17;
  110:7,8;123:23,24;
  124:17;130:5;
  131:16;132:7,8
**much (8)**
  25:25;37:20;38:1,
  10;54:14;120:9,23;
  135:10
**Murdaugh (2)**
  16:21;17:8
**murder (13)**
  25:16,17,20;33:6,
  19;34:20;35:11,14;
  44:2;61:15,17,20;
  103:5
**murdered (1)**
  95:17
**Murdo (1)**
  17:9
**Murdock (2)**
  17:3,7
**must (1)**
  94:20
**myself (1)**
  32:13

# N

**name (19)**
  4:11,17;5:10;7:5,6,
  6;9:22;10:18,21;
  21:22;22:1;59:24;
  66:19;67:3,17;73:2;
  91:10;122:4;129:23
**named (2)**
  9:12;133:4
**names (6)**
  21:17,24;59:10,12;
  91:13;130:25
**narrative (2)**
  21:3;92:17
**nature (1)**
  9:10
**near (1)**
  13:8
**necessarily (6)**
  5:20;29:3;30:5,17;
  56:24;134:25
**need (5)**
  6:23;33:24;39:13,
  14;62:13
**needed (2)**
  7:9;39:17
**needs (1)**
  61:13
**negating (1)**
  55:8
**negatively (1)**
  36:8
**neighborhood (3)**
  114:5,8;115:1
**new (1)**
  64:25
**newly-elected (1)**
  12:4
**next (3)**
  12:2;33:14;118:13
**nickname (1)**
  97:6
**night (7)**
  95:18;102:16;
  106:4,16;108:19;
  112:17;114:6
**nights (1)**
  106:18
**nobody (1)**
  34:8
**nods (1)**
  6:19
**nondisclosure (1)**
  134:8
**nonparty (2)**
  41:3;69:21
**Nor (1)**
  112:25
**norm (1)**
  30:13
**normal (1)**

37:25
**normally (8)**
  35:8;37:20;53:24;
  61:7,8;93:17,19;
  99:15
**North (2)**
  20:18;69:4
**Northern (5)**
  4:4;13:14;20:12,
  13,14
**notably (1)**
  44:21
**note (1)**
  132:16
**noted (1)**
  129:10
**notice (17)**
  41:1;47:3,20;48:2;
  49:25;50:1,7,13,24;
  51:3,17;54:1;60:4,
  18;97:7;102:20;
  127:23
**noticing (1)**
  4:16
**number (6)**
  4:5;6:15,16;7:15;
  129:20,20
**numeral (2)**
  28:21;33:2

# O

**oath (3)**
  41:1;80:23;81:15
**obey (1)**
  99:5
**Object (90)**
  19:17;21:2;26:25;
  29:11,18;30:19;32:5,
  18;33:5,9,16,19,23,
  25;35:17,24;37:23;
  39:8,25;41:10;43:19;
  45:17;46:10;47:2,22;
  48:19;49:11;51:14;
  52:12;53:10;54:5;
  56:21;57:4;60:24;
  61:10,18,24;64:17;
  65:24;68:4;69:14,22;
  79:17;81:19,22;
  82:10;83:8,21;84:2,
  18,24;85:14,17;86:5,
  21,25;87:13,20;
  88:13;92:15;94:10;
  97:10;98:5;101:16;
  103:14;110:10;
  111:14,19;113:9;
  115:3;116:12;
  117:14;119:10,18;
  120:6,12;121:3,19;
  122:8;123:4,11;
  124:19;125:24;
  126:15;128:3,12;
  130:8;131:17;132:9,

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al
Case No. 2:17-CV-00032
USDC IN/ND case 2:17-cv-00032-TLS
Videotaped Deposition of: SCOTT L. KING
document 368-2 filed 02/26/24 page 403 of 940
July 17, 2019

24

**objecting (2)**
104:6,17

**objection (33)**
19:23;26:7,11;
27:4;29:1,18;30:6;
31:14;33:17;34:2;
36:16;38:16;53:16;
59:17;62:10,23;65:9;
79:4,16;80:24;85:17;
88:23;98:9,25;99:6,
20;102:9;104:5;
115:20;118:22;
124:7;130:18;133:17

**objections (6)**
34:15;82:19,25;
100:12;102:19;
106:10

**obligation (5)**
6:24,25;55:1;67:6;
134:25

**obtain (2)**
36:22;41:22

**obviates (1)**
37:15

**obviously (3)**
7:2;21:6;95:9

**occasion (1)**
118:2

**occurred (9)**
25:1,24;51:10;
102:17;103:5;117:1;
121:18;122:7;131:16

**occurring (1)**
73:9

**off (19)**
7:4;12:11,13,13;
24:19;28:24;43:12;
49:5;51:2;59:12;
76:19,22;89:8;
109:23;114:15;
116:15;117:9;
134:19,20

**offense (1)**
38:22

**offenses (5)**
52:5;55:9;58:9;
66:9;108:24

**offer (5)**
47:23;48:1;54:4;
58:6;116:17

**offered (4)**
10:16,17;13:11;
14:9

**offering (1)**
52:19

**office (24)**
7:12;12:12;13:12,
17;14:4,24;17:21;
18:1;19:12;21:16;
22:11;51:4;64:7,15;
65:6,11;68:2;69:2;
71:2;72:16;75:23;

86:12;87:7;135:4

**officer (11)**
43:6,9,12;44:20;
45:5;62:4;76:16;
77:12;80:18;87:24;
88:3

**officers (2)**
43:1,2

**Oltman (1)**
4:11

**once (6)**
9:7;25:5;52:16;
84:13;86:2;88:8

**one (43)**
11:6,6;21:18;
22:17;32:23;36:25;
37:10;41:21;47:12;
48:16,16,22;49:1,18;
51:5,5;52:1,2;61:25;
62:3,19;67:15;75:1;
84:10;85:21;91:16;
93:12,15,20;102:2;
103:24;106:5,18;
112:5,20,21;116:9;
118:3;120:21;
126:17;127:18;
131:11;132:15

**one-man (1)**
95:17

**one's (1)**
38:21

**ongoing (1)**
38:7

**only (4)**
21:25;28:6;52:7;
114:4

**open (8)**
17:3;58:11;77:13;
106:14,19;109:25;
120:25;125:13

**opened (5)**
14:20,22;15:8;
16:15;42:7

**opening (52)**
92:12;93:5,7,18,
23;94:17,24;96:7,10,
11,15,20,22,25;97:8,
19;98:11,18,20;
100:11,16;101:7;
102:3,24;103:8,13;
104:2,9,25;105:6,11;
106:15,23;108:4,9,
12,16;109:12,19,25;
110:2;111:5;112:9,
12;113:6,11;114:1,
20,24;130:15,20,24

**operate (1)**
38:4

**opinion (6)**
32:6,19;41:14;
77:17;82:5;111:20

**opinions (2)**
24:8,9

**opponent (1)**
41:23;42:20

**opportunity (4)**
30:25;31:1;125:4,9

**opposed (2)**
49:16;120:21

**opposing (1)**
41:23

**option (1)**
93:4

**options (1)**
108:2

**order (9)**
38:13;39:6;44:11;
54:11,11;63:11,22;
64:5;68:6

**ordered (2)**
64:13;68:1

**organization (1)**
82:9,17,23

**organized (3)**
6:1;15:2,5

**originally (1)**
7:22

**others (2)**
86:18;88:4

**otherwise (1)**
50:16

**out (23)**
6:18,20;20:3;23:9;
42:8;45:15;49:2,8;
56:2,13,16,19;80:14,
22;89:3;90:1;102:6,
18;111:3;116:21;
121:10;129:16;131:6

**outburst (2)**
94:25;95:7

**outcome (1)**
54:18

**Outlaw (4)**
4:3,20;5:14;75:4

**outline (2)**
96:16,19

**outlined (1)**
97:17

**outset (1)**
24:15

**outside (5)**
5:11;20:7;69:18;
79:13;111:23

**over (20)**
6:5,6,12,12;17:24;
23:20;27:23;47:13;
50:14;55:2;60:3;
79:15,18;88:17;
105:8;106:8;108:14,
23;118:16;128:21

**own (6)**
14:20,20,22;15:8;
16:15;38:21

---

**P**

**page (61)**
27:17,17,20;28:15,
18,20,23;29:7;31:11;
33:1;51:17;55:3;
57:25;64:4;71:4,13;
90:20,21;92:14,25;
93:24,25;96:18;
97:17;101:6;103:12,
25;104:1;105:4,7,8,
24;106:8,14;107:11;
108:11,15,23;109:14;
112:8;113:24;
115:16,17;117:17,23;
118:16;119:25;
120:19;121:22;
125:1,2,7,11;126:2;
127:13;128:15,20,23;
129:11;131:1,23

**paper (1)**
104:8

**paragraph (4)**
33:3;51:18;63:17,
22

**paraphrase (1)**
113:13

**Park (1)**
100:20

**part (39)**
5:18;10:16;13:23;
29:8;30:11;35:3;
45:20,20,23;49:6;
50:20,25;52:6;54:11;
55:10;57:7,24;65:1,
7;70:3;82:1,8,16;
87:2;92:8;95:17,22;
97:14,16;101:10;
102:13;103:2;107:3;
109:24;111:1;
113:15;118:25;
127:9;134:17

**particular (7)**
22:14;43:11;54:20;
75:5;85:7;95:6;134:7

**particularly (5)**
30:12;36:9;44:8;
94:6,14

**partner (5)**
16:23,24;23:6;
78:11;79:13

**partners (2)**
17:2,12

**partnership (2)**
17:6,22

**partnerships (1)**
16:25

**parts (2)**
90:10,13

**party (1)**
4:15

**passage (1)**
36:6

**passed (2)**
8:21;9:7

**Past (3)**
21:24;107:19;
131:25

**pathologist (2)**
44:1,6

**Paul (6)**
103:10,17,22;
106:3,17;127:12

**pay (2)**
120:9,22

**paying (1)**
72:4

**PCR (3)**
79:19;81:25;82:2

**people (9)**
34:1;44:19;45:10;
94:15;97:2;114:8;
127:18;129:16;
130:14

**perceive (1)**
45:23

**percent (1)**
24:17

**percentage (1)**
10:8

**perform (1)**
26:16

**performance (1)**
33:15

**Perhaps (1)**
56:5

**peril (1)**
42:14

**period (7)**
15:7;18:7;24:13;
36:22;39:3;106:17;
114:9

**periodically (1)**
87:5

**periods (1)**
60:21

**perpetrated (1)**
73:15

**perpetrator (3)**
52:5;53:8;108:23

**person (26)**
30:16;35:14;36:25;
50:3;52:2,2,4,10;
67:20;68:3;73:15;
109:20,23;112:22;
114:10;121:14,16;
122:4,5,24;123:21;
125:16,21;126:7,23;
127:20

**personally (2)**
18:21;31:7

**personnel (1)**
107:16

**person's (2)**
24:18;37:5

**pertaining (1)**
64:9

**peruse (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al
Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 10/26/22    page 404 of 940

92:13
**petition (7)**
25:18;27:11;28:7,
13;31:1;44:3,16
**Petitioner's (1)**
28:12
**phases (1)**
32:13
**Phil (1)**
125:3
**photo (1)**
67:17
**photograph (5)**
67:12,19;109:5,22,
23
**photographic (1)**
112:3
**photographs (5)**
69:7;70:4;109:5,
16;111:6
**physical (6)**
55:8;56:7;67:15;
110:24;113:7;134:3
**pick (4)**
15:23;108:20;
121:16;129:16
**picked (1)**
129:19
**picture (4)**
121:12,13,24;
129:17
**piece (1)**
112:21
**place (16)**
24:14;37:3;48:6,6,
51:8;53:7;57:21;
76:1;114:25;120:24;
123:2,23;124:17;
130:6;132:5,8
**plaintiff (2)**
4:24;116:19
**plaintiff's (2)**
22:10,24
**plan (2)**
10:16;96:20
**planned (1)**
59:15
**plans (1)**
102:5
**plea (2)**
28:1;44:13
**pleading (2)**
58:22;127:24
**please (7)**
4:14;5:1;46:25;
118:25;119:2;124:3;
134:17
**plural (2)**
49:15;100:25
**plus (1)**
24:17
**pm (8)**
4:7;89:9,14;97:23;

98:13;120:1;134:19;
135:12
**Point (6)**
16:1;56:3;69:4;
75:24;122:16,20
**pointed (4)**
56:2,13,16,19
**pointing (1)**
111:3
**police (35)**
22:19;42:25;43:1,
9;44:20;62:4;65:19;
67:2;73:11,18;74:9;
75:17;76:16;77:6;
78:2,14,15;79:13;
80:15,18;84:11;
85:11,15,21;86:9,9;
87:3,4,9;108:25;
110:19,23;111:3,11;
112:13
**policewoman (2)**
72:23;73:1
**policy (1)**
88:19
**Pontiac (9)**
103:11,17;106:17;
107:15,17;115:15;
116:23,24;127:12
**portion (1)**
128:6
**portions (1)**
22:15
**position (9)**
9:3;10:25;11:10;
12:2,9;13:11;14:9,
10;132:20
**positively (1)**
132:17
**possession (1)**
69:7
**possible (8)**
6:13;54:15;70:7;
80:5,8;81:10,14,23
**possibly (1)**
57:15
**post (12)**
22:16,19;27:11,16;
28:1,4,13;29:23;
79:22;80:1,20;81:25
**potential (1)**
59:12
**potentially (2)**
46:8;59:6
**power (2)**
84:21;85:3
**practice (23)**
9:19;10:4,5,10;
11:17;14:19;15:18;
16:15;18:19;35:12,
13,15,21;38:11;
40:22;42:10;43:1;
55:19;71:19;87:11,
15;88:10,19

practiced (1)
11:14
**practicing (6)**
6:15;8:18,22,23;
9:9;19:9
**practitioner (5)**
9:8,16,17;17:14;
18:9
**pre (1)**
22:18
**precise (2)**
51:1;73:16
**prejudice (1)**
38:25
**preparation (3)**
32:3;72:2;74:11
**prepare (1)**
62:9
**prepared (5)**
27:12;31:7,7,23;
59:9
**preparing (4)**
21:12;26:5;43:17;
61:1
**presence (1)**
77:2
**present (3)**
6:3;23:25;52:16
**presented (5)**
55:11,24;111:7;
114:7;133:6
**presenting (1)**
48:5
**pressing (1)**
105:23
**pressing (1)**
6:24
**pressure (2)**
75:3;77:7
**pressured (4)**
77:14;79:12;80:13;
88:4
**pretrial (2)**
32:8;44:21
**pretty (1)**
25:25
**previous (3)**
114:15;127:22;
130:23
**previously (1)**
118:24
**Price (2)**
58:1;91:4
**prices (2)**
108:1,1
**primarily (1)**
18:20
**principal (1)**
16:22
**Principally (2)**
14:2;15:5
**prior (1)**
42:7

**private (1)**
14:19
**privately (1)**
77:16
**pro (5)**
20:17;29:22,24;
30:12,16
**probable (1)**
25:13
**probably (8)**
6:16;19:7;36:18;
40:19;50:8;53:1;
66:19;79:19
**problem (1)**
77:4
**problems (2)**
110:18,22
**procedure (3)**
88:19;110:18;
111:4
**procedures (1)**
111:10
**proceeded (1)**
75:2
**proceeding (3)**
22:16;28:8;81:25
**proceedings (3)**
4:16;56:3;135:11
**produced (2)**
64:14;68:1
**production (2)**
47:5;69:6
**professional (4)**
5:12;6:6,25;17:23
**program (1)**
8:3
**prohibitions (1)**
15:16
**prompted (2)**
73:20;80:16
**proofing (1)**
52:25
**properly (1)**
62:9
**proposition (1)**
56:1
**prosecution (1)**
50:1
**prosecutions (1)**
133:23
**Prosecutor (9)**
12:4,10;44:9;
54:12,12,21;59:5;
78:18;79:2
**prosecutors (1)**
77:12
**prosecutor's (7)**
12:12;13:12,16;
14:4;51:4;75:12,23
**protocol (1)**
25:16
**provide (3)**
59:4;60:12;66:8

**provided (2)**
32:9,16
**providing (1)**
67:4
**public (2)**
19:12;76:22
**purchase (2)**
101:14,15
**purchasing (1)**
118:5
**purport (1)**
38:5
**purportedly (2)**
67:12,19
**purpose (3)**
47:20;50:5;96:22
**purses (1)**
112:16
**pursuant (1)**
41:1
**put (13)**
5:22;53:22,24;
54:3;57:17,18;73:20;
76:19;90:16;110:14,
17,18;133:13
**putting (4)**
50:1;77:6;110:21;
111:9

---

**Q**

**quartered (1)**
10:15
**quickly (2)**
6:12;111:5
**quote (2)**
75:10;108:16
**quote-unquote (1)**
52:9

---

**R**

**raised (1)**
48:17
**raising (1)**
51:6
**range (1)**
38:20
**ranged (1)**
11:21
**rather (3)**
30:13;39:20;75:10
**read (23)**
25:12;31:15;45:4;
59:11;82:3,5;105:8;
107:4,12;111:1;
113:11,17;116:13;
119:1,3;122:9,12;
123:12;124:3,4;
126:3;128:6;131:19
**reading (4)**
109:7,24;116:15;
123:8

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al
Case No. 2:17-CV-00032   Videotaped Deposition of: SCOTT L. KING
USDC IN/ND case 2:17-cv-00032-TLS   document 368-2   filed 01/26/22   page 405 of 940
July 17, 2019

**ready (8)**
26:1;39:24;40:13;
60:13,22;61:1,6;
68:14
**reality (2)**
45:20;134:2
**realized (1)**
88:18
**really (1)**
126:8
**reason (10)**
96:8;97:9;98:22;
99:9;105:21,23;
107:3;119:16;126:9,
20
**reasonable (1)**
66:25
**reasonably (1)**
46:2
**reasons (1)**
118:23
**recall (102)**
11:11,16,24;12:24;
13:2;21:5;24:4,21;
25:19;29:20;33:20;
35:7,9,10;40:5,8,15,
21;47:15;49:5,10,15;
52:18,19;53:15,17,
19;56:11;58:8;60:10,
20,25;62:7,15,17,21,
22,24;63:4;65:1,4,5,
14,19;67:13,23;
69:18;70:15,18;71:8,
25;72:4,19,24,25;
73:10,17,24;74:1;
79:25;80:4;90:15;
91:8,22;93:7,9,15;
94:13;95:3,4,6,19,21,
22;98:3,11;106:4,20;
110:14,16,25;117:12;
119:11;120:24;
121:20;122:3,3,22;
123:25;124:11,13;
125:13,19,25;126:21;
127:25;128:20,23,25;
129:24;131:7;132:3
**recant (1)**
76:10
**recess (1)**
89:12
**recipe (1)**
134:9
**recognizance (1)**
38:21
**recognize (8)**
29:4;91:13;125:16,
20;126:6;127:24;
129:15;131:5
**recollect (2)**
13:8;107:18
**recollection (41)**
20:20,24;21:1,4;
22:5;31:5;33:8,13;

40:10;47:16;52:24;
58:4;59:13;67:18;
70:6;73:3,16,19;
91:12,14;102:13;
105:10,14,16;110:1;
111:8;113:4;114:17;
116:3;117:11;118:7,
14;119:15,22;120:2;
121:6,11;122:19,21;
123:6;126:17
**record (16)**
4:2,14;7:5;27:10;
46:25;49:24;54:14;
89:9,14,16;104:16;
129:23;134:19,21,23,
23
**recorded (1)**
42:8
**records (1)**
69:19
**refer (4)**
96:24;97:2,3,7
**reference (1)**
28:6
**referenced (4)**
92:1,2;131:23;
132:15
**references (1)**
59:19
**referring (1)**
96:3
**reflected (2)**
107:13;109:11
**reflection (1)**
82:1
**reflects (10)**
99:19,21,22;
100:18;105:2;108:8;
109:18;110:6;
113:25;114:23
**refresh (9)**
22:5;105:14,15;
107:2;110:1;113:4,
10,23;114:16
**refreshed (2)**
123:17;124:12
**refreshes (1)**
105:10
**refreshing (2)**
98:7;126:16
**regarding (14)**
15:16;20:20;22:5,
16;63:16;64:14,15;
65:6,22;66:9;67:11;
105:12;108:5,9
**regardless (1)**
38:22
**related (5)**
6:9;27:25;28:3;
64:23;114:24
**relates (3)**
30:7;86:19;110:7
**relation (1)**

74:10
**relationship (1)**
9:11
**relative (1)**
36:4
**relatively (3)**
40:22,23;43:24
**release (8)**
38:21;63:11,16,23;
64:7,21;74:2,24
**released (2)**
74:16;75:13
**relevance (15)**
35:18,24;82:13;
83:22;84:19;85:18;
87:1;94:11;102:10;
103:15;132:25
**relevant (2)**
41:8;56:25
**relief (11)**
22:16;27:12,16;
28:1,5,13;29:8,23;
79:22;80:1,21
**remarkably (1)**
114:10
**remarks (1)**
94:17
**remedial (1)**
87:6
**remedy (2)**
38:20,20
**remember (52)**
5:20;6:17;9:1,10;
12:7,19;14:13;17:19;
18:6,13;21:6,7,17,22,
24,25;22:1,9;24:1,12;
25:8;47:14;53:6;
55:10,13;67:18;
68:12,17;69:8,11,16;
74:9;96:2,4;99:24;
102:7;104:19;105:1,
11;106:4,5;107:22,
23,24,25;108:3;
110:21;118:18,19;
119:7;129:4;130:19
**remembered (1)**
103:23
**remembers (2)**
104:8,24
**remotely (1)**
112:22
**repeat (2)**
60:15;118:25
**rephrase (3)**
40:12;53:5;60:17
**replace (1)**
86:15
**replaced (1)**
86:9
**Report (2)**
78:13;84:14
**reported (3)**
78:12;79:1;100:13

**reporter (11)**
4:13;5:1,7;6:4,18,
21;33:24;34:5;99:6;
119:3;124:4
**Reporters (1)**
4:14
**reports (5)**
22:19,20;24:5;
43:3,7
**represent (3)**
4:18;39:7;41:9
**representation (5)**
5:16;6:7;10:17;
35:3;130:23
**represented (4)**
28:9;91:3;98:19;
115:6
**representing (2)**
4:12,22
**reputation (2)**
54:22,22
**request (7)**
28:4;29:8;35:16;
37:10;38:13;63:15;
66:7
**requested (1)**
35:5
**requesting (2)**
69:12,18
**requests (1)**
69:6
**require (1)**
50:16
**required (1)**
37:3
**requirement (1)**
50:25
**requires (1)**
7:1
**requisite (1)**
72:4
**reschedule (1)**
135:1
**reside (3)**
7:7;16:3,6
**residence (2)**
15:23;100:19
**respect (1)**
49:18
**respectful (1)**
134:12
**responding (2)**
45:5;74:23
**response (4)**
47:6;68:11;74:7;
124:23
**restraining (1)**
43:6
**reveal (1)**
64:1
**review (6)**
22:4,8;117:9;
119:7;122:21;132:11

**reviewed (2)**
47:16;102:23
**reviewing (1)**
92:24
**Rhonda (6)**
62:15,18,21;
108:17;114:3,13
**Ricardo (1)**
4:19
**Richard (3)**
91:5;127:11,16
**Rick (3)**
103:21;105:12;
106:1
**right (64)**
6:10,22;7:3;8:11,
23;11:5;12:25;13:4,
21;16:8,19;19:5;
22:3;25:2;31:20;
32:23;34:7,10;36:25;
37:10;48:15;50:9;
53:3;62:21;63:19;
66:21,23,25;72:24;
74:17;75:24;76:11;
84:1;85:10;88:17;
89:10,22,24;90:9;
92:8,19;97:16;99:24;
100:1;101:23,25;
105:15;115:13;
118:1;120:20;
121:22;122:1,2,16,
18,20;123:9,14;
124:6;127:4,9;129:2;
134:11;135:6
**rings (2)**
59:24;73:2
**risk (1)**
75:10
**River (1)**
8:1
**robbed (1)**
114:9
**robber (1)**
114:12
**robberies (3)**
67:17;103:3;
114:25
**robbery (4)**
33:6;35:11,15;
114:3
**robbery-murder (1)**
114:4
**Roman (2)**
28:21;33:2
**Ron (1)**
115:15
**Ronald (1)**
91:5
**room (2)**
23:2;31:4
**rooms (1)**
75:1
**routine (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

Case No. 2:17-CV-00032
document 368-2 filed 02/26/22 page 406 of 940

Videotaped Deposition of: SCOTT L. KING
July 17, 2019

11:20
**Rule (4)**
  37:4,4,17;38:24
**rules (1)**
  75:22
**run (1)**
  75:10

———————

**S**

**sadly (1)**
  38:9
**salesmen (1)**
  107:20
**same (19)**
  17:1,13;19:23;
  26:11;27:4;34:1;
  36:23;41:22;73:9,9;
  80:18;82:19,25;
  98:25;100:12;102:9,
  19;106:10;114:9
**sandbagging (1)**
  54:13
**saw (2)**
  94:15;108:19
**saying (15)**
  16:8;30:3;39:2;
  56:16,17;57:9,12;
  66:13;81:17;85:12;
  86:23;104:24;
  105:11,18,20
**scale (1)**
  15:5
**scenario (1)**
  37:22
**schedule (1)**
  90:2
**school (4)**
  8:11,13;9:3;43:13
**Scott (6)**
  4:8,23;5:2;7:6;
  22:25;135:6
**scratch (1)**
  119:23
**scripted (1)**
  45:22
**se (4)**
  29:22,24;30:12,16
**searched (1)**
  112:13
**second (9)**
  28:17,19,20;29:7;
  33:1,3;34:13;36:3;
  71:12
**section (1)**
  90:18
**secure (3)**
  26:22;68:15;72:5
**selection (1)**
  59:9
**semi-retired (1)**
  9:21
**sending (1)**

71:8
**sense (1)**
  113:20
**sent (5)**
  69:2;71:1;72:16;
  75:13;91:16
**sentence (2)**
  33:14;94:13
**September (1)**
  89:24
**serious (2)**
  77:23,25
**serology (1)**
  134:5
**served (1)**
  7:12
**serves (4)**
  11:9;17:23;73:7;
  76:14
**set (5)**
  23:11,13,13;54:11,
  20
**setting (3)**
  5:12;76:22;81:11
**several (1)**
  79:18
**shaky (1)**
  45:13
**shall (1)**
  42:3
**shared (1)**
  100:20
**shares (1)**
  16:25
**Sharon (2)**
  100:21,24
**Sheila (7)**
  21:18,22,25;91:4,
  10;100:21,24
**shopping (9)**
  49:2,9,20;58:11;
  99:17;102:18;103:1,
  2;116:21
**shorten (1)**
  36:14
**shorter (1)**
  36:22
**Shortly (1)**
  25:14
**shot (1)**
  114:6
**show (23)**
  24:2;27:8;34:25;
  46:18;58:15;63:5;
  67:24;68:17,24;
  70:23;89:21;90:4;
  92:3;96:17;103:21;
  110:22;111:9;112:1;
  115:8;116:23;127:4;
  134:23;135:9
**showed (2)**
  24:2;110:17
**showing (4)**

56:17;96:21;122:3;
  132:3
**shown (9)**
  22:12,13;53:6,13;
  56:18;80:25;102:25;
  121:12,13
**shows (2)**
  91:3;117:19
**show-up (1)**
  112:2
**shutter (1)**
  76:25
**sic (2)**
  17:4;71:2
**sides (1)**
  38:4
**signature (8)**
  28:24;29:2;31:12,
  19;47:9;59:1;63:19;
  127:24
**significant (1)**
  95:13
**significantly (1)**
  39:21
**signing (1)**
  28:24
**similar (2)**
  23:24;114:10
**Sisson (16)**
  91:5;103:21;
  105:12;106:1;
  127:11,16,18;128:1,
  25;129:4,25;130:14;
  131:2;132:5,12,17
**sister (13)**
  21:15,19;24:12;
  25:6,23;35:4;100:23;
  101:14,24;102:15;
  103:9;116:19;132:13
**sisters (7)**
  21:5;49:3,19;
  100:20,25;101:1;
  102:2
**sister's (1)**
  103:10
**sit (14)**
  20:20;44:10;59:13;
  67:8,10;70:14;77:11;
  94:5;123:19;125:12;
  126:20;127:25;
  128:6;132:2
**Six (1)**
  14:7
**sold (1)**
  18:5
**solicited (1)**
  131:11
**solo (5)**
  9:15,15,17;17:14;
  18:9
**Somebody (2)**
  23:6;70:2;79:12
**sometime (4)**

13:8;14:15;19:11;
  25:24
**sometimes (3)**
  38:8;44:7;45:9
**Somewhere (6)**
  13:3;48:13;50:4;
  66:22;73:12;113:12
**Sonya (6)**
  71:2,10,25;91:16,
  17,22
**soon (1)**
  25:7
**sorry (12)**
  13:10;15:1;34:3;
  39:10;47:23;49:12;
  50:20;57:7;63:3;
  113:15;115:25;
  118:25
**sort (2)**
  10:24;134:6
**sorts (2)**
  11:19;44:14
**sound (1)**
  25:1
**sounds (1)**
  15:20
**source (1)**
  67:2
**South (1)**
  71:20
**Southern (1)**
  20:12
**speak (1)**
  74:25
**speaking (1)**
  72:23
**specialist (2)**
  4:12;20:4
**specialization (1)**
  19:25
**specialty (1)**
  19:22
**specific (10)**
  10:2;12:12;15:2,
  11;19:1;30:8;40:5,8;
  56:11;129:5
**specifically (5)**
  29:20;58:13;60:25;
  61:5;79:10
**speculation (10)**
  30:20;36:17;43:20;
  46:13;61:19;62:11;
  65:25;79:5;88:24;
  133:18
**speech (1)**
  8:4
**speedy (8)**
  35:5,16,22;36:13,
  20;37:1,22;38:12
**spoke (3)**
  25:22;40:16;73:1
**spree (2)**
  95:18;96:2

**stamp (4)**
  27:14;47:9;71:23;
  115:18
**stand (1)**
  75:8
**standard (1)**
  26:16
**standing (1)**
  98:9
**start (6)**
  7:4;9:9;11:10;
  12:11;25:21;97:17
**started (3)**
  12:13,13;13:3
**starting (9)**
  4:15;27:14;95:14;
  100:17;105:6;
  112:10,11;113:24;
  114:1
**starts (4)**
  27:15;92:13;96:18;
  117:25
**state (14)**
  20:10;27:9;32:15;
  37:9,15;45:13;50:9,
  17,25;52:3;66:8;
  90:12;92:10;95:14;
  96:5;106:1;107:13;
  112:11
**stated (8)**
  100:10;105:18;
  108:15;109:11;
  114:23;118:24;
  130:3;133:13
**statement (60)**
  34:19;45:6;73:14;
  92:12;93:5,7,18,23;
  95:19;96:9,10,11,15,
  20,23,25;97:18;98:3,
  11,12,18,21;100:11,
  16;102:4,8,25;103:8,
  13;104:2,9,25;105:6,
  12;106:15,21,23;
  108:4,4,9,12;109:12,
  19;110:1,3,6;112:9;
  113:6;114:1,19,20,
  24;117:4,7,8,11;
  119:22;130:15,20,25
**statements (1)**
  39:13,20;41:1;
  94:24
**States (6)**
  4:4;20:11;50:8;
  63:23;128:19;129:22
**state's (6)**
  36:5,10;41:2;
  42:22;48:7;96:7
**stating (1)**
  32:15
**station (5)**
  73:18;74:9;75:17;
  79:13;80:15
**statute (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

USDC IN/ND case 2:17-cv-00032-TLS   document 368-2   filed 10/26/22   page 407 of 940

Case No. 2:17-CV-00032   Videotaped Deposition of: SCOTT L. KING
July 17, 2019

50:18
**stay (3)**
13:1;14:6,16
**stayed (3)**
11:24;12:19;
106:19
**steps (3)**
60:20,21;87:6
**still (6)**
16:8,11;129:2;
133:9,14;134:5
**stint (1)**
13:17
**stipulating (1)**
37:14
**stock (2)**
97:25;98:14
**stop (1)**
89:20
**stopped (1)**
101:14
**story (1)**
45:16
**strategy (5)**
40:22;42:21;46:4,
6;56:9
**Street (2)**
69:4;71:20
**strength (1)**
36:4
**Strickland (1)**
26:15
**Studies (2)**
133:22,24
**study (1)**
8:2
**subpoena (18)**
7:9,11;41:2;69:1,
19;70:18;71:3,5,8;
72:4,16;73:20;74:3,7,
17,23;75:13;80:16
**subpoenaed (3)**
68:19;69:20;70:15
**subpoenas (3)**
68:14;70:10;91:15
**subsection (3)**
33:2,3;55:4
**subsequently (1)**
44:5
**substantive (1)**
76:15
**successful (1)**
54:18
**suggested (1)**
73:14
**suggestive (1)**
112:2
**Suite (1)**
4:9
**Sunbird (1)**
107:24
**supplemental (1)**
47:5

**support (5)**
116:10;127:20;
128:1;130:1,16
**supported (1)**
128:10
**supporting (1)**
126:24
**supportive (1)**
129:9
**suppress (2)**
44:22;112:4
**Supreme (1)**
20:16
**Sur (6)**
103:10,17,22;
106:3,17;127:12
**sure (17)**
23:12;39:15;49:24;
56:14;59:8;75:3;
77:24;78:10;79:15,
18;80:6,13;81:18;
104:5,16;108:16;
109:20
**suspect (1)**
66:17
**suspects (2)**
66:9;110:24
**suspended (1)**
19:14
**sustained (1)**
33:18
**swear (1)**
5:1
**sworn (2)**
5:4;41:1

**T**

**Tabor (1)**
9:5
**tactics (1)**
42:21
**talk (6)**
61:23,25;62:3,5;
84:21;93:21
**talked (8)**
53:25;54:1;70:8;
72:19,22;74:8;76:4;
101:9
**talking (14)**
22:24;34:1;56:13,
14,18;62:15,22;
71:22,25;107:24;
111:5;121:24;
122:14,14
**tamper (5)**
82:9,18,24;83:7,13
**tampered (3)**
84:1,11;85:12
**tampering (8)**
78:3,22;82:14;
83:15;86:24;87:18;
88:11,20

**Task (1)**
15:3
**tecum (1)**
69:2
**telling (3)**
79:25;81:12;88:3
**tends (2)**
51:20;55:6
**term (2)**
31:4,9
**terms (9)**
36:8;37:2;48:9;
55:1;60:11;67:13;
104:24;105:11;109:8
**terrifying (1)**
95:17
**test (2)**
107:23,23
**testified (13)**
5:4;25:4;28:7;
73:25;80:20;81:3;
117:13;119:25;
120:8;124:14;
125:19;126:10;
130:19
**testify (10)**
59:15;74:1;77:7,9;
79:22;81:16;101:13;
103:22;108:18;
131:13
**testifying (4)**
79:25;80:22;91:14;
125:13
**testimony (27)**
7:10;22:15;37:15;
42:8;43:15;44:3;
45:18;56:7;63:1;
68:5,15;76:6;80:3;
81:24;103:20;107:6,
16;114:16;120:3;
124:1;126:5;128:13;
131:4,11;132:4;
133:24;134:1
**theory (2)**
52:15;57:13
**thinking (2)**
30:24;66:24
**third (7)**
36:5;71:4;90:20;
125:16,20;126:7,23
**third-party (1)**
41:3
**Thiros (4)**
13:6,18,20;14:1
**Thomas (4)**
71:10,25;91:17,22
**Thomas's (1)**
72:5
**Thompkins (3)**
121:25;122:5;
129:23
**Thompson (17)**
52:3,11,21;53:8;

54:2;63:17,25;64:9,
15;65:7,23;66:18,20;
67:11,20;68:2;71:2
**though (3)**
42:11,16;91:13
**three (4)**
17:2;18:18;24:6;
129:20
**three-page (1)**
47:3
**three-quarters (1)**
93:1
**Thursday (2)**
106:4,16
**till (1)**
19:11
**timely (1)**
64:24
**times (2)**
29:22;45:4
**Timmy (2)**
96:25;97:3,8
**today (26)**
5:13;16:3,6;20:20;
22:3,9;23:2,14;
27:23;41:4,5;47:13;
59:14;67:8,10;70:14;
78:9;81:17;82:4;
123:20;125:12;
126:5,21;127:25;
128:6;132:3
**Today's (1)**
4:6
**TOLBERT (154)**
4:17,18;5:9,11;
19:18,24;26:8,12;
27:1,7;29:5,13;30:2,
15,21;31:17;32:11,
22;33:11;34:6;35:20;
36:12,24;38:2;39:1,
11;40:3;41:12,16;
43:21;46:11,15,22;
47:7,24;48:3,20;
49:13;51:16;52:14;
53:11,18;54:7;56:22;
57:6;58:19;59:21;
61:3,11,22;62:2,14;
63:2,9;64:20;65:12;
66:4;68:7,23;69:17,
24;70:22;72:13;79:7,
21;81:2,5,9,13,20;
82:11,15,21;83:1,9,
23;84:4,12,20;85:1,
19;86:7,22;87:8,16,
22;88:1,16;89:1,7,10,
15;90:8;92:7,19,21;
94:18;97:13;98:10;
99:2,23;100:15;
101:20;102:12,21;
103:19;104:11,18,21;
105:3;106:12;107:8;
110:13;111:16,18,22;
113:14;115:4,12,24;

116:14;117:16;
119:1,5,12,20;120:7,
14;121:5,21;122:11;
123:7,13,15;124:2,5,
9,21;126:1,19;127:3,
8;128:4,14;130:10,
21;131:21;132:19;
133:1,20;134:11,22;
135:5,8
**Tolbert's (1)**
92:17
**told (12)**
23:21;74:12;75:6;
76:21;77:16,21;78:8,
8;79:11;80:10,11;
95:15
**Tony (1)**
4:21
**took (6)**
8:21;14:10;53:7;
87:6,6;130:5
**tool (5)**
39:23;40:1,4,6;
41:7
**tools (1)**
40:9
**top (1)**
90:21
**tough (2)**
94:6,15
**toward (1)**
107:18
**towards (2)**
27:13;90:17
**town (2)**
15:24;23:10
**trade (2)**
10:14,23
**transcript (57)**
22:14;44:4;90:11,
13;92:9;96:13;98:16,
20,23;99:10,18,21,
22;100:5,17;101:6;
102:8,23;103:13;
104:1,7,22,23;105:2,
5,18,22,25;106:9,14;
107:3,13;108:8,12,
13;109:12,18,25;
110:6;112:10;
113:25;114:23;
115:19;117:10,18,19;
119:7,14,17;122:10,
22;123:8,12;125:12;
127:10;129:10;
130:24
**transcripts (6)**
24:6;44:16,18,22;
132:11,16
**transitioned (2)**
12:17,20
**transpired (1)**
81:24
**traveled (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al

Case No. 2:17-CV-00032

Videotaped Deposition of: SCOTT L. KING
July 17, 2019

USDC IN/ND case 2:17-cv-00032-TLS   document 368-2   filed 10/26/22   page 408 of 940

107:15
**trial (100)**
7:9;19:21;20:14;
22:17,18,19;24:25,
25;25:24;26:2,18;
30:1;32:3,8;33:4;
34:7;35:5,16,22;
36:13,19,20;37:1,2,6,
7,18,22;38:9,12;39:6,
16,18,24;40:14;42:5,
9,14,17;43:15,18;
46:3,6;48:18;53:7,17,
23;54:4,17,19;56:9;
57:1,22;58:6;59:7,
16;60:22;61:1,2,6;
62:9,16;64:16,19,22,
25;68:14,15,19;
70:16;72:1,6;74:10,
17,18,19,20;76:23;
78:4;90:11,16,20;
91:2,2,9;92:9;
109:11;110:22;
116:6,17;117:4,13,
20;118:20;120:3;
121:10;125:14;
126:11;127:10;130:2
**trials (3)**
14:8;19:5;32:9
**trial's (1)**
38:18
**tried (6)**
34:8;35:9;38:14;
52:17;67:21;110:15
**triggers (2)**
50:7,24
**true (11)**
30:5,11;32:4,17;
33:7,21;85:2;119:6;
120:8,13;121:15
**truth (1)**
81:12
**truthfully (1)**
80:22
**try (9)**
5:21;6:1,12,17,19;
7:3;84:14,23;95:11
**trying (6)**
34:23,24;35:1;
49:23;99:5;126:17
**tug-o-war (1)**
50:14
**turn (3)**
55:1;90:17;120:19
**turns (1)**
42:8
**two (19)**
8:4;9:18;11:6;
18:14,16,18;20:10;
24:6;34:1;45:8;58:4;
60:21;91:15;100:20;
103:23;106:5;118:3;
130:14,14
**type (1)**

14:23
**types (1)**
19:1
**typical (1)**
50:19,21
**typically (6)**
24:16,19;37:1;
56:10;59:4;96:19

**U**

**unavailability (1)**
37:12
**unavailable (1)**
42:9
**uncharged (1)**
73:8
**unclear (3)**
98:6;104:6,14
**under (12)**
33:2;37:4,21;38:4;
41:1;50:7,8;73:20;
75:22;80:23;81:14;
115:17
**undergraduate (2)**
7:21,25
**unduly (1)**
112:2
**union (4)**
10:14,15,18,23
**United (1)**
4:3
**university (4)**
7:21;8:1,7,14
**Unless (1)**
50:24
**unusual (3)**
40:23;94:21;95:2
**up (17)**
15:8,23;17:3;23:8,
11,14;26:16;38:8,23;
42:7;19;49:23;54:11;
55:21;66:16;67:3;
80:2
**upon (6)**
43:7;50:13;86:12;
109:5;129:5;130:23
**use (16)**
39:23;40:9,13;
57:3,12;68:13,13;
70:8;98:6,8;103:15;
113:1;118:23;121:4;
131:18;132:10
**used (4)**
38:24;40:15;45:14;
57:1
**usual (1)**
25:20
**usually (2)**
24:17;25:16
**utilize (1)**
39:22
**utilized (1)**

40:9

**V**

**vacuum (1)**
56:15
**vague (4)**
21:3;30:20;37:24;
43:20
**Valparaiso (2)**
8:14;9:6
**Valpo (2)**
8:15,17
**van (1)**
107:23
**Vanes (1)**
79:19
**varied (1)**
61:20
**varies (2)**
39:20;40:23
**variety (2)**
13:22;36:10
**various (2)**
22:12;67:16
**varying (1)**
16:25
**vehicle (1)**
44:15
**vehicles (2)**
39:22;44:14
**verbatim (2)**
113:17;122:12
**verdict (2)**
33:19;34:20
**versus (5)**
4:3;5:14;26:15;
90:12;92:10
**vice (1)**
20:17
**victim (2)**
62:1;95:7
**victims (3)**
61:23;62:6;73:8
**victim's (2)**
94:16,25
**video (2)**
4:12;134:19
**VIDEOGRAPHER (5)**
4:1,25;89:8,13;
134:18
**videographer's (1)**
6:4
**video-recorded (1)**
4:8
**view (2)**
30:10;95:10
**Village (2)**
58:11;99:17
**violation (1)**
77:25
**Virginia (1)**
11:2

**visited (1)**
128:18
**voir (1)**
111:24

**W**

**wait (2)**
25:21;33:24
**WALKER (2)**
4:21,21
**Washington (2)**
10:15;26:15
**waste (1)**
6:2
**way (11)**
37:14;45:22;65:18;
75:14;90:1;93:1,15;
98:7;110:23;111:12;
128:15
**weak (4)**
44:8,24,25;45:15
**weakness (1)**
36:5
**wear (1)**
89:3
**wearing (2)**
112:15,23
**wedded (1)**
43:3
**week (3)**
23:7;106:18;
118:15
**well-convinced (1)**
21:7
**well-trusted (1)**
54:24
**weren't (2)**
66:16;67:4
**Western (1)**
20:17
**What's (10)**
7:17;46:18;58:15;
81:24;99:7;100:13;
113:13,20;115:6;
125:18
**whatsoever (2)**
112:24;113:1
**whenever (2)**
35:13;56:13
**wherever (1)**
11:4
**whichever (2)**
49:1;126:17
**white (1)**
67:12
**whole (2)**
22:13;45:22
**who's (1)**
23:2
**whose (3)**
10:21;71:15;85:11
**widespread (3)**

87:11,15;88:10
**Williams (13)**
62:16,18,21;
102:17;108:17;
109:21;114:13;
123:1,24;124:17;
130:5;131:16;132:7
**Williams' (2)**
110:8;114:3
**Willie (15)**
4:2,24;5:13,17;
20:21;29:3;31:13,16;
90:11;92:9;97:23;
98:12;100:19;109:6;
120:4
**win (1)**
30:25
**wintertime (1)**
129:2
**wit (2)**
83:25;95:7
**within (7)**
31:9;36:22;37:7;
38:19;39:3;50:18;
64:8
**without (2)**
30:17;41:22
**witness (48)**
5:1,3,6;37:11;
39:19;41:2,3;42:2,13,
20,23,25;44:8,11,19,
24,25;45:2,11,13,13,
15;60:7;68:15;78:3,
22;82:9,14,17,24;
83:7,11,15;84:1,11;
85:12;86:24;87:17;
88:19;89:4;92:24;
119:11;123:12;
127:19,19;130:19;
134:14;135:3
**witnesses (28)**
36:10;39:13,14;
40:17;58:1,4,13,23;
59:6,14,15;60:7,8,19;
62:20;67:16;88:11,
21;90:15,19,22;91:2,
9;111:3;116:9;
127:23;131:12;133:3
**woman (3)**
103:24;106:6;
118:4
**word (1)**
40:9
**words (1)**
104:8
**work (10)**
9:23;10:6,9,23;
11:17;16:17;36:21;
45:21;90:1;99:16
**worked (5)**
9:2,11;100:8;
101:12,18
**working (1)**

WILLIE T. DONALD vs.
BRUCE OUTLAW, CARLA K. PYLE et al
Case No. 2:17-CV-00032    Videotaped Deposition of: SCOTT L. KING
July 17, 2019
USDC IN/ND case 2:17-cv-00032-TLS    document 368-2    filed 08/26/22    page 409 of 940

25:6
**worried (2)**
43:11,12
**writ (1)**
31:4
**writing (1)**
107:25
**written (1)**
122:1
**wrong (1)**
134:1
**wrongful (1)**
134:10
**Wyatt (2)**
17:18;18:3

**Y**

**year (8)**
9:25;10:1;13:13;
14:17;15:7,9;118:11,
11
**years (6)**
6:15;7:15;8:6,15;
16:1;17:24
**yesterday (1)**
95:15
**young (3)**
109:4;118:3,3

**0**

**000110 (1)**
71:23

**1**

**1 (8)**
27:5,9,11;28:12;
63:17,22;105:8;
106:8
**1:21 (1)**
4:7
**10 (8)**
28:14;115:9,10,13;
116:16;117:19,24;
120:19
**1085 (1)**
4:9
**11 (9)**
117:25;118:16;
127:5,6,13,16;128:7,
21;131:20
**11:00 (1)**
23:16
**12 (2)**
121:23;126:3
**1340 (1)**
115:17
**14 (1)**
112:11
**16 (1)**
95:14

**17th (1)**
4:6
**18 (2)**
108:13,14
**19 (1)**
100:17
**1976 (3)**
8:17,24;19:10
**1978 (1)**
15:22
**1980 (3)**
16:2,13,14
**1981 (2)**
13:9;100:8
**1982 (2)**
13:17;14:4
**1984 (1)**
15:10
**1988 (2)**
97:25;98:2
**1992 (45)**
5:18;6:8,10;18:8,9,
20;19:5;20:22;25:1,
25;32:4;39:24;40:14;
47:10;48:18;51:4;
52:7,17,20;53:6;
55:12;58:7,22;59:16;
60:5,9,14;63:13;
65:8;67:22;95:18;
98:13;101:15;
111:12;118:12;
119:9;120:4,11;
121:9;124:15;
125:17,22;126:14,24;
129:3
**1996 (3)**
8:24;86:14;88:8
**1998 (1)**
97:24
**1st (4)**
17:5;58:21;60:9;
86:14

**2**

**2 (14)**
27:19;46:19,20,23,
24;51:2,17,18;55:3,3;
57:25;60:5;105:8;
106:9
**2:17-CV-32 (1)**
4:6
**2:56 (1)**
89:9
**20 (5)**
22:11;23:17;105:7,
24,25
**2004 (1)**
28:14
**2006 (1)**
19:11
**2018 (1)**
17:5

**2019 (1)**
4:6
**21 (2)**
93:3;106:15
**2293 (1)**
69:4
**23 (1)**
93:3
**24th (1)**
63:13
**25 (3)**
105:7,25;108:14
**27th (13)**
47:10;51:4;60:5;
95:18;98:13;101:15;
119:9;120:11;121:9;
124:15;125:17,22;
126:24
**28 (1)**
125:1
**283 (2)**
27:18,20
**2nd (1)**
109:2

**3**

**3 (5)**
58:16,17,20;60:6;
93:25
**3:04 (1)**
89:14
**3rd (1)**
109:2

**4**

**4 (7)**
37:4,4;63:6,7,10;
96:18;131:4
**4:00 (3)**
89:5,20;134:12
**4:01 (1)**
134:19
**4:02 (1)**
135:12
**4:30 (1)**
99:16
**46410 (1)**
7:13

**5**

**5 (3)**
68:21,25;69:1
**5:30 (2)**
97:23;98:13
**555 (1)**
92:14
**56 (2)**
93:24,25
**58 (2)**
96:18;97:17

**59 (1)**
101:6

**6**

**6 (5)**
28:21;33:2;70:20,
24,25
**60 (5)**
103:12,25;105:4,7,
24
**61 (4)**
104:1;105:8;106:8,
14
**62 (1)**
107:11
**6300 (2)**
103:11,18
**64 (1)**
108:11
**65 (3)**
108:15,23;109:14
**67 (1)**
112:8
**68 (1)**
113:24

**7**

**7 (7)**
72:11,15,15;97:18,
22;113:25;114:2
**70 (5)**
8:8;37:7,18;38:12,
19
**702 (1)**
27:15
**71 (1)**
92:14
**73 (3)**
8:8,10,16
**76 (1)**
8:16
**78 (2)**
12:8;128:15
**787 (1)**
128:20
**788 (3)**
128:16,21,23
**79 (1)**
13:3
**7th (1)**
20:15

**8**

**8 (10)**
90:5,6,10,18;92:1,
2;94:1;107:11;
112:11;129:20
**8:30 (1)**
120:1
**801 (1)**

129:11
**803 (1)**
131:1
**809 (1)**
115:17
**80s (1)**
15:13
**81 (2)**
13:3,5
**810 (2)**
117:17,23
**811 (1)**
119:25
**816 (1)**
120:19
**82 (1)**
13:12
**823 (3)**
121:22;125:2,7
**828 (3)**
125:1,11;126:2
**83 (2)**
13:15;14:15
**86 (1)**
17:20

**9**

**9 (12)**
92:4,5,8;93:1,20;
100:14;105:5;
109:14;110:11;
113:21;115:7;126:2
**9:00 (2)**
106:19;107:18
**90 (1)**
24:17
**90s (2)**
17:24,25
**9211 (1)**
7:12
**96 (2)**
18:2;19:11

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

WILLIE T. DONALD,             )
                               )    No. 2:17-CV-00032-TLS
             Plaintiff,   )
                               )    Judge Theresa L. Springmann
                v.         )
                               )
BRUCE OUTLAW, CARLA K. PYLE, as  )
special administrator of the ESTATE OF  )
JOHN E. JELKS, JR., CITY OF GARY,  )    JURY TRIAL DEMANDED
and other as-yet unknown employees  )
of the City of Gary,              )
                               )
            Defendants.  )

# Exhibit 34

## Plaintiff's Summary Judgment Response

**IN THE**
**INDIANA COURT OF APPEALS**
CAUSE NO. ___45A039705CR00179___

| | | |
|---|---|---|
| **WILLIE T. DONALD,** | ) | Appeal from the Superior |
| Appellant (Defendant Below) | ) | Court of Lake County |
| | ) | |
| V. | ) | **#45G01-9203-CF-00065** |
| | ) | |
| **STATE OF INDIANA,** | ) | The Honorable |
| Appellee (Plaintiff Below) | ) | Richard Maroc, Judge |



## RECORD OF PROCEEDINGS

| | | |
|---|---|---|
| CHARLES E. STEWART, JR. 473-45 | ) | JEFF MODISETT |
| LAKE SUPERIOR COURT | ) | STATE OF INDIANA |
| APPELLATE PUBLIC DEFENDER | ) | ATTORNEY GENERAL |
| 2293 NORTH MAIN STREET | ) | 219 STATE HOUSE |
| CROWN POINT, IN 46307 | ) | INDIANAPOLIS, IN 46204 |
| TEL: (219) 755-3500 | ) | TEL: (317) 232-6249 |
| ATTORNEY FOR APPELLANT | ) | ATTORNEY FOR APPELLEE |

**VOL. IV OF VII**
**PAGES 751 - 1000**

⸱ VANES 000765

```
 1    Q    And you know Kimerly Belinsky and you knew
 2         Bernard Jiminez?
 3    A       Yes.
 4    Q    And you knew what house they lived in on
 5         that block, correct?
 6    A       Yes.
 7    Q    And, in fact, a couple houses across the
 8         street down from yours, correct?
 9    A       Yes.
10    Q    And directing your attention to the
11         evening hours, February 27th, 1992,
12         approximately 9:00 o'clock, what were you
13         doing at that time?
14    A       Well, I was coming outside, putting my
15         clothes in my cousin's car 'cause I
16         was going to go over to my girlfriend'
17         house, and --
18    Q    Where was that car parked at?
19    A       It was parked on the street in front
20         of the house.
21    Q    Okay.  And what, if anything, did you see
22         or hear when you were coming out to put
23         the clothes in the car?
24    A       Okay, I heard a lot of arguing and
25         cussing.
```

220

MAY 23 1997

Anna M. Anton

751  CLERK LAKE SUPERIOR COURT

Filed in Clerk's Office

VANES 000766

1    Q    Where was that coming from?

2    A        It was coming from Kim' house.

3    Q    And what, specifically, did you hear if

4         you can recall?

5    A        "Give me your money.  Give me your

6             damn money."

7    Q    Now, you were putting some clothes in your

8         car, right?

9    A        Yes.

10   Q    Okay.  What happened?  Did there come a

11        point you went back in your house?

12   A        Oh, yeah, I ran in the house and I

13            told my cousin, I said, I said, "Call

14            the police.  Kim and them getting

15            robbed.  Kim and them getting robbed."

16            And then so she didn't call the police

17            right at the time, she called Loraine,

18            which is Kim' best friend stay across

19            the street, and Loraine said, "They

20            probably be just arguing or

21            something."

22   Q    I want to back up a little bit.  Okay,

23        now, you testified you were coming out to

24        put some clothes in your car?

25   A        Yes.

221

VANES 000767

| | | |
|---|---|---|
| 1 | Q | Okay. And you went back into your house, |
| 2 | | correct? |
| 3 | A | Yeah, I went in the house. |
| 4 | Q | The first time you came out to your car, |
| 5 | | what did you see at the Belinsky |
| 6 | | residence? |
| 7 | A | I seen people standing out towards the |
| 8 | | porch. |
| 9 | Q | Okay. |
| 10 | A | And I seen grocery bags. |
| 11 | Q | And then you went back into your house, |
| 12 | | right? |
| 13 | A | Right, right. |
| 14 | Q | Had you heard anyone threaten anyone at |
| 15 | | that point, the first time you were |
| 16 | | outside? |
| 17 | A | Yes; yes. |
| 18 | Q | You went back in your house and you came |
| 19 | | out again, correct? |
| 20 | A | Uh-huh. |
| 21 | Q | What did you see when you came out the |
| 22 | | second time at the Belinsky residence? |
| 23 | A | Well, after I told him them to call |
| 24 | | the police -- they hadn't called the |
| 25 | | police right at the time -- so I went |

222

755

VANES 000768

```
 1                back out, and I said, "Get off the
 2                telephone and call the police," so by
 3                the time I came back out the second
 4                time, I went around the house and I
 5                was standing on the side of the house.
 6                And it was like five minutes, I heard
 7                like a shot and it was like a small
 8                caliber gun, a small gun.  I heard the
 9                shots, and I run back in the house, so
10                I was in, you know.
11     Q    Okay, so you heard this arguing going on
12           for about five minutes?
13     A        Yeah, about five.
14     Q    Now, let's back up a second.  You saw
15           Kimerly and the children and Bernard
16           Jiminez on the porch?
17     A        Right.
18     Q    And where was the robber at?
19     A        He was facing towards him.
20     Q    Okay, I would like you to turn around and
21           take a look at these pictures.  And as you
22           look at State's Exhibit 2 and State's 3, I
23           ask you if you recognize that porch area?
24     A        Yeah.
25     Q    And is that where you saw this incident
```

223

754

VANES 000769

```
 1        occur on February 27th?
 2    A        Yes.
 3    Q    How close was the robber to the porch in
 4         terms of distance between me and you?
 5         Closer, farther?
 6    A        About five feet.
 7    Q    About five feet?
 8    A        Yeah.
 9    Q    About this far, would that be fair to say?
10    A        Uh-huh.
11    Q    And you were able to see Mr. Jiminez and
12         Ms. Belinsky, correct?
13    A        Who is that?
14    Q    You could see Bernard Jiminez and Kimerly
15         Belinsky, correct?
16    A        Oh, yeah, okay.
17    Q    Okay, you know them by their first names,
18         correct?
19    A        Yeah.
20    Q    Okay, I apologize.  Were their backs to
21         the robber or were their faces to the
22         robber?
23    A        Their faces.
24    Q    Their faces?
25    A        Yeah.
```

224

VANES 000770

```
 1    Q    Your testimony is that they were about
 2         five feet away?
 3    A         Uh-huh.
 4    Q    And you heard this arguing going on for
 5         five minutes?
 6    A         Yeah, yes.
 7    Q    Could you tell whether or not the robber
 8         had a gun?
 9    A         Yeah.
10    Q    What did you hear him say?
11    A         "Give me your damn money.  I'm going
12              to kill you.  I'm going to kill you."
13    Q    Could you see where he was pointing the
14         gun?
15    A         No.
16    Q    Now, you saw people on the porch and you
17         saw the robber right next to them,
18         correct?
19    BY MR. KING:
20                   Judge, at this point, I'll
21                   object to the recitation of
22                   the answers in the form of
23                   questions.  Further, it's
24                   leading.
25
```

225

756

VANES 000771

```
 1  | BY THE COURT:
 2  |        Well, if he's reiterating prior
 3  |     answers, I think it's permissible.  Go
 4  |     ahead.
 5  | BY MR. BENSON:
 6  | Q   After this arguing on the porch, what did
 7  |     you see?
 8  | A        After it happened?
 9  | Q   After the arguing happened.
10  | A        I didn't see nothin'.  Well, I was
11  |          standing on the side of the house; I
12  |          just heard the shots.
13  | Q   Okay, let's back up a little bit.  You
14  |     heard arguing on the porch, correct?
15  | A        Uh-huh.
16  | Q   Okay, what, if anything, did anyone on the
17  |     porch do to the robber?
18  | A        Huh?
19  | Q   What, if anything, did anyone on the porch
20  |     do to the robber?
21  | A        It looked like Bernie, he charged --
22  |          he charged him.
23  | Q   He charged him?
24  | A        Yeah, charged him.
25  | Q   And what did you observe then?
```

226

VANES 000772

```
 1  ││  A       Shots.
 2  ││  Q    What happened between the robber and
 3  ││       Bernard Jiminez that you saw?  Did they
 4  ││       shake hands, or what happened between
 5  ││       them?
 6  ││  A       No, swung, he like -- I guess he
 7  ││          jumped off the porch and like swung or
 8  ││          tried to swing on him or whatever.
 9  ││  Q    So there was a struggle, is that what
10  ││       you're saying?
11  ││  A       Yeah.
12  ││  Q    How long did this last for?
13  ││  A       I don't know 'cause I went in the
14  ││          house after that 'cause I heard the
15  ││          shots.
16  ││  Q    Approximately how many shots did you see?
17  ││  A       I didn't see any.
18  ││  Q    I'm sorry, heard, not saw.
19  ││  A       About three.
20  ││  Q    Three?
21  ││  A       Yeah.
22  ││  Q    Approximately how long did the struggle
23  ││       last?
24  ││  A       I couldn't say; like I say, I went in
25  ││          the house.
```

227

VANES 000773

```
 1   Q   Were you able to identify anything the
 2       robber might have been wearing?
 3   A       No -- black clothing, dark clothes.
 4   Q   And were you able to draw any conclusion
 5       as to the age of this person?
 6   A       It sound like, you know, he was like
 7           young, like in his early twenties,
 8           black street voice, you know.
 9   Q   And your house is a couple houses down,
10       correct?
11   A       Uh-huh.
12   Q   Is that north or south?
13   A       Across the street?
14   Q   Yes.  As you're looking at the Jiminez
15       residence from your house, is the Jiminez
16       residence to the left or the right?
17   A       To the right.
18   BY MR. BENSON:
19           Thank you very much.  I have nothing
20       further.
21                   CROSS-EXAMINATION
22                         BY
23                      MR. KING
24   Q   Rodney, what did you do, look over the
25       fence to see this?
```

228

VANES 000774

```
 1    A        No, I could see -- okay, I was on the
 2             porch, right.
 3    Q   You were on your porch?
 4    A        Yeah, and her house, the porch steps
 5             is higher, so I could see over the
 6             fence.
 7    Q   So you were seeing over the fence from the
 8        porch?
 9    A        Yes.
10    Q   This five minutes business, you're just
11        giving an estimate here, am I correct?
12    A        Yes, yes, about.
13    Q   And it's nothing you timed?  You weren't
14        looking at a watch or a clock, am I
15        correct?
16    A        Excuse me?
17    Q   You weren't looking at a watch or a clock,
18        right?  Am I correct?
19    A        No.
20    Q   All right.  So this fellow that you saw
21        robbing these folks was wearing black
22        clothing, and you're figuring from the
23        voice young, early twenties, a black
24        street voice, is that right?
25    A        Yes.
```

229

VANES 000775

1 Q It would fit a lot of folks, that

2   description, wouldn't it?

3 A  Yes.

4 BY MR. KING:

5   That's all I have.  Thank you.

6 BY MR. BENSON:

7   No redirect, Your Honor.

8 BY THE COURT:

9   Okay, that's all, sir.  Thank you.

10 BY THE WITNESS:

11   Okay.

12 BY MR. BENSON:

13   May we approach, Judge?

14

15   WHEREUPON THE FOLLOWING DISCUSSION WAS

16 HELD AT THE BENCH OUTSIDE OF THE HEARING

17 OF THE JURY:

18

19 BY MR. BENSON:

20   Your Honor, we have Rhonda Williams

21 here to testify.  Her testimony is I

22 assume going to be very lengthy.

23 BY THE COURT:

24   We are running a little behind

25 schedule.  So shall we push on?

230

VANES 000776

```
 1  ║  BY MR. BENSON:
 2  ║         All right.
 3  ║
 4  ║         WHEREUPON THE FOLLOWING PROCEEDINGS
 5  ║      WERE ONCE AGAIN HELD IN THE HEARING OF THE
 6  ║      JURY:
 7  ║
 8  ║  BY MS. LAKE:
 9  ║         The State would call Rhonda Williams.
10  ║               RHONDA WILLIAMS,
11  ║      having been first duly sworn upon her oath,
12  ║      testifies as follows:
13  ║               DIRECT EXAMINATION
14  ║                     BY
15  ║                  MS. LAKE
16  Q  Would you please state and spell your name for
17  ║  the court reporter?
18  A     Okay, my name is Rhonda Williams,
19  ║         R-h-o-n-d-a  W-i-l-l-i-a-m-s.
20  Q  Ms. Williams, where do you currently live?
21  A     Indianapolis.
22  Q  Where did you reside in February of this year?
23  A     4409 Connecticut.
24  Q  And where is that?
25  A     Gary.
```

231

VANES 000777

```
 1   Q   And how long did you live at 4409 Connecticut
 2       Street?
 3   A       Three weeks.
 4   Q   And how old are you, ma'am?
 5   A       Thirty-one.
 6   Q   Are you married or are you single?
 7   A       I'm separated.
 8   Q   Do you have any children?
 9   A       Yes.
10   Q   How many children do you have?
11   A       Two.
12   Q   How old are your children?
13   A       Six and ten.
14   Q   Are you employed?
15   A       Yes.
16   Q   Where are you employed?
17   A       White Castle.
18   Q   And what do you do at White Castle?
19   A       I'm assistant supervisor.
20   Q   In Indianapolis?
21   A       Yes.
22   Q   Ms. Williams, I'd like to direct your
23       attention to February 27th, 1992.  Do you
24       recall the events that occurred that evening?
25   A       Yes.
```

232

763

VANES 000778

```
 1  Q   Did anything unusual happen?
 2  A      Yes.
 3  Q   What happened?
 4  A      I was robbed.
 5  Q   Do you see the person in the courtroom that
 6      robbed you?
 7  A      Yes.
 8  Q   Would you please identify him by where he's
 9      seated and what he's wearing?
10  A      He has on a gray shirt and sitting at the
11         table.
12  BY MS. LAKE:
13         Your Honor, the State would ask that the
14      record would reflect the witness's
15      identification of the defendant.
16  BY THE COURT:
17         The record will so indicate.
18  BY MS. LAKE:
19  Q   Now, where did this robbery take place, Mrs.
20      Williams?
21  A      At my home.
22  Q   And is that in Gary, Lake County, Indiana?
23  A      Yes.
24  Q   And approximately what time did this occur?
25  A      Oh, about a quarter to 9:00
```

233

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

704

VANES 000779

```
 1   Q   And how is it that you remember that it was a
 2       quarter to 9:00?
 3   A       I heard a noise and I looked at the clock.
 4   Q   What were you doing at that time?
 5   A       I was sleeping.
 6   Q   Had you just gotten off work, or why were you
 7       sleeping so early?
 8   A       I was working midnights, and I was --
 9   Q   And what type of noise is it that you heard?
10   A       Like a rumbling at my bedroom window.
11   Q   And what did you proceed to do after you heard
12       the noise?
13   A       I got up, I looked at the clock, and I
14           started turning on lights in the house.
15   Q   And then what did you do?
16   A       I looked out one of the windows to see if
17           I saw anything, and I went back to bed; I
18           laid back down.
19   Q   And then what happened?
20   A       Then I heard a knock at the door.
21   Q   What did you do after you heard the knock at
22       the door?
23   A       I got up and went to the door and asked
24           who was it.
25   Q   And was there a response at the door?
```

234

VANES 000780

| | | |
|---|---|---|
| 1 | A | Yes, the guy said, "It's your neighbor." |
| 2 | Q | Okay, did you recognize the voice of this |
| 3 | | person? |
| 4 | A | No, I didn't pay any attention. |
| 5 | Q | Did you recognize if it was a male or female |
| 6 | | voice? |
| 7 | A | It was a male voice. |
| 8 | Q | And what did you proceed to do? |
| 9 | A | I opened the door. |
| 10 | Q | And what happened when you opened the door? |
| 11 | A | There was a guy standing there with a gun |
| 12 | | in my face. |
| 13 | Q | And what did the defendant do? |
| 14 | A | I started screaming and kind of tussling a |
| 15 | | little bit. I was kind of shocked that |
| 16 | | when I opened the door what I saw. And he |
| 17 | | kind of forced his way in the house, and |
| 18 | | when he got in the house, he closed the |
| 19 | | door, and he told me to turn around; and |
| 20 | | he asked me if I had any money. |
| 21 | Q | And what did you respond? |
| 22 | A | I said, "I have a little bit," and he |
| 23 | | asked me where, where was it, and I told |
| 24 | | him, "In my bedroom," and he told me, |
| 25 | | "Come on, let's go." And we started |

235

VANES 000781

```
 1              walking through the house to my bedroom.
 2              And at the walkway before we get to the
 3              bedroom, he says that he knows that I'm at
 4              home by myself.
 5    Q    Did he say how he knew that?
 6    A         No.
 7    Q    Go ahead.
 8    A         And then we proceed to go on to my bedroom
 9              and he asked me where the money was.  And
10              it was on my dresser, and I handed it to
11              him.
12    Q    How much money was on your dresser if you
13         know?
14    A         It was fifty dollars.
15    Q    All right, then what happened?
16    A         Then he told me to lay down on the floor.
17    Q    Was there any reaction by the defendant when
18         you gave him the fifty dollars?
19    A         He just asked me how much it was.
20    Q    Did you hand it to him?
21    A         Yes.
22    Q    Okay.  Then you got on the floor.  What
23         happened next?
24    A         Then he start rumbling through my purse
25              and in my drawers.
```

236

VANES 000782

```
 1   Q   How do you know he was rumbling through your
 2       purse?
 3   A       Because when he was taking stuff out, and
 4           he was asking, "What's this?  What's
 5           this?" stuff like that.
 6   Q   How were you lying on the ground?
 7   A       Face down with my face like, you know,
 8           towards him a little bit.
 9   Q   So were you able to watch him as he was
10       throwing stuff out of your purse?
11   A       Well, I could see little stuff in the
12           corner of my eye.
13   Q   And what happened next?
14   A       And he opened -- I have a little -- I have
15           a dresser where you can open the cabinet,
16           and he took a purse out, and he asked me
17           what was in that, and I said, "Nothin',
18           you know, just an old purse," and then
19           after he did that, he pulled the mattress
20           like looking maybe up between the mattress
21           to see if I had anything.  And then he
22           walked over to me and put a pillow over to
23           my head and he said he was going to count
24           to five and --
25   Q   What were you thinking at that point when he
```

237

768                    VANES 000783

```
 1        put the pillow over your head?
 2   A       I was going to die.
 3   Q   All right, what happened?
 4   A       And he put the pillow over and he put the
 5           gun in the -- I could feel the pressure of
 6           the gun.  And he said if I didn't come up
 7           with any more money or tell him where any
 8           more money was that he would blow my head
 9           off.
10   Q   Where did you feel the gun?
11   A       In my head.
12   Q   On the back of your skull?
13   A       Right, right there (indicating).
14   Q   And what was your response when you were
15       threatened again?
16   A       I just told him he could take my t.v.s or
17           whatever 'cause I don't have any more
18           money.
19   Q   What happened next?
20   A       Then he counted to four and he took the
21           pillow off my head and told me to get up,
22           and he asked me did I have any guns in the
23           house or anything, and I said, "No."  And
24           as we were walking out of the room, he
25           asked me did I have a telephone, and I
```

238

          VANES 000784

```
 1 ||          say, "Yes;" he asked me where was it, I
 2 ||          told him, "In the kitchen." He said, "Come
 3 ||          on, let's go."  On our way to the kitchen,
 4 ||          he looked in my kids' bedroom, and then we
 5 ||          walked farther to the dining room and he
 6 ||          start taking stuff out of my coat 'cause I
 7 ||          had a coat laying on a chair in the dining
 8 ||          room.  And then after he looked through
 9 ||          that, he had said that he really hate
10 ||          robbing black people, but if I knew his
11 ||          situation, I would understand.  And then
12 ||          we walked to the kitchen, and after we get
13 ||          to the kitchen, I realize the phone isn't
14 ||          there, 'cause I have a cordless, and I
15 ||          said, "Well, it must be in the bedroom,"
16 ||          you know, "We can go back and get it if
17 ||          you want."  And he said, you know, "That's
18 ||          okay."  Then after that, he told me to go
19 ||          lay down on the floor in the living room
20 ||          in the corner.  And I laid there, and
21 ||          after I laid there for a little while, he
22 ||          left, and then he left the door kind of
23 ||          cracked, so I crawled to the door to get
24 ||          ready to close it and he came back then.
25 || Q    How far was the door --
```

239

770

VANES 000785

```
 1   A        It was like cracked, just cracked.

 2   Q    And how did you say you got to the door?  You

 3        crawled to the door?

 4   A        Yeah, I crawled to the door to get ready

 5            to shut it, and just when I got ready to

 6            shut it, he came back in.

 7   Q    And what happened?

 8   A        When he came back in, he had the gun, and

 9            he said, "I told you," you know, "to lay

10            there," and -- 'cause I just was going to

11            close the door, you know, I was just was

12            going to close and lock the door, that's

13            all I was doing.  He just told me to, "Go

14            back and lay down," and then all of a

15            sudden he told me to, "Get up and come

16            here," and I went to him, and he had me to

17            stand outside.  And when I was standing

18            outside, it was like the neighbor next

19            door, and they were looking, you know, and

20            then he told me to come back in.  He asked

21            me did I know my neighbors, and I said,

22            "No."

23   Q    Now, which neighbors were you referring to?

24        Are they across the street or are they next

25        door?
```

240

771

VANES 000786

```
 1 ║ A        They were next door, right next door.
 2 ║ Q    And they were looking at you?
 3 ║ A        Yes, they were looking out the window.
 4 ║ Q    And did you do anything when you were standing
 5 ║      outside?
 6 ║ A        No, I was too scared to move.
 7 ║ Q    Okay, what happened next?
 8 ║ A        Then he told me to come back in -- and he
 9 ║          was still kind of looking out the door as
10 ║          he made me, you know, come back in.  Then
11 ║          he made me go back out, and as I'm
12 ║          standing out there, he says, "I need a
13 ║          car," and I didn't say anything.  Then he
14 ║          said, "But I don't want your car."  And I
15 ║          still didn't say anything.  Then he asked
16 ║          me did I have a screwdriver, and I say
17 ║          yes, so he asked me where was it; I told
18 ║          him, "In the kitchen."  So we went back to
19 ║          the kitchen where the screwdriver was, and
20 ║          he asked me where was it; I told him, "In
21 ║          the drawer," and he told me, "Go get it."
22 ║          I got it out the drawer and I handed it to
23 ║          him; and when I handed it to him, he threw
24 ║          it back -- he threw it in the kitchen.
25 ║          And I said, "What's wrong?"  and I had
```

241

772

VANES 000787

```
 1          realized myself it was he probably
 2          couldn't use it 'cause it was a BY MR.
 3          BENSON:lips screwdriver.  And at this
 4          time, it seemed like he was kind of
 5          frustrated and told me to go back to my
 6          spot, which I went back in the living room
 7          and laid down.  And he asked me did I have
 8          anything cold to drink or anything like
 9          that, I said, "No," and then I could hear
10          some noise in the kitchen like he was -- I
11          thought maybe he was getting a glass or
12          something.  And he came out of the kitchen
13          and he stood in the middle of the living
14          room and he said he was going to leave but
15          I wouldn't know because he was watching
16          me.  And I just -- he left and I just laid
17          there.
18  Q   Now, Mrs. Williams, you described when he
19          first came to your door, you began to tussle,
20          is that correct?
21  A       Yes.
22  Q   Can you stand up and show the jury what you
23          mean by that?  First of all, how tall are you,
24          ma'am?
25  A       Four eleven and a half.
```

242

```
 1   Q    Okay, and can you describe to the jury how it
 2        is that you were tussling with him?
 3   A        I just -- well, when he came in, I took
 4            his hand like this (indicating) and moved
 5            it out of my face, moved his hand out of
 6            my face.
 7   Q    And did he respond when you did that, when you
 8        moved the gun?
 9   A        Yeah, he -- he just -- something just told
10            me to let him go and I just stopped; that
11            was it.
12   Q    And then did you back into your house or did
13        you turn --
14   A        Yeah, I backed in.
15   Q    Okay, so you were looking directly at his
16        face?
17   A        Not really.  At that point when I was
18            tussling with him, when I opened the door,
19            I could see him, you know.
20   Q    When you first opened the door --
21   A        There he was.
22   Q    How much taller is he than you?  Can you
23        estimate?
24   A        I came up to about here, up to here to him
25            (indicating).
```

243

774

VANES 000789

```
 1   Q   So up to his chest you're saying?

 2   A      Yes.

 3   Q   Now, can you describe the gun?

 4   A      It was black; it was all black.

 5   Q   And what was the defendant's demeanor after he

 6       got in your house?

 7   A      He wanted money.

 8   Q   How was his tone of voice?

 9   A      He was --

10   Q   Was he calm, was he irritated?  I mean can you

11       describe how he acted?

12   A      He was more calm; he was kind of calm.

13   Q   Was there any point in time that he was not

14       calm and that his tone changed?

15   A      When he put the pillow over my head, and

16          when he threw the screwdriver back.

17   Q   He became, what, irritated?

18   A      Yeah, he was kind of getting irritated.

19   Q   Now, when he put the pillow over your head and

20       you said you felt the gun in your skull, was

21       he standing over you or was he --

22   A      He was kneeled down.

23   Q   He was kneeled on top of you or kneeled on the

24       floor?

25   Q      He was kneeled on the floor.
```

244

VANES 000790

```
 1   Q   And with the gun to your head?

 2   A       (Indicating.)

 3   Q   You said he also was irritated when he threw

 4       the screwdriver at you?

 5   A       Well, he like threw it over me like, and

 6           he sounded like he was getting kind of

 7           tired of, you know, dealing with the

 8           situation, you know.

 9   Q   What was going on through your mind when he

10       was in the house?

11   A       I didn't upset him.  At that time, when he

12           threw the screwdriver, I saw that upset

13           him.

14   Q   What was going on through your mind?

15   A       I was scared, felt like I was going to die

16           if I didn't do the right thing.

17   Q   Now, can you estimate how long it is that the

18       defendant was inside your house that evening?

19   A       Well, when he left the last time and I was

20           laying down on the floor, it was 9:30; but

21           while he was there, the alarm clock, you

22           know, had went off, and it was set for

23           9:00 o'clock for me to get up to go to

24           work.

25   Q   The alarm clock went off during the time that
```

245

VANES 000791

```
 1 ||        he was in there?
 2 || A        Right, and he had been there a while
 3 ||          before the alarm clock had went off.
 4 || Q   What time do you think he first arrived at
 5 ||     your house?  Was it right after you heard the
 6 ||     noise at the window?
 7 || A        Yes.
 8 || Q   And you testified that was 8:45?
 9 || A        Yeah, about.
10 || Q   Okay, did you shut the alarm off after you
11 ||     heard it?
12 || A        No, he wouldn't let me go no where to turn
13 ||          the alarm off.  It went off when he was
14 ||          there?
15 || Q   And did it just stay on?
16 || A        Yeah, it just stayed on.
17 || Q   And how long after the alarm was on did he
18 ||     leave?
19 || A        Well, it was on for a long time, because
20 ||          when I laid down, I had -- the last time
21 ||          he left when I laid down, I was trying --
22 ||          I looked at my watch to give myself enough
23 ||          time to just try to make sure he was gone,
24 ||          and it was 9:30.
25 || Q   Is that when he came back or when he left?
```

246

```
 1 │ A        No, that was the last time.
 2 │ Q    Okay.  So you looked at your watch and it was
 3 │      9:30 and he had gone for the last time?
 4 │ A        Uh-huh.
 5 │ Q    What were the lighting conditions in your
 6 │      house?  How many lights did you have on?
 7 │ A        I had two living room lights on, I had a
 8 │          light in the hallway of the kitchen,
 9 │          between the -- like the kitchen and then
10 │          it's a little hallway; there was a light
11 │          on there. And there was a light on in my
12 │          bedroom.
13 │ Q    And what about the porch?  Did you have a
14 │      porch light on?
15 │ A        Yes.
16 │ Q    Now, you described when you had gone outside
17 │      twice when the neighbors were out there.  What
18 │      was the defendant doing when you were standing
19 │      outside on the porch?
20 │ A        Standing in back of me with a gun in my
21 │          back.
22 │ Q    And then you backed back into the house, is
23 │      that correct?
24 │ A        (Indicating.)
25 │ Q    All right, what occurred then after the
```

247

778

VANES 000793

```
 1       defendant finally left your house?  What did
 2       you do?
 3   A       I had went to go look for the telephone so
 4           I can call the police.
 5   Q   And did you call the police?
 6   A       Yes.
 7   Q   And what happened then?
 8   A       They told me -- asked me my address and
 9           where was I and what happened and they
10           would send somebody right out.
11   Q   Did there come a time when you went down to
12       the police station?
13   A       I did go down to the police station.
14   Q   And you gave the police a statement?
15   A       Yes.
16   Q   And you gave them a description of the
17       defendant?
18   A       Yes.
19   Q   And what else did you do when you were down at
20       the police station?
21   A       I gave them a statement, I looked at some
22           photos, and I looked at a line-up.
23   Q   And can you say how many photographs that you
24       looked at?
25   A       It was in the hundreds.
```

248

VANES 000794

```
 1   Q    I'm sorry?
 2   A         It was in the hundreds.
 3   Q    Would you say one hundred or four hundred, the
 4        high hundreds or the low hundreds?
 5   A         Well, the book was pretty thick, and I
 6             looked at about six or seven books.
 7   Q    Okay, you looked at about six or seven books.
 8        For the jury, describe to the jury how thick
 9        are those books?  Can you estimate?
10   A         Maybe about like this (indicating).
11   Q    And how many photos are on each page?
12   A         It was like three photos going across
13             three times, so I guess it's nine photos
14             on a page.
15   Q    And do you remember your reaction when --
16        well, first of all, were you able to identify
17        any of the photographs that you looked
18        through?
19   A         Not until I got to the one.
20   Q    Okay, to which one?
21   A         To the defendant's photo.
22   Q    Okay, do you remember what your reaction was
23        when you saw the defendant's photograph?
24   A         Shaking, and I was panicky, and I just
25             said, "That's the guy."
```

249

780

```
 1   Q    Okay, what did you do after you identified him
 2        to yourself?  Did you tell anybody?
 3   A        The officer.
 4   Q    And did you have occasion to look at a photo
 5        array?  Do you recognize Defendant's Exhibit
 6        Number 1?
 7   A        Yes.
 8   Q    And were you able to recognize anyone?
 9   A        Yes, number two.
10   Q    Number two, is that the photograph that you're
11        referring to?
12   A        Yes.
13   Q    Okay, and after you picked that photograph
14        out, what happened next?
15   A        He took me into the office, and I guess
16            the police woman looked through the file
17            number --
18   BY THE COURT:
19            Could you speak a little louder, Mrs.
20        Williams?
21   BY THE WITNESS:
22   A        I'm sorry.  She looked through the file.
23   BY MS. LAKE:
24   Q    Okay, but what did you do next after picking
25        that photograph out?  Did you have occasion to
```

250

VANES 000796

```
1        look at any others, or what happened next?
2    A       I didn't look at any more pictures after I
3            picked that picture.
4    Q   Did you have occasion to look at a line-up, a
5        physical line-up?
6    A       Yes.
7    Q   And was that the same day?
8    A       Yes.
9    Q   Okay.  Now, I'm going to hand you State's
10       Exhibit 8 and ask if you recognize that?
11   A       Yes.
12   Q   Is that the line-up that you looked at?
13   A       Yes.
14   Q   And were you able to identify anyone?
15   A       Yes.
16   Q   And what number would that be?
17   A       Number four.
18   Q   And is that the same person that you
19       identified in the photo?
20   A       Yes, it is.
21   Q   And, Mrs. Williams, State's Exhibit 17, which
22       was originally Defense Exhibit Number 1, do
23       you recognize that?
24   A       Yes.
25   Q   Okay, and that is the same photo array that
```

251

732

VANES 000797

```
 1        you were shown?
 2   A        Yes.
 3   Q   And you were able to identify the defendant?
 4   A        Yes.
 5   BY MS. LAKE:
 6        At this time, I would move to admit
 7        State's Exhibit 17.
 8   BY MR. KING:
 9        Your Honor, leave to take the witness on
10        voir dire?
11   BY THE COURT:
12        Yes.
13                VOIR DIRE EXAMINATION
14                       BY
15                    MR. KING
16   Q   Ms. Williams, when were you shown this array
17        of photos?
18   A        At the -- at the police station.
19   Q   Okay.
20   BY THE COURT:
21        Again, you'll have to answer louder; the
22        jury is having trouble hearing you now.
23   BY THE WITNESS:
24        I'm sorry.
25   BY MR. KING:
```

252

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

783

VANES 000798

```
 1  Q  Okay, when at the police station?  Before the
 2     line-up?
 3  A      No, it was after the line-up?
 4  Q  After the line-up?
 5  A      I think so.
 6  Q  Now, by the line-up, I mean when six fellows
 7     are standing up on the stage with the height
 8     lines behind them and -- are we talking about
 9     the same thing?
10  A      Yes.
11  Q  And you say then you were shown State's
12     Exhibit 17?
13  A      Yes, yes.
14  Q  Had you ever seen State's Exhibit 17 before
15     the line-up?
16  A      I saw that picture before the line-up.
17  Q  All right.  Who showed you State's Exhibit 17
18     after the line-up?
19  A      I think at the jail house -- I think at
20         the jail house I seen it.
21  Q  At the what, ma'am?
22  A      Jail house.
23  Q  Police station?
24  A      Police station, right.
25  Q  13th and Broadway?
```

253

VANES 000799

```
 1   A        Yes.

 2   Q   The same night you saw the line-up?

 3   A        Yes.

 4   Q   Do you have any idea who the policeman was

 5       that showed you?  Let me ask you this:  Was it

 6       the same policeman that took the statement

 7       from you?

 8   A        Yes.

 9   Q   Okay, so whoever that officer was, that's the

10       same one that showed you that after the line-

11       up?

12   A        Yes.

13   Q   Are you sure it was him?

14   A        Yes, I think so.

15   Q   Pardon me?

16   A        I think so.

17   Q   But you're not sure?

18   A        I'm not sure.

19   Q   And are you certain that all those six

20       pictures were in State's 17, or might they

21       have been different pictures?

22   A        No.

23   Q   No what?

24   A        They're the same ones.

25   Q   Okay, you're sure they're the same pictures
```

                            254

VANES 000800

```
 1        but you're not sure when you were shown that
 2        exhibit, is that correct?
 3   A         Right.
 4   Q   Pardon me?
 5   A         Right.
 6   BY MR. KING:
 7             No objection.
 8   BY THE COURT:
 9             All right, I'll admit it without
10        objection.
11
12             WHEREUPON STATE'S EXHIBIT NUMBER 17 IS
13        ADMITTED INTO EVIDENCE.
14
15   BY MS. LAKE:
16   Q   Mrs. Williams, now, I'm going to ask you if
17        you can identify, first of all, State's
18        Exhibit 19, if you can identify that and what
19        it is?
20   A         Yes.
21   Q   And what is it?
22   A         It's my statement.
23   BY THE COURT:
24             Again, a little louder.
25   BY THE WITNESS:
```

786

VANES 000801

```
 1 │ A          My statement.  I'm sorry.
 2 │ BY MS. LAKE:
 3 │ Q    And how many pages of your statement is it?
 4 │ A          It's three pages.
 5 │ Q    And did you sign that statement?
 6 │ A          Yes, I did.
 7 │ Q    I'm referring to page 3.  Do you recall when
 8 │      it is that you looked at the line-up?
 9 │ A          Yes.
10 │ Q    What time was it?
11 │ A          It says 7:30.
12 │ Q    You looked at the line-up at 7:30 and
13 │      identified the defendant, is that correct?
14 │ A          Yes.
15 │ Q    Mrs. Williams, how sure are you that this
16 │      defendant is the man that robbed you at
17 │      gunpoint on February 27th, 1992?
18 │ A          Very sure.
19 │ BY MS. LAKE:
20 │            Very sure.
21 │ BY THE COURT:
22 │            Before we start cross, let me just ask the
23 │      jury:  I determined that we would take this
24 │      witness up today and we would go until about
25 │      5:00.  Does anyone need to make a call home
```

256

VANES 000802

```
 1    because we're going to stay until about 5:00
 2    today?  Okay, let's take a short break and let
 3    anybody that needs to make phone calls make
 4    phone calls.  Don't talk about the case while
 5    you're outside the courtroom.
 6         Ma'am, just take about a five-minute break
 7    and you'll be back on the witness stand.
 8    We're doing this for the benefit of the jury.
 9
10         WHEREUPON THE COURT RECESSED AND
11    RECONVENED AND THE FOLLOWING PROCEEDINGS WERE
12    HELD IN THE PRESENCE AND HEARING OF THE JURY:
13
14                  CROSS-EXAMINATION
15                        BY
16                     MR. KING
17  Q  Ms. Williams, let's talk for a minute here
18     about your recollection of times. As I
19     understand your testimony, the last time you
20     recollect was looking at your watch and seeing
21     9:30 after this fellow that robbed you had
22     left, am I right?
23  A       Yes.
24  Q  Now, do you know how long it was that you were
25     on the floor there for the last time, from the
```

257

VANES 000803

```
 1      time this fellow left to the time you looked
 2      at your watch and saw it said 9:30?
 3   A      Well, it felt like forever.
 4   Q   Sure.  Do you know?
 5   A      Maybe about fifteen minutes.
 6   Q   Well, I mean what you know is when you hear
 7      this noise, this rustling-like noise at your
 8      bedroom window, which is what wakes you out of
 9      a sleep, and when you get up to investigate
10      that, you noted that the time was a quarter
11      till 9:00, am I correct?
12   A      Right.
13   Q   And that was significant because 9:00 o'clock
14      was wake-up time to get yourself prepared to
15      go to work, am I correct?
16   A      Right.
17   Q   So you get up out of a sleep, you turn on some
18      lights -- I believe you ended up with the
19      hallway lights, the living room lights and
20      your bedroom lights on, am I correct?
21   A      Yes.
22   Q   You check out another window, go back to bed,
23      lay down and close your eyes because you have
24      a few minutes to sleep before you have to get
25      up at 9:00 o'clock, am I correct?
```

258

729

VANES 000804

```
 1   A        Yes.
 2   Q    Now, if you can recall, did you doze back off
 3        or did you stay awake until you heard the
 4        knock on the door and the voice saying it was
 5        your neighbor?
 6   A        No, I didn't doze back off.
 7   Q    So you stayed awake.  In any event, some time
 8        after 8:45, you laid back down, there's a
 9        knock on the door, it's your neighbor, you
10        open the door, am I correct?
11   A        Yes.
12   Q    Now, the person that comes in after you open
13        the door, from the time you open that door
14        until the alarm clock goes off, to the best of
15        your ability to recall -- and if you can't
16        recall, that's fine -- how much time passed?
17   A        I can't recall.
18   Q    All right, you related for us pretty much in
19        chronological order what this man that came
20        into your house did, right, from beginning to
21        end, am I correct?
22   A        Yes.
23   Q    You didn't, you know, jump around, you told us
24        he did this, then this, then this, then this,
25        culminating in leaving, am I correct?
```

259

VANES 000805

```
 1   A        Yes.
 2   Q    What was this fellow doing when the alarm went
 3        off?  Right at the instant the alarm clock
 4        went off, what was this fellow doing and where
 5        were you?
 6   A        He was standing right behind me.
 7   Q    Where?
 8   A        In the dining room.
 9   Q    Okay.  Was this before or after the business
10        with the screwdriver and --
11   A        It was before.
12   Q    Okay, what was the closest to him doing out of
13        what you told us?
14   A        At that time, when the alarm clock -- he
15            was telling me to go lay down on the
16            floor.
17   Q    For the first time?
18   A        Yes.
19   Q    All right, so fairly quickly after he got
20        there, the alarm went off, am I correct?  Was
21        this before he put the pillow over your head?
22   A        No.
23   Q    Okay.
24   A        The alarm clock went off after the pillow
25            incident.
```

260

VANES 000806

```
 1  Q    All right, so you had already been -- okay, he
 2       comes in, you open the door.  The first thing
 3       you see is a gun in your face, am I correct?
 4  A       Yes.
 5  Q    And you saw that gun well enough to know
 6       not only was it a dark in color gun but
 7       you also noticed that it wasn't a
 8       revolver, didn't you?
 9  A       Yes.
10  Q    Because there wasn't that cylinder in the
11       center?
12  A       Yes.
13  Q    So you knew from seeing that gun right in your
14       face, which is the first thing you see when
15       you open this door --
16  A       I saw his face and the gun.
17  Q    Well, the gun is put right into your face, is
18       it not?
19  A       Yes.
20  Q    And you look at it and you know it's an
21       automatic weapon, is that correct?
22  A       Yes.
23  Q    Now, does he have you turn around and follow
24       you with the gun at your back into your home?
25  A       No.
```

261

792

VANES 000807

```
 1   Q   All right, tell me what happened.
 2   A       I'm walking backwards.
 3   Q   All right, how far into your house could you
 4       go backwards?
 5   A       Until he could shut the door after
 6           hisself.
 7   Q   After he shut the door, did you turn around
 8       then?
 9   A       Yes.
10   Q   And that's when you're led through the house
11       with him with the gun in your back, am I
12       correct?
13   A       Yes.
14   Q   So as soon as he's able to come in long enough
15       to close the door behind him, you're turned
16       around, back to him, taken through the house,
17       am I correct?
18   A       After he closes the door.
19   Q   All right.  So not very much time at all
20       passes from the door opening to the door
21       closing, am I correct?
22   A       Right.
23   Q   Now, at this point, the demand is made for
24       money, am I correct?
25   A       Yes.
```

262

VANES 000808

| | | |
|---|---|---|
| 1 | Q | You direct him into the bedroom because you |
| 2 | | have fifty bucks or fifty dollars, |
| 3 | | thereabouts, on your dresser, am I correct? |
| 4 | A | Yes. |
| 5 | Q | Once you're inside the bedroom -- do you go |
| 6 | | immediately to the bedroom once he turns you |
| 7 | | around and is marching behind you? |
| 8 | A | Yes. |
| 9 | Q | All right.  Once you're in the bedroom, you're |
| 10 | | told to lay down on the floor? |
| 11 | A | Yes. |
| 12 | Q | Do you do so? |
| 13 | A | Yes. |
| 14 | Q | And it's at this point that he takes the |
| 15 | | fifty dollars off the dresser, am I |
| 16 | | correct? |
| 17 | A | Yes -- before he already have it. |
| 18 | Q | He already had the money? |
| 19 | A | He already has the money. |
| 20 | Q | Now, you got on the floor? |
| 21 | A | Yes. |
| 22 | Q | And when you're down on the floor this time, |
| 23 | | the pillow is put over your head? |
| 24 | A | He rumbled through the room first. |
| 25 | Q | Yeah, I know some other stuff happened; I'm |

263

VANES 000809

```
 1        just trying to see if we're at the same
 2        general point here.
 3   A        I'm sorry.
 4   Q    When he told you to lay down for the first
 5        time in the bedroom --
 6   A        Yes.
 7   Q    -- did you ever get up before he put the
 8        pillow over your head?
 9   A        No.
10   Q    Okay, so you're in the bedroom, he's
11        rustling through drawers and whatever
12        else, and you're seeing a little bit out
13        of the corner of your eye some stuff being
14        tossed about, and then he wants more
15        money, am I correct?
16   A        Yes.
17   Q    And then using the pillow and, "I'm going to
18        count to five," and all that business, that
19        happens then, am I correct?
20   A        Yes.
21   Q    The alarm still hasn't gone off, has it?
22   A        No.
23   Q    So we're some time prior to 9:00 o'clock, at
24        least according to the times on your clock, am
25        I correct?
```

264

795

VANES 000810

```
1  A        Yes.
2  Q    Were your clocks -- if you know -- were they
3       pretty accurate?  I mean did you set them off
4       the radio, or like some people, did you set
5       them fast?  Like an alarm clock, some folks
6       set it fast.
7  A        No.
8  Q    Okay, yours were pretty accurate as far as
9       you're concerned?
10 A        Yes.
11 Q    Was your watch in sync with your alarm clock,
12      if you know?
13 A        Yes, 'cause I set it from them.
14 Q    You set it from them?
15 A        Uh-huh.
16 Q    So whatever time was on your watch, the same
17      time, as best you know, was on your alarm
18      clock, am I right?
19 A        Yes.
20 Q    So we're doing this pillow and all this other
21      stuff, then counts to four as I recall your
22      testimony, and then what?  Do you get up?
23 A        He tells me to get up.
24 Q    You get up and then you go to a different
25      room?
```

265

796

VANES 000811

```
 1 | A        Exactly.
 2 | Q   Okay, is this looking for the phone now?
 3 | A        Yes, we are.
 4 | Q   And is he behind you with the gun?
 5 | A        Yes, he is.
 6 | Q   All right, walking you through the house.
 7 |     Now, where are you the next time you're told
 8 |     to lay down, what room?
 9 | A        The dining room.
10 | Q   Okay.  And you go pretty much from the bedroom
11 |     -- once you get up, him behind you with the
12 |     gun -- do you pretty much go to the dining
13 |     room or do you stop at another room?
14 | A        Yeah, you go to the dining room; it's a
15 |          hallway and then you go to the dining
16 |          room.
17 | Q   Well, is that where he took you?
18 | A        Yes.
19 | Q   And then makes you lay down again?
20 | A        No, he takes me -- no, we are going
21 |          through the dining room --
22 | Q   Uh-huh.
23 | A        -- and we stopped in the dining room, and
24 |          that's where he starts to look through my
25 |          coat and stuff.
```

266

797

VANES 000812

| 1 | Q | Is he still behind you? |
|---|---|---|
| 2 | A | When he looked through my coat, he's |
| 3 | | standing like right next to me. |
| 4 | Q | You're indicating to your left, is that |
| 5 | | correct? |
| 6 | A | Right. |
| 7 | Q | Now, the lights aren't on in the dining room? |
| 8 | A | Right. |
| 9 | Q | In any event, he looks through the coat. Then |
| 10 | | what? Does he march you around again or make |
| 11 | | you lay down? |
| 12 | A | No, he grabs me to pull me in front of |
| 13 | | him, and then we walk toward, you know, |
| 14 | | going toward the kitchen to look for the |
| 15 | | phone -- |
| 16 | Q | Okay. |
| 17 | A | -- and right when you're in the dining |
| 18 | | room, it's a doorway right there and you |
| 19 | | can look directly in the kitchen, and |
| 20 | | that's when I noticed the phone's not |
| 21 | | there. Then the dining room is like cut |
| 22 | | off right here, and then it's the living |
| 23 | | room with a big opening, the living room. |
| 24 | Q | Okay, you go into the living room? |
| 25 | A | Yes. |

798

VANES 000813

```
 1 ║ Q   And the alarm still hasn't gone off, am I
 2 ║     correct?
 3 ║ A       When we're standing in the dining room, it
 4 ║         goes off right there.
 5 ║ Q   After he has gone through your coat?
 6 ║ A       Right.
 7 ║ Q   Okay.  That's when it goes off and this guy
 8 ║     says, "I got to get out of here.  It's time to
 9 ║     leave," or something to that effect, am I
10 ║     correct?
11 ║ A       He says, "I got to get out of here." He
12 ║         asked me, "What was that?"  I said, "My
13 ║         alarm clock.  I could go turn it off," and
14 ║         he said, "No," and told me to, "Just go
15 ║         lay down."
16 ║ Q   So that just kept ringing?
17 ║ A       Right.
18 ║ Q   Did you ever shut that -- I mean we know it's
19 ║     not ringing today -- did you ever shut it off
20 ║     that evening?
21 ║ A       Yes.
22 ║ Q   Okay, after he had left for the last time?
23 ║ A       Yes.
24 ║ Q   All right.  So this is buzzing the whole time,
25 ║     am I correct?
```

268

709

VANES 000814

```
 1 || A        Exactly.
 2 || Q    All right.  So from that point forward in the
 3 ||      dining room when the alarm clock goes off, he
 4 ||      has already taken the money from your bedroom,
 5 ||      rifled through the drawers and whatever else
 6 ||      while you're on the floor, he has taken you
 7 ||      in, gone through your coat in the dining room
 8 ||      where the lights were off, he has gone looking
 9 ||      for the phone in the kitchen.  Now, you've
10 ||      gone back toward the living room with him
11 ||      behind you with the gun, am I correct?
12 || A        Yes.
13 || Q    And this is when the alarm goes off?
14 || A        Yes.
15 || Q    Now, at that point, and after he says, "I've
16 ||      got to get out of here," do you stay standing
17 ||      or do you get --
18 || A        I'm standing, he's standing there.
19 || Q    Now, while this guy is doing this stuff, one
20 ||      of the things you recollect him saying is he
21 ||      doesn't like to rob black people but that if
22 ||      you knew his situation, you would understand,
23 ||      or words to that effect, am I correct?
24 || A        Yes.
25 || Q    If you knew his situation.  Did you have any
```

269

VANES 000815

```
 1    clue of what was meant by that, "if you knew
 2    his situation"?
 3  A      No, I didn't.
 4  Q  The way this guy was looking for money and
 5    everything, you know, in your coat, your
 6    dresser and all over the house, he appeared to
 7    be fairly desperate, didn't he?
 8  A      Yes, he did.
 9  Q  One of the other things you noticed, at some
10    point after he has invaded your home, this guy
11    takes time out to try to get a cold drink from
12    the refrigerator, am I correct?
13  A      Yes.
14  Q  But doesn't want beer, am I correct?
15  A      Yes.
16  Q  In fact, he complained that the only thing
17    you've got in your refrigerator is beer, you
18    don't have any cold water, you don't have any
19    cold pop, anything like that, am I correct?
20  A      Yes.
21  Q  And then one of the things you remember about
22    this guy is he's telling you he needs a car
23    but he doesn't want your car?
24  A      Yes.
25  Q  Was your car in the driveway or parked out
```

270

301

VANES 000816

```
 1 ||      front?
 2 || A        Right in front of the house.
 3 || Q   What kind of car did you have?
 4 || A        A white car.
 5 || Q   Year?
 6 || A        '88.
 7 || Q   An '88.  What kind of car?
 8 || A        Escort.
 9 || Q   A 1988 Escort?
10 || A        Yes.
11 || Q   And this guy who was desperately going through
12 ||      your house, he doesn't want your '88 Escort?
13 || A        No.
14 || Q   Never even demanded or asked for your keys,
15 ||      did he?
16 || A        No.
17 || Q   But then he asked you for a screwdriver, am I
18 ||      correct?
19 || A        Yes.
20 || Q   Now, one of the things you said earlier when I
21 ||      was asking you questions, Ms. Williams, was,
22 ||      you know, asking about times and trying to
23 ||      figure out how long different things took, one
24 ||      of the things you shared with us was being in
25 ||      this situation, obviously terrifying, am I
```

302

VANES 000817

```
 1      correct?  I mean you were scared?
 2  A        Yes.
 3  Q   "It seemed like an eternity," I think was your
 4      phrase, or, "seemed like forever," or
 5      something like that, am I correct?
 6  A        Yes.
 7  Q   All right.  And then after the guy leaves the
 8      first time, you think it's safe to at least go
 9      out the door, he pops back in, so it was even
10      scarier, wasn't it?
11  A        Yes.
12  Q   You don't know when this guy is going to come
13      back.  But would it be accurate to say that
14      even though you look at your watch when you
15      think it's safe to do that -- now, you don't
16      look at your watch like when he walks out of
17      the house the last time, do you?
18  A        I didn't look at my watch until the last
19          time he left.
20  Q   What I'm saying is:  Did you look at your
21      watch when you thought it was safe to get up
22      or did you look at your watch when he walked
23      out the door the last time?  If you're
24      following me.
25  A        I understand.
```

272

VANES 000818

```
 1   Q   Okay.
 2   A       I looked at my watch after he leaves.
 3   Q   Like right away?
 4   A       Not exactly right away.
 5   Q   Okay.  And when you do look at your watch,
 6       it's 9:30?
 7   A       No, I said I was saying to myself, "At
 8           9:30, I'm going to get up."
 9   Q   Oh, okay.
10   A       And it was like twenty-five after.
11   Q   Well, do you know?  And this may be something
12       you don't remember, and that's totally
13       understandable.  Do you really remember what
14       time it was when you looked at your watch?
15   A       Yes, I do.
16   Q   Okay, what time was it?
17   A       It was 9:25.
18   Q   And how long before you looked at your watch
19       and saw 9:25 on the dial had this guy walked
20       out of the house.
21   A       Right after he walked out.
22   Q   You mean like right as he's passing through
23       the doorway or --
24   A       No.
25   Q   -- did you let some time pass?
```

273

804

VANES 000819

```
 1 │ A        I let a little bit of time pass.
 2 │ Q   Okay.  So your house is located over on --
 3 │     what was that, Connecticut?
 4 │ A        Yes.
 5 │ Q   The 4400 block?
 6 │ A        Yes.
 7 │ Q   Connecticut, how many streets west of
 8 │     Massachusetts is Connecticut?
 9 │ A        A street over I think.
10 │ Q   The next street over?
11 │ A        Yes.
12 │ Q   Because if you're headed east from Broadway,
13 │     you've got Broadway, you've got Massachusetts,
14 │     Connecticut --
15 │ A        Yes.
16 │ Q   -- and Delaware, Maryland, Pennsylvania, is
17 │     that right?
18 │ A        Yes.
19 │ Q   Okay.  So you're one block over, one block
20 │     east of Massachusetts -- and those are short
21 │     blocks running east and west, am I right?
22 │ A        Yes.
23 │ Q   I mean the blocks are much longer north and
24 │     south there --
25 │ A        Yes.
```

274

895

VANES 000820

| | | |
|---|---|---|
| 1 | Q | -- than they are east and west? |
| 2 | A | Yes. |
| 3 | Q | All right, so you're one short block over from |
| 4 | | Massachusetts and you're two blocks north of |
| 5 | | the 4600 block, correct? 4400 is two blocks |
| 6 | | north of 4600, correct? |
| 7 | A | Yes. |
| 8 | Q | Okay. Now, in terms of -- obviously when you |
| 9 | | feel it's safe at some time after 9:25, you |
| 10 | | arrange to call the police and tell them what |
| 11 | | happened, is that correct, ma'am? |
| 12 | A | Yes. |
| 13 | Q | And you talked to a policeman that very night, |
| 14 | | didn't you? |
| 15 | A | Yes. |
| 16 | Q | Now, you were -- would it be accurate to say |
| 17 | | that when you got a chance to talk to the |
| 18 | | policeman that night that you did your best to |
| 19 | | accurately tell him what happened? |
| 20 | A | Yes. |
| 21 | Q | All right. I'm sure you were still scared, |
| 22 | | weren't you? |
| 23 | A | Yes. |
| 24 | Q | But did you feel like you were capable of |
| 25 | | giving a decent description of what happened? |

275

VANES 000821

```
 1 │ A        Yes.
 2 │ Q    All right.  One of the things they wanted to
 3 │      know -- and was this policeman in uniform?
 4 │ A        When he came?
 5 │ Q    Yes.
 6 │ A        Yes, he was.
 7 │ Q    When the policeman in uniform came, one of the
 8 │      things he wanted to get from you was a
 9 │      description as best he could of the fellow
10 │      that did this to you, am I correct, ma'am?
11 │ A        Yes.
12 │ Q    And did you do your level best to give him
13 │      accurate information?
14 │ A        Yes.
15 │ Q    Do you recollect the officer being there some
16 │      time shortly after 10:00 p.m. that evening?
17 │ A        Yes.
18 │ Q    And came to your house, am I correct?
19 │ A        Yes.
20 │ Q    Do your recall the description you gave the
21 │      person that had done this to you?
22 │ A        Yes.
23 │ Q    Okay, what do you recall?
24 │ A        That he had on a black hat, black leather
25 │          coat -- he had on all black.  And he had
```

276

807

VANES 000822

```
 1              something red, maybe a red bandanna or
 2              something.
 3    Q    Where was that?
 4    A         Around his head.
 5    Q    Under the hat?
 6    A         Yes.
 7    Q    Do you remember telling the height, how tall
 8         this fellow was?
 9    A         Yes.
10    Q    How tall did you tell them?
11    A         About five ten, five nine.
12    Q    Well, do you remember telling this officer,
13         the first policeman you're talking to on the
14         very night this happened, that the fellow that
15         did this to you was five foot seven inches
16         tall?
17    A         No, I don't.
18    Q    He had bad skin?
19    A         Yes.
20    Q    Twenty-five years old or thereabouts?
21    A         Yes.
22    Q    Medium complexion?
23    A         Yes.
24    Q    Slim build?
25    A         Yes.
```

277

808

VANES 000823

```
 1   Q   Black clothing?
 2   A       Yes.
 3   Q   Black leather jacket?
 4   A       Yes.
 5   Q   Do you recall now that it was a black leather
 6       jacket?
 7   A       Yes.
 8   Q   A red bandanna?
 9   A       Yes.
10   Q   And a black Kangoll cap?
11   A       Yes.
12   Q   Now, a Kangoll cap is a manufactured cap, am I
13       correct?
14   A       Yes.
15   Q   Now, they make a couple different styles,
16       don't they?
17   A       Yes.
18   Q   They make one that's sort of rounded and
19       it's got like a little tiny brim in the
20       front and back and all the way around?
21   A       It wasn't like that.
22   Q   This was like a cap, am I correct?
23   A       It was like a hat, like a hat.
24   Q   Okay, describe it.  Did it have a little bill
25       on it?
```

278

VANES 000824

| 1 | A | Yes. |
|---|---|---|
| 2 | Q | A little thing on the front? |
| 3 | A | Yes. |
| 4 | Q | Do you know it was a Kangoll -- this Kangoll |
| 5 | | carries an insignia of a little kangaroo. |
| 6 | A | Well, it was made like one. |
| 7 | Q | Okay, what I'm wondering is if did you happen |
| 8 | | to see if it actually had a kangaroo on it or |
| 9 | | anything? |
| 10 | A | No, no. |
| 11 | Q | Okay. So that's the cap we have. Then we |
| 12 | | have a red bandanna underneath the cap, am I |
| 13 | | correct? |
| 14 | A | Yeah, I think -- yeah. |
| 15 | Q | I'm sorry, ma'am? |
| 16 | A | Yes, I had told the officer, "I think he |
| 17 | | had a red bandanna on his head." |
| 18 | Q | And one of the things initially you thought is |
| 19 | | this fellow was wearing leather gloves, am I |
| 20 | | correct? |
| 21 | A | Yes. |
| 22 | Q | I'm just talking about initially. Now, later |
| 23 | | -- correct me if I am wrong -- later you |
| 24 | | thought about it some, and you're not sure |
| 25 | | about the gloves, is that correct? |

279

810

VANES 000825

```
 1    A         He didn't have any on.

 2    Q    He didn't have any on?

 3    A         After I thought about it, you know, he

 4         didn't.

 5    Q    We met one time before this, am I right, back

 6         in April, early April, was it?  Do you

 7         remember?

 8    A         When I said -- when I went down --

 9    Q    When I asked you questions and --

10    A         Okay.

11    Q    Okay, and do you recall at that time saying

12         you just remember at some point when you

13         reached up you touched something that might

14         have felt like a glove?

15    BY MS. LAKE:

16                   Objection, improper impeachment.

17    BY MR. KING:

18              I'm not impeaching the witness.

19    BY THE COURT:

20              Well, it might have that effect.

21    BY MR. KING:

22    Q    Let me just ask you now, today:  Are you

23         saying now this person did not have gloves?

24    A         Yes, I'm saying he did not have gloves.

25    Q    Now, is there any particular reason that you
```

280

811

VANES 000826

```
 1        can think of why you might have mentioned
 2        gloves to the first policeman that you talked
 3        to?
 4    A      'Cause I told him that when I was tussling
 5           with him like this, I grabbed something.
 6    Q    I see.  So actually that might have even been
 7         a jacket or just about anything, right?
 8    A      Yes.
 9    Q    So now you're sure this guy didn't have gloves
10         on?
11    A      Yes.
12    Q    And this guy was all over your dresser and in
13         your dresser and was in your kitchen and in
14         there rooting around in the cabinets, even
15         maybe I think at one point you thought maybe
16         he was looking for a glass, am I right?
17    A      Yes.
18    Q    And when did you leave out of that house and
19         go to Indianapolis, about how long ago?
20    A      I've been in Indianapolis for a month.
21    Q    Okay.  From the night this happened until you
22         left to go to Indianapolis, did the police,
23         Gary or Lake County or anybody, ever come over
24         there and look for a fingerprint?
25    A      No.
```

281

VANES 000827

```
 1  Q   Never came over there and took pictures of
 2      anything?
 3  A      No.
 4  Q   Now, it sounds as though from the time this
 5      man came to the door of your home, put the gun
 6      in your face, with all these things that he
 7      did, while you were periodically able to look
 8      at this man's face, it sounds like from your
 9      testimony that most of the time this man
10      either has you lying on the floor face down or
11      standing behind you with a gun pressed in your
12      back walking you from one point to the other.
13      Is that accurate to say, ma'am, that in terms
14      of most of the time from the time this guy
15      came into your house, you're either face down
16      or in front of him with him with a gun behind
17      you, is that correct?  I'm not saying all the
18      time but most of the time.
19  A      Yes.
20  Q   Did you ever discover, you know, when all this
21      happened and you had a chance to recollect a
22      little bit, did you ever see if anything
23      beside your fifty dollars from the dresser had
24      been taken by this man?  Were you missing
25      anything else from within your
```

282

813

```
 1 |   home?
 2 | A      Yes.
 3 | Q   What?
 4 | A      A two-dollar bill.
 5 | Q   A two-dollar bill?
 6 | A      Yes.
 7 | Q   Where had that been the last you knew?
 8 | A      In my purse.
 9 | Q   All right, so this fellow apparently went
10 |     through your purse pretty good, is that right?
11 | A      Yes.
12 | Q   Did you have it tucked away inside the purse?
13 | A      No.
14 | Q   In a wallet?
15 | A      It was between a wallet and a book, a
16 |        telephone book.
17 | Q   All right, had this fellow thrown all your
18 |     stuff out of your purse?
19 | A      Yes.
20 | Q   Did you tell the policemen this?
21 | A      Yes.
22 | Q   Any talk, any mention about somebody coming
23 |     over to see if maybe there might be a
24 |     fingerprint or two or ten?
25 | A      Later.
```

283

814

VANES 000829

| 1 | Q | Later. But they didn't do it? |
|---|---|---|
| 2 | A | No. |
| 3 | Q | But they didn't do it? |
| 4 | A | No. |
| 5 | Q | One of the first things you noticed about this |
| 6 | | person that assaulted you in your home that |
| 7 | | night, after the gun is produced in your face, |
| 8 | | was scars on his face, is that correct? |
| 9 | A | Yes. |
| 10 | Q | A noticeable feature, am I correct? |
| 11 | A | Yes. |
| 12 | Q | Scars that looked as though they had developed |
| 13 | | from either a bad bout of acne or chicken pox |
| 14 | | or something of that nature, is that correct? |
| 15 | A | Yes. |
| 16 | Q | A pitted sort of appearance in terms of the |
| 17 | | scarring? |
| 18 | A | Yes. |
| 19 | Q | The cheeks I believe you said -- |
| 20 | A | Yeah. |
| 21 | Q | -- the cheek area? |
| 22 | A | Yes. |
| 23 | Q | And that was something that really, you know, |
| 24 | | in terms of recollecting somebody you just |
| 25 | | saw, that was something that really stuck out |

284

815

VANES 000830

```
 1 │      in your mind, am I correct?
 2 │ A       Yes.
 3 │ Q   Now, after the policeman talks to you at your
 4 │     home which is on February 27th, a Thursday
 5 │     night, your next contact with the police would
 6 │     have been Wednesday, March the 3rd, am I
 7 │     correct?  Do you know?
 8 │ A       It was the next day.
 9 │ Q   The next day?
10 │ A       The next day I had to go down there.
11 │ Q   Friday, the 28th?
12 │ A       I think so.
13 │ Q   Okay.  You're probably right; let me look.
14 │     What did you do that next day?  Did you talk
15 │     to a policeman?  The reason I ask, Ms.
16 │     Williams, is the statement -- you know, the
17 │     prosecutor showed it to you a few minutes ago.
18 │ A       Yes.
19 │ Q   That statement appears to be dated March 3rd.
20 │     So might a few days have passed?
21 │ A       Yes.
22 │ Q   I know it has been a little bit.  Well, let's
23 │     put it this way:  When you did go to the
24 │     police station for the first time --
25 │ A       I think it was -- I'm trying to remember
```

285

816

VANES 000831

```
 1          the day.
 2    Q    Let me ask you this:  A policeman came to your
 3          house, you give the description we just went
 4          over here, am I correct?
 5    A         Yes.
 6    Q    Okay, you don't go to the police station that
 7          night, am I correct?
 8    A         Right.
 9    Q    When you do go to the police station, whenever
10          that might have been, is that when you give
11          the statement and look at the pictures and the
12          line-up and all that business, all in the same
13          day?
14    A         No.
15    Q    All right.  Well, did you give the statement?
16    A         Yes.
17    Q    Well, did you look at the date on the
18          statement the prosecutor showed you?  This is
19          State's 19 for identification.
20    A         Okay.
21    Q    Ms. Lake asked you some questions a minute
22          ago.
23    A         Okay.
24    Q    That's your statement, right?
25    A         Yes.
```

286

VANES 000832

| | | |
|---|---|---|
| 1 | Q | What's the date? |
| 2 | A | It says the 3rd. |
| 3 | Q | March the 3rd? |
| 4 | A | Yes. |
| 5 | Q | Okay, between February 27th when the policeman |
| 6 | | talked to you at home and March the 3rd when |
| 7 | | you gave this statement, had you made an |
| 8 | | earlier visit to the police station? |
| 9 | A | Yes. |
| 10 | Q | To do what? |
| 11 | A | Give them my statement; I gave them a |
| 12 | | statement. |
| 13 | Q | That one? |
| 14 | A | I didn't sign this till the 3rd, till the |
| 15 | | same day that I went down and saw the |
| 16 | | line-up. |
| 17 | Q | You're saying you gave the statement but -- |
| 18 | A | I talked to Officer Outlaw when I went the |
| 19 | | first time. |
| 20 | Q | Oh, you talked to him? |
| 21 | A | Right. |
| 22 | Q | Do you know if he typed up a statement? |
| 23 | A | Oh, no, he didn't. |
| 24 | Q | Okay. All right, what did you do, talk to him |
| 25 | | up in the Detective Bureau? |

287

818

VANES 000833

```
 1 │ A      Right.
 2 │ Q   Tell him basically what had happened?
 3 │ A      Right.
 4 │ Q   I see.  You don't know if he took anything
 5 │     down or not?
 6 │ A      No, he didn't.
 7 │ Q   All right, so that's Friday the 28th that you
 8 │     did this?
 9 │ A      Yes, I think it was the next day.
10 │ Q   The next day?
11 │ A      I think it was the next day.
12 │ Q   All right. Then the following Wednesday you
13 │     go, you give the statement, you look at
14 │     pictures and look at a line-up, am I correct?
15 │ A      Yes.
16 │ Q   All right.  And you've told me you don't
17 │     recollect telling the first policeman the
18 │     night this happened the fellow that did this
19 │     was five foot seven inches?
20 │ A      No.
21 │ Q   You've told me that.  Do you recollect that
22 │     when you gave your statement, State's Exhibit
23 │     19 for identification, on March 3rd, a
24 │     Wednesday, that you said the guy was five foot
25 │     ten inches tall?
```

288

VANES 000834

```
 1 | A        About five nine, five ten.
 2 | Q    Five nine, five ten?
 3 | A        Yes.
 4 | Q    Then you picked out a picture, then you go
 5 |      look at a line-up and you pick out the guy in
 6 |      the line-up whose picture you saw if I
 7 |      understand your testimony correctly.
 8 | A        Yes.
 9 | Q    Was that within hours, one or the other?  Were
10 |      you there at the police station the whole time
11 |      to do this statement, look at the picture,
12 |      look at the line-up?
13 | A        No.
14 | Q    Did you come back and forth?
15 | A        Yes.
16 | Q    Okay.  Were other folks there?
17 | A        Yes.
18 | Q    All right, at the line-up?
19 | A        Were my folks at the line-up?
20 | Q    No, no, not your folks, other people.  Were
21 |      other people there at the line-up, you know,
22 |      like looking at the line-up?  I'm not --
23 | A        Yes, Officer Outlaw was with me.
24 | Q    Okay.  You lost a two-dollar bill and you lost
25 |      fifty dollars in whatever denomination it
```

289

820

VANES 000835

```
 1       might have been, is that correct?
 2   A       Yes.
 3   Q   All right.  How long had you been living in
 4       that neighborhood?
 5   A       Three weeks.
 6   Q   Three weeks?
 7   A       Yes.
 8   BY MR. KING:
 9           That's all I have, Ms. Williams.  Thank
10       you very much.
11               REDIRECT EXAMINATION
12                   BY
13                MS. LAKE
14   Q   Ms. Williams, Mr. King asked you about the
15       offense report.  The night that this happened,
16       you talked to a police officer, is that
17       correct?
18   A       Right.
19   Q   And you told that police officer about the
20       gloves?
21   A       Yes, I said, "He might have had on gloves
22           but I'm not sure."
23   Q   But you told him at that point, you remembered
24       he was wearing gloves?
25   A       Yes.
```

290

VANES 000836

```
 1   Q   And then no one came in your house and took
 2       pictures?
 3   A       No.
 4   Q   And no fingerprints were taken at that time?
 5   A       No.
 6   Q   Okay.  Now, that offense report, did you read
 7       it over?
 8   A       No.
 9   Q   Did you ever sign that offense report?
10   A       I don't know.
11   Q   I'm now going to hand you State's Exhibit 20
12       and ask if you recognize what that is?
13   A       That's the report.
14   Q   That's the offense report?
15   A       That the officer --
16   Q   Okay, look it over and tell me if you had an
17       opportunity to sign that or if you did sign
18       it?
19   A       No.
20   Q   Did you read it over when you talked to the
21       police officer?
22   A       No.
23   Q   Or did you just talk to him?
24   A       I just talked to him.
25   Q   Okay, and then on March the 3rd, you gave a
```

291

822

VANES 000837

```
 1 ||    statement to the police, in fact, right?
 2 || A     Yes.
 3 || Q  And that statement you did look over and you
 4 ||    did sign, correct?
 5 || A     Yes.
 6 || Q  And you told the police then that the
 7 ||    defendant was wearing a black leather jacket?
 8 || A     Yes.
 9 || Q  And you told him he was wearing a black
10 ||    Kangoll cap?
11 || A     Right.
12 || Q  You also told him he had dark jeans and dark
13 ||    shoes, right?
14 || A     Right.
15 || Q  And he was about five nine or five ten?
16 || A     Yes.
17 || Q  He had a slender build?
18 || A     Yes.
19 || Q  He had a medium complexion?
20 || A     Yes.
21 || Q  And you said that he had bump-like scars on
22 ||    his face, is that right?
23 || A     Yes.
24 || Q  Has his appearance changed today now that you
25 ||    look at him?
```

292

823

VANES 000838

```
 1   A        No.
 2   Q   Are the bump-like scars on his face the same
 3       or are they different in any way?
 4   A        They're the same.
 5   Q   Is there any doubt in your mind that that is
 6       the man that robbed you at gunpoint?
 7   A        No.
 8   Q   When you picked this defendant's picture out
 9       of the hundreds of photos that you looked at,
10       did anyone tell you which photo to pick?
11   A        No.
12   Q   Did anyone suggest in any way which photo to
13       choose from?
14   A        No.
15   Q   When you picked this defendant out of the
16       physical line-up later on, did anyone suggest
17       to you which person to pick?
18   A        Oh, no.
19   Q   And did you talk to a person by the name of
20       Kim Belinsky about your identification?
21   A        No.
22   Q   And did anyone suggest to you in any way what
23       person to look for?
24   A        No.
25   BY MS. LAKE:
```

293

824

VANES 000839

```
 1 |    Nothing else.
 2 |              RECROSS-EXAMINATION
 3 |                   BY
 4 |                MR. KING
 5 | Q   All right, ma'am, the prosecutor asked you --
 6 |     going back -- you originally said something
 7 |     about gloves.  Now, you told me there was a
 8 |     discussion with a Gary policeman about
 9 |     fingerprinting within your home?
10 | A        Yes.
11 | Q   When was that?  About the time you gave the
12 |     statement?
13 | A        I had told them at that time.
14 | Q   As of March 3rd, you had told the Gary police?
15 | A        That I remember he didn't have on gloves.
16 | Q   That he didn't have gloves on?
17 | A        Yes.
18 | Q   And you had told them about this guy rifling
19 |     through the closet in the bedroom and
20 |     everything else.  And did they actually
 1 |     mention fingerprinting?
 2 | BY MS. LAKE:
 3 |                    I'm going to object as to hearsay
24 |                    and to which police officer he's
25 |                    referring to.
```

294

VANES 000840

1 | BY MR. KING:

2 |       Well, it's not hearsay, it's not truth of

3 |    the matter, it's --

4 | BY THE COURT:

5 |       Well, if we can limit it to that.

6 | BY MS. LAKE:

7 |       To which police officer?

8 | BY THE COURT:

9 |       First of all, before you answer this, and

10 |    I don't know if you can answer this question,

11 |    but let me admonish the jury: At this point I

12 |    believe the witness is being asked to repeat

13 |    what a Gary police officer said to her. We

14 |    don't know who that officer is, and this

15 |    person has not been on the witness stand, so

16 |    this is not evidence in this case -- it's not

17 |    subject to cross-examination at this point --

18 |    but I am going to permit her to answer it to

19 |    show what effect it had on this witness

20 |    subsequently and in the case.

  | BY MR. KING:

  | Q  Was it the same officer that took your

  |    statement from you, the statement that was

24 |    signed?

25 | A      Yes.

295

826

```
 1 ║ Q    Detective Outlaw?
 2 ║ A        Yes.
 3 ║ Q    Bruce Outlaw?
 4 ║ A        Yes.
 5 ║ Q    And at or before the time on March 3rd, 1992
 6 ║      that this statement was taken, your
 7 ║      recollection is that you specifically told the
 8 ║      detective the guy that came in your home
 9 ║      didn't have gloves on, is that correct?
10 ║ A        Yes.
11 ║ Q    And this detective specifically said something
12 ║      in your presence about checking for
13 ║      fingerprints?
14 ║ A        Yes.
15 ║ Q    And to this day, or at least until the time
16 ║      you moved out to move to Indianapolis, no one
17 ║      ever showed up to even look for a fingerprint,
18 ║      did they?
19 ║ A        No.
20 ║ BY MR. KING:
21 ║           That's all I have.  Thank you, ma'am.
22 ║ BY MS. LAKE:
23 ║           Nothing else.
24 ║ BY THE COURT:
25 ║           Ma'am, you may step down.  That's all.
```

                              296

VANES 000842

```
 1        Well, my watch shows 4:59, so we are going to
 2        recess pretty close to 5:00 o'clock.  We are
 3        going to recess for the day at this point,
 4        ladies and gentlemen.
 5   BY MR. KING:
 6        May we approach for a second?
 7   BY THE COURT:
 8        Certainly.
 9
10        WHEREUPON THE FOLLOWING DISCUSSION WAS
11   HELD AT THE BENCH OUTSIDE OF THE HEARING OF
12   THE JURY:
13
14   BY THE COURT:
15        What do you need?
16   BY MR. KING:
17        It's my request like at the end of the day
18   when you do the admonishment, in addition to,
19   "Do not discuss the case, you're not to form
20   or express any opinion," to remind them at
21   day's end in addition to not talking about it,
22   they're not individually to make up their
23   minds until they have heard all the evidence.
24   The admonishments are to be such cure-alls, so
25   let's see if it's --
```

297

828

VANES 000843

```
 1   BY THE COURT:
 2          Yes, I think we'll address that, and also
 3       the possible press, people are here taking
 4       notes.
 5   BY MR. KING:
 6          Yeah, that they should not read anything.
 7   BY THE COURT:
 8          Right.
 9   BY MR. KING:
10          I'm just saying then at day's end to
11       remind them.
12   BY THE COURT:
13          Right.
14
15          WHEREUPON THE FOLLOWING PROCEEDINGS WERE
16       ONCE AGAIN HELD IN THE HEARING OF THE JURY:
17
18   BY THE COURT:
19          I want to remind all of you and admonish
20       you that now that you have heard evidence in
21       this case that each of you is not to form or
22       express any opinion on the evidence that you
23       have heard up to this point and that you are,
24       in addition, not to converse about the
25       evidence you have heard in this trial with
```

298

820

VANES 000844

1   anyone, family or friends at home or among
2   yourselves when you're here in the building or
3   outside of the courtroom.
4       And, in addition, there probably will be
5   some newspaper accounts of these proceedings,
6   and it would be good advice if you do get the
7   local paper, tomorrow morning when the papers
8   come out, if you do get the paper, to have
9   somebody else in the family go through the
10  paper and get rid of, cut out, excise anything
11  to do with this case so that you jurors do not
12  read anything about these proceedings in a
13  media account of the proceedings on radio or
14  in the newspaper.
15      Media accounts are shorthand and they're
16  not focused on the same way that evidence is
17  at trial and they may contain information that
18  would be prejudicial.
19      I believe we have a somewhat lengthy court
20  call tomorrow.  I am going to require that you
21  all come in tomorrow again at 10:00 and we'll
22  see how it goes.  We may not be able to begin
23  at that time; I hope we can.  There are a
24  number of things that need to be done --
25  Thursday looks like a much lighter court call

299

VANES 000845

```
 1        -- but tomorrow, we're going to be very busy.
 2        I want to have you here and we'll have you in
 3        court as quickly as we can if it's after
 4        10:00.
 5              The jurors are excused.
 6
 7              WHEREUPON THE COURT ADJOURNED FOR THE DAY.
 8
 9              WHEREUPON THE COURT RECONVENED AND THE
10        FOLLOWING PROCEEDINGS WERE HELD OUTSIDE THE
11        PRESENCE AND HEARING OF THE JURY ON JUNE 10,
12        1992:
13
14   BY MR. BENSON:
15              If we could approach, please?
16   BY THE COURT:
17              Yes.
18
19              WHEREUPON THE FOLLOWING DISCUSSION WAS
20        HELD AT THE BENCH OUTSIDE OF THE HEARING OF
21        THE JURY:
22
23   BY MR. BENSON:
24              There are two issues to be addressed. One
25        of them is that in my Motion for Continuance
```

300

FILED IN CLERK'S OFFICE

MAY 23 1997

*Anna M. Anton*

CLERK LAKE SUPERIOR COURT

VANES 000846

```
 1 ┃  which was filed and was denied by the Court, I
 2 ┃  indicated that the State of Indiana did not
 3 ┃  receive the names of the car dealers until I
 4 ┃  believe the first week of June. Defense
 5 ┃  counsel has pointed out to me that those names
 6 ┃  were mentioned in the Petition to Let Bail by
 7 ┃  Detective Bruce Outlaw, and at this time I
 8 ┃  want to apologize to the Court for that motion
 9 ┃  and apologize to defense counsel for having
10 ┃  insinuated that during the argument.
11 ┃ BY THE COURT:
12 ┃      You did receive them?
13 ┃ BY MR. BENSON:
14 ┃      I did receive the names during the
15 ┃  Petition to Let Bail. That was an inaccurate
16 ┃  reflection and I apologize. Second of all,
17 ┃  for the record, we have tendered the documents
18 ┃  which the Court ordered us to in regards to
19 ┃  those other three or four crimes in the Glen
20 ┃  Park area which occurred the first week of
21 ┃  June.
22 ┃ BY MR. KING:
23 ┃      And I got those this morning, and from my
24 ┃  initial review of them, I don't think it's
25 ┃  going to be an issue in the case. Simply, the
```

301

832

VANES 000847

```
 1       descriptions just aren't very thorough.
 2    BY THE COURT:
 3            Plus, there's more than one individual
 4       involved?
 5    BY MR. KING:
 6            Yeah, in each one of the instances.  So
 7       there's really, realistically, not enough to
 8       go on at this point.
 9    BY THE COURT:
10            All right.
11    BY MR. BENSON:
12            Does the Court need to see those to grant
13       that part of the Motion in Limine?
14    BY MR. KING:
15            No, I concede to that.
16    BY THE COURT:
17            I would so grant that until we hear
18       otherwise.
19    BY MR. KING:
20            Yes.
21    BY MR. BENSON:
22            Thank you, Judge.
23    BY THE COURT:
24            Okay, I think we're ready for the jury
25       then, Mr. Bailiff.
```

302

VANES 000848

```
 1        WHEREUPON THE JURY WAS BROUGHT INTO OPEN
 2    COURT AND THE FOLLOWING PROCEEDINGS WERE HELD
 3    IN THEIR PRESENCE AND HEARING:

 4
 5  BY THE COURT:
 6        Well, folks, we did the best we could, but
 7    it was as long as we thought it might be on
 8    the court call of other cases.  Mr. Benson and
 9    Mr. King have been popping in about every ten
10    minutes to see if we're ready to get started
11    and, now, we finally are, and we'll get back
12    to this trial and pick up where we left off
13    yesterday.  Mr. Benson?
14  BY MR. BENSON:
15        Thank you, Judge.  The State would call
16    Officer Faulkner.
17            OFFICER RICHARD FAULKNER,
18    having been first duly sworn upon his oath,
19    testifies as follows:
20            DIRECT EXAMINATION
21                  BY
                 MR. BENSON
      Q  Officer, would you please state your full name
         and spell it for the court reporter?
      A     Richard Earl Faulkner, F-a-u-l-k-n-e-r.
```

                        303

                        834

VANES 000849

```
 1  Q   Mr. Faulkner, where are you employed?
 2  A      Gary Police Department.
 3  Q   And how long have you been with the Gary
 4      Police Department?
 5  A      Fourteen years.
 6  Q   And at this time, in what branch of the Gary
 7      Police Department do you work?
 8  A      What division?
 9  Q   Yes.
10  A      The Patrol Division.
11  Q   How long have you been in the Patrol Division?
12  A      Off and on for fourteen years.
13  Q   Officer, what are your general duties in that
14      division?
15  A      Patrolling the streets and taking reports,
16          report writing.
17  Q   You take reports at the scene of the
18      occurrence, correct?
19  A      Yes, I do.
20  Q   I would like to direct your attention to
21      February 27th of 1992 and ask you if you had
22      occasion to take an offense report from a
23      Rhonda Williams?
24  A      Yes, I did.
25  Q   Do you recall where that occurred at?
```

304

VANES 000850

```
 1 │ A        I'd have to take a look at the report to
 2 │          refresh my memory of her address.
 3 │ Q   I would like to show you what's been marked
 4 │     for purposes of identification as State's
 5 │     Exhibit 21 and ask you to please take a look
 6 │     and read over that document.
 7 │ A        Okay.
 8 │ Q   Does that document refresh your memory as to
 9 │     where you took that offense report from?
10 │ A        Yes, it does.
11 │ Q   And where was that at, Officer?
12 │ A        It was at 4409 Connecticut Street.
13 │ Q   And that was the residence of Rhonda Williams?
14 │ A        Yes, it was.
15 │ Q   Do you recall what time that report was taken,
16 │     approximately?
17 │ A        Well, it was taken at approximately 10:00
18 │          p.m.
19 │ Q   And would you please tell the ladies and
20 │     gentlemen of the jury how it came to be you
21 │     were at her house?
22 │ A        I was dispatched to take a report of a
23 │          robbery at that location from police
24 │          headquarters.
25 │ Q   And in speaking with Ms. Williams, did she
```

305

VANES 000851

```
 1  ||      give you a description of the individual who
 2  ||      had robbed her?
 3  || A       Yes, she did.
 4  || Q  And what did she tell you about the person
 5  ||      that robbed her?
 6  || A       She said it was a male black, medium
 7  ||         complexion with bad skin, he was about
 8  ||         five seven -- she wasn't too sure on the
 9  ||         height.  She said he was of slender build
10  ||         and he had a black kangol cap on and red
11  ||         bandanna.
12  || Q  Did she describe -- strike that, please.  Did
13  ||      she tell you what happened, how this crime had
14  ||      occurred?
15  || A       Yes, she did.
16  || Q  What did she say about how it occurred?
17  || BY MR. KING:
18  ||                  Objection, hearsay.  I cite
19  ||                  Modisett v. State.
20  || BY MR. BENSON:
21  ||           May we approach, please?
22  || BY THE COURT:
23  ||           Yes.
24  ||
25  ||           WHEREUPON THE FOLLOWING DISCUSSION WAS
```

306

337

VANES 000852

```
 1        HELD AT THE BENCH OUTSIDE OF THE HEARING OF
 2        THE JURY:

 3

 4   BY THE COURT:

 5             I believe there are three exceptions.

 6   BY MR. KING:

 7             Neither of which apply here in terms of

 8        the occurrence.  The only thing that there was

 9        a foundation for impeachment laid upon was

10        height.

11   BY THE COURT:

12             There is another exception as to identity

13        though in Modisett.

14   BY MR. BENSON:

15             Yes, identification made after perceiving

16        an individual; that is an exception to

17        Modisett; that's the third prong of that.  And

18        since defense counsel has challenged --

19   BY MR. KING:

20             Well, excuse me, though.  The question is

21        not directed toward identification; that was

22        asked and answered.  Now, the question is,

23        "What did she tell you about the occurrence?"

24        That's a different animal.

25
```

307

VANES 000853

```
 1 │ BY THE COURT:
 2 │      Could the occurrence have something to do
 3 │      with identification?
 4 │ BY MR. BENSON:
 5 │      Judge, defense counsel on cross-
 6 │      examination pointed out the difference
 7 │      between what Ms. Williams said to this officer
 8 │      about the height and what she subsequently
 9 │      said to Detective Bruce Outlaw.  I believe
10 │      that the jury now is entitled to examine the
11 │      opportunity that she would have had to observe
12 │      the individual, how long, and was she kneeling
13 │      down, laying down.  And defense counsel has
14 │      questioned off the report, which is part of
15 │      the officer's testimony.
16 │ BY MR. KING:
17 │      No, he's misrepresenting.  During the
18 │      either direct or cross-examination of Ms.
19 │      Williams, there was nothing done by way of
20 │      impeachment in terms of the opportunity to
21 │      observe and the sequence of events.  The only
22 │      issue gone into was the height, which has been
23 │      established and asked and answered.  Now, this
24 │      does not open the door for them to put
25 │      Patterson evidence in.  That was the only
```

308

823

VANES 000854

```
 1 |      point of impeachment with that witness.
 2 | BY THE COURT:
 3 |      I don't think it can be based on the
 4 |      impeachment, but I do think there's an
 5 |      exception as to identity and perception.
 6 | BY MR. KING:
 7 |      I understand.  But what he is asking here
 8 |      is not on that point, is not on that point.
 9 |      It was carefully established with her both on
10 |      direct and cross-examination what happened,
11 |      when, what the time sequences were.  The issue
12 |      generated by cross-examination was the height
13 |      description given.  If the Court permits this
14 |      testimony on just a narrative of what
15 |      happened, it violates the defendant's right to
16 |      confront, it violates the defendant's
17 |      objection on the basis of hearsay.
18 | BY THE COURT:
19 |      I'm trying to square it with Modisett,
20 |      that's all, and with your rebuttal.
21 | BY MR. BENSON:
22 |      Judge, defense counsel asked questions in
23 |      detail about how many lights were on in the
24 |      house during the crime, what rooms they walked
25 |      through to the crime, which direction Ms.
```

309

VANES 000855

```
 1 │   Williams had been facing during the crime.
 2 │   All that goes to her --
 3 │ BY MR. KING:
 4 │       Do you want to retrieve the exhibit,
 5 │   please?  I think a review by the Court -- I
 6 │   think the Court would of necessity have to
 7 │   read -- since the basis is the document under
 8 │   the narrative section, there is nothing
 9 │   germane, even were it to be an exception, in
10 │   that report to the question counsel is
11 │   suggesting to the Court.
12 │ BY THE COURT:
13 │       But he's not asking about the report, he's
14 │   asking, "What did she say to you about what
15 │   happened?"
16 │ BY MR. KING:
17 │       Well, let me then take him on voir dire in
18 │   order to attempt to establish that his basis
19 │   for testimony would be the contents of the
20 │   report.
21 │ BY THE COURT:
22 │       He has no independent recollection?
23 │ BY MR. KING:
24 │       I don't know what his answer will be.
25 │
```

310

841

VANES 000856

```
 1   BY THE COURT:
 2          Okay, you may.
 3   BY MR. KING:
 4          But I still want the Court to look at
 5       Modisett because I don't think this fits.
 6   BY THE COURT:
 7          Yes, I do want to look at Modisett.
 8
 9          WHEREUPON THE FOLLOWING PROCEEDINGS WERE
10      ONCE AGAIN HELD IN THE HEARING OF THE JURY:
11
12   BY MR. KING:
13          May I proceed?
14   BY THE COURT:
15          Yes.
16              VOIR DIRE EXAMINATION
17                     BY
18                  MR. KING
19   Q   Officer Faulkner, when you're at the scene and
20       you're talking to somebody complaining about
21       having been the victim of a crime --
22   A      Right.
23   Q   -- you take notes, don't you?
24   A      Yes, I do.
25   Q   And then you prepare that in the form of what
```

311

842

VANES 000857

```
 1        is known in the Gary Police Department as an
 2        offense report, is that correct, sir?
 3   A        The way I do mine --
 4   Q    I'm sorry?
 5   A        The way I do mine, I put the information
 6            directly on the offense report rather than
 7            write it on a pad.
 8   Q    You put it right onto the offense report?
 9   A        This particular one, I put it directly
10            onto the report.
11   Q    All right, and by "this particular one," you
12        mean, of course, State's Exhibit 21 for
13        identification, is that correct?
14   A        Yes, sir.
15   Q    All right.  Now, other than what is contained
16        in the narrative section of State's 21 for
17        identification, the contents of that is your
18        complete recollection of what you were told by
19        Ms. Williams about what happened and how it
20        happened?
21   A        Yes, it is.
22   Q    Do you have -- apart and aside from State's 21
23        for identification, do you have any
24        independent recollection of any additional
25        information that is not contained in State's
```

312

843

```
 1        21?
 2   A        Any additional information that was told
 3            by her?
 4   Q   Yes, sir, about what happened or about the
 5       description.
 6   A        Well --
 7   Q   Let me ask you this:  Did you put everything
 8       you recollect on the report?
 9   A        That I recollect, but it was more
10            conversation; but I put, you know, the
11            basic.
12   Q   Do you happen to recall the additional
13       conversation as you sit here today that's not
14       on the report --
15   A        Yes.
16   Q   -- about what happened?
17   A        Right.
18   Q   Okay.
19   A        Well, she had said that --
20   Q   Okay, there are things that you recall that
21       aren't on the report, is that your testimony?
22   A        As far as our conversation, correct.
23   Q   I understand.  About what happened?
24   A        Right.
25
```

313

844

VANES 000859

```
 1 │ BY MR. KING:
 2 │         All right.  Thanks.
 3 │ BY THE COURT:
 4 │         Mr. Benson, if I can have you back for
 5 │     just one second here.
 6 │
 7 │         WHEREUPON THE FOLLOWING DISCUSSION WAS
 8 │     HELD AT THE BENCH OUTSIDE OF THE HEARING OF
 9 │     THE JURY:
10 │
11 │ BY THE COURT:
12 │         Are you saying now that this is something
13 │     consistent with what she said?  You want him
14 │     to testify consistently with what she said at
15 │     trial?
16 │ BY MR. BENSON:
17 │         Yes, Your Honor, but it's also being
18 │     offered -- I believe when defense counsel got
19 │     into it with her about all the movement
20 │     throughout the house and then questioned her
21 │     about two possibly different height
22 │     descriptions that resulted from her
23 │     opportunity to observe that that I now, even
24 │     under Modisett, have the opportunity now that
25 │     counsel has opened that door --
```

314

345

VANES 000860

```
 1 │ BY THE COURT:
 2 │        A recent fabrication or improper influence
 3 │     or motive?
 4 │ BY MR. BENSON:
 5 │        I think the inference was there was a
 6 │     recent fabrication of the five ten height.
 7 │ BY MR. KING:
 8 │        Your Honor, as the Court will recall the
 9 │     testimony was pointed out by the defense on
10 │     cross-examination questioning of this witness
11 │     that as of April the 6th, her testimony was
12 │     five foot ten inches tall.  And there was
13 │     nothing that could fairly be read in the tenor
14 │     of the cross-examination other than point out
15 │     the height discrepancy of any recent
16 │     fabrication.
17 │        But in any event, the prosecutor cannot
18 │     say because she was impeached on the height
19 │     that that, therefore, opens the door to the
20 │     entire conversation that occurred.  If it is
21 │     not germane to the height, it is not relevant
22 │     evidence under Modisett.
23 │ BY THE COURT:
24 │        How about the fingerprints?  You pointed
25 │     out there was a statement about gloves being
```

315

846

VANES 000861

```
 1       worn and then later that there were no gloves.
 2   BY MR. KING:
 3            Exactly, and if he chooses to ask a
 4       question about the statement about gloves,
 5       that's fine, I have no objection to that;
 6       that's proper.  But what he's attempting to do
 7       is say, if you will, if the door is opened on
 8       one issue, it's opened for all purposes.
 9   BY THE COURT:
10            Why wouldn't it be?  Why wouldn't it be
11       her whole statement?
12   BY MR. KING:
13            Because her whole statement is not germane
14       to the area she was impeached upon.  It is
15       simply not germane.
16   BY MR. BENSON:
17            When challenging identification in such
18       detail as counsel did -- he talked about her
19       opportunity to observe, which is directly
20       relevant to identity, and I just merely want
21       to clear up that she has always contended that
22       she had the ability to observe.
23   BY MR. KING:
24            But it was clearly specified even during
25       cross what that opportunity was.  We went in
```

316

847

VANES 000862

```
 1        more detail than she did on direct, but --
 2   BY THE COURT:
 3        Well, he can get into it too then about
 4        the identification of a person.
 5   BY MR. KING:
 6        For what purpose?  You can't because it's
 7        an out-of-court declaration.
 8   BY THE COURT:
 9        But there's an exception in Modisett for
10        identification if it goes to that.
11   BY MR. KING:
12        But my point is, it doesn't; that's
13        precisely my point, that it does not go to
14        that.  He has established no foundation
15        through her testimony.
16   BY THE COURT:
17        I guess you're objecting to what kind of
18        actions was he doing at the scene of the
19        offense is what you asked him, isn't it, most
20        recently?
21   BY MR. KING:
22        "What did she tell you about what had
23        happened inside?"
24   BY MR. BENSON:
25        Well, I can ask him a more specific
```

317

VANES 000863

```
 1         question, "What did she tell you about her
 2         observations, of her ability to observe?"
 3   BY THE COURT:
 4            Well, I think that would be permissible.
 5         I understand there's no objection to it if you
 6         change your question to that.
 7   BY MR. BENSON:
 8            I will.
 9   BY MR. KING:
10            But please note the continuing objection.
11   BY THE COURT:
12            Yes, I do.
13
14            WHEREUPON THE FOLLOWING PROCEEDINGS WERE
15         ONCE AGAIN HELD IN THE HEARING OF THE JURY:
16
17   BY MR. KING:
18            Will the question now be rephrased, Your
19         Honor?
20   BY THE COURT:
21            It will be rephrased and permitted as
22         rephrased.
23   BY MR. BENSON:
24   Q    Officer, what did Ms. Williams tell you about
25         her ability or opportunity to observe the
```

318

849

VANES 000864

```
 1    person who came into her residence?
 2  A    Well, she stated while she was on the
 3       floor, she looked up at him, she was able
 4       to get a description of him, the
 5       information she gave me.
 6  Q  Did she indicate to you how long this person
 7     was in the house for, approximately?
 8  A    Well, she didn't give me an approximate
 9       time, but she said she thought it was
10       about twenty minutes; she said that, you
11       know.
12  Q  Did she indicate to you whether or not she
13     thought the person who robbed her was wearing
14     gloves or not?
15  A    Well, this is the information she gave me:
16       She said she thought she saw gloves on
17       his hands.
18  Q  And did you note that any place in your
19     report?
20  A    Yes, I did.
21  Q  And that would be the report that's State's
22     Exhibit 21?
23  A    Yes, it is.
24  Q  That is listed in what section of that report?
25  A    This is listed in section 32.
```

319

VANES 000865

```
 1 │ Q    And what specifically did you write down in
 2 │      regards to what she told you about whether or
 3 │      not this person was wearing gloves?
 4 │ A       Well, I wrote "black leather gloves" in
 5 │         the description.
 6 │ BY MR. BENSON:
 7 │         No further questions.  Thank you very
 8 │      much, Officer.
 9 │ BY THE WITNESS:
10 │         Okay.
11 │                   CROSS-EXAMINATION
12 │                        BY
13 │                     MR. KING
14 │ Q    For the benefit of the jury, you, as the first
15 │      officer on the scene talking to the victim of
16 │      a crime, and in your job of filling out an
17 │      offense report such as State's Exhibit 21 for
18 │      identification, after you write down what
19 │      somebody who has been victimized tells you,
20 │      that document is then disseminated to
21 │      detectives in the case, is it not?
22 │ A       Well, when I finish the report, I turn it
23 │         over to my supervisor.
24 │ Q    But your experience as a police officer, the
25 │      detective investigating the case gets these
```

320

851

VANES 000866

```
 1 ||      offense reports to help him develop the case,
 2 ||      is that correct?
 3 || A      Correct.
 4 || Q  So this isn't simply for your own sake of
 5 ||      recollection, you know when you're writing
 6 ||      this information down that that will or could
 7 ||      be used by others in your department to
 8 ||      investigate a crime, is that correct?
 9 || A      Correct.
10 || Q  Accuracy of that information is critical for
11 ||      the best possible investigation of a crime, is
12 ||      it not?
13 || A      That's correct.
14 || Q  Inaccurate information could seriously
15 ||      compromise a detective's ability to properly
16 ||      and thoroughly investigate a crime, isn't that
17 ||      correct?
18 || BY MR. BENSON:
 9 ||                 Objection.  That question is
 0 ||                 argumentative.
 1 || BY MR. KING:
22 || Q  Have you been a detective?   Have you served
23 ||      as a detective in the investigative mode?
24 || A      No, I haven't.
25 || Q  Have you had occasion to investigate crimes
```

321

852

VANES 000867

```
 1        after reports?

 2   A        Yes, I have.

 3   Q    Is accurate information important to you?

 4   A        Yes, it is.

 5   Q    If you don't have accurate information, you

 6        might not arrest the right guy, correct?  That

 7        could be one downside to not having accurate

 8        information, isn't it?

 9   A        I don't know about not arresting them, but

10            as far as information, it, you know, would

11            be.

12   Q    It's important, isn't it?

13   A        It's important, yes.

14   Q    Now, you said that she gave you a description.

15        Now, I would expect this young lady was upset

16        when she talked to you, am I correct?

17   A        She was upset.

18   Q    Having just gone through what she had been

19        through, correct?

20   A        She was nervous and upset, yes.

21   Q    But in the course of questioning her, if you

22        asked her a question, was her response a

23        response to the question you asked?

24   A        Yes, it was because I calmed her down and

25            talked to her before we started writing.
```

853

VANES 000868

```
 1              We talked for a while and it calmed her
 2              down.
 3   Q   So were you comfortable that the lady
 4       understood what you were asking and the lady
 5       was doing her level best to give you accurate,
 6       truthful information?
 7   A       After I calmed her down, yes, sir.
 8   Q   Which is when you got all this information,
 9       right?
10   A       Right.
11   Q   Including the description of the suspect, am I
12       correct?
13   A       That's correct.
14   Q   Now, in your direct examination, you said on
15       two points, height and the question of gloves,
16       that, if I understood your testimony
17       correctly, that she thought or she wasn't
18       sure, words to that effect.  Is that accurate,
         sir?
     A       Well, referring to what, the height?
     Q   The height.  You told us on direct examination
22       when she said five foot seven, I believe you
23       added that she said she thought about five
24       foot seven but she said she really wasn't
25       sure?
```

323

854

VANES 000869

```
 1   A         Right, that's correct.  What she meant was
 2             he could have been taller.
 3   Q   That's what she meant?  Is that what she said?
 4   A         Because I indicated in the report that he
 5             was slim build, you know, so she meant he
 6             was taller (sic).
 7   Q   Now, I'm curious now.  You also say she wasn't
 8       sure on the black leather gloves.
 9   A         No, I didn't say that; I said she gave me
10             the information that he had on black
11             leather gloves.
12   Q   Didn't you tell us on direct examination that
13       she said she wasn't sure?
14   A         No, I don't recall about the black leather
15             gloves.  She told me he had black leather
16             gloves.
17   Q   Now, what about the slim build?
18   A         She told me that he was slim build.
19   Q   Any question about that?
20   A         No, she said -- I asked her was he --
21   Q   No, no, no, you didn't understand my question.
22       When she said slim build, did she say, "I
23       think," or, "I'm not sure," or, "He wasn't
24       that heavy"?
25   A         I was getting ready to answer that.  I
```

324

VANES 000870

```
 1              gave her three choices, heavy, you know,
 2              heavy build --
 3   Q   And what did she say?
 4   A        -- thin build or slim build, and she said,
 5              "He was slim build."
 6   Q   What about medium complexion?
 7   A        She told me, "He was medium complexion."
 8   Q   Any question or doubt about that?
 9   A        The reason she seemed to be sure about
10              that because she said he had --
11   Q   Do you understand my question?
12   A        She didn't have any doubt about the
13              complexion.
14   Q   What about bad skin?  Was she sure about that,
15        not sure?
16   A        As far as an outstanding feature of his
17              face, she told me he had bad skin when I
18              asked --
19   Q   Black clothing, was she sure about that?
20   A        She was sure about the black clothing.
21   Q   Black Kangol hat, was she sure about that?
22   A        She was sure about that.
23   Q   Black leather jacket, was she sure about that?
24   A        She was sure about that.
25   Q   Red bandanna, was she sure about that?
```

325

VANES 000871

```
 1 ‖  A        The information she gave me, she was sure
 2 ‖           about that.
 3 ‖  Q    Why is it then in the same listing all these
 4 ‖       things that she was sure of --
 5 ‖  A        Uh-huh.
 6 ‖  Q    -- you know that a height of a five foot seven
 7 ‖       inches without any sort of indicator that she
 8 ‖       was less sure of the height than she was of
 9 ‖       any of these other features?  Wouldn't that be
10 ‖       useful for a detective investigating this
11 ‖       case, instead of going out and looking,
12 ‖       limiting the search for suspects to a man five
13 ‖       foot seven inches to have some kind of input
14 ‖       that, "Hey, the height, she's not really sure.
15 ‖       He might have been taller"?  I mean why is it
16 ‖       on this report that everything else she is
17 ‖       sure of, but the height, according to your
18 ‖       testimony here today, without any difference
19 ‖       being made in the report you made, that's
20 ‖       something she wasn't sure about, the guy could
21 ‖       have been taller?
22 ‖  BY MR. BENSON:
23 ‖                    Objection, Your Honor, the
24 ‖                    witness is incompetent to answer
25 ‖                    that question he's asking.
```

326

VANES 000872

```
 1  BY MR. KING:
 2          No, he's not; he did the report.
 3  BY MR. BENSON:
 4          He's asking this officer to speculate as
 5      to why Ms. Williams may have said five seven.
 6  BY THE COURT:
 7          I don't believe that was the focus of it.
 8      I'll overrule it.  Now, that was a long
 9      question.
10  Q   Do you understand what he's asking you, Mr.
11      Faulkner?
12  A       I understand.
13  BY THE COURT:
14          You may answer.
15  BY THE WITNESS:
16  A       This is the information she gave me is
17          five seven, and I didn't indicate on that.
18  BY MR. KING:
19  Q   What she told you was five seven?
20  A       She told me five seven, correct.
21  Q   That was her best.  We're not saying that --
22  A       It was her best.
23  Q   We're not saying that, you know, she committed
24      a crime by not being accurate.  But what she
25      told you was five seven?
```

327

858

```
 1 │ A        She told me five seven.
 2 │ Q   Now, the truth of the matter, my client
 3 │     happens to be five foot eleven inches.  He
 4 │     doesn't fit five foot seven, am I correct,
 5 │     sir?
 6 │ A        That's correct.
 7 │ BY MR. BENSON:
 8 │                 Objection, Your Honor.  Counsel
 9 │                 is testifying; there is no
10 │                 evidence of his client's height
11 │                 in the record.
12 │ BY THE COURT:
13 │         Sustained and order the answer stricken.
14 │ BY MR. KING:
15 │ Q   Now, on the black leather gloves, is it your
16 │     recollection that Ms. Williams at the time she
17 │     gave that description to you indicated she was
18 │     unsure?
19 │ A        No, she didn't indicate anything as far as
20 │         the black leather gloves.
21 │ Q   Now, in addition, one of the things she told
22 │     you about pertained to the gun that was put
23 │     upon her by the person that did this to her,
24 │     is that correct?
25 │ A        Correct.
```

328

850

VANES 000874

```
 1    Q    How did she describe the gun?
 2    A         She didn't give me a description of the
 3              gun except for a revolver.
 4    Q    A revolver?
 5    A         Uh-huh.
 6    Q    As opposed to an automatic?
 7    BY MR. BENSON:
 8                   I'm going to object, Judge.  Can
 9                   we approach at this point,
10                   please?
11    BY THE COURT:
12         All right.
13
14         WHEREUPON THE FOLLOWING DISCUSSION WAS
15    HELD AT THE BENCH OUTSIDE OF THE HEARING OF
16    THE JURY:
17
18    BY MR. BENSON:
19         I believe this goes outside of the scope
20    of identification which I was prohibited from
21    getting into.  Now, the details of how this
22    crime occurred and what instrumentality was
23    used, I was prohibited from doing that.
24    BY MR. KING:
25         Well, I'm testing the efficacy in Clerk's Office
```

329

MAY 23 1997

860   Anna M. Anton
      CLERK LAKE SUPERIOR COURT

```
 1        officer's testimony that he accurately noted
 2        what she told him.  I'm not saying that he's
 3        right and she's wrong.
 4   BY THE COURT:
 5            How does it square with Modisett what
 6        you're asking now?  You're asking him --
 7   BY MR. KING:
 8            This would be a prior inconsistent
 9        statement; prior inconsistent statements are a
10        different exception under Modisett.
11   BY THE COURT:
12            How so?
13   BY MR. KING:
14            I mean read Modisett; I mean it's laid out
15        under Modisett.
16   BY THE COURT:
17            Well, there are three exceptions noted:
18        prior sworn statements -- well, it was; she
19        testified in court.
20   BY MR. BENSON:
21            Yes, but the statement he's questioning
22        him about now was not sworn to.
23   BY THE COURT:
24            No, this was prior at the scene, which you
25        objected to the State getting into.
```

330

VANES 000876

```
 1 ║ BY MR. KING:
 2 ║        Yes, on a different basis.
 3 ║ BY THE COURT:
 4 ║        Well, I don't know how different it was.
 5 ║    You said it didn't fit any exception.
 6 ║ BY MR. KING:
 7 ║        And it was hearsay.  I'm not offering it
 8 ║    to prove the truth of the matter asserted that
 9 ║    it was the gun.
10 ║ BY THE COURT:
11 ║        Mr. Benson just said the same thing.
12 ║ BY MR. KING:
13 ║        But he didn't.
14 ║ BY MR. BENSON:
15 ║        The point of it is.
16 ║ BY MR. KING:
17 ║        Well, he has answered the question already
18 ║    that she said revolver, so I'll withdraw the
19 ║    question.
20 ║ BY THE COURT:
21 ║        He's asking for it to be stricken I
22 ║    suppose.
23 ║ BY MR. KING:
24 ║        And I object to that.
25 ║
```

331

862

VANES 000877

```
 1  BY THE COURT:
 2          All right, I'll let it stand at this
 3      point.
 4
 5          WHEREUPON THE FOLLOWING PROCEEDINGS WERE
 6      ONCE AGAIN HELD IN THE HEARING OF THE JURY:
 7
 8  BY MR. KING:
 9          All right.  No further --
10  Q    Well, let me ask you this one other thing,
11      Officer Faulkner:  This night in this
12      neighborhood on February 27th, 1992 -- I don't
13      know if you were or not -- were you made aware
14      that there were a number of reported robberies
15      occurring in this section of Glen Park that
16      night?
17  A      Yes, I did.
18  Q    Of a similar nature?
19  A      That's correct.
20  Q    Do you recall how many other robberies
21      occurring in that section of Glen Park were
22      reported as being perpetrated by the person
23      fitting the description given to you by Ms.
24      Williams were made that night?
25
```

332

VANES 000878

```
 1 ║ BY MR. BENSON:
 2 ║                      I would object, Your Honor.  That
 3 ║                      calls for a response based on
 4 ║                      hearsay.
 5 ║ BY THE COURT:
 6 ║           Yes, I would limit it too, and advise the
 7 ║      jury, that what he was told is not evidence in
 8 ║      this trial, but I would permit him to answer
 9 ║      as to what he was told, if he was.
10 ║ BY THE WITNESS:
11 ║ A         I was told -- I think it was about four or
12 ║           five.
13 ║ BY MR. KING:
14 ║ Q    Four or five?
15 ║ A         Right.
16 ║ Q    And similar-description perpetrator, am I
17 ║      correct, sir?
18 ║ A         That's correct.
19 ║ Q    Similar MO or modus operandi, is that correct,
20 ║      sir?
21 ║ A         That's correct.
22 ║ Q    And, again, similar neighborhood, within
23 ║      blocks of the other, is that correct, sir?
24 ║ A         That's correct.
25 ║ Q    And in terms of the time of night, within an
```

333

VANES 000879

```
 1          hour and a half, maybe two hours one of the
 2          other, is that correct, sir?
 3   A         I can't elaborate on the time; I'm not --
 4   Q    You didn't get that information?
 5   A         No.
 6   Q    Did you personally -- were you dispatched or
 7          otherwise involved yourself in the
 8          investigation of any of these other robberies
 9          that occurred that night, or was this the only
10          one, the Rhonda Williams' incident, that you
11          were involved in investigating?
12   A         Well, I'm not sure if it was pertaining to
13              this particular suspect, but I did take a
14              robbery report earlier that evening.
15   Q    From whom?
16   BY MR. BENSON:
17                   I would object, Your Honor.  Once
18                   again, we're going into evidence
19                   that is clearly hearsay; and
20                   unless that person is here and
21                   has testified, the answer is
22                   unacceptable.
23   BY THE COURT:
24                   Well, as to the name -- I don't think the
25          name -- we won't get into conversations, but
```

334

865

VANES 000880

```
 1 ||        do you know a name?
 2 || BY THE WITNESS:
 3 || A          No, sir, I wouldn't even know.
 4 || BY THE COURT:
 5 ||          All right.
 6 || BY MR. KING:
 7 || Q    Let me ask you as best you recall if any of
 8 ||      the following names ring a bell with you --
 9 ||      and, again, we're referencing February 27th,
10 ||      approximately the same time, approximately the
11 ||      same neighborhood.
12 || BY MR. BENSON:
13 ||                    I'll object, Your Honor.  Counsel
14 ||                    is talking about names, and there
15 ||                    has been no evidence introduced,
16 ||                    there is no relevancy at this
17 ||                    point in the proceeding.
18 || BY MR. KING:
19 ||          Yes, there is.
20 || BY THE COURT:
21 ||          Well, he has answered questions about
22 ||      similar reports, so I would permit the name.
23 ||      Overruled.  Go ahead.
24 || BY MR. KING:
25 || Q    How about a Sonya Cox?
```

335

866

VANES 000881

```
 1   A        That name doesn't ring a bell.
 2   Q    Mary Banks?
 3   A        I know a Mary Banks; yes, I'm familiar
 4            with that incident.
 5   Q    You are?
 6   A        Yes, I am.  As far as hearsay, I didn't,
 7            you know --
 8   Q    I'm sorry, what?
 9   A        As far as hearsay.
10   BY THE COURT:
11            So you're saying you didn't take that
12        report?
13   BY THE WITNESS:
14   A        No, sir, no; just as hearsay.
15   BY MR. KING:
16   Q    What about Tisa Johnson?
17   A        That name don't ring a bell.
18   Q    What about Christina Cullum?
19   A        That sounds familiar to me, that name.
20   Q    All right, if there were a report with your
21        name on it and her name on it, would that
22        possibly refresh your recollection?
23   A        Right.
24   Q    Look at the top page of the seven documents
25        I've just given you -- don't read it, just
```

336

867

VANES 000882

```
 1        look at it -- and tell me if your memory has
 2        been refreshed as to whether or not Christina
 3        Cullum is one of the victim of the similar
 4        offenses that you had occasion to talk to that
 5        evening.
 6   BY MR. BENSON:
 7                    I would object, Your Honor.  That
 8                    calls for a legal conclusion,
 9                    "the similar incidents."  Counsel
10                    is attempting to testify by that
11                    comment.
12   BY MR. KING:
13            Well, I'm basing it on his testimony.
14   BY MR. BENSON:
15            It only calls for an answer that is
16        hearsay based upon his conversations.
17   BY THE COURT:
18            I don't know if he could answer that
19        without getting into hearsay at this point, so
20        if you would, rephrase the question.
21   BY MR. KING:
22   Q    Is your memory refreshed?  Was Christina
23        Cullum one of these victims that you talked to
24        that night?
25   A        Well, I documented this report, but this
```

337

VANES 000883

```
 1           was -- this is 8:30 p.m.  This is my
 2           report.
 3   Q  8:30 p.m. what date?
 4   A       This is February 27th, 1992.
 5   Q  An hour and a half before you were talking to
 6           Rhonda Williams, is that correct, sir?
 7   A       That's correct.
 8   Q  And, again, in all these other cases, the
 9           description of this perpetrator was the same,
10           was it not?
11   A       Well, I can't say whether it was the same,
12           but --
13   Q  What about with Ms. Cullum who you interviewed
14           at 8:30?  What description was given?
15   A       I see in this a description of a male
16           black, slim build, medium complexion with
17           a black Kangol cap on.
18   Q  What about the height, if you recall?
19   A       She said he was slim build.
20   Q  Height?
     A       I didn't get a description of the height.
     Q  I'll ask you again look at the same document
23           under description of the suspect and see if
24           that refreshes your memory as to whether or
25           not you were given a description of the
```

338

369

VANES 000884

```
 1 ||        height, sir.
 2 || A       Okay, she said he was five seven.
 3 || Q    Five feet seven inches?
 4 || A       Yes, sir.
 5 || BY MR. BENSON:
 6 ||                  Once again -- I've objected three
 7 ||                  times.  Now, he's testifying as
 8 ||                  to what someone else said.
 9 || BY THE COURT:
10 ||      You didn't reiterate the objection going
11 ||   through this report, but I would sustain it
12 ||   there and order that stricken.
13 || BY MR. KING:
14 ||      That's all I have.
15 ||              REDIRECT EXAMINATION
16 ||                  BY
17 ||              MR. BENSON
18 || Q   Officer, do you know how many robberies were
19 ||   committed in Gary that evening?
20 || A       I believe about four or five.
21 || Q   Do you if there were robberies on the west
22 ||   side, the north side, the south side?
23 || A       No, I was working the Glen Park area, only
24 ||       in my district.
25 || Q   You don't know how many other robberies were
```

                              339

VANES 000885

```
 1        committed that evening, do you?
 2   A        No, I can't say.
 3   Q   Now, you have been involved in apprehensions
 4        of suspects who you have received descriptions
 5        for, correct?
 6   A        That's correct.
 7   Q   Approximately how many times over the course
 8        of your fourteen-year career?
 9   A        Well, I'll say hundreds of times.
10   Q   And how would you characterize the description
11        that Rhonda Williams gave you from that man
12        (indicating)?
13   A        Well, we have to look at it like she was
14             like laying on the floor and she had to
15             look upward and he might have appeared to
16             have been shorter than what he really was
17             by her looking up and laying on the floor.
18   Q   Based upon your experience, would you say that
19        her description of this defendant was an
20        accurate one?
21   A        I would say it was an accurate
22             description.
23   BY MR. BENSON:
24             Thank you very much.
25
```

340

871

VANES 000886

```
 1                    RECROSS-EXAMINATION
 2                            BY
 3                        MR. KING
 4   Q    The difference in height, you're excusing
 5        that, correct?
 6   A         No, I'm not excusing it; I was just saying
 7              she was lying on the floor, she was
 8              looking up at this particular person and
 9              he might have appeared to have been
10              shorter than what she thought.
11   Q    The description she gave to you, how many
12        people -- and let's just limit it to people
13        living in Gary --
14   A         Uh-huh.
15   Q    -- the description she gave you, how many
16        people would that description be consistent
17        with?
18   BY MR. BENSON:
19                   Objection.  The witness is
20                   clearly incompetent to answer
21                   that question.
22   BY MR. KING:
23   Q    How long have you lived in Gary?
24   A         Well, forty-one years.
25   Q    All right, and how long have you been a
```

341

VANES 000887

```
 1        policeman?
 2   BY THE COURT:
 3            You're asking him what now?
 4   BY MR. KING:
 5            In his opinion, how many people would fit
 6        the description --
 7   BY THE COURT:
 8            Who live in Gary?
 9   BY MR. KING:
10            Yeah, people in Gary who would fit the
11        description.
12   BY THE COURT:
13            Well, considering what redirect has been
14        and what cross has been, I would permit the
15        question.  You may answer if you can.
16   BY MR. KING:
17   Q   Can you tell me?
18   A        I wouldn't be able to answer that.
19   Q   We're talking height, we're talking the
20        complexion, we're talking the age range, we're
21        talking the race, we're talking black
22        clothing.
23   A        Yeah, I wouldn't be able to answer that.
24   Q   It's not a unique or unusual description, is
25        it?
```

342

VANES 000888

```
 1 || A        No, it's not.
 2 || BY MR. KING:
 3 ||        That's all I have.
 4 || BY MR. BENSON:
 5 ||        No re redirect, Your Honor.
 6 || BY THE COURT:
 7 ||        That's all, sir.
 8 || BY MR. BENSON:
 9 ||        May we approach, please?
10 ||
11 ||        WHEREUPON THE FOLLOWING DISCUSSION WAS
12 ||    HELD AT THE BENCH OUTSIDE OF THE HEARING OF
13 ||    THE JURY:
14 ||
15 || BY MR. BENSON:
16 ||        I would assume our next witness is going
17 ||    to take extremely long; I don't know what the
18 ||    Court wants to do.
19 || BY THE COURT:
20 ||        Who is it?
21 || BY MR. BENSON:
22 ||        Bruce Outlaw.
23 || BY MR. KING:
24 ||        What are you going to take long for on
25 ||    direct?  You can do your direct in ten
```

343

VANES 000889

```
 1        minutes.
 2   BY THE COURT:
 3        It's awkward.  We got off to a late start,
 4        it's 11:44, and --
 5   BY MR. KING:
 6        Why doesn't he do direct and we'll play it
 7        by ear then.
 8   BY THE COURT:
 9        Okay.  Let's go to 12:30 and see what
10        happens.
11
12        WHEREUPON THE FOLLOWING PROCEEDINGS WERE
13        ONCE AGAIN HELD IN THE HEARING OF THE JURY:
14
15   BY MR. BENSON:
16        The State would call Detective Bruce
17        Outlaw to the stand.
18             OFFICER BRUCE OUTLAW,
19        having been first duly sworn upon his oath,
20        testifies as follows:
21             DIRECT EXAMINATION
22                  BY
23                MR. BENSON
24   Q  Would you please state your full name and
25        spell it for the court reporter?
```

344

875

VANES 000890

```
 1 | A        Bruce Lloyd Outlaw, Senior, B-r-u-c-e
 2 |          L-l-o-y-d O-u-t-l-a-w, S-r, period.
 3 | Q    Where are you employed?
 4 | A        Gary Police Department.
 5 | Q    How long have you been with the Gary Police
 6 |      Department?
 7 | A        It will be eight years December 11th.
 8 | Q    And what division do you work in?
 9 | A        Investigative Division.
10 | Q    Commonly known as the Detective Bureau?
11 | A        Correct.
12 | Q    How long have you been in the Detective Bureau
13.|      for?
14 | A        About two and a half years.
15 | Q    In the course of that time, how many
16 |      investigations have you been involved in,
17 |      approximately?
18 | A        Any specific type of investigation?
19 | Q    Homicides.  Just a round number, if you can
20 |      recall.
21 | A        Over twenty.
22 | Q    Robberies?
23 | A        Over a hundred.
24 | Q    I would like to direct your attention to late
25 |      February of 1992 and ask you if you had
```

345

876

VANES 000891

```
 1        occasion to become involved in the
 2        investigation of the murder of a Bernard
 3        Jiminez and a robbery of Rhonda Williams?
 4   A         That's correct.
 5   Q    Would you please tell the ladies and gentlemen
 6        of the jury how you became involved in those
 7        two incidents?
 8   A         Okay, I was first involved with the
 9             investigation and the homicide of Bernard
10             Jiminez some time in the latter part of
11             February, possibly the 27th, 28th.  I was
12             on duty working the 4:00 to 12:00 shift in
13             the Detective Division.  I received a
14             phone call stating that a shooting victim
15             was at the 4500 block of Massachusetts;
16             the exact address was supplied.  And
17             myself and other investigators proceeded
18             to that location.  We arrived at the
19             prescribed location and were met by
20             ambulance personnel along with patrol
21             officers who were on the scene, and they
22             somewhat gave me the preliminaries of the
23             situation, which was the shooting victim
24             had been shot at approximately 4580, 4560
25             Massachusetts Street and he had ran
```

346

877

VANES 000892

```
 1          directly across the street where he
 2          succumbed on a neighbor's porch.  The
 3          ambulance were called, and by the time I
 4          arrived, they were administering treatment
 5          to the victim in the ambulance.  And by
 6          that time, I was advised by the personnel
 7          that his condition was critical and they
 8          would have to rush him immediately to the
 9          hospital.  But I looked in the ambulance
10          and noticed it was a male Latin being
11          treated.  And upon being notified of this
12          hospital that they were taking him to, I
13          proceeded to the supervisor on the scene
14          of patrol and he advised me of more
15          particulars of the case and directed me to
16          possible witnesses to the crime.
17  Q   And this was at Massachusetts Street?
18  A       Right, about 4580 and the home directly
19          across the street.
20  Q   And this was the home of Bernard Jiminez?
21  A       Right, Bernard Jiminez would have lived at
22          somewhere around 4580, 4560, and where he
23          succumbed would have been directly across
24          the street.
25  Q   I would like to show you a report and ask you
```

347

878

VANES 000893

```
 1        if this refreshes your memory as to the
 2        address where Mr. Jiminez resided?
 3   A        Yes, 4600; that would have been the 4600
 4            block of Mass.  My mistake.
 5   Q    And did you have occasion to speak with any
 6        individuals?
 7   A        Yes.
 8   Q    What were their names?
 9   A        Okay, I spoke with Kim, Kimerly; and I
10            spoke with a male black neighbor who lived
11            further down the block, and I spoke with
12            the residents, an adult female and a
13            younger male who lived directly across the
14            street from 4660 where the victim
15            succumbed at.
16   Q    Do you recall those people's names?
17   A        Not exactly.
18   Q    Is there any document that would refresh your
19        memory as to their names?
20   A        Yes.
21   Q    I ask you to take a look at that document.
22   A        Yes.
23   Q    I ask you does that refresh your memory as to
24        the names of the people that you spoke with
25        that evening?
```

348

870

VANES 000894

```
 1 │ A      Yes.

 2 │ Q   What were their names?

 3 │ A      I spoke with a Lorraine Hobson who lived

 4 │        at 4667 Massachusetts, and a Rodney Gray

 5 │        who lived at 4643 Mass, and also Kim

 6 │        Belinsky who lived at 4660 Mass.

 7 │ Q   Did you speak to Joseph Kirkwood?

 8 │ A      I'm not exactly sure if I spoke with him.

 9 │ Q   After speaking with those individuals, what

10 │     did you do?

11 │ A      Okay, upon that, I proceeded to the

12 │        hospital which would have been Saint Mary

13 │        Medical Center.

14 │ Q   Where is that located?

15 │ A      That's located at 540 Tyler Street in

16 │        Gary.  And I went to the hospital to get

17 │        an update on the victim's condition.

18 │        Okay, I arrived at the hospital and was

19 │        met by hospital personnel who advised me

20 │        that the victim had expired.

21 │ Q   And after finding out that information, what

22 │     did you do?

23 │ A      Okay, I stayed at the hospital long enough

24 │        to get preliminary information as far as

25 │        the name of the victim and was -- met with
```

349

850

VANES 000895

```
 1            personnel from the coroner's office where
 2            they could do their investigation.  And I
 3            left the hospital and went back to the
 4            scene of the crime.
 5   Q   What was your purpose of going back to the
 6       scene of the crime?
 7   A        To advise the units there that the case
 8            now, in fact, was a homicide, and I was
 9            going to make sure that any and all
10            evidence that could possibly be recovered,
11            that an attempt was made.
12   Q   And upon returning to the scene, what did you
13       do in that regard?
14   A        Okay, I met with investigators from the
15            crime lab and more or less directed them
16            in the area where I wanted searched and
17            processed for any and all evidence.
18   Q   Had you spoke to anyone as to what area should
19       be searched?
20   A        Okay, I spoke with Kim.
21   Q   Kim Belinsky?
22   A        Kim Belinsky; she was pretty hysterical at
23            the time.  I was able to get an account of
24            actually where the shooting occurred,
25            which would have been around the porch
```

350

881

VANES 000896

```
 1              area directly in front of 4660.
 2   Q   I would like to show you what's been
 3       previously admitted into evidence as State's
 4       Exhibits 2 through 6 and ask you if this is
 5       the porch area that you're referring to -- and
 6       State's Exhibit 3.
 7   A       This area right in here (indicating).
 8   Q   Okay.
 9   A       This porch right here is the porch area
10           (indicating).
11   Q   And were you able to secure any evidence from
12       that front partial area of the residence of
13       Kim Belinsky?
14   A       To the best of my recollection, no.
15   Q   What were you looking for?
16   A       We were looking for possible evidence of
17           shell casings, anything that possibly
18           could have been dropped by the victim or
19           the perpetrator, anything that may appear
20           out of the ordinary that might be relevant
21           to the crime that occurred.
22   Q   Were you able to find anything?
23   A       No.
24   Q   What did you do after you searched the area
25       for any evidence?
```

351

VANES 000897

```
 1 │ A        Okay, I stayed around long enough for the
 2 │          crime lab investigators to complete their
 3 │          investigation.
 4 │ Q    Were they searching with you also or in
 5 │      addition to?
 6 │ A        Okay, myself -- actually, the search and
 7 │          recovery was going to be done by the crime
 8 │          lab technicians; but basically my position
 9 │          was showing which area might be relevant
10 │          to the case.  So I would step back and
11 │          say, "Let's check this area."
12 │ Q    You were working with them?
13 │ A        Right.  And we proceeded across the
14 │          street, checking the path leading across
15 │          the street to the house where he succumbed
16 │          at.
17 │ Q    I would like to show you what's previously
18 │      been admitted into evidence as State's
19 │      Exhibits 9, 10 and 11 and ask you if you
20 │      recognize that house?  I ask you if this is
21 │      the house that you searched for evidence?
22 │ A        Okay, once the investigation was
23 │          completed, I proceeded back to the police
24 │          station.
25 │ Q    And what happened once you returned back to
```

352

VANES 000898

```
 1           the Gary Police Department?
 2    A      Okay, when I got back, I made sure that
 3           the necessary reports were compiled, the
 4           office report stating what type of crime
 5           occurred versus the homicide digest, which
 6           was prepared by the first officer which
 7           would indicate who was there, who arrived,
 8           and some particulars that could have been
 9           obtained on the scene.
10    Q    And was that done?
11    A      Yes.
12    Q    And approximately what time was this at now if
13         you can recall?
14    A      We're in practically -- if not after
15           midnight, we're right about at midnight
16           now.
17    Q    Okay, after you got started on that, what did
18         you do next?
19    A      Okay, at that time, once all the reports
20           were completed, we went back to the
21           hospital and the coroner's office
22           investigator was completed, went back and
23           compiled our reports and got prepared to
24           start back at it the next morning.
25    Q    And what happened the next morning?  What did
```

353

884

VANES 000899

```
1  ||        you do in relation to this case?
2  ||  A        Okay, the following day, possibly the
3  ||            morning or the afternoon shift, I got in
4  ||            contact with Kimerly and spoke with her on
5  ||            the phone, and she was still pretty
6  ||            distraught under the circumstances, and
7  ||            advised her once she gets herself somewhat
8  ||            together I would like to ask her a few
9  ||            things in reference to the investigation.
10 ||  Q    And did you do that?
11 ||  A        I did.
12 ||  Q    Did you ever ask her to attempt or make
13 ||        arrangements for her to attempt to identify
14 ||        who this person was that had killed her
15 ||        fiance?
16 ||  A        Yes.
17 ||  Q    How did that occur?
18 ||  A        Okay, sometime going into March, maybe
19 ||            around the 2nd, 3rd, the beginning of the
20 ||            month of March, I had instructed her to
21 ||            come down to the police station some time
22 ||            during the day-time shift to view
23 ||            photographs.
24 ||  Q    And is that you who actually shows her these
25 ||        photographs?
```

354

Filed in Clerk's Office

MAY 23 1997

Anna N. Anton
CLERK LAKE SUPERIOR COURT

VANES 000900

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay.  And who does that? |
| 3 | A | Okay, the photographs are kept in the Gary |
| 4 | | Police Department Bureau of Identification |
| 5 | | and -- |
| 6 | Q | How are they arranged? |
| 7 | A | They are arranged in several large so-to- |
| 8 | | speak portfolios which hold several |
| 9 | | pictures in them. |
| 10 | Q | Like binders? |
| 11 | A | Binders, yes. |
| 12 | Q | Do you know approximately how many pictures |
| 13 | | are in each of those binders?  How many are on |
| 14 | | a page? |
| 15 | A | Well, my last recollection of looking at |
| 16 | | the books that held the photographs, it |
| 17 | | must have been about eight on each page. |
| 18 | Q | Okay, how many pages are in the book, |
| 19 | | approximately? |
| 20 | A | Over thirty. |
| 21 | Q | So would it be fair to say there's at least |
| 22 | | two hundred and forty pictures in each book? |
| 23 | A | A pretty good approximation. |
| 24 | Q | And did Ms. Belinsky, in fact, come down and |
| 25 | | look at those books? |

355

VANES 000901

```
 1    A       She did.
 2    Q   Do you know how many books she looked through?
 3    A       I'm not exactly sure.
 4    Q   And what, if anything, occurred after she came
 5        down to the police station and looked at those
 6        books?
 7    A       Okay, there came a time approximately
 8            March 2nd, March 3rd where I received a
 9            notice of correspondence from the Bureau
10            of Identification directed to me
11            indicating that Kim Belinsky had came in
12            and, in fact, viewed the photographs and
13            had a possible identification on the
14            Bureau of Identification photographs which
15            corresponded to the number that is
16            assigned to each picture.
17    Q   And what was the name of that picture?
18    A       Okay, the number, I matched the number up
19            and secured the picture, and the name that
20            corresponded to the picture was Willie
21            Donald.
22    Q   And you also were involved in the
23        investigation of a robbery that same evening,
24        correct?
25    A       Yes.
```

356

327

VANES 000902

```
1   Q   And it was a Rhonda Williams?
2   A       That's correct.
3   Q   And would it be fair to say that you did
4       basically the same thing for the robbery as
5       you did for the homicide up to this point in
6       terms of gathering the reports?
7   A       Okay, as far as the report gathering, yes.
8   Q   And did Ms. Williams ever come down and
9       basically do the same thing that Kim Belinsky
10      did, look at these books?
11  A       That's correct.
12  Q   And was she able to indicate by looking at
13      those books who had robbed her?
14  BY MR. KING:
15                  Objection unless the State
16                  specifies whether or not that was
17                  done in the presence of this
18                  officer or if he's basing his
19                  testimony on reports made
20                  available to him as a detective
21                  on the case.
22  BY THE COURT:
23          Well, can we clarify that?  I would
24      sustain it at this point.
25
```

357

VANES 000903

```
1    BY MR. BENSON:
2    Q    Did you become aware through the reports
3         whether or not Ms. Williams had indicated who
4         her assailant was?
5    A        Yes.
6    Q    And who was that?
7    A        Okay, I received the same correspondence
8             stating that she had viewed photographs
9             and which she made positive identification
10            on the photograph that corresponded to the
11            number on the report that was supplied to
12            me.  And the name that corresponded with
13            that number was Willie Donald.
14   Q    Now, once the defendant -- the picture had
15        been identified in these books, what did you
16        do after getting that information?
17   A        Possibly -- my first step, of course, was
18            to attempt to obtain any information about
19            Mr. Donald that I could.  And the
20            following day -- well, the information I
21            obtained would have been to see, you know,
22            see if he was wanted for anything, such as
23            that, and I was able to obtain a bench
24            warrant through the Gary City Clerk's
25            office.
```

358

880

VANES 000904

```
1    Q    Tell the ladies and gentlemen what a bench
2         warrant is.
3    A         A bench warrant is issued by a judge when
4              an individual fails to appear in court on
5              a prescribed date for whatever crime the
6              incident was referring to, whether it be a
7              misdemeanor, a felony or some type of
8              infraction like a traffic ticket, failed
9              to show up in court, and it's the judge'
10             discretion to issue a bench warrant for
11             failure to appear, which means upon
12             commanding any officer to arrest this
13             individual, he would have to go before the
14             judge and explain why he failed to appear
15             on a prescribed date.
16   Q    And in conducting this search -- is that your
17        routine practice when you have a suspect?
18   A         Yes, I would check for wanted -- see if
19             he's wanted for any particular situation.
20   Q    And in this case, you did find that there was
21        a warrant for the arrest of the defendant,
22        correct?
23   A         That's correct.
24   Q    And once you find out that information, what
25        do you do?
```

359

800

VANES 000905

```
 1    A        Okay, the bench warrant itself is an
 2             arrest warrant.  And the following day, I
 3             with other officers went to seek out Mr.
 4             Donald.
 5    Q    And where did you find him?
 6    A        I'm not sure of the exact address but,
 7             possibly, 3840 Connecticut, 3830.
 8    Q    I would like to show you a document and ask
 9         you if this refreshes your memory as to the
10         address where you found the defendant?
11    A        Yes.
12    Q    And where was that?
13    A        That would have been 3860 Connecticut
14             Street in Gary.
15    Q    And would it be fair to say that you were
16         going there to arrest him on the bench
17         warrant, but you had other suspicions,
18         correct?
19    A        That's correct.
20    Q    And a search warrant is a vehicle by means
21         that you can bring him into the station,
22         right?
23    A        Excuse me?
24    Q    A search warrant is a vehicle -- I'm sorry,
25         the arrest warrant is a vehicle by which you
```

360

VANES 000906

```
 1          can bring him into the station legally,
 2          correct?
 3    A       Correct.
 4    Q  And tell the ladies and gentlemen of the jury
 5       what happened when you arrived at 3860 --
 6    A       Connecticut.  Okay, about between 5:30,
 7            6:00 o'clock on a particular day, myself
 8            and other investigators, along with three
 9            patrol uniform officers including the
10            sergeant, we went to that address.  Myself
11            and Sergeant DeLeon went to the front
12            door, I had the warrant in my possession,
13            in my hand, we knocked on the door, we
14            knocked again and --
15    Q  Now, who was in uniform and who wasn't?
16    A       Sergeant Deleon was in uniform, he went to
17            the front door with me; Officer Darrius
18            Brannon was in full uniform; and I think
19            Corporal Ben Portis was in full uniform;
20            Corporal John Jelks was in plain clothes;
21            Corporal Sherry Lee was in plain clothes;
22            and myself, I was in plain clothes.
23    Q  What is the purpose of taking a uniformed
24       officer to the door with you?
25    A       So there wouldn't be any discrepancy as
```

361

892

VANES 000907

```
 1              far as whether or not these are actually
 2              the police.
 3       Q   And you stated you knocked on the door,
 4           correct?
 5       A       Right.
 6       Q   What happened?
 7       A       We knocked on the door, and after a short
 8               period of time I noticed a male subject --
 9               I think it was the type of door with a
10               little window with a curtain behind it.  I
11               noticed a male open the curtain and close
12               it back up; he looked out, briefly looked
13               out at myself and Sergeant Deleon who was
14               standing in front of the door.  He looked
15               out and we knocked, we said, "Police," and
16               no one answered the door.  And then a
17               short time later after we knocked again --
18               because I could hear something going on
19               behind the door but I wasn't exactly sure
                 what it was, and we were getting a little
                 uneasy.  So then the male subject opened
22               the door.
23       Q   And who was the male subject?
24       A       The male subject was Willie Donald.
25       Q   And that's the same subject who looked through
```

362

893

VANES 000908

```
 1            the curtain and closed it earlier?
 2    A       As far as I can recollect, yes.
 3    Q   And how much time had elapsed from when you
 4        first knocked until the defendant answered the
 5        door?
 6    A       Ten minutes.
 7    Q   So you were waiting outside for the defendant,
 8        who had already seen you, to open the door?
 9    A       Yes.
10    Q   And what did he do?
11    A       After he opened the door, what happened --
12            of course, I'm in plain clothes along with
13            the uniform officer.  I presented my
14            identification and identified myself as a
15            police officer.  And I asked him, "Are you
16            Willie Donald?" He said, "Yes."  I said,
17            "I have a warrant for your arrest," and I
18            had it in my possession.  He asked to see
19            it; I showed it to him.  And at that time,
20            he was placed under arrest.
21    Q   What was his demeanor?
22    A       He was nervous; he was a little nervous.
23    Q   And after you arrested the defendant, what did
24        you do?
25    A       Okay, Sergeant DeLeon who was in a marked
```

363

894

VANES 000909

```
1              patrol unit --
2    Q    Let me back up.  I'm sorry to cut you off; I
3         want to back up.  At this time, who was
4         present at the house when this arrest was
5         executed?
6    A         As far as officers are concerned?
7    Q    No, anybody in the house.
8    A         Okay, I recall a younger female who
9              identified herself as a niece to Mr.
10             Donald.  I spoke with her and I gave her a
11             telephone number where I could be
12             contacted in reference to the arrest of
13             Willie Donald and told her we were going
14             to 1301 Broadway with him, and she said
15             she would give it to his mother, Willie
16             Donald's mother, to call.  And one of the
17             officers, possibly Sergeant DeLeon put the
18             handcuffs on him and, you know, walked him
19             outside to the car and we stopped outside
20             at the car and I read Mr. Donald his
21             rights, and he stated that he understood.
22             And at that point --
23   BY THE COURT:
24             Counsel, could you approach the bench for
25        a moment?
```

364

VANES 000910

```
 1          WHEREUPON THE FOLLOWING DISCUSSION WAS HELD AT
 2     THE BENCH OUTSIDE OF THE HEARING OF THE JURY:
 3
 4     BY THE COURT:
 5               I just wanted to interrupt at that point;
 6          I don't know what's coming.  Was there any
 7          statement made?
 8     BY MR. BENSON:
 9               No, he didn't say anything.  I'll just ask
10          him another question to get away from this.
11     BY THE COURT:
12               So there is no statement?
13     BY MR. KING:
14               No.  And also at the station, he requested
15          an attorney; and this guy, this idiot, is
16          capable of saying anything so you had be very
17          careful about that or you'll have a mistrial.
18     BY MR. BENSON:
19               Well, I'm going to move past it.
20     BY THE COURT:
21               Yes, let's get away from this area of
22          advising him of his rights and so forth.
23     BY MS. LAKE:
24               Could you also make a comment to the
25          spectators?
```

365

806

VANES 000911

```
 1  ║  BY MR. KING:
 2  ║         I have already gestured to them, and the
 3  ║     Court can watch.  It's my client's mom and his
 4  ║     sister and, you know --
 5  ║  BY THE COURT:
 6  ║         Okay.
 7  ║
 8  ║         WHEREUPON THE FOLLOWING PROCEEDINGS WERE
 9  ║     ONCE AGAIN HELD IN THE HEARING OF THE JURY:
10  ║
11  ║  BY MR. BENSON:
12  ║  Q   There came a point that the defendant was
13  ║     transferred back to the station, correct?
14  ║  A      Excuse me, Mr. Benson?
15  ║  Q   There came a point where the defendant was
16  ║     transported back to the station, right?
17  ║  A      Correct.
18  ║  Q   And let's back up a little bit.  The defendant
19  ║     is at the station.  Prior to going out and
20  ║     executing this outstanding warrant, you had
21  ║     taken a statement from Ms. Williams and Ms.
22  ║     Belinsky, correct?
23  ║  A      I can't recollect as far as exact dates
24  ║         are concerned.
25  ║  Q   Let's see if I can show you some documents and
```

366   897

VANES 000912

1            see if that refreshes your memory.  I would

2            like to show you two documents and ask you if

3            that refreshes your memory as to whether or

4            not a statement was taken from Ms. Belinsky

5            prior to you going out and arresting the

6            defendant.  Please check the dates on those

7            two documents.

8    A      Yes.

9    Q   So you had taken a statement from Ms. Belinsky

10            before you went out to arrest the defendant,

11            correct?

12    A      Correct.

13    Q   And in regards to Ms. Williams, when was her

14            statement taken in relation to this arrest?

15    A      Her statement was taken later on that same

16               day, that same night.

17    Q   Other than arresting the defendant to execute

18            the warrant, did you have another reason why

19            you wanted the defendant?

20    A      Yes.

21    Q   What was that?

22    A      It was an investigation reference the

23               robbery of Rhonda Williams and the

24               homicide of Bernard Jiminez.

25    Q   And what was your intent once you had the

VANES 000913

```
 1            defendant in custody?
 2     A         My intent was to get the best possible
 3               identification, have the victims come in
 4               to view a physical line-up.
 5     Q    And did you, in fact, have that done?
 6     A         I did.
 7     Q    Tell the ladies and gentlemen of the jury how
 8               that process came about.
 9     A         Okay --
10     Q    Let's back up.  I'm sorry.  You arrested the
11               defendant in the evening hours of March 2nd,
12               correct?
13     A         Yes -- possibly the 3rd.
14     Q    I'm sorry, March 3rd at 6:00 p.m., correct?
15     A         Right.
16     Q    And you conducted a search of the residence at
17               a later time, didn't you?
18     A         Yes.
19     Q    Was the search conducted before or after you
20               had the in-person line-up done?
21     A         After.
22     Q    So the order would have been the arrest, the
23               in-person line-up and then the search,
24               correct?
25     A         Correct.
```

368

899

VANES 000914

1    Q    Tell the ladies and gentlemen of the jury how
2         the line-up came to be after you arrested the
3         defendant.
4    A         Okay, once he was arrested and brought on
5              station, I contacted Ms. Rhonda Williams,
6              the robbery victim, and asked her to come
7              in a view a line-up, a physical line-up;
8              and I contacted Kimerly and asked her to
9              come to view a physical line-up.  They
10             arrived at the station shortly thereafter.
11   BY MR. KING:
12        Could the defense please ask for a time
13        reference if the witness is able to give us
14        one?
15   BY THE COURT:
16             Yes, go ahead.
17   BY MR. BENSON:
18   Q    Do you recall approximately what time Ms.
19        Williams arrived and Ms. Belinsky at the
20        station?
21   A         Half an hour to an hour or less.
22   Q    But in regards to what time it was, was it in
23        the morning, afternoon, evening?
24   A         Okay, it would have been afternoon.  It
25             could have been about an hour, hour and a

369

VANES 000915

```
 1              half.  I think the time of the arrest was
 2              some time around 6:00; I think we may have
 3              started the actual line-up around 7:15,
 4              7:30, somewhere in that area.  It was
 5              about an hour.
 6    Q    That same evening?
 7    A         Right, that same evening.  You know, it
 8              took time for them to arrive, and I had to
 9              meet with the jail warden to prepare for
10              the line-up.
11    Q    Tell the ladies and gentlemen of the jury what
12         needs to be done when an in-person line-up is
13         going to occur, what you have to do.
14    A         Okay, preferably, you want to conduct a
15              line-up with subjects similar in physical
16              characteristics.
17    Q    What is the purpose of that?
18    A         So, therefore, it would be fair, trying to
19              make it as fair as possible without, you
20              know, characteristics outstanding so to
21              speak.  So I went upstairs and met with
22              the jail warden and advised him of the
23              situation to prepare for a physical line-
24              up and if he could get together,
25              preferably -- like I said, in most
```

370

901

VANES 000916

```
 1          instances, we like to use the guys who are
 2          already incarcerated as opposed to going
 3          out on the streets and say, "Let me find
 4          someone that looks like him." So we
 5          basically dealt with who we had in
 6          custody; and we got as close to the
 7          physical characteristics as we could.
 8          And, usually, it's six persons that are
 9          involved in a line-up, you know; that's
10          the standard of operation that we use is
11          six persons.  There persons -- of course,
12          I take down his height, weight and type of
13          clothing he's wearing -- and each one is
14          given a particular number because they're
15          going to be positioned one through six.
16          Each one -- we got together five other
17          individuals, male blacks as close as we
18          could, and each one was assigned a number.
19          And we have a screen, two-way screen, in
20          which the subjects of the line-up would
21          stand behind the screen; but whomever is
22          viewing it could see them but they can't
23          see whoever is viewing it.  It's like,
24          that's how the line-up is --
25     Q    Two-way mirror?
```

371

VANES 000917

```
 1    A          Right.  You can see the subject of the
 2               line-up but they can't see you.  So we got
 3               together the other five individuals and we
 4               positioned them in the line-up.  So the
 5               line-up in itself was set and, of course,
 6               you have to set your proper lighting to
 7               make sure that the subjects of the line-up
 8               cannot view out and see whomever is
 9               viewing it.
10    Q    How does that happen?
11    A          Okay, we have special lighting in the
12               Detective Division that is positioned over
13               the line-up area which is on the extreme
14               end of the Detective Division.  You would
15               cut out all the lights in the exterior
16               portion, and you have a little area -- I
17               would give it roughly five by fifteen,
18               five by seventeen; that would be a rough
19               approximation -- which would be the line-
20               up area with a certain light which would
21               bring out the effect of the two-way.
22    Q    So it's a room that's cut in half, one with a
23         stage and the two-way mirror?
24    A          Right, but it's not connected directly to
25               the Detective Bureau, it's separate doors.
```

372

VANES 000918

```
 1                     So the line-up was prepared and everyone
 2                     is in position.
 3          Q    In this case, did you do what you just
 4               described?
 5          A       Yes.
 6          Q    And how many people were in the line-up?
 7          A       Six total.
 8          Q    And the defendant was one of the people in the
 9               line-up, correct?
10          A       Correct.
11          Q    I'd like to show you what's previously been
12               admitted into evidence as State's Exhibit 8
13               and ask you if you recognize that photograph?
14          A       Yes.
15          Q    What is that a photograph of?
16          A       That's a photograph of the physical line-
17               up that was conducted by myself.
18          Q    For Ms. Belinsky and Ms. Williams?
19          A       Correct.
20          Q    What is your purpose in taking a photograph of
21               that line-up?
22          A       That would, of course, show an accurate
23               recollection of what actually occurred.
24          Q    Did there come a time when you had Ms.
25               Williams or Ms. Belinsky come in and look at
```

373

VANES 000919

```
 1              that line-up?
 2      A          Yes.
 3      Q   You called them and they came down to the
 4          station, correct?
 5      A          Correct.
 6      Q   Did you take any steps to ensure that they
 7          would remain separated when they were at the
 8          station?
 9      A          Yes.
10      Q   Tell the ladies and gentlemen of the jury why
11          you would do that.
12      A          Of course, you wouldn't want anything to
13                 be prejudiced, whereupon one viewing
14                 first, they go back and converse with the
15                 other victim so we would show no form of
16                 prejudice as far as the line-up was
17                 concerned and who selected whomever.  You
18                 know, you didn't want anything like that
19                 to come up.
20      Q   In this case, what did you do to secure that
21          independence?
22      A          Okay, we kept them separate outside of the
23                 Detective Division, which is also outside
24                 of the line-up area.  And each one would
25                 come in individually.  And while they're
```

374

VANES 000920

```
 1                  in the waiting area, you know, they were,
 2                  of course, advised no one talks with no
 3                  one; and an officer was positioned out
 4                  there to ensure that that's what actually
 5                  occurred.
 6       Q    And did there come a point where either Ms.
 7            Williams or Ms. Belinsky came into the line-up
 8            room to view these six individuals?
 9       A         Yes.
10       Q    Do you recall which person came in first?
11       A         I'm not exactly sure who came in first.
12       Q    I would like to show you two documents and ask
13            you -- well, show you one document first of
14            all and ask you if that document helps you
15            recollect at what time Ms. Belinsky viewed the
16            in-person line-up?
17       A         Yes.
18       Q    And what time did Ms. Belinsky view that line-
             up?
         A         At 7:41 p.m.
         Q    And now I show you another document --
22       BY MR. KING:
23                 Could the defense please have the date?
24       BY THE COURT:
25                 Well, I thought we had established that
```

375

906

VANES 000921

```
1    |    already.
2    | BY MR. KING:
3    |      We might have, Judge, but I need to be
4    |    sure.
5    | BY THE COURT:
6    |      Would you ask so we're sure?
7    | BY MR. BENSON:
8    | Q  All right, 7:41 p.m. on what day?
9    | A      March the 3rd, 1992.
10   | Q  And that's for Ms. Belinsky?
11   | A      Correct.
12   | Q  And I'd like to show you another document and
13   |    ask you to turn to page three of that document
14   |    and ask you if that helps you recall what time
15   |    Ms. Williams looked at the in-person line-up?
16   | A      7:30 p.m., March the 3rd, 1992.
17   | Q  That would have been approximately ten minutes
18   |    before Ms. Belinsky did, correct?
19   | A      Correct.
20   | Q  Tell the ladies and gentlemen of the jury what
21   |    you did when Ms. Williams was brought in to
22   |    view the in-person line-up.
23   | A      I went and got her personally from the
24   |      outer area, waiting area, and directed her
25   |      into the darkened, of course, Detective
```

376

```
1              Bureau.
2    Q    What was her demeanor?
3    A         Okay, you walk down a little hallway first
4              and then you make a right turn into the
5              Detective Division and the line-up is
6              about as far as you get to the back wall.
7              And as we're walking up towards it, she
8              said, "Wait a minute.  Can they see me?"
9              and I said, "No, they can't see you."  She
10             got a little nervous; she said, "Wait a
11             minute," you know.  I said, "You got to
12             come sit right in the front," and she
13             said, "No, they're going to see me."  So
14             she's like, "Wait, wait, wait," you know,
15             and I said, "Come on.  It's okay; nobody
16             can't see you."  And the officers, you
17             know, who was up there, assured us that,
18             "No one can see you."  She was a little
19             afraid about that at first, and once she
20             got herself together, she came and sat in
21             a chair that I had positioned -- I'd give
22             it seven feet, ten feet in front of the
23             actual screen, which is more or less
24             elevated.  She sat down and she's still a
25             little nervous.  I said, "Sit down," you
```

377

908

VANES 000923

```
 1              know, "and act only upon my instructions,"
 2              and I explained to her, "I have each
 3              subject of the line-up, which was six
 4              total, come out individually, they would
 5              step forward and turn each direction so
 6              she could get a left-side view and also a
 7              right-side view of each individual, that
 8              each individual would turn completely
 9              around where she can get an over-all view
10              of them as far as from the back side and
11              the front, then they would step back, and
12              I would do it one through six, each
13              individual.
14      Q    Now, when you say, "come out," they're all
15              standing there and they step forward, is that
16              what you mean?
17      A        That's correct.
18      Q    You didn't bring them out one at a time, did
19              you?
20      A        No, but they're still in the little line-
21              up area.  They would step back from the
22              wall so to speak.
23      Q    So in relation to State's Exhibit 8, they
24              would all be there and step forward from that
25              position?
```

378

VANES 000924

```
 1    A        Right, they're basically standing by the
 2             wall, which would show the approximate
 3             height of each individual, and they would
 4             step forward maybe just probably one step,
 5             you know, enough to step away from the
 6             group which would distinguish them more so
 7             as far as standing all together.
 8    Q   And did you have each one step forward?
 9    A        Each one individually, one through six.
10    Q   And did anything happen when any of them
11        stepped forward?
12    A        Okay, each one stepped forward; and once
13             the sixth person, the person, number six,
14             had stepped back, I asked Ms. Rhonda
15             Williams, "Do you recognize anyone?" and,
16             you know, she pointed her finger, you
17             know, shaking it like this (indicating),
18             she said, "Number four."
19    Q   Did you ask her anything else?
20    A        She was sitting there and just staring,
21             you know, for a little short period of
22             time.  I said, "Rhonda, Ms. Williams," you
23             know, she was staring there for a while,
24             and I said, "Are you sure?"  She said she
25             was sure.
```

379

910

VANES 000925

```
1    Q    Did she express any doubt to you whatsoever
2         that number four was the person who robbed
3         her?
4    A         She held fast that she was sure it was
5              number four.
6    Q    After she identified the defendant as the
7         person that had robbed her, what did you do?
8    A         Okay, I escorted her from the little area
9              that she was viewing the line-up back to
10             the waiting area.  And, of course, I
11             documented the time it started versus the
12             time it ended and her name and the
13             indication of her identification.
14   Q    And did you then conduct any more line-ups of
15        these individuals with Ms. Belinsky?
16   A         Yes.
17   Q    And tell the ladies and the gentlemen here how
18        that began.
19   A         Okay, after Ms. Rhonda Williams was
20             escorted back to the waiting area, I went
21             back to get Kimerly Belinsky and brought
22             her up.  And she was even more nervous
23             than Ms. Williams was, so I'm trying to
24             console her and walk her up.  She said
25             that do she have to sit up in the front,
```

380

911

```
 1                 and I said, "Just sit up in the front,"
 2                 and then basically the same, can they get
 3                 to her and --
 4    Q    Was this when you were in there or walking in?
 5    A         As we're walking up to her seat, you know,
 6              we're walking up to where she is to be
 7              seated at; and she start crying then, you
 8              know, and I asked her would she be okay.
 9              She said, "Yeah," and she finally took her
10              seat.  And she started to point, and I
11              said, "Wait a minute," and I explained to
12              her --
13    Q    What did she start to do?
14    A         She started to point up at the line-up and
15              I said, "Wait a minute."
16    Q    This is before you even get in, correct?
17    A         Right, I said, "We have to explain," you
18              know, "the formality," you know, that
19              basically, I call each one up where she
20              would see each individual, all views of
21              them, we would have them turn around and
22              step back; and then, and then only, if she
23              is able to make an identity was she to
24              make it and remain silent, you know, until
25              we complete the formality.  So I went
```

381

912

VANES 000927

```
 1              through the formality and she's sitting
 2              there, she's crying, she's shaking in the
 3              chair, and once I complete the formality,
 4              she said, "Number four."
 5    Q    Did she give you any degree of certainty of
 6         how certain she was?
 7    A         (Indicating.)  I had to stop though.  She
 8              said she was getting sick and she had to
 9              go around the corner to the bathroom, and
10              she was in there for a short period.
11    Q    Did she do anything when she was in there?
12    A         Yeah; she was throwing up.
13    Q    This is after she pointed to the defendant in
14         the line-up, correct?
15    A         (Indicating.)  So we got out her out the
16              bathroom -- you know, we went in there to
17              make sure she was okay -- and brought her
18              out and sat her down.  She was a little
19              shook up.  And I asked her once again,
20              "Are you sure?" and she said she was sure,
21              and I documented the information.
22    Q    Both of these witnesses pointed out number
23         four as the suspect who had robbed and
24         murdered Bernard Jiminez and robbed Rhonda
25         Williams, correct?
```

382

910

VANES 000928

```
1      A        Correct.
2      Q    And number four was who in this line-up?
3      A        Willie Donald.
4      Q    And do you see Willie Donald in the courtroom
5           today?
6      A        Yes, I do.
7      Q    And where is he seated and what is he wearing?
8      A        He's seated to the right of Mr. King; he's
9               wearing a light-colored shirt, multi-
10              colored tie and light-colored pants.
11     Q    After Ms. Williams identified the defendant,
12          you took a statement from her, correct?
13     A        That's correct.
14     Q    And you also had occasion to show her another
15          photo line-up after this incident, is that
16          correct?
17     A        Correct.
18     Q    I'd like to show you what's been admitted into
19          evidence as State's Exhibit 17 and ask you to
20          take a look at that document and ask you if
21          you recognize it.  Do you recognize that
22          document?
23     A        Yes, I do.
24     Q    And tell the ladies and gentlemen of the jury
25          what that is.
```

383

914

VANES.000929

```
 1    A        This would be a six-picture photographic
 2             line-up that I had prepared.
 3    Q   And you showed that to Ms. Williams after the
 4        in-person line-up, correct?
 5    A        That's correct.
 6    Q   What was the reason behind showing her the
 7        photographic line-up after the in-person line-
 8        up?
 9    A        I was attempting to go through the
10             channels to make sure that the
11             identification was the best of her
12             recollection as possible.  And when she
13             had originally picked the photograph, it
14             wasn't more or less in a so-to-speak line-
15             up form.
16    Q   It was out of a book?
17    A        Right, it was just in a book and it never,
18             to the best of my recollection, was
               presented to her in the form of a line-up.
               And I did that just to be sure.
      Q   After Ms. Belinsky and Ms. Williams picked the
          defendant out of the line-up, did there come a
23        point where you ever attempted to get a search
24        warrant for the defendant's house?
25    A        Yes.
```

384

Filed in Clerk's Office

MAY 23 1997

*Anna M. Anton*
CLERK LAKE SUPERIOR COURT

915

VANES 000930

```
 1    Q    And do you recall when that occurred?
 2    A         Okay, myself and the other investigator
 3              upon completion of the line-up, the
 4              statement from Ms. Rhonda Williams, the
 5              statement completion from Ms. Belinsky,
 6              started preparing the line-up affidavit
 7              thing that same night in hope of possibly
 8              serving it then.
 9    Q    Getting a search warrant?
10    A         Right, getting a search warrant then to --
11              we were unsuccessful in locating a
12              magistrate or judge who have to sign it
13              authorizing us to search said premises.
14    Q    You just can't go out and search, you have to
15         have a judge sign that document, right?
16    A         No, you have to have it signed by a judge
17              or a presiding magistrate.  That's the
18              only way that, based on our -- it has to
19              be accepted first of all, and the
20              acceptance would be based on a judge or a
21              magistrate; otherwise, it's invalid.
22    Q    And in this case, you finally were able to
23         obtain a judge's signature, correct?
24    A         Not until the next morning.
25    Q    Approximately what time?
```

385

916

VANES 000931

```
 1    A        10:00 a.m., 11:00 a.m.
 2    Q    After obtaining this signature, what did you
 3         do with this search warrant?
 4    A        Okay, the following morning, 10:00
 5             o'clock, 11:00 o'clock, earlier in the
 6             day, we went to the prescribed location
 7             for the search warrant, which would have
 8             been 3860 Connecticut Street.
 9    Q    The defendant's residence?
10    A        Correct.
11    Q    Now, this was almost sixteen hours after he
12         had been arrested with someone else in the
13         house, correct?  He was arrested at 6:00
14         o'clock the night before, correct?
15    A        Correct.
16    Q    And you're now going to search the house at
17         11:00 o'clock the next day, correct?
18    A        Yes.
19    Q    So about sixteen, seventeen hours had passed
20         with no surveillance on the house?
21    A        Yes, that's a pretty good approximation.
22    Q    Was there any surveillance on the house during
23         this interim period?
24    A        If it was, I wasn't aware of it.
25    Q    You would have been the one to authorize it,
```

386

VANES 000932

```
 1            correct?  You were the investigating
 2            detective.
 3    A         Hopefully.
 4    Q     And when you went back with the search
 5            warrant, were you able to find any items that
 6            you were searching for?
 7    A         No.
 8    Q     What items were you looking for?
 9    A         So to speak "fruits of the crime,"
10            anything -- first, I would look for
11            anything that would directly relate the
12            defendant to Ms. Rhonda Williams, anything
13            that might relate the defendant to Bernard
14            Jiminez and, of course, anything that
15            would relate to the clothing description
16            that was given to the officers of what the
17            subject was wearing on the date of the
18            crime.
19    Q     And you weren't able to locate any of those
20            items, were you?
21    A         No.
22    Q     Do you find that unusual considering that
23            sixteen hours passed from the time the
24            defendant was arrested with someone's
25            knowledge to the time the house was searched?
```

387

VANES 000933

```
 1    A       It was strange.
 2    Q    Would it be fair to say that the sooner the
 3         search warrant was executed, the better chance
 4         you would have of recovering any of the
 5         "fruits of the crime" as you refer to them,
 6         correct?
 7    A       General practice, you would like to serve
 8            it as soon as possible.
 9    Q    And, ideally, you would like to serve the
10         warrant when he was arrested, correct?
11    A       Correct.
12    Q    But that was impossible given the
13         circumstances?
14    A       Correct.
15    BY THE COURT:
16            Do you have some more direct with this
17         witness?
18    BY MR. BENSON:
19            Yes, Your Honor.
      BY THE COURT:
              Let's break at this point.  Obviously,
22         we're not going to complete direct and cross,
23         and there's probably a great deal more
24         questioning to be done of this particular
25         witness, and it is nearly 12:40, so we'll
```

388

919

VANES 000934

1    break for lunch at this point and again keep

2    the jury together for lunch, escort them as a

3    group to the cafeteria, and return.  And we

4    should resume the trial in one hour.

5         Let me admonish the ladies and gentlemen

6    of the jury not to converse about this case in

7    any manner while you're away from the

8    courtroom at lunch.  The jury may be excused.

9

10        WHEREUPON THE COURT RECESSED AND

11   RECONVENED AND THE FOLLOWING PROCEEDINGS WERE

12   HELD IN THE PRESENCE AND HEARING OF THE JURY:

13

14   BY THE COURT:

15        Mr. Benson.

16   Q  Detective Outlaw, when you were conducting

17      this in-person line-up, you stated that you

18      asked individuals to step forward in the line-

19      up and turn to the left and turn to the right,

20      is that correct?

21   A    Correct.

22   Q  When you asked them to step forward, did you

23      refer to them by name or number?

24   A    Number.

25   Q  At any time during this process, did you

389

VANES 000935

```
 1          either indicate to Ms. Williams or Ms.
 2          Belinsky who they should pick?
 3     A       No.
 4     Q   Did you in any way suggest to them who the
 5          suspect might be?
 6     A       No.
 7     Q   Let's direct your attention to the robbery of
 8          Ms. Williams.  You had occasion to review the
 9          offense report taken by Officer Faulkner, is
10          that correct?
11     A       That's correct.
12     Q   And that's one of the reports you previously
13          referred to?
14     A       That's correct.
15     Q   And in reviewing that report, were you made
16          aware of whether or not the perpetrator was
17          wearing gloves at that time?
18     A       I can't recollect whether that information
            was supplied.
       Q   I'd like to show you what's previously been
            marked as State's Exhibit 21 and ask you if
22          this refreshes your recollection?
23     A       Yes.
24     Q   And is State's Exhibit 21 what you reviewed
25          from Officer Faulkner?
```

390

VANES 000936

```
 1    A        That's correct.
 2    Q    And what did that report indicate to you as to
 3         whether or not that person was wearing gloves?
 4    A        The report indicated that the person was
 5             wearing black leather gloves.
 6    Q    And when you received that report indicating
 7         that the assailant had worn leather gloves,
 8         based upon that information, would you direct
 9         that fingerprints be taken at the crime scene
10         based upon that information?
11    A        No, I would not.
12    Q    And why is that?
13    A        Okay, with him wearing gloves, there would
14             be the strong possibility there wouldn't
15             be any prints there belonging to the
16             suspect.
17    Q    And in this case, did you order that
18         fingerprints be taken?
19    A        No, I did not.
20    Q    And why was that?
21    A        Okay, with the suspect allegedly wearing
22             gloves, there more than likely wouldn't be
23             any fingerprints there belonging to the
24             suspect.
25    Q    To the best of your recollection, were you
```

391

922

VANES 000937

```
 1  ║         ever informed by anybody as to whether or not
 2  ║         this perpetrator wore gloves or did not wear
 3  ║         gloves other than the report that you reviewed
 4  ║         from Officer Faulkner?
 5  ║  A         No.
 6  ║  Q    If you had been informed that the perpetrator
 7  ║         did not wear gloves, would you have ordered
 8  ║         fingerprints?
 9  ║  A         I would have.
10  ║  Q    Now, this evening when this in-person line-up
11  ║         was conducted, that was March 3rd, correct?
12  ║  A         Correct.
13  ║  Q    There were other individuals who viewed that
14  ║         line-up, is that correct?
15  ║  A         That's correct.
16  ║  Q    And how did it come to pass that other
17  ║         individuals also looked at this in-person
18  ║         line-up with the defendant?
19  ║  A         Excuse me?
20  ║  Q    How did that occur that other people other
21  ║         than Rhonda Williams and Kim Belinsky viewed
22  ║         that line-up?
23  ║  A         Okay, on the night in question, on the 3rd
24  ║              -- excuse me, the 27th of February, there
25  ║              were two other robberies that occurred in
```

392

```
 1              Glen Park area at somewhere pretty close
 2              to the same time frame but more so on the
 3              north a little -- maybe three to five
 4              blocks north --
 5    Q    Okay.
 6    A         -- and based on possibly these robberies
 7              could have been connected in the same
 8              chain, sequence of events, I asked the
 9              victims of the two other robberies to also
10              come to the Gary police station to do the
11              in-person line-up.
12    Q    And do you recall where those robberies
13         occurred at?
14    A         Okay, the first robbery, which possibly
15              occurred first, would have been at 39 --
16              in front of 3973 Virginia Street, the
17              victim's name being Tisa Johnson.  She was
18              robbed as she got out of her automobile.
19              And minutes later, there was an additional
20              robbery from a person, Christine Cullum as
21              she came out of the lounge on the corner
22              of 39th Avenue and Tennessee.  It may have
23              been, the name of the lounge, maybe the
24              Bamboo Lounge -- I'm not sure of the exact
25              name -- but she was robbed as she came
```

393

924

VANES 000939

```
 1                out.  And the time frame from the robbery
 2                at 3973 Virginia to the one that occurred
 3                on the corner as Christina was coming out
 4                of the Bamboo Lounge, we're talking about
 5                a fifteen-minute time span.
 6      Q    And the direction of the perpetrator in that
 7           case was in a northerly direction, correct?
 8      A        He would have been moving from 3973 going
 9                north to approximately 3901, which would
10                have been the corner building.
11      Q    About a block difference roughly?
12      A        Block, three quarters of a block.
13      Q    At the ends of the 3900 block, correct?
14      A        Right.
15      Q    And did you arrange to attempt to have Tisa
16           Johnson come down and look at the in-person
17           line-up which included the defendant?
18      A        I called her, yes, I did.
19      Q    And did she come down?
        A        She came after the completion of the in-
                 person line-up; she was late.
        Q    And did you conduct anything to try and
23           ascertain the identity of the perpetrator in
24           that crime?
25      A        Yes, I did.
```

394

VANES 000940

```
 1    Q    What did you do?
 2    A         I presented to Ms. Tisa Johnson a
 3              photographic line-up, a six person.
 4    Q    And that would have been State's Exhibit 17?
 5    A         That's correct.
 6    Q    Before showing her that, did you ascertain
 7         whether or not she had indicated if she would
 8         be able to identify the perpetrator?
 9    A         Okay, she told me that during the course
10              of the robbery there was a struggle and
11              she got a good look at the perpetrator's
12              face and she would be able to identify
13              him.
14    Q    And in talking with you, she never indicated
15         that the perpetrator had bad skin, is that
16         correct?
17    A         No, she didn't.
18    Q    And she looked at those photographs, correct?
19    A         Correct.
20    Q    Was she able to identify anybody?
21    A         She looked at the photographs and she
22              advised me that the person that robbed her
23              wasn't amongst the pictures.
24    Q    And that's the robbery at 3973?
25    A         3973 Virginia Street right in front as she
```

395

VANES 000941

```
 1              got out of her car.
 2    Q   Now, let's talk about the robbery that was a
 3        little farther north.  That occurred shortly
 4        after this robbery of Tisa Johnson, correct?
 5    A      Correct.
 6    Q   And that was who?
 7    A      Christina McCullum if I may be correct
 8           (sic).
 9    Q   And was she able to give you a description of
10        the perpetrator in that robbery?
11    A      Yes.
12    Q   And in the course of the description, did she
13        ever indicate whether or not the perpetrator
14        had bad skin?
15    A      She made no mention of that fact.
16    Q   And did you, in fact, show her the in-person
17        line-up, physical line-up?
18    A      Yes.  If I'm not mistaken, Christina did
19           do the line-up.
20    Q   And was she able to identify the perpetrator?
21    A      She viewed the line-up and said the person
22           that robbed her wasn't amongst the
23           subjects in the line-up.
24    Q   Now, there was another crime too, a Gary
25        police officer and her daughter, correct?
```

396

VANES 000942

```
 1    A        This is correct.
 2    Q    And that occurred shortly after the murder of
 3         Bernard Jiminez, correct?
 4    A        Yes, somewhere in that time frame.
 5    Q    And did you have occasion to talk to that
 6         person?
 7    A        Yes.
 8    Q    And who was that
 9    A        The victim would have been Sonya, who is
10            the daughter of Mary Banks.
11    Q    In speaking with her, did she indicate to you
12         whether or not she got a good look of this
13         perpetrator?
14    A        She told me that she really didn't get a
15            good look at him.
16    Q    In spite of that information, did you still
17         conduct an in-person line-up and let her view
18         the line-up which included the defendant?
19    A        Yes, I asked her to come down.
20    Q    And why would you do that if a person told you
21         they couldn't recognize him to begin with?
22    A        Okay, based on the robbery of Rhonda
23            Williams leading up to the homicide of
24            Bernard Jiminez, it appeared that the
25            pattern was going south.  And, also, Mary
```

397

```
 1                     Banks had made mention that she noticed
 2                     something, the perpetrator may have had
 3                     bad skin.  And the clothing description
 4                     was similar to the clothing description
 5                     given by Rhonda Williams and Kimerly
 6                     Belinsky.
 7     Q    And the description of the complexion was also
 8          similar, is that correct?
 9     A         Correct.
10     Q    And that description was different from
11          Christina Cullum and Tisa Johnson, the
12          robberies north of the Jiminez residence,
13          correct?
14     A         That's correct.
15     Q    And Ms. Banks or Ms. Thomas, were they able to
16          identify who was in that line-up as the
17          perpetrator?
18     A         No, they were not.
19     Q    Did that surprise you?
20     BY MR. KING:
21                    Objection.  Whether he's
22                    surprised or not is irrelevant.
23     BY THE COURT:
24          Sustained.
25
```

398

VANES 000944

1    BY MR. BENSON:

2    Q   Would you find that unusual in light of the

3        fact that she said she didn't get a very good

4        look at him?

5    BY MR. KING:

6                    Objection.  That's irrelevant

7                    what he finds unusual.  He's here

8                    to tell us what happened.

9    BY THE COURT:

10                Well, perhaps with some foundation.  I

11       would at this point sustain it.

12   BY MR. BENSON:

13   Q   You had a conversation with Ms. Banks before

14       this line-up, correct?  You just didn't drag

15       her in the room and say, "Look at these

16       people," did you?

17   A       No, I didn't.

18   Q   What conversation did you have with her, about

19       what?

20   A       Okay, I asked, of course, what happened

21           during the incident and did she get a good

22           look at him where she could possibly

23           identify him.

24   Q   What did she say?

25   A       She said, well, she's not sure.

                        399

VANES 000945

```
 1    Q    Did she indicate to you whether or not there
 2         was any lighting in the area where she saw
 3         him?
 4    A         She said when she got out of her
 5              automobile that's when the robbery
 6              occurred and her porch light wasn't on.
 7    Q    Was or was not?
 8    A         Was not.
 9    Q    At any time during the in-person line-up which
10         included the defendant, did she tell you that
11         that person was not in the line-up?
12    A         She still based her account on she wasn't
13              sure, you know; she wasn't sure.
14    Q    So she did not exclude the defendant at that
15         time as a suspect, correct?
16    A         Excuse me?
17    Q    She did not -- during the course of that line-
18         up,  she did not exclude the defendant as a
           possible suspect, she merely did not confirm
           it?
      A         That's correct, she couldn't recognize
                him.
23    Q    Now, you have been a detective for how long?
24    A         About two and a half years.
25    Q    And you investigated cases in which a criminal
```

                                400

Filed in Clerk's Office

MAY 23 1997

931   Anna N. Anton
      CLERK LAKE SUPERIOR COURT

VANES 000946

```
 1          defendant commits more than one crime on an
 2          evening, correct?
 3    A         Unfortunately, yes.
 4    Q    Based upon your observations of the five
 5          crimes that occurred, the two on Virginia
 6          Street heading in a northerly direction, and
 7          the three on Connecticut and Massachusetts
 8          heading in a southerly direction, is it your
 9          opinion that one or two different individuals
10          committed those groups of crimes?
11    A         Two different.
12    Q    What do you base that on?
13    A         First of all, with the crimes occurring at
14              3973 Virginia, Ms. Johnson, and with
15              Christina at the corner of 39th and
16              Virginia, the outstanding characteristic,
17              possibly the bad skin, was not prevalent
18              in that situation.  Also, it appears that
19              the perpetrator is heading in a northerly
20              direction away, and on the other end, it
21              appears that the pattern possibly would
22              have started at 4409 Connecticut with Ms.
23              Rhonda Williams and proceeded south.
24              We're talking about from 43rd and
25              Connecticut to 46th and Massachusetts,
```

401

932

VANES 000947

```
 1             about three and a half blocks.  From
 2             there, it proceeded maybe about a block
 3             and a half further south to 48th and
 4             Pennsylvania, and we could be talking
 5             about a time span of twenty to thirty-
 6             five, forty minutes.
 7    Q   What was the consistent identifying factor in
 8        the description of the perpetrator's face in
 9        that situation?
10    A        Okay, the consistent characteristic was
11             the bad skin.
12    Q   And that was absent the description of the
13        other two robbers, correct?
14    A        And that was absent in the description of
15             the other two robberies, correct?
16    A        They made no mention to me about it.
17    Q   In attempting to ascertain the search warrant
18        in which you searched the defendant's house,
19        you used all this information you were
20        gathering about any of these crimes to conduct
21        that search, is that correct?
22    A        That's correct.
23    Q   And where was the defendant's house located in
24        reference to all these crimes?
25    A        The defendant's house would have been 38th
```

                              402

VANES 000948

```
 1              and Connecticut, 3860 possibility (sic) --
 2              3860 Connecticut; that would have been
 3              north.  We're talking about from 3800 to
 4              the robbery of Rhonda Williams, which is
 5              the 4400 block, so we're talking about six
 6              blocks north of the one that's on the
 7              extreme north of this little situation.
 8    Q    The farthest these crimes occurred away from
 9         the defendant's residence was six blocks,
10         correct?
11    A         The closest to the defendant's residence,
12              which would have been Ms. Rhonda Williams,
13              was six blocks, the closest.  And the
14              farthest being the one on 48th and
15              Pennsylvania, which we're talking about
16              ten blocks south and about two blocks
17              east, so we're talking about roughly
18              twelve blocks.
19    Q    When you had the search warrant, you listed
20         the numerous items that you were looking for,
21         correct?
22    A         Correct.
23    Q    And those were the clothing items, correct?
24    A         Correct.
25    Q    Any guns?
```

403

VANES 000949

```
 1    A        Of course, a weapon, yes.
 2    Q    And any of the items taken from any of the
 3         victims in these five crimes, correct?
 4    A        Correct.
 5    Q    And isn't it true that you were also looking
 6         for a pair of gloves, and that item was
 7         enumerated in the search warrant also,
 8         correct?
 9    A        Correct.
10    Q    And that would be consistent with the
11         description that Rhonda Williams gave you of
12         what the assailant was wearing?
13    A        Correct.
14    BY MR. BENSON:
15         One moment, please.  I have no further
16         questions, Judge.  Thank you.  Pass.
17    BY MR. KING:
18         Judge, I'm going to require use of the
19         blackboard at some point in my cross.  If the
           State could remove the documents they put up
           there, it would be appreciated.
      BY THE COURT:
23         All right.
24
25
```

404

935

VANES 000950

```
 1  ‖              CROSS-EXAMINATION
 2  ‖                    BY
 3  ‖                  MR. KING
 4  ‖  Q   Let me start with this, Detective:  From the
 5  ‖      time you first began to investigate these
 6  ‖      crimes up to and including today, did you come
 7  ‖      up with one shred of physical evidence
 8  ‖      whatsoever linking my client with these
 9  ‖      crimes?
10  ‖  A       No, I haven't.
11  ‖  Q   No, you haven't.  Is that your answer, sir?
12  ‖  A       That's correct.
13  ‖  Q   Now, you told this jury that you didn't check
14  ‖      for any fingerprints because of the report by
15  ‖      Rhonda Williams to Officer Faulkner that the
16  ‖      perpetrator was wearing gloves.  Was that your
17  ‖      testimony, sir?
18  ‖  A       That's correct.
    ‖  Q   Now, do you admit or deny that in your first
    ‖      in-person meeting with Rhonda Williams that
    ‖      she specifically told you that at that time
22  ‖      that, indeed, she had been mistaken and that
23  ‖      the man that robbed her did not wear gloves?
24  ‖  A       I never had such conversation with her.
25  ‖  Q   She never told you that, is that your
```

405

VANES 000951

```
 1  ||        testimony?

 2  ||    A        To the best of my recollection, that was

 3  ||             never mentioned to me.

 4  ||    Q   Now, based upon the description that Rhonda

 5  ||        Williams gave you of how this perpetrator went

 6  ||        through her house, every room in the house

 7  ||        virtually, and handled glasses and furniture

 8  ||        and dresser tops and went through drawers and

 9  ||        went through her purse and the belongings in

10  ||        that purse, would you agree with me, sir, in

11  ||        your experience as a detective, that if the

12  ||        perpetrator was not wearing gloves, you had a

13  ||        good likelihood to recover fingerprints of the

14  ||        person that committed this crime?

15  ||    A        It's a possibility, yes.

16  ||    Q   A possibility?  Certainly a possibility worth

17  ||        exploring for a police detective, am I

18  ||        correct, sir?

    ||    A        That's correct.

    ||    Q   Was it ever pursued?

    ||    A        No, based on information about the gloves.

22  ||    Q   Well, sir, did somebody tell you before your

23  ||        arrival here in court today that Rhonda says

24  ||        the guy wasn't wearing gloves?

25  ||    A        That information has never been passed on
```

406

VANES 000952

```
 1                    to me.

 2     Q    Even to this minute?

 3     A         Exactly.

 4     Q    Now, as I understand your testimony here today

 5          you are telling this jury that there's no way

 6          one guy committed the robbery of Rhonda

 7          Williams, the robbery and homicide of Mr.

 8          Jiminez, the robbery of Christina Cullom, the

 9          robbery of Tisa Johnson and the robbery of

10          Mary Banks along with her daughter, Sonya

11          Thomas.  Was I correct in understanding that

12          to be your testimony, sir?

13     BY MR. BENSON:

14                         I would object, Your Honor.

15                         Counsel is misquoting the

16                         witness; the witness gave his

17                         opinion and he did not use the

18                         term "no way."

       BY THE COURT:

                 Those were not his words, that's correct.

       BY MR. KING:

       Q    Is it your opinion that one person did not

23          commit all the crimes I just recited to you?

24     A         In my opinion, yes.

25     Q    All right.  And as I understand your opinion,
```

407

938

VANES 000953

```
 1          the two factors for that decision are
 2          different directions and the fact that some of
 3          the witnesses didn't say something about bad
 4          skin.  Is that correct?  Those are the two
 5          reasons for your opinion?
 6   A        Those were the only two reasons that were
 7            addressed.
 8   Q     Were those your reasons, sir?
 9   A        I base it upon some other analogies.
10   Q     Well, let's start with -- let's start with
11         times.  Were all of the times that all of
12         these different robberies committed -- was it
13         possible for one person, based on the time, to
14         have committed every one of these offenses?
15   BY MR. BENSON:
16                   Objection, that's speculation,
17                   Your Honor.
18   BY MR. KING:
19           Well, that same speculation he engages in,
20         he gave his opinion the other way.
     BY THE COURT:
             Yes, considering the fact that an opinion
23         was given, I think it can be challenged.
24         Overruled.
25
```

408

VANES 000954

```
 1    BY MR. KING:

 2    Q    Do you recall my question?

 3    A        No.

 4    BY THE COURT:

 5            Repeat, please.

 6    BY MR. KING:

 7    Q    Based upon the time reported to you by the

 8         victims of these various crimes, is it your

 9         testimony that it could not have been

10         committed by one person?

11    A        Okay, that's still --

12    Q    Yes or no.

13    A        -- opinionated, my opinion.

14    BY MR. BENSON:

15            Let the witness explain his answer.

16    BY THE COURT:

17            I think he can explain his answer.  Go

18         ahead.

19    BY THE WITNESS:

      A        Like I said, that is basically

              opinionated.  My opinion, I couldn't --

      BY MR. KING:

23    Q    You just gave an opinion when the prosecutor

24         asked you.

25    A        Okay, as far as the time is concerned --
```

409

VANES 000955

```
1    Q   Do you know what times were reported?
2    A       See, we have nothing to say that this
3            particular time where this victim say this
4            occurred (sic)  Well, her clock may have
5            been ten minutes fast versus this.  We
6            have nothing, you know, authentic to say
7            that each time was consistent with each
8            other.  So I really couldn't base it upon
9            that.
10   Q   Well, did you ever look at the times these
11       people said it happened?
12   A       Okay, for example, when Chris --
13   Q   Do you understand my question?
14   A       I really couldn't base it upon the time
15           because --
16   Q   The question is:  Did you ever look and see
17       what time all these different people said
18       these crimes happened?  Did you ever look?
19   A       Right, yes, I did.
20   Q   Did you?
21   A       Yes, I did.
22   Q   Having looked at the times, was there any one
23       time from all these reports that would have
24       made it impossible for one person to have
25       committed all these offenses?  Yes or no.
```

410

941

VANES 000956

```
1    A        There was an effect that would make it
2             impossible.
3    Q    All right.  Now, as I understand it, what
4         we're talking about here is Christina Cullom,
5         Tisa Johnson, Sonya Thomas and Mary Banks at
6         the same time, mother and daughter, and, of
7         course, the Rhonda Williams and the Bernard
8         Jiminez and Kim Belinsky.  Now, what I'm going
9         to do, sir, is put before you a series of
10        documents I have been provided.  Now, what I
11        want you to do --  Tisa Johnson, what time did
12        she report she was robbed?
13   A        8:20 p.m., February 27th, 1992.
14   Q    The time again, sir?
15   A        That would be 8:20 p.m., February 27th of
16           '92.
17   Q    Well, so the fact of the matter is every one
18        of these was February 27th, correct?
19   A        Correct.
20   Q    And the location reported, sir?
21   A        3973 Virginia.
22   Q    Now, what is the next incident in time that
23        was reported?
24   A        It would have been Christina Cullum.
25   Q    Time?
```

411

VANES 000957

```
 1    A       8:30 p.m.
 2    Q    Location?
 3    A       Corner of 39th -- 3901 Virginia on the
 4         corner.
 5    Q    The next one in time?
 6    A       Rhonda Williams, 9:00 p.m.
 7    Q    Location?
 8    A       4409 Connecticut.
 9    Q    Next one?
10    A       Bernard Jiminez.
11    Q    Time?
12    A       9:15 p.m.
13    Q    Location?
14    A       4660 Massachusetts.
15    Q    Next?
16    A       Sonya Thomas and Mary Banks.
17    Q    Time?
18    A       9:20 p.m.
19    Q    Address?
20    A       4821 Pennsylvania.
21    Q    Now, first of all, on your theory of your
22         different directions, the fact of the matter
23         is that just taking these in chronological
24         sequence as reported to the police -- which is
25         all you had to go on, am I correct?
```

412

VANES 000958

```
 1    A      Yes.
 2    Q    From 3973, we would move north to 3901
 3         Virginia, am I correct?
 4    A      Correct.
 5    Q    Basically the length of a city block, am I
 6         correct?
 7    A      Correct.
 8    Q    Then we would move south to 4409 Connecticut,
 9         am I correct?
10    A      Correct.
11    Q    And Connecticut runs the same direction as
12         Virginia, does it not, north and south?
13    A      I'm not sure.  It may have been a one-way
14         or not; I'm not sure that's a one-way
15         street.
16    Q    No, I'm not asking what way.  The same
17         direction?
18    A      Oh, yeah, north and south, yes.
19    Q    All right.  How many streets over from
20         Virginia is Connecticut?
21    A      Going from Virginia, going west, you would
22         have Delaware, Pennsylvania, then
23         Connecticut would be the third block west
24         of Virginia.
25    Q    All right.  And in Gary, and in that section
```

413

VANES 000959

```
 1            of Gary , it's pretty much laid out as a grid
 2            pattern, and the blocks as they head east and
 3            west are shorter than the blocks are north and
 4            south, am I correct?
 5    A            Okay, yes.
 6    Q     All right.  So according to your testimony,
 7            we're three short blocks over to Connecticut
 8            and five blocks south of the 3900 block, am I
 9            correct?
10    A            Correct.
11    Q     Now, first of all, would you agree that a
12            person, even on foot, within the span of a
13            half an hour or, frankly, even the span of
14            fifteen minutes, could walk or run from the
15            3900 block of Virginia to the 4400 block of
16            Connecticut?
17    A            As relating to the robberies?
18    Q     No.  Can a person make it from point A to
19            point B within that time span?
20    A            Yes, it's possible.
21    Q     Now, having made it to 4409 Connecticut, we
22            would then move over how many blocks from
23            Connecticut to Massachusetts?
24    A            Massachusetts would be the first block
25                west of Connecticut.
```

414

VANES 000960

```
 1   Q    All right.  So we only have one short block
 2        over to Massachusetts, and we have two blocks
 3        south of the 4400 block, am I correct?
 4   A       Correct.
 5   Q    And would you agree with me that using these
 6        times, which is what you had to work with, a
 7        person can make it from that point to that
 8        point (indicating)?
 9   A       Just walking?
10   Q    Yeah.
11   A       After the commission of a crime?
12   Q    Well, now --
13   A       Which one?
14   Q    From here to here (indicating).
15   A       Okay, Mr. King, I don't understand.  Are
16           you saying if a person was --
17   Q    Could a person --
18   A       -- just, in fact, nothing relating to
19           crime, could he just leave point A to
20           point  B?
21   Q    Anybody.  If I was visiting a friend at this
22        address and didn't have my car --
23   A       Okay.
24   Q    -- could I walk from there to here
25        (indicating) in the span of fifteen minutes?
```

415

VANES 000961

```
 1    A       Yes.
 2    Q    You do realize it is the State's theory, at
 3         least in this case, that the same person did
 4         commit these two offenses?  Are you aware of
 5         that?
 6    A       Yes.
 7    Q    Now, to go from 4660 Massachusetts to 4821
 8         Pennsylvania, how many blocks away from
 9         Massachusetts is Pennsylvania?
10    A       Connecticut -- we're talking about the
11             second block east of Massachusetts and two
12             blocks south.
13    Q    Two short blocks to the east, according to
14         your testimony, and two blocks south, am I
15         correct?
16    A       Correct.
17    Q    All right.  Now, is it your opinion that one
18         person robbed these two people and a different
19         person robbed these three people -- four
20         people, actually?
21    A       That's not what I said.
22    Q    Is it your opinion that whoever robbed these
23         two people did not rob these people
24         (indicating)?
25    A       No.
```

416

947

VANES 000962

```
 1    Q    Is it your opinion that one person could,
 2         indeed, have robbed every one of these people?
 3    A       No.
 4    Q    You're eliminating then -- so it's possible
 5         somebody could rob these people but the same
 6         person couldn't have robbed these people
 7         (indicating)?
 8    A       In my opinion.
 9    Q    Okay.  So there's something different about
10         these two than this group?
11    A       Yes.
12    Q    All right.  And was that the description
13         given?
14    A       No -- that was a portion of it.
15    Q    Was it the distance involved?  Because you
16         have already told us you can make it from
17         these points to each other to this point
18         within the time.
19    A       Yes.
20    Q    So the time is not a factor, is it, based on
21         your earlier testimony?
22    A       We have to look at the extenuating
23         circumstances of the crime, Mr. King.
24    Q    Let's look at the extenuating circumstance of
25         what you have already testified to, which is a
```

417

VANES 000963

```
 1          person can go from here to here within this
 2          time frame, is that correct?
 3     A        That's -- on that question, Mr. King, just
 4              leaving the house -- and we're talking
 5              about someone who is not being pursued by
 6              the police or a victim.
 7     Q    Well, do you have any evidence whatsoever,
 8          any, that anybody was being pursued by the
 9          police as of 9:00 o'clock p.m.?
10     A        That, I couldn't answer, Mr. King.
11     Q    Look at your reports.
12     A        Okay.  For example --
13     Q    Christina Cullum --
14     A        Okay.
15     Q    -- while she reported that it occurred at 8:30
16          p.m., or while she said that it happened at
17          8:30 p.m., what time did she report it to the
18          police?
19     A        9:05 p.m.
20     Q    9:05 p.m., five minutes after the time on
21          Rhonda Williams, is that correct?
22     A        That's correct.
23     Q    Tisa Johnson said it occurred at 8:20.  And
24          what time was it reported?
25     A        It was reported at 8:30.
```

418

VANES 000964

```
 1    Q    Now, being reported, does that mean that it is
 2         called in and a car dispatched to talk to her?
 3    A        Correct.
 4    Q    All right.  Now, earlier you told the jury
 5         that you noted, if I understood your testimony
 6         correctly, you noted significant differences
 7         in the descriptions given by these various
 8         people.  Did I understand you correctly?
 9    A        That's correct.
10    Q    Do you have your own copies of these reports
11         so you can follow along?
12    A        Which one are you referring to?
13    Q    All the ones that we just went through.
14    A        Okay.
15    Q    Let's turn first to Tisa Johnson.  Would you
16         agree with me that Tisa Johnson at 8:30 p.m.
17         on February 27th, 1992 reported to an officer
18         of the Gary Police Department that the person
19         that robbed her was a male black in his mid
20         twenties?
21    A        Correct.
22    Q    I'm going to use the initials T.J., male
23         black, mid twenties.  She described the height
24         as six feet?
25    A        Correct.
```

419

VANES 000965

```
 1      Q    Thin build, am I correct?
 2      A         Correct.
 3      Q    A black skull cap.  All right, what is that
 4           next two words there?
 5      BY MR. BENSON:
 6                      At this time, I'll object.
 7                      Perhaps it's best to just put
 8                      these reports into evidence since
 9                      they have the description, which
10                      is being written now by counsel.
11      BY MR. KING:
12           Well, yeah, we could do that without too
13      much of a problem, but I am going to, for
14      demonstrative purposes, let him go through
15      this anyway.
16      BY THE COURT:
17                 I think you have a right to use
18           demonstrative aids in court diagrams and
19           writing it out and so forth, either side does.
20           You may do so.
21      BY MR. BENSON:
22                 Are questions being posed to Mr. Outlaw?
23      BY MR. KING:
24                 Yes, counsel.
25      Q    After black skull cap, there's a word "dark"
```

420

VANES 000966

```
 1           and it looks like s-k-i.
 2    A           Dark skin.
 3    Q    Dark skin, okay.  Then we have black coat, am
 4         I correct?
 5    A           Correct.
 6    Q    Blue jeans.  Then we also have reference made
 7         to a blue steel revolver, correct?
 8    A           Correct.
 9    Q    Now, if memory serves me, Christina Cullum was
10         the next one in time.  Follow along again,
11         sir, if you would.
12    A           Okay.
13    Q    Ms. Cullum's description, Christina Cullum's
14         description, again, a male black, slim.
15    BY MR. BENSON:
16                      Judge, I'm going to object at
17                      this point.  Counsel has not
18                      posed a question.  He's writing
19                      things on that paper.  Is that
20                      counsel testifying?
21    BY MR. KING:
22           Well, I have the witness sitting here
23         reading along with me to demonstrate I'm not
24         making this up off of documents given me by
25         the State.  And I think it's appropriate.
```

421

952

VANES 000967

```
 1     BY MR. BENSON:
 2              I'm sorry, I didn't hear a question.
 3     BY THE COURT:
 4              Well, from time to time, he is questioning
 5          the witness as to whether or not this is all
 6          what is on the reports.
 7     BY MR. BENSON:
 8              The State doesn't take issue with the
 9          reports.  We'll stipulate that those were the
10          reports that were used in these incidents.
11     BY THE COURT:
12              Well, it takes two to stipulate if you
13          wish to do it this way, counsel.
14     BY MR. KING:
15              I'm just trying to point out as quickly as
16          I can what these descriptions are.
17     Q   What description was given of the complexion
18          of the person by Ms. Cullum?
19     A       Medium.
       Q   Now, did you take that as a description of the
           relative shade of the perpetrator's skin
           coloration?
23     A       Yes.
24     Q   You know, light, dark or medium, that sort of
25          thing?
```

422

VANES 000968

```
 1   ║   A        Yes.
 2   ║   Q    Okay.   Then she described a mustache, am I
 3   ║        correct?
 4   ║   A        That's correct.
 5   ║   Q    Black clothing?
 6   ║   A        Correct.
 7   ║   Q    And a black Kangol hat?
 8   ║   A        Correct.
 9   ║   Q    And that's what she told us except for the
10   ║        height.   What height did she give us?
11   ║   A        Right there all by itself.
12   ║   Q    All right, five seven.
13   ║   A        Five foot seven inches.
14   ║   Q    Now, the next one in time was Ms. Rhonda
15   ║        Williams, am I correct, sir?
16   ║   A        Correct.
17   ║   Q    She described a male black, is that correct,
18   ║        sir?
19   ║   A        Correct.
20   ║   Q    She described the slim build, is that correct?
21   ║   A        Correct.
22   ║   Q    She described a medium complexion, is that
23   ║        correct?
24   ║   A        Correct.
25   ║   Q    She described bad skin, is that correct?
```

423

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

954

```
 1      A         Correct.

 2      Q    She described the height -- and, again, we're

 3           referring to these reports -- five feet seven

 4           inches, is that correct?

 5      A         Correct.

 6      Q    She described black clothes, correct?

 7      A         Correct.

 8      Q    She described a black Kangol cap?

 9      A         Correct.

10      Q    A black leather jacket?

11      A         Correct.

12      Q    A red bandanna?

13      A         Correct.

14      Q    She gave an age of twenty-five years, is that

15           correct?

16      A         That's correct.

17      Q    She has reference in this report again to the

18           black leather gloves, is that correct?

19      A         That's correct.

20      Q    Now, in this instance, I would like you to

21           look down in what is known as the narrative

22           section of the report.  Was there reference

23           given by her, or a description of any sort,

24           about a weapon?

25      A         A revolver.
```

424

955

VANES 000970

| | |
|---|---|
| 1 | Q   Now, let's turn please to the offense report |
| 2 | with respect to Mr. Jiminez and Ms. Kimerly |
| 3 | Belinsky.  Do you have that in front of you, |
| 4 | sir? |
| 5 | A      I do. |
| 6 | Q   We have here -- and I'm going to use the |
| 7 | initials B.J. for this -- male black, five |
| 8 | feet ten inches -- |
| 9 | A      Uh-huh. |
| 10 | Q   -- black jacket, black pants? |
| 11 | A      Yes. |
| 12 | Q   In his twenties? |
| 13 | A      Correct. |
| 14 | Q   Now, what I'm going to do is move on with the |
| 15 | offense reports to our last one, and that |
| 16 | would be the offense report prepared with |
| 17 | regard to the Mary Banks' and Sonya Thomas', |
| 18 | her daughter, incident.  Is that correct, sir? |
| 19 | A      That's correct. |
| 20 | Q   Now -- |
| 21 | BY MR. BENSON: |
| 22 | Judge, I would object.  I will |
| 23 | indicate for the record that in |
| 24 | the Bernard Jiminez report |
| 25 | there's also an indication that |

425

VANES 000971

1                            there was a gun as well as in Ms.

2                            Rhonda Williams, and that was

3                            omitted in those two descriptions

4                            I believe.

5    BY MR. KING:

6            If it isn't, I'll put it there.

7    Q   Okay, if you take a second, let's go back to
8        the report we were just looking at.

9    A       Which one, the Jiminez?

10   Q   Yeah.  Now, there's reference to a gun in the
11       report, is that correct, sir?

12   A       That's correct.

13   Q   Is there any description beyond there being a
14       gun?

15   A       Excuse me?

16   Q   Like revolver, automatic or color or anything
17       like that?

18   A       It doesn't indicate it in the report; it
19               just says a gun.

20   Q   Okay, let's put that up here.  All right,
21       now, let's go to Sonya Thomas.  Here we have a
22       description of a male black, five feet eleven
23       inches, dark complexion, bad skin, black
24       pants, black hat, black jacket.  Now, under
25       the hat, the next entry is that it was a

426

VANES 000972

```
 1  ||        Kangol, am I correct, sir?
 2  ||   A        That's correct.
 3  ||   Q   Slender build, is that correct?
 4  ||   A        Correct.
 5  ||   Q   Now, is it your testimony that based on these
 6  ||        descriptions given by these various victims of
 7  ||        crime that these of necessity describe more
 8  ||        than one perpetrator?
 9  ||   A        Yes.
10  ||   Q   So it must be distinctions based, for example,
11  ||        on some saying medium complexion, some saying
12  ||        a dark complexion, is that it?
13  ||   A        That's part of the basis.
14  ||   Q   Is it some saying five foot seven and some
15  ||        saying five foot ten?
16  ||   A        Part of the basis.
17  ||   Q   So as I understand it, sir, as a detective,
18  ||        you would be of a mind to eliminate as a
19  ||        suspect a person who was three inches shorter
20  ||        or taller than the description given by a
21  ||        victim?  Is that of such critical importance
22  ||        to you?
23  ||   A        No, I wouldn't base it all on a two-to
24  ||             three-inch differential; no, I wouldn't.
25  ||   Q   Now, earlier you said, and you were accurate,
```

427

VANES 000973

```
 1          that in these reports not every one of the
 2          victims of these crimes described a scarred or
 3          a bad-skin situation.  That's right, isn't it?
 4     A        Correct.
 5     Q   But you know from statements you later took
 6          from Kim Belinsky and from Rhonda Williams
 7          that both of them described that, didn't they?
 8     A        Correct.
 9     Q   And you know right off of the offense report
10          that Sonya Thomas and Mary Banks described bad
11          skin, is that correct, sir?
12     A        That's correct.
13     Q   You also see that while some people said he
14          had a gun, other people said -- were more
15          specific that he had a blue steel revolver, is
16          that correct, sir?
17     A        Well, in one of the reports there was an
18              omission, which I couldn't testify the
19              reason for the omission.  The Sonya Thomas
20              report, which would reflect further, and
21              Officer Banks' officer's report, it would
22              reflect that a revolver was displayed.
23              But in the offense report that the officer
24              took, he made no indication that a
25              revolver was displayed.  So we might have
```

428

VANES 000974

```
 1              discrepancies that I really couldn't
 2              attest to based on another officer's
 3              account.
 4    Q   Well, since you brought up the topic of
 5        Officer Mary Banks officer's report, it's
 6        something apparently you relied upon as you
 7        set out on your investigation, am I correct,
 8        sir?
 9    A       That was more her direct account of what
10            happened.
11    Q   Whatever it was.  Were you made aware of it
12        and did you utilize it and consider the
13        information as you investigated these crimes?
14    A       Yes, I read it, yes.
15    Q   Mary Banks in her report, in addition to the
16        descriptions we have already discussed, in
17        addition to the times and the locations that
18        we already discussed, told you that at about
19        9:20 p.m. February 27th, 1992 a man who she
20        described when he approached her said, "I just
21        shot a man.  I just shot somebody," isn't that
22        correct?
23    A       That was in her report.
24    Q   Do you doubt what a fellow officer told you
25        was said by the perpetrator of an offense?
```

429

VANES 000975

```
 1    A        No, I have no problem with that.
 2    Q    Did it occur to you as the detective on this
 3         case that Mary Banks saying that at 9:20 she's
 4         approached by a person fitting the same
 5         description given by Rhonda Williams and given
 6         by Ms. Belinsky at a time five minutes after
 7         Mr. Jiminez was shot and approached her with a
 8         gun saying, "I just shot somebody," did that
 9         strike a cord with you --
10    BY MR. BENSON:
11                    Objection, Your Honor.
12    BY MR. KING:
13    Q    -- possibly linking these offenses together in
14         your mind?
15    BY THE COURT:
16              Grounds?
17    BY MR. BENSON:
18              Well, he has cleared it up by the rest of
19         his question.
20    BY THE COURT:
21              All right, you may answer.
22    BY THE WITNESS:
23              Well, I was distracted.
24    BY THE COURT:
25              Would you repeat that then?
```

430

VANES 000976

```
 1     BY MR. KING:
 2     Q    Did it dawn on you that since Ms. Banks not
 3          only gave this description but also said this
 4          man's words were, "I just shot somebody,"
 5          given the time sequence involved, that it was
 6          on the heels of Mr. Jiminez's death, did it
 7          dawn on you that these two crimes were linked
 8          together by the same perpetrator?  Did that
 9          occur to you?
10     BY MR. BENSON:
11                        Objection, Your Honor, that was
12                        asked and answered.  The witness
13                        testified that he believed --
14     BY MR. KING:
15          I'm on cross-examination.
16     BY MR. BENSON:
17          No, it was asked and answered during
18          cross-examination.
19     BY MR. KING:
20          I don't care; I am entitled to --
21     BY THE COURT:
22          Well, this being cross --
23     BY MR. BENSON:
24          Judge, I don't care whether defense
25          counsel cares or not; he can't ask the same
```

431

VANES 000977

1    question five times on cross.

2    BY MR. KING:

3         Yes, he's right, I shouldn't have said

4    that.  But the point is the law permits on

5    cross-examination --

6    BY THE COURT:

7         Well, this is cross-examination, and

8    repetition is not to be encouraged, but I

9    think that it being cross you may ask it

10   again.  There's a question before you now if

11   you remember what it is.

12   BY MR. KING:

13   Q  Did it dawn on you that these were linked

14      together?

15   A     Yes, it did.

16   Q  Now, as I understand your testimony earlier,

17      you do these line-ups the night of March 3rd,

18      1992.  And am I correct that the same people

19      were in the same line-ups viewed by all these

20      different people?

21   A     Correct.

22   Q  Were they in the same positions, holding the

23      same number cards in each instance?

24   A     Correct.

25   Q  Now, would you agree with me, sir, that based

432

963

VANES 000978

1    upon the description I've written behind you

2    given you on the Mary Banks-Sonya Thomas

3    robbery that that's a pretty good description,

4    is it not?

5  A        I don't understand your question.

6  Q    Well, look at it.  Look at it behind you if

7    you can read my handwriting.  I mean you've

8    got height, you've got complexion, you've got

9    the clothing, you've got the Kangol hat, you

10    got the being slender, and you've got the bad

11    skin reference.  That's a pretty complete

12    description, would you agree, sir?

13  BY MR. BENSON:

14            Objection; that's argumentative.

15            "Complete description," what is

16            that supposed to mean?

17  BY THE COURT:

18       Well, since this is a detective, I think

19    you can ask that question.  Overruled.

20  BY MR. KING:

21  Q    It's a pretty complete description, is it not,

22    sir?

23  A        Fairly, yes.

24  Q    Now, in order to give a pretty complete

25    description, one would assume one had a pretty

433

VANES 000979

```
 1          good look at the perpetrator, is that correct,
 2          sir?
 3    A        Correct.
 4    Q     And where that person is a fifteen-year
 5          veteran police officer, as is the case with
 6          Mary Banks, would you expect the police
 7          officer's hours and skills of observation to
 8          be better than the average guy on the street?
 9    A        Mr. King, I can't attest to no one else'
10             abilities other than my own.
11    Q     Well, you guys get trained to do this, don't
12          you?
13    A        Someone put -- officers put more emphasis
14             on different types of training.  We're
15             different.
16    Q     You all go to the academy, don't you?
17    A        Yes.
18    Q     Pardon?
19    A        That's true.
20    Q     And you get trained there.  You don't get a
21          badge out of a box of Cracker Jacks, do you?
22          I mean, you know, somebody doesn't just come
23          up and anoint you and say, "Okay, you're a
24          policeman.  Go on"?  You've got to go to be
25          trained, don't you?
```

434

VANES 000980

| | | |
|---|---|---|
| 1 | A | Supposedly. |
| 2 | Q | Well, did you? |
| 3 | A | I did. |
| 4 | Q | Did you go to class? |
| 5 | A | Yes, I did. |
| 6 | Q | Take tests? |
| 7 | A | I did. |
| 8 | Q | Did you pass them? |
| 9 | A | Yes, I did. |
| 10 | Q | Did you get put on the force? |
| 11 | A | I did. |
| 12 | Q | Did Mary?  Or did she just get hired because |
| 13 | | they liked the cut of her jib? |
| 14 | A | I'm assuming that she went through the |
| 15 | | same basic requirements. |
| 16 | Q | So here you have a police officer giving you a |
| 17 | | description noted right behind you, and this |
| 18 | | police officer looks at the same line-up and |
| 19 | | doesn't pick anybody out, is that correct, |
| | | sir? |
| | A | No, she didn't pick anyone out. |
| | Q | And neither did her daughter? |
| | A | No. |
| 24 | Q | And neither did Ms. Cullum? |
| 25 | A | No. |

435

VANES 000981

```
 1  ||  Q   And neither did Tisa Johnson?
 2  ||  A       Tisa Johnson didn't view the in-person
 3  ||          line-up.
 4  ||  Q   Oh, I'm sorry; you are right.  But Tisa didn't
 5  ||      pick out the picture?
 6  ||  A       No.
 7  ||  Q   State's Exhibit 17, is that correct?
 8  ||  A       No, she didn't.
 9  ||  Q   Now, all these line-ups were done the same
10  ||      night, is that correct?
11  ||  A       The in-person, yes.
12  ||  Q   Now, you gave us some times earlier when these
13  ||      line-ups were done.  I think you referred to
14  ||      some documents, is that correct?
15  ||  A       Correct.
16  ||  Q   You told this jury about a search warrant that
17  ||      you obtained, is that correct, sir?
18  ||  A       That's correct.
19  ||  Q   I'm going to hand you what's been marked for
20  ||      identification as Defendant's Exhibit 2.  It's
21  ||      a document consisting of three pages.  I ask
22  ||      you to take a moment, look at it, and tell me
23  ||      whether or not you recognize Defendant's 3 for
24  ||      identification.  Have you had the opportunity
25  ||      to review Defendant's 2 for identification?
```

436

967

VANES 000982

```
 1  ┃  A      Yes.
 2  ┃  Q   What is it?
 3  ┃  A      A search warrant prepared by Corporal John
 4  ┃         Jelks.
 5  ┃  Q   Does your name appear on it?
 6  ┃  A      Yes, as one of the affiants.
 7  ┃  Q   Is that the search warrant that issued in this
 8  ┃         case?
 9  ┃  A      Yes.
10  ┃  Q   Is it the original search warrant that issued
11  ┃         in this case?
12  ┃  A      Yes.
13  ┃  Q   I direct your attention to the very last page.
14  ┃         Does it appear to be in the same condition it
15  ┃         was in when last you saw it?
16  ┃  A      Yes.
17  ┃  Q   And even though Corporal Jelks signed the
18  ┃         affidavit, do you acknowledge that yourself,
19  ┃         Detective Terry Lee and Detective Jelks' names
20  ┃         appear at the top, is that correct, sir?
21  ┃  A      That's correct.
22  ┃  Q   And you have previously acknowledged in direct
23  ┃         testimony when the prosecutor was asking you
24  ┃         questions that you participated in obtaining
25  ┃         and serving or executing a search warrant, is
```

437

363

```
 1              that correct?
 2     A          That's correct.
 3     BY MR. KING:
 4              At this point, the defense would move for
 5          the introduction into evidence of Defendant's
 6          2 marked for identification.  Would the record
 7          please reflect I'm tendering that exhibit to
 8          counsel for the State.
 9     BY MR. BENSON:
10              The State has no objection to that.
11     BY THE COURT:
12              Show Defendant's Exhibit 2 admitted.
13
14              WHEREUPON DEFENDANT'S EXHIBIT NUMBER 2 IS
15          ADMITTED INTO EVIDENCE.
16
17     BY MR. KING:
18     Q   Now, sir, you participated in the preparation
19          as well as the execution or the serving of
            this warrant, is that correct, sir?
       A          Could you expand as far as --
       Q   Well, you knew what was being put into this
            affidavit, is that correct, sir?  You knew the
24          information that was being put into it.  It
25          was your case, is that correct, sir?
```

438

VANES 000984

```
 1   A        Myself and Corporal Jelks.
 2   Q    All right.
 3   A        Right.
 4   Q    That includes you, right?  For the benefit of
 5        the jury, to get a search warrant authorizing
 6        you to go into somebody's house, the first
 7        thing you have to do, a policeman has to do,
 8        the first thing you have to, a policeman has
 9        to do, is take an oath and present facts to a
10        judge to see if the judge finds there to be
11        probable cause to issue the warrant, am I
12        correct?
13   A        Correct.
14   Q    That's the procedure?
15   A        Correct.
16   Q    What the policemen have to do is take an oath,
17        the same oath you took on the stand here
18        today, and then present this information to a
19        judge and say, "Judge, we swear this is the
20        information we know.  We would like to have a
21        warrant," am I correct?
     A        That's correct.
     Q    And that, "We swear" business, that's covered
          by page one of Defendant's 2, the affidavit
25        for search warrant, am I correct?
```

439

VANES 000985

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Then, if the Judge agrees with you, the |
| 3 | | policeman, that under oath you have shown |
| 4 | | enough facts to show probable cause to go into |
| 5 | | somebody's house and search it, the judge will |
| 6 | | issue the actual search warrant, which is a |
| 7 | | piece of paper that will let you go in the |
| 8 | | home, am I correct, sir? |
| 9 | A | Correct. |
| 10 | Q | And then if the judge does that, it's signed |
| 11 | | and it's dated, am I correct? |
| 12 | A | Yes. |
| 13 | Q | And the time is noted when the warrant issues, |
| 14 | | am I correct? |
| 15 | A | Correct. |
| 16 | Q | You then take the warrant that the judge |
| 17 | | issued and then you serve it and do the |
| 18 | | search, am I correct? |
| 19 | A | Correct. |
| 20 | Q | And if you find something, you file a report |
| 21 | | called an inventory and say, "Okay, we served |
| | | it.  Here's what we found," am I correct? |
| | A | Yes, that would be the return. |
| | Q | Now, you have no return in this case, because |
| 25 | | when you searched my client's house, you |

440

VANES 000986

```
 1        didn't find anything of evidentiary value, did
 2        you?
 3   A        No, I didn't.
 4   Q    And what you were looking for was based upon
 5        the same victims that we have gone through and
 6        written on these pieces of paper about as told
 7        to the police, am I correct, sir?
 8   A        Correct.
 9   Q    Pardon?
10   A        Basically, what they were told and what we
11            found out.
12   Q    All right.  Now, that wasn't just Rhonda
13        Williams, was it, or Kim Belinsky?  It
14        included Christina Cullum, it included what
15        Mary Banks and daughter Sonya told you and
16        what Tisa Johnson told you, isn't that
17        correct?
18   A        Correct.
19   Q    Now, you then were telling the judge that you
20        believe -- and you told him this under oath --
21        you believe, you have probable cause to
22        believe that if you went and searched my
23        client's house, you were going to find stuff
24        from all these different victims and you were
25        going to find a gun and you were going to find
```

441

Filed in Clerk's Office

MAY 23 1997

Anna M. Anton
CLERK LAKE SUPERIOR COURT

972

VANES 000987

```
 1          the clothing, a Kangol cap, a black leather
 2          jacket, a red bandanna worn by the
 3          perpetrator, am I correct, sir?
 4    A         That's what we were searching for.
 5    Q   And in order to search, that's what you told
 6          the judge under oath you expected to find, is
 7          that correct, sir?
 8    A         It wasn't based on expectations, it was
 9               more or less that's what we were searching
10               for.
11    Q   All right, now, because you thought that one
12          person might have been responsible for all
13          these robberies?
14    A         But at that point, based on my opinion, it
15               could have been possible or it could not
16               have been.
17    Q   You mean to say you went in front of Judge
18          Graddick and said, "Judge, I think in my
19          opinion it might have been possible," or were
20          you telling the judge, "Judge, we believe, we
             have probable cause that these things are
             going to be there when we go looking for
             them"? Now, which is it, Detective?
      A         The probable cause affidavit that Corporal
25               Jelks had typed up stated that we have
```

442

VANES 000988

1              probable cause to believe that the items

2              or fruits from the crimes would be there

3              so we wanted to search to ascertain if

4              they were there or not.

5    Q   And those items would have been, in reference

6        to Judge Graddick -- well, for the jury here:

7        What is the date you guys gave that affidavit

8        to Judge Graddick to get your warrant?

9    A          Like I stated, Mr. King, the actual

10             presentation of it was done by Corporal

11             Jelks.

12   Q   What is the date?  At the bottom under the

13       search warrant, it's March 3rd, 1992, is that

14       correct, sir?

15   A          That's the date on the search warrant,

16             yes.

17   Q   Right. So we know the document, the affidavit,

18       part of Defendant's Exhibit 2, was prepared

19       March 3rd, 1992 but you couldn't get hold of

20       the judge until the following morning or early

21       afternoon, is that correct, sir?

22   A          Okay, Corporal Jelks prepared the document

23             based on the evidence that we acquired

24             working jointly.   And later on that night

25             of the 3rd, we were unable to get in

                          443

                        974

```
 1  |||                 contact with the judge or magistrate until
 2  |||                 the following day.
 3  |||   Q   And when you did find him, he signed the
 4  |||       warrant on March the 4th, am I correct?
 5  |||   A       That would have been the 4th.
 6  |||   Q   But your document, your affidavit for the
 7  |||       search warrant, was completed, typed, signed,
 8  |||       fully prepared as of March 3rd, 1992, isn't
 9  |||       that correct, sir?
10  |||   A       Yes.
11  |||   Q   By at what time?  What time of the day or
12  |||       night was that affidavit prepared, signed and
13  |||       completed?
14  |||   A       Like I stated, Mr. King, Corporal Jelks
15  |||               prepared the search warrant itself, and
16  |||               later on that night I can testify to the
17  |||               search warrant being typed up.
18  |||   Q   Sir, I direct your attention to the bottom of
19  |||       the second page of Defendant's Exhibit 2,
20  |||       which is now into the evidence.  Does it or
21  |||       does it not say, "Dated this 3rd day of March,
22  |||       1992 at the hour of 6:00 o'clock p.m."?
23  |||   A       Yes, it's on the form, yes.
24  |||   Q   All right, and this is the original warrant,
25  |||       is  that correct?
```

444

975

VANES 000990

```
 1    A        Yes.

 2    Q    And once again, the affidavit that accompanied

 3         this warrant was signed under the same oath

 4         that was taken by you on this witness stand

 5         here today, is that correct, sir?

 6    A        Like I stated, Mr. King, when --

 7    Q    Yes or no, sir.

 8    A        No, I didn't sign it; Corporal Jelks

 9         signed it, Mr. King.

10    Q    The oath, sir, the oath.

11    A        The oath was administered to Corporal

12         Jelks; I did not sign it.

13    Q    Now, perhaps you could explain to this jury

14         how it is that in a document dated and timed

15         6:00 o'clock p.m., March 3rd, 1992, you could

16         -- the officers could have included in the

17         first paragraph that my client had been picked

18         out of line-ups, line-ups that did not happen,

19         according to your testimony, until 7:15 to

20         7:45, more than an hour later than that

           document is signed, timed and dated?

      A        I couldn't answer that.  Like I said, Mr.

23         King, Corporal Jelks prepared this.

24    Q    Well, you were working in conjunction with

25         Corporal Jelks?  Earlier, you were.
```

445

VANES 000991

```
 1    A        Yes, if you --
 2    Q   Would you please look at the top --
 3    A        I see it.
 4    Q   Isn't it a fact that in the first paragraph
 5        typed in in that affidavit, you make reference
 6        that my client had been picked out of physical
 7        line-ups?
 8    A        Mr. King, would you say --
 9    Q   Yes or no.
10    A        You have to expand a little bit on your
11             question.
12    Q   All right, let me read it to you.  Read it
13        with me.  "Further that on," now, what's here
14        is 2-3-92; I'm assuming since these crimes
15        were not committed until February 27th, it was
16        intended to state 3-3 of '92.  Would that be
17        accurate, sir?
18    A        Yes, it's that date.
19    Q   "Willie T. Donald was picked from a physical
20        line-up by one of the armed robbery victims
21        and positively identified and was picked from
22        the physical line-up by the homicide witness
23        to the killing of Mr. Jiminez."  That's in
24        there, isn't it?
25    A        It's there.
```

446

977

VANES 000992

```
 1    Q   Under the affidavit signed under oath, is that
 2        correct, sir?
 3    A       Signed by Corporal Jelks.
 4    Q   And dated March 3rd, 1992 at 6:00 o'clock p.m.
 5        Is that on that document, sir?
 6    A       It's on the document.
 7    Q   And once again, can you explain to the jury
 8        how you can have my client at 6:00 o'clock
 9        getting picked out of a line-up that didn't
10        happen until after 7:00 o'clock?  Can you
11        explain that?
12    A       As I stated, Mr. King, I did not put the
13            time on the document, this document was
14            prepared by Corporal Jelks.  Whether it
15            was a typographic error or who actually
16            put 6:00 p.m. on this report, I cannot
17            testify to.
18    Q   Well, you're the detective in charge of the
19        investigation, am I correct?
20    A       Myself and Corporal Jelks.
21    Q   Okay, am I getting the gist here that this is
22        all Jelks' fault?  Is that what's happening
23        here?
24    BY MR. BENSON:
25                Objection, Your Honor, that's
```

447

VANES 000993

```
 1                            argumentative.  It hasn't been
 2                            established that anyone was at
 3                            fault.
 4       BY MR. KING:
 5              Well --
 6       BY THE COURT:
 7              Well, yes, as phrased, I would sustain the
 8          objection to that question.
 9       BY MR. KING:
10       Q    Jelks goofed up on something else in this
11          investigation, didn't he?
12       BY MR. BENSON:
13                     I would object; argumentative.
14       BY THE WITNESS:
15       A      I don't know what you're talking about.
16       BY THE COURT:
17              Sustained; order the answer stricken.
18       BY MR. KING:
19       Q    Well, isn't it a fact that shortly after my
20          client got arrested at his home that one of
21          his sisters informed you that she, along with
22          him, along with her fiance, Dan Hopkins, were
23          car shopping at Paul Sur Pontiac the night of
24          these offenses?
25
```

448

```
 1      BY MR. BENSON:

 2                      Objection, Your Honor.  Counsel

 3                      is testifying and it calls for a

 4                      hearsay response.

 5      BY MR. KING:

 6              Your Honor, it is not hearsay, and I can

 7          document on previous sworn testimony by this

 8          witness that this information was made known

 9          to him.  The State has elected to have him

10          testify as to his opinion, and I am entitled

11          to present to this jury everything that was

12          known by this police officer as it regards

13          that opinion.  And included in that is the

14          evidence I'm proffering at this point; my

15          basis for it is prior sworn testimony by this

16          witness given on April 6th, 1992.

17      BY THE COURT:

18              I think that's satisfactory.  Counsel, I

19          need to have you approach the bench on another

20          issue though.

21

22              WHEREUPON THE FOLLOWING DISCUSSION WAS

23          HELD AT THE BENCH OUTSIDE OF THE HEARING OF

24          THE JURY:

25
```

449

980

VANES 000995

```
 1      BY THE COURT:
 2              I got this note about half hour ago.  Do
 3          you want to break early and take care of it?
 4      BY MR. KING:
 5              Yes.
 6
 7              WHEREUPON THE FOLLOWING PROCEEDINGS WERE
 8          ONCE AGAIN HELD IN THE HEARING OF THE JURY:
 9
10      BY THE COURT:
11              We need to take a short break at this
12          point, members of the jury.  We'll give you
13          your afternoon break and again admonish you
14          not to converse about the case while you're
15          outside of the courtroom.  We'll be in recess
16          for ten minutes.
17
18              WHEREUPON THE COURT RECESSED AND
19          RECONVENED AND THE FOLLOWING PROCEEDINGS WERE
20          HELD IN THE PRESENCE AND HEARING OF THE JURY:
21
22      BY THE COURT:
23              Mr. King.
24      BY MR. KING:
25      Q    When we broke, I was asking you if you
```

450

981

VANES 000996

```
 1          recollected at any point during the course of
 2          your investigation receiving information from
 3          my client's sister regarding my client's
 4          whereabouts the night of February 27th, 1992.
 5     A        I did; I spoke with her.
 6     Q    Now, sir, do you have an approximation as to
 7          when you received that information?
 8     A        Possibly the day after -- the morning
 9             after the arrest.
10     Q    I'm sorry?
11     A        Okay, it could have possibly have been at
12             the time we executed the search warrant
13             which would have been the 4th, 11:00,
14             12:00, 1:00 o'clock, or that morning, I
15             think they came down to see us.  I think I
16             came to the station first thing that
17             morning.
18     Q    The morning of the 5th?
19     A        No, no, no, no, the day after the arrest,
20             so we're talking about the 4th, either the
21             morning at the station or later on at
22             their house at the execution of the search
23             warrant.
24     Q    And did you receive information from her that
25          she had been with Willie along with her fiance
```

451

VANES 000997

```
 1              and they were out car shopping?
 2         BY THE COURT:
 3              Let me just remind the jury:  I believe
 4              there is a hearsay exception if an expert
 5              opinion is being challenged, but anything that
 6              this sister would say that you would learn
 7              about in this questioning itself is not
 8              evidence in this case.
 9              Detective Outlaw, I'm sorry.  Go ahead.
10         BY MR. KING:
11         Q    Do you recall receiving such information from
12              her?
13         A         Yeah, she told me that.
14         Q    To your knowledge, have you, did you or
15              Corporal Jelks or any other officer ever check
16              that out?
17         A         Okay, Mr. King, I didn't check it out
18                   personally.
19         Q    Did anybody to your knowledge ever check it
20              out?
21         A         I don't know.
22         Q    Was anybody supposed to check it out in the
23              Gary Police Department?
24         A         Yes.
25         Q    Who?
```

452

VANES 000998

| | | |
|---|---|---|
| 1 | A | Well, between myself and Jelks, he agreed |
| 2 | | to check it out. |
| 3 | Q | Jelks agreed to check it out? |
| 4 | A | Yes. |
| 5 | Q | To your knowledge, did he ever check it out? |
| 6 | A | He never made mention to me about it. |
| 7 | Q | Have you ever seen a report or a statement or |
| 8 | | any other document indicating Jelks or anybody |
| 9 | | else from the Gary Police Department, having |
| 10 | | been told sometime on the 4th of March about |
| 11 | | this information, ever checked it out? |
| 12 | A | Not to my knowledge. |
| 13 | Q | Now, as I understand it, when you first went |
| 14 | | and arrested my client, that was on what day, |
| 15 | | sir?  Was that March the 3rd?  You can look at |
| 16 | | any document here. |
| 17 | A | Okay, Mr. King -- |
| 18 | Q | Yes, sir. |
| 19 | A | -- it was March the 3rd. |
| 20 | Q | What time? |
| | A | 6:00 p.m. |
| | Q | Now, you said you arrested him on a bench |
| | | warrant that you had located within the office |
| | | of the Clerk of the Gary City Court, correct? |
| 25 | A | Correct. |

453

VANES 000999

```
 1    Q    And a bench warrant, as you've indicated, is a
 2         warrant that a court can issue if someone that
 3         is supposed to be there in court doesn't show
 4         up, is that correct?
 5    A         Failure to appear, yes.
 6    Q    What were the charges that the bench warrant
 7         reflected?  In other words, what case pended
 8         according to the records of the clerk against
 9         Mr. Donald?
10    A         Just a second.  Traffic infraction.
11    Q    And those infractions would have been failure
12         to carry registration and failure to yield, is
13         that correct?
14    A         That's correct.
15    Q    And according to the warrant that you arrested
16         him on, he had failed to appear on October
17         16th of 1990, is that correct?
18    A         That's correct.
19    Q    Now, you weren't particularly interested in
20         bringing Willie Donald in because he didn't
 1         appear on failure to have registration and a
 2         failure to yield case, were you?
 3    A         The warrant was pursuant to my
 4              investigation.
25    Q    The warrant gave you legal authority to bring
```

454

385

VANES 001000

```
 1            just on these offense reports but when it came
 2            to Ms. Belinsky and when it came to Ms.
 3            Williams, you later took more complete in-
 4            depth statements from both of them, am I
 5            correct, sir?
 6       A         That's correct.
 7       Q   And these statements were obtained either at
 8            or prior to the time either one of them ever
 9            looked at that picture in State's 17, am I
10            correct, sir?
11       A         Excuse me?
12       Q   The timing of the statements you took, Kimerly
13            Belinsky, do you recollect that to have
14            occurred February 28th of 1992?
15       A         Yes, I have that.
16       Q   Now, Rhonda Williams, her statement was 9:40
17            p.m. March 3rd, 1992, is that correct?
18       A         Yes, it was March 3rd about 9:40 p.m.
19       Q   Now, her statement -- and by "her" I mean Ms.
             Williams -- when it came to the scarring or
             the acne, she described bump-like scars on his
             face, on his cheeks, am I correct, sir?
         A         You're referring to Ms. Williams?
24       Q   Yes, I am, sir.
25       A         Yes.
```

463

VANES 001001

```
 1      Q    And Ms. Belinsky described bad skin, "It
 2           looked like he may have had pimples and
 3           scratched them away and left bad blemishes,"
 4           is that correct, sir?
 5      A         Correct.
 6      Q    Now, with again reference to the picture of my
 7           client contained in State's 17, would you
 8           agree that that picture certainly does not
 9           show bump-like scars, and it certainly doesn't
10           show pimples that had been scratched away
11           leaving scars?
12  BY MR. BENSON:
13                      Object, Your Honor, unless
14                      there's going to be some
15                      reference to a time frame when
16                      that picture was taken.
17  BY THE COURT:
18           Well, there is not and it's not in
19           evidence in this case that I recall; you're
             referring just to the picture.
    BY MR. KING:
             Exactly, and I'm talking about the
23           witnesses, Ms. Belinsky and Ms. Williams, and
24           it has already been said that that's the
25           picture they looked at.
```

                              464

VANES 001002

```
 1  ║ BY THE WITNESS:
 2  ║        Okay, your question?
 3  ║ BY MR. KING:
 4  ║ Q   The question is:  Looking at that picture, do
 5  ║     you agree that it does not portray bump-like
 6  ║     scars, the description give by Ms. Williams to
 7  ║     you, or bad skin, pimples that had been
 8  ║     scratched away leaving scars, the description
 9  ║     given by Ms. Belinsky?
10  ║ A      Okay, you want my interpretation of the
11  ║        picture?
12  ║ Q   Looking at the picture for whatever reason the
13  ║     picture was taken.  Are you able to sit there
14  ║     and say that shows bump-like scars on that
15  ║     person in that picture?  Do you think that?
16  ║ A      If it is, it's not very prevalent.
17  ║ Q   It's not, is it?
18  ║ A      (Indicating.)
19  ║ Q   Now, when you eliminate these bump-like scars
20  ║     that were described, when you eliminate hair,
21  ║     because nobody knew anything about the guy's
22  ║     hair because of the cap or bandanna or both,
23  ║     what feature on that persons compared to the
24  ║     descriptions given by the witnesses, what
25  ║     could be compared between those two?
```

465

          VANES 001003

```
1    BY MR. BENSON:

2                        Objection, Your Honor.  That is

3                        argumentative and speculative.

4                        How much more speculative can you

5                        get than besides what compares

6                        with what might possibly exist?

7    BY MR. KING:

8         Well, it's this detective's opinion that

9         the State went into in terms of their direct

10        examination, and I'm entitled -- part of it

11        was the selection by Ms. Williams and Ms.

12        Belinsky of this photograph, and I am entitled

13        to, I believe, with this detective question

14        his opinion with regard to those observations.

15        He went into it on direct; I can go into it on

16        cross it seems to me.

17   BY THE COURT:

18        Well, understand he didn't render an

          opinion as to these photographs, the opinion

          that was --

     BY MR. KING:

22        I'm not asking him -- the photographic

23        selection was part and parcel of the opinion

24        rendered.

25
```

466

327

VANES 001004

1    BY THE COURT:

2         It may have been, yes.

3    BY MR. BENSON:

4         This witness is being asked to interpret

5         what someone meant by bump-like scars, and

6         that can mean a hundred different things, and

7         that is speculation when he's trying to

8         interpret what someone else used to describe

9         an individual.

10   BY MR. KING:

11   Q    Let me ask this question:  Detective, with

12        respect to Ms. Belinsky and with respect to

13        Ms. Williams, whatever they meant by bump-like

14        scars or pimples scratched away leaving scars,

15        it was a prominent enough feature for them to

16        recall and relate to the police, is that

17        correct, sir?

18   A         According to -- yes, right.

19   Q    Was any description ever given of the mouth or

20        nose or ears of the perpetrator of these

21        crimes by any of these witnesses?

22   A         The eyes.

23   Q    Well, I was asking the nose, the ears.  We'll

24        talk about the eyes in a second.  You know,

25        like, "I remember a real big nose," or, "a

467

VANES 001005

```
 1            real skinny nose," or, "I remember large
 2            ears," or, "I remember small ears," or, "I
 3            remember an earring," anything like that, any
 4            description from any of these people of any of
 5            those features?
 6      A          No, not that I can recollect.
 7      Q.   Now, you made reference to a description of
 8            the eyes, and Ms. Belinsky gave you a
 9            description initially in a statement of stony-
10            type eyes, is that correct, sir?
11      A          That's correct.
12      Q    Did she ever further describe them as kind of
13            sleepy eyes or half-closed eyes in terms of
14            explaining what she meant by the phrase
15            "stony"?
16      A          Her interpretation of "stony" she gave to
17                 me, she used some type of cartoon
18                 character to just pick it out -- I'm
19                 trying to think of which one exactly she
20                 used -- but the impression she gave me
21                 based on talking with her was someone
22                 under the influence of drugs.
23      Q    Okay.  Now, someone under the influence of
24            drugs, of course, it would depend on what drug
25            one was under the influence of, would you
```

468

VANES 001006

```
 1          agree?
 2     BY MR. BENSON:
 3                    I'm going to object, Judge.  Now,
 4                    Detective Outlaw is a medical
 5                    expert on how drugs affect
 6                    people's eyes?
 7     BY MR. KING:
 8          He's a veteran police officer.
 9     BY MR. BENSON:
10          A M.D. has a little more training.
11     BY THE COURT:
12          Well, I don't know that he is an expert,
13          but --
14     BY MR. BENSON:
15          How far is the Court going to go in
16          letting Detective Outlaw offer his opinion as
17          to anything?
18     BY THE COURT:
19          He was asked the question and he responded
20          that that's what the witness told him, and
21          that kind of rudimentary question I think he
22          could give an answer to.
23     BY MR. KING:
24     Q    Do you agree the reaction of a person's eyes
25          to a drug would depend on the drug involved?
```

Filed in Clerk's Office

469

MAY 23 1997

Anna N. Anton
CLERK LAKE SUPERIOR COURT

VANES 001007

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 35

## Plaintiff's Summary Judgment Response

Filed in Open Court

JAN 2 5 2016

_[signature]_
CLERK LAKE SUPERIOR COURT

STATE OF INDIANA )   SUPERIOR COURT OF LAKE COUNTY
                                      CRIMINAL DIVISION
COUNTY OF LAKE )   CROWN POINT, INDIANA

WILLIE T. DONALD )
        Petitioner )
                                  )
    v.                          )   CAUSE 45G01-9203-CF-00065
                                  )
STATE OF INDIANA )
        Respondent )

**RECEIVED**

JAN 2 8 2016

_[signature]_
CLERK LAKE SUPERIOR COURT

## <u>Findings of Fact</u>

1. Petitioner Donald was convicted by a jury in June, 1992, for the murder of Bernard Jiminez and the robbery of Rhonda Williams, separate incidents occurring on the same evening (2/27/92) in the same neighborhood in Gary.

2. The sole issue as trial was the identification of the perpetrator of these crimes. The prosecution presented no physical evidence linking Donald to the crimes, but did present identification testimony from Williams and the Jiminez widow. Each made a positive identification of Donald during the trial, and evidence was presented by the State that each had made a positive pretrial identification of him via photos and/or an in-person lineup. No other persons testified as eyewitnesses to either crime.

3. Donald offered an alibi for both crimes. There was never any suggestion at trial by either the prosecution or the defense that different individuals committed the separate crimes. As was later stated by the Court of Appeals in the course of Donald's direct appeal, whoever committed one offense also committed the other.

4. A few days after the offenses, and prior to Donald's arrest, Williams urgently called the police to report that she'd just seen near her home the man who robbed her, and she requested that

1

***Willie T. Donald v. State of Indiana***, Cause 45G01-9203-CF-00065, p. 2.

the department send a squad to apprehend him. The street sighting of the robber occurred when Donald was demonstrably elsewhere. It could not have been him. This information was developed by John Jelks, the junior detective on the case, and passed along to the lead detective, Bruce Outlaw, but it was never disclosed to either the prosecution or the defense by Outlaw. It surfaced about one year after the trial when Jelks disclosed it to the defense.

5. In a 2013 deposition, robbery victim Williams testified that when she viewed the books of "mug shots", looking for the perpetrator, the widow of Bernard Jimenez was seated next to her, looking at books, as well. When Williams pointed to the Donald's photo, and indicated that that was him, Mrs. Jiminez looked over at the photo to which Williams was pointing, and started to cry. On the form completed by Jimenez identifying whom she selected, the officer noted that Mrs. Jimenez was not completely certain of the identification.

6. Also in the 2013 deposition of Williams, she testified that when she viewed the in-person lineup, she told Outlaw, who was conducting the lineup, that the man in the lineup (Donald) looked bigger and taller than her robber. She further testified that Outlaw then told her that "they arrested him [Donald] across the street from where I live and that they were sure it was him." Donald was in fact not arrested near the Williams home. Williams went on to indicate that the police were "basically convincing me that it was him" and that Outlaw "convinced me I had picked the right guy." Williams stated in the deposition that she did not inform the trial prosecutors about (a) her reservations about the identification that she had expressed to Outlaw or (b) Outlaws' attempts to persuade her about Donald's guilt. Williams' also reiterated her belief, first expressed to the police in 1992, that the man by her home several days after the robbery was in fact the one who robbed her.

2

*Willie T. Donald v. State of Indiana*, Cause 45G01-9203-CF-00065, p. 3.

7. The Gary police did not inform the State or the defense that Williams had reservations about an identification during the in-person lineup, nor about the attempt to persuade her at that time that Donald was guilty in fact. Trial counsel for Donald was unaware of these matters at the time of Donald's trial and could not confront Williams' regarding the exculpatory statements of identification uncertainty because they were never disclosed to him before or during the trial.

8. The prosecution argued at trial that all of the Williams identifications (in-court and pretrial) were positive and that there was never any indication by the witness of any uncertainty on her part at any point in time. The information known to the Gary police at the time would have demonstrated otherwise, had it been disclosed.

## Conclusions of Law

1. The suppression by the prosecution of evidence favorable to an accused – evidence material either to guilt or punishment – violates the due process clause of the federal constitution, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Where there is a violation of the duty to disclose exculpatory evidence, commonly known as the *Brady* obligation, a new trial is warranted if it is demonstrated that the withheld or non-disclosed information was material and that non-disclosure of same undermined confidence in the verdict(s).

2. The *Brady* obligation extends to law enforcement agencies, such as the Gary Police Department. The prosecution is ultimately accountable for exculpatory information known only to police investigators. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

3. Where there are multiple incidents of undisclosed information, the incidents are not

3

DONALD 001353

*Willie T. Donald v. State of Indiana*, Cause 45G01-9203-CF-00065, p. 4.

analyzed separately, *in seriatim*, but rather cumulatively. *Goudy v. Basinger*, 604 F.3d 394, 399-401 (7th Circ.2010).

4. The street sighting by Williams of someone other than Donald as the perpetrator was the subject of an earlier appeal, but that evidence must be considered again by this Court in light of its obligation to evaluate the cumulative impact of undisclosed evidence upon the fairness of the trial.

5. This was an identification-only trial. There were no other issues. The prosecution's case depended entirely upon identifications made by the two victim eyewitnesses. Evidence calling into question the accuracy of either was material in a case where the identifications were mutually-supporting. If, as the Court of Appeals noted and as this Court concurs, the evidence indicates that whoever committed one crime committed the other, then doubts about Donald's guilt for one crime raises doubts about his guilt of the other. This is especially true in that Mrs. Jimenez' identification was arguably tainted by the fact that she observed and adopted the identification made by Williams.

6. The statements of uncertainty made to Outlaw by the witness at the time of the lineup, and his statements to the witness attempting to assuage her doubts, both when viewed in isolation and when viewed in the combination with the earlier undisclosed information regarding the 1992 street sighting, are material as contemplated by *Brady*, their non-disclosure undermines confidence in the verdicts rendered against the petitioner, and a new trial on both charges is warranted.

## Judgment

The petitioner's convictions for murder and robbery are vacated, and further proceedings are now ordered in this matter. The Sheriff of Lake County is ordered to transport the Petitioner (DOC #923457) from the Indiana State Prison ( or any other facility within the Department of Correction

4

DONALD 001354

*Willie T. Donald v. State of Indiana*, **Cause 45G01-9203-CF-00065, p. 5.**

to which he may have been transported prior to this order) to the Lake County Jail for further

proceedings on January 28, 2016, before the magistrate. Clerk to notify counsel, the petitioner, the

Department of Correction, the Indiana State Prison, and the Lake County Sheriff.

Date: January 25, 2016

So recommended: _____

Hon. Kathleen A. Sullivan, Magistrate

So ordered: _____

Hon. Salvador Vasquez, Judge

5

DONALD 001355

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

WILLIE T. DONALD,            )

                                )    No. 2:17-CV-00032-TLS

            Plaintiff,     )

                                )    Judge Theresa L. Springmann

              v.          )

                                )

BRUCE OUTLAW, CARLA K. PYLE, as  )

special administrator of the ESTATE OF  )

JOHN E. JELKS, JR., CITY OF GARY,  )    JURY TRIAL DEMANDED

and other as-yet unknown employees    )

of the City of Gary,              )

                                )

            Defendants.   )

# Exhibit 36

## Plaintiff's Summary Judgment Response

TO:      Dave Wade,
           CHIEF OF POLICE

           George Woods,
           Deputy Chief Of Police

           John Roby, Deputy Inspector
           Investigative Services

FROM:    Lt. C. Mitchell, Commander
           Investigative Division

DATE:    March 23, 1992

RE:      CPL. BRUCE OUTLAW


DEAR SIRS:

ON FEBRUARY 27, 1992, A ROBBERY/HOMICIDE WAS COMMITTED AT 4660
MASS. STREET, GARY, IN.    THIS CASE (92-5357 ROBBERY RELATED
HOMICIDE OF BERNARD JIMENEZ) WAS ASSIGNED TO CPL. BRUCE OUTLAW
ON THE 4PM TO 12AM SHIFT.

CPL. OUTLAW USING GOOD DETECTIVE WORK GOT A BREAK IN THE CASE
AND ARRESTED A SUSPECT (WILLIE DONALD).  CPL OUTLAW HAD A LINE-
UP AND GOT A POSITIVE IDENTIFICATION OF THE SUSPECT.  FOR MANY
REASONS, SOME GOOD AND SOME REALLY NOT PERTINENT TO THE CASE,
CPL. OUTLAW DECIDED NOT TO FILE THE CASE IN LAKE COUNTY CRIMINAL
COURT.

ON MARCH 3, 1992, I DISCUSSED THE CASE WITH SEVERAL DETECTIVES
AND DEPUTY INSPECTOR JOHN ROBY.  IT WAS DECIDED THAT CPL. OUTLAW
WAS TO FILE THE CASE IMMEDIATELY ON THE FACTS ALONE AND NOT ON
CONJECTURE.  CPL. OUTLAW INSISTED THAT HE DID NOT HAVE ENOUGH
EVIDENCE TO FILE.  ON MARCH 4, 1992, I, LT. CHARLES MITCHELL,
ORDERED CPL. OUTLAW TO FILE THE CASE IN LAKE COUNTY CRIMINAL
COURT.

CPL. OUTLAW AND CPL. JELKS, WHERE IN AND OUT OF THE OFFICE ALL
DAY ON MARCH 4, 1992.  IT WAS LATER, THAT SAME EVENING WHEN I
WAS INFORMED BY CPL. OUTLAW THAT THE CASE HAD NOT BEEN FILED.
CPL. OUTLAW STATED TO ME, THAT HE WANTED TO CHECK OUT SOME MORE
LEADS AND THAT HE WAS GOING TO RELEASE THE SUSPECT.  HE FURTHER
STATED THAT HE COULD EASLY PICK UP THE SUSPECT AGAIN IF IT
BECAUSE NECESSARY.

ON MARCH 5, 1992, I TOLD CPL. OUTLAW TO TAKE THE CASE TO CROWN POINT WITHOUT FURTHER DELAY. AT APPROXIMATELY 9:30AM THAT SAME DAY, CPL. OUTLAW AND SGT. HIGHTOWER WERE IN THE PROCESS OF TRANSPORTING THE SUSPECT TO CROWN POINT, CPL. OUTLAW RECEIVED A CALL AND WAS INFORMED THAT HIS HOME WAS ON FIRE. CPL. OUTLAW INFORMED LT. MITCHELL OF HIS EMERGENCY AND STATED THAT HE COULD NOT GO TO CROWN POINT.

CPL. OUTLAW STATED THAT HE WAS GOING TO CHECK ON HIS HOME AND HIS FAMILY.

AT THIS TIME LT. MITCHELL, INFORMED CPL. OUTLAW THAT DUE TO HIS NEGLIGENCE THE SUSPECT AND CASE COULD HAVE BEEN FILED IN CROWN POINT. LT. MITCHELL TOLD CPL. OUTLAW TO GO HOME AND CHECK ON HIS FAMILY AND IF THE SITUATION WAS NOT A LIFE AND DEATH SITUATION, HE WOULD ASSURE HIS FAMILY THAT AFTER FILING THE CASE HE WOULD BE BACK HOME.

WHEN CPL. OUTLAW ARRIVED AT HIS RESIDENCE AND CHECKED OUT THE SITUATION HE INFROMED SGT. HIGHTOWER WHAT HE WAS NOT GOING TO CROWN POINT.

ONLY AFTER DEPUTY CHIEF WOODS ORDERED CPL. OUTLAW TO FILE THE CASE, DID HE RESPOND.

THE SUSPECT. (WILLIE DONALD) WAS FINALLY CHARGED WITH ROBBERY AND MURDER I AND II.

LT. CHARLES MITCHELL

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

WILLIE T. DONALD,                          )
                                           )        No. 2:17-CV-00032-TLS
            Plaintiff,         )
                                           )        Judge Theresa L. Springmann
            v.                 )
                                           )
BRUCE OUTLAW, CARLA K. PYLE, as            )
special administrator of the ESTATE OF     )
JOHN E. JELKS, JR., CITY OF GARY,          )        JURY TRIAL DEMANDED
and other as-yet unknown employees         )
of the City of Gary,                       )
                                           )
            Defendants.        )

# Exhibit 37

## Plaintiff's Summary Judgment Response

Page 1:

```
 1
 2  STATE OF INDIANA    )    SUPERIOR COURT OF LAKE COUNTY
                        )SS: CRIMINAL DIVISION
 3  COUNTY OF LAKE      )    CROWN POINT, INDIANA

 4  WILLIE T. DONALD,       )
 5       Petitioner,        )
 6  vs.                     )  CAUSE NO:
 7                          )  45G01-9203-CF-00065
    STATE OF INDIANA,       )
 8       Respondent.        )
 9  _____)

10
11        The Deposition of RHONDA FLEMING, taken at the
12  instance of the Defendant, herein, pursuant to notice as to
13  time and place and pursuant to the Statutes of the State of
14  Indiana, before Melissa A. Hill, CSR and Notary Public for
15  the State of Indiana, at the offices of the Lake County
16  Prosecutor's Office, 2293 North Main Street, Crown Point,
17  Indiana, on the 28th day of May, 2013, commencing at the
18  hour of 1:30 in the afternoon.
19
20
21
22
23
24            FISSINGER & ASSOCIATES, LTD.
                   9212 Birch Avenue
25             Munster, Indiana 46321
                   (219) 972-0600
```

Page 2:

```
 1               A P P E A R A N C E S
 2   MR. THOMAS W. VANES
        9120 Connecticut Drive, Suite G
 3      Merrillville, Indiana 46410
 4      on behalf of the Plaintiff;
 5   MR. MARK WATSON
       MS. KATHLEEN O'HALLORAN
 6   DEPUTY PROSECUTING ATTORNEYS
     2293 North Main Street
 7   Crown Point, Indiana 46307
 8      on behalf of the Defendant.
 9               I N D E X
10  DEPOSITION OF: RHONDA FLEMING
11       DX   CX   RDX   RCX
    BY MR. WATSON . 2 . . . . . . . 71 . . . . . .
12  BY MR. VANES . . . . . 57 . . . . . . . 75 . .
13               EXHIBITS
    Respondent's Exhibit Number 1 marked . . . . Page 6
14  Respondent's Exhibit Number 2 marked . . . . Page 32
    Respondent's Exhibit Number 3 marked . . . . Page 51
15
                 RHONDA FLEMING,
16  being first duly sworn to testify the truth and nothing but
         the truth, deposeth and saith as follows:
17
18             D I R E C T   E X A M I N A T I O N
    BY MR. WATSON:
19  Q.  Ma'am, please state and spell your full name.
20  A.  Rhonda Fleming.  It's R-h-o-n-d-a, F-l-e-m-i-n-g.
21  Q.  And previously did you go by Rhonda Williams?
22  A.  Yes.
23  Q.  When did you start going by Fleming?
24  A.  In 2004.
25  Q.  Are you currently employed?
```

Page 3:

```
 1  A.  Yes.
 2  Q.  Where are you employed?
 3  A.  At Bic Graphics.
 4  Q.  What is that?
 5  A.  It is a marketing company.
 6          MR. VANES:  Would you spell Bic?
 7  A.  B-i-c, Graphics.
 8  Q.  BY MR. WATSON:  And your date of birth, please?
 9  A.  October 29th, 1960.
10  Q.  Where do you currently live, town and state?
11  A.  Largo, Florida.
12  Q.  How long have you lived in Florida?
13  A.  Since 2010.
14  Q.  And does Mr. Vanes have a contact phone number and
15      address for you?
16  A.  Yes.
17  Q.  Just to be clear, in 1992 when your last name was
18      known as Williams, you testified in a trial pertaining
19      to Willie Donald here in Lake County; is that right?
20  A.  Yes.
21  Q.  And your testimony in that case was directly related
22      to you being robbed inside your home; is that correct?
23  A.  Yes.
24  Q.  Within the last year or two I've been provided with a
25      copy of an affidavit of Rhonda J. Fleming, which
```

Page 4:

```
 1      essentially recants your identification of
 2      Willie Donald as the person who robbed you; is that
 3      right?  Did you do an affidavit recanting that
 4      Willie Donald was the person that robbed you?
 5          MR. VANES:  I'm not sure a civilian would know
 6      what recants signifies.
 7          MR. WATSON:  Okay.
 8  Q.  BY MR. WATSON:  Did you sign a paper, an affidavit of
 9      Rhonda Fleming indicating that Willie Donald, the
10      person you had identified, was not the person that
11      robbed you?
12  A.  Correct.
13  Q.  All right.  To back up just a little bit, my name is
14      Mark Watson, I'm a deputy prosecuting attorney, and
15      this is Ms. O'Halloran, she's also a deputy
16      prosecuting attorney.  We'll be asking you -- or I'll
17      probably be asking you all of the questions today
18      pertaining to the circumstances of your trial
19      testimony, what has happened since then, your contact
20      with the people who obtained the affidavit from you,
21      things of that nature.  If you don't understand a
22      question that I ask you, just let me know and I'll
23      rephrase it.
24  A.  Okay.
25  Q.  The other thing is, and so far this hasn't been an
```

DONALD 001112

**5**

1 issue, when I ask a question please make sure that you
2 let me finish, and in return when you answer a
3 question I'll make sure I let you finish because the
4 gal off to your left is typing everything down and she
5 can't type us both at once if we're talking over each
6 other.  And also just make sure that you clearly state
7 yes or no or whatever the answer is because if you
8 shake your head or do uh-huhs and huh-uhs, she won't
9 know quite what to type down on the transcript.  Do
10 you have any questions about anything?
11 A.  No.
12 Q.  Okay.  I have to ask a few questions here that are not
13 meant to offend you, but we have to establish the
14 answers before we get into some of the other things
15 because it will tie in with some of the paperwork
16 here.  Can you please tell me your level of education?
17 A.  I have some college.
18 Q.  Okay.  What year did you graduate high school?
19 A.  1979.
20 Q.  What high school did you graduate from?
21 A.  Lew Wallace High School.
22 Q.  Do you have -- I see you're wearing glasses.  Do you
23 have any issues with your vision in terms of being
24 able to read documents or things like that?
25 A.  Without the glasses, yes.  With the glasses, no.

**6**

1 Q.  Again, this is not meant at all to offend you, it just
2 ties into what we're about to get into.  Are you fully
3 literate in the English language, you can read and
4 write fully the English language?
5 A.  Yes.
6 Q.  I'm going to show you --
7       MR. WATSON:  Can I please have this marked?
8       (RESPONDENT'S EXHIBIT NUMBER 1 WAS MARKED FOR
9 IDENTIFICATION)
10 Q.  BY MR. WATSON:  It's been marked as Respondent's
11 Exhibit Number 1.
12 A.  Okay.
13 Q.  Do you recognize what that is?
14 A.  Yes.
15 Q.  What is it?
16 A.  It's an affidavit that was given to me in the presence
17 of Sergio when I was with Sergio.
18 Q.  Okay.  I'll take that back from you for one second.
19 If you need to refer to it, I'll give it back to you.
20 A.  Okay.
21 Q.  You mentioned Sergio.  Who is that?
22 A.  He is -- I believe he is like a teacher or something.
23 I'm not quite sure what his title is.  He was doing
24 some type of research on this case.
25 Q.  Now, on this affidavit that has been marked as

**7**

1 Respondent's Exhibit 1, there is a line here for
2 Rhonda J. Fleming, affiant, and a signature above it.
3 Did you, in fact, sign this affidavit?
4 A.  Yes.
5 Q.  Did you read this document before you signed it?
6 A.  Yes.
7 Q.  Who actually typed this out, you or somebody else?
8 A.  Someone else.
9 Q.  And is everything in this affidavit true and correct?
10 A.  Yes.
11 Q.  Is there any part of it that for whatever reason you
12 didn't read because somebody told you to focus on
13 something or anything like that?
14 A.  No.
15 Q.  You read the whole thing?
16 A.  Yes.
17 Q.  All right.  Were any corrections made to this
18 affidavit after it was first presented to you?  In
19 other words, did they originally hand you an affidavit
20 and you said, this is wrong and this is wrong
21 and they went back and made any corrections or did you
22 sign it just as it is?
23 A.  Just as it is.
24 Q.  Again, did this come directly from the person you've
25 referred to as Sergio?

**8**

1 A.  Yes.
2 Q.  When were you first contacted by Sergio or people that
3 were working with him in this case?
4 A.  I can't remember the day or the year or anything like
5 that.  He came to my home.
6 Q.  In what town at the time?
7 A.  Indianapolis, Indiana.
8 Q.  Did he call ahead of time or did he show up there?
9 How did it work?
10 A.  He didn't call, he just -- actually, I pulled in my
11 driveway and I saw another car and then he stepped out
12 and approached me.
13 Q.  This was the first time --
14 A.  Yes.
15 Q.  -- anybody had contacted you about any of this?  I
16 don't mean in terms of the trial and all of that, but
17 about --
18 A.  Yes.
19 Q.  -- a potential affidavit or things of that nature?
20 A.  Yes.
21 Q.  All right.  And what did he say?
22 A.  He just said to me that he was here because he wanted to
23 talk to me about the Willie Donald case, the incident
24 that happened to me in 1992.
25 Q.  Was this affidavit done on that day?

DONALD 001113

---

**9**

1  A. No.

2  Q. Okay. When was the next time that you had contact

3  with Sergio? And I'm going to keep calling him Sergio

4  because that's how you know him.

5  A. Yes.

6  Q. When is the next time you had contact with Sergio or

7  somebody else working with him?

8  A. I'm not sure of the time and dates or anything like

9  that.

10 Q. I guess in relation to this was it the next day, a

11 week later, a month later? It doesn't have to be

12 exact. I'm just trying to get an idea of --

13 A. Maybe a month later.

14 Q. And where was it at?

15 A. I met him at a restaurant.

16 Q. In what town?

17 A. Indianapolis, Indiana.

18 Q. And what was the purpose of that meeting?

19 A. That was just to talk, discuss the case again and he

20 was also with a reporter.

21 Q. What kind of reporter, like a newspaper reporter?

22 A. I believe she was. I'm not sure about that either.

23 Q. I understand. The affidavit that we have here as

24 Respondent's Exhibit 1, was that done on this

25 particular day?

---

**10**

1  A. No.

2  Q. Okay. When was the next time that you had contact with him

3  in relation to meeting at the restaurant?

4  A. We left the restaurant and then we went to an office

5  and it was -- we made a tape that day and, I believe,

6  it was that day that I signed that. I'm not quite

7  sure.

8  Q. Okay. Where was the office at?

9  A. It was in Indianapolis, Indiana. It was downtown.

10 Q. And made a tape, do you mean you were recorded giving

11 a statement?

12 A. Yes, a video. I'm sorry. It was a video.

13 Q. At the time that you gave that videotaped statement

14 then, are you saying you had not still done this

15 affidavit?

16 A. I believe I had done it afterwards, I believe.

17 Q. After the video?

18 A. Yes. I'm not sure.

19 Q. Okay. So your recollection is it was on one day

20 Sergio comes to your house, you meet with him in your

21 home?

22 A. Yes.

23 Q. And then they come back sometime a few weeks later or a

24 month later, somewhere in that range, I'm not trying

25 to hold you to an exact day, you meet at a restaurant

---

**11**

1  and the idea comes up of going to an office building

2  and recording your statement?

3  A. Yes.

4  Q. And then you believe that later after that video was

5  done they have you do this affidavit?

6  A. Correct.

7  Q. Okay. So, to your recollection, the affidavit is done

8  after the videotaped statement?

9  A. Correct.

10 Q. Okay. What was the building you went to for that

11 videotaped statement? In other words, did it tie in

12 with the reporter's workplace, did it tie in with

13 Sergio's workplace, do you know?

14 A. No, I don't.

15 Q. Okay. Because I notice in the video that there is a

16 sign behind you, a large sign that says something to

17 the effect of The Times of Northwest Indiana. Were

18 you aware of that when you gave the statement, that

19 that sign was behind you?

20 A. No.

21 Q. You didn't see that?

22 A. No.

23 Q. Okay. Was it a Northwest Indiana Times office, to

24 your knowledge, that you went to?

25 A. No, I can't --

---

**12**

1  Q. You just don't recall?

2  A. No.

3  Q. What did they record you with? In other words, was it

4  set up to be a room where cameras were already in

5  place? I'm not sure if you follow where I'm getting

6  at. Was this an audio visual room set up for

7  recording or did they have to bring their stuff and

8  set it up in there?

9  A. I believe that it was already set up when I got there.

10 Q. Okay. How many video statements did you give in this

11 case?

12 A. One.

13 Q. All right. We'll come back to the statement, but for

14 now if you could just give me the 30-second version of

15 what happened on the day of the robbery?

16 A. I was asleep in bed and I heard some scratching at my

17 bedroom window and I got up and I turned on the light

18 and the scratching stopped and I said, well, I guess

19 I'll get ready for work. So I started getting ready

20 for work and I was fully dressed and I was on my way

21 out the door and I heard someone knock at the door and

22 I asked who it was and he said a name and it sounded

23 like my neighbor, he said he was my neighbor. And so

24 I opened up the door and the man was standing in the

25 door with a gun in my face and I was trying to get

---

DONALD 001114

| | |
|---|---|
| **13** | **15** |

**Page 13**

1  myself together like is this for real or am I
2  dreaming, but I realized that there was -- actually a
3  man was in my face with a gun and I was getting ready
4  to scream and he told me don't do that and he said
5  just go back in the house, and I went back in the home
6  and he asked me was there anybody here with me and --
7  no, he did not say that.
8     He asked me -- he said he knows that I'm home
9  alone, that's what he said. And he asked me did I
10 have any money and I said I've got a little bit and he
11 asked me where was it and I told him in my room. And
12 he had me go to the room and he followed me with the
13 gun and I gave him some money and he had me to lay
14 down on the floor, and while I was laying down on the
15 floor he asked me did I have a gun and I told him no.
16 And then he started to ransack the room and after he
17 done that he put a pillow over my head and he put the
18 gun in the back of my head and he said that if I
19 didn't come up with any more money by the time he
20 counted to five that he was going to blow my head off,
21 and he counted to four and he told me to get up and
22 then we got to the living room and he had me to lay
23 down on the floor and he was looking out the door.
24    And then he told me to get up again and I walked
25 over to the door where he was and he had me to look

**Page 14**

1  out the door and he was standing behind me and he
2  asked me did I have a car and I told him that I -- I
3  can't remember what I said, but I just know in my mind
4  I didn't want him to take my car. I believe I said
5  no, but I'm not sure. There was some people outside
6  and he was looking around and he told me to come back
7  in and get back down on the floor and he asked me how
8  old I was and then he left -- told me to stay on the
9  floor and he left and I was about to get up and he ran
10 back in and he said didn't I tell you to stay down on
11 the ground and I just laid there for a long time, it
12 felt like a long time anyway. And I got up and I ran
13 to the door to lock it and tried looking for the phone
14 so I can call the police.
15 Q. Was the robbery completely finished at that point?
16 A. Yes.
17 Q. So about how much time approximately do you think it
18    took from beginning to end?
19 A. I don't know, maybe 45 minutes, 30 minutes. I don't
20    know.
21 Q. Was he wearing a mask or anything like that?
22 A. No.
23 Q. Was he making attempts to hide his face?
24 A. No.
25 Q. Did that make you nervous, I guess, that he wasn't

**Page 15**

1     trying to hide his face at all?
2  A. I didn't even think about that.
3  Q. Would you say you got a good look at his face during
4     all of this?
5  A. From the time I opened the door I could see his face,
6     and I was trying not to really look at it after that.
7  Q. So do you believe in your mind, in your opinion, based
8     on what you observed, do you feel that you got a good
9     look at his face?
10 A. In my mind I'd say, yes, just that few seconds when I
11    opened the door. The only thing I could remember was
12    the bad skin.
13 Q. Did you get a good look at his face ever again during
14    this incident after the period of time when you opened
15    the door?
16 A. No. I tried not to look.
17 Q. All right. I believe you said that you called the
18    police after that?
19 A. Yes.
20 Q. Did they come to your residence?
21 A. Yes.
22 Q. And did you actually go to the police station that
23    night for anything?
24 A. No.
25 Q. What did they do while they were at your house, the

**Page 16**

1     police?
2  A. They just questioned me.
3  Q. And did you give any written statements at that time?
4     I believe they took a police report where they were
5     writing, but did you give any written statements to
6     them or write anything down to give to them or
7     anything like that?
8  A. I can't remember.
9  Q. All right. When was the first time you went to the
10    police station in relation to this incident?
11 A. I don't know.
12 Q. If I told you that our records indicate this occurred,
13    I believe, on February 27th of 1992, does that sound
14    about right?
15 A. Yes.
16 Q. Okay. Did there come a point where you did go to the
17    police station?
18 A. Yes.
19 Q. And what was the reason you went to the police station
20    the first time?
21 A. To look at some photos.
22 Q. Who all was in the room when you were looking at the
23    photos? And if you don't know names, that's okay, but
24    just describe to me who the people would have been.
25 A. Okay. It was me, my mother, and this other woman.

DONALD 001115

17

1 **Q.** From being in the room with her or from conversation
2 or from anything, did you get a sense as to who the
3 other woman in the room was?
4 **A.** **Well, when she came in the detective brought her in**
5 **and he was saying -- he was talking to her and I was**
6 **just over listening to what he was talking to her. He**
7 **had her to look at some photos, and from there it was**
8 **like I just put two and two together in my mind of who**
9 **she was.**
10 **Q.** I guess what was it about the conversation between the
11 detective and her that led you to put two and two
12 together?
13 **A.** **Because it was something he said about the death of**
14 **her -- shooting of her husband or something like that**
15 **and I just can't remember how I connected it together.**
16 **Q.** The affidavit lays out, I think, that person is termed
17 as the widow?
18 **A.** **Uh-huh.**
19 **Q.** Is that your term or the term of whoever wrote the
20 affidavit?
21 **A.** **Whoever wrote that affidavit.**
22 **Q.** All right. Given that Lake County has a decent amount
23 of violent crime, how could you yourself be sure that
24 this was the same case as you? It could have been a
25 family member or something from an unrelated shooting.

18

1 I guess I'm just trying to figure out how in your mind
2 you believed it was this case?
3 **A.** **Well, the detective had said that after the guy left**
4 **my home he killed someone and I just -- I don't know.**
5 **It was something that triggered me to believe that it**
6 **was her.**
7 **Q.** What did this person look like? Not the detective,
8 the gal who was brought in to look at photos?
9 Describe her appearance.
10 **A.** **She was Caucasian.**
11 **Q.** Okay. Approximate age?
12 **A.** **I'm not sure.**
13 **Q.** Was she extremely young or extremely advanced in years
14 or just somewhere in between?
15 **A.** **I would say somewhere in between, I guess. It's hard**
16 **to tell her age. I don't know.**
17 **Q.** What instructions were you given by the police as to
18 how to approach the photos you were going to look at?
19 What did they tell you the purpose of you being there
20 was?
21 **A.** **To identify who robbed me.**
22 **Q.** And I'm assuming that it crossed your mind that they
23 might take whatever identification you made and pursue
24 that further?
25 **A.** **Yes.**

19

1 **Q.** How many pictures would you say you looked at
2 approximately?
3 **A.** **I don't know, maybe six to eight books. I know it was**
4 **books and there was photos. I didn't really count**
5 **them, but I'm going to say at least six to eight books**
6 **and I'm not sure how many was in each book.**
7 **Q.** Okay. So are we talking in the hundreds of photos or
8 just like 30 or 40, I guess, is what we're trying to
9 figure out? I don't know how many pictures were in
10 the book, I haven't seen them.
11 **A.** **I'm going to say more than 30 or 40.**
12 **Q.** But you can't say if it was over 100?
13 **A.** **No, I can't.**
14 **Q.** And you and the gal that was brought in the room, were
15 you going through the books at the same time?
16 **A.** **Yes.**
17 **Q.** With each other looking at the same book at the same
18 time?
19 **A.** **No. She was looking at a book and I was looking at a**
20 **book.**
21 **Q.** Were you discussing initially what you were seeing in
22 the books and kind of comparing notes at that time?
23 **A.** **No.**
24 **Q.** Were there any police officers sitting there with you?
25 **A.** **No.**

20

1 **Q.** Did they give you any instructions about how to
2 approach the photos? What I mean by that is did they
3 say anything along the lines of he'll definitely be in
4 here or he may or may not be in here, anything like
5 that did they give you or any advice as to how to
6 approach these photo books?
7 **A.** **I can't remember.**
8 **Q.** Okay. How many times did you see at this time a
9 picture of the person who you eventually picked out of
10 the books? In other words, was there anybody else you
11 looked at in those books that you thought could be the
12 guy or was this photo that you alerted the police to,
13 was that the only one?
14 **A.** **That's the only one -- well, I'm sorry.**
15 **Q.** Go ahead.
16 **A.** **That's the only one I picked out.**
17 **Q.** Okay. Were there others that you had thoughts about?
18 **A.** **I'm not sure.**
19 **Q.** Okay. What was it about the photo that got your
20 attention? Why did you think this was one to alert
21 the police to?
22 **A.** **It was the eyes and the scarring on the face.**
23 **Q.** Now, to be clear, at the time you saw this did you
24 even know who this guy was?
25 **A.** **No.**

DONALD 001116

21

1 Q. But now after getting into this case a bit, you know
2   the person's name wound up being Willie Donald?
3 A. Yes.
4 Q. What was your emotional reaction to seeing the
5   picture?
6 A. I got a little nervous and scared.
7 Q. Why?
8 A. It was just the eyes.
9 Q. Why did it scare you though, just because you thought
10   it might be the person or is there another reason?
11   Why did it make you anxious or nervous at the time?
12 A. It just reminded me of the person that robbed me.
13 Q. All right. Now, did you -- when you were giving your
14   statement to -- I'm going to keep calling him Sergio
15   for clarity's sake and consistency. Did you talk with
16   Sergio about that, that your initial emotional
17   reaction upon seeing the photo was that it made you a
18   little bit nervous and scared?
19 A. I believe so.
20 Q. Okay. So who did you tell back that day at the police
21   station? What did you do when you saw this photo?
22 A. I just told them that -- I just pointed him out and I
23   said that's him.
24 Q. Who did you say that to?
25 A. The detective. Well, she was in there too, the lady

22

1   and my mom, and I said this is -- I believe this is
2   him, just like that (indicating).
3 Q. You said I believe this is him?
4 A. Yes.
5 Q. And it won't show up on the transcript, but you kind
6   of pointed your finger?
7 A. Yeah, at the picture (indicating).
8 Q. Okay. So I believe this is him and then you're saying
9   that the gal that was brought in later was --
10 A. She came -- she looked over at it.
11 Q. What did she say?
12 A. And she just nodded her head and then she just started
13   crying.
14 Q. So what was said, if anything, after that between you
15   and her?
16 A. Nothing.
17 Q. Nothing more?
18 A. I don't believe so.
19 Q. So what did you do in terms of letting the police
20   officer know that?
21 A. Someone came in, I believe someone -- I can't remember
22   how it all -- either somebody was called or somebody
23   at the time in the middle of us watching, I mean,
24   looking at the photos, if somebody else was in there,
25   an officer or something, I can't remember, but anyway,

23

1   they came over and pointed to him.
2 Q. At the exact moment when you first saw this photo
3   though, was a police officer sitting with you and
4   watching you?
5 A. Oh, no.
6 Q. After the fact somebody came in?
7 A. Right.
8 Q. You just can't recall whether you called for them or
9   they came in coincidentally?
10 A. Right.
11 Q. Okay. And what did you actually say to the police
12   officer who came in the room about that photo, as best
13   as you can recall?
14 A. I just said that I believe this is -- it's him right
15   here.
16 Q. Do you happen to recall if you said that to the actual
17   detective or just some officer that was kind of
18   overseeing the room or do you know?
19 A. I believe there was a detective that came in.
20 Q. All right. Now, prior to seeing that picture, had
21   anybody said anything to you along the lines of, hey,
22   take a close look at this one or kind of give you a
23   hint that this is the person to look at, anything like
24   that?
25 A. Not at that time.

24

1 Q. So the initial discovery of the photo was yours?
2 A. Right.
3 Q. And you said that the resemblance that caught your
4   attention was the eyes?
5 A. And the scarring on the face.
6 Q. Anything else that jumped out at you about the photo?
7 A. I can't remember. I just remember those two.
8 Q. All right. So what happened after you alerted the
9   police, what was the next thing that happened?
10 A. They called me and had me come downtown -- I mean, to
11   the -- to do a line-up or wherever that might be. I'm
12   not sure.
13 Q. After you told them about the photo, they sent you
14   home?
15 A. Yeah.
16 Q. Was there anything else to be done at that time before
17   you left they had you do?
18 A. I can't remember.
19 Q. All right. So you went home and they called you?
20 A. Right.
21 Q. When did they call you in relation to you being at the
22   station?
23 A. Maybe that evening or -- I remember it was in the
24   evening.
25 Q. What did you say when they called you?

DONALD 001117

25

1  A. We would like you to come down and look at a line-up.
2  Q. When you say a line-up, was it like an in-person
3     line-up or a bunch of photos on a piece of paper?
4  A. In person.
5  Q. Was the detective there when you went down to the
6     station?
7  A. Yes.
8  Q. Now, do you happen to know the detective's name that
9     you were dealing with or did you come to learn it
10    later?
11 A. He introduced himself as Outlaw.
12 Q. So any time in this deposition when we've been talking
13    about the detective, you've been talking about him?
14 A. Yes, correct.
15 Q. You got down to the station and tell me what happened
16    with the line-up.
17 A. The only -- I saw a man. The only thing I can
18    remember is seeing this guy. I don't know -- at the
19    time I didn't know if it was Willie Donald or not and
20    then it was -- I didn't know his name, I guess I would
21    say, I didn't know his name and he said is that him
22    and I said he looks bigger and taller than the guy
23    that robbed me.
24 Q. You told this to the police?
25 A. Yes.

26

1  Q. Let me back up for just a second. When you first got
2     there, I'm assuming that Detective Outlaw accompanied
3     you to some kind of room where there's some glass
4     between you and the people?
5  A. Correct.
6  Q. Okay. And who else was in the room with you at the
7     time you're doing this?
8  A. I want to say it was just me and him.
9  Q. Okay. The gal who had been in the room with you when
10    you were looking at the photo books, was she in the
11    room with you when you're doing the line-up?
12 A. No.
13 Q. Okay. So, I guess, to the best of your recollection,
14    it's you and the detective, if there's somebody else
15    you're not recalling it right now?
16 A. Correct.
17 Q. Okay. And it's your testimony that they bring in the
18    people and I'm assuming you at least -- well, did you
19    recognize the person you picked out of the photo as
20    being in that line-up? The person you picked out of
21    the photo books, did you see him in the line-up?
22 A. I'm -- I would say yes.
23 Q. Okay. Just for me to clarify for you a little bit, I
24    guess all I'm asking you at this point is if the
25    person that you saw in those books was in the line-up?

27

1     I'm not necessarily getting to the part where we say
2     is the person that robbed you in the line-up. I just
3     want to know if the person you saw in those books that
4     day wound up being in that line-up when you went back
5     to the police station?
6  A. Okay. When you say line-up, you know, when I look at
7     movies there will be two or three guys, right, four
8     guys. There was only one that I saw.
9  Q. You only saw one person in the line-up?
10 A. Yes.
11 Q. They didn't bring out like five guys for you to look
12    at?
13 A. No, they just brought him. I don't remember -- I only
14    remember seeing one guy. I don't know if I was just
15    focusing just --
16 Q. So based on your recollection right now, you recall
17    the police just brought one person out for you to look
18    at and asked you yes or no is this the guy?
19 A. Yes.
20 Q. And what did you tell them? As best you can, exactly
21    what did you tell them?
22 A. I said he's too big, he's too tall.
23 Q. You said that directly to Detective Outlaw?
24 A. Yes.
25 Q. Or whatever detective it was?

28

1  A. Yes.
2  Q. He's too big, he's too tall?
3  A. Yes.
4  Q. In your opinion, since you were there, did you make it
5     clear to him that guy you're showing me is not the
6     guy?
7  A. Yes.
8  Q. And what, if anything, did the police officer say when
9     you said that to him?
10 A. He just said okay and in that room --
11 Q. We'll get to the rest.
12 A. Okay.
13 Q. I'll let you explain what happened later.
14 A. Okay.
15 Q. I'm trying to go in order here. Did they bring out
16    any other people then for you to look at for an
17    in-person line-up?
18 A. No.
19 Q. So the only in-person line-up you ever were a witness
20    to was the one we just talked about?
21 A. Yes.
22 Q. And, to your recollection, it was just you and the
23    detective in the room, not the gal from the room with
24    the photo books?
25 A. Correct.

DONALD 001118

29

1  Q. All right. So what happened next?
2  A. Then he was talking to me and he was telling me that
3     they arrested him across the street from where I live
4     and that they were sure that it was him.
5  Q. Was this conversation had in that same room or was
6     this later?
7  A. Later.
8  Q. So where are you at now?
9  A. I believe that I'm either in the hallway or -- because
10    I'm not sitting.
11 Q. You're not giving your formal statement yet?
12 A. No.
13 Q. He's telling you he lives across the street?
14 A. They arrested him across the street.
15 Q. From where you lived?
16 A. Yes.
17 Q. What else did they tell you?
18 A. And they told me that I was doing the right thing,
19    basically convincing me that it was him.
20 Q. And all of this was said after you told them
21    essentially that's not the guy?
22 A. Correct.
23 Q. But they said you're doing the right thing?
24 A. Yes. He said they believe that it was him and they
25    asked me, but I just told them that he just looked too

30

1     big, just like that, he just looked too big.
2  Q. Who else was present for this conversation?
3  A. It was just me and him.
4  Q. In some hallway not sitting down?
5  A. Right.
6  Q. Okay. So what was the next step after that
7     conversation?
8  A. I went home.
9  Q. When did you give a formal written statement?
10 A. I'm not sure.
11 Q. Was it that night?
12 A. Maybe.
13 Q. Did you -- by the time you did this affidavit, I'm not
14    sure, but it sounds like you had two conversations
15    with Sergio?
16 A. Uh-huh.
17 Q. Okay. Did you tell Sergio?
18       MR. VANES: Was that a yes?
19 A. Yes. I'm sorry.
20 Q. BY MR. WATSON: That's all right. Did you tell that
21    to Sergio in these two conversations that you had told
22    the police officer that the guy in the in-person
23    line-up was the wrong guy?
24 A. I told him that he was too big and that -- yes. And,
25    yes, I did tell him, I believe, that it was the wrong

31

1     guy.
2  Q. Okay. Did you tell Sergio or people working with him
3     though that you told the police at that time it was
4     the wrong guy?
5  A. Yes.
6  Q. Okay. Because I don't see it in the affidavit, I
7     guess, that's my question: Why does it not appear in
8     this affidavit that you told the police this
9     information?
10       MR. VANES: Objection to the form of the question
11    because it calls for speculation.
12       MR. WATSON: Are you telling her not to answer
13    it?
14       MR. VANES: No.
15       MR. WATSON: For the record?
16       MR. VANES: Yes.
17 Q. BY MR. WATSON: Do you understand my question?
18 A. Can you repeat the question?
19 Q. I'll try and rephrase it a little bit. You read over
20    the affidavit before you signed it?
21 A. Uh-huh.
22       MR. VANES: That's yes?
23 A. Yes. I'm sorry.
24 Q. BY MR. WATSON: It happens all the time, trust me. I
25    believe it's your testimony that prior to doing this

32

1     affidavit you had informed Sergio of what you told the
2     police about the line-up?
3  A. Yes.
4  Q. Did you ask them -- did you ever ask Sergio or anybody
5     else why it wasn't in the affidavit?
6  A. No.
7  Q. All right. So you don't recall if you gave your
8     actual written statement that night or not? You may
9     have, but you're not sure or you're sure you didn't?
10 A. I'm not sure.
11 Q. So when, to your recollection, would you say how much
12    longer would it have been before you did that written
13    statement?
14 A. I don't know.
15 Q. But you did do one?
16 A. Yes.
17 Q. And who was present for the written statement?
18 A. I believe Detective Outlaw.
19       (RESPONDENT'S EXHIBIT NUMBER 2 WAS MARKED FOR
20    IDENTIFICATION)
21 Q. BY MR. WATSON: We've had this document marked as
22    Respondent's Exhibit 2. If you don't mind, you don't
23    have to necessarily read it, but just take a look at
24    it, there's several pages, and I'm just going to ask
25    you in a second here if you recognize what that is?

DONALD 001119

33

1   A.   No, I don't.
2   Q.   You don't recognize that?
3   A.   No, it's been so long.
4   Q.   I understand.  There's a few other pages.  Now, there
5        is a signature line, I believe, on every page?
6   A.   Yes.
7   Q.   Does that appear to you to be -- and you can look at
8        these as well, I'm just going to show you where they
9        are.  Does that appear to you to be your signature?
10  A.   Yes.
11  Q.   Okay.  The exhibit is shown to be a statement of
12       Rhonda Jermaine Williams.  I believe there is a
13       signature line that's cut off on the bottom of the
14       first page, but there's also on the bottom of the
15       second page, bottom of the third page, and then we get
16       to the fourth page and it's a photographic line-up
17       admonition, which has a signature line for you and a
18       printed name and then the last page is a six-person
19       photo line-up.  After having a chance to look at the
20       whole thing, does that refresh your recollection at
21       all as to being the statement that you gave to
22       Detective Outlaw in this case?
23  A.   Yes.
24  Q.   I'm sorry?
25  A.   Yes.

34

1   Q.   Okay.  Do you have any reason to believe that's not
2        the statement you gave in this case?
3   A.   It's been so long.  I haven't read this, so --
4   Q.   I understand.  Review what you think you need to, if
5        you want to take a minute or two.  We've taken about a
6        minute, a minute and a half here for you to review
7        Respondent's Exhibit Number 2.  After looking at this,
8        what are your thoughts as to what it is?
9   A.   I believe that's the statement.
10  Q.   You did give a statement in this case to the
11       detective?
12  A.   Yes.
13  Q.   And there's some signature lines on here.  Do you
14       believe the signatures to be yours?
15  A.   They are mine.
16  Q.   All right.  Do you yourself have any reason, as you
17       sit here now and you look at this, to think this isn't
18       your statement?  Is there anything that jumps out at
19       you as not being consistent with what you remember
20       doing?
21  A.   I just briefly looked at it.  So what I've read, that
22       is what I said.
23  Q.   I understand.  You read parts of it, but not the whole
24       thing?
25  A.   Correct.

35

1   Q.   All right.  A document like this, I know -- well, when
2        you gave the statement, did you sign it after reading
3        it?  Did you read the statement is what I'm asking
4        you?
5   A.   No, I just signed it.
6   Q.   Why would you do that?
7   A.   I'm just trusting that it's okay, that it's correct.
8   Q.   Okay.  So when the police finished typing up this
9        statement, did they give you the opportunity to read
10       it?
11  A.   I can't remember.
12  Q.   Okay.  But it's your recollection that you just signed
13       it and did not review it?
14  A.   Correct.
15  Q.   Attached to the statement I reference that there is a
16       sheet of paper that shows six photographs?
17  A.   Correct.
18  Q.   Do you recall picking somebody out of a paper photo
19       line-up such as this?
20  A.   No.
21  Q.   Is it possible that you've forgotten doing that or you
22       just don't believe that you ever did that?
23  A.   No, because the only photos that I looked at was in
24       that book.
25  Q.   Okay.  Do you recall ever seeing before this sheet

36

1        that says photographic line-up admonition?
2   A.   I don't remember.
3   Q.   Is it possible that you were shown this at the time or
4        do you just believe that you never saw it?
5   A.   This particular sheet?
6   Q.   Correct.
7   A.   I don't remember.  I just don't remember all what I
8        signed, I don't.
9   Q.   And attached to that is this six-person line-up and
10       it's your testimony that you've never seen that
11       before?
12  A.   I never seen that paper before.
13  Q.   Now, do you recall in your statement whether the
14       police asked you about viewing the in-person line-up?
15  A.   Could you repeat that?
16  Q.   Do you recall during this statement we're talking
17       about, when you gave a written statement did the
18       police ask you any questions about what you saw during
19       the in-person line-up?
20  A.   I don't remember that.
21  Q.   Okay.  So since you don't remember that, I'm guessing
22       you don't remember them asking you if you were
23       absolutely sure of your identification?  Do you recall
24       them asking you that question?
25  A.   I don't remember that.

DONALD 001120

37

1  Q. This is really for purposes of the record, so we can
2     get it all out there. In this statement there is a
3     question at the top of the last page and the question
4     is: "I will now show you a photographic array of
5     pictures numbered 1-6. I want you to closely look at
6     the photographs and tell me if you recognize anyone
7     and if so from where?" To be clear, you just don't
8     remember if that question was asked?
9  A. No, I don't.
10 Q. Okay. So obviously you don't remember your answer
11    being that you recognize Picture Number 2, correct?
12 A. Correct.
13 Q. And then there is another question at the top of that
14    page, the second question down --
15       (OFF THE RECORD)
16 Q. BY MR. WATSON: To pick up where we left off, on that
17    same Page 3 of 3 from the statement, there is another
18    question and I'm just asking you if you remember it
19    being asked. The question is, "I now ask you if you
20    viewed a police line-up at the Gary Police Department
21    on March 3rd, 1992 at approximately 7:30 p.m. and if
22    you did, were you able to make an identification of
23    any suspects to the incident when you were robbed?"
24    Do you recall being asked that question?
25 A. Yes.

38

1  Q. During the formal statement?
2  A. Yes, I believe so.
3  Q. So do you recall what your answer was during the
4     formal statement to that question?
5  A. I believe I probably said yes.
6  Q. Why do you believe you probably said yes?
7  A. Because they convinced me that this was the guy,
8     but --
9  Q. Well, do you specifically recall telling them that or
10    are you just guessing as to what you told them?
11 A. I just recall telling them that.
12 Q. You do recall telling them yes? And to clarify, the
13    reason you're saying you told them yes was because
14    they had convinced you of that?
15 A. Yes.
16 Q. Do you recall specifically giving this answer, "Yes, I
17    recognized the man holding number 4 as the person who
18    forced his way into my home at gun-point and robbed me
19    on February 27th, 1992." Do you recall giving that
20    answer?
21 A. What's 4?
22 Q. I can just read you the answer. You either recall it
23    or you don't.
24 A. I don't.
25 Q. Okay. What happened after you gave your statement?

39

1     Did you have to go down to the police station any more
2     that you recall?
3  A. I don't believe so.
4  Q. All right. To get back to where we started here, at
5     the beginning of the deposition we talked a little bit
6     about your being approached by a person that you know
7     as Sergio and being asked questions. What was the
8     first thing that he said to you about this whole
9     thing?
10 A. He just said that he just wanted to talk to me about
11    it, the incident, and he was saying where he was from
12    and why he was there.
13 Q. Now, at some point this case obviously went to court
14    and you were subpoenaed to testify, correct?
15 A. Correct.
16 Q. All right. At some point did you talk to the
17    prosecutor handling the case about your uncertainty?
18 A. No.
19 Q. Ever? Did you ever tell the prosecutor handling the
20    case that I'm not sure if I picked out the right
21    person, was that ever brought up?
22 A. No.
23 Q. Why not?
24 A. He convinced me that I had picked the right guy.
25 Q. Who convinced you?

40

1  A. Outlaw.
2  Q. Okay. So you didn't feel the need to tell the
3     prosecutor because Outlaw had convinced you that it
4     was the right person?
5  A. Correct.
6  Q. Again, I'm not trying to be condescending at all, but
7     you are aware that in Illinois they call the
8     prosecutor, I think, the state's attorneys and here
9     they call us deputy prosecutors? So when I say
10    prosecutor, I mean also state's attorney. Did you
11    ever tell the state's attorney that you were uncertain
12    about your identification?
13 A. No.
14 Q. All right. Did you ever have a conversation over the
15    phone with anybody telling them that you were -- I
16    guess I should say anybody in law enforcement, anybody
17    that had to do with the trial, did you ever tell
18    anybody over the phone that you were uncertain about
19    your identification?
20 A. No.
21 Q. So, I guess, at the time this case went to trial you
22    expressed your concern only to Detective Outlaw, is
23    that a fair statement?
24 A. Yes.
25 Q. Who was the prosecutor you were primarily dealing with

DONALD 001121

---

**41**

1  when they were calling you at trial and maybe asking
2  for your statement again to get it straight for trial?
3  Were you speaking with a male or a female or do you
4  recall?
5  A.  I don't recall.
6  Q.  So when you were at trial, what do you recall saying
7  your level of certainty was to the jury that was
8  sitting there in the courtroom?
9  A.  Well, they just asked me to point him out.
10  Q.  You don't recall them asking you if you were positive?
11  A.  I don't recall that.
12  Q.  All right.  In your video statement to Sergio you
13  indicated that you had been rushed.  Can you describe
14  for me what you mean by that?  When were you rushed, I
15  guess, is what I'm saying?  Are you talking about when
16  the police were investigating or when the case went to
17  trial?
18  A.  When the police was investigating.
19  Q.  Okay.  Now, it's also my understanding from going
20  through the case file that after the robbery you had
21  seen someone outside of your house or on your street
22  that you thought was the person that robbed you?
23  A.  Yes.
24  Q.  Okay.  And you called the police?
25  A.  Yes.

---

**42**

1  Q.  And you believe, as you sit here now, what about
2  whether that person was the perpetrator or not?  Did
3  you think the person you saw outside your house was
4  the person that robbed you?
5  A.  Yes.
6  Q.  What was it about that person that made you believe
7  that person was the person that robbed you?
8  A.  It was his build, his face, his eyes.  That was it.
9  Q.  Okay.  Were you walking or driving at the time you saw
10  that person?
11  A.  Driving.
12  Q.  Somewhere in the case file it says you may have been
13  coming back from purchasing a dog?  Does that sound
14  familiar?
15  A.  Yes.
16  Q.  Does that sound right from where you were coming from?
17  A.  Yes.
18  Q.  So was there actually a dog in the car with you at the
19  time?
20  A.  Yes.
21  Q.  And when you were actually driving and this person
22  caught your attention, how fast were you going
23  approximately?  I know you don't know the exact speed,
24  but were you making a turn, were you driving straight?
25  Give me some idea.

---

**43**

1  A.  I was going slow because I believe that I was at a
2  stop sign and I was making a turn.
3  Q.  How many people approximately were in the group of
4  people that you saw?
5  A.  Two.
6  Q.  And at the exact moment that you saw this person, did
7  you believe that that was the person that robbed you?
8  A.  Yes.
9  Q.  Was this before or after you went down and looked at
10  the photo books at the police station?
11  A.  It was after.
12  Q.  What is your level of certainty that it was after?
13  A.  Because I had looked at the photos and the reason I
14  remember is because I wouldn't go home and I purchased
15  a dog so I thought that would make me feel better to
16  go back home and when I saw him I wanted them to come
17  and get him.  I had already picked out -- I already
18  had been to the police station for the photo.
19  Q.  Okay.  So you went to your house and called the
20  police?
21  A.  No.  I went to my mom's house and called because I
22  didn't want to go back home.
23  Q.  All right.  Did you tell the police everything that
24  happened?
25  A.  Yes.

---

**44**

1  Q.  And what, if anything, was done?
2  A.  I don't know.
3  Q.  You didn't have to go and give another statement or
4  anything like that about that particular incident?
5  A.  No.
6  Q.  All right.  Did you tell the officer who you spoke
7  with that you had already identified somebody as the
8  person that robbed you --
9  A.  No.
10  Q.  -- in the books?  You didn't tell them that?
11  A.  No.
12  Q.  Why not?  Why wouldn't you tell them that?
13  A.  I didn't think it was necessary.  I wanted the guy
14  that I just saw, I wanted them to come get him.  I
15  didn't think about that.
16  Q.  Okay.  How did you know that the person that you had
17  seen on the road wasn't the same person you had picked
18  out of the photo books?
19  A.  I didn't.
20  Q.  You didn't know?
21  A.  No.
22  Q.  In your statement to Sergio you had mentioned that the
23  prosecutors had coached you on what to say.  Do you
24  recall telling Sergio that?
25  A.  Yes.

---

DONALD 001122

45

1  Q.  What do you mean when you say they coached you?
2  A.  They convinced me that this was the guy and when --
3      before I went to trial, they was just telling me
4      little things to say.
5  Q.  Such as?
6  A.  I can't remember.  I just know that -- I just remember
7      them telling me what they'll probably ask you and you
8      say this, what they'll probably ask you, you know, you
9      say that.
10 Q.  Were they telling you to say things that were not
11     true?
12 A.  I'm going to say yes.
13 Q.  Well, such as what?
14 A.  I can't remember them all.  I can't remember
15     everything.
16 Q.  Can you remember any of them though?
17 A.  Like when they ask you is this the defendant, you
18     know, the guy, just, you know, say yes and I do
19     remember that.
20 Q.  But had you given them any reason to think that wasn't
21     true, the prosecutors?
22 A.  I don't know.  I don't believe so.  I'm not sure.  I
23     don't believe so.  I'm not sure.
24 Q.  I understand it's been a long time.  I understand
25     that, but I have to dig into this a little bit.  I

46

1      mean, what I'm trying to focus on is:  Was there
2      anything that they told you to say that you had told
3      them, hey, that's not true?
4  A.  I don't know.
5  Q.  Okay.  Now, you said that they had convinced you that
6      this was the guy.  You're talking about the
7      prosecutors?
8  A.  I'm talking about Outlaw, if he is a prosecutor or
9      whatever.
10 Q.  He is a police officer.
11 A.  Okay.  That's it.
12 Q.  Okay.
13 A.  I guess I'm getting kind of frustrated because I don't
14     remember a lot of this stuff.  It's been a long time
15     for me.  I have tried to block out this whole deal
16     here, you know, but I do know that that is not the guy
17     and I've carried this for a long time now and so I am
18     getting a little frustrated.
19 Q.  I do understand that, I do, but I have to dig into
20     this and I'll tell you why.  These are some pretty
21     serious allegations you're making.
22 A.  Right.
23 Q.  I mean, you have specifically said in here in the
24     affidavit, "I testified at the trial of Willie T.
25     Donald and identified him in court mostly because I

47

1      felt pressured and intimidated by the prosecutor.
2      When I told him that I couldn't swear in court that
3      Mr. Donald was the perpetrator, the prosecutor warned
4      me that if I didn't testify the perpetrator would get
5      away with robbery as well as murder."
6  A.  That's correct.
7  Q.  Well, the reason I have to dig into this is because
8      you've told me already on a couple of occasions that
9      you never told the prosecutor you had reservations.
10     So that's why I'm asking and that's why I have to ask
11     the questions.  I understand it's uncomfortable, but I
12     have to understand why you're saying what you're
13     saying in Number 7 and by Number 7 I mean on this
14     affidavit.
15 A.  Right.
16 Q.  Number 7, so --
17 A.  And, like I said, I don't -- with me not into law and
18     all of this, prosecutor, I can't remember anybody's
19     title that talked to me.
20 Q.  Okay.  So, as you sit here now, I guess to make it as
21     kind of straightforward as I can, --
22 A.  Uh-huh.
23 Q.  -- I need to know, please, who specifically pressured
24     and intimidated you?  That's what I'm basically trying
25     to ask.

48

1  A.  I'm going to say it was Outlaw.  That's the only
2      person I remember ever talking to and I'm -- you know,
3      at the time, like I said, I don't know anybody's title
4      like officer or prosecutor or -- I know what a judge
5      is.
6  Q.  I understand, I do.  I'm just -- this is what I've
7      been provided about what you're going to say, this
8      affidavit and a video.  So I need to make sure that I
9      cover this.
10 A.  Okay.
11 Q.  Okay.  So, as you sit here now, and tell me if I'm
12     wrong, but as you sit here now, you believe that the
13     only person that made you feel pressured and
14     intimidated was Detective Outlaw; is that fair?
15 A.  Yeah.
16 Q.  And, again, tell me if I'm wrong, I'm just trying to
17     figure it out, you don't believe that you expressed
18     reservation or told the prosecutors themselves, the
19     people in court, you don't believe you told them that
20     when you spoke with them?
21 A.  Right.  I don't believe so, no.
22 Q.  You don't believe so?
23 A.  No, I don't believe so.
24 Q.  Okay.  We're getting close to being done here.  Going
25     back now to when you first talked to Sergio, how long

DONALD 001123

49

1    did it take to get to the point where you kind of
2    admitted to him that what you said in court was not
3    the truth? I mean, how long into the conversation did
4    that come up? Did you tell him immediately or did it
5    take a while, what happened?
6  **A. I told him immediately.**
7  Q.  All right. Did you yourself have any questions about
8    whether or not you could get in any kind of trouble
9    for it? Did that come up in your conversation with
10    him?
11 **A. No.**
12 Q.  Did he make any promises or anybody associated with
13    him make any promises to you about what could or could
14    not happen?
15 **A. No.**
16 Q.  They never said anything to you along the lines of the
17    statute of limitation has passed, those words didn't
18    come up?
19 **A. No.**
20 Q.  Did they in any way try and influence you in your
21    mind?
22    MR. VANES:  They being?
23    MR. WATSON:  I'm sorry.
24 Q.  BY MR. WATSON:  Sergio and the people that were
25    working with him, did they try and influence you to

50

1    say anything?
2  **A. No.**
3  Q.  Okay. Did they tell you that they thought Mr. Donald
4    was innocent?
5  **A. Yes.**
6  Q.  Did they tell you why they thought that?
7  **A. Yes.**
8  Q.  And what did they say?
9  **A. They said that the day that I picked out the guy on**
10    **the street Willie Donald was somewhere else.**
11 Q.  When did they first tell you that, which meeting?
12 **A. The first one.**
13 Q.  Okay. Did you know that prior to them telling you
14    that?
15 **A. No.**
16 Q.  Okay. Were they friendly to you throughout this?
17 **A. Yes.**
18 Q.  At any point did -- were you shown any notes that they
19    advised you came from a police officer's file or a
20    prosecutor's office file or anything like that? Did
21    they tell you that some notes were found?
22 **A. Just my testimony. I think it was my testimony or**
23    **something, I believe.**
24 Q.  What did they tell you? And I'm not talking about
25    meeting with Mr. Vanes.

51

1  **A. No.**
2  Q.  I'm talking about --
3  **A. He gave me something stating that -- he showed me**
4    **something stating that I said that he was too large**
5    **and too tall, that I actually said that.**
6  Q.  Was this the first meeting that he showed you this?
7  **A. Yes.**
8  Q.  And was it before or after you told him, you know,
9    hey, I wasn't completely truthful at trial? Did he
10    show you that before or after you said that to him?
11 **A. After.**
12 Q.  So you had already admitted to him that I said some
13    things that weren't true in court?
14 **A. Yes.**
15 Q.  Then he showed you the notes?
16 **A. Yes.**
17 Q.  Okay.
18    MR. WATSON:  Can I get this marked, please?
19    (RESPONDENT'S EXHIBIT NUMBER 3 WAS MARKED FOR
20    IDENTIFICATION)
21 Q.  BY MR. WATSON:  This is Respondent's Exhibit Number 3,
22    two pages. As you sit here now, do you recognize what
23    that is?
24 **A. It seems familiar to me.**
25 Q.  Is it possible that that is a copy of the same notes

52

1    you were shown by Sergio?
2  **A. Yes. It could be, yes.**
3  Q.  All right. When he showed you these notes, did you
4    remember a conversation where you said these things?
5  **A. No, because -- no.**
6  Q.  All right. You were going to say because. Because
7    why?
8  **A. Because all this time I wished that I had told**
9    **somebody.**
10 Q.  When did you start feeling that way?
11 **A. I don't know, maybe years after.**
12 Q.  Because I don't know if you recall, after the trial do
13    you recall being subpoenaed to come back for another
14    hearing?
15 **A. No.**
16 Q.  No?
17 **A. No.**
18 Q.  And it wouldn't have been a trial, there wouldn't have
19    been a jury sitting in there, but just a court hearing
20    where you were asked some questions about seeing the
21    gentleman on the street. You don't remember that
22    hearing?
23 **A. No.**
24 Q.  Since you don't remember the hearing, I'm pretty sure
25    I know the answer to the next question here, but do

DONALD 001124

53

1     you recall an investigator from this office coming to
2     talk with you about the hearing?
3  **A.**  No.
4  **Q.**  No? All right. We can take five minutes. I'm
5     guessing we have about 10 or 15 minutes left in the
6     deposition, but we can take a break now, if you want.
7  **A.**  No.
8  **Q.**  All right. So you don't remember coming back to court
9     and you don't remember an investigator coming to talk
10    to you again?
11  **A.**  No.
12  **Q.**  Was there ever a time that you told anybody in law
13     enforcement after the trial was over that you thought
14     you might have picked out the wrong person?
15  **A.**  No.
16  **Q.**  I think -- and I'm just letting you know. I think the
17     hearing I'm talking about that was after the trial, I
18     want to say that was about a year and a half later and
19     the subject of that hearing was focused on the person
20     you saw standing on the road and the attorney,
21     Mr. King, was there and the prosecutor was there and a
22     judge was there. You just don't remember having that
23     hearing?
24  **A.**  No, I don't.
25  **Q.**  Are you in any kind of contact any more with Sergio or

54

1     the people from wherever he was working?
2  **A.**  No.
3  **Q.**  Since the video interview, I guess it was in
4     Indianapolis, has there been any further contact
5     between you and them?
6  **A.**  No.
7  **Q.**  Was there ever a time when -- and I'm not necessarily
8     singling out him, he is just the person that I'm aware
9     of, I don't know who all you dealt with. Was there
10    ever a time that anybody from the people he was
11    working with ever tried to influence you or tell you
12    what to say when this went to court?
13  **A.**  No.
14  **Q.**  I'm sorry. What was your answer?
15  **A.**  If it went to court when?
16  **Q.**  For this. Did anyone ever try and tell you what to
17     say when you had a deposition?
18  **A.**  No.
19  **Q.**  Were you -- again, I'm not trying to insult you, I'm
20     just trying to cover all of my bases. Were you ever
21     offered anything, any kind of reward money or anything
22     like that to do this?
23  **A.**  No.
24  **Q.**  Give me just a second here.
25     (BREAK TAKEN)

55

1  **Q.**  BY MR. WATSON: Just a few more. Was there ever a
2     time that you believed you had picked out the right
3     person?
4  **A.**  **Yes, the guy on the walk.**
5  **Q.**  Was there ever a time that you believed the person you
6     picked out of the photo books was the right person?
7  **A.**  **No.**
8  **Q.**  You always from the beginning felt that was not him?
9  **A.**  **Right.**
10  **Q.**  Did that start when you viewed the in-person line-up
11    or did it start even before that?
12  **A.**  **In person.**
13  **Q.**  Okay. So, I guess, for whatever period of time there
14    was between the photo books and the in-person line-up,
15    you thought it was the right person; is that correct?
16  **A.**  **From the photo I thought that was the correct person.**
17  **Q.**  Then as soon as you got to the line-up, the in-person
18    line-up, then you did not believe that was the person?
19  **A.**  **Correct.**
20  **Q.**  And from that point on you did not believe that was
21    the right person?
22  **A.**  **Correct.**
23  **Q.**  All right. When you were approached by the group with
24    Sergio, was it ever mentioned to you that there was
25    another person that they thought was the actual

56

1     perpetrator? Did they tell you that?
2  **A.**  **Yes.**
3  **Q.**  Which meeting was it that they told you that?
4  **A.**  **I want to say the first meeting.**
5  **Q.**  And what did they say about that, what information did
6     they have?
7  **A.**  **I can't remember what that was.**
8  **Q.**  Did they ever mention any specifics or was it just
9     generally we think we know who did it?
10  **A.**  **I can't remember if it was like that.**
11  **Q.**  And was this brought up to you before or after you
12    acknowledged to them that you had picked out the wrong
13    person?
14  **A.**  **It was after.**
15  **Q.**  After? Was any information given by them to you about
16    this case before you told them that you thought you
17    picked out the wrong person? In other words, did they
18    give you reasons they thought you picked out the wrong
19    person before you admitted that to them?
20  **A.**  **No.**
21  **Q.**  No? Everything they told you came after?
22  **A.**  **Exactly.**
23  **Q.**  All right. I don't have any other questions, but is
24    there anything that you want to add at this point that
25    you think might help things at all?

DONALD 001125

**57**

1 A. I just wish that I had said something sooner.
2 Q. Okay. Is there any of the questions I asked you that
3   you feel I didn't give you a chance to explain your
4   answers or anything you want to add to any of those
5   answers?
6 A. The questions that you asked me why I didn't say, you
7   know, I was scared, I was nervous, and I guess I just
8   wanted it to be over with.
9 Q. The questions when I asked you why, why what?
10 A. Why I didn't say something to the officers or --
11 Q. Okay. We just about a five to ten-minute break.
12   Was there anything that you thought of during that
13   break that you wanted to bring up now about anything
14   we've talked about today?
15 A. No.
16     MR. WATSON: Okay. I don't have any other
17   questions. I think Mr. Vanes does.
18     C R O S S - E X A M I N A T I O N
19 BY MR. VANES:
20 Q. When Sergio first approached you in Indianapolis
21   several years back, what was your initial reaction
22   when he identified himself and told you the topic he
23   wanted to talk about? Was your reaction one of fear,
24   anger, relief, nervousness? And I'm not limiting the
25   choices to just those. You tell us, Rhonda. What was

**58**

1   your reaction when he popped up in your driveway and
2   said he wanted to talk about this?
3 A. I was -- actually, I had some relief that somebody was
4   showing up to do something because I had basically
5   been praying about this and I didn't know how to go
6   about reversing this and so I was glad that he was
7   there.
8 Q. Now, you said to Mr. Watson that at some point a few
9   years after the trial and the robbery and all of the
10   legal proceedings you began to get regrets about what
11   you had said or done in the course of the
12   investigation, correct?
13 A. Correct.
14 Q. What prompted the regrets?
15 A. I'm sorry?
16 Q. What prompted those regrets?
17 A. It was that, I guess, I felt guilty for not saying
18   anything and this man was going to jail and just
19   started thinking about family and all of that, you
20   know.
21 Q. Let me ask it this way: Did anyone put the idea of
22   regret in your head, did anyone come to you and
23   suggest that you should be concerned, you shouldn't have
24   said that?
25 A. No.

**59**

1 Q. You should be sorry for what you did, anyone of any
2   sort?
3 A. No.
4 Q. Was the regret entirely a product of your own
5   thinking?
6 A. It was my own thinking.
7 Q. Okay. Is this something that just popped up in the
8   last few years or does it go back into the '90s? Do
9   you remember when you started dwelling on it to some
10   extent with any sense of regret?
11 A. It would come and go. It was in the '90s and I would
12   forget, try to press it away, and then it would come
13   back again in the 2000s.
14 Q. So you lived with this a long time?
15 A. Correct.
16 Q. Okay. You teared up on occasions here during the
17   course of this deposition. How have you emotionally
18   dealt with this lingering sense of regret, what have
19   you done? For example, have you ever received
20   counseling regarding it?
21 A. I'm sorry?
22 Q. Have you ever received counseling regarding this?
23 A. Not regarding this, but just other issues.
24 Q. Such as? Without getting too personal, I guess, but I
25   guess I have to.

**60**

1 A. Well, emotionally, you know, I -- I don't know. I
2   just feel bad that I didn't say anything. I've got a
3   lot of guilt and shame, you know, and -- well, the end
4   result is I do have to take anti-depressants and
5   things like that.
6 Q. Now, someone from Project Innocence in general,
7   they're the ones that paid for your flight up here,
8   correct?
9 A. Correct.
10 Q. Okay. Did they give you the money to buy it yourself
11   or did they just book it and tell you what the flights
12   were?
13 A. They booked it.
14 Q. Yesterday I bought you and your mother some breakfast
15   when we met for the first time, correct?
16 A. Correct.
17 Q. Beyond those two things, has anyone else given you any
18   other money?
19 A. No.
20 Q. For time lost or anything --
21 A. No.
22 Q. -- at work? Okay. What do you do at Bic Graphics?
23 A. I'm a credit coordinator.
24 Q. What does that mean?
25 A. I deal with large accounts and customers who order

DONALD 001126

61

1    large dollar items and I have to look at their credit
2    to make sure that they have enough funds, they're not
3    going over their limit, and get the orders released so
4    the customers can receive it.
5    Q.   You're missing work at least today by being up here,
6         right?
7    A.   Right.
8    Q.   Is anyone compensating you for your time up here?
9    A.   No.
10   Q.   How are you dealing with that at work?
11   A.   I'm sorry?
12   Q.   How are you dealing with the missed time at work?
13   A.   I'm using my vacation.
14   Q.   Did you know from the neighborhood after this robbery
15        that there had been other robbery victims or other
16        people shot the same night that you were robbed, did
17        you learn that from any source?
18   A.   I learned that from the police officer.
19   Q.   Do you know which police officer told you that?  Let
20        me back up.
21             There would have been at least one police officer
22        at your house that night or early that morning taking
23        the initial information from you about what had
24        happened, correct?
25   A.   Yes.

62

1    Q.   And then you would have dealt with at least one other
2         police officer, Detective Outlaw, in the course of
3         photo books and/or physical line-ups, true?
4    A.   Correct.
5    Q.   Do you remember which officer would have told --
6         which of those two or any others that would have told
7         you, hey, other people got stuck up or shot too?
8    A.   I can't remember how I got that information other than
9         that.
10   Q.   Do you remember what Detective Outlaw may have said
11        about the man in the line-up other than the fact that
12        he was arrested across the street from you?  Did he
13        say anything else about that particular man that led
14        Outlaw to believe that was the person who robbed you?
15   A.   He just kind of indicated that that was him, the one I
16        picked out in the line-up.
17   Q.   Now, the room where you actually looked at these photo
18        books, how big was it compared to the room we're in
19        now, bigger or smaller?
20   A.   It's about this size, I guess.
21   Q.   About this size?
22   A.   Yes.
23   Q.   This conference room being --
24             MR. VANES:  Do you guys know what it is?
25             MS. O'HALLORAN:  Ten by fifteen, I'd guess.

63

1              MR. WATSON:  I'd say at least that, somewhere in
2         that neighborhood.
3    Q.   BY MR. VANES:  Approximately 10 by 15 feet?
4    A.   Yes.
5    Q.   At the time you were in there looking at books, your
6         mom was in there?
7    A.   Yes.
8    Q.   She's here with you today?
9    A.   Yes.
10   Q.   And there was a white woman in there who you pieced
11        together who you believe was a victim of the same
12        night's crimes?
13   A.   Correct.
14   Q.   Were any police officers in there monitoring all three
15        women continuously?
16   A.   I don't think so.
17   Q.   Did they leave you at least to some extent on your
18        own?
19   A.   Yes.
20   Q.   I assume they brought the books to you?
21   A.   Yes.
22   Q.   You didn't have to go fetch them and carry them into
23        the room?
24   A.   No.
25   Q.   Do you remember -- other than Outlaw, were any other

64

1         police officers involved in any fashion with books in
2         the room that's the size of this deposition room?
3    A.   There was a woman police officer, I believe.
4    Q.   Some female police officer was involved in some
5         fashion --
6    A.   Yeah.
7    Q.   -- in this process?
8    A.   Yes.
9    Q.   Okay.  Now, you told Mr. Watson that as far as you can
10        recall now what we're calling the physical line-up
11        where you're seeing not a picture but a person, that's
12        what we mean by a physical line-up, okay, that you
13        recall only seeing one person in that physical
14        line-up, correct?
15   A.   Yes.
16   Q.   You started to tell Mr. Watson, and you correct me if
17        I'm wrong, --
18   A.   Okay.
19   Q.   -- that it's possible that you only essentially
20        focused on that one person and there may have been
21        other people on it, but they didn't catch your
22        attention or you didn't pay attention to them or you
23        don't remember if they were even there; am I right?
24   A.   You're right.  I just know it was just him, it just
25        seemed like it was just him.  I don't remember looking

---

65

1    at anyone else.
2  **Q.**  Okay.  Because there are pictures that were
3    introduced, I think, at the trial showing Mr. Donald
4    in a line-up with about five other people.  Okay?  And
5    I guess what we need to know from you is:  Did you at
6    any point see a line-up with a total of about six
7    people and just not remember the other people or did
8    you see just one or are you not sure either way?
9  **A.**  **I think I just saw one.**
10  **Q.**  Okay.  Now, you had done some work looking through
11    some books and you fingered one of them and brought it
12    to the attention of the police, right?
13  **A.**  **Yes.**
14  **Q.**  And when you had done at least the initial pointing,
15    the other woman, did she get off her chair to come
16    over and look?
17  **A.**  **She leaned over.**
18  **Q.**  How far was she from you?
19  **A.**  **She sat right here (indicating).**
20  **Q.**  Okay.  There is a chair you're sitting in now.  Why
21    don't you adjust the other chair to how close the
22    other woman was?
23  **A.**  **(Witness indicating).**
24  **Q.**  Could you reach out and touch the other woman?
25  **A.**  **Yes.**

---

66

1  **Q.**  Did you actually see her lean over and look at what
2    you were pointing at?
3  **A.**  **Yes.**
4  **Q.**  And her reaction to that was what?
5  **A.**  **She started crying and she was nodding her head.**
6  **Q.**  Nodding her head up and down or sideways?
7  **A.**  **Like, you know, she was just looking and she just**
8    **started crying.**
9  **Q.**  Did she nod her head as a yes or did she nod her head
10    as a no?  When you say nod, you mean generally up and
11    down yes?
12  **A.**  **Up and down, yes, but she also was like -- she was not**
13    **sure as well.**
14  **Q.**  Okay.  What gave you that impression?
15  **A.**  **Because she was just like this (indicating).  I don't**
16    **know.  She was crying and I didn't look at her that**
17    **much, but she was crying.**
18  **Q.**  Did you sense she looked over or did you actually see
19    her lean over?
20  **A.**  **No, she leaned over.**
21  **Q.**  And you were pointing to one particular picture at
22    that time?
23  **A.**  **Yes.**
24  **Q.**  Now, I think you indicated that at some point after
25    the robbery you were returning home with a dog?

---

67

1  **A.**  **Yes.**
2  **Q.**  Was this meant to be a guard dog?
3  **A.**  **Yes.**
4  **Q.**  The dog was in the car and you pulled up to near your
5    house?
6  **A.**  **Yes.**
7  **Q.**  Do you remember how close it was to your house?
8  **A.**  **I only had to turn the corner and I would have been**
9    **maybe five or six houses down.**
10  **Q.**  When you saw this man, your immediate reaction was
11    that's the person who robbed me?
12  **A.**  **Yes.**
13  **Q.**  So you called the police so they could arrest the
14    person you saw on the corner?
15  **A.**  **Yes.**
16  **Q.**  From that point on, did you ever go back and live in
17    your house?
18  **A.**  **No.**
19  **Q.**  Where did you move to, your mom's?
20  **A.**  **Yes.**
21  **Q.**  From your mom's you moved to where?
22  **A.**  **Indianapolis.**
23  **Q.**  You were actually living in Indianapolis at the time
24    this case came up in court for a jury trial, right?
25  **A.**  **Yes.**

---

68

1          MR. VANES:  Do you have the exhibits?
2  **Q.**  BY MR. VANES:  I think Mr. Watson showed you these,
3    these are some notes.  Now, I know you don't -- or at
4    least you did not then know people by titles.  Okay?
5    But that document purports to be notes taken by
6    someone of a phone conversation with you just before
7    the trial that occurred in this case.  Let me start
8    here:  Do you remember having any phone conversations
9    with any officials of any kind before you came here
10    and actually testified at the trial?
11  **A.**  **No.**
12  **Q.**  Now, there is a phone number in here that purports to
13    be or it looks like it's your phone number.  It's an
14    area code 317 and above it is the word -- just above
15    it to the right is the word Indianapolis.  You said
16    you were living in Indianapolis at the time?
17  **A.**  **Yes.**
18  **Q.**  The area code for Indianapolis is, of course, 317,
19    right?
20  **A.**  **Yes.**
21  **Q.**  Going back 21 years here or so, do you remember was
22    that a phone number you had in Indianapolis at the
23    time, does that ring any bells now?
24  **A.**  **Not really.**
25  **Q.**  Okay.  Down toward the bottom of Page 1 of Exhibit 3,

---

DONALD 001128

## 69

1 I'll quote this: "Can't swear in court that the D" --
2 Delta, the Greek D -- "is the person" followed by
3 "face looks fuller in line-up (larger build) than
4 robber." As you looked at the line-up, is that
5 accurate that the person in the line-up had a larger
6 build and a bigger face?
7 **A. Yes.**
8 Q. But you don't remember saying that to anyone before
9 the trial?
10 **A. Right.**
11 Q. Okay. The business about can't swear in court that
12 the defendant is the person, is that a true reflection
13 of what your state of mind was at the time of the
14 trial? In other words, was that accurate that before
15 going to trial you could not swear that the person in
16 the line-up was the one who robbed you?
17 **A. Correct.**
18 Q. Okay. So both of the statements in that are true,
19 they're true now?
20 **A. Yes.**
21 Q. They were true back at the time of the trial, correct?
22 **A. Yes.**
23 Q. You don't remember actually saying that to anybody
24 though?
25 **A. No.**

## 70

1 Q. Do you even remember that phone conversation?
2 **A. I don't remember the phone conversation, but I do**
3 **remember telling Outlaw at the line-up that he's**
4 **bigger.**
5 Q. Let's go through this. Is it possible you said that
6 to someone, but it wasn't Outlaw, it was the person
7 who called you on the phone just before the trial? Is
8 it possible you said it to two separate people, do you
9 know?
10 **A. I don't know.**
11 Q. Okay. Now, you don't know -- you said you did not
12 know people by official titles at that point in time?
13 **A. Right.**
14 Q. Do you remember that actually it was a woman lawyer
15 who questioned you for the trial, does that ring any
16 bells?
17 **A. No.**
18 Q. One of the things we talked about yesterday was that
19 how important it was that at this stage you not say
20 something just to make me happy, you not say something
21 just to make the prosecutors here in this deposition
22 room happy, all we're looking for is a straight answer
23 regardless of who it helps and who it hurts, correct?
24 **A. Correct.**
25 Q. With that in mind, the person you saw in that line-up,

## 71

1 was that the person who robbed you, yes, no, or I'm
2 not sure?
3 **A. No.**
4 MR. WATSON: I'm sorry to interrupt, but which
5 line-up?
6 Q. BY MR. VANES: The in person meaning the physical
7 line-up where you were actually seeing a body?
8 **A. Right. It wasn't him. It was no.**
9 Q. Okay. Once again, keeping in mind we're not asking
10 you to please any of us here, just tell it as you see
11 it. The person you saw on the street, did that appear
12 to you to be the person who robbed you?
13 **A. Yes.**
14 MR. VANES: Nothing else.
15 MR. WATSON: That prompts just a few follow-ups.
16 R E D I R E C T   E X A M I N A T I O N
17 BY MR. WATSON:
18 Q. The Caucasian lady in the room with the photo books,
19 did she actually say that she wasn't sure or was it
20 the way she was acting?
21 **A. Just the way she was acting.**
22 Q. Did she say anything at all about it?
23 **A. No, not that I can remember.**
24 Q. When I say did she say anything at all about it, I
25 mean when looking at the photo did she express any of

## 72

1 her thoughts about what she was looking at that you
2 recall?
3 **A. I don't think so.**
4 Q. All right. Mr. Vanes asked you a few questions about
5 Detective Outlaw. You've testified already that it
6 was after viewing the in-person line-up you told him
7 that the person in the line-up was too big and he,
8 according to your testimony, said some things meant to
9 influence you to say, no, that is the guy. Is that
10 all correct?
11 **A. Yes.**
12 Q. And you said that it was at that time he made
13 reference to the fact that he was arrested across the
14 street and other facts that you believe were meant to
15 suggest to you that they had the right guy, correct?
16 **A. Yes.**
17 Q. Was there, besides that time right after the in-person
18 line-up, any other times that you spoke with Outlaw
19 along those lines? Was there any further conversation
20 between you and him where you suggested to him that
21 you didn't think the person in the in-person line-up
22 was the right person besides that day?
23 **A. I don't believe so.**
24 Q. And besides that day right after doing the in-person
25 line-up, was there any other times that you recall

DONALD 001129

---

73

1    where Outlaw tried to influence you to say that that
2    was the person?
3    A.  Somewhere closer to the trial, I believe.
4    Q.  Can you give me any specifics about that conversation?
5    A.  No.
6    Q.  Any other times besides that?
7    A.  I'm not sure.
8    Q.  Okay.  So to summarize that a little bit, you believe
9        that on two separate occasions the detective tried to
10       suggest to you that the person you picked out of the
11       line-up was, in fact, the right person?
12   A.  Correct.
13   Q.  And one of those was right after viewing the in-person
14       line-up and one of those, the other occasion, was
15       closer to trial?
16   A.  Correct.
17   Q.  Were there any other occasions that you recall by
18       Detective Outlaw or anybody else where people tried to
19       suggest to you that they had the right person?
20   A.  I can't remember that.
21   Q.  Was it ever like a threat by him or just him trying to
22       influence you?
23   A.  It wasn't a threat.  It was more that he was
24       influencing me.
25   Q.  A reassurance that, yes, we arrested the right person?

---

74

1    A.  Correct.
2    Q.  And based on what you're saying here today, is it fair
3        for me to say that you never indicated to any police
4        officer that they had the right person in that
5        in-person line-up?  Did you ever tell any police
6        officer the person in the in-person line-up is the
7        right guy?
8    A.  No.
9    Q.  You told Detective Outlaw this guy's not the right
10       body type, he's too big or something like that?
11   A.  Correct.
12   Q.  BY MS. O'HALLORAN:  Did you have anything happen in
13       your life after the trial?  Did you or a family member
14       have any dealings with law enforcement?
15   A.  No.  What do you mean?
16   Q.  Do you have children?
17   A.  Do I have children?
18   Q.  Yes.
19   A.  Yes, I do.
20   Q.  Did any of your children have involvements with law
21       enforcement after the trial, any arrests?
22   A.  They had a driving ticket.
23   Q.  Is that all?
24   A.  Yes.
25   Q.  Okay.  So no one in your family had any convictions or

---

75

1    arrests following the trial that you're aware of?
2    A.  Well, I was arrested once for a traffic ticket --
3        well, not a traffic ticket, but a $14 check that
4        bounced and I paid it, but the state had took it up,
5        so --
6    Q.  Okay.  Are you on any other medications?  You
7        mentioned medication for depression?
8    A.  No.  What does this have to do with the case?
9    Q.  I don't know because I don't know what you're on.
10   A.  Oh, yes, I don't.
11   Q.  Are you still on medications for depression?
12   A.  Yes, I am.
13   Q.  Do you have any other diagnoses other than depression?
14   A.  Fibromyalgia.
15           MS. O'HALLORAN:  Okay.
16           R E C R O S S - E X A M I N A T I O N
17   BY MR. VANES:
18   Q.  Mr. Watson was asking about Detective Outlaw --
19       Detective Outlaw's attempts to reassure you that they
20       had arrested the right person.  You recall that,
21       right?
22   A.  Yes.
23   Q.  Did you buy into or accept or tend to believe
24       Detective Outlaw's reassurances?
25   A.  I believed him.

---

76

1    Q.  You believed him.
2           MR. VANES:  Okay.  Nothing else.  The court
3        reporter is going to type this up.  Under the rules
4        you would have the opportunity to actually review it
5        to make sure that it's been taken down and is typed up
6        as you said it here today.  Okay?  It might be a
7        logistic nightmare doing that.  If you were to insist
8        on it -- how would it be done, mail it down there?
9           COURT REPORTER:  Typically she would come to our
10       office in Munster, but being out of town if her
11       attorney ordered a copy of the transcript, they could
12       get it to her.
13          MR. VANES:  Okay.  We'd have to mail it down and
14       you'd have to proofread it and make sure that it got
15       recorded correctly here today.  Most people don't do
16       that, most people say file it with the court once it's
17       typed up, but it's your choice.  It's called waiving
18       signature.  She can file it directly without your
19       signature, you can waive it, or we can hold it and
20       have you review it.  It's your choice.
21          THE DEPONENT:  Okay.  Do I have to say that now?
22          MR. VANES:  Yes, if you would.  If you would let
23       us know how to proceed because we need to know how to
24       proceed.
25          THE DEPONENT:  I would like to sign it, I guess.

---

DONALD 001130

77

```
1        MR. VANES:  Okay.  You'll have to get it to me
2   and I'll do some sort of Fed Ex magic and get it down
3   to her for review.
4
5            FURTHER DEPONENT SAITH NOT
6            * * * * * * * * * * * *
7
8        I, RHONDA FLEMING, do hereby state that I have
    read the foregoing transcript of the testimony given
9   by me at my deposition on the 28th day of May, 2013,
    and that said transcript is a true and correct record
10  of the testimony given by me at said deposition,
    except as may be indicated on the errata sheets, if
11  any, attached hereto.
12  ERRATA SHEET(S) ATTACHED:  _____ YES  _____ NO
13       _____
         RHONDA FLEMING
14
    SUBSCRIBED AND SWORN
15  before me this _____ day
    of _____, 2013.
16
    _____
17    Notary Public
18  My county of residence:
19  My commission expires:
20
21
22
23
24
25
```

78

```
1            C E R T I F I C A T E
2        I, MELISSA A. HILL, CSR and Notary Public for the
    State of Indiana, do hereby certify that there
3   appeared before me deponent, RHONDA FLEMING, at the
    office of the Lake County Prosecutor's Office, 2293
4   North Main Street, Crown Point, Indiana, on the 28th
    day of May, 2013, who was thereupon first duly sworn
5   by me to testify the truth and nothing but the truth
    in response to questions propounded to said deponent
6   at the taking of the foregoing deposition relating to
    the above-captioned cause now pending and undetermined
7   in said court.
8        I further certify that I then and there reported
    in machine shorthand the testimony so given at said
9   time and place, and that the testimony was then
    reduced to typewriting from my original shorthand
10  notes, and that the foregoing typewritten transcript
    is a true and accurate record of said testimony given
11  by said deponent at said time and place.
12       I further certify that I am not related by blood
    or marriage to any of the parties to said suit, nor am
13  I an employee or any of the parties or of their
    attorneys or agents, nor am I interested in any way,
14  financially or otherwise in the outcome of said
    litigation.
15
         I further certify that signature was reserved.
16
         Dated at Crown Point, Indiana, this 12th day of
17  June, 2013.
18
19       _____
         MELISSA A. HILL, CSR, Notary Public
20       ILLINOIS CSR NO. 084-004440
    My commission expires:
21  10/6/2014
22
23
24
25
```

DONALD 001131

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 38

# Plaintiff's Summary Judgment Response

STATE OF INDIANA    )
                     ) ss:
COUNTY OF LAKE    )

SUPERIOR COURT OF LAKE COUNTY
CRIMINAL DIVISION
CASE  45G01-9203-CF-00065

WILLIE T DONALD,         )
                         )
         Petitioner,    )
                         )
     v.                   )
                         )
STATE OF INDIANA,      )
                         )
         Respondent.   )
                         )

**RECEIVED**

JAN 2 8 2016

CLERK LAKE SUPERIOR COURT

## ORDER

01-27-16    The State of Indiana by Chief Deputy Prosecuting Attorney Barbara McConnell, files a motion to dismiss for the following reasons: The State of Indiana has insufficient evidence to prove the charges beyond a reasonable doubt. Motion to dismiss is granted. The Court setting of January 28, 2016 is vacated. The defendant is ordered released from custody *instanter*. The defendant is not to be returned to the Department of Correction. The clerk is directed to notify the defendant, Attorney Thomas Vanes and the Sheriff.

SO ORDERED: Salvador Vasquez, Judge. (jd/27)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 39

# Plaintiff's Summary Judgment Response

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

WILLIE T. DONALD,       )
    Plaintiff,       )
                )
                )
    v.       )      Case No. 2:17-cv-00032-JVB-PRC
                )
BRUCE OUTLAW, CARLA K. PYLE,       )
as special Administrator of the ESTATE       )
OF JOHN E. JELKS, JR., CITY OF       )
KAREN HOWELL and THOM HOWELL,  )
                )
    Defendants.       )

## DEFENDANT, BRUCE OUTLAW'S SUPPLEMENTAL ANSWERS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, Bruce Outlaw, by counsel, Ricardo A. Hall, and Kopka Pinkus Dolin PC and for

his Answers to Plaintiff's First Set of Interrogatories states as follows:

    3.    Please identify all Complaints that have ever been made against any of the Individual Defendants relating to their roles as law enforcement officials, including but not limited to any and all internal affairs, intra- or inter- departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive, or torturous methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, use of unduly suggestive visual or voice identification procedures, and lawsuits or administrative complaints filed in state or federal courts or agencies alleging police or prosecutorial misconduct. For each Complaint, please state: (a) the date of the Complaint; (b) a detailed description of the nature of the Complaint; (c) an identifying number of the Complaint; and (d) how the Complaint was resolved, including any discipline imposed in connection with the Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**Response:**    **In addition to "complaints" referenced in correspondence from counsel for plaintiff dated September 29, 2017, and matters reflected in Bruce Outlaw's supplemental discovery response served on September 20, 2018, defendant Outlaw would state that he was required to present before the Accident Review Board in connection with an automobile accident at some point in the 1990s. Moreover, defendant Outlaw states that he was required to reimburse the Gary Police Department for a shot gun that was stolen from his vehicle in the 1990s. Furthermore, defendant Outlaw states that he was at some point in the 1990s reprimanded for not wearing a hat outdoors.**

5.    Please state whether any of the Individual Defendants or any other agent, Investigator, and/or employee of the City of Gary involved in the Glen Park Robberies Investigation acted inconsistently with any of the policies, customs, or practices of the Gary Police Department at any time during the investigation or subsequent prosecution of Plaintiff for those crimes. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to your knowledge was violated; (b) describe the circumstances and manner in which said policy custom, or practice was violated; and (c) state whether any discipline resulted from that violation.

**Response:    Defendant Outlaw further states that he did not act inconsistently with any of the policies, customs, or practices of the Gary Police Department at any time during the investigation and prosecution of the crimes for which plaintiff was convicted.**

6.    Do you contend that Willie T. Donald perpetrated any of the Glen Park Robberies? If so, please provide the complete factual basis for your contention, including but not limited to a description of what, if any, physical evidence exists or ever existed connecting Mr. Donald to any of the crimes.

**Response:    Defendant Outlaw states that to the best of his recollection probable cause existed to arrest plaintiff for the subject crimes committed in 1992; and further that proper and sufficient evidence was presented at trial to support the jury's verdict. The facts and circumstances upon which defendant Outlaw's contention rests are contained in documents and materials which are already within plaintiff's possession, or which are equally accessible, including a transcript of trial proceedings in 1992.**

9.    If the answer to any of your responses to Plaintiff's First Set of Requests for Admission to All Defendants is anything other than an unqualified "Admit", please describe the complete factual basis for your position, and state with specificity every witness and/or piece of evidence (including Documents) that supports your position.

**Response:    Defendant Outlaw would refer plaintiff to information provided in defendant's supplemental answer to plaintiff's Interrogatory #6 hereinabove. Moreover, while defendant Outlaw recalls that John Jelks, deceased, would have arranged for an investigation and spoken with one or more representatives of the Goldblatts store where plaintiff reportedly worked at the time in question, defendant Outlaw does not recall any specific discussion with Officer Jelks, and Jelks would have been expected to put any information from said investigation into a written report to be incorporated into the records of the Gary Police Department.**

14.     Under oath, please identify every Communication that you had with any Person, including but not limited to Plaintiff and any of the Individual Defendants, Investigators, or employees of the City of Gary, about any of the allegations, events, or circumstances described in Plaintiff's Complaint, including but not limited to the Glen Park Robberies Investigation. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when and with whom the Communications occurred; and (c) provide the date of the Communication. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your Communications responsive to this Interrogatory is contained in the Documents that you reference. This Interrogatory includes Communications that were not memorialized in a police report

**Response:**     **Defendant Outlaw states that he does not recall any communication with the plaintiff, particularly after plaintiff would have been informed about his *Miranda* rights. Defendant Outlaw generally recalls that he would have talked with the following officers of the Gary Police Department about his investigation and case file associated with the subject crimes: Lt. Charlie Mitchell, Commander John Robbie, Joseph Starks, deceased, Lt. Lewis Thompson, and Clarence Hightower.**

15.     Please state with specificity each activity and investigative task that you participated in during the Glen Park Robberies Investigation. For each activity and task, please describe the Person who assigned you each task and the Person to whom you reported for each task. Please note that the scope of this Interrogatory includes all activity to investigate the Glen Park Robberies up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Glen Park Robberies Investigation is described in the Documents that you reference.

**Response:**     **Defendant Outlaw states that he conducted and assisted officers with interviews, as well as the identification process; participated in lineup procedures; and solicited information about the subject crimes from the public through media sources.**

17.     For punitive damages purposes, please estimate your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities.

Please also provide an income statement for the five years prior to the filing of this complaint, including your annual salary and any income from any other source for those years.

**Response:**     **In addition to his previous response to this Interrogatory, defendant Outlaw states that he is willing to table the discussion relative to punitive damages.**

## **VERIFICATION**

I, Bruce Outlaw, state that I am above the age of majority, have personal knowledge of and am competent to testify to the above mattes, and that these are true subject to the penalties of perjury.

_(signature)_

Bruce Outlaw

Respectfully submitted,

By:  _(signature)_

Ricardo A. Hall (#19103-53)
Attorney for the Defendant, Bruce Outlaw

KOPKA PINKUS DOLIN PC
9801 Connecticut Drive
Crown Point, IN 46307-1000
Telephone: (219) 794-1888
Facsimile: (219) 794-1892

## Certificate of Service

I hereby certify that on the _2nd_ day of _November_, 2018, service of a true and complete copy of the attached pleadings and papers was made upon all counsel of record by depositing same in the United States mail with sufficient first class postage affixed.

Scott Drury/D. Samuel Heppell
John Loevy/Arthur Loevy
Elizabeth C. Wang
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
sam@loevy.com

Tony Walker
The Walker Law Group PC
363 S. Lake Street
Gary, IN 46403
tony@walkerlawgroup.biz

Michael E. Tolbert
Shelice R. Tolbert
Candace C. Williams
Tolbert & Tolbert LLC
1085 Broadway, Ste. B
Gary, IN 46402
Mtolbert@tolbertlegal.com
Stolbert@tolbertlegal.com
cwilliams@tolbertlegal.com

Ricardo A. Hall

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIE T. DONALD, | ) | |
| | ) | No. 2:17-CV-00032-TLS |
| Plaintiff, | ) | |
| | ) | Judge Theresa L. Springmann |
| v. | ) | |
| | ) | |
| BRUCE OUTLAW, CARLA K. PYLE, as | ) | |
| special administrator of the ESTATE OF | ) | |
| JOHN E. JELKS, JR., CITY OF GARY, | ) | JURY TRIAL DEMANDED |
| and other as-yet unknown employees | ) | |
| of the City of Gary, | ) | |
| | ) | |
| Defendants. | ) | |

# Exhibit 40

## Plaintiff's Summary Judgment Response

UUSSDDCCNNWWDDccaassee221177ccvv00000033224HILSS ddooccuummeenntt338033399 fifilleedd0206/0077/2222 ppaaggee6923ooff2449400

# City of Gary Police Department

1301 BROADWAY

GARY, INDIANA 46407-1385

PHONE (219) 881-1201

THOMAS V. BARNES
*MAYOR*

RICHARD J. COMER
*DEPUTY MAYOR*

DAVID WADE
*CHIEF OF POLICE*

GEORGE W. WOODS
*DEPUTY CHIEF*



### "MANUAL OF PROCEDURES FOREWORD"

The following General Orders have been revised, updated and placed in effect for the government, discipline, administration and disposition of the Gary Police Department members. This manual contains an integral part of the administrative process.

It is recognized that this Manual of Procedures cannot hope to prescribe the specific action to be taken in each situation encountered by individual police officers nor is this its intent. Its primary purpose is to serve as a guide to all members of this department. Any violation of these General Orders shall be made the subject of disciplinary actions against all members responsible for such violation as may be directed by the Chief and Deputy Chief and subordinate commanders.

Periodic orders and directives of the Chief and other superior officers will provide an ongoing supplementary guide to meet changing conditions. Suggestions from all members of the Department are welcomed and encouraged.

All members must regard themselves as part of a team dedicated to the safety and protection of the community. Loyalty, courage, integrity and dedication are all qualities expected of a professional police officer. Professionalism demands that service to the community always be paramount in our attitudes and actions. Personal feelings must be sublimated for the good of the community.

Commanding officers must realize that their capacity and character are accurately reflected by the work of their subordinates. They must also be aware that courtesy between superior and subordinates promotes discipline, efficiency and mutual respect.

The success of a police force, in the performance of its duties, is largely measured by the degree of support and cooperation it receives from the people of the community which it serves. It is of paramount importance to secure the confidence and respect of the public. The cultivation of such desirable attitudes is dependant upon proper performance of duty by all members of the department.

*PUBLIC OFFICE MEANS — PUBLIC SERVICE*

Exhibit
Wade
#1
Date: 12-3-19

**EXHIBIT 18**

TABLE OF ORGANIZATION

OFFICE OF THE CHIEF OF POLICE AND DEPUTY CHIEF OF POLICE

A.    Legal Advisor

B.    Supervisor of Operations

C.    Police Community Relations Office

D.    Internal Affairs Division

E.    Administrative Unit

F.    Criminal Justice Planning and Research

G.    Religious Counseling Services

BUREAU OF UNIFORM SERVICES

A.    Patrol Division

      1.   Supervisors of Patrol

B.    Traffic/Tactical Division

C.    Aviation Unit

D.    Marine Patrol Unit

E.    Auxiliary Police Section

F.    Motor Transport Division

000002

EXHIBIT 18

USDC IN/ND case 2:17-cv-00033-PPS document 303-9 filed 05/06/22 page 695 of 940

TABLE OF CONTENTS

GENERAL ORDER  01-92
USE OF DEADLY FORCE AND HANDLING OF FIREARMS . . . . . . .  11

    GENERAL ORDER 01.1-92
    AUTHORIZED FIREARMS & AMMUNITION . . . . . . . . . . .  12

    GENERAL ORDER 01.2-92
    FAILURE TO QUALIFY WITH DEPARTMENTAL WEAPON . . . . .  14

    GENERAL ORDER 01.3-92
    POLICY ON POSSESSION OF GUNS BY CIVILIAN EMPLOYEES . .  15

    GENERAL ORDER 01.4-92
    REMOVAL OF FIREARMS FROM INTOXICATED MEMBER . . . . .  16

    GENERAL ORDER 01.5-92
    AUTHORIZED SHOTGUN AND AMMUNITION . . . . . . . . . . .  16A

    GENERAL ORDER 01.6-92
    FIREARMS REVIEW BOARD . . . . . . . . . . . . . . .  16C

GENERAL ORDER 02-92

PROCEDURES FOR PROCESSING SUBPOENAS . . . . . . . . . . .  17

    GENERAL ORDER 02.1-92
    MEMBERS TO APPEAR IN COURT 12 MIDNIGHT TO 8 A.M. TOUR OF DUTY
    . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    GENERAL ORDER  02.2-92
    DRESS CODE FOR COURT APPEARANCES . . . . . . . . . .  20

GENERAL ORDER 03-92
RELIGIOUS COUNSELING SERVICE . . . . . . . . . . . . . . .  21

GENERAL ORDERS 04-92
SUGGESTIONS OR GRIEVANCES . . . . . . . . . . . . . . . .  22

GENERAL ORDERS 05-92
NEWS RELEASES . . . . . . . . . . . . . . . . . . . . . .  23

GENERAL ORDER 06-92
ASSIGNMENT OF MARKED AND UNMARKED DEPARTMENT VEHICLES . . .  24

GENERAL ORDER 07-92
SEARCH WARRANTS . . . . . . . . . . . . . . . . . . . . .  25

**EXHIBIT 18**

Gary Police Department — Organization Chart

**EXHIBIT 18**

USDC ND/OH case 2:17-cv-00032-HLSS document 380339 filed 02/06/07/22 page 6 of 940

TABLE OF ORGANIZATION
Continued


BUREAU OF INVESTIGATIVE SERVICES

A.   Detective Division

   1.   Victim Assistance
   2.   Project Outreach

B.   Public Morals Division

C.   Juvenile Aid Division

D.   Auto Detail Division


BUREAU OF SUPPORTIVE SERVICES

A.   Front Desk

B.   Training Division

C.   Identification Section

D.   Records Section

E.   Correctional Service Section

F.   Property Clerk Unit

G.   Building Maintenance

H.   Communications Division

   1.   Computer Information Services
   2.   Warrants

EXHIBIT 18

## TABLE OF CONTENTS

GENERAL ORDER  01-92
USE OF DEADLY FORCE AND HANDLING OF FIREARMS  . . . . . . .  11

    GENERAL ORDER 01.1-92
    AUTHORIZED FIREARMS & AMMUNITION . . . . . . . . . . .  12

    GENERAL ORDER 01.2-92
    FAILURE TO QUALIFY WITH DEPARTMENTAL WEAPON  . . . . .  14

    GENERAL ORDER 01.3-92
    POLICY ON POSSESSION OF GUNS BY CIVILIAN EMPLOYEES . .  15

    GENERAL ORDER 01.4-92
    REMOVAL OF FIREARMS FROM INTOXICATED MEMBER  . . . . .  16

GENERAL ORDER 02-92
PROCEDURES FOR PROCESSING SUBPOENAS . . . . . . . . . . .  17

    GENERAL ORDER 02.1-92
    MEMBERS TO APPEAR IN COURT 12 MIDNIGHT TO 8 A.M. TOUR OF DUTY
    . . . . . . . . . . . . . . . . . . . . . . .  19
    GENERAL ORDER  02.2-92
    DRESS CODE FOR COURT APPEARANCES . . . . . . . . . . .  20

GENERAL ORDER 03-92
RELIGIOUS COUNSELING SERVICE . . . . . . . . . . .  21

GENERAL ORDERS 04-92
SUGGESTIONS OR GRIEVANCES . . . . . . . . . . . . . . .  22

GENERAL ORDERS 05-92
NEWS RELEASES . . . . . . . . . . . . . . . . .  23

GENERAL ORDER 06-92
ASSIGNMENT OF MARKED AND UNMARKED DEPARTMENT VEHICLES . . .  24

GENERAL ORDER 07-92
SEARCH WARRANTS . . . . . . . . . . . . . . . . . . .  25

    GENERAL ORDER 07.1-92
    PROCEDURES FOR SEARCH WARRANTS . . . . . . . . . . . .  26

GENERAL ORDER 08-92
SICK LEAVE POLICY . . . . . . . . . . . . . . . . . . .  35

    GENERAL ORDER 08.1-92
    VACATION SCHEDULES . . . . . . . . . . . . . . . . . .  39

**EXHIBIT 18**

GENERAL ORDER 08.2-92
DEATH IN FAMILY LEAVE . . . . . . . . . . . . . . . .     40

GENERAL ORDER 08.3-92
MATERNITY LEAVE . . . . . . . . . . . . . . . . . . .     41

GENERAL ORDER 08.4-92
MEDICAL POLICY
SKIN DISORDER/FACIAL BEARDS . . . . . . . . . . . .     43

GENERAL ORDER 08.5-92
ON THE JOB INJURIES . . . . . . . . . . . . . . . .     44

GENERAL ORDER 08.6-92
DUE DAY PROCEDURE . . . . . . . . . . . . . . . . .     45


GENERAL ORDER 09-92
TO SAFEGUARD EVIDENCE AND DETAIN WITNESSES FOR
CRIME SCENE PROCEDURE . . . . . . . . . . . . . . . .     47

GENERAL ORDER 09.1-92
PROCEDURE FOR EVIDENCE/PROPERTY . . . . . . . . . .     49


GENERAL ORDER 10-92
COMMAND DISCIPLINE . . . . . . . . . . . . . . . . .     51


GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE RELATIVE TO
ALL POLICE VEHICLES . . . . . . . . . . . . . . . . .     57


GENERAL ORDER 12-92
FAIR LABOR STANDARDS ACT . . . . . . . . . . . . . .     65

GENERAL ORDER 12.1-92
SWORN PERSONNEL TIME SHEET . . . . . . . . . . . .     67

GENERAL ORDER 12.2-92
OVERTIME . . . . . . . . . . . . . . . . . . . . .     68

GENERAL ORDER 12.3-92
OVERTIME . . . . . . . . . . . . . . . . . . . . .     69

GENERAL ORDER 12.4-92
OVERTIME GUIDELINES . . . . . . . . . . . . . . . .     70

GENERAL ORDER 12.5-92
SUSPENSION OF OVERTIME PRIVILEGES . . . . . . . . . .     72

EXHIBIT 18

GENERAL ORDER 13-92
WATCH COMMANDER'S DUTIES AND RESPONSIBILITIES . . . . . . .    73

GENERAL ORDER 14-92
PROPOSED PLAN FOR POLICE PROTECTION FOR THE CITY OF GARY IN THE
EVENT OF A JOB ACTION BY SWORN PERSONNEL OF DEPARTMENT  . .    76

GENERAL ORDER 15-92
ACCIDENT REVIEW BOARD . . . . . . . . . . . . . . . .    80

GENERAL ORDER 16-92
PROCEDURE — LOST OR STOLEN LICENSE PLATES . . . . . . . .    82

GENERAL ORDER 17-92
COMMUNICATIONS ROOM PROCEDURES  . . . . . . . . . . . .    83

      GENERAL ORDER 17.1-92
      COMMUNICATIONS PROCEDURE
      FIELD OFFICER/RADIO DISPATCHER . . . . . . . . . . .    87

      GENERAL ORDER 17.2-92
      DETAIL ASSIGNMENT — COMMUNICATIONS . . . . . . . . .    89

      GENERAL ORDER 17.3-92
      IDACS — WANTED FILES VALIDATION PROCEDURES . . . . . .    90

GENERAL ORDER 18-92
TELE-SERVICE TECHNICIAN . . . . . . . . . . . . . . .    92

GENERAL ORDER 19-92
EFFECTIVE DATA QUALITY CONTROL  . . . . . . . . . . . .    94

      GENERAL ORDER 19.1-92
      DATA ENTRY PROCEDURES FOR ARRESTED INDIVIDUALS . . . .    95

      GENERAL ORDER  19.2-92
      DATA ENTRY PROCEDURES FOR ARRESTED JUVENILES . . . . .    96

GENERAL ORDER 20-92
BONDSMAN PROCEDURES . . . . . . . . . . . . . . . . .    97

GENERAL ORDER 21-92
GARY POLICE LEGAL ADVISOR . . . . . . . . . . . . . . .    98

000008

**EXHIBIT 18**

GENERAL ORDER 22-92
LOSS OF DEPARTMENT ISSUED EQUIPMENT . . . . . . . . . . . 101

GENERAL ORDER 23-92
THE CITY OF GARY'S
DRUG-FREE WORKPLACE POLICY . . . . . . . . . . . . . . 102

    GENERAL ORDER 23.1-92
    DRUG SCREENING OF PROBATIONARY OFFICERS. . . . . . . 112

GENERAL ORDER 24-92
DOMESTIC VIOLENCE POLICY. . . . . . . . . . . . . . . 113

GENERAL ORDER 25-92
FINGERPRINTING AND PHOTOGRAPHING . . . . . . . . . . . 117

GENERAL ORDER 26-92
CONFISCATED MOTOR VEHICLES . . . . . . . . . . . . . . 119

GENERAL ORDER 27-92
RIDING IN SQUAD CARS . . . . . . . . . . . . . . . . 122

GENERAL ORDER 28-92
MOTOR TRANSPORT DIVISION . . . . . . . . . . . . . . 123

    GENERAL ORDER 28.1-92
    MOTOR TRANSPORT'S RULES AND REGULATIONS . . . . . . . 124

GENERAL ORDER 29-92
POLICE DEPARTMENTAL RECOGNITION . . . . . . . . . . . 128

GENERAL ORDER 30-92
REGULATIONS FOR UNIFORM DRESS FOR SWORN PERSONNEL . . . . . 130

    GENERAL ORDER 30.1-92
    DRESS CODE - GROOMING . . . . . . . . . . . . . 139

    GENERAL ORDER 30.2-92
    DRESS CODE - PLAIN CLOTHES . . . . . . . . . . . 144

**EXHIBIT 18**

GENERAL ORDER 31-92
ESTABLISHMENT OF THE BUREAU OF UNIFORM SERVICES . . . . . .    147

    GENERAL ORDER 31.1-92
    DUTIES/SUPERVISOR PATROL BUREAU OF UNIFORM SERVICES  .    148

    GENERAL ORDER 31.2-92
    DEPLOYMENT OF PERSONNEL  . . . . . . . . . . . . . . .    151

    GENERAL ORDER 31.3-92
    MARINE PATROL UNIT . . . . . . . . . . . . . . . . . .    153

    GENERAL ORDER 31.4-92
    AUXILIARY POLICE SECTION . . . . . . . . . . . . . .    156

GENERAL ORDER 32-92
PLAINCLOTHES OFFICER IDENTIFICATION . . . . . . . . . . .    156

GENERAL ORDER 33-92
ESTABLISHMENT OF THE PUBLIC MORALS DIVISION . . . . . . .    157

GENERAL ORDER 34-92
INFORMANTS IN UNDERCOVER OPERATIONS . . . . . . . . . . .    158

GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING  . . . . . . . . . . . .    162

GENERAL ORDER 36-92
DUTIES AND RESPONSIBILITIES OF THE COMMANDING OFFICER OF
THE TECHNICAL SERVICE DIVISION  . . . . . . . . . . . . .    168

GENERAL ORDER 37-92
TRANSPORTATION FOR PSYCHIATRIC PATIENTS . . . . . . . . .    170

    GENERAL ORDER 37.1-92
    TRANSPORTATION FOR PSYCHIATRIC PATIENTS BY
    GARY FIRE DEPARTMENT ESCORTED BY GARY POLICE DEPARTMENT    171

GENERAL ORDER 38-92
CORRECTIONAL SERVICES SECTION . . . . . . . . . . . . . .    174

    GENERAL ORDER 38.1-92
    CODE OF ETHICS - CORRECTION SERVICE PERSONNEL  . . . .    180

000010

**EXHIBIT 18**

GENERAL ORDER 38.2-92
RULES AND PROCEDURES FOR CORRECTIONAL OFFICERS
(WARDENS AND MATRONS) . . . . . . . . . . . . . . . 182

GENERAL ORDER 38.3-92
DUTIES OF CORRECTION OFFICER UNUSUAL OCCURRENCE . . . 184

GENERAL ORDER 38.4-92
WARDENS PHOTOGRAPHING AND FINGERPRINTING OF PRISONERS 186

GENERAL ORDER 38.5-92
VISITING CLERGYMEN - CORRECTION FACILITY . . . . . . . 187

GENERAL ORDER 38.6-92
CORRECTIONAL SERVICES SECTION . . . . . . . . . . . 189

GENERAL ORDER 38.7-92
JAIL STANDARD OPERATING PROCEDURES . . . . . . . . . 190

GENERAL ORDER 39-92
DISPOSAL OF NARCOTIC RELATED PROPERTY/CONTRABAND, FIREWORKS AND
ETC. . . . . . . . . . . . . . . . . . . . . . . . 192

GENERAL ORDER 40-92
BOOKING OF PRISONERS BY ARRESTING OFFICERS . . . . . . . 195

GENERAL ORDER 40.1-92
BOOKING PROCEDURES . . . . . . . . . . . . . . . . 197

GENERAL ORDER 41-92
PROCEDURE FOR EVIDENCE/PROPERTY . . . . . . . . . . 198

GENERAL ORDER 42-92
VEHICLE INSPECTIONS . . . . . . . . . . . . . . . . 200

GENERAL ORDER 42.1-92
VEHICLE INSPECTION DESIGNATION . . . . . . . . . . 201

GENERAL ORDER 42.2-92
MOTOR VEHICLE INSPECTION . . . . . . . . . . . . . 202

GENERAL ORDER 42.3-92
POLICE INSPECTION FOR OUT OF STATE VEHICLES, NEW RESIDENT
. . . . . . . . . . . . . . . . . . . . . . . . . 203

**EXHIBIT 18**

GENERAL ORDER 43-92
PROCEDURES FOR EMERGENCY INCIDENTS . . . . . . . . . . . .   204

    GENERAL ORDER 43.1-92
    AIRCRAFT DISASTERS . . . . . . . . . . . . . . . . .   205

    GENERAL ORDER 43.2-92
    TRAIN DISASTERS  . . . . . . . . . . . . . . . . . .   207

    GENERAL ORDER 43.3-92
    BUILDING COLLAPSE. . . . . . . . . . . . . . . . . .   208

    GENERAL ORDER 43.4-92
    FIRE . . . . . . . . . . . . . . . . . . . . . . . .   211

    GENERAL ORDER 43.5-92
    BOMB THREATS/EXPLOSIONS  . . . . . . . . . . . . . .   213

    GENERAL ORDER 43.6-92
    DANGEROUS CONDITIONS . . . . . . . . . . . . . . . .   217

    GENERAL ORDER 43.7-92
    GAS LEAKS  . . . . . . . . . . . . . . . . . . . . .   219

    GENERAL ORDER  43.8-92
    DAMAGED LIVE WIRES . . . . . . . . . . . . . . . . .   221

    GENERAL ORDER 43.9-92
    WATER LEAKS  . . . . . . . . . . . . . . . . . . . .   223

    GENERAL ORDER 43.10-92
    RADIOACTIVE/HAZARDOUS MATERIALS INCIDENTS  . . . . .   225

    GENERAL ORDER 43.11-92
    OPERATIONAL PROCEDURES/RADIATION INCIDENTS . . . . .   227

    GENERAL ORDER 43.12-92
    TABLE OF ISOLATION AND EVACUATION DISTANCES  . . . .   229

GENERAL ORDER 44-92
CANINE PATROL . . . . . . . . . . . . . . . . . . . . . . .   231

GENERAL ORDER 45-92
SEXUAL HARASSMENT . . . . . . . . . . . . . . . . . . . . .   238

GENERAL ORDER 46-92
STRIP SEARCHES  . . . . . . . . . . . . . . . . . . . . . .   241

**EXHIBIT 18**

GENERAL ORDER  01-92
USE OF DEADLY FORCE AND HANDLING OF FIREARMS


I.   PURPOSE

The purpose of this order is to provide Gary Police Department officers with departmental policy concerning the use of deadly force and the handling of firearms.

II.  LEGAL REFERENCE

INDIANA CODE SECTION 35-41-3-3-(b) (As modified by this
                                    policy)

DEFINITIONS

"Deadly force" means force that creates a substantial risk for use by the Gary Police Department.

"Firearm" shall mean any handgun, shotgun, or rifle authorized for use by the Gary Police Department.

III. POLICY ON THE USE OF FIREARMS

A.   It is crucial that Gary Police Department officers exhaust all reasonable means before resorting to the use of a firearm. Deadly force shall be considered as a last resort rather than an alternative. Deadly force shall never be used on mere suspicion. The safety of citizens and fellow officers shall always be a consideration in any decision to use a firearm.

B.   Use of Reasonable Force and Deadly Force.

1.   Officers are justified in using reasonable force if he reasonably believe that force is necessary to effect a lawful arrest.

2.   An officer is justified to using Deadly Force:

a.   To prevent serious bodily injury to himself or a third person or the commission of a forcible felony.

b.   An officer may use Deadly Force to prevent the escape of a Felon only where:

000013

**EXHIBIT 18**

The officer has probable cause to believe that
the suspect poses a threat of serious physical
harm either to the officer or others.

C. Prohibited use and handling of firearms by officers.

1. Officers are prohibited from firing warning shots.

2. Officers shall not fire into crowds.

3. Generally officers are prohibited from firing
through doors, windows, openings or into buildings,
unless the person is clearly visible.

4. Discharging a firearm from or at a moving vehicle
is prohibited unless the occupants of the other
vehicle are using deadly physical force against the
officers or another by means other than the
vehicle.

5. Officers shall not fire in areas heavily populated
by citizens on foot or in vehicles, except to
prevent death or serious injury to the officer or
other person(s).

6. Officers shall not draw, flaunt, or otherwise
display a firearm except in strict compliance with
the line of duty and departmental policy.

7. Drawing and display of firearms:  The policy of
this Department permits the drawing of firearms
when an officer, in the exercises of sound
judgement, has reason to fear for his own personal
safety and/or the safety of others (this includes,
but is not limited to, the search of a building.)

D. All officers upon discharging his/her firearms
shall submit a written report to his/her immediate
supervisor and immediately request the radio
dispatcher to notify the Turn Commander and a
member of Inspectional Services Division. Delay in
the required notification shall be allowed only to
render first aid, to effect an arrest or to prevent
the escape of a felon; to protect a crime scene or
when the officer himself is incapacitated.  The
immediate supervising officer of the member who
discharges a weapon shall see that foregoing rule
is complied with.

5

**EXHIBIT 18**

B. SECOND WEAPONS

1. Officers wishing to carry a second gun may do so providing they carry as their primary gun a departmental weapon which is the standard weapon carried by Departmental Personnel with the required rounds of ammunition.

2. Shotguns, rifles and automatic rifles are prohibited except for special units with prior approval of the Chief or Deputy Chief of Police.

3. All handguns, department's and privately owned shall be registered with the Training Division of this department.

4. The Training Division superior officer shall maintain the registration file.

5. The Training Division shall inspect each officer's firearm(s) annually for serviceability and record the serial number(s).

6. Whenever an officer's issued weapon is lost or stolen he shall immediately report the occurrence to the Office of the Chief and the Training Division.

## FIREARMS REVIEW BOARD

A Firearm Review Board is hereby established effective this date. The Board shall consist of a six (6) member board and shall review and investigate reports concerning the discharge of weapons by members of the force and auxiliary police and will submit recommendation thereafter to the Chief for discipline training, commendation or other official action as deemed advisable.

## FIREARM REVIEW BOARD'S STRUCTURE

Bureau of Uniform Services, Commander (Chairman)

Juvenile Division Commander

10

000015

**EXHIBIT 18**

Training Division Commander

Internal Affairs Commander

Technical Services Division Commander

Detective Division Commander

1. The Board will sit on the last Thursday of each month.

2. The FRB's secretary shall prepare and maintain minutes and recommendation reports.

3. The Chief of Police will review all reports and approve or modify recommendations of FRB as required.

11

000016

**EXHIBIT 18**

GENERAL ORDER 01.1-92
AUTHORIZED FIREARMS & AMMUNITION

I.  PURPOSE

The purpose of this general order is to provide the
authorization for Gary Police officers to carry firearms and
ammunition.

II.  POLICY

Officer shall carry and use only the firearms and ammunition
as outlined in this order.

III. PROCEDURE

A.  On Duty

1.  Uniform officers shall carry the fully loaded
departmentally issued semi-automatic Ruger P-85 and 31
rounds of ammunition, both clips.

2.  Investigative and administrative personnel shall carry
the fully loaded departmentally issued semi- automatic
Ruger P-85, 16 rounds of ammunition.

B.  OFF-DUTY

1.  While in uniform, officers are required to comply with
Section III, item #1 of this general order.

2.  In plain clothes, officer can carry either departmental
issued or personal firearms providing the firearms are
departmentally approved, registered with the Training
Commander and officer shall successfully pass the
firearms qualifications course.

C.  SECOND WEAPON

Officer may carry a second weapon providing the second
weapon is carried in addition to the departmentally
issued semi-automatic Ruger P-85 firearm.  Second weapon
shall be approved, registered with the Training Commander
and officer shall satisfactorily pass the firearms
qualification course.

12

000017

**EXHIBIT 18**

1. Officers wanting permission to carry an additional firearm on-duty shall register and provide the following information to the Training Commander of this department:

   a. Make;
   b. Model;
   c. Caliber;
   d. Barrel length;
   e. Serial number;
   f. Registration number

D. AMMUNITION

All handguns carried on duty or while working in uniform by Gary Police Officers and Gary Auxiliary Police Officers shall contain hollow point half jacketed or hollow point full jacketed ammunition. Only the hollow point half jacketed or hollow point full jacketed ammunition will be carried by the officer. This applies to any issued handgun as well as any secondary handgun carried by the officer.

13

**EXHIBIT 18**

GENERAL ORDER 01.2-92
FAILURE TO QUALIFY WITH DEPARTMENTAL WEAPON

I.   PURPOSE

Provide for the safety of the community as well as the safety
of all officers and the department.

II.  POLICY

Any officer failing to qualify with his departmental weapon
shall at that time surrender his departmental weapon to the
firing range officer in charge.   The failing officer shall
also at that time be relieved of duty for incapacity for two
(2) days during which time he shall appear at another
rescheduled appointment with the range officer to re-qualify.
Should the officer fail a second time he shall continue his
relief from duty and again reschedule another appointment with
the range officer to re-qualify within two (2) days.   Should
a third attempt prove unsuccessful the officer's repeated
inability to qualify with his departmental weapon shall be
considered a continuing incapacity and a referral to the Gary
Police Civil Service Commission may result.

Except by order of the Chief, all efforts to re-qualify shall
be within two (2) days of the last unsuccessful attempt.   Each
period of relief from duty under this order shall be without
pay or, at the election of the Chief, shall be deducted from
the officer's authorized leave time to include, but not
limited to, compensatory time of off days.

Whenever an officer fails to qualify with a second weapon, he
may not carry that weapon on duty until such time that he does
successfully qualify with that weapon.

14

000019

**EXHIBIT 18**

**GENERAL ORDER 01.3-92**
**POLICY ON POSSESSION OF GUNS BY CIVILIAN EMPLOYEES**

I.    PURPOSE

            To maintain security and safeguard the welfare of
            the public and employees of the department.

II.   POLICY

            At no time is a civilian employee allowed to carry
            any form of loaded weapon during working hours.
            Any such person caught with the above will be
            discharged in accordance with the Personnel Manual
            outlined for City of Gary Employees.

15

**EXHIBIT 18**

**GENERAL ORDER 01.4-92**
**REMOVAL OF FIREARMS FROM INTOXICATED MEMBER OF THE SERVICE**

I. **PURPOSE**

To remove firearms from an intoxicated member of the service for safety of the officer and all others.

II. **DEFINITION**

Intoxicated - unfit for duty due to the influence of alcohol, narcotics or other drugs.

III. **PROCEDURE**

Upon observing a member of the service who is intoxicated. Superior Officer shall:

1. Remove firearms from member.

2. Order member to remain at station house or other suitable location.

3. Order the officer to submit to a chemical breath examination.

4. Should the officer refuse the chemical breath examination, the superior officer has the discretion to:

   a. arrest the officer (charge-public intoxication).
   b. relieve officer from duty (file disciplinary report).

5. Arrest officer if he attempts to leave before being instructed by superior officer (public intoxication).

6. Return firearm to officer if determine fit for duty by Commanding Officer.

16

000021

**EXHIBIT 18**

GENERAL ORDER 02-92
PROCEDURES FOR PROCESSING SUBPOENAS

I.   PURPOSE

This policy establishes a procedure for effective notice to
all police officers where required to appear in court.

II.  PROCEDURE

Court subpoenas to police officers are to be served by the
officer assigned to the Technical Services Division, hereafter
referred to as the Subpoena Officer.  The procedure is to be
as follows:  The prosecutor's office is to provide the court
officer all subpoenas to be served on Gary Police Officers.
The court officer will list all information from subpoenas on
the form provided.  He will then give one (1) copy of the form
and the subpoenas to the Subpoena Officer.

The Subpoena Officer will list all information from subpoenas
on the form provided.  After the subpoenas have been served he
will return one (1) copy of the form to the court officer.

Officers subpoenaed are to report to the designated court, on
the date subpoenaed at the designated time.  Officers who are
working on the 8 am to 4 pm turn will see court officer in the
Gary City Court (only) prior to 9 am on the date they are to
appear in court in order that the court officer will know that
they are working and available.  The officer will give the
court officer the sector he is assigned to and his P unit
number.  The court officer will then advise the officer of the
possible time he should return to court and/or the court
officer will call the communications division prior to needing
the officer in court so they may be apprised of the situation
in regard to dispatching units to calls.

17

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 02-92
PROCEDURES FOR PROCESSING SUBPOENAS ISSUED TO GARY POLICE OFFICERS

If an officer receives a subpoena from two (2) courts for the same date, he is to notify the Subpoena Officer of the situation. The Subpoena Officer will then contact the court officers in the respective courts and determine, if possible where the officer is most needed. If no determination can be made as to which court the officer is most needed, appearances will take place in this order; Federal Courts, State Courts, City Courts. The Subpoena Officer will contact the officer and advise him which court he is to appear in on the date in question.

If a court officer has prior knowledge that a case has been disposed of or continued, he is to notify the Subpoena Officer and/or attempt to contact the officer so that he will be aware of the situation.

If an officer fails to appear in court when subpoenaed, the court officer is to notify the Technical Services Commander on the form provided. The Technical Services Commander will then forward all necessary information to the office of the Chief for processing. The Commanding Officer of the respective division will make a recommendation as to disciplinary action after receiving such complaint from the office of the Chief.

If an emergency arises, the officer is to notify the court officer prior to the designated time and date of his/her court appearance.

Failure to comply with the above orders will result in disciplinary action.

000023

**EXHIBIT 18**

GENERAL ORDER 02.1-92
MEMBERS TO APPEAR IN COURT 12 MIDNIGHT TO 8 A.M. TOUR OF DUTY

I.   PURPOSE

     This policy establishes a schedule for court appearance for
     officers working the 12 midnight to 8 am tour of duty.

II.  POLICY

     Members of the force who are assigned on the 12 midnight to
     8:00 A.M. tour of duty, who are scheduled to appear (later in
     same day) in any local, state or federal court or agencies in
     response to a subpoena, court order or administrative process,
     are to be excused from duty at 5:00 A.M.

13

000024

**EXHIBIT 18**

GENERAL ORDER 02.2-92
DRESS CODE FOR COURT APPEARANCES

I.   PURPOSE

     This policy establishes a court appearance dress code.

II.  POLICY

     The dress code for Police Officers of the Gary Police
     Department making court appearance, be it Federal, State,
     Criminal or City, shall be as follows:

     1.  Well Groomed
     2.  The police uniform is always acceptable
     3.  When not in uniform:
         a.  Shirt and tie/sport shirt and slacks
         b.  A suit is recommended, but a sports jacket in
             good taste is acceptable.

         Disciplinary action will be taken against any officer
         cited by the Judge for violation of this dress code.

000025

**EXHIBIT 18**

GENERAL ORDER 03-92
RELIGIOUS COUNSELING SERVICE

I.   PURPOSE

A religious counseling team has been established for service
to those members of the Police Department who may be
experiencing domestic, social or personal problems.

II.  POLICY

Furthermore, the Police Chaplains have developed a "Prison
Ministry" for jail inmates.  The service of these clergymen
are available to all members of the force on an anonymous
basis and may be contacted by any individual in this
department desiring advice of counsel independent of any
official action taken by the department.

III. PROCEDURE

Members of the force, front desk personnel, corrections, and
radio dispatchers shall utilize this service whenever social
conditions reported to the department can be remedied or
mitigated by a member of the religious counseling team, e.g.,
threatened suicides, hostage situations, violant domestic
crisis, etc.

Professional courtesy will be afforded to our chaplains when
they are providing any service to a member of the force or
civilian employees of the department.

21

000026

**EXHIBIT 18**

**GENERAL ORDERS 04-92**
**SUGGESTIONS OR GRIEVANCES**

Any sworn member of the force or civilian employee may request an interview with the Chief of Police DIRECT when they feel ordinary channels of communications are not conducive to the resolution of their concerns.

In the absence of the Chief, they may confer with the Deputy Chief of Police if they consider their needs or suggestions warrant immediate attention.

All suggestions or grievances shall be written and forwarded, signed or unsigned, in a sealed envelope to the Chief of Police and marked PERSONAL AND CONFIDENTIAL.

All suggestions or grievances shall be reviewed by the undersigned and those members who sign their letters will be personally interviewed by the Chief of Police after review of their communications.

22

**EXHIBIT 18**

**GENERAL ORDERS 05-92**
**NEWS RELEASES**


I.    **POLICY**
      News or public information releases are of the immediate
      responsibility of the Public Information Officer. In his/her
      absence, the higher ranking officer on duty is authorized to
      provide news releases and public information.

      In addition, the ranking officer at a crime scene is
      authorized to release information to the news media relative
      to that crime. Also, the investigating officers are
      authorized to release information to the news media on cases
      they are investigating.


      At no time should the news media be denied information due to
      the absence of the public information officer.

23

**EXHIBIT 18**

**GENERAL ORDER 06-92**
**ASSIGNMENT OF MARKED AND UNMARKED DEPARTMENT VEHICLES**

All department vehicles are to be under control of the Commanding Officer of the Motor Transport Division (M.T.D.). Except in emergency situations, all vehicles assigned to respective divisions and changes in assignments shall originate in writing from the office of the Chief or designee.

Commanding Officers shall request in writing the allocation, assignment or re-assignment of department vehicles as the needs of their command require.

The Commanding Officer, of the Motor Transport Division shall institute a daily trip ticket procedure for the use of all department vehicles including the mileage, fuel usage and other management information necessary for adequate records.

Vehicles shall be used for departmental business only and may include social and civic functions devoted to municipal-state-federal affairs.

000029

**EXHIBIT 18**

GENERAL ORDER 07-92
SEARCH WARRANTS


I. **PURPOSE**

   To assure compliance is adhered to as outlined by law.

II. **POLICY**

   To assure compliance with the prohibition of unreasonable searches and seizures expressed in the 4th Amendment of the Constitution of the United States and Article I, Section 11 of the Constitution of the State of Indiana; and to assure that Search Warrants are being obtained as required by law, the DEPUTY CHIEF OF POLICE shall be consulted prior to the search of any structure including but not limited to private residences, businesses, and garages, etc.

   Further, where it is determined that a Search Warrant be obtained the Department's Legal Advisor shall be consulted. The affidavit for Search Warrant and other legal documents as well as the return of Search Warrant to be presented for judicial review, shall be submitted to and reviewed by the Department's Legal Advisor prior to their presentment to the proper Judicial Officer.

25

**EXHIBIT 18**

GENERAL ORDER 07.1-92
PROCEDURES FOR SEARCH WARRANTS

PURPOSE:

     No police officer shall apply for or serve a search warrant without notifying his commanding officer or inspector or his designee prior to applying for and serving the warrant. The purpose of this order is to set forth rules governing the conduct of officers of this department when serving search warrants and in searching under the authority of the warrant. This order does not cover procedures for drafting or obtaining search warrants. The requirements relating to affidavits, issuance of the warrant, and similar technical/legal problems are set forth in various sections of the Indiana Code of Laws.

1.   DEFINITIONS:

    a.   **Officer in Charge:**   The search team member most knowledgeable about the case and most responsible for the investigation. Usually, he is the affiant who requested the search warrant. He will be in charge of the execution of the warrant unless a higher ranking officer from the Investigative or Public Morals Division is present, and takes charge of the search personally.

    b.   **Search Site:**   The place to be searched as described in the search warrant.

    c.   **Search Team:**   Those persons, officers and supporting civilian personnel taking part in the execution of a particular search warrant.

    d.   **Seizable Items:**  Contraband, Stolen, property, anything used in committing a crime, or other evidence of crime.

    e.   **Evidence Collector:**   A member of the search team designated by the officer in charge to take possession, of package, seal and mark all items seized at the search site.

2.   UNIFORM REQUIREMENT:

    The search team shall include at least one (1) uniformed officer. All non-uniformed officers will have their badge affixed to their outer clothing in the same approximate position as the badge on a uniformed officer.

000031

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 07.1-92
PROCEDURES FOR SEARCH WARRANTS

3.   PROMPTNESS IN EXECUTING WARRANTS:

A search warrant properly issued must be executed within ten
(10) days and return on the warrant should be made within
three (3) days; although ten (10) days are allowed to execute
and serve the warrant, the police officer should execute the
warrant promptly.  If there is a delay in execution of the
warrant, it must be for a reasonable and valid reason.

4.   NIGHTTIME WARRANT LIMITATIONS:

Generally, search warrants should be executed only in the
daytime.  Daytime is considered to be that period between
sunrise and sunset.  If the search warrant must be executed at
night, the approval of the Inspector/and or Deputy Chief,
Public Morals Commander or the Chief of Police, in his
absence, must be obtained.  A search begun during the daytime
may extend into the night, provided that the search team acts
reasonably and does not prolong the search as a form of
harassment.  Proper planning and precautions taken before the
execution of the warrant will lessen the danger to police
officers and alleviate needless friction and controversy
between the search team and those persons occupying the search
site.

5.   ASSURING THAT THE SEARCH SITE IS CORRECT:

The officer in charge shall take every reasonable precaution
to make certain that the premises listed in the warrant is in
fact the premises sought to be searched; and that the premises
about to be entered is in fact the premises listed on the
warrant.   He shall also be alert to any change of
circumstances that cancels the reason for the search.   The
location must be confirmed by positive identification of the
physical site.  If the officer in charge is not certain that
the premises is in fact that listed on the warrant, and that
sought to be searched; or if he concludes that the reason for
the search no longer exists, no entry shall be made.

6.   RECORDING:

The search team shall record the entire execution of a search
warrant beginning with a statement of the time before
approaching the search site and continuing until the search
team has left the site.

27

000032

EXHIBIT 18

PAGE 3/GENERAL ORDER 07-1-92
PROCEDURES FOR SEARCH WARRANTS

7.    CONDUCT DURING THE SEARCH:

    a.    Courtesy:  Occupants of the premises must be treated with
        as much restraint and courtesy as is possible under the
        circumstances.

    b.    Search:  Any person on the premises may be searched if it
        reasonably appears that an item listed in the warrant may
        be concealed upon his person.  Mere presence at a search
        site, without more, is not sufficient reason to search an
        occupant.

    c.    Frisk:  Any person on the premises may be frisked if a
        member of the search team reasonably suspects that such
        individual has on his person a concealed weapon or
        dangerous instrument, and that a frisk is necessary to
        protect members of the search team.

    d.    Public Morals Division can ask the K-9 Unit to assist in
        the search for drugs.

8.    RESTRICTION OF MOVEMENT:

    a.    Restrictions may be imposed on the movements of any
        person at the search site in order to prevent
        interference with the search.  Upon request, one person
        should usually be permitted to observe the conduct of the
        search.

    b.    Restrictions may be imposed on the movements of any
        person at or from the search site if an item listed in
        the warrant is readily concealable or destructible.

    c.    Restriction of any persons' movement must end when the
        item(s) has been found or the search has been otherwise
        completed and the security of the search team is assured,
        unless the person is subjected to full custody arrest.

9.    ARREST

    Probable cause to arrest a person at the search site may arise
    during execution of a search warrant.  In that even a search
    incidental to that arrest but independent of the warrant may
    be conducted.

28

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 07.1-92
PROCEDURES FOR SEARCH WARRANTS

    a.    Discovery of Unspecified Seizable Items:  If during the
            search incidental to that arrest but independent of the
            warrant may be conducted.

    b.    Termination of Search:  When all items listed in the
            warrant have been found, or when it reasonably appears
            that the items are not on the premises, the search shall
            be terminated.

    c.    Leave a copy of Search Warrant with a list of all
            property seized and must be signed by the Evidence
            Collector.

10.    CONDUCT AFTER THE SEARCH:

    a.    Maintaining a Record:  A complete record of the important
            features of a search must be made, including the time and
            place the warrant was obtained, the time execution began,
            all circumstances of the entry, and the identities of
            those persons on the search team and those occupying the
            search site.  (a copy of this record shall be submitted
            to the Public Morals Commander or Inspector or Deputy
            Chief.  Photographs of the areas searched should be taken
            before and after the completion of the search.  Video
            recording devices may be used to help complete the record
            in unusual or highly significant searches.

    b.    Erroneous Search:  If the search team believes that a
            search was the result of a law enforcement error, the
            lead investigator should apologize to the occupants for
            the inconvenience and a detailed report submitted to the
            Chief of Police.  The apology, however, must not include
            any admission of liability or indication that any
            governmental agency will compensate momentarily for the
            intrusion.

11.    PROTECTING PREMISES IF DAMAGE OCCURS DURING ENTRY:

    Premises to be left vacant:  If damage occurs during any entry
    to premises that will be left vacant, and the damage is
    sufficient to jeopardize the security of the premises, the
    search team shall make arrangements to protect the premises
    until they can be secured.

29

000034

**EXHIBIT 18**

PAGE 5/GENERAL ORDER 07.1-92
PROCEDURES FOR SEARCH WARRANTS

12. **UNSUCCESSFUL SEARCH:**

If a search has been unsuccessful, and the damage incurred is sufficient to jeopardize the security of the premises of the occupants, the occupants must be asked if they would like protection until the premises can be made secure. If the occupants so indicate, the search team shall see to it that the premises are protected until they can be secured.

13. **OTHER CIRCUMSTANCES:**

When any other circumstances arise which reasonably obligate the searching agency to provide protection until repairs are made, or where it would be in the best interest of the searching agency to provide protection, the search team shall see to it that the premises are protected until the property is secured.

14. **TURNING OVER SEIZED ITEMS TO PROPERTY CUSTODIAN:**

The evidence collector must secure any seized items in a manner which will preserve the chain of custody for evidentiary purposes.

15. **RETURNING THE WARRANT:**

The lead investigator shall see to it that the warrant is returned to the issuing authority as soon as practicable, and in no event longer than three (3) days after the search. A copy of the list of all items seized during the execution of the warrant shall accompany the warrant.

16. **RELEASE OF SEIZED ITEMS:**

When non-contraband items seized during the execution of a warrant are no longer needed for prosecution purposes, they should be released to the proper party, and a receipt obtained.

17. **WHEN FOREGOING MODEL RULES MAY BE DISREGARDED:**

Whenever it appears that any of the foregoing rules should be modified or disregarded because of special circumstances, specific authorization to do so must be obtained from Public Morals Commander, Inspector, Deputy Chief of the Chief of Police.

35

000035

**EXHIBIT 18**

STATE OF INDIANA    )
                      ) SS:
COUNTY OF LAKE     )

### AFFIDAVIT FOR SEARCH WARRANT

_____ swears or affirms that he believes and has good cause to believe (here set forth the facts and information constituting the probable cause);

That (here describe the things to be searched for and the offense in relation thereto);

...are concealed or located in or about the premises of (here describe the house or place)

...of (her describe the possessor or owner, if known);

I swear, under the penalty for perjury as specified by IC 35-44-2-1, that the foregoing is true to the best of my information and belief.

_____

31

000036

**EXHIBIT 18**

STATE OF INDIANA     )
                             )    SS
COUNTY OF LAKE       )

Subscribed and sworn to before me this _____ day of _____

19_____.

_____
Judge/Magistrate

32

000037

**EXHIBIT 18**

STATE OF INDIANA    )
                    ) ss:
COUNTY OF LAKE     )      IN THE _____ COURT
                                       OF LAKE COUNTY

## SEARCH WARRANT

To_____
   (herein insert the name, department of the law enforcement officer)

You are authorized and ordered, in the name of the State of Indiana, with the necessary and property assistance to enter into or upon (here describe the place to be searched with sufficient specificity);

and there diligently search for (here describe the property or person which is the subject of the search);

You are ordered to seize such property and/or persons, or any part thereof, found on such search.

Dated this _____ day of _____, 19_____
at the hour of _____ am/pm.


_____
Judge/Magistrate

Executed this _____ day of _____, 19_____
at the hour of _____ am/pm.


_____
Investigator - Officer

33

**EXHIBIT 18**

STATE OF INDIANA )
                ) SS:
COUNTY OF LAKE )

### RETURN OF SEARCH WARRANT

I received the attached Search Warrant on the _____ day of
_____, 19_____, and have executed it as follows:


On the _____ day of _____, 19\_\_\_\_, at _____
o'clock _____M. I searched the premises described in the Search
Warrant and I left a copy of the Search Warrant with
_____,
(name of person searched) or ( a person at the place of search)
together with a receipt for the property seized.


The following is an inventory of property taken pursuant to the
Search Warrant:




This inventory was made in the presence of
_____ and _____.

I swear that this inventory is a true and detailed account of all
the property taken by me pursuant to said Search Warrant.

                         _____


Subscribed and sworn to and returned before me this _____ day
of _____, 19 _____.

                         Notary Public
                         My Commission Expires:

(SEAL)

34

**EXHIBIT 18**

GENERAL ORDER 08-92
SICK LEAVE POLICY


I.  POLICY

Gary Police Departmental Policy and Orders regarding absence
from duty caused by Illness or injury.


II.  DEFINITIONS

SICK LEAVE - Any period of absence from duty in excess of
three (3) calendar days due to illness or injury.

SICK DAY - Absence from an officers scheduled eight (8) hour
shift or tour of duty due to illness or injury.

WORKING DAY - An eight (8) hour shift or tour of duty during
which an officer is scheduled to be on ACTIVE duty or other
assignment to include an on call status.

OFF DAY - Any twenty four (24) hour period, aside from turn or
shift changes or vacations, during which an officer has no
active or on call duty.

MEDICAL RELEASE - A Gary Police Department Medical Form (A)
completed and signed by the Physician.

GENDER REFERENCES - All references to "him", "he", and "his"
throughout this order and statement of policy apply equally to
both male and female officers.

III. PURPOSE

A.   To establish clear guidelines and procedures regarding
     all absences from duty assignments caused by illness or
     injury.

B.   To prevent abuse of the sick leave benefits now in place
     by city ordinance.

C.   To provide incentives to those officers who voluntarily
     refrain from abusing said benefits.

000040

**EXHIBIT 18**

## GARY POLICE SICK LEAVE BENEFIT DURATION

Each member of the Police Department shall be entitled to ninety (90) calendar days paid injury or sick leave within any twelve (12) month period whether taken continuously or one sick day or days at a time.  This sick leave is not to diminish vacation benefits. However, off days which fall during any period of sick leave, or number of sick days, shall not be retrieved, accumulated or used to extend the maximum ninety (90) calendar days of sick leave provided to each officer. Any extensions of said leave for either injury or sickness may be granted by the Chief of Police.  When no such extension is granted, an officer who has spent ninety (90) calendar days of sick leave or ninety (90) sick days during any twelve month period of time shall be removed from the payroll of the Gary Police Department unless he returns to work.

Officers not able to return to full police duty unless granted an extension of sick leave due to exceptional circumstances are advised to apply for a temporary or permanent pension prior to exhausting their ninety (90) days.

## REPORTING OFF FROM WORK DUE TO ILLNESS OR INJURY

Employees are expected to report for work whenever scheduled. Any officer desiring to report off sick will do so by telephoning his/her immediate supervisor at least ONE HOUR prior to scheduled tour of duty.  Officers reporting off shall give name, address, telephone number (where they can be reached), rank badge number, and explain the nature of illness or injury.

Any officer who reports off sick on a day that he/she has been subpoenaed to city, county or federal court shall be responsible for notifying the proper agency that he/she will not be able to comply with the subpoena because of illness or injury.  The officer also has the responsibility of notifying the proper agency in cases where the officer has been subpoenaed by a Grand Jury or for a deposition.

All officers shall be required to report off each and every day that they are off sick.  This procedure applies to all officers except those who have provided medical reports from their doctors stating that they will be off for an extended period of time.  Any officer not able to report off because of a severe illness will be exempted from calling off daily.

36

EXHIBIT 18

The immediate supervisor of the officer reporting off sick shall record the person as sick in the Division Records. The supervisor shall also prepare a sick report in duplicate. The original shall be forwarded to the Chief's Office statistician and a carbon copy forwarded to the Division Commander.

## THE MEDICAL RELEASE REQUIREMENT

All officers who report off due to illness or injury for three (3) or more consecutive days shall be required to submit a medical release to the Police Chief's office. Whenever an officer is unable to immediately obtain a medical release because of a holiday or an extenuating circumstance that officer may be returned to duty by the immediate supervisor. However, in such cases in which the medical release is not then available the supervisor and the returning officer are to certify on a Return to Duty Form that the returning officer make the following representations without qualification:

A.   That the returning officer is fully fit to return to his regular assignment.

B.   That the physician of the returning officer supports his return to regular duty and, but for a holiday or another extenuating circumstance, would have then provided him with a medical release.

C.   That the returning officer shall, within seventy two (72) hours of his return to duty provide the immediate supervisor and the Office of the Chief with his written medical release.

This Return to Duty Form containing the above representations of the returning officer shall be signed by the returning officer before he begins duty. Said form shall also be signed by the immediate supervisor and the Watch Commander provided they have no cause to deny the officer's return to duty. Should the returning officer fail to produce the above mentioned release within the time required, such failure may result in disciplinary action to include, but not limited to, the charge of Absent Without Leave (AWOL) for the period of time the officer was off duty and purportedly ill prior to returning.

Any officer reporting off sick because of illness or injury the day before and after his scheduled days off, will be regarded as on sick leave for the entire period of absence. He shall be required to provide the Chief's Office with a medical release form upon his return to work or within seventy two (72) hours of same as conditions permit.

37

000042

**EXHIBIT 18**

Once an officer has accrued nine (9) or more sick days during a calendar year he or she shall be required to provide a medical release for each occurrence of illness or injury thereafter. Any officer seriously ill with hospitalization, injured on duty, had surgery or pregnant will be exempted from the nine (9) days restriction, after review by the Chief. The above provision does apply to any residual effect or recurrent problems subsequent to a return to duty injury. Pregnancy shall be treated as an illness for sick leave purposes and is subject to the same departmental procedures and policies as any other disabling medical condition.

## SECOND JOB

Any officer, while on sick leave due to illness or injury, shall not engage in off duty employment without prior approval from the Chief of Police.

## DESCRIPTION

Officer who fails to comply with the policy and procedure in regard to sick leave shall be carried as ABSENT WITHOUT LEAVE (AWOL), and he/she will be subject to disciplinary action and/or loss of wages.

## SAFEGUARDING ISSUED EQUIPMENT

Officers on sick leave who feel that they will not be able to safeguard their weapon, radio shield, and badge shall notify their immediate supervisor.

The supervisor will, at that time, take possession of the issued equipment and turn it into the Training Division.

## SUSPENSION

Officers who are suspended while on sick leave or who become disabled while on suspension and are unable to return to duty after the expiration of the suspension shall follow regular procedures for placement on sick leave.

## COMPENSATORY TIME OFF

Any officer completing one full calendar year without a deduction for sick time, he/she will be granted an additional five (5) days which may be added to their vacation or taken one (1) at a time with approval of the supervisor. Time may be accrued in the manner from year to year and may be scheduled to extend vacations or such off time may be taken a day or more at a time as the officer and his supervisor see fit.

38

**EXHIBIT 18**

GENERAL ORDER 08.1-92
VACATION SCHEDULES

1.  Vacations will be selected in the following manner:

    Based on Department Rank

    Based on Department Seniority

2.  If an officer is transferred to another division after the selection of vacations, that vacation will be honored if still available in the new division.

3.  If the officer's previously selected vacation is not available, the officer will be required to select another available vacation date.

4.  Each Commanding Officer must submit to the next highest superior officer in the chain of command a written request to take his selected vacation or any other leave of absence, due dates, etc., and recommending a subordinate officer to fill his vacated position during any of his absences.

5.  The next highest superior officer shall either approve or disapprove each request including the recommended assignment of a subordinate officer for replacement duty during any absence.

6.  An officer hired after July 1st will not receive a vacation for that calendar year.

7.  An officer hired between April 1st through July 1st will receive one (1) week vacation.

8.  An officer hired between January 1st through April 1st will receive two (2) weeks vacation.

9.  After one (1) full year of employment an officer will receive three (3) weeks vacation per year.

10. After an officer's fifth full year of employment, officer will receive four (4) full weeks of vacation.

39

000044

**EXHIBIT 18**

GENERAL ORDER 08.2-92
DEATH IN FAMILY LEAVE

I. PURPOSE

The purpose of this order is to grant a member of the force a leave of absence with pay when a member of his immediate family dies.

II. DEFINITION OF IMMEDIATE FAMILY SHALL INCLUDE THE FOLLOWING:

a. Spouse
b. Natural, foster or step parent
c. Child
d. Brother or sister
e. Father-in-law
f. Mother-in-law
g. Any relative residing in the household

III. WHEN A DEATH OCCURS IN THE IMMEDIATE FAMILY:

a. Leave of absence.

b. Roll call officer will prepare the application if member of the force is unable to make personal application.

c. Submit to commanding officer.

IV. THE COMMANDING OFFICER SHALL:

a. Grant four (4) consecutive tours with full pay.
b. Verify the death and relationship.
c. Have the member of the force produce the official notice of death if the relative was in the military service of the United States.
d. Forward copy of application with endorsements through departmental channels for file in the personal folder of the member of the force

40

**EXHIBIT 18**

GENERAL ORDER 08.3-92
MATERNITY LEAVE

I.   PURPOSE

This order shall define departmental policy as it applies to female officers of the Gary Police Department concerning maternity leave of absence in accordance with law.

II.  POLICY

A.   Maternity Sick Leave shall be granted to female officers of up to ninety (90) days with pay, upon written request by the officer's physician.

B.   Extended Leave (Pre-natal) may be granted without pay for an additional period not to exceed six (6) months.

III. PROCEDURE

A.   Maternity Sick Leave

1.   An officer wishing to use Sick Leave shall use his/her remaining sick days, up to and not exceeding ninety (90) days.

2.   Before the leave is to begin, the officer shall present a written request from her physician to the office of the Chief.

B.   Extended Leave

1.   Extended Leave (Pre-natal, Post natal) may be granted without pay for an additional period not to exceed six (6) months.

2.   When applying for Extended Leave the officer must first exhaust all of her vacation time and/or any other earned days before the request will be approved.

41

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 08.3-92
MATERNITY LEAVE

      3. Extended Leave must be stipulated in a letter from the Officer's physician, reviewed and approved by the Police Surgeon, and directed for approval to the Chief of Police.

        4.     If the Extended Leave is approved, the officer is required to obtain a medical statement from the Police Surgeon and present it to the Office of the Chief on a monthly basis.

            a. The statement shall include the reason(s) why the officer is unable to return to duty and, if possible,

            b.  The anticipated date of return.

  C.  Return to duty

      After the officer has been released by her physician, she shall report to the Police Surgeon for review.

000047

**EXHIBIT 18**

GENERAL ORDER 08.4-92
MEDICAL POLICY
SKIN DISORDER/FACIAL BEARDS

I.   PURPOSE

    This order assigns responsibilities and establishes procedures
    to be followed when a sworn member, auxiliary member, or a
    uniformed civilian member, i.e., Correctional Officer, who is
    aggravated by shaving.

II.  RESPONSIBILITIES AND PROCEDURES

    A.   A sworn member, auxiliary member or a uniformed civilian
         member who has a skin disorder which is aggravated by
         shaving will:

         1.   Submit to the Police Surgeon a current letter,
              within seven (7) days, completed by a dermatologist
              expressing the physician's opinion in detail that
              the medical treatment and therapy of the skin
              disorder require that the member stop shaving.

         2.   Be examined by a dermatologist selected by the
              Police Surgeon for diagnosis and proper shaving
              instructions regarding the minimal length the beard
              can be shaved without aggravating the skin
              disorder.

         3.   Continue full duty if corrective treatment does not
              require the member to stop shaving.

         4.   Be assigned to convalescent duty if corrective
              treatment requires that the member stop shaving.
              The Police Surgeon will determine the length of
              time the member will not shave.  During this period
              of time, the member will be assigned to duties
              which limit public view of him in uniform.

         5.   At the end of the convalescent period, return to
              the Police Surgeon for examination.

         6.   Return to full duty when convalescent duty is
              terminated by the Police Surgeon.

43

000048

**EXHIBIT 18**

GENERAL ORDER 08.5-92
ON THE JOB INJURIES

All on the job injuries are to be handled in the following manner:

1.  Inform your supervisor as soon as possible of said injury.

2.  It will be the supervisors responsibility to make sure there is a written report on file.  If there is no injury report on file, bills received will be the officer's responsibility.

3.  Forward all bills to the office of the Chief so they can be processed for payment.

4.  Processing package includes:

    a.  On the job injury written report
    b.  Claim form (handled through the office of the Chief)
    c.  Bill
    d.  Letter of verification from Supervisor
    e.  Letter of approval from Deputy Chief

000049

**EXHIBIT 18**

GENERAL ORDER 08.6-92
DUE DAY PROCEDURE


I.  **PURPOSE**

    This order shall establish a uniform procedure for requesting
    due days.

II. **POLICY**

    Officers shall prepare and submit a due day request form(s)
    when requesting time-off from the department.

III. **PROCEDURE**

    A.  Request Form

    1.  In completing the due day request form, officers shall
        only denote one (1) category (perfect attendance, awarded
        days, etc.) on a single form.  If two (2) or more
        categories are to be used, then      separate forms shall
        be submitted for each.

    2.  Officers shall submit their request within ten (10) d__
        following the event for which the day is requested.

    3.  All due day request forms are to be signed by the
        Division Commanders and the officer submitting the
        request.

    B.  Granted Form

    1.  The Bureau Office shall prepare a due day form for each
        day granted and the form will be forwarded to the
        officer.  When the due day is used the due day form will
        be attached to the Daily Detail being sent to the Bureau
        Office.

    2.  Commanders shall forward due day granted forms to the
        Chief's Office attached to the daily detail sheet.

    C.  Statistician

    1.  Shall be responsible for receiving, posting and filing
        all due day granted forms.

45

000050

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 08.6-92
DUE DAY PROCEDURE

D.  Category Break-down

1.  DS - Due days according to sick policy (see 05/59-90).
    These days are approved the following year when an
    officer does not call off due to sickness, A.W.O.L. or
    suspension days for the entire year; commencing January
    1st and ending December 31st. Only five (5) days can be
    taken.

2.  DA - Due days are awarded by the Bureau Commander. The
    reason is to be notated on request form.

3.  DC -   Due day(s) earned for court time.   A
    verified/signed court sheet must be attached to request
    form showing time in and out and totalling up to eight
    (8) hours. This is for time that would be considered as
    off time if the officer had not been required to be in
    court.

4.  DT - Due day for accumulated time. A time card(s) must
    be attached to request form showing overtime worked in
    excess of eight (8) hours only reasonable time to
    complete the task will be allowed.

5.  DW - Due day for warrants served. During the course of
    one (1) month if an officer is able to serve seven (7)
    warrants, he is entitled to one (1) due day. No due days
    will be awarded for warrants served while working
    overtime. Verifying documentation must be attached to
    request form.

46

**EXHIBIT 18**

GENERAL ORDER 09-92
TO SAFEGUARD EVIDENCE AND DETAIN WITNESSES FOR
CRIME SCENE PROCEDURE

I.   PURPOSE

Upon responding to a crime which may require safeguarding of
the scene, to preserve evidence:

II.  PROCEDURE

1.  Request response, through the Communications Division
    of:

    a.  Patrol Supervisor
    b.  Detective Division

2.  Remove unauthorized persons from the area and secure the
    crime scene:

    a.  DO NOT DISTURB EVIDENCE

3.  Detain witnesses and persons with information pertinent
    to the crime.

4.  Rope off the crime scene area and have CRIME SCENE signs
    posted.

5.  Record on activity sheet

    a.  Observations
    b.  Identity of suspects/witnesses with addresses and
        telephone number and any other information
        including statements made whether casually or
        formally.

6.  Advise Patrol Supervisor and Detectives of:

    a.  Identity of witnesses/suspects detained.
    b.  Other information regarding the case.

7.  The provisions of this order will automatically be placed
    into effect by a member of the force that is first on
    the scene of the following:

47

**EXHIBIT 18**

     a. Homicide
     b. Forcible rape
     c. Robbery or hijacking with injuries caused by
       firearms.
     d. Aggravated assault with a dangerous instrument and
       the victim is likely to die.
     e. Burglary involved forced safes, circumvented
       alarms, other physical evidence.
     f. Any crime which may require services of the
       Bureau of Identification.

8. The Press Relations Officer will provide and maintain a
supply of CRIME SCENE signs no smaller than 10" X 14"
bearing the legend NO TRESPASSING GARY POLICE DEPARTMENT,
CRIME SCENE in double size letters, black over yellow.

9. The commanding Officer Training Division will provide
three (3) ropes to be used to establish the crime scene
area. One (1) rope shall be placed in each of the mobile
support vehicles with adequate CRIME SCENE signs.

10. In a homicide or other serious cases, the ranking member
of the Detective Division who is present at the scene
will be in charge of the investigation.

EXHIBIT 18

GENERAL ORDER 09.1-92
PROCEDURE FOR EVIDENCE/PROPERTY

I.   PROCEDURES FOR PROPERTY/EVIDENCE

1.   Property turned in will be stored in the two (2) cabinets
     already used as property holding spots.

The cabinets are located directly behind the desk sergeants
desk.

The cabinet that has a cut drop slot on its side will be used
for the following evidence only, MONEY, NARCOTICS, & HANDGUNS.
This cabinet is so marked.  The only keys for this cabinet
will be in the possession of the property clerk only.   The
side slot will be the dropping point.

The second cabinet will be used for bulk items such as RIFLES,
SHOTGUNS, & OTHER SMALLER VALUABLES, the desk sergeant has a
key to open this cabinet for placement of items.

II.   TURNING IN PROPERTY

All property turned in will be logged into four (4) separate
categories.

1.   Narcotics
2.   Money
3.   Guns
4.   Other (any item other than the three (3) above)

Each item turned in that falls in the first three (3)
categories must have a separate property slip attached with
the case number.

III.  PROCEDURE IN EVIDENCE OR PROPERTY SLIPS

Officer turning in property will make out a property slip.

The turn supervisor will double check to make sure that all
items listed are correct and accountable, then sign the
property slip.

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 09.1-92
PROCEDURE FOR EVIDENCE/PROPERTY

Desk personnel will verify the accountability of the property and also sign the property slip.

The desk personnel will then heat seal the property prior to the dropping of the property in the cabinet.

Very large items will still be held where room allows.

IV. **PROPERTY CLERK**

There will be a log book assigned for each of the four (4) categories which will be kept by the property clerk, each book will have all entries concerning the property.

The small safe will be installed in the main vault which will be used for money only, the money and log book will be locked in the safe.

A metal file cabinet will also be placed in the main vault for narcotics use only.

The main vault will hold narcotics, guns, and money only. All bulk items will be stored in the locked Bureau of Identification holding rooms behind the Training Room.

A scale will be used to weigh each package of narcotics that is turned in or taken out.

No property will be accepted by the property clerk unless it is submitted properly.

> HEAT SEALED, CORRECTLY INVENTORIED, CASED, PROPER SIGNATURES.

Four (4) log books will be correctly maintained, listing all items.

50

000055

**EXHIBIT 18**

GENERAL ORDER 10-92
COMMAND DISCIPLINE

I.   POLICY

     To establish procedures and guidelines for the implementation
     of any punishment.

II.  PURPOSE

     To permit a commanding officer to correct minor violations of
     rules and procedures without resorting to formal charges and
     Gary Police Civil Service trials, COMMAND DISCIPLINE,
     non-commission punishment, is now available to correct minor
     deficiencies and maintain discipline within his command.

     The Legal Advisor of the Gary Police Department will be
     consulted whenever guidance is needed by commanding officers
     in procedural matters or constitutional guidelines.

III. PROCEDURES

     Municipal Ordinance 6545 passed and adopted by the Common
     Council of the City of Gary effective December 6, 1991 revised
     Section 10.

     SECTION 10:  Discipline:  Findings & Proposed Discipline for
     Violation - Grounds for Complaint.

     A.   Any commanding officer with rank of Sergeant or above,
          may with the approval of the Chief, recommend the
          following discipline for minor violations of rules and
          orders of the Board, Commission or Chief:

          1.   Up to five (5) working days suspension, with or
               without pay and allowance;

          2.   Imposition of said punishment under Subsection A.
               1, shall be immediate and take effect prior to a
               Commission hearing.

     B.   An officer so suspended who desires an interview by the
          Chief regarding suspension shall have ten (10) calendar
          days from receipt of the written request for said
          interview with the Chief.

                                                              51

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 10-92
COMMAND DISCIPLINE

C.  In all cases wherein the Chief has imposed a pre-hearing suspension, the officer's interview shall be for the purpose of presenting a request for reconsideration.

D.  Should the suspended officer fail to a make timely request for an interview or fail to appear for the interview, shall be deemed to have waived his right to contest imposition of the terms of the suspension.

E.  However, should the officer appear at the interview and still desire to appeal the suspension, shall within ten (10) days of the interview request a review of the Chief's suspension by the Commission. The burden of proof shall be upon the Chief to show that said complaint procedure was in accordance with due process of law.

F.  In all cases of suspension without pay and/or allowances the Chief shall submit within ten (10) days of suspension, a written explanation to the Commission explaining the rule and/or regulation violated.

G.  The Commission may confirm, reject or modify the adverse action taken by the Chief of Police.

H.  A police officer shall be disciplined, in the manner permitted under Section 35.127 of this chapter, if:

1.  he/she is convicted of a crime;

2.  he/she has been indicted or charged in a court of appropriate jurisdiction upon charges constituting felony or Class A misdemeanor; or

3.  the commission finds him/her guilty of a misconduct including:

    a.  negligence of duty;
    b.  violation of Commission rules;
    c.  negligence or disobedience of orders;
    d.  continuing incapacity;
    e.  absence without leave;
    f.  immoral conduct;
    g.  conduct injurious to the public's peace and welfare;
    h.  conduct unbecoming a police officer; or
    i.  furnishing information to an applicant for appointment or promotion that gives that

52

000057

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 10-92
COMMAND DISCIPLINE

person advantage over another applicant.

I.   In the absence of the Chief of Police, the Deputy
     Chief shall assume all authority granted to the
     Chief of Police under this section.

     To begin disciplinary proceedings under this
     subsection, the Chief must file a complaint against
     the police officer with the Commission. However, a
     police officer may be suspended by the Chief
     without a hearing in those cases described in
     clause 2 of this subsection.

     Any person, including a commissioner, may file a
     complaint with the Commission alleging that one (1)
     or more police officers are guilty of misconduct.
     A complaint filed under this subsection must be
     verified by a sworn affidavit submitted into the
     Commission with the complaint. Where a complaint
     is filed by a commissioner under this section, the
     commissioner is disqualified from taking any action
     with respect to that complaint.

Section 10.1:  Discipline, Hearing procedure,
               continuances, limitation or actions,
               Hearing Officer, costs

A.   A complaint or appeal may be rejected by the
     Commission. If accepted, the Commission or Hearing
     Officer may hear the complaint.

     A Hearing Officer selected pursuant to Subsection H
     may conduct a hearing for each complaint filed with
     the Commission under this Chapter. The Commission
     may refer the complaint to a Hearing Officer no
     later than thirty (30) days after the police
     officer against whom the complaint is filed. The
     notice may be served in person or by leaving a copy
     at the police officer's last and usual place of
     residence. In addition, a copy of the notice shall
     be mailed to the person or persons who filed the
     complaint. The notice must state:

53

000058

**EXHIBIT 18**

PAGE 4 GENERAL ORDER 10-9
COMMAND DISCIPLINE

    1.  the date, time and place of the hearing on the
        complaint;

    2.  the basis of the complaint;

    3.  that all parties to the complaint are
        entitled:

        a.  to be presented by counsel or other
            representative of his/her choice;

        b.  to call and cross-examine witnesses;
        c.  to require the production of evidence; and
        d.  to have subpoenas issued, served and
            executed.

B.    The Hearing Officer or Commission may:

    1.  compel the attendance of witnesses;

    2.  examine witnesses under oath;

    3.  order the production of books, papers, and
        other evidence; and

    4.  issue subpoenas.

C.    If a witness refuses to appear at a hearing after
    having received written notice requiring his/her
    attendance, or refuses to produce evidence that the
    Hearing Officer requests by written notice, the
    Hearing Officer may file an affidavit in the
    Circuit Court of the county setting forth an
    affidavit in refusal.  Upon the filing of the
    affidavit, a subpoena shall be issued from the
    Circuit Court and be served by the Sheriff of the
    county requiring the appearance of the witness or
    the production of records or evidence to the
    Hearing Officer.

D.    Disobedience of a subpoena constitutes contempt of
    the Circuit Court from which the subpoena has been
    issued.  Expenses related to the filing of an
    affidavit and the issuance and service of a
    subpoena shall be charged to the witness against
    whom the subpoena has been issued, unless the
    Circuit Court finds that the action of the witness
    was taken in good faith and with reasonable use.

54

**EXHIBIT 18**

PAGE 5 GENERAL ORDER 10-92
COMMAND DISCIPLINE

In the case, and in any case in which an affidavit has been filed without the issuance of a subpoena, the expenses shall be charged to the Commission.

E.   The Hearing Officer shall keep a transcript of the proceedings, the transcript of testimony adduced and pleadings, exceptions, motions, requests, and papers filed by the parties, other than separately presented briefs or arguments of law, shall constitute the complete and exclusive record. The Hearing Officer shall prepare a recommended finding and determination. Notice of the filing shall be given to the parties involved in the complaint or appeal. Any party may within then (10) days file his/her objections to the entry of the record filed, the Commission shall set the matter for hearing which shall be on the record filed with the Commission. The Commission may hear additional evidence. In order to hear additional evidence, the Commission may exercise the powers granted a Hearing Officer under division B) and C) of this section. After the hearing, the Commission shall adopt, amend or modify the recommended finding and determination. If no objections are filed, the Commission may adopt the recommended finding and determination without further hearing. If the Commission does not so adopt the recommended finding and determination, it shall set the matter for hearing and notify the parties involved in the complaint or appeal and proceed as though objections had been filed to the recommended finding and determination of the Commission shall be given promptly to the parties involved in the complaint by the Commission. The Commission's finding and determination, including any discipline ordered by the Commission, shall become final within ten (10) days unless appealed from this Commission as provided in 35-128.

F.   No continuance of any hearing shall be granted unless a written request for such continuance is received in the officer of the Commission at least five (5) days prior to the date set for hearing. Notice of the continuance shall be provided to each of the parties involved.

55

EXHIBIT 18

PAGE 6 GENERAL ORDER 10-92
COMMAND DISCIPLINE

G.     No disciplinary proceeding shall be commenced more than
       one hundred twenty (120) days after discovery and in no
       event more than two (2) years after occurrence of the
       alleged misconduct, except where the alleged misconduct
       would, if proved in a court of appropriate jurisdiction,
       constitute a felony or Class A misdemeanor.

H.     The Commission shall establish a list of five (5)
       attorneys, admitted to practice law in the state, who are
       willing to act as Hearing Officers. The Commission shall
       adopt rules concerning the rotation of names of the
       attorneys to act as a Hearing Officer on any particular
       case.

I.     Each party shall bear his/her own costs of any hearing
       conducted before a Hearing Officer of the Commission.

J.     During the time period after a complaint is filed with
       the Commission and before the Commission makes its final
       finding and determination with respect to that complaint,
       a party to the complaint may not communicate with the
       assigned Hearing Officer or member of the Commission,
       unless notice of the meeting is given, and an opportunity
       to be present is afforded, to the other parties to the
       complaint. However, this division does not apply to an
       official hearing or proceeding conducted under this
       section.

56

**EXHIBIT 18**

GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE RELATIVE TO
ALL POLICE VEHICLES

I.  PURPOSE

    The purpose of this order is to establish guidelines
    concerning the operations of police vehicles during normal,
    emergency, and pursuit conditions; and procedures related to
    police vehicle accidents and damage.

II. LEGAL REFERENCE

    Indiana Code 9-4-1-25

III. POLICY

    It is the policy of the Gary Police Department that all
    officers operate city-owned/leased vehicles with due regard
    for the safety of all persons. Officers are reminded that
    State and local provisions will not protect the officer from
    the consequences of his reckless disregard for the safety of
    others.

IV. TRAFFIC SAFETY

    A.  Officers shall consider road, traffic, and weather
        conditions at all times while operating a police vehicle.

    B.  Officers shall use reasonable care, regardless of the
        nature of the run, for the protection of life and
        property.

    C.  When a officer exits a police vehicle the officer shall
        remove the key from the ignition and maintain key in
        his/her possession.

    When an officer exits a police vehicle, for any reason other
    than an emergency situation, all doors to departmental vehicle
    shall be locked.

    At no time shall the vehicle be left with engine running.

57

000062

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE

V.  EMERGENCY OPERATION

A.  For all reasons to operate on an emergency basis the
    officer must first be granted permission from his
    supervisor. Once permission has been granted the officer
    shall enter the name of the supervisor on his activity
    sheet.

B.  While operating a police vehicle under emergency
    conditions, the red light and siren must be operating,
    exception: silent runs (refer to Section VI).

C.  When driving under emergency conditions, the following
    procedures shall be adhered to:

    1.  Police vehicles approaching a red traffic signal or
        stop sign will stop and yield right-of-way to all
        moving vehicles and pedestrians within the
        intersection, and those approaching in a manner
        that would cause them to become a hazard.

    2.  Police vehicles approaching a green traffic signal
        or an intersecting street, where the officer has
        the right of way shall be prepared to take evasive
        action and brake, if necessary, then proceed with
        caution only when safe.

D.  EXCEPTION

    1.  When making a routine traffic stop the red light
        and siren may be used without the supervisor's
        permission.

        a.  This does not mean that an officer may proceed
            with a pursuit of the vehicle without the
            supervisor's permission.

    2.  When a car is kept in a parked position during
        traffic control the red light may be used without
        the supervisor's permission.

38

000063

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE

VI.   SILENT RUNS

    A.   Silent run is defined as operating under emergency conditions utilizing red lights but no audible signal.

    B.   Silent runs are authorized for the following:

        1.   For all reasons to operate on silent runs the officer must first be granted permission from his supervisor. Once permission has been granted the officer must enter the name of the supervisor on his activity sheet.

    C.   When using red lights only, the officer must:

        1.   Obey all traffic laws.

        2.   Stop at all stop signs and traffic signals; proceed only when the way is clear.

        3.   Operate with extreme caution and at a reasonable speed so as not to endanger the life and property of others.

VII.  PURSUIT DRIVING CONDITIONS

    A.   Pursuit is defined as sustained chase of a known or suspected law violator and is permitted with the permission of his supervisor, for the following:

        1.   On-sight pursuit of known or suspected felon.

        2.   On-sight pursuit of traffic or misdemeanor violators, witnessed by the officer;

        3.   To assist a pursuit vehicle, but only when ordered to do so by a field supervisor through the Communications Center.

    B.   PURSUIT PROCEDURES

        1.   While operating under pursuit conditions, red light and siren must be operating.

55

000064

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURES

    2.    The pursuing officer shall notify Communications immediately of the following:

        a.  Unit number
        b.  Location
        c.  Direction of travel
        d.  Reason for pursuit
        e.  Description of vehicle, occupants, license number etc.

C.    The officer shall remain in constant contact with Communications and advise of all pertinent information until such time as additional units are called for assistance.

D.    Communications shall broadcast the chase on all channels.

E.    Unmarked police vehicles, van-type, jeeps, cycles, and wagons may initiate a pursuit only under extreme circumstances but shall terminate such pursuit immediately when a marked vehicle using red lights and sirens takes up the pursuit. If the vehicle is not equipped with red lights and sirens, it cannot pursue.

    1.    EXCEPTION: A wagon transporting prisoners cannot initiate/join a pursuit at any time under any circumstance.

    2.    The initiating unit will proceed under normal driving conditions; in the event of an apprehension, the initiating unit shall respond to the scene.

F.    ASSISTING UNITS

    1.    At no time shall more than two (2) police vehicles be in actual pursuit of another vehicle unless specifically ordered to do so by the Communications Division or Field Supervisor through the Communications Division.

    2.    The second vehicle involved in the pursuit shall keep Communications advised of all pertinent information relating to the pursued and pursuing vehicle.

60

000065

**EXHIBIT 18**

3.    The second vehicle may take over the actual pursuit only after being requested to do so by the initial pursuing unit.

4.    Police units relatively close may move in using normal emergency limitations but shall not leave their assigned sector/beat or use pursuit driving conditions unless specifically ordered to do so by the Communications Division.

5.    At no time shall assisting units convoy behind the pursued vehicle.

G.    HELICOPTER ASSISTANCE

1.    Helicopter assistance will be requested by the Communications Division of Field Supervisor through the Communications Division.

2.    Ground units will relay all necessary information to helicopter personnel.

3.    Helicopter units will advise ground units of upcoming traffic congestion, road hazards, and other factors possibly endangering the safety of pursuing units and other life and property.

4.    When a helicopter is available and has visual contact with the pursued vehicle, the primary unit should consider discontinuing emergency operation (red lights and siren) and allow the helicopter to continue surveillance of the suspect and assume the responsibility of directing the ground units so as to apprehend the suspect without the dangers involved in a pursuit.

H.    TERMINATION OF PURSUIT

1.    Pursuit conditions may be terminated upon the authority of the pursuing officer, the Communications Division, or the Field Supervisor through the Communications Division.

2.    The only units remaining at the termination point should be the initial pursuing officer, last officer pursuing, and anyone ordered by the Field Supervisor.

61

EXHIBIT 18

PAGE 6/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE

3.    The officer of the primary unit is responsible for the arrest when the suspect voluntarily terminates the pursuit, or becomes involved in a traffic accident.

J.  ROADBLOCKS

1.    Members of the Department shall take reasonable precaution to protect life and property when establishing a roadblock for the purpose of stopping fleeing vehicle.

2.    Upon the authority of the Field Supervisor roadblocks shall be established using the following criteria:

a.    A roadblock shall not be established on a blind curve or crest of a hill where the driver of the fleeing vehicle, or any other vehicle, would be denied the ability to stop.

b.    The roadblock shall not be placed in a dark or shaded location where it cannot be readily seen by any driver of any vehicle.

c.    Every effort should be made to locate the roadblocks in an area that would minimize the probability of property damage or personal injury. Considerations include population, proximity to parks, hospitals and schools, and open areas as opposed to residential and business districts.

d.    Police and privately owned vehicles shall not be used for roadblocks. Police vehicles may be used as a warning device with red lights operating and parked as far off of the roadway as possible.

e.    If time permits, flares shall be placed 500 feet before the roadblocks to give adequate and appropriate notice to the pursued vehicle and all other approaching motorists.

f.    The Communications Division shall be advised of the roadblock and all pertinent information for relay to the pursuing vehicles.

62

**EXHIBIT 18**

PAGE 7/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE

3. Supervisor's Responsibility

    a.   A Field Supervisor shall be immediately dispatched to the termination point, if not already on the scene, and shall assume responsibility for any further police action at the scene.

    b.   The supervisor shall prepare any special reports that may be required.

VIII. POLICE VEHICLE ACCIDENTS AND DAMAGES

A. Accidents

1. The following procedures shall be used when the Police Department or city-owned vehicle (including leased and confiscated) driven by police personnel is involved in an accident.

    a.   The Communication Division shall be notified of the accident, location, conditions, and persons involved.

    b.   Communications shall dispatch all necessary units:

        1. Accident Investigator;
        2. Paramedics, if needed;
        3. Tow truck, if needed;
        4. Field Supervisor assigned to the Sector. If none are available, a field supervisor from the next closest sector shall be called. A Turn Lieutenant should be dispatched only when unusual circumstances exist.
        5. City Investigator

2. The vehicle should not be moved unless directed by the Accident Investigator, superior officer, or if the vehicle is in a position to cause danger.

3. If injuries are involved:

    a.   If injured and under arrest, civilians will be sent to the nearest hospital capable of administering necessary medical treatment. If they refuse treatment, they shall be required to sign a medical release.

63

EXHIBIT 18

PAGE 8/GENERAL ORDER 11-92
STANDARD OPERATIONAL PROCEDURE

      b.    Police personnel (sworn or civilian) shall be sent to the nearest hospital for examination anytime injury is sustained.

4.    All transactions between persons and officers involved in the accident shall be exchanged through the Accident Investigator.

5.    All reports shall indicate the officers name, assignment, whether on or off duty, confidential number, and license plate number. If the vehicle was parked at the time of the accident, the name of the officer who parked the vehicle shall be included in the Incident Report.

6.    Reports - P/I, P/D Accident

      a.  Officer - Indiana Standard Accident Report (SR 21)

      b.  Officer - Damage to vehicle report and officer's report. See Form -1

      c.  Accident Investigator - Indiana Standard Accident Report

      d.  Supervisor - Report and recommendations.

B.    Damage to Police Vehicle

      1.    Each officer shall be responsible for checking his assigned vehicle for damage prior to moving the vehicle. If an officer fails to do so, that officer may be charged with any damages found on vehicle while vehicle is under his control.

C.    All Police Officers that are involved in accidents will be referred to the Accident Review Board and, if found to be at fault will face disciplinary action.

**EXHIBIT 18**

**GENERAL ORDER 12-92**
**FAIR LABOR STANDARDS ACT**

Effective 12:01 A.M. Saturday, October 1985 this department will implement a policy to comply with the Federal Fair Labor Standards Act specifically the 207K Exemption for Police Personnel. This policy affects all police personnel except those who because of their duties and responsibilities have been clarified exempt.

All personnel will be required at the start of their tour of duty to sign an individual time sheet and also sign this time sheet at the end of their tour of duty. The Turn Commander will be responsible to assure time sheets are completed daily and are legible. Time sheets must be signed by each individual and cannot be signed in advance. These time sheets must be approved by the Turn Commander and forwarded to the Payroll Clerk, Office of the Chief, no later than 10:00 a.m. Monday following the end of a pay period. A schedule of pay period dates will be supplied.

This department has established and alternative work schedule in accordance with provisions of the Fair Standards Act which specifically covers fourteen (14) days, eighty-six (86) hours; the work week will begin Saturdays at 12:01 A.M. and end fourteen days later at 12:01 midnight. Thereafter, each succeeding work schedule will begin Saturdays at 12:01 a.m. and will end fourteen (14) days.

Turn Commanders will be responsible to monitor time sheets daily, accumulate each officers total hours, and adjust the officers weekly schedule to assure the officer does not exceed the required forty (40) hours per week.

     EXEMPT RANK POSITIONS

     Chief

     Deputy Chief

     Inspector

     Deputy Inspectors

     Commanding Officer of the Bureau of Uniform Services

     Commanding Officer of the Traffic/Tactical Division

65

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 12-92
FAIR LABOR STANDARDS ACT

Commanding Officer of the Bureau of Investigative
Services

Commanding Officer of the Public Morals Bureau

Commanding Officer of the Juvenile Aid Bureau

Commanding Officer of Auto Detail

Commanding Officer of Detective Division

Commanding Officer of the Technical Services Bureau

Commanding Officer of the Bureau of Identification

Commanding Officer of the Internal Affairs Division

Commanding Officer of the Training Division

Commanding Officer of the Community Services Division

Commanding Officer of Communications Division

Commanding Officer Motor Transport Division

Commanding Officer Patrol Division

66

**EXHIBIT 18**

**GENERAL ORDER 12.1-92**
**SWORN PERSONNEL TIME SHEET**

Effective 12:01 a.m. Saturday, October 12, 1985, this department implemented a policy to comply with the Federal Fair Labor Standards Act specifically the 207K Exemption for Police Personnel. This policy affects all police personnel except those who because of their duties and responsibilities have been clarified exempt.

All personnel will be required at the start of their tour of duty to sign an individual time sheet and also sign this time sheet at the end of their tour of duty. The Turn Commander will be responsible to assure time sheets are completed daily and are legible. Their time sheets must be signed by each individual and cannot be signed in advance. These time sheets must be approved by the Turn Commander and forwarded to the Payroll Clerk, office of the Chief, no later than 10:00 a.m. Monday following the end of a pay period. A schedule of pay period dates will be supplied.

This department has established an alternative work schedule in accordance with provisions of the Fair Labor Standards Act which specifically covers fourteen (14) days, eighty-six (86) hours; the work week will begin Saturdays at 12:01 a.m. and end fourteen days later will begin Saturdays at 12:01 a.m. and end fourteen days later at 12:01 midnight. Thereafter, each succeeding work schedule will begin Saturdays at 12:01 a.m. and will end fourteen (14) days.

67

000072

**EXHIBIT 18**

GENERAL ORDER 12.2-92
OVERTIME

In order to maintain full financial accountability/control on overtime worked on city and federal programs (development taskforce, PMD, surveillance) the following guideline is effective immediately:

No officer may claim overtime in excess of 16 hours in any 24 hour period. After working 16 hours in any 24 hour period, all additional time worked will be reimbursed with compensatory time and not at the overtime rate.

68

**EXHIBIT 18**

GENERAL ORDER 12.3-92
OVERTIME


Whenever special events require the scheduling of additional duty hours, wages will be paid at one and one half (1/2) times an officer's regular hourly rate.

If an officer fails to complete his normally scheduled hours due to illness, injury, or any other unexcused absence, but is scheduled for additional duty, the additional hours will be paid at the officer's regular hourly rate.

Overtime wages will only be paid for special events; all other additional hours will be regulated by the Fair Labor Standards Act.

Officer who normally work in an exempt capacity will be entitled to overtime provisions for special events only.

69

**EXHIBIT 18**

GENERAL ORDER 12.4-92
OVERTIME GUIDELINES

This administration was successful in its attempts to have the Gary Common Council set aside monies to pay sworn police officers who are interested in working their off duty hours.

It is clear the declining number of police officers on this Department has placed a serious burden on each and every division. However, the primary area of concern is the Patrol Division, and it is there, our efforts will be directed.

Sufficient funds have been secured to keep this program in effect. The following guidelines are initiated for those interested in participating:

1.    Those wishing to participate in the overtime program will be required to sign-up in advance.  Sign-up sheets will be available in the Office of the Bureau of Uniform Services.

2.    Officers will be monitored on their performance, especially in the following categories: (1) Response to Radio Calls; (2) Felony Arrests; (3) Misdemeanor Arrests; (4) Traffic Citations; and (5) Parking Citations.

3.    To qualify for the overtime program, an officer must have worked the prior pay period without having accumulated any sick time, or time that is considered "Absent Without Leave".

4.    When an officer fails to complete his regularly scheduled hours for any reason other than Vacation Days, Days Off, or time considered Absent With Leave  (A.W.L.), but has worked overtime hours – the overtime hours will not be paid at a premium rate.

5.    No overtime personnel will be given special assignments, i.e., Hospital Guard Duty, Front Desk, Radio, City Hall, Roving Cars, etc.

6.    For the purpose of monitoring productivity all overtime personnel will work as a group in areas or sectors as designated by the Office of the Bureau of Uniform Services or Watch Commander.

78

000075

**EXHIBIT 18**

PAGE 2 GENERAL ORDER 12.4-92
OVERTIME GUIDELINES

7.   When there is not a sufficient number of vehicles available to
     accommodate the scheduled manpower, it shall be permissible to
     assign two (2) man action cars. However, both officers shall
     be of the same status, either overtime, or regularly scheduled
     personnel.

8.   All overtime personnel will be subject to existing
     departmental rules, regulations, and policies.

9.   All overtime personnel will be expected to perform the patrol
     assignments given them regardless of their rank. However, on
     those days when the regular turn commander is not working, and
     the overtime schedule contains an officer with the rank of
     Lieutenant or above, with the permission of the Bureau of
     Uniform Services, he may assume command.

10.  All overtime personnel shall submit activity sheets and time
     sheets (yellow in color) on a daily basis.

11.  Overtime personnel reporting late for roll call are subject to
     being replaced without benefit of notification.

12.  FAILURE TO REPORT FOR SCHEDULED TOURS OF DUTY, OR REPORTING
     LATE FOR ROLL CALL, WILL RESULT IN MINIMAL FUTURE
     CONSIDERATION.

71

000076

**EXHIBIT 18**

GENERAL ORDER 12.5-92
SUSPENSION OF OVERTIME PRIVILEGES


Effective Saturday, January 11, 1992, the following procedure shall be instituted relative to disciplinary action.

An officer receiving disciplinary actions, i.e., Written Warning or Suspension Notice, will not be entitled to overtime privileges. See Below:

One (1) Written Reprimand - Suspension of one (1) week overtime privileges.

Two (2) Written Reprimands or more - Suspension of two (2) weeks of overtime privileges.

Suspension from pay and duty for one (1) day or more - Suspension of two (2) weeks or more overtime privileges.

The officer shall contact his commander after the suspension privilege period to reschedule overtime activities.

72

**EXHIBIT 18**

GENERAL ORDER 13-92
WATCH COMMANDER'S DUTIES AND RESPONSIBILITIES

I. **PURPOSE**

This order shall establish the Watch Commander's duties and responsibilities.

II. **POLICY**

The Watch Commander shall have immediate control of the Gary Police Department in the absence of the Chief of Police, Deputy Chief, Inspector, and Deputy Inspectors.

III. **PROCEDURE**

He shall be held strictly responsible for the preservation of the public peace, the protection of life and property, and the general good order of the City. He shall be vigilant in enforcing all the laws and ordinances of the City of which the Department takes cognizance. He shall give his best efforts to the prevention of crime, investigation and solution of criminal cases, apprehension of offenders, locating of missing persons, suppression of vice and gambling in all parts of the City, and criminal investigations for other cities and fugitive requisition proceedings.

IV. **DUTIES AND RESPONSIBILITIES**

1. Insure proper performance of functions designated for each bureau, division, squad, unit and other branches of the Department, including the Auxiliary Police Division.

2. Insure the efficiency and discipline of personnel of all branches of all Divisions.

3. Check on the serviceability, proper care and use of the Department's buildings, records and equipment.

4. Make frequent personal inspections of the uniforms, equipment, and general appearance of all members of the Department.

73

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 13-92
WATCH COMMANDER'S DUTIES

5. Examine daily schedules and records of each division to insure accuracy and to prevent abuse.

6. Investigate reports of neglect of duty coming to his attention.

7. Supervise all personnel in the performance of their duties in the field and in the department's building.

8. Utilize resources of the Department to cope efficiently with the existing problems which arise unexpectedly while on duty.

9. Assume command and perform functions of any Commanding Officer as required during his absence as directed.

10. Notify unit commander of hazards not readily corrected by on-duty personnel.

11. Re-deploy personnel if necessary on a temporary basis to cope with emergency/staffing situations.

12. Insure that official reports are accurate and complete.

13. Advise Commanding Officers of appropriate divisions of matters of importance, unusual arrests or occurrences and importance messages or conditions requiring immediate attention.

14. Evaluate continuously the effectiveness of all assignments within the organizational structure of the Police Department.

15. Insure that disciplinary reports concerning members of the force and civilian employees of the Department, are made as required.

16. Investigate and report on injuries to members of the Department and damage to the Department property as required.

74

000079

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 13-92
WATCH COMMANDER'S DUTIES

17.   Initiate disciplinary proceedings against any subordinate
      officer (division commander, turn commander, etc.)
      allowing violations to occur within their command.

18.   Watch Commander will provide a daily report to the Chief,
      Deputy Chief, Inspector/Deputy Inspector.

19.   When the Public Information Officer is not on duty, the
      Watch Commander is responsible for News/Press Releases to
      all news media.

20.   Watch Commander's duty station will be the Patrol
      Commanders Office.

21.   Dress Code will consist of uniform dress unless ordered
      by the Chief of Police.

75

**EXHIBIT 18**

GENERAL ORDER 14-92
PROPOSED PLAN FOR POLICE PROTECTION FOR THE CITY OF GARY IN THE
EVENT OF A JOB ACTION BY SWORN PERSONNEL OF DEPARTMENT

I.    ASSESSMENT

The Chief of Police or his designee upon reliable information
that a job action is eminent or in progress, shall conduct a
meeting with all Gary Police Department Commanders for the
purpose of determining manpower requirements, deficiencies if
any, and evaluating manpower needs.  During this meeting all
job action participants shall be identified and all
information shall be reduced to writing.

Upon evaluation and determination that assistance may be
needed, the following agencies will be notified immediately in
the order and as indicated by the Chief of Police or his
designee:

1.    Lake County Sheriff's Department
      1-219-755-3300

2.    Indiana State Police
      Superintendent
      1-317-232-8241

3.    Office of the Governor - State of Indiana
      Special Assistant for Public Safety
      1-317-232-4579

II.  The Chief of Police shall issue an order directing that an
     emergency exists and that all sworn personnel shall be on
     standby and available for duty on an as needed basis when
     ordered to report for duty by a superior officer.  The order
     shall further provide that all vacations and off days are
     canceled to meet the needs of the Department.

     Where the Chief of Police, in consultation with the Director
     of Public Safety, the Mayor of the City or his designee,
     determines that the available manpower is insufficient to
     provide the necessary police protection for the City of Gary,
     the Chief of Police shall re-sign sworn personnel, including
     Auxiliary Police, and establish work schedules to meet the
     department's requirement of necessary police services to the
     community.

76

000081

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 14-92
JOB ACTION BY SWORN PERSONNEL

The Chief of Police shall, in consultation with the Director of Public Safety and the Mayor or his designee, reduce the demands for police services with an aim towards deferring services of the least priority depending upon the then existing manpower availability until such time as manpower is sufficient to conduct normal police services.

III. Where all of the above actions have been taken and the Chief of Police, in consultation with the Director of Public Safety and the Mayor or his designee, determine that additional manpower is needed to provide critical police services to the City, assistance shall be sought first from the Lake County Sheriff. Should it be determined that the assistance provided by the Lake County Sheriff, combined with Gary City and Auxiliary Police is insufficient to provide vital police services then assistance shall be sought from the Indiana State Police. Should a determination that the combined manpower of the aforementioned agencies are insufficient to provide vital police services to the City of Gary and that an emergency exist, assistance will be sought from the Governor of the State of Indiana vis-a-vis the Indiana National Guard.

The above County and State Police Agencies have been contacted and will provide assistance as follows:

A. Lake County Sheriff;s Department

1. The Sheriff will provide approximately four (4) cars and personnel per shift.

2. Helicopter Patrol as needed.

3. Additional manpower if City of Gary provide vehicles and communication.

4. Support police services such as photography and fingerprinting.

77

000082

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 14-92
JOB ACTION BY SWORN PERSONNEL

5.    The County Sheriff's personnel first priority will
      be with traffic problems and as backup for other
      police services.

   B.  Indiana State Police

   1.    First priority for State Police will be
         traffic control, then as backup support for
         other police services.

   2.    The city of Gary will be billed at a letter
         date for expenses incurred by State Police
         Personnel except for wages.  This includes,
         but is not limited to, mileage (.22 per mile),
         per diem ($15.00 per day), housing costs at a
         negotiated rate.

   C.  Indiana National Guard

   1. All  necessary  public  safety  activities.   All
      arrests shall be processed through the Gary Police
      Department.

IV.  Procedure for Notification and Activation

   A.  Lake County Sheriff's Department

   1. Verbal request by the Chief of Police or designee
      initiates Sheriff's assistance.

   2. Formal request in writing from the Chief of Police
      or Director of Public Safety.

   B.  Indiana State Police

   1. Verbal  request  to  Governor's  Office,  Special
      Assistant  for  Public  Safety,  1-317-232-4579,
      initiates State Police assistance.

   2. Formal letter from the Chief of Police or Director
      of Public Safety.

000083

**EXHIBIT 18**

        C.  Indiana National Guard

        1. Verbal request from Mayor to the Governor declaring State of Emergency initiates procedures to activate the National Guard.

        2. Formal letter from the Mayor to the Governor declaring State of Emergency.

        3. Confirmation of Emergency from Superintendent of the Indiana State Police.

**V.**  **Discipline**

    **A.**  Any sworn member of the Department who fails to report for his regularly assigned duties shall not be paid and is subject to disciplinary action until he establishes to the satisfaction of the Chief of Police the legitimacy of his absence(s). Likewise, any sworn member of the Department who fails to report for duty even though not scheduled when ordered to do so by a superior officer shall be subject to disciplinary action.

    **B.**  Any sworn member of the Department who violates Departmental Orders, Directives, Rules and Regulations of the Gary Police Civil Service Commission shall be subject to immediate disciplinary action which may result in suspension and/or demotions or dismissal.

000084

**EXHIBIT 18**

GENERAL ORDER 15-92
ACCIDENT REVIEW BOARD

I.  PURPOSE

This order shall establish the creation of an ACCIDENT REVIEW
BOARD intended to handle all accidents involving police
department vehicles.

II.  COMPOSITION

This Board shall be composed of the following eight (8)
members:

Bureau of Investigative Services Commander - Chairman

Patrol Commander

Traffic Commander

Hit and Run Investigator

Police Garage Supervisor

Three (3) Uniform Officers to sit on the Board each month.

The Board will sit on the last Tuesday of each month.

III. POLICY - PROCEDURE AND RESPONSIBILITY:

1.   Both the officer involved and his immediate supervisor
     will submit detailed reports concerning the circumstances
     of the accident to the Division Commander.

2.   The Division Commander will then see that copies of these
     reports and any others concerning the accident are
     forwarded to the Deputy Chief of Police.  Along with
     these reports he will submit a recommendation of action
     to be taken concerning culpability.

80

EXHIBIT 18

**PAGE 2/GENERAL ORDER 15-92**
**ACCIDENT REVIEW BOARD**

3. The Accident Review Board will then meet, review the circumstances involved, and make a recommendation to the Deputy Chief of Police based on their findings. Every effort will be made to see that this meeting takes place within forty-eight hours of the accident.

4. The Turn Commander (Lieutenant) shall be permitted to address the Accident Review Board, and present evidence or testimony pertinent to accidents involving those under his command. He shall also be subject to mandatory appearance should the Board find his presence necessary.

81

000086

**EXHIBIT 18**

GENERAL ORDER 16-92
PROCEDURE - LOST OR STOLEN LICENSE PLATES


Effective immediately the following procedure will be followed
relative to Lost or Stolen license plates:

1.   Unrecovered stolen plate(s) may be entered into file if a
     theft report has been made.

2.   Entries are usually limited to instances where all plates
     issued are reported stolen.  In a two-plate State where only
     one plate is reported stolen, an entry is permitted provided
     the entering agency is assured the remaining plate will not be
     on a vehicle.   IN ADDITION, an owner may not know whether
     his/her license plate has been stolen or lost.  He/she should
     then report it to the police/Bureau of Motor Vehicle as stolen
     and complete a theft report.  The record could then be entered
     into N.C.I.C. provided that the same license plate number is
     not reissued or the remaining second plate will not be used.

     When the police officer prepares the stolen or lost license
     plate report from the complainant, he/she is to explain the
     above procedure.

82

000087

**EXHIBIT 18**

GENERAL ORDER 17-92
COMMUNICATIONS ROOM PROCEDURES


The following procedures will be implemented immediately by all personnel of the Communications Division:

1.   Uniforms will be worn by all sworn personnel.

2.   All personnel will report ten (10) minutes before the hour to relieve on duty personnel.

3.   All schedules will be prepared to reflect the status of all personnel and submitted to the Office of the Chief thirty (30) minutes after the start of the turn. The midnight turn will place their schedule in the Chief's basket in the Technical Services Bureau - Desk area.

4.   All due days or extra days off will be approved by Communications Commander prior to taking day(s) off.

5.   All personnel will be present in Radio Room for the entire scheduled shift, with an exception - one (1) hour lunch.  No other exception.

6.   Call-offs and calls of lateness will be placed to the Commander (Chief's Office) when possible.  If not able to contact Commander, personnel must report off to the supervisor on duty in the Radio Room.  No exceptions.

7.   Supervisors receiving call-offs and tardy reports will document information and forward to Commander.  No exceptions.

8.   All cards and messages presented to Dispatcher will be acted upon promptly.

     a.   Backlog of all calls in given district; It's your responsibility to notify field supervisor.

     b.   Under no circumstances, no call is to be held more than 30 minutes.  Backlog calls will be given to supervisor for him/her to take.

000088

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 17-92
COMMUNICATIONS ROOM PROCEDURES

9.  All cards will be inspected by the Dispatcher for completeness.

10. It is the responsibility of the Dispatcher to oversee any and all announcements.

11. It is the responsibility of the Dispatcher to point out the failure to radio operating procedures on the part of field personnel.

    Example A: 10-20 not given
            B: 10-23 not given
            C: Two radios turned on in the same vehicle causing feedback.

    The Dispatcher should also bring it to the attention of the supervisor for corrective action.

12. It is the responsibility of the Dispatcher to give call letter announcement, approximately every one (1) hour, (60 minutes).

13. Names will not be used when Broadcasting.

14. All action calls (Break-In in Progress, Large Disturbances, Armed Robbery, simicast, preceded by Alert Tone).

15. The Dispatcher and supervisor are responsible for keeping background noise in radio room to a minimum.

16. In the absence of a supervisor and/or sworn personnel, the senior technician is responsible for the Radio Room.

17. It is the responsibility of all radio personnel to make certain, only authorized persons are in the radio room.

18. Whenever possible, codes will be used when dispatching.

19. If a district car is involved in a minor situation and a more serious call is pending, the dispatcher will re-assign this unit.

84

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 17-92
COMMUNICATIONS ROOM PROCEDURES

20. The dispatcher has the responsibility for advising field units of the proper channel use:

    Example: 10-28, 10-29 – tow trucks, etc., Channel 2
             car to car traffic – Channel 3

21. After attempting to call any units three (3) times, without acknowledgement, the supervisor will be notified.

22. The dispatcher must remember the field officer does have other responsibilities in addition to listening to his radio. Be patient and courteous.

23. When hearing a P-Unit with poor transmission, dispatcher will note location of officer and location of tower transmitting. This information will be placed on log.

24. It is mandatory that all personnel know the operational procedure for the equipment in the radio room.

25. It is the responsibility of all personnel to bring to the attention of their supervisor if they do not know standard operating procedures for the operations of any and all equipment.

26. It is the responsibility of the dispatcher for the opening and closing of garage doors.

27. Every person will be responsible for cleaning the lounge after they use it. No dirty dishes will be left in the sink. All utensils will be put away after being used.

28. No personnel will leave the radio room for any reason without first gaining permission from the supervisor on duty.

29. All personnel are responsible for keeping their work area clean.

85.

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 17-92
COMMUNICATIONS ROOM PROCEDURES

30. The dispatcher will be responsible for announcing signal 500, whenever an officer calls for assistance. Signal 500 transmission will be on channel one (1) only. All other transmissions will go to Channel 2 until re-advised by Channel one (1) operator - unless involved in assistance.

31. NO UNAUTHORIZED PERSONNEL WILL BE ALLOWED IN RADIO ROOM.

Each individual is responsible for the above listed procedures - the police supervisor has overall responsibility to make sure that these procedures are adhered to.

The turn supervisor will see that each employee receives a copy of this directive, read and understand it, and implement it fully.

86

**EXHIBIT 18**

GENERAL ORDER 17.1-92
COMMUNICATIONS PROCEDURE
FIELD OFFICER/RADIO DISPATCHER

I.   PURPOSE

The purpose of this order is to establish proper radio procedures between the officer in the field and the Communications Center. This will eliminate confusion and establish continuity by utilizing correct procedures.

II.  POLICY

All officers shall be held in violation of this order for failing to comply as described in Section III

III. PROCEDURE

The proper method of responding to the Communication's Dispatcher when being given an assignment will be as follows:

A.   When responding to the initial call from Radio or any other unit, the field officer will give his unit number, P unit number or Sector number - as it may apply, and location (10-20).

B.   After being given the assignment, the field officer, will indicate to the radio dispatcher, that he has received and understands the message.

C.   Upon arrival at said assignment the officer shall notify the radio dispatcher by using the National Code Number (10-23).

D.   Upon completion of assignment, the officer shall notify the radio dispatcher by using the National Code number (10-24) and give disposition to the call.

E.   In the event a responding officer is detained between the time of being given the assignment, and the time of arrival, he shall report to the dispatcher the circumstances of the delay. The radio dispatcher will then duly record the delay by making the appropriate entry on the dispatch data card.

87

000092

**EXHIBIT 18**

PAGE 2 GENERAL ORDER 17.1-92
COMMUNICATIONS PROCEDURES

    F.    No message, except an emergency message should be transmitted until communications have been established between the control dispatcher and the Field Unit.

    G.    SIGNAL 500

        Effective this date a Signal 500 will be placed into effect whenever an officer or supervisor determines an emergency situation exists and all radio traffic should stop on Channel 1 until the emergency situation clears. All regular traffic not involving the Signal 500 will go to Channel 2. Communications will not implement the Signal 500. It must be initiated and cleared by the officer or his supervisor.

    F.    Effective this date, radio traffic will be conducted on the following channels:

        1.  Channel One - Regular Dispatch/City wide
        2.  Channel Two - Information/10-28/10-29/warrants
        3.  Channel Three - Car to Car/Special Assignments

Patrol supervisors picking up reports should request headquarters to announce that units with reports go to Channel Three. Car to Car traffic should be kept to a minimum on Channel One.

**EXHIBIT 18**

GENERAL ORDER 17.2-92
DETAIL ASSIGNMENT - COMMUNICATIONS

Whenever a manpower shortage occurs in the Communications Division and a request is made by the Communications Division's supervisor for assistance, an officer from the Patrol Division or the Auxiliary Section shall be detailed to Communications for assignment.

Be advised that there shall be four (4) persons manning the Radio Room on the day turn (8 a.m. to 4 p.m.) and evening turn (4 p.m. to 12 midnight). The midnight turn (12 a.m. to 8 a.m.) can operate with three (3) persons.

89

**EXHIBIT 18**

GENERAL ORDER 17.3-92
IDACS - WANTED FILES
VALIDATION PROCEDURES

The purpose of this order is to instruct each Division Commander and personnel assigned on the proper IDACS - Wanted Files - Validation Procedures. Validation print-outs are received by this department on - approximately the 25th day of each month.

1.    The IDACS Coordinator or designee shall distribute validation print-outs to each Division within 24 hours after receipt by this department.

2.    Each Division Commander or designee shall sign for receipt of the validation print-out.

3.    Division Commanders or designees shall confirm that the wanted files are active or in-active.

4.    Once this procedure is completed, validations print outs shall be returned to the Communications Division's IDACS Coordinator or designee no later than the 12th day of each month. TIME FACTOR IS IMPERATIVE.

5.    IDACS Coordinator or designee shall sign for updated print-out upon receipt.

6.    IDACS Coordinator or designee receiving completed validation print-outs from required Divisions shall place the validation print-outs in the designated location to be processed by all IDACS operators.

7.    Once all validations print-outs are completed by the Communications Division's personnel, print-outs shall be returned to Division Commanders or designees. It shall be the responsibility of the Division Commander to review, verify and confirm that the validation process was properly and correctly entered.

90

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 17.3-92
IDACS VALIDATION PROCEDURES

8. The Communications Division shall submit to the Office of the Deputy Chief, by the 21st of each month, a complete report indicating that the validations were timely processed.

91

**EXHIBIT 18**

GENERAL ORDER 18-92
TELE-SERVICE TECHNICIAN

The Tele-Service Technician will perform the following (1) follow-up investigations on stolen auto, theft for, criminal mischief to, and unauthorized control of motor vehicles; (2) file case cards on all new incoming cases and match the release forms with all tow-ins and recovered vehicles.

1.  JOB RESPONSIBILITIES

    A.  With the aid of the telephone the Tele-Service Technician contacts the victims or complainants to gain additional information relevant to the investigation of stolen auto, theft from criminal mischief to, and unauthorized control of motor vehicles.

    B.  With the aid of the telephone the Tele-Service Technician will notify the complainants or victims of the location of their vehicle or property from vehicle whenever possible.

    C.  With the aid of the telephone the Tele-Service Technician will refer the complainants or victims to the proper office within the department or to an investigator to assist in the recovery of the vehicle or property in question, when possible.

    D.  Any additional information submitted by the victims or the complainants will be recorded and referred to the proper office of to an investigator to help expedite the investigation.

    E.  The Tele-Service Technician will assist the complainants or victims with questions or complaints they may have and refer to the proper office or an investigator to help expedite the investigation.

    F.  The Tele-Service Technician will properly file all case cards for new incoming cases.

92

000097

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 18-92
TELE-SERVICE TECHNICIAN

    G.    The Tele-Service Technician will match the release forms to the tow-ins and recovered vehicle reports.

2.    NECESSARY QUALIFICATIONS:

    Ability to read and write the english language;

    Ability to record, transmit and communicate information properly;

    Ability to maintain a good interpersonal relationship with co-workers and others in the department;

    Ability to ask questions and give intelligent answers;

    Must have good communication skills; and have

    Knowledge of all the necessary report forms to do the job efficiently and effectively.

000098

**EXHIBIT 18**

GENERAL ORDER 19-92
EFFECTIVE DATA QUALITY CONTROL

I.   PURPOSE

     To insure that the Gary Police Department data records
     information is complete and accurate.

II.  DESCRIPTION

     Currently, the basic standard by which to measure all
     police-generated reports is our daily bulletin. Therefore, we
     must ensure that all reports listed on our daily bulletin are
     entered into the computer system on a timely basis.

III. This can be accomplished by performing a periodic comparison
     of data records entered by any particular department against
     the daily bulletin's listing of the associated reports (i.e.
     Data Entry Records will compare offense, vehicle tow, and auto
     theft reports against the case numbers listed on the daily
     bulletin; Bureau of Identification will compare adult arrest
     against the daily bulletin; Juvenile will compare juvenile
     arrest against the daily bulletin). The comparison will yield
     information regarding any missing reports slated for entry
     into the computer system.  It is each department's
     responsibility to ensure that all reports designated for entry
     by that department are entered.

     In the case of accuracy, one should never assume when entering
     a record.  If the correct procedure for entering a record is
     not known, then the operator should contact their supervisor
     or the computer systems manager for assistance.  If the
     operator enters an error, it is that person's responsibility
     to modify the record and eliminate the error.

     The computer system manager will perform periodic data quality
     control checks and inform the department supervisor of any
     errors found in the course of his data inspection.

96

000099

**EXHIBIT 18**

GENERAL ORDER 19.1-92
DATA ENTRY PROCEDURES FOR
ARRESTED INDIVIDUALS

I.  PURPOSE

To generate identification numbers for all arrested persons.
It is imperative that all persons arrested by the Gary Police
Department personnel shall have individual identifying
numbers.

II.  PROCEDURE

The Bureau of Identification will no longer be required to
pick up Offense Reports from the Desk Sergeant.

The Bureau of Identification statistician will be responsible
for entering into the computer system all arrest reports.

The yellow copy of the arrest report shall be used to enter
data into the computer system.

Instructions will be provided by the System Manager of
Computer Information Services, this department.

95

000100

**EXHIBIT 18**

GENERAL ORDER 19.2-92
DATA ENTRY PROCEDURES FOR
ARRESTED JUVENILES


I.   PURPOSE

     To generate identification numbers for all arrested persons.
     It is imperative that all juveniles arrested by the Gary
     Police Department personnel have individual identifying
     numbers.

II.  PROCEDURE

     The Juvenile Aid Division will be responsible for all
     identifications numbers of arrested juveniles.

     The Juvenile Aid Division stenographer will be responsible for
     entering all juvenile arrest records into the computer system.

     Instructions will be provided by the System Manager of
     Computer Information Services, this department.


                                                              96

**EXHIBIT 18**

GENERAL ORDER 20-92
BONDSMAN PROCEDURES

1.  Bondsmen are not to enter the Front Desk area at anytime for
    any reason.  They are to remain in the lobby area.

2.  Bondsmen are not to go to the Bull Pen area to talk to any
    prisoner.

3.  Bondsmen are prohibited from obtaining from the Gary Police
    Department ARREST FORMS and are not to view the DAILY IN
    CUSTODY JAIL SHEET for any reason.

4.  Bondsmen are not to hand out Business Cards to people in the
    lobby of the Police Station.

5.  Bondsmen are not allowed to give business cards to MINISTERS
    on Sunday Morning for the purpose of passing them on to in
    custody prisoners.

6.  Police officers are not to call the Bondsman;  The person
    hiring the Bondsman is to make the call himself.  This person
    will be allowed to use the Gary Police Department telephone to
    make such call.  NO RECOMMENDATION shall be made by officers.

7.  Bondsmen ARE NOT to sit in their vehicles outside the station
    to solicit business.

8.  Bondsmen doing business at the Gary Police Department are to
    write the Bond and then leave the Police Station.  AT NO TIME
    are they to LOITER in the Police Station lobby.

97

**EXHIBIT 18**

GENERAL ORDER 21-92
GARY POLICE LEGAL ADVISOR

I.    REQUIREMENTS

Graduation from an accredited School of Law with the Degree of
Juris Doctor or equivalent, successful completion of the
Indiana State Bar examination with at least three (3) years
engaged in the active Practice of Law.

II.   DUTIES

ADVISOR FUNCTION

When needed and available the Legal Advisor will review cases
which the investigative division files with the officer of the
Lake County Prosecutor and will also provide Legal advice and
counsel to the office of the Chief of Police and to those
department division heads and supervisors designated by the
Chief.

TRAINING FUNCTION

The legal advisor will design and construct a course of
instruction in Constitutional Law applicable to Police Law
Enforcement duties to be taught to regular and auxiliary
Police Officers of the Gary Police Department.

PUBLIC INFORMATION FUNCTION

When needed and available the Police Legal Advisor will serve
as an additional Public Information Officer.

DRAFTING FUNCTION

In conjunction with the City Law Department the Police Legal
Advisor will draft, as needed, proposed City Ordinances
requested by the Chief of Police on which the City Law
Department requires assistance.

98

000103

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 21-92
POLICE LEGAL ADVISOR

LIAISON OFFICER FUNCTION

The Gary Police Legal Advisor at the direction of the Chief of
Police or the Director of Public Safety will serve as a
liaison officer between the Gary Police Department and all
criminal courts, Law Enforcement Agencies, educational
institutions, private industry and other organizations as
needed for the purpose of obtaining any information which may
enhance the    operation efficiency of the Gary Police
Department and will advise the Chief of Police of information
so obtained.

COUNSEL ON CALL FUNCTION

The police legal advisor will be on call by radio, by
telephone or by pager depending on conditions of duty
assignment primarily but not exclusively during the evening
shift under an assignment to the Detective Division without
case assignments.  The Legal Advisor will respond to all calls
not as an investigator but as an attorney providing legal
counsel as needed to the Police Chief and his designated
supervisors.

AUTHORITY

The police legal advisor is authorized to obtain from other
divisions within the department any and all information
required to enable his functioning as advisor to the Police
Chief, Public Information Officer, and liaison officer to the
courts and prosecutor.

99

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 21-92
POLICE LEGAL ADVISOR

### LEGAL RESEARCH

The police legal advisor will research the law on issues which
affect the Gary Police Department and its operations as the
need arises on the advisor's own direction or that of the
Police Chief or Director of Public Safety.  Resources for said
research include the Gary City Law Department volumes when
available.  When the need for resources beyond those locally
available arises the legal advisor is encouraged to utilize
the law libraries of Indiana University, and other nearby law
schools.

100

**EXHIBIT 18**

**GENERAL ORDER 22-92**
**LOSS OF DEPARTMENT ISSUED EQUIPMENT**

Effective immediately, any officer who loses department issued equipment, i.e. weapons or radios, will be required to reimburse the department, the fair market value of the item at the time of loss.

If an officer looses department issued equipment he/she is to submit a written report to his commander. The officers commander will investigate as to the validity of the officer's report and then submit his findings in writing to the Chief's Office. The officer will not receive replacement equipment until his report is submitted.

101

**EXHIBIT 18**

GENERAL ORDER 23-92
THE CITY OF GARY'S
DRUG-FREE WORKPLACE POLICY

This is official notification that as an entity covered by the Drug Free Workplace Act of 1988, and to protect the City of Gary's status as a responsible source for the award of federal contracts, the following policy will be strictly enforced:

Effective August 1, 1991 any location where City of Gary business is conducted is declared to be A DRUG-FREE WORKPLACE. This means:

I.     All employees are absolutely prohibited from the use, sale, dispensing distribution, possession, or manufacture of illegal drugs and narcotics, drug paraphernalia or alcoholic beverages on City premises, in City owned-vehicles or on City time.

Any employee violating this policy will be severely disciplined, up to and including termination for the first offense.

Any employee convicted of violating a criminal drug statute in the workplace must inform the Personnel office of such a conviction (including pleas of guilty or nolo contendere) within five (5) days of the conviction occurring. Failure to so inform the Personnel office will result in severe disciplinary action, up to and including termination for the first offense. By law, the City of Gary will, if a federal contract is involved, then notify the appropriate federal contracting officer within ten (10) days of receiving notification from an employee or otherwise receiving notice of such conviction.

II.    All employees will receive a copy of this policy in its entirety and will receive a prescribed number of hours of education about the dangers of alcohol and drug abuse in the workplace. All supervisors will receive a prescribed number of hours of supervisory training to assist in identifying and addressing illegal drug and alcohol use by employees.

III.   All employees will receive information regarding the City of Gary's Employee Assistance Program. The City of Gary reserves the right to offer employees, convicted of violating a criminal drug statute in the workplace, participation in an approved rehabilitation or drug abuse assistance program, with the employee required to participate satisfactorily as a condition of continued employment.

102

000107

**EXHIBIT 18**

However, it is the City of Gary's position that these resources are best used voluntarily before workplace problems occur. If an employee has failed to avail him or herself of such help and such problems do occur, the City of Gary will have little choice but to act severely against such abusers in the interest of protecting all of our employees.

IV. The City of Gary shall establish a drug testing program to be implemented by duly authorized assessment centers for determining whether possible substance abuse exists.

Occasions for which drug testing will be ordered will include but not be limited to:

a) pre employment -- All city positions that, by the Director of Personnel, the City Attorney and the Mayor, are deemed to directly involve the public's safety will be required to submit to a drug/alcohol test.

b) post employment -- reasonable suspicion
An employee shall be required to submit to drug/alcohol testing when the presence or occurrence of specific, objective facts or events, which have been accurately documented in writing, allow for reasonable suspicion that an employee is under the influence of illegal drugs or alcohol.

c) post employment -- promotion
Any employee being considered for transfer or promotion to a position of increased responsibility may be required to submit to drug/alcohol testing if the new position is deemed by the Director of Personnel, the City Attorney, and the Mayor, to directly impact on the public's safety.

V. A Drug Free Workplace Committee will be appointed to ensure compliance with each component of this Drug Free Workplace policy.

ALL EMPLOYEES ARE ASKED TO ACKNOWLEDGE THAT THEY HAVE BEEN INFORMED OF THE ABOVE POLICY AND AGREE TO ABIDE BY IT IN ALL RESPECTS. BY LAW, SUCH ACKNOWLEDGEMENT AND AGREEMENT ARE REQUIRED OF YOU AS A CONDITION OF CONTINUED EMPLOYMENT.

I. Policy Statement

The above policy is published to notify all employees that the illegal presence of drugs and alcohol in the workplace is strictly prohibited and to specify what steps will be taken if the policy is violated.

183

000108

**EXHIBIT 18**

A.   **Background**

Illegal drug use and excessive alcohol use is prevalent in the workplace and endangers fellow workers, security, public safety, employee morale, production and services.  It is estimated that one (1) out of every ten (10) American workers have their productivity impaired by substance abuse.  It is also estimated that substance abusers are three (3) times as likely to be involved in on-the-job accidents, are absent from work twice as often, and incur three (3) times the average level of sickness costs as non users.  The total costs to the economy of substance abuse is estimated to be over $100,000,000,000 annually.  Illicit drug use and alcohol abuse is responsible for a substantially higher tax rate to pay for local law enforcement protection, border control, and the cost of investigation, prosecution confinement, and treatment.

The City of Gary, as an employer, is particularly concerned about the devastating effects illegal drugs and alcohol abuse have on individuals and on society.  The City of Gary also recognizes that its most valuable asset is its employees, and its most important responsibility is to the public that they serve.  Therefore, this Drug-Free Workplace policy is an important step that has been taken to attempt to alleviate this problem.

B.   **The Law**

The Drug-Free Workplace Act of 1988, passed the last day of the 100th Congress as a part of the massive federal anti-drug program, in a sense "drafted" many of the nation's businesses into the war against substance abuse. For the first time, any business doing even minimal business with the federal government (a single contract of $25,000 or more) was required to maintain a drug free workplace — or face such severe penalties as LOSS OF CONTRACT, SUSPENSION, OR EVEN DEBARMENT FROM ALL FEDERAL BUSINESS FOR UP TO FIVE (5) YEARS.

To comply with the Drug-Free Workplace Act, there are these four tasks:

1.   Publish a policy prohibiting the illegal presence of controlled drugs in the workplace, and distribute to all employees.  It must be verified in the process that all employees agree to abide by the policy as a condition of continued employment.

104

**EXHIBIT 18**

2.    Establish an awareness program for employees on the dangers of
      drug abuse in the workplace and fulfill the employees' right
      to know about any help that is available in combating drug
      problems (Employee Assistance Programs, community programs,
      informal counseling, etc.)

3.    Require employees to notify you about any convictions they
      receive for violations of criminal drug statutes in the
      workplace within five (5) days of such conviction, then report
      each conviction within ten (10) days thereafter to the
      contracting or grantor federal agency.

4.    Within thirty (30) days of the time you learn of a conviction,
      either discipline the employee in an appropriate manner, up to
      and including termination, or as an alternative, offer help in
      combating his or her drug problem.  This help must be in the
      form of a drug abuse assistance or rehabilitation program
      approved by a governmental health agency or other agency.  If
      you elect to offer such help, and the employee accepts it,
      it's then your responsibility to verify that the employee
      satisfactorily carries out the program as a condition of
      continued employment.

II.   The Awareness/Education Component

      The purpose of the Awareness/Educational component is to have
      the entire workforce aware of and educated to the devastating
      effects of alcohol and drug abuse in the workplace.  The goals
      are to provide important, timely, factual information about
      the hazards of alcohol and drug abuse in the workplace, as
      well as provide in-service training to all employees.  Another
      important aspect of this component will be the supervisory
      training on chemical dependency with a specific focus on
      effective employee communications.

      A.   The Awareness Program

      Each month employees will receive some information about
      Alcohol and Drug Abuse in the Workplace.  Each department will
      be required to create a drug-free awareness environment
      through the use of conspicuously displayed posters, signs, and
      recorded phone messages where available etc.

105

000110

**EXHIBIT 18**

B. The Educational Program

1. For Employees

Each employee will receive a minimum of two (2) hours of education on the issues of alcohol and drugs in the workplace. These instructional sessions will be mandatory and will focus not only on the negative effects alcohol and drug abuse have on the workplace, but also the negative effect it has on the family and the community. During these in-services information about qualified rehabilitation programs and employee assistance programs will be distributed.

2. For Supervisors

Each supervisory level employee will receive a minimum of four (4) hours of in service training on chemical dependency with a focus on effective employee communications. These instructional sessions will also stress how to document compliance with the drug-free workplace policy.

III. The Employee Assistance Component

The primary goal of an employee assistance program (EAP) is to provide an effective, confidential, non-threatening environment in which an employee can seek help without the fear of career damage.

A. The Background

The purpose of the employee assistance component is to help employees deal with personal problems that are affecting their work including those dealing with alcohol and drug abuse. It is estimated that over 70% of those employees seeking help through an employee assistance program have their difficulties based in alcohol/drug use themselves or some member of their family.

B. The Criteria

Any facility selected to provide an Employee Assistance service to the City of Gary must meet the following criteria:

1. must be able to offer assessments by trained professionals

2. must offer a detoxification program

3. must offer a certified rehabilitation program

105

000111

**EXHIBIT 18**

4. must have a certified aftercare program

5. must offer intensive and less intensive outpatient services

6. must offer support groups

7. must offer drug screening

8. must offer comprehensive family counseling services

9. must offer community awareness programs

10. must work cohesively with the City of Gary by providing some of the employee education and supervisory training.

When an employee is required to seek help through an EAP the employee must select one that meets the above stated criteria. From the time the employee receives this requirement in writing by certified mail, he or she will have ten (10) working days during which to show proof of attendance from an EAP that meets the above criteria.

Before an employee can return to the workplace he or she must bring certification of successful completion from the EAP program before that employee can be reinstated.

When an employee is encouraged to seek help through an EAP, the employee may select an EAP that meets the criteria or any counseling situation that may meet their needs. A certificate of attendance and/or completion may be voluntarily supplied to the Personnel Director.

C. Memoranda of Understanding

An Employee Assistance Program is available to all employees of the City of Gary and their families. This program offers assistance to all who desire help for an alcohol or drug abuse problem, a marriage or family problem, an emotional or behavior problem, as well as assistance in other troubled areas in an employee's life. All contact with the employee assistance program will be confidential.

107

**EXHIBIT 18**

The City of Gary has executed Memoranda of Understanding with St. Mary Medical Center, in Gary and Hobart, Our Lady of Mercy in Dyer and Kingwood Hospital, Michigan City to provide employee Assistance Services for City of Gary employees. They will also serve as assessment centers for any evaluations that may be needed.

The Employee Assistance Program is not intended to replace, or be a substitute for, the supervisor's responsibility in any area involving orders, policies, rules, regulations, or directives of any kind which relate in any way to the subject of alcoholism and drug addiction. Seeking help for problems through the Employee Assistance Program will not in itself be grounds for disciplinary action. The function of the Employee Assistance Program is to bring the proper aid to the employee who needs it.

## IV.  Drug Testing Component

This component is necessary in order to preserve and protect the integrity of the City of Gary, its personnel and to guard against the harmful consequences to public good occasioned by the unauthorized, unlawful use of, or the illegal trafficking in, illicit drugs by city employees and to preserve and maintain a high degree of public confidence in all those charged with the responsibility of administering city government.

### A.  Background

To reduce the incidence and prevalence of alcohol and drug abuse in the workplace and to promote and foster confidence in the services provided by the City of Gary, a system of identifying as early as possible an employee who is abusing drugs must be established.

The goals of an effective drug testing program should be to:

1.  establish uniform policies and procedures to govern its administration

2.  test for drugs which have a high potential for abuse, and for which there is no safe protocol for medical use, when there is reasonable cause to suspect its use in the workplace.

3.  to encourage and/or require an employee found to be using drugs to seek rehabilitation.

100

000113

EXHIBIT 18

**B. The Methodology**

A Drug Free Workplace Compliance Committee will be appointed by the Mayor to oversee compliance with all of the conditions of the drug-free workplace Act.

One of the initial responsibilities of the committee will be to establish uniform procedures in the three (3) areas where drug testing will be required.

**1. Pre employment**

All applicants for a vacant position for the City of Gary will be required to be tested for the presence of illegal or abused substances in the urine, if the position for which they are applying has been deemed one that directly affects the public safety.

**2. Post employment -- reasonable suspicion**

Any employee may be required to submit to a urine, blood or breath test for chemical analysis to determine the presence of drugs that are commonly abused when there is reasonable suspicion.

Reasonable suspicion shall be defined as the presence or occurrence of specific objective facts or events that the employee is at the time of suspicion, under the influence of drugs and/or alcohol. Such facts or events must be documented in writing, and must be observed by at least one (1) other supervisory level employee and may include but not be limited to the following:

a. observed possession or use of drugs or alcohol by the employee on the job or prior to reporting off duty.

b. the smell of marijuana or alcohol on the employee's person

c. the occurrence of an accident or incident involving personal injury of damage to property when there is no reasonable explanation for the occurrence thereof.

d. mood swings, agitation, hyperactivity, explosiveness, violence, combativeness, or other remarkable behavior that is uncharacteristic of the employee.

e. excessive absenteeism, tardiness, or other significant documented changes in job performance.

**EXHIBIT 18**

### 3. Post employment -- promotion/transfer

Any employee being considered for a promotion or transfer or assignment from a position not directly involving the public safety to a position directly involving public safety will be required to submit to a routine physical examination to determine the employee's fitness to perform the new duties and responsibilities required of the new position. Such examination at the discretion of the Personnel Director, the City Attorney and the Mayor may include a drug screen for more commonly abused substances.

### C. The Follow-up

Whenever an applicant or employee's urine, blood or breath samples test positive for the presence of drugs the sample shall be subjected to a more scientifically accurate confirmatory test.

If the confirmatory test is positive, the applicant or employee may request that an independent confirmatory test be conducted on the sample. The request shall be made in writing to the Personnel Director within five (5) calendar days of the date on which the employee receives the results of the initial test. The facility to perform the confirmatory test shall be selected by the applicant or employee from a list of laboratories approved and on file with the Department of Personnel.

An applicant whose test results on the final confirmatory test are positive shall be denied employment, unless there is an explanation for the positive results acceptable to the assessment center and review by the Mayor.

An applicant who is required to submit to a drug test because of the nature of the position being applied for, but refuses to execute an appropriate consent form for submit to the required test, will be denied employment.

When it has been determined that an employee's final confirmatory test is positive, the employee may be referred to the Employee Assistance Program for evaluation, diagnosis, and treatment coordination. If the Employee Assistance Program recommends treatment, the employee shall be required to participate in, and successfully complete the treatment plan that is recommended. The City of Gary must be able to verify his or her participation in, and successful completion of the treatment plan. Failure of the employee to successfully complete the treatment plan or to execute appropriate releases may result in disciplinary action up to an including termination.

118

**EXHIBIT 18**

Any employee who is required to submit to drug testing and who refuses to execute the appropriate releases, or to submit to the required test will be subject to discharge.

**V.    The monitoring Component**

The purpose of the monitoring component will be to ensure that all of the objectives of the Drug-Free Workplace policy are being met and that the City of Gary is in 100% compliance with the Drug-Free Workplace Act of 1988.

**A.    The Committee Structure**

The Mayor will establish a seven (7) member Drug-Free Workplace Compliance Committee. The make up of the committee will be as follows:

1.  one member from the personnel department
2.  one member form the law department
3.  one union representative
4.  one staff person from an Employee Assistance Program
5.  The Health Commissioner
6.  one female employee (elected from the general staff)
7.  one male employee (elected from the general staff)

**B.    The Responsibilities**

The immediate responsibilities of the Drug-Free Workplace Compliance Committee will be to establish the procedures necessary to comply with each aspect of the policy. The committee will also review all instances requiring drug testing to assure uniformity of disciplinary actions.

111

000116

**EXHIBIT 18**

GENERAL ORDER 23.1-92
DRUG SCREENING OF PROBATIONARY OFFICERS

I.  PURPOSE

This order assigns responsibility and establishes procedures to be used by the Police Department, Surgeon, when performing Drug Screen testing on probationary officers of the Gary Police Department.

II.  RESPONSIBILITIES AND PROCEDURE

1.  The office of the Police Surgeon shall maintain a list of those applicants who have successfully completed all medical requirements and are approved for appointment to the Department.

2.  During the first year of employment, each Probationary Officer will be subject to random screening. These test will be conducted by the Police Surgeon, and done at his discretion.

3.  Notification can be made directly through the officers' supervisor, or by contacting the Personnel Officer. Upon notification, said officer shall report immediately to the office of the Police Surgeon.

4.  In the event of refusal by the officer to comply, or detection of any controlled substance, the Police Surgeon shall immediately notify the Chief of Police in written form.

112

000117

**EXHIBIT 18**

GENERAL ORDER 24-92
DOMESTIC VIOLENCE POLICY


The purpose of this general order is to establish guidelines for
police response to domestic disturbance calls, including, but not
limited to, incidents involving violence.

POLICY

Domestic violence is a serious crime against the individual and
society. This crime produces disharmony in families, leads to
escalating violence, and may culminate in intra-family homicide, as
well as creates an unhealthy atmosphere for childhood development.
The definition of domestic violence includes bodily injury, or the
infliction of fear of imminent bodily injury, between family or
household members. Bodily injury is any impairment of physical
condition including physical pain. (I.C. 35-41-1-4)

   Family/Household - Includes persons who:

   1. Are legally married to one another.
   2. Are related by blood.
   3. Were formerly married to one another.
   4. Are related by marriage.
   5. Have a child in common, regardless of whether such persons
      have been married or have lived together at any time.
   6. Are not legally married, but are currently living together
      in a family-type relationship.
   7. Have a boyfriend/girlfriend relationship.
   8. Are not legally married, but formerly lived together in a
      family-type relationship.

It shall be the policy of the Gary Police Department to respond to
all calls of domestic violence. In response to such calls,
officers shall conduct detailed preliminary investigation to
include victim/witness interviews and evidence collection. If the
preliminary investigation establishes probable cause that a crime
has been committed, the Gary Police Department supports Battery
arrest as a preferred response to domestic violence.

113

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 24-92
DOMESTIC VIOLENCE POLICY

TYPES OF ARREST POSSIBLE

There are a variety of arrest alternatives available to an officer
to protect victims from the offender. Arrest may be made for
felony as in any criminal case. Warrantless arrest on misdemeanor
charges is also possible under conditions discussed below:

A.   Battery (I.C. 35-42-2-1):

     1.   An officer may arrest a person for battery when the
          officer has probable cause to believe the person is
          committing or attempting to commit a battery in the
          officer's presence.

     2.   Moreover, under I.C. 35-33-1-1(a), an officer may arrest
          a person for a Class A Misdemeanor when battery was not
          committed in the officer's presence when the officer has
          probable cause to believe that the person has committed
          a battery resulting in bodily injury (any impairment of
          physical condition, including pain.)

     3.   Arrest shall be made without regard to:

          a.   Whether the parties are married or living together.
          b.   Whether the aggrieved person has sought or obtained
               a legal restraining or vacate order.
          c.   Whether the aggrieved person has instituted divorce
               proceeding.
          d.   Whether the aggrieved person has called for police
               protection previously and has not pursued, or has
               withdrawn, the criminal complaint against the abuser.

B.   Violations of protective or restraining orders (Arrest
     procedures "Invasion of Privacy", I.C. 35-46-1-1.5):

     1.   An officer may arrest a person for Invasion of Privacy,
          a Class B Misdemeanor, when the officer has probable
          cause to believe the person is committing or attempting
          to commit an intentional violation of:

          a.   A protective order issued under I.C. 34-4-5.1.
          b.   A temporary restraining order issued under I.C. 31-1-
               11.5(b).
          c.   An order issued as a condition of pretrial release or
               pretrial diversion requiring the person to refrain
               from any direct or indirect contact with another
               person.

114

EXHIBIT 18

asfff

sfasf

PAGE 3/GENERAL ORDER 24-92
DOMESTIC VIOLENCE POLICY

C.  Criminal Recklessness (I.C. 35-42-2-2(c)(1):

A person who recklessly, knowingly, or intentionally inflicts serious bodily injury on another person commits criminal recklessness, a Class D felony.

PROCEDURES

A.  ON SCENE INVESTIGATION:

The purpose of any on-scene investigation is to establish "probable cause" through: Interviewing of all parties, recording statements, preserving the crime scene, and collecting evidence. The probable cause standard applied to family violence crimes is no different from the standard applied to other crimes.

B.  When responding to a family violence call, the officer(s) will:

1.  Restore order by separating all parties involved and attempting to calm them;

2.  Assess the need for medical attention and procure same if necessary;

3.  Interview all parties separately (the victim, the offender, and witnesses) using supportive interviewing techniques. (Children should be interviewed in a manner appropriate to their age.)

4.  After each party has been interviewed separately, confer as a team to decide if any arrest should be made and/or other actions taken;

5.  When appropriate, photograph injuries and property damage;

6.  Collect and record evidence;

7.  If the offender has left the scene and it has been established that a crime has been committed, officer(s) shall:

    a.  Conduct a search of the immediate area;

    b.  Obtain information from the victim(s), and the witness(s) as to where the offender(s) might have fled;

115

000120

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 24-92
DOMESTIC VIOLENCE POLICY

      c.  If appropriate, refer the matter to the investigative unit.

8.  Officers must fully document their responses to every domestic violence call on the appropriate form regardless of whether or not a crime has been committed or an arrest has been made;

9.  In those instances were probable cause exists and no arrest has been made, the responding officer shall document the reasons for not making an arrest.

10.  If an arrest is made, officers should emphasize to the victim and the offender that the criminal action is being initiated by the State, not the victim.

OTHER LAW ENFORCEMENT ACTION

A.  Other crimes:  An officer may affect an arrest for crimes other than those discussed above when appropriate probable cause exists to justify an arrest.

B.  Citizen complaints:  An officer shall make a reasonable effort to inform victims of options for citizen initiated prosecution through complaints to the Prosecutor's Office, when the officer feels a lack of probable cause exists at that time to initiate an arrest.

VICTIM ASSISTANT

Officers shall also inform victims of local services for their shelter, protection, and welfare, and arrange for, or provide, transportation to that location when necessary.

116

EXHIBIT 18

GENERAL ORDER 25-92
FINGERPRINTING AND PHOTOGRAPHING

I.   PURPOSE

The purpose of this order is to establish procedures for
photographing victims of crimes and the fingerprinting of
incarcerated subjects..

II.  PROCEDURES

A.  PHOTOGRAPHING

1.   Commander of the Bureau of Identification is to train
designated police officers in the use of the 35mm self
focusing cameras.

2.   Two (2) 35mm self focusing cameras shall be maintained in
a specified location at the front desk.   When a camera is
needed, a sign-in/sign-out sheet will be maintained at the
Front Desk for check out purposes.

3.   In the event of situations where on scene crime photos are
required, i.e., bad knifings, shooting, serious Personal
Injury Accidents (when the victim may expire in the hospital),
squad car accidents, it shall be the responsibility of the
Turn Sergeant to take pictures of the mentioned incidents.

4.   In the event one of the two cameras malfunctions, the
reserved 3rd camera will be maintained for that purpose.

5.   The Hit and Run Officer shall be responsible for taking
the pictures of all vehicle accident fatalities.   In the event
that the Hit and Run Officer cannot be contacted, i.e.,
vacation/sickness, etc., it shall be the responsibility of the
Turn Sergeant to take pictures of the fatality incidents.

B.   HOMICIDE INVESTIGATION

The assigned investigating Detective shall be responsible for
taking photographs when dispatched to homicide scenes and
crimes against person offenses.

117

000122

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 25-92
FINGERPRINTING AND PHOTOGRAPHING

C. Fingerprinting - processing and loading of the mug shot camera.

1. Correctional Officers will be trained and will fingerprint and photograph prisoners.

2. Correctional Officers will be trained to process mug shots and fingerprints at the time the subject is arrested and incarcerated.

3. Bureau of Identification Commander shall also be responsible for training the Desk Personnel on proper fingerprinting procedures and their training (on station) in the proper utilization of the mug shot camera.

4. It shall be the responsibility of the B of I personnel to load and process films in the mug shot camera.

D. LOCATION

The third floor North male section will be the designated area where the photos and printing will be done.

1. It will be the responsibility of the other Division within the Police Department i.e., Auto Detail, Juvenile and P.M.B. to take the necessary pictures they deem necessary for their investigations.

2. After crime scene pictures are taken. It will be the responsibility of the respective divisions to take the film from the camera and give it to the B of I personnel for developing.

000123

**EXHIBIT 18**

GENERAL ORDER 26-92
CONFISCATED MOTOR VEHICLES


I. **PURPOSE**

Establishes guidelines for processing confiscated motor vehicles.

II. **POLICY**

Department personnel shall process all confiscated vehicles in accordance with IC 34-4-30.1 Vehicle means a device for transportation by land, water, or air; and includes mobile equipment with provisions for transport of an operator. (IC 34-41-1-2)

III. **PROCEDURE**

To qualify under IC 34-4-30.1, the vehicle must be used in or intended for use in the transportation of (1) controlled substance for purpose of sale, receipt, delivery or dealing, (2) stolen or converted property with a value greater than one hundred dollars ($100.00). This statute also includes the following provisions:

1. Showing by the state must be by a preponderance of the evidence.

2. The seizure can be prior to an arrest if by court order.

3. The seizure can be incident to a lawful arrest or search, without a court order.

4. The statute does not provide for reimbursement to the seizing agency for towing or storage costs. Seized vehicles that the arresting officer believes to be of the type and condition that would be of value to the Department should be taken to the Motor Transport Division/Police Garage. If the vehicle has a lien or is not of suitable quality, it should be removed to a reputable storage garage. Either situation will require that all copies of the Gary Police Department's Tow-In Report be completed and a copy attached to the original criminal case.

5. The Commander of the Bureau of Investigative Services shall be notified as soon as possible of any vehicle that has been seized and the arresting officer believes to be of value for Department use. The Bureau of Investigative Services Commander shall cause the vehicle to be examined by

115

**EXHIBIT 18**

---

PAGE 2/GENERAL ORDER 26-92
CONFISCATED MOTOR VEHICLES

a Motor Transport Division mechanic and will determine if forfeiture proceedings will be requested.

6. If the Department wishes to utilize the vehicle, the Lake County Prosecutor must bring forfeiture proceedings within ninety (90) days from day of seizure. Impounding officer shall notify the Prosecutor of the following; make, model, vehicle identification number, registered owner, lien holder, operator, passenger(s), reason for seizure, and approximate value of the vehicle.

7. Notice of forfeiture proceedings must be served on all parties of interest, and they have twenty (20) days in which to answer.

8. Court will hold hearings to determine if the vehicle forfeiture is to be ordered. If forfeited, the court will order the Bureau of Motor Vehicles to transfer clear title of said vehicle from defendant to seizing agency.

9. When the Bureau of Investigative Services receives a court ordered forfeiture, the order will be sent to the Commander of the Bureau of Investigative Services who will be responsible for processing the order through the Motor Transport Division to obtain the title and commission the vehicle.

10. If the Department is not going to use the vehicle, the commander of the Motor Transport Division shall cause the vehicle to be titled and delivered to the Sheriff of Lake County, who shall then sell the vehicle at public auction, and the money, less expenses, shall be placed in the State Common School Fund.

11. If the vehicle is to be used in the Gary Police Department's fleet, it will be delivered to the Motor Pool - Motor Transport Division. The Department will have use of the vehicle for one (1) year from date of forfeiture order. At the end of one (1) year, the Commander of the Motor Transport Division shall cause the vehicle to be titled and delivered to the Sheriff of Lake County who shall then sell the vehicle at public auction.

000125

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 26-92
CONFISCATED MOTOR VEHICLES

12. The Commander of the Bureau of Investigative Services shall be responsible for the assignment and use of all forfeited vehicles under Department control. Seized vehicles shall not be utilized in any manner by Department personnel until all legal proceedings have been completed and the vehicle has been commissioned.

13. This procedure will be used in conjunction with Department Regulations and all relevant Policies and Procedures.

121

**EXHIBIT 18**

**GENERAL ORDER 27-92**
**RIDING IN SQUAD CARS**

At no time shall any member of this department call communications and request transportation, from sector marked units, to and from the station or any other location unless authorization has been granted by a commanding officer of the division in which the requesting member of this department is assigned.

122

000127

**EXHIBIT 18**

GENERAL ORDER 28-92
MOTOR TRANSPORT DIVISION

1.  This division will be attached to the Bureau of Uniform
    Services.

2.  A member of the force shall be designated as Commanding
    Officer and he will be responsible for the administration,
    supervision, discipline and control of all members of the
    force and civilian employees assigned to the Motor Transport
    Division.

3.  The Commanding Officer of the Motor Transport Division will
    report to the Commander of the Bureau of Uniform Services on
    all matters affecting his Division.

4.  The Motor Transport Division shall hereafter:
    a.  Absorb all functions presently conducted by the staff of
        the Police Garage.
    b.  Assume responsibility for and supervision of:

        1.  All automotive equipment including; but not limited
        to, automobiles; trucks; wagons; cycles; scooters; etc.

        2.  Spare parts including but not limited to tires,
        accessories, etc.

        3.  All shop equipment including tools.

        4.  Gas, oil and lubrication facilities and distribution.

        5.  All records requisitions for vehicles, supplies and
        equipment.

        6.  Monitoring the Motor Transport Division's budget and
        such other duties as prescribed by the Chief of Police.

123

**EXHIBIT 18**

GENERAL ORDER 28.1-92
MOTOR TRANSPORT'S RULES AND REGULATIONS

1.  All civilian employees are expected to punch the time clock when beginning or ending their tour of duty. Termination will be requested for anyone punching the card of another employee.

2.  Any employee leaving the Police Garage must report to Supervisor and/or Shop Foreman for permission.

3.  An employee must punch time clock when leaving Police Garage, and returning, when not applicable to police business.

4.  All employees will sign attendance sheets on a daily basis. It will be forbidden to sign these sheets in advance.

5.  Supervisors and/or Shop Foreman will be responsible for knowing the whereabouts of personnel under their command.

6.  Supervisors and/or Shop Foreman will be responsible for assuring that personnel are working at all times.

7.  Authorization shall be obtained from the Supervisor before any Vehicle will be taken off the premises for road testing.

8.  Under no circumstances will a civilian employee take a police vehicle out of the Motor Transport compound for personal use, i.e. errands, food pick up, etc.

9.  Periodic but no less than weekly tool box checks will be instituted by the Supervisor and/or Shop Foreman.

10. Any tools or shop equipment belonging to the City of Gary (Police Garage) is not to be taken off the premises.

11. All employees will be required to finish job on vehicle started, or be able to explain to supervisor reasons why not. When a job is incomplete due to time element, mechanic must advise Supervisor and/or Shop Foreman what has been done, and what still needs to be done to complete repairs.

12. The parts room will be kept locked at all times. Supervisors and Shop Foreman will have possession of the key, and will be held accountable for distribution of any an all parts.

124

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 28.1-92
MOTOR TRANSPORT'S RULES AND REGULATIONS

13. The Police Garage Tow Truck is not to be put into use between the hours of 1:00 a.m. and 7:00 a.m., unless there is an emergency situation, and then must be authorized by the Supervisor or Division Commander.

14. Gasoline pumps, when not manned, are to be kept in the off position, and will be kept in this position at all times between the hours of 1:00 a.m. and 7:00 a.m.

15. Mechanics will be responsible for the distribution of gasoline when attendant is not working.

16. Motor pool technicians are to be held responsible for maintaining gasoline sheets as far as tallies, etc. Supervisors will see that these sheets accurately account for the amount of gasoline dispersed.

17. Private cars will be forbidden in the police garage.

18. There will be absolutely no working on private and/or personal vehicles either during working hours, or off duty in the police garage.

19. Priority will be given to working police officers who come to the garage with a vehicle in need of repair. Other duties shall temporarily cease, and every effort shall be made to return these officers to their tour of duty.

20. It shall be the responsibility of the Supervisor to see that no civilians or unauthorized employees are permitted inside the police garage.

21. Personnel are not to socialize in the Supervisor's Office, and should not enter unless their duties necessitate being there.

22. Personal telephone calls will be kept to a minimum, and then will be limited to three (3) minutes.

23. Employees of the police garage are entitled to a one hour lunch period. However, lunch will be taken between the hours of 11:00 a.m. and 1:00 p.m., unless permission is granted by the supervisor to do otherwise and this will not be done on a permanent basis.

125

EXHIBIT 18

PAGE 3/GENERAL ORDER 28.1-92
MOTOR TRANSPORTATION DUTIES AND RESPONSIBILITIES

24. Employees will not be permitted to leave the Motor Pool Compound for their lunch period, and then return and eat on premises after the designated hour.

25. Due days will be considered only when requested in writing, and no later than 48 hours in advance, with the explanation on why they are entitled. The shift Supervisor will then have the authority to approve or deny based on the available manpower for the time requested.

26. Employees reporting off because of illness notify the Supervisor's Office at least one (1) hour prior to schedules shift time. Information shall also be given as to the nature of illness, and the estimated time of return to duty.

27. Any employee off three (3) or more consecutive days because of illness will be expected to produce a doctor's slip upon his/her return to work.

28. It shall be the responsibility of the turn supervisor to see that records are kept on those employees that consistently report off for short periods of time. When sufficient documentation is accumulated, dismissal will be requested.

29. Each employee shall see that the Supervisor's Office has an accurate address and telephone number where he can be reached. Changes shall be reported to this office within 48 hours after being made.

30. All employees, where applicable, must maintain a valid Indiana Driver's license.

31. Any employee discovering theft of property are to submit a written report to the supervisor for follow-up. A decision will then be made concerning the need for further action, i.e. criminal reports, internal investigation, etc.

32. All inquiries reference to the activities of the Motor Transport Division are to be directed to the Division Commander, or Chief's Office for response.

33. Supervisors are responsible for assuring that someone is performing necessary duties during shift changes, or until properly relieved.

126

EXHIBIT 18

PAGE 4/GENERAL ORDER 28.1-92
MOTOR TRANSPORTATION DUTIES AND RESPONSIBILITIES


34. Turn Supervisors shall see that terminated or suspended
    employees turn in all city property i.e. keys, uniforms,
    identification cards, etc.

In regards to sworn police personnel assigned to the Motor
Transport Division, these orders are not intended to supersede or
relieve the employee from complying with any previous orders set
down by the Office of the Chief of Police.

127

**EXHIBIT 18**

GENERAL ORDER 29-92
POLICE DEPARTMENTAL RECOGNITION

A Board has been officially created for Policeman of the Month Award.

Award selection shall be of three (3) categories:

1.   Most Outstanding Arrest
2.   Outstanding Follow-up Investigation
3.   Policeman of the Month Service and Performance Award

Recommended candidates for selection may be nominated by Commanders, Supervisors, Fellow-Officers or citizens from the community.

It is hoped that civil service credit will be granted for each award of 1/4 credit and a full one (1) point credit for POLICE OFFICER OF THE YEAR.

The Department Board shall consist of the following members:

Deputy Inspector - Bureau of Supportive Services (Chairman)
(2) Police Officers
(1) Traffic Officer
(2) Officers from Investigations
(1) Officer from Technical Services
(1) Public Relations Officer

The officers will be selected on monthly rotations to serve on the Board.  Board members will meet on the 2nd Wednesday of each month.

Nominees can also be selected from mail correspondence received commending police officers for their professionalism, job performance, etc.

Service Awards implemented to honor those officers who have performed their duties in a courteous, helpful manner, and those who normally serve in an administrative capacity and might not otherwise be considered for other categories.

129

000133

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 29-92
POLICE DEPARTMENTAL RECOGNITION


It should also be noted that nominees for most outstanding arrest should not be limited to the Uniform Services Division, nor should outstanding follow-up investigations be limited to those officers assigned to an Investigative Division.  All officers are eligible for nomination in all categories.  Arrest and investigations conducted while off duty may also be considered.

Commanders, Supervisors, Fellow officers should include in their recommendation, copies of arrest reports, case numbers, etc.


129

**EXHIBIT 18**

GENERAL ORDER 30-92
REGULATIONS FOR UNIFORM DRESS FOR SWORN PERSONNEL

I.   PURPOSE

This order establishes the regulation for uniforms for sworn
personnel.

II.  OFFICIAL UNIFORM AND EQUIPMENT

A.   When assigned to uniform duty, the official dress for
male and female officers will consist of a neat, clean
and well pressed uniform, fully loaded official Gary
Police pistol, with at least one (1) extra fully loaded
magazine, identification card, official badge and shield,
nameplate, handcuff key, leather set, baton, citation
books (parking and traffic), watch, flashlight, notebook,
and ball point pen.

B.   While riding or driving in a departmental squad car, the
cap may be removed but, when the officer emerges from the
squad car he or she will immediately put on his or her
cap.

C.   In an announced emergency, off-duty sworn members will
report in regulation uniform to the police station unless
otherwise directed.

III. UNIFORM AND EQUIPMENT SPECIFICATIONS

A.   Winter Uniforms

1.   Patrolman and Corporals

a.   Cap is to be French blue in color with a patent
leather visor and black patent leather or plastic band
encircling the front half of the cap with the ends
secured with silver P buttons.  The cap shield will be
worn in the space provided.  The winter fur hat may be
worn in the winter season.

b.   Field jacket with silver buttons.  The spring and
fall windbreaker also may be worn.

130

000135

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 30-92
UNIFORM REGULATION

c. Trousers will be French blue in color and have a 3/4'
navy blue stripe sewn over the outside leg seam from the
waist to the bottom.

d. Shirt shall be long sleeve navy blue permanent press
with silver buttons with a French blue clip on tie.

e. The uniform sweater is an optional wear.

    1.  The uniform sweater can only be worn with the
winter uniform.

    2.  The uniform sweater must be a pull over type,
navy blue in color, with ridges, long sleeves and a
V or Crew neck.

    3.  The time period to wear the uniform sweater
shall commence and cease when designated by the
Commanding Officer of the Bureau of Uniform
Services.

2. Sergeants and above

a. Cap is to be French blue in color with a black patent
leather visor and gold band (as approved for each rank)
encircling the front half of the cap with the ends
secured with gold P buttons. The cap shield will be worn
in the space provided. The winter fur hat may be worn in
the winter season.

b. Field jacket with gold buttons, the spring and fall
windbreaker also may be worn.

c. Trousers will be French blue and have a 3/4" navy
blue stripe sewn over the outside leg seam from the waist
to the bottom.

d. Shirts for sergeant shall be long sleeve navy blue
permanent press with gold buttons with a French blue clip
on tie. Shirts for Lieutenants and above shall be long
sleeve white permanent press with gold buttons and a dark
blue clip on tie.

131

000136

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 30-92
UNIFORM REGULATIONS

B. Summer Uniform

   1. Patrolman and Corporals

   a.  Cap is to be French blue in color with a patent
   leather visor and black patent leather or plastic band
   encircling the front half of the cap with the end secured
   with silver P buttons.  Corporals shall wear silver hat
   bands.   The cap shield will be worn in the space
   provided.

   b. Field jacket with silver buttons, the spring and fall
   windbreaker also may be worn.

   c.  Trousers will be French blue and have a 3/4" navy
   blue strip sewn over the outside leg seam from the waist
   to the bottom.

   d. Shirt shall be short sleeve navy blue permanent press
   with silver buttons.

   e. All officers may wear the optional baseball style cap
   as part of the summer working uniform.  This cap shall be
   dark blue with a special Gary Police Department insignia
   patch on front.

2. Sergeants and above

   a. Cap is to be French blue in color with a black patent
   leather visor and gold band (as provided for each rank)
   encircling the front half of the cap secured with gold P
   buttons.    The cap shield to be worn in the space
   provided.

   b. Field jackets with gold buttons, and the spring and
   fall windbreaker may also be worn.

   c.  Trousers will be French blue with 3/4" navy blue
   stripe sewn over the outside leg seam from the waist to
   the bottom.

   d. Shirt for sergeants shall be navy blue  short sleeve
   permanent press with gold buttons.    Shirts  for
   Lieutenants and above shall be short sleeve white
   permanent press with gold buttons.

   e. Tee shirts may be worn but, only white tee shirts may
   be worn with the summer uniform.

132

000137

**EXHIBIT 18**

C.  UNIFORM LEATHER GOODS

    1.  All items of leather equipment carried by sworn uniform officers are to be black in color and can be plain or basketweave in design.

    2.  The equipment belt (gun belt) will carry holster with a snap down strap, baton holder, cartridge case, handcuff case, and a walkie-talkie holder.

    3.  Shoes and boots

    a.  The dress shoe is to be clorino with a plain toe, black in color.  The dress shoe may be worn year round.

    b.  The walking (athletic) shoe is the Rocky #2050 or #180 that has a leather upper and a non-skid sole the shoe is black in color.  This shoe may be worn ONLY with the summer uniform.

    c.  The boot is the Rocky #8032 or #4044 that has a leather cordura upper, Gore-Tex bootie, thinsulate lining, and lug sole, black in color.  This boot may be worn ONLY with the winter uniform.

    d.  Shoes and Boots are to be kept clean and shined.

D.  UNIFORM ACCESSORIES for all ranks are to be black in color without ornamentation.

    1.  Raincoat (clear plastic optional)
    2.  Rain cap cover (clear plastic)
    3.  Ear covering (leather, wool or cotton) to be worn with winter uniform ONLY.
    4.  Mufflers and scarves (wool or cotton) to be worn with winter uniform ONLY.
    5.  Gloves (leather, wool or cotton)
    6.  Sweater of material suitable for climatic conditions (may be navy blue).
    7.  Overshoes (zipper, slip-on, or buckle type)
    8.  Windbreaker, spring-fall type (may be navy blue)
    9.  Socks (may be navy blue)

133

**EXHIBIT 18**

PAGE 5/GENERAL ORDER 30-92
UNIFORM REGULATIONS

    E.  WEATHER EXCEPTIONS for all sworn uniform personnel

        1.  Whenever the weather becomes unseasonably warm and winter uniforms are in effect the long sleeve shirt may be worn as the outer garment.

        2.  When the short sleeve shirt is the authorized outer garment and the weather becomes unseasonable cool, the field jacket or windbreaker may be worn.

IV.  PLACEMENT OF INSIGNIA OF RANK, BADGE AND DEPARTMENT PATCH

    A.  All officers, lieutenants, and above when wearing a uniform blouse, jacket, overcoat, or alternate raincoat, will wear insignia or rank on the shoulder straps.  The collar insignia of rank will be worn only on shirts.  See diagrams #4 and #5.

    B.  Sergeants will wear the regulation (3) three chevrons (gold in color) on all shirts, coats and jackets (except the raincoat).  The chevrons will be sewn on both sleeves.  The color insignia of rank will be worn only on shirts.  See diagram #3, #6, #7 and #8.

    C.  Corporals will wear the regulation (2) two chevrons (royal blue in color) on all coats, shirts, and jackets (except the raincoat).  The chevrons will be sewn on both sleeves.  The color insignia of rank will be worn only on shirts.  See diagrams #2, #6, #7, and #8.

    D.  Patrolman will wear collar insignia "GPD" only on shirts. See diagram #1.

    E.  All uniform officers regardless of rank will wear their badge on their outer garment in the holder provided on the garments, over the left breast.

    F.  The departmental patch will be worn on all shirts and jackets (except the raincoat).  See diagram #9.

    G.  The name plate shall be the same color as the badge and will be worn on the left side of shirt and the right side on jacket.

134

EXHIBIT 18

PAGE 6/GENERAL ORDER 30-92
UNIFORM REGULATIONS

V.  ALL SWORN OFFICERS ARE PROHIBITED FROM WEARING THE FOLLOWING
    ITEMS.

    A.  Faded, frayed, torn, or ragged uniform shirts, trousers,
    department patches, chevrons, braids, ties, jackets, coats or
    caps.

    B.  Any identifiable items of the uniform while in civilian
    dress except the official badge, revolver and I.D. tag.

    C.  Wearing of the GARY POLICE UNIFORM while on suspension.

    D.  Wearing suspenders exposed to view.

    E.  Wearing earrings of any kind.

    F.  Wearing more than one ring per hand.

    G.  Wearing chains, necklaces, dogtags in plain view.

    H.  Faded, cracked, or torn pistol belt or pistol belt
    accessories.

    I.  The length of the uniform trousers shall not extend below
    the top of the uniform shoes.

    J.  No civilian clothing are to be worn with the official
    police uniform while on duty, off duty or while working a
    second job.

135

**EXHIBIT 18**

PAGE 7/GENERAL ORDER 30-92
UNIFORM REGULATIONS

DIAGRAM #1



Patrolmen shall display "GPD" insignia on both shirt collars. The insignia will be clutch back type Rhodium plated.

DIAGRAM #2



Corporals shall display the openstrip chevron (3/4 inch wide) on both shirt collars. The insignia will be clutch back type with Rhodium plating.

DIAGRAM #3



Sergeants shall display the openstrip chevron (3/4 inch wide) on both shirt collars. The insignia will be clutch back type, gold in color.

DIAGRAM #4



Lieutenant shall display gold lieutenants bar (3/4 inch long on both shirt collars. Bars will be clutch back style.

136

000141

EXHIBIT 18

PAGE 8/GENERAL ORDER 30-92
UNIFORM REGULATIONS

DIAGRAM #5



Captains shall display gold double bars (3/4 inch long) on both shirt collars. Bars will be clutch back style.

DIAGRAM #6



Corporals and Sergeants will display sewn-on chevrons in the appropriate place on both sleeve of their short sleeve shirts.

DIAGRAM #7



Corporals and Sergeants will display sewn-on chevrons in the appropriate place on both sleeves of their long sleeve shirts.

137

000142

**EXHIBIT 18**

PAGE 9/GENERAL ORDER 30-92
UNIFORM REGULATIONS



RIGHT SLEEVE                    LEFT SLEEVE
DIAGRAM #8

Corporals and Sergeants will display sewn-on chevrons in the
appropriate place on both sleeves of their outer garment, such
as the windbreaker and the car duty coat.  Superior officers
of the rank of Lieutenant and above shall display the
appropriate rank on the shoulders of the outer garment.

DIAGRAM #9    RIGHT SLEEVE                    LEFT SLEEVE



The Department Patch is to be worn on all uniform shirts,
jackets and coats except the rain coat.  The patch is to be
worn on the left sleeve only.

138

000143

**EXHIBIT 18**

GENERAL ORDER 30.1-92
DRESS CODE - GROOMING

I.   PURPOSE

     This order shall define, establish, and illustrate the standard of grooming for all sworn members of the department.

II.  POLICY

     As long as an officer's appearance is kept in a neat manner, the acceptability of an officer's personal grooming shall be based upon the criteria in this order.

III. STANDARDS

     A.  MALE

     1.  HAIR

          a.   Hair shall be neatly groomed and clean

          b.   The length and/or bulk of the hair shall not be excessive or present a ragged or unkept appearance, with or without the uniform cap.  Hair shall not exceed one and one-quarter (1 1/4) inches in bulk, regardless of length, e.g., afro, natural styling, or permanent waved styling.

          c.   The hair on the sides and back of the head shall present a tapered or blocked appearance and shall not touch the shirt or coat collar except for the closely cut hair at the nape of the neck.  Hair shall not extend over the top of the ear but shall be tapered around the ear or blended naturally behind the ear and into the hair at the back of the head at all times while in uniform.

          d.   Hair in front shall be groomed so that it does not fall below the band of properly worn headgear.

          e.   Wigs or hair pieces, are permissible, however, the wig or hair piece shall conform to the standard haircut and grooming guidelines.

139

000144

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 30.1-92
DRESS CODE - GROOMING

2.  SIDEBURNS

    a.  Shall be neatly trimmed with the base clean shaven
        in a horizontal line.

    b.  Shall not extend downward below the earlobe.

    c.  Shall be trimmed so that hair does not extend
        beyond the natural outline of the sideburn.

    d.  Shall not be bulky, but shall be trimmed and
        tapered in the same manner as the haircut.

    e.  Muttonchops or styles of the same nature shall not
        be permitted.

3.  MUSTACHE

    a.  Shall be neatly trimmed.

    b.  Shall not extend over the upper lip or beyond one-
        quarter (1/4) inch below the sides/corner of the
        mouth.

    c.  Shall not be bulky in appearance.

    d.  No other styles are permitted, i.e., handlebars,
        etc.

4.  BEARDS

        Beards, chin whiskers, and/or hair below the bottom
        lip are not permitted unless the officer is
        assigned in an undercover investigative capacity in
        the Investigation Division.  The wearing of a beard
        is at the discretion of the Chief of Police.

5.  See Page #5

140

000145

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 30.1-92
DRESS CODE - GROOMING

B.  FEMALE

1.  HAIR

    a.  Shall be neatly groomed and clean.

    b.  Shall be neatly shaped and arranged in an attractive style.

    c.  While in uniform, hair may touch the collar but shall not fall below the lower edge of the collar.

    d.  Conspicuous ribbons, scarves, pins, combs, and barrettes shall not be worn in the hair while in uniform.

    e.  Hair coloring or lightening used shall harmonized or complement the skin coloring.  Colors shall not be harsh and shall be natural looking.

    f.  Wigs, if worn, shall look natural and shall conform to all of the above listed regulations.

    g.  Hair shall not exceed one and one quarter (1 1/4) inches in bulk, regardless of length, e.g., natural styling, permanent waving, bouffant styling, etc. Cornrowing and pigtails are not permitted.

2.  COSMETICS

    a.  Cosmetics shall be worn that harmonize with and enhance the natural coloring of the skin.

    b.  Makeup is applied for the purpose of improving the appearance and shall not be worn in a "heavy-handed" or conspicuous manner.

    c.  Makeup shall be worn in a light and natural manner and shall not look artificial.

    d.  Perfume shall not be "heavily" scented, and shall be used sparingly.

141

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 30.1-92
DRESS CODE – GROOMING

3.  See page 6

C.  EXCEPTIONS

Divisional Commanders may permit officers under their
command to wear their hair, sideburns, and beards in any
manner so long as the officers are engaged in a type of
investigative assignment whereby other styling might
hamper the effectiveness of the officers.  However, any
officer not engaged predominately in an undercover
position, but in plain clothes (Detective, Administrative
Personnel, etc.) shall follow the above outlined
procedures.  Also, any officer normally engaged in an
investigative assignment but detailed to a uniform patrol
for any special reason shall conform to the above
outlined procedure.  This order applies whenever the
official Gary Police Department Uniform is worn in
connection with outside employment and/or when the
uniform is worn while off duty.

D.  Fingernails (all fingernails) will be kept short and
neatly trimmed.  Only clear fingernail polish may be
used, colored polish will not be worn.

142

**EXHIBIT 18**

PAGE 5/GENERAL ORDER 30.1-92
DRESS CODE - GROOMING

MALE PERSONAL GROOMING
STANDARDS



A.   HAIR MUST:

1.   Be clean.

2.   Be tapered side and back and conform generally to the shape of the skull.

3.   Be arranged in an orderly manner.

MUST NOT:

1.   Be worn in the following styles: braids, ducktail, pageboy, flip, mohawk, or bulky hair styles.

2.   Exceed 1/4 inches in bulk regardless of length.

B.   SIDEBURNS MUST:

Be neatly trimmed and tapered in same manner as haircut.

MUST NOT:

Extend downward below the earlobe



C.   MUSTACHE MUST NOT:

Extend over the upper lip or beyond one quarter (1/4) inch below the sides/corner of the mouth.

143

**EXHIBIT 18**

PAGE 6/GENERAL ORDER 30.1-92
DRESS CODE - GROOMING

FEMALE PERSONAL GROOMING

STANDARDS





NOT EXTEND BELOW
COLLAR'S LOWER EDGE



NOT EXTEND BELOW
COLLAR'S LOWER EDGE

HAIR MUST;

1. Be Clean.

2. Neatly arranged
in an attractive
style.

MUST NOT:

1. Be worn in
following styles;
pigtails, braids,
cornrowing or bulky
hair styles.

2. Exceed 1 1/4
inches in bulk
regardless of
length.

3. Conspicuous
ribbons, scarves,
etc. shall not be
worn.

144

000149

**EXHIBIT 18**

**GENERAL ORDER 30.2-92**
**DRESS CODE - PLAIN CLOTHES**

I.  **PURPOSE**

   This order shall establish the dress code for members of the
   Department.

II. **POLICY**

   A.  Court or any Review Board appearance

   1.  Male officers shall be well-groomed and wear:
       a.  Uniform or
       b.  Shirt and tie, or
       c.  Suit and tie.

   2.  Female officers shall be well-groomed and wear:
       a.  Uniform, or
       b.  Skirt and blouse, or
       c.  Dress, or ladies suit

   B.  Detective/Administrative Personnel

   1.  Male officers, while on duty and in civilian
       clothing, shall be well-groomed and wear:
       a.  Shirt and tie, or
       b.  Suit and tie.

**145**

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 30.2-92
DRESS CODE - PLAIN CLOTHES

2. Female officers, while on duty and in civilian
   clothing, shall be well-groomed and wear;
   a.  Skirt and blouse, or
   b.  Dress, or
   c.  Suit.

C.  PROHIBITED

1.  No member of the Department shall report for duty,
    court, or any Review Board Hearing in leisure suits,
    jeans, or any suit made out of denim material.

D.  EXCEPTIONS

1.  Those officers assigned to units having altered dress
codes as established by the Chief of Police (i.e., undercover
detail).

146

000151

**EXHIBIT 18**

GENERAL ORDER 31-92
ESTABLISHMENT OF THE BUREAU OF UNIFORM SERVICES


A Bureau of Uniform Services will be established in this Department.

A commanding officer will be designated and he shall be responsible for the government, discipline, administration, and disposition of the following commands:

1. Patrol Division
2. Tactical/Traffic Division
3. Aviation Unit
4. Marine Patrol Unit
5. Auxiliary Police Section

The commanding officer of the Bureau of Uniform Services shall recommend transfers of personnel, allocations of space and equipment and similar management affairs and shall exercise control of all records, clerical procedures and reports on a regular basis for Divisions under his command.

An Administrative Assistant will be assigned to the Office of the Bureau of Uniform Services to provide day to day administrative continuity for the affairs of the Bureau and shall keep the commanding officer apprised at all times of important matters and emergency situations.

The proper channels of communications, except in emergencies, shall be from subordinate command to the Bureau of Uniform Services and then to the Deputy Chief of Police.

147

**EXHIBIT 18**

GENERAL ORDER 31.1-92
DUTIES/SUPERVISOR PATROL
BUREAU OF UNIFORM SERVICES

A position of Supervisor of Patrol has been created within the Bureau of Uniform Services. Superior Officers when available will be assigned for this purpose.

1.  Insure proper performance of functions designated for each division bureau, squad, unit and other branches of the department.

2.  Insure the efficiency and discipline of personnel of all branches of the Bureau of Uniform Services.

3.  Check on the serviceability, proper care and use of department buildings, records and equipment utilized by the Bureau of Uniform Services.

4.  Instruct and frequently test the knowledge of members of all commands of the Bureau of Uniform Services in their duties and responsibilities.

5.  Make frequent personal inspections of the uniforms, equipment and general appearance of all members assigned to the Bureau of Uniform Services.

6.  Frequently examine all books and records of the Bureau of Uniform Services at unscheduled intervals.

7.  Investigate reports of neglect of duty coming to his attention.

8.  Supervise uniform patrol personnel at irregular intervals in the field and in department buildings.

9.  Utilize resources of the department to cope efficiently with the existing problems which arise unexpectedly while on duty.

10. Perform duty in uniform or plainclothes as the exigencies of the services require and approved by the Commanding Officer of the Bureau of Uniform Services.

11. Supervise the activities of the Auxiliary Police Unit while they are performing duty with and for the department.

148

000153

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 31.1-92
DUTIES/SUPERVISOR PATROL
BUREAU OF UNIFORM SERVICES

12. Assume command and perform functions of any Commanding Officer as required during his absence as directed.

13. Conduct investigations as directed by the Commanding Officer of the Bureau of Uniform Services

14. Represent the Commanding Officer of the Bureau of Uniform Services at community meetings or other public assemblies as directed.

15. Perform tours of duty as directed by the Commanding Officer of the Bureau of Uniform Services.

16. Notify unit commanders of hazards not readily corrected by on-duty personnel.

17. Redeploy personnel if necessary on a temporary basis to cope with emergency situations.

18. Respond to and direct police activities at serious crimes and emergencies until the arrival of a higher ranking superior officer.

19. Insure that official reports are accurate and complete.

20. Advise the Commanding Officer of the Bureau of Uniform Services of matters of importance, unusual arrests or occurrences and important messages or conditions requiring immediate attention.

21. Evaluate continuously the effectiveness of all assignments within the organizational structure of the Bureau of Uniform Services.

22. Make disciplinary reports concerning members of the force and civilian employees of the department as required.

23. Investigate and report on injuries to members of the department and damage to the department property as required.

24. Visit courts to supervise performance and conduct of members of the force.

149

000154

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 31.1-92
DUTIES/SUPERVISOR PATROL
BUREAU OF UNIFORM SERVICES

25. Inform local businessmen of department policy concerning corruption and gratuities.

26. Maintain rapport with members of the force and others to seek symptoms of corruption and inefficiency.

27. Perform such other duties as required by the position of the Supervisor of Patrol or as directed by the Commanding Officer of the Bureau of Uniform Services or higher ranking superior officers.

150.

**EXHIBIT 18**

GENERAL ORDER 31.2-92
DEPLOYMENT OF PERSONNEL

I.   INTRODUCTION

Investigative and Technical Service Bureau Commanders, other
Division Commanders and the Chief's Office shall submit a
monthly work schedule of all sworn personnel, (Lieutenants and
below) to the Commander of the Uniform Service Bureau for the
purpose of being scheduled to work in the Patrol Division.

Each Lieutenant, Division Commander and others working a 5-2
schedule will work one (1) day a week in the Patrol Division.

Officers working 4-2 schedule will work one (1) day per four
(4) day work period.

The schedule submitted shall specify what day of the week the
personnel will be working in the Patrol Division.

II.  DEPLOYMENT OF PERSONNEL

All Lieutenants will be assigned to a Patrol Shift as a Acting
Watch Commander or shift Commander where needed by the
Commander of the Bureau of Uniform Services.

All Sergeants will be assigned as Sector Supervisors on the
same shift they are assigned to work in their regular
divisions.

All Corporals and below will work the same shift they are
assigned to work in their regular divisions.

Whenever, an officer is scheduled to work in the Patrol
Division and calls off from duty, the Watch Commander will
submit a report to the Commander of the Bureau of Uniform
Services the following morning.

The Bureau Commander will notify the officer's Bureau
Commander.

Any officer who calls off from duty the day he/she is
scheduled to work in the Patrol Division will work two (2) or
more days in the Patrol Division the following work period.

Any officer who calls off from duty on his/her regular shift
and have to be replaced by another officer will work two (2)
or more days in the Patrol Division when scheduled.

151

000156

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 31.2-92
DEPLOYMENT OF PERSONNEL

Whenever, an officer has to be reassigned to his/her regular duties because of an emergency and it is within the first three (3) hours of his/her patrol shift, he/she will make up the patrol day on his next day in the Patrol Division, in addition to working this regualar scheduled day in the Patrol Division. Instead of working one (1) day in the Patrol Division, he/she will work two (2) consecutive days that week.

At all times there will be one (1) sworn personnel on each shift in the Communication Room and Front Desk.

III. EMERGENCY DEPLOYMENT OF PERSONNEL

All Investigative and Technical Service personnel while working in the Patrol Division may be utilized by the Watch or Acting Watch Commander to assist in any critical situation in their divisions.

The Watch or Acting Watch Commander when utilizing these individuals in these capacities will report in detail, all circumstances of the need to the Uniform Services Bureau Commander that day (day shift) or the following morning.

A. EXCEPTIONS:

1. All members of the Public Morals Division are exempt from this deployment procedure.

152

000157

**EXHIBIT 18**

GENERAL ORDER 31.3-92
MARINE PATROL UNIT

A Marine Patrol Unit has been established and will function as an operating arm of the Patrol Division.

The Commanding Officer, Patrol Division shall be responsible for the administration, supervision and control of this unit.

The Commanding Officer, Marine Patrol Unit, shall be seasonally selected from the total available force and shall be responsible for the discipline, assignment and training of the crew seasonally selected from the total available force. His duties shall consist of but are not limited to the following functions:

1.  Maintenance of a ship's log which shall contain the following:

    a.  Information concerning all licenses required by law for the vessel and members of the crew.

    b.  A current property inventory which shall be checked weekly and notations made with results thereof.

    c.  Record of all activity undertaken concerning the vessel including dates and hours afloat on patrol and in berth, fuel taken on board, new equipment added, unusual incidents effecting the craft or crew members including a record of all visitors taken on board and the reason thereof, both official and unofficial.

    d.  All other activity concerning the craft or crew not mentioned heretofore including discipline.

    e.  Record of all assistance rendered bathers, boater or other authorities.

    f.  Liaison with other marine authorities both government and civilian.

    g.  Such other matters, not listed above but consistent with entries in a ship's log.

2.  Storage, refurbishing and berthing of the craft specifying dates, time and particulars thereof.

3.  Prepare daily activity reports for the Commanding Officer, Patrol Division.

153

000158

EXHIBIT 18

GENERAL ORDER 31.4-92
AUXILIARY POLICE SECTION

I.   An Auxiliary Police Section is hereby created and is assigned
     to the Bureau of Uniform Services for administration.

II.  The Commanding Officer of the Auxiliary Police Section shall
     coordinate activities of all members of the auxiliary police.

     A. He shall be responsible for the recruitment of new members
     and the retention of present members.

     B. He shall be responsible for the training of all auxiliary
     police.

     C. He shall coordinate the activities of the auxiliary police
     with other branches of this department.

     D.  He shall be responsible for the issuance and return of
     department property used by auxiliary police including
     automobiles, radios, etc.

     E.  He shall be responsible for the control, supervision and
     discipline of all members of the auxiliary police.

     F.  He shall investigate all matters pertaining to members of
     the auxiliary police unless the Internal Affairs Division is
     assigned to a specific case.

     G.  He shall be responsible for the administration of
     department affairs concerning all members of the auxiliary
     police and shall act as liaison officer with all private and
     governmental agencies.

     H.  He shall be responsible for installing a record keeping
     system which will maintain a roster with basic personnel
     information on each member to assure adequate department
     records for administrative use as needed.

     I.  He shall be responsible for all the duties connected with
     the operation of the Auxiliary Police Section which are not
     specified in the foregoing sub-division.

III. It is the intention of this department to use the service of
     qualified members of the community who volunteer for duty as
     auxiliary police in a manner consistent with safety,
     efficiency and common sense for the benefit of all members of
     the department and the citizens of the City of Gary.

154

000159

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 31.4-92
AUXILIARY POLICE SECTION

IV.  Auxiliary Police Personnel are authorized to utilize marked
     radio motor patrol vehicles when they report to duty.  A trip
     ticket is necessary and will be issued and signed by the
     Patrol Command, Executive Officer or Turn Commander if the
     Commanding Officer of the Auxiliary Police Section is not
     available.  Assignments will also be made in this manner if
     the Commanding Officer - Auxiliary Police Section is not
     present.

155

000160

**EXHIBIT 18**

**GENERAL ORDER 32-92**
**PLAINCLOTHES OFFICER IDENTIFICATION**


PURPOSE:


Officers working in plainclothes shall be prompt to identify
themselves when the necessary arises. At the scene of an emergency
where it is desirable to display the badge continuously it shall be
attached to an outer garment.

156

000161

**EXHIBIT 18**

GENERAL ORDER 33-92
ESTABLISHMENT OF THE PUBLIC MORALS DIVISION


The Public Morals Bureau office will be detached from the station.
This office will be for administrative purposes only.  All evidence
and prisoners shall be processed only at the Police Headquarters
building.

Narcotics evidence or other contraband seized or found by or given
to any member of the Public Morals Bureau will be inventoried and
sealed in department plastic bags and numbered serially with Public
Morals Bureau Property Numbers in conjunction with the sequence
established by the Department Property Clerk.  The bag shall be
sealed and signed by a member of the Public Morals Bureau and
countersigned by a Public Morals Bureau superior officer.

Continuity of P.M.B. property clerk's serial numbers shall be
recorded in a bound book.  The Commanding Officer of the Public
Morals Bureau shall examine such book daily for accuracy and
completeness of all entries concerning such evidence or contraband.

A Police Department safe (Mosler, serial number 18819-43, Model 12)
shall be provided for the foregoing purposes.  The combination
shall be changed at the start of these procedures and shall be
changed semi-annually thereafter.  The combination shall only be
known to the Chief of Police, the Commanding Officer - Public
Morals Bureau and two (2) subordinate superior officers assigned to
the P.M.B.

157

000162

**EXHIBIT 18**

GENERAL ORDER 34-92
INFORMANTS IN UNDERCOVER OPERATIONS

I.  PURPOSE:

1.  To determine if a crime is being planned or committed.
2.  To identify all persons involved.
3.  To obtain evidence for court.
4.  To locate contraband or stolen property.
5.  To determine a suitable time for executing search warrants and/or arrest warrants.

II.  DEFINITION:

Undercover work is an investigative process in which disguises and pretexts are used to gain the confidence of criminal suspects for the purpose of determining the nature and extent of any criminal activities they may be contemplating perpetrating.

III.  BUY PROCEDURES:

1.  Agent Buy:  Directly involves the undercover police officer in the purchase of a contraband substance.  This type of a case is ideal for prosecution because the trafficker has sold directly to a law enforcement officer; and that fact usually convinces a jury of the suspect's guilt.

2.  There are two (2) methods to utilize when an undercover officer in making buys.

a.  Buy bust:  Is a very useful procedure for the narcotics unit.  By using this method, the unit does not have to actually spend its buy money.  The dealer is arrested at the time of the sale.  If money is used, the serial numbers should be recorded.  This money found on defendant at time of arrest is additional evidence against the defendant that the sale did take place and all money found with the recorded money can be seized.

b.  Walk-away:  If a buy is made by the officer but an arrest warrant is obtained at a later date.  This protects the identity of the undercover police officer and enables the officer to work his way into the drug circle and to make buys from as many traffickers as possible.  Once completed, arrest warrants are obtained for the sales and arrests are made.

158

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 34-92
INFORMANTS IN UNDERCOVER OPERATIONS

In both cases, surveillance will be used for protection of the undercover officer whenever possible. However, during long term investigations this may not be possible. In this case, the officer needs to evaluate each situation and use good judgement.

3.    Controlled Informant Buy: Is the least prosecutable of buy cases if the informant is to be used as a witness in court. The informant is usually involved in criminal activities himself and it becomes a matter of one criminal's word against another. This method is most commonly used in obtaining search warrants. You must establish the reliability of the informant. the following procedure is to be used if controlled buy informant is used.

a.  Thoroughly brief the informant.

b.  Make some independent effort to authenticate the informant's information.

c.  Make no promises to the informant. His participation must be completely voluntary.

d.  If possible have informant telephone the suspect while you monitor the call.

e.  Search the informant, making sure that the informant does not have any contraband on his person.

f.  Take all money and personal property from informant and return after buy is made.

g.  Give informant official funds and record the serial numbers.

h.  Set up surveillance of informant and maintain continual surveillance until informant completes buy and returns.

i.  After the buy, secure the evidence.

j.  Search the informant again. This assures that the informant is not holding back on the money and does not have any of the evidence or other contraband on him.

k.  Return the informant's personal belongings to him.

153

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 34-92
INFORMANTS IN UNDERCOVER OPERATIONS

1. Advise informant how and when to maintain contact with you.

IV. ESSENTIAL PROCEDURES AND POTENTIALS:

1. Undercover work will never be undertaken without authority unless a situation develops where it is impractical to contact a superior and immediate action is appropriate. Unsupervised and uncontrolled buys will only be made in serious or critical situations. In every case, a complete written report will be submitted stating the circumstance requiring an unsupervised, unplanned, or uncontrolled buy.

2. During the preliminary investigation, determine requirements by obtaining as much as you can about the suspect and the neighborhood.

3. Obtain a background story beforehand. Make every effort to live the part. Be ready for questions that might be asked. This applies to both officers and informants.

4. Maintain communications among surveillancing officers and surveillance on undercover officers or informants.

5. Suspect may want the undercover officer to use part of the drugs he purchases. In this situation, the officer must avoid its use. The officer can simulate smoking marijuana or fake taking a tablet or capsule. In the case of heroin or cocaine, the officer will have to bluff his way out and still maintain credibility with the suspect.

6. Do not spend more money than would be normal for assumed character and position.

7. In general, do not associate with or court women or men who are associated in any way with the suspect.

8. Women informants used in controlled buy situations:

a. are to be searched by a police woman or matron.
b. Follow same procedures in making controlled buys.
c. Maintain constant surveillance.
d. Be cautious. Women informants are more likely to make accusations against a police officer than any other informant, especially if informant is working off pending charges

160

000165

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 34-92
INFORMANTS IN UNDERCOVER OPERATIONS

    e.    Avoid being seen with informant in area where
investigation is being conducted. This will minimize any
problems that may arise.

    f.    Whenever possible, have another officer with you while
working women informants. This will minimize any
problems that may arise.

    g.    Do not get friendly with any informants (male or
female). Maintain relationship only on a working basis.

    h.    Never trust or rely on an informant. Be cautious and
skeptical. This is also standard procedure for a
suspect.

    i.    Do not take part in any criminal act or law violation
without the prior knowledge and approval of the Chief of
Police.

9.    AVOID ENTRAPMENT

    a.    Definition: An act by a law enforcement officer
characterized by inducing a person to commit a crime
that he would not normally commit.

    b.    An officer may provide the opportunity to commit a
crime, but not the criminal intent.

    c.    Search the informant again. This assures that the
informant is not holding back on the money and does not
have any of the evidence or other contraband on him.

    d.    Return the informant's personal belongings to him.

    e.    Advise informant how and when to maintain contact with
you.

10.    Observed sale: Where the officer actually observes a street
sale take place and both parties are arrested. The seller,
the purchaser, and the evidence is recovered.

161

000166

**EXHIBIT 18**

GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

I.  INTRODUCTION

    The proper collection, preservation, and handling of physical
    evidence is becoming increasingly important.  The chain of
    evidence from recovery to the time of court presentation is
    being carefully scrutinized by the courts.  Thus the proper
    handling of physical evidence may be a determining factor in
    the successful prosecution of criminal cases.

    To insure that the physical evidence collected by Gary Police
    Department personnel will meet the requirements of the courts,
    it is necessary to establish standard procedures which will
    permit the proper collection and preservation of evidence.

    Found property and confiscated property while not as critical
    from a judicial standpoint, must be handled with equal
    diligence to insure its proper disposition.

    All property shall be the responsibility of the person
    accepting the property until such time as the property is
    delivered to the Property Clerk or Evidence Custodian.

    A.  Evidence  – Any item of property seized by an officer
        that is directly related to a case under investigation;
        the seizure of which is intended for use in the
        identification of suspect, and/or in court presentations
        in that case.

    B.  Found Property – Any lawful item of property, the control
        of which is assumed by an officer for the purpose of
        returning the property to its rightful owner, whether the
        owner is known or unknown.

    C.  Confiscated Property – Any item of property seized by an
        officer that does not meet the criteria above the
        evidence or found property.

II. EVIDENCE HANDLING PROCEDURES

    A.  Officers involved in the evidence collection process
        should use discretion in collecting evidence items.
        Evidence storage space is critical, therefore, only items
        of sound evidentiary value should be collected.

162

000167

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

    B.    The evidence will not be accepted if the following guidelines are not followed. The evidence will be returned to the Turn Lieutenant or Supervisor for proper tagging.

III. COLLECTION OF EVIDENCE

    A.    Liquids – No flammable liquids will be brought into the police department. If there is a flammable liquid for evidence, the HazMat technician, Fire Department representative or Bomb Technician should be notified concerning the proper handling storage or disposal of said liquid.

    B.    Evidence tags will not be wrapped around a can, bottle, etc., as the container cannot be properly identified as to the type or brand. The evidence tag can be attached to a bottle by a piece of string.

    C.    All evidence will be sealed by the collecting officer and marked with his name, the date, time and case number.

    D.    All evidence will be tagged separately and will not be placed in the same bag as any other to prevent any form of contamination of the evidence.

    E.    If more than one container is tagged as evidence, show ownership to each container on the property sheet and on the evidence itself. Each item will have a separate tag and separate bag.

IV. DRUGS

    A.    Be very careful when handling drugs as they can be absorbed through the skin.

    B.    Drug evidence will be tagged separate from all other evidence. A separate property sheet and copy of the report will be made along with a copy of the arrest form.

        Narcotics are sent to the Indiana State Toxicology Laboratory by the Public Morals Investigator assigned to the case for testing. All other evidence is kept by the Evidence Custodian.

183

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

    C.    Different type drugs will be placed in different bags so as not to contaminate each other.

    D.    Narcotics will also be initialed, dated and times like any other evidence. If it cannot be done on the evidence itself, initial the evidence bag.

    E.    If large amounts of narcotics are taken, the Public Morals Division will be notified immediately.

V.    TOOLS

    A.    Evidence tags will be attached by a piece of string, not by tape.

    B.    Mark the tools with the officer's initials, date and time in a place that will not interfere with other markings that might be important as evidence.

    C.    If there are markings on the tools to be preserved as evidence, wrap the tool in paper. Also note same on the property sheet so it can be tested.

VI.    WEAPONS

    A.    All firearms will have an NCIC check made and a copy of the teletype will be attached to the property sheet and report.

    B.    If there is not a serial number on the firearm it will be noted on the property sheet.

    C.    All weapons will be initialed, dated and timed by the officer obtaining the weapon in a place so as not to damage the weapon. For example: Under the grips on a gun.

    D.    All ammo will be placed in a separate bag away from the firearm.

    E.    All firearms will be unloaded before being placed in evidence. If the gun is jammed or for some other reason it cannot be unloaded the supervisor and Desk Sergeant will be notified immediately.

164

000169

EXHIBIT 18

PAGE 4/GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

    F.    Tape will not be put on any weapon. The evidence tag will be placed on the weapon with string or the weapon placed in an evidence bag.

VII. BLOODY CLOTHING/FABRICS

    A.    Wet items will not be placed in a plastic bag as this causes rapid decomposition and destroys the evidence.

    B.    If the officer obtains wet clothing that officer will immediately notify Crime Lab or Evidence Custodian. The Officer will have the evidence tags ready to be turned in along with all paper work.

    C.    If Crime Lab is not working, the Desk Sergeant will be told about the wet clothing immediately, and the evidence custodian or crime lab will be notified as soon as possible. All paper work will be completed on the items.

    D.    In the event that someone needs to enter the Evidence Room the Evidence Custodian will be present at all times.

    E.    This is to ensure that entry to the Evidence Room is controlled to prevent any alteration, unauthorized removal, theft, or other compromise of evidence.

    F.    An Evidence Room Log Sheet will be signed when personnel enter the evidence room. The date, case number, reason for entering, time in, time out, name printed and named signed will be noted on the log sheet.

VIII.    SEPARATING EVIDENCE

    A.    All juvenile evidence will be separated from other types of evidence.

    B.    All narcotics evidence will be separated from other types of evidence.

    C.    All found property evidence will be separated from other court evidence.

163

000170

**EXHIBIT 18**

PAGE 5/GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

    D.    Different types of narcotic evidence will not be put in the same evidence bag as this may cause cross-contamination of the evidence. Tests cannot be run on evidence that has been contaminated by other substances.

IX.    SUBMISSION OF EVIDENCE TO LABORATORY

When a number of personnel are involved in the investigation of a crime, a false assumption may be made that someone else has taken action to get evidence to the lab for examination. It will be the responsibility of the investigator assigned to insure that a written request for the examination is submitted to the Crime Lab for examination. The request should identify the type exam requested. (i.e., blood, semen, glass fragments, latent examination, etc.)

Requests should be submitted within five (5) working days on a standard memo form with all pertinent information, (i.e. complaint, victim, subject and material to be tested); except for latents for which a fingerprint comparison request will be used.

Procedures for the submission of evidence to a laboratory will be as follows:

A.    A written request will be required for all cases where evidence is to be submitted to any laboratory for analysis. The written request will vary in accordance with the particular laboratory to which it is sent.

B.    Indiana State Police Laboratory Division required the use of their request for laboratory examination form 38930R2.

C.    F.B.I. Laboratory required the letter type request. If a laboratory refuses to accept evidence that does not include known samples, that evidence will remain in the custody of the Evidence Custodian until known samples are collected or until there is authorization destruction. In any case a supplemental report will be made to note the refusal of the laboratory to accept evidence. Any destruction of evidence is noted on an evidence destruction form.

166

000171

**EXHIBIT 18**

PAGE 6/GENERAL ORDER 35-92
EVIDENCE AND PROPERTY HANDLING

X. ACCOUNTABILITY AND INSPECTIONS

A. The Evidence Custodian is accountable for control of all evidence accepted for storage as evidence until final disposition.

The Property Custodian is responsible for all found and confiscated property as well as recovered property not to be used as evidence. The Property Custodian is responsible for all found and confiscated property as well as recovered property not to be used as evidence.

The Property Custodian is responsible for all Departmental property. Large evidence items will be kept by the Property Custodian in a secured cage in the supply room.

Items of evidence may be returned to the owner with written permission from the Prosecutor/Judge handling the case. The written release from the Prosecutor/Judge will state:

1. What the item is,
2. Serial number or other identifying number,
3. Description of the item,
4. What type of photographs to be taken, if any, and
5. To whom the item may be released.

Property may be released to an owner only after reasonable proof of ownership has been presented to the property custodian.

B. Records of evidence will be kept in several different methods, each system backing up the other:

1. Evidence Log - The case number, officer, incident type, item location and description of evidence.

2. Computer - The case number, date evidence obtained by evidence custodian, item of evidence, location of evidence, date and how evidence was disposed of, and weapon information.

167

000172

**EXHIBIT 18**

GENERAL ORDER 36-92
DUTIES AND RESPONSIBILITIES OF THE COMMANDING OFFICER OF
THE TECHNICAL SERVICE DIVISION

1.   The commanding officer of the Technical Services Bureau shall
be responsible for the administration, supervision and control
of the following units of the Department.

A.   Custodial Services Unit,
1.  Police Headquarters Building
2.  Police Headquarters Parking Lot
3.  Court and Court Facilities

B.   Court Services Unit
1.  Court Officers
2.  Court Subpoenas Processing Unit.
3.  Warrant Service Squad
4.  City Clerk Services

C.   Correctional Services Staff
1.  Cell blocks
2.  Prisoner Services
3.  Jail records

D.   Main Desk
1.  Main desk records

E.   Property Clerk Unit
1.  Property Clerk Unit
2.  Physical Property Control
3.  Property Clerk Security

F.   Bureau of Identification
1.  Photo Unit
2.  Forensic Section
3.  Criminal Information Unit

G.   Records Section
1.  Statistical Preparation Unit
2.  Records Security
3.  Civilian Supportive Personnel

H.   Special Assigned Functions
1.  Code Enforcement Detail
2.  Technical Services Bureau In-Service Training

I.   Communications Division

168

000173

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 36-92
DUTIES OF COMMANDER OF TECHNICAL SERVICES

2.   The Commanding Officer of the Technical Services Bureau shall ordinarily perform duties during the hours 9 a.m. till 5 p.m. - Monday through Friday and is expected to be available at police headquarters during his tour of duty.

3.   The Commanding Officer of the Technical Services Bureau shall respond to police headquarters for emergencies concerning any of the units under his command regardless of the time of day or night.

4.   There will be no exceptions to any of the foregoing without specific permission of the Deputy Chief or Chief.

169

000174

**EXHIBIT 18**

GENERAL ORDER 37-92
TRANSPORTATION FOR PSYCHIATRIC PATIENTS

In conjunction with requests from the Judge of Gary City Court and the Judge of the Lake Superior Court, Room 4, the Police Department will transport psychiatric patients from Saint Mary Medical Center to the Northwest Indiana Psychiatric Evaluation Center. Two police officers must be assigned to each transfer and they will be accompanied by a medical attendant from Saint Mary Medical Center on all such transfers.

The Medical Director, Gary Community Mental Health Center has guaranteed that violent patients will be either restrained or sedated chemically prior to transfer.

Request for such transfers will originate at the Saint Mary Medical Center and they will telephone the Radio Dispatcher at the Communication Division of this Department for implementation of the foregoing procedures. Medical Director has promised that there will be no delay at the pick-up point or discharge location. No more than two to five such transfers per week are anticipated. Members of the force are requested to return the psychiatric attendant to Saint Mary Medical Center safely, if such attendant has no means of transportation.

The foregoing order will be complied courteously with the safety of patients and the safety of the police officers considered foremost.

170

000175

**EXHIBIT 18**

GENERAL ORDER 37.1-92
TRANSPORTATION FOR PSYCHIATRIC PATIENTS BY
GARY FIRE DEPARTMENT ESCORTED BY
GARY POLICE DEPARTMENT


Following is a summary of the agreement made among the Gary Police
Department, Gary Fire Department and the Gary Community Mental
Health Center regarding the transporting and assessing of
psychiatric patients.

I.  Request for transportation from the Gary Community Mental
    Health Center.

    A.  Requests for transportation from the Gary Community
        Mental Health Center shall continue to be made through
        the Gary Police Department who will contact the Gary Fire
        Department. The arrival time of the police officer(s)
        and the ambulance will be coordinated through their
        respective dispatch operators. The Gary Mental Health
        Center will handle the patient until the other parties
        coordinate their schedules;

    B.  The Gary Mental Health Center will be aware that the Gary
        Fire Department will send an ambulance as soon as one is
        available pending disposition on any emergency cases they
        may have;

    C.  The Gary Mental Health Center will have the patient ready
        for transport upon arrival of the police and fire
        department personnel.

II. Transportation of patients picked up by the Gary Fire
    Department and the Gary Police Department in the Community

    A.  Emergency cases (those presenting a question of danger to
        self or others, or those presenting symptoms of
        irrational or unusual/bizarre behavior) will be picked up
        in the community by the Gary Police Department and
        transported by the Gary Fire Department to the St. Mary
        Medical Center Emergency Room for a mental health
        evaluation;

    B.  If the Fire Department receives a call to transport a
        patient the Gary Police Department will be notified and
        a police officer(s) will meet and accompany the Fire
        Department personnel;

171

000176

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 37.1-92
TRANSPORTING MENTAL PATIENTS

C. When the Gary Fire Department transport the patient, they can leave, understanding that if the patient becomes an emergency detention, they will be called to return to transport the patient from the hospital emergency room to the Northern Indiana Psychiatric Evaluation Center (N.I.P.E.C.) following the procedures outlined in section I;

D. When the Gary Fire Department ambulance is involved, the Fire Department will alert, by code, the St. Mary Medical Center Emergency Room, that they are in route with a psychiatric patient. The Emergency Room staff will notify the Gary Mental Health Center Emergency Service Staff;

E. When an ambulance is not available and the patient is in grave emergency state (a danger to self and/or others the Gary Police Department officer(s) will notify their dispatcher who will alert the St. Mary Medical Center that the police are in route with a psychiatric patient. The Emergency Room Staff will notify the Emergency Service Staff;

F. The police officer(s) will remain with the patient until an evaluation with a recommendation is completed. It has been agreed that the preference is that the case be medically triaged and cleared by the Emergency Room doctor first. When the Emergency Room is backed up and the patient is presenting no physical symptomatology, the mental health assessment can begin before the patient is cleared by the Emergency Room doctor in order to expedite the assessment time so as not to delay the police officer(s). Hopefully the assessment and medical clearance can be completed within one (1) hour.

G. If an admission, either voluntary or emergency detention is needed, the Gary Police Officer need only remain until the hospitalization is effected. The Gary Mental Health Center will obtain the emergency detention order and process the necessary documents. Non-voluntary patients can be placed in restraints, if indicated, and the police officer(s) can leave.

172

000177

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 37.1-92
TRANSPORT MENTAL PATIENTS

III. JAIL EVALUATIONS

    A.    A request for services for a person(s) in jail seen as needing emergency evaluations (are a danger to self and/or others) will be made by the Gary Police Department by contacting the Gary Mental Health Services (885-4264). If a staff member is available, an evaluation will be performed on site at the jail. If a staff member is not available, the Gary Police Department with the Gary Fire Department ambulance will transport the person to the St. Mary Medical Center Emergency Room. The Gary Police Department may transport the person if emergent and if an ambulance is not readily available. In either case the Police Department will call the Emergency Services first to alert them that an emergency evaluation is in route.

    B.    If needed, other non-emergency persons in jail will be referred by the police department to the Emergency Service and a pre-screening process via telephone, will be completed in an effort to evaluate and effect recommendations, thereby averting a transport.

173

000178

**EXHIBIT 18**



GENERAL ORDER 38-92
CORRECTIONAL SERVICES SECTION

A Correctional Services Section has been established within the Technical Services Bureau effective 0800 hours, April 6, 1981.

The duties and responsibilities of the Commanding Officer of the Correctional Services Section shall be as follows:

A.   Assignment, administration, control and supervision of male and female correction officers and police officers while assigned to this duty.

B.   Management of all Gary Police Department detention cells and cell blocks and records associated with their use.

C.   Administration and control of prisoner services.

D.   Administration and control of all detention accommodations including but not limited to:

   1.   Physical facilities including inmate alarm systems, etc.
   2.   Prisoner records.
   3.   Medical records.
   4.   Food supply and preparation.
   5.   Budgetary control and inventory of all supplies and equipment.
   6.   Visitation privileges.
   7.   Visitor records.

E.   Regular in-service training of all assigned personnel.

F.   Detention cell furnishings and equipment including fire alarms, etc.

The Commanding Officer of the Correctional Services Section shall also perform such other duties as directed by the Commanding Officer - Technical Services Bureau.

174

000179

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 38-92
CORRECTIONAL SERVICES SUPPLEMENT DEFINITIONS

JAIL    A confinement facility, usually by a local law
        enforcement agency, which holds persons detained pending
        adjudication and/or persons committed after adjudication
        for sentences one (1) year or less. jails, while
        intended for the confinement of adults, sometimes hold
        juveniles as well. (This is also a definition of a
        detention facility).

HOLDING FACILITY OR LOCK UP

        A temporary confinement facility, for which the custodial
        authority is usually less than 48 hours, where arrested
        persons are held pending release, adjudication, or
        transfer to another facility.

INMATE  Any person whether pretrial, unsentenced, or sentenced,
        who is confined in a detention or holding facility.

SECURITY OR CUSTODY

        The degree of restriction of inmate movement within a
        detention/correctional facility, usually divided into
        maximum, medium and minimum risk levels.

CLASSIFICATION

        A process for determining the needs and requirements of
        those for whom confinement has been ordered and for
        assigning them to housing units and programs according to
        their needs and existing resources.

SUPERVISION

        Is the sum total of all the techniques used by
        supervisors to influence subordinates to achieve specific
        objectives.

SURVEILLANCE

        In a jail is used to monitor rather than to direct
        activities.

        1.  It involves minimal contact with prisoners.
        2.  It has limited usefulness.
        3.  It cannot replace supervision, which demands close
            contact with prisoners.
        4.  It tends to ignore human factors required to insure
            prisoner behavior.

175

000180

EXHIBIT 18

PAGE 3/GENERAL ORDER 38-92
CORRECTIONAL SERVICE SUPPLEMENT

    5. There is no substitute for person to person supervision.

POSITIVE JAIL CLIMATE REQUIRES:

    1. Staff preserve inmates' self-respect by treating them as individuals.

    2. This will contribute to improved morale and reduce tensions among jail personnel and inmates.

    3. Cooperation of staff and inmates necessary and cannot exist in hostile atmosphere.

    4. Jail personnel responsible for safety and welfare of inmates cannot be delegates to other inmates.

    5. When inmates supervise other inmates staff no longer has control of the jail.

SUPERVISION IS DIRECTING THE ACTIVITIES OF OTHERS:

    1. It is a social process requiring

      A. Personality
      B. Supervisory behavior
      C. Supervisory Techniques

    2. Not much can be done with a person who has an inadequate personality for a supervisor's position.

    3. Supervisory behavior and techniques can be learned

      A. They must become an integral part of supervisor's thinking and behaving on the job.

    4. Effective supervisory techniques result in conformity.

    5. Prisoners do not follow orders because they are afraid of jail personnel.

    6. Prisoners generally cooperate if treated humanly, and their needs are being met.

176

000181

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 38-92
CORRECTIONAL SERVICE SUPPLEMENT

OBJECTIVES OF SUPERVISION IN A JAIL:

>    BASICALLY DEVELOPMENT OF AN ORDERLY ENVIRONMENT
>
>    1.   Prevention of escapes
>
>    2.   Safekeeping of prisoners
>
>    3.   Control of jail

Require physical presence of personnel in the jail.

CORRECTIONAL GOALS

1.   To provide for the protection of society by the safe keeping of offenders committed to institutional custody.

2.   To provide for the protection, care, and welfare of the inmates.

3.   To provide for suitable programs for the rehabilitation of offenders, and

4.   To establish and maintain an efficient correctional agency.

CIVIL AND CRIMINAL LIABILITIES OF JAIL OPERATIONS
VICARIOUS LIABILITY OF SUPERVISORS

1.   Negligent hiring

2.   Failure to direct

3.   Failure to train

4.   Negligent supervision

5.   Negligent assignment

6.   Negligent retention

CONSTITUTIONAL RIGHTS UNDER THE CIVIL RIGHTS ACT OF 1871

1.   If inmate is harassed, beat and sexually assaulted by another inmate - Supreme Court rules that the sheriff, warden assistant warden, shift supervisor, and the corrections officer supervising that inmate are liable.  Classification officer could also be included.  All can be sued for heavy punitive damages.

*177*

000182

**EXHIBIT 18**

PAGE 5/GENERAL ORDER 38-92
CORRECTIONAL SERVICES SUPPLEMENT

CLOSE SUPERVISION OF INMATES ESSENTIAL BECAUSE:

1.    Inmates are constantly exposed to rape and assault.

2.    Supervisors and corrections officers are liable for inmate
      behavior.

3.    Supervisors and corrections officers can be sued for heavy
      punitive damages.

4.    Supervisors and corrections officers subject to punitive
      damages when they act with indifference in the manner they
      perform their work - leave their post of duty; jail to
      visually supervise each inmate.

5.    Punitive damages are personal and not official

6.    U.S. Supreme Court decision against the Prince George County
      Detention Center, College Park, Maryland in 1983.

NEGLIGENT HIRING
          sheriff or whoever does the hiring must have good testing and
          selection procedures to eliminate the unfit.

FAILURE TO DIRECT

          Development of a policy/procedure manual to serve as a guide
          for operations.

FAILURE TO TRAIN

          All jail personnel must be trained concerning the division's
          policies and procedures. Training must include all aspects of
          jail operations and administration, example - suicide
          incidents grievance procedures.

178

000183

**EXHIBIT 18**

PAGE 6/GENERAL ORDER 38-92
CORRECTIONAL SERVICE SUPPLEMENT

NEGLIGENT SUPERVISION

Supervisor knew or should have known the quality of staff he
is supervising and used appropriate procedures to insure
proper work performance of his subordinates. Most documented
violations and staff attitudes; submit written reports to
administration.   Failure to supervise properly brings on
lawsuits for negligence supervision.

NEGLIGENT ASSIGNMENT

Again, supervisor know or should have known if a subordinate
is obviously unfit for a sensitive assignment, then supervisor
is under obligation to change that subordinate's assignment.
Failure to do so subjects all supervisors who knew or should
have known to a law suit or negligent assignment.

NEGLIGENT RETENTION

If a subordinate is obviously unfit for service, then
everything said about negligent assignment above also applies
to negligent retention.  When an administrator supervisor is
aware concerning the incompetence of a subordinate, he should
have him removed from the service.

179

**EXHIBIT 18**

GENERAL ORDER 38.1-92
CODE OF ETHICS - CORRECTION SERVICE PERSONNEL

An employee of the Gary Correction Services Section, I pledge myself:

1. To strive to maintain the highest moral personal conduct so that I place the welfare of my section, my City, my State, and my Nation above the loyalty to any special interest, group, or person.

   Employees should be extremely careful that personal commitments do not in any way negatively effect performance of one's duties within the Correction Services Section. Care is to be taken also to assure that no relationships are formed nor actions of a sexual nature are engaged in, either verbally or otherwise, with any inmate.

2. To uphold the Constitution of the United States and the State of Indiana, and to comply with all laws and legal regulations established for my guidance in the proper performance of my duties.

   If any employee willfully disregards any law in regard to performance of duties, that employee is guilty of a law violation as certainly as any inmate.

3. To give a full day's work; to put forth my best effort in carrying out any official obligations so that I shall fulfill my personal responsibilities as a loyal and efficient employee.

   An employee should never allow an inmate to do work the employee is to do. This includes such tasks as count, making work assignments or calling in counts.

4. Never to discriminate for or against any person or group because of differences or similarities in political thought, religious belief, race, or ethnic background.

   Personal biases and feelings have no place in correctional work. All persons must be accepted on an even basis.

5. To make no private commitments of any kind binding upon the duties of my office, since a city employee has no private work which can be binding upon public duty.

   An employee is never to make any private contract or agreement as to how he/she will perform any job.

180

000185

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 38.1-92
CODE OF ETHICS/CORRECTION SERVICE PERSONNEL

6. Never to contract for any business with the Correction Services Section or any local, state or federal agency of government, which would be inconsistent with my role as a public employee, or which would interfere with the honest performance of my official duties and obligations.

   Do not establish any business commitments of any type that could in any way cause question to be raised about your job responsibility.

7. Never to reveal confidential information contained in the personal records of either employees or inmates, unless duly authorized to do so by Department policies or by my supervisors.

   Unless specifically authorized, do not reveal any information relative to employees, inmates, or facilities.

8. To maintain all city property entrusted to my care, and to never make unauthorized personal use or appropriation of city materials, goods, tools, or services.

   An employee is charged with the protection to all city property. It must be safeguarded against theft, abuse, misuse or inappropriate use.

9. To never solicit or accept any free services, gifts, or gratuities from any inmate, parolee, probationer, or from a member of their family or friends; and furthermore, I shall not give or donate any item to any inmate, parolee, or probationer, unless duly authorized to do so by my supervisors.

   Any employee should give nothing and take nothing from any prisoner. Neither should anything be given or taken from anyone related or acquainted with a prisoner.

10. To uphold the above-listed principles, ever conscious that public office is a public trust.

    Conduct yourself as a City employee, as if the entire success and reputation of the Department rests upon you.

181

**EXHIBIT 18**

GENERAL ORDER 38.2-92
RULES AND PROCEDURES FOR CORRECTIONAL OFFICERS
(WARDENS AND MATRONS)

Wardens and Matrons shall make a search of all prisoners before they are confined and shall take from them all valuable possessions and other property that might be used by them to cause physical harm to themselves, i.e., belts, neckties, straps or any other similar articles or implements. The property shall be labeled, and the proper record of entry made on a standard department form or book in use by the detention section.

Wardens and Matrons shall not place any unconscious or injured person in a cell or detention room unless ordered to do so by a superior officer or by orders of a physician. In the event any prisoner becomes ill or injured while in detention, Wardens and Matrons shall immediately notify the officer in charge. Medical aid will be obtained for sick or injured prisoners when necessary.

Wardens and Matrons when bringing a prisoner to his or her cell, shall give the prisoner a blanket, a mattress, and allow the prisoner one phone call. If the prisoner is intoxicated, they will not be allowed a phone call until such time as they are sober. When releasing prisoners, the Warden and Matron shall see that the mattress is cleaned, the blanket is folded and placed in its proper place, and that the cell is cleaned prior to the prisoners being released. The prisoner is then taken to the front desk, given his property and released.

Wardens and Matrons shall put a prisoners name on a sign-out sheet when a prisoner is taken out for questioning as well as the person signing him out. The time and the date, also the time when the prisoner is returned to the cell will be recorded on the sign out sheet.

Wardens and Matrons shall keep a necessary reserve of all supplies used for the operation of the detention quarters, and shall be held strictly responsible for the security of all doors, locks and cells of the detention area while prisoners are in confinement.

Wardens and Matrons will report any unusual incidents or questionable actions of prisoners that come to their attention, including the detention of any contraband or forbidden items. They shall report any condition or hazard that may result in personal injury, fire or damage to the detention room cell or area.

182

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 38.2-92
RULES AND PROCEDURES

Wardens and Matrons may purchase cigarettes for prisoners out of
their own money being held for them, providing the police charges
pending against them do not relate in any way to this money.  In
the event of a purchase made from such money, the amount expended
shall be entered in the proper records.

Wardens and Matrons shall not place or confine adults and juveniles
in the same room or cell for detention purposes.

Wardens and Matrons shall not grant special privileges to prisoners
without the permission of their Commanding Officer or the Officer
in charge of the Arresting Division.

Matrons working the 8 am to 4 pm turn shall take a copy of the
Daily Bulletin from the Desk Sergeant, make copies of same and
distribute to various departments as designated by the Technical
Services Officer in charge, making sure that each department
designated has a complete copy of the Daily Bulletin.

Correctional Officers shall check their prisoners at the beginning
of each turn, once each hour and a final check is made before the
end of the turn.  These checks, or head counts are to be recorded
on the head count sheet and any unusual circumstances, reference
the condition of the prisoners or the cell assigned to them are to
be noted by the Correctional Officer.  The Correctional Officer
performing the initial check will complete the Medical Record Form
indicating the date, time, and condition of the prisoner. The
Correctional Officer will sign the Medical Form when completed.

Wardens are at no time to check female prisoners in the cells
unless accompanied by a matron or a policewoman.  If no matron or
policewoman is available they are to be accompanied by the senior
officer on the turn.

No firearm is to be carried in the Gary jail proper by Correctional
personnel, or police officers.  This includes correctional officers
with valid Indiana Gun Permits.  Correctional Officers with valid
Indiana Gun Permits are to check their firearms with the Desk
Sergeant before starting their tour of duty.

183

**EXHIBIT 18**

GENERAL ORDER 38.3-92
DUTIES OF CORRECTION OFFICER
UNUSUAL OCCURRENCE

I.   PURPOSE

To make notifications and investigate certain unusual occurrences relating to prisoners.

II.  DEFINITION

Unusual occurrences relating to prisoners means that a prisoner in custody of this department:

A.  Dies
B.  Attempts suicide
C.  Assault a member of the Department
D.  Escapes or attempts to escape
E.  Is involved in any other occurrence of an unusual nature.

III. CORRECTIONAL OFFICERS PROCEDURE

1.  Notify Desk Sergeant
2.  Notify Detectives assigned to prisoners case if he or she is being held on probable cause, if detectives are unavailable notify their commander.
3.  Prepare an official report and forward it to proper authority.
    a.  Desk Sergeant
    b.  Detectives (if applicable)

184

**EXHIBIT 18**

GENERAL ORDER 38.4-92
WARDENS PHOTOGRAPHING AND
FINGERPRINTING OF PRISONERS

I.   PROPOSAL

That the 8 am to 4 pm turn and the 4 p.m. to 12 mn turn will
do all the fingerprinting and photographing of prisoners in
custody or taken into custody during their tour of duty.
Recommend that the following procedures be followed by the
Wardens pertaining to the fingerprinting and photographing of
prisoners.

II.  8 am to 4 pm Turn

Since the midnight or 12 mn turn will not be fingerprinting or
photographing of any prisoners, the responsibility of
fingerprinting and photographing all prisoners in custody from
the midnight turn, plus all prisoners during their tour of
duty.

1.   Obtain the gold copy of the arrest sheet from the box
     besides the report clerks desk and take to the Bureau of
     Identification for processing.

2.   The Bureau of Identification will mark the arrest sheet
     with the following information concerning if a full local
     print card is needed or Full FBI card, or green sheet or
     GS, disposition sheet or a photograph is needed, plus
     issuing a Bureau of Identification number.

3.   Wardens will then take the arrest sheet to the jail,
     where they will proceed to take the prisoner to the 3rd
     floor North Male section.  The information on the arrest
     sheet will be gone over with the prisoner to get the
     correct spelling of their first, middle and last names,
     address, birthday, height, weight, color of eyes, hair,
     place of birth, social security number, alias names,
     place of employment, occupation, next of kin (like
     mother, father, brother or some other relative) and the
     kins address.  Additional questions of information such
     as years of education, condition of teeth (good, bad,
     fair, false and etc.) complexion, build, scars, birth
     marks, tattoos and if they wear glasses.

000190

**EXHIBIT 18**


PAGE 2/GENERAL ORDER 38.4-92
WARDENS PHOTOGRAPHING AND FINGERPRINTING OF PRISONERS

4.  Upon starting to fingerprint the prisoner, have sign the
    print card first, then proceed the prisoner as called for
    on the arrest sheet as indicated by the Bureau of
    Identification personnel.  If the warden is in doubt as
    to what cards he should use, he should proceed to
    fingerprint the prisoner using a Gary Police Department
    local print card, a FBI print card and a FBI green
    disposition sheet.

5.  After the fingerprints have been taken, the photograph or
    mug board will be set up showing the days date, Bureau of
    Identification number and the prisoners date of birth.
    This board has a chain and will be attached around the
    prisoners neck once he/she is seated in front of the
    camera.

6.  Photographing the prisoner, you will place the prisoner
    on the stool facing the camera and after lining up the
    prisoner in the camera for full face shot.  After the
    full face photograph is taken, have the prisoner still
    facing the camera, turn only him/her left for a profile
    photograph.

7.  Once the prisoners are all fingerprinted and photographed
    and returned to the cells, the wardens will return the
    fingerprint cards and arrest sheets to the Bureau of
    Identification, where they will be typed and necessary
    filing completed.

8.  After seven (7) prisoners have been photographed or the
    counter on the camera shows fourteen (14), the warden
    will trigger the camera six (6) more times and reset the
    camera counter to zero.  Whenever this is done, a note
    should be left on the counter stating the time and date
    that the film was advanced so the Bureau of
    Identification will know where to cut the film for
    processing.

186

000191

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 38.4-92
WARDENS PHOTOGRAPHING AND FINGERPRINTING

4:00 p.m. to 12:00 mn Turn

Will follow the procedures as the 8:00 am to 4:00 pm turn.

Following are some terms that will be used on the arrest sheets by
the Bureau of Identification that the wardens will need to know
concerning the procedures to be followed in the fingerprinting and
photographing of prisoners.

Full set of rolled fingerprints: Where all ten (10) fingers are
rolled from one side of the finger to the opposite side of the
finger.

Fixed impression: Where the fingers are placed straight down on
the fingerprint card.

Local fingerprint card: Has the name of Gary Police Department on
it, spaces for all ten (10) fingers to be rolled and at the bottom
of the card for the fixed impression of all ten (10) fingers.

Full FBI card: Has the name of the Federal Bureau of Investigation
on the back and typing and lines are in red. Has ten (10) spaces
for rolled prints of all ten (10) fingers and at the bottom of
print card, space for fixed impression of all ten (10) fingers.

Green sheet or GS: This is where a fixed impression of the right
hand is placed on a FBI fingerprint card.

Disposition sheet: Green in color and the fixed impression of the
four fingers of the right hand are placed on the bottom on the
right side.

It is the responsibility of the Bureau of Identification to provide
continuous instructions in the areas of photographing and
fingerprinting inmates.

If a problem concerning the condition of a prisoner, such as being
drunk, unruly or a physical or mental condition that prevents the
photographing and fingerprinting, they will mark the arrest sheet
stating the reason or problem and leave it for the next turn. If
the second turn of wardens are unable to handle the prisoner, they
should then notify the Bureau of Identification for assistance.

187

000192

**EXHIBIT 18**

GENERAL ORDER 38.5-92
VISITING CLERGYMEN - CORRECTION FACILITY

1.  In order to insure religious assistance whenever needed or requested by prisoners in jail at the Gary Police Headquarters, permission will be granted by the Main Desk Superior Officer under guidelines established by the Commanding Officer - Correctional Services Section and approved by the Commanding Officer - Technical Services Bureau.

2.  Clergyman requesting visitation privileges will be required to be on the approved list established after investigation by the Commanding Officer, Correctional Services Section and approval of the Commanding Officer - Technical Services Bureau. Applications for administrative clearance for visitation privileges will be on a copy of the attached qualification questionnaire and evaluated by the Gary Police Department's Chief of Chaplains for recommendation purposes prior to approval by the Commanding Officer Technical Services Bureau.

3.  A numbered certified list of approved visiting clergymen will be maintained at the Main Desk and by the Commanding Officer of the Correctional Services Section at the Technical Services Bureau.

4.  In an emergency situation where a visiting clergyman requests immediate visitation privileges with a prisoner and is not on the certified list, verbal clearance will be sought from a Gary Police Department Chaplain and approved by the Platoon Commander. A written record of such instances will be maintained by the Commanding Officer - Correctional Services Section.

188

000193

**EXHIBIT 18**

GENERAL ORDER 38.6-92
CORRECTIONAL SERVICES SECTION

In addition to other duties required by Correctional Services Section, the following specific responsibilities are established for all Wardens and Matrons and members of the force assigned to such duties:

1.    Prisoners shall be searched for weapons prior to being removed from the downstairs holding cell. Normally the desk officer will notify the Warden/Matron that there is/are prisoner(s) to be taken to the main jail area. Correctional Officers are not to assume that prisoner(s) have already been searched by any others than themselves. Any weapons or evidence found by the Correctional Officer is to be given to the Superior Officer at the desk and a report made.

2.    Upstairs the Correctional Officer will inventory the prisoner(s) property and complete the property slip in duplicate making certain that they are signed by the prisoner and the other is placed in the property bag which is then sealed. The property is then placed in the property locker located in the property room next to the desk. It is to be locked and secured at all times and the key given to the Correctional Officer's relief.

3.    Upon release from custody the property is checked in the presence of the Correctional Officer by the prisoner and the property slips signed by the prisoner(s) and Correctional Officer. The prisoner is then brought to the desk officer where both property slips are attached to the arrest sheet.

4.    If at any time the Correctional Officer has a question concerning the procedure or property of the prisoner he/she is to contact the superior officer on duty at the time.

5.    When a prisoner has maliciously damaged City property, it shall be the responsibility of the correctional officer to notify the desk supervisor of said damages and to prepare an offense report reflecting damages; and file the proper affidavit with the City Prosecutor before the inmate is released form custodial detention.

185

000194

**EXHIBIT 18**

GENERAL ORDER 3B.7-92
JAIL STANDARD OPERATING PROCEDURES

1.  Each day the jail should be swept and mopped before breakfast, and swept after each meal.  The same for the catwalks. Cleanliness is to be maintained at all times, each prisoner is responsible for his cell.

2.  When releasing a prisoner, he is to bring his blanket and mattress out with him.  His blanket should be shaken and folded neatly, the mattress is to be cleaned thoroughly.

3.  Each prisoner should take shower every day, soap and towels should be given out when available.

4.  After every meal their tables should be cleaned.

5.  Every correctional officer or warden should make sure the jail is clean and stays clean on his shift.

6.  There should be more communication between correctional officers and matrons, about prisoners and jail procedures.

7.  Prisoners should be let out of their cells, for at least eight (8) hours a day, on the 0800-1600 shift, back in their cells before the 0800-1600 shift is over.

8.  Make sure each prisoner has his three (3) meals a day, he is to be given his breakfast before court or seen by a detective. If he is being seen by a detective at brunch time he is to be brought back to the jail to be fed than return to the detective bureau.

9.  When a prisoner is taken from the jail a sign out sheet is to be used.

10. No blankets, mattresses, or phone calls when intoxicated or causing a problem.

11. At no time should prisoner be allowed food, candy, or pops from the outside.

12. Most of the jail cleaning should be done by prisoners.

13. Should have random shake downs.

14. We need our juveniles in sections for juvenile offenders.

15. Toilet and sink in cells should be cleaned three (3) times a week.

190

000195

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 38.7-92
JAIL STANDARD OPERATIONAL PROCEDURES

16.   Garbage cans should be emptied and cleaned everyday.

17.   At the end of each shift every prisoner should be in his cell.

191

000196

**EXHIBIT 18**

GENERAL ORDER 39-92
DISPOSAL OF NARCOTIC RELATED PROPERTY/CONTRABAND, FIREWORKS AND
ETC.

SECTION I.    DISPOSAL OF NARCOTIC OR NARCOTIC RELATED PROPERTY
              BY THE GARY POLICE DEPARTMENT

THE FOLLOWING PROCEDURES WILL BE FOLLOWED BY THE GARY POLICE
DEPARTMENT CONCERNING THE DESTRUCTION OF NARCOTICS AND NARCOTIC
RELATED ITEMS.

1.    The Property officer of the Gary Police Department will check
      the case files on all narcotic or narcotic related items that
      have been in-custody of the Gary Police Department for six (6)
      months or longer.  If the case in question has been rejected
      by the prosecutor, nolle prossed or case was never filed, or
      case has gone to court and the Judge has ordered it destroyed,
      the Property Officer will compile and itemized list containing
      an item number, case number and brief description of the
      property.

2.    The Property Officer will forward the itemized list to the
      Chief of Police, Commander of the Technical Services Division
      and one copy for the Property Officer's file, stating that the
      following items are ready for destruction.  Requesting that
      the Chief of Police assign a representative other than from
      the Technical Services Division to witness the destruction of
      the narcotic or narcotic related items.

3.    Narcotic or narcotic related items that are suitable for
      combustion will be burned at a time and place of determination
      by the representative of the Chief of Police and Technical
      Services Division.

      Narcotic and narcotic related items that are not suitable for
      combustion or are of liquid form will either be destroyed by
      pouring the liquid in the city sewer or taking it out to some
      sandy soil, where it would pour into the ground, along with
      gasoline and set on fire, or other means of destruction.

4.    The Property Officer will sign all property slips or case
      records with the disposition of these narcotics or narcotic
      related items along with the property log book being marked
      and the index card file card being marked as destroyed.

5.    Indiana Code 35-1-5.1
      (F) Disposition by destruction of property, the possession of
      which is unlawful, shall be witnessed by two (2) persons who
      will also attest to the destruction.

                                                            **192**

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 39-92
DISPOSAL OF NARCOTICS AND CONTRABAND

SECTION II    DISPOSAL OF CONTRABAND, FIREWORKS AND ETC. BY THE
              GARY POLICE DEPARTMENT

THE FOLLOWING PROCEDURES WILL BE FOLLOWED BY THE GARY POLICE
DEPARTMENT CONCERNING THE DESTRUCTION OF CONTRABAND, FIREWORKS AND
ETC. ITEMS.

1.    The Property Officer of the Gary Police Department will check
      the case files on all contraband, fireworks and related items
      that have been in-custody of the Gary Police Department for
      six (6) months or longer.  If the case in question has been
      rejected by the prosecutor, nolle prossed or never filed, or
      the case has gone to court and the Judge has ordered the
      contraband, fireworks or related items destroyed, the property
      officer will compile an itemized list containing an item
      number, case number and brief description of the property.

2.    The Property Officer will forward the itemized list to the
      Chief of Police, Commander of the Technical Services Division
      and one copy for the property officer's file, stating the
      following property is ready for destruction.  Requesting at
      this time that the Chief of Police assign a representative
      other than from the Technical Services Division as a witness
      to the destruction of the contraband, fireworks, or other
      related property.

3.    Property of contraband, fireworks and related property that is
      suitable for combustion will be taken to sandy soil (most
      likely the beach area) where a hole would be dug and the
      contraband soaked with gasoline, placed in the hole, and
      ignited.

      Other forms of contraband, and related property would be
      destroyed depending on the form and condition of the property.

4.    The Property Officer will sign all property slips, and case
      records with the disposition of these contraband items,
      fireworks and related items, along with the property log book
      being marked and the index card file card being marked as
      destroyed.

5.    Time and place will be determined by the representative of the
      Chief of Police and Technical Services Division.

193

EXHIBIT 18

PAGE 3/GENERAL ORDER 39-92
DISPOSAL OF NARCOTIC AND CONTRABAND

6.   Under Indiana Code 35-1-5.1
     (F) Disposition by Destruction of Property, the possession, of
     which is unlawful, shall be witnessed by two (2) persons who
     also will attest to the destruction.

194

000199

**EXHIBIT 18**

GENERAL ORDER 40-92
BOOKING OF PRISONERS BY ARRESTING OFFICERS

It shall be the responsibility of the turn-key assigned to the Technical Services Division to see that the door to the turn-key's room is locked at all times. Officers bringing subjects on station to be booked will question the prisoner as to his physical condition, and inquire if any medical attention is needed. If the turn-key determines that the prisoner is requesting medical attention, prior to the time that he/she is placed in the turn-key's room, it shall be the responsibility of the arresting officer to take the prisoner to the hospital for the required medical care.

Once a prisoner is placed in the turn-key's room, he/she becomes the full responsibility of the turn-key and he is the only one authorized to remove them for any reason. Any additional information needed for the booking of a prisoner will be requested from the turn-key. Once a prisoner is booked and he/she requests medical attention it shall be the responsibility of the turn supervisor in the Technical Services Division to see that the prisoner receives the required medical attention. Medics will be called to the station to determine the extent of medical treatment needed. If the medic determines that the prisoner should be transported to the hospital, the turn supervisor in the Technical Services Division will inquire if the prisoner will be transported by ambulance. If the medic determines that no ambulance is needed, it shall be the responsibility of the turn supervisor in the Technical Services Division to notify the Communications Division that a Patrol Unit is needed on station to transport a prisoner to the hospital for medical treatment. Once a prisoner is released to the custody of the Patrol Unit for transportation to the hospital for treatment it shall be the responsibility of the transporting officer to remain with the prisoner until (a) the prisoner is confined to the hospital (b) the treatment is completed and the prisoner is released from the hospital. If the prisoner is released from the hospital, it shall be the responsibility of the Patrol Unit to return the prisoner to the custody of the turn supervisor in the Technical Services Division. If the prisoner is confined to the hospital, the transporting officer will notify his/her turn supervisor in the Patrol Division and the turn supervisor in the Technical Services Division. It shall be the responsibility of the turn supervisor in the Patrol Division to see that a guard is maintained on all prisoners confined to the hospital on felony charges. There should be no need to place a guard on a prisoner that is confined to the hospital on misdemeanor charges. When an inmate self inflicts an injury while in custody and requires medical treatment, the inmate/prisoner shall register

195

000200

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 40-92
BOOKING OF PRISONERS BY ARRESTING OFFICERS

himself for treatment thereby releasing the City of Gary and Police
Department from liability.

196

000201

**EXHIBIT 18**



GENERAL ORDER 40.1-92
BOOKING PROCEDURES

Effective immediately the following changes in arrest procedures
will be implemented. All subjects placed under arrest and brought
to the Gary Police station will be given a regular case number and
a official Gary Police Department arrest form completed. Posting
of a bond immediately has no effect on the procedures:

1. Felony and Misdemeanor arrests will be processed as in the
   past.

2. Traffic Arrests: (DUI. DWS. NO OPER. LICENSE, ETC.) All
   individuals brought to the police station on traffic charges
   will be given a regular case number and a official Gary Police
   Department arrest form completed.

3. Warrant Arrest (Alias, Bench, Crown Point Warrant, Out of
   County, Out of State): All arrest warrants will be given a
   regular case number and a official Gary Police Department
   arrest form completed.

4. Serving Days: The 5 x 8 arrest form will be re-designed and
   used only for persons serving days.

137

**EXHIBIT 18**

GENERAL ORDER 41-92
PROCEDURE FOR EVIDENCE/PROPERTY

PROCEDURES FOR PROPERTY/EVIDENCE

1.  Property turned in will be stored in the two (2) cabinets already used as property holding spots.

    The cabinets are located directly behind the desk sergeants desk.

    The cabinet that has a cut drop slot on it's side will be used for the following evidence only, MONEY, NARCOTICS, & HANDGUNS. This cabinet is so marked. The only keys for the cabinet will be in the possession of the property clerk only. The side slot will be the dropping point.

    The second cabinet will be used for bulk items such as RIFLES, SHOTGUNS, & OTHER SMALLER VALUABLES, the desk sergeant has a key to open this cabinet for placement of items.

2.  TURNING IN PROPERTY

    All property turned in will be logged into four (4) separate categories.

    1.  Narcotics
    2.  Money
    3.  Guns
    4.  Other (any item other than the three (3) above)

    Each item turned in that falls in the first three (3) categories must have a separate property slip attached with the case number.

3.  PROCEDURE IN EVIDENCE OR PROPERTY SLIPS

    Officer turning in property will make out a property slip

    The turn supervisor will double check to make sure that all items listed are correct and accountable, then sign the property slip.

    Desk personnel will verify the accountability of the property and also sign the property slip.

198

000203

EXHIBIT 18

PAGE 2/GENERAL ORDER 41-92
PROCEDURE FOR EVIDENCE/PROPERTY

The desk personnel will then heat seal the property prior to dropping of the property in the cabinet.

Very large items will still be held where room allows.

4. PROPERTY CLERK

There will be a log book assigned for each of the four categories which will be kept by the property clerk, each book will have all entries concerning the property.

A small safe will be installed in the main vault which will be used for money only, the money and log book will be locked in the safe.

A metal file cabinet will also be placed in the main vault for narcotics use only.

The main vault will hold narcotics, guns, and money only. All bulk items will be stored in the locked B. of I holding rooms behind the training room.

A scale will be used to weigh each package of narcotics that is turned in or taken out.

No property will be accepted by the property clerk unless it is submitted properly.

HEAT SEALED, CORRECTLY INVENTORIED, CASED, PROPER SIGNATURES.

Four (4) log books will be correctly maintained, listing all items.

**EXHIBIT 18**

**GENERAL ORDER 42-92**
**VEHICLE INSPECTIONS**


The motor check lane is located in the front of the Station on Broadway.

When individuals enter the station for a motor check, officers at the front information desk will be responsible to comply with their request.  However, all police personnel will issue vehicle checks if and when requested by a motorist.

At no time will the officers at the front desk request an officer to be called in to issue motor checks.

000205

**EXHIBIT 18**

GENERAL ORDER 42.1-92
VEHICLE INSPECTION DESIGNATION

The parking zone identified for motor inspection directly in front of the police station is restricted for emergency parking and vehicle identification inspections only.

Persons parking their vehicles in this restricted zone are subject to have their cars towed.

201

000206

**EXHIBIT 18**

GENERAL ORDER 42.2-92
MOTOR VEHICLE INSPECTION


PURPOSE:

There will be a five ($5.00) fee imposed for each motor vehicle inspection.

PROCEDURE:

1.  Vehicle Motor Inspections will be administered between the hours of 8:30 a.m. until 3:30 p.m., Mondays through Fridays at the Gary Police Department, 1301 Broadway.

2.  Individuals requesting motor vehicle inspections shall be directed to the Traffic Accident Report window to pay the fee and obtain a receipt.

3.  Once the receipt has been obtained by the individual, it shall be the responsibility of the Desk Personnel to conduct the motor vehicle inspection in the designated Motor Check Lane in front of the station.

4.  The desk personnel will validate the receipt by signing their signature on the back of receipt. The officer's signature is the official validation.

5.  If the vehicle is not in the area of the station, the individual may come to the station, pay the fee - then present the receipt to any Gary Police Officer to administer the motor vehicle inspection and validation.

6.  Businesses wishing to have vehicle motor inspection of their company/business fleet(s) must first come to the police station, pay the fee and obtain a receipt for the vehicles they wish to have inspected.

7.  NO OFFICER IS AUTHORIZED TO ADMINISTER A MOTOR VEHICLE INSPECTION UNLESS THEY ARE PRESENTED WITH A RECEIPT.

8.  Intake clerk shall record on receipt the make model, and vehicle identification number.

202

**EXHIBIT 18**

GENERAL ORDER 42.3-92
POLICE INSPECTION FOR OUT OF STATE VEHICLES, NEW RESIDENT

In order to expedite police inspections of out of state vehicles
and to assure the customer will process the title correctly, the
Bureau of Motor Vehicles, Gary Office will issue a photocopy of the
title to the customer along with a letter of request for the title.
Police Officers administering the inspections shall make necessary
indications for out of state title checks on the vehicle inspection
form.

The Bureau of Motor Vehicles is not allowed to give the customer
the actual title when a lien is showing.

**203**

**EXHIBIT 18**

GENERAL ORDER 43-92
PROCEDURES FOR EMERGENCY INCIDENTS


The following is an outline of procedures for emergency incidents
to be used during emergencies/disaster operations by members of the
Gary Police Department. Each member of the force shall be familiar
and use these procedures when directed to respond to any of the
unusual situations described and outlined in this section.

All commanding officers are responsible that members of their staff
are familiar with the contents as outlined. They have been
prepared with a view to usage in the field.

204

**EXHIBIT 18**

GENERAL ORDER 43.1-92
AIRCRAFT DISASTERS

There is only one airport in the City of Gary. The Gary Municipal
Airport is located on Industrial Highway west US No. 12.

In the event of an airplane crash at the airport, the Radio
Technician will be alerted by a telephone call from the Airport
Control Tower. The Radio Technician will dispatch appropriate
personnel and equipment.

The airport is under the control and jurisdiction of the Airport
Authority, and in the event of a disaster, responding
emergency/rescue units will be met and escorted to the site by
Airport Authority Police.

The Police Coordinator at the disaster area shall establish an:
- Inner Perimeter: Area wherein the damage is sustained and the
wreckage of the plane is strewn.

- Outer Perimeter: Area where at vehicular traffic is excluded and
pedestrian traffic is controlled, in order to prevent interference
with operations being performed in the Inner Perimeter.

The Superior Officer of Command at the scene will confer with the
Police Coordinator and ascertain the current status of the
emergency/rescue operation, the type of aircraft involved, the
number of passengers, and any existent problems which might hamper
emergency operations. Except in cases of fire, he will direct
emergency/rescue operations.

Police personnel will be assigned to the Inner Perimeter and:

- Perform primary disaster functions, i.e. - provide illumination,
assist other agencies, search for victims, administer first aid,
etc.

- Assist the Police Coordinator in securing the area from
unauthorized persons by providing rope and any other necessary
equipment.

- Cooperate with properly identified representatives of the
National Transportation Safety Board (N.T.S.B.) and the Federal
Aviation Agency (F.A.A.).

Police personnel shall observe the following precautions:

- They shall not smoke in the immediate vicinity of the disaster.

205

000210

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.1-92
AIRCRAFT DISASTERS

- They shall not drive vehicles onto possible active portions of the airport unless escorted by a Port Authority vehicle which has radio contact with the Control Tower.

- They shall confer with representatives of the National Transportation Board before commencing the search to recover personal property.

- They shall be guided by the information received from the N.T.B.B. and F.A.A. in performing emergency operations on the plane or any part thereof.

206

**EXHIBIT 18**

GENERAL ORDER 43.2-92
TRAIN DISASTERS

The primary function of police personnel at the scene of a railroad disaster involving serious or fatal injuries, is to provide relief for the injured and lessen the fatality hazard.  The rescue function in these cases is divided into two (2) efforts, namely:

1.  Rendering aid to detrained victims:

     . Clearing the area of ambulatory persons.
     . Removing fencing to provide exit for victims and access for responding emergency personnel and equipment.
     . Securing cars which could possible topple over.

2.  Rendering aid to injured and entrapped victims:

It should be noted that train disasters may also involve shipment of explosive, chemical, or radioactive materials. 'Police personnel shall comply with the guidelines published by the Manufacturing Chemists Association on "Chem Cards" which indicate:

- The fire and exposure potential of the hazardous material.

- The corrective measures to be taken in specific cases, i.e. -- spill or leak, fire or exposure.


The following precautions shall be taken by police personnel at the scene of a train disaster:

- Always assume that the electric power is on.

- Maintain constant vigilance while in the track area.  Always anticipate the possibility of moving trains even though the power has allegedly been turned off.

- Police personnel, acting as flagman, shall be located at least 3/4 of a mile from the emergency scene in the direction of oncoming traffic.  The average train travelling at maximum speed, needs at least this distance to come to a complete stop.

- Flagman, when attempting to stop a train, shall wave their flashlight or a rolled up newspaper in a vigorous back-and-forth motion.

- A pre-arranged area of safety shall be selected, and used, in the event circumstances arise which might dictate such use.

- Securely fasten all items of clothing to prevent the possibility of loose clothing being caught on a moving train.

207

EXHIBIT 18

GENERAL ORDER 43.3-92
BUILDING COLLAPSE

Buildings of the same class and type of construction tend to collapse in much the same way. They can be divided into two main categories:

- Unframed - the weight of the floors and roof are supported by the walls. Failing of the bearing walls, columns, or upper floor beams results in extensive collapse accompanied by large amounts of rubble and debris. Rescue operations in these cases are usually difficult, lengthy, and dangerous. Fortunately, rescues can be made because of the formation of voids created by structural members, etc.

- Framed - constructed of structural steel or reinforced concrete skeletons. The floors or roof are not dependent on the walls for support. Collapse is generally more localized and not so extensive.

Immediately after a collapse, the Operational Plan should, if possible, follow this general pattern: Contact the Fire Department, then:

- Survey the purpose for which building is used, number of occupants, number of people trapped and location, extent of damage, etc.

- Immediately rescue survivors who can be seen or heard or whose exact location is known.

- Explore strong or sheltered parts of building even though no definite information has been received that persons may be trapped thereat.

- Remove selected debris according to a predetermined plan developed through reconnaissance and prior experience.

- Clear general rubble after all other methods have been employed and persons are still missing and their location is unknown.

The following are Rescue Techniques which may be utilized:

- Clearing and removal of surface debris by hand.

- Trenching to reach specific locations.

- Tunnelling to reach specific locations.

- Breaching walls if this is the quickest way to reach a victim.

208

EXHIBIT 18



PAGE 2/GENERAL ORDER 43.3-92
BUILDING COLLAPSE

- Shearing with timbers to brace walls and prevent further collapse.

The following precautions and guidelines should be taken, and followed, by police personnel assisting in performing Rescue Operations:

- Contact NIPSCO and Gary Hobart Water Department to cut off electricity, gas and water supplies.

- Provide sufficient illumination.

- Clear area of persons not usefully engaged in the rescue operation.

- Survey the building for weakened walls, floors, or roof

- Keep vehicle fleet and equipment away from weakened structures.

- Wear protective equipment, i.e. -- helmet, gloves goggles, mask, etc.

- Work in pairs, frequent relief, know whereabouts of all personnel.

- Coordinate activity if more than one operation is in progress.

- Do not smoke.

- Check for presence of gasses, refrigerants, chemicals, etc.

- Caution overzealous members. Enforce safety precautions.

- Avoid vibrations near weakened structures.

- Protect victims. Provide ventilation, if needed.

- Avoid unnecessary agitation of loose debris.

- Do not move natural props, such as open doors, supporting debris.

- Avoid cutting timbers that appear to support debris.

- Work around heavy obstructions, if possible.

- Do not pull or force timbers. Cut them to free other timbers.

209

EXHIBIT 18

PAGE 3/GENERAL ORDER 43.3-92
BUILDING COLLAPSE

- Avoid cutting gas and water pipes.

- Wet down area if using cutting torch. Avoid igniting combustibles.

- Remove debris by hand when working close to victim.

- Cooperate fully with all interested parties and agencies.

210

**EXHIBIT 18**

GENERAL ORDER 43.4-92
FIRE

The ranking Fire Officer at the scene shall be in command of emergency operations. The Commanding Officer shall confer with him to ascertain how police personnel can cooperate in the operation.

If the police personnel are the first to arrive at a fire scene, pending the arrival of Fire Department personnel, they shall:

— Immediately send an alarm or make certain that one has been sent.

— Warn occupants of the burning building; drop fire escape ladders; and assist occupants to the street.

— Not enter the burning building except to save a human life. If necessary to enter a burning building, personnel should;

   . Make a quick visual survey to determine the location of -- the fire, fire escapes, and possible escape routes to adjoining buildings.

   . Not run. Heavy breathing causes higher absorption of carbon monoxide.

   . Crawl, don't walk, when in thick smoke. Hot gases rise.

   . Keep doors and windows closed to exclude oxygen. However, if a stairway is on fire open the scuttle or door to the roof to prevent mushrooming of flames through apartment doors.

   . Feel the surface of doors before opening. If the door is hot, stand aside and kick it open to prevent hot flames and gases, rushing out under pressure, from nearing the body and lungs.

   . To force a door, break a panel near the lock.

   . Keep near walls, where floors and stairs are strongest.

   . Pull electrical switches or remove fuses.

   . Don't go alone into a smoke filled building without a safety line and a man standing by, outside.

III

000216

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.4-92
FIRE

If Fire Department personnel are present at the scene, police
personnel shall:

- Render any assistance requested by the Fire Officer in command:

    . Evacuate the burning or adjacent buildings.

    . Assist Fire Department personnel as requested.

- Provide rope to assist in maintaining fire lines.

- Provide illumination of the scene, if needed.

Do not enter the premises for search operations unless requested by
the Fire Officer in charge. If requested, safety helmets should be
worn.

Remember, cooperating with, and rendering assistance to, Fire
Department personnel, will expedite fire-fighting operations and
cause a reduction in injury or death and damage to property.

212

000217

**EXHIBIT 18**

GENERAL ORDER 43.5-92
BOMB THREATS/EXPLOSIONS

Upon responding to a bomb scare scene, police personnel shall, if possible, park their vehicles on the opposite side of the street from the involved location and, where practical, in a position that places a building between the vehicle and the reported location.

Responding personnel shall not transmit, either by portable or mobile radio, unless they are at least 150 feet from the concerned location.

The commanding officer, present at the scene, is in complete charge of the situation and is responsible for the implementation of proper procedures. Responding police personnel will confer with the officer in charge, to wit:

- Secure the assistance of building security and custodial personnel.

- Recommend an evacuation and identify an evacuation route.

- Prevent unauthorized persons from entering the evacuated area.

- Obtain a floor plan of the building, if possible.

- Establish search teams.

- Assign specific search areas to each Search Team; record assignments.

- Apprise Search Teams is a specific time of detonation had been given. If so and the premises is unoccupied, discontinue the search 20 minutes prior to the threatened time and do not resume the search until at least one (1) hour has elapsed from the threatened time.

- Utilizing building personnel on a volunteer basis, begin an orderly search of the proposed evacuation route.

- Subsequent to the evacuation route search, or in conjunction with it, give top priority to searching all public areas of the building.

- If no specific part of the building has been pinpointed as the target of the bomb threat, begin a search pattern starting from the uppermost floor to the basement, if feasible.

213

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.5-92
BOMB THREATS/EXPLOSIONS

- During the course of the search, do not use building elevators unless absolutely necessary. If an elevator must be used, use those which are not accessible to the public.

- If a suspected infernal device is located:

  . Don Protective equipment.

  . DO NOT TOUCH IT OR MOVE IT IN ANY MANNER.

  . Notify the command post through another member or by telephone; do not use the portable radio.

  . The supervisor in charge at the command post will request the response of - Bomb/Arson personnel, additional police for crowd and traffic control, and Fire Department standby equipment.

  . Remove any flammable or potential fragmentary-type material from the area surrounding the device.

  . Open doors and windows to allow escape of explosion pressures and reduce damage if there is detonation.

  . Have power, gas, or fuel lines leading into the area, shut off.

  . If the building has not already been evacuated, DIRECT that the evacuation take place in that portion of the building it is felt necessary (usually one (1) floor above and one (1) floor below).

  . Keep all person at least 300 feet away from the device.

  . Continue the search as other devices may have been secreted.

- Bomb Section personnel will assume charge of the situation upon their arrival and the supervisor in charge will abide by their instructions and recommendations.

Upon being notified that an explosion has occurred, the radio dispatcher, will dispatch the appropriate police personnel.

Responding police personnel shall perform the following functions:

214

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 43.5-92
BOMB THREATS/EXPLOSIONS

- Proceed to the scene without delay and assist in securing the area from intrusion by unofficial persons motivated by curiosity. The crime scene area must be roped off and all persons, not connected with emergency or investigative tasks, removed.

- Perform appropriate, standard disaster functions, i.e. -- provide illumination, assist representatives of other governmental agencies, etc.

- Assist Bomb and Arson Disposal Investigators with one of the most vital phases of the investigation--the crime scene search. First, however, preliminary inspection and evaluation of the debris and standing structure should be conducted by appropriately trained personnel to insure the safety of all emergency and investigative manners.

Once the structure has been declared safe, the crime scene search must be conducted. It will include all debris, the remaining portions of the structure and the surrounding area. The primary objectives of the search are to establish:

- The nature of the bomb/explosion.

- The method of ignition.

- Other evidence which may assist in the identification and apprehension of the person or person involved.

The nature of the bomb may be determined as follows:

- If the explosive was lighter than air, as in the case of natural gas, the walls will be blown or bowed out near the ceiling.

- If the material was vapor heavier than air, the walls will be blown out near the floor.

- If the material was a solid with low order burning characteristics, there will be a noted pushing effect and a gap in the force path wherever it passed large fixed objects, such as upright posts.

- High order explosions, of which dynamite is the best example, create a local shattering effect at the center of the blase.

215

**EXHIBIT 18**

PAGE 4/GENERAL ORDER 43.5-92
BOMB THREATS/EXPLOSIONS


The nature of the explosion material will give an indication of the type of igniting device and container to search for, e.g.--if it was a high order explosion, a blasting cap would be searched for.

Anything which is foreign to the immediate surroundings should be carefully collected, marked, and wrapped or tagged as per the directions of the member in charge of the investigation.

215

000221

**EXHIBIT 18**

GENERAL ORDER 43.6-92
DANGEROUS CONDITIONS

The Dangerous conditions for which operational guidelines have been
prepared and outlined on the following pages, include:

    Gas leaks
    Damaged live wires
    Water leaks
    Radioactive incidents

The above conditions are compounded during emergencies resulting
from severe rain or snow storms, high winds or tides, and other
natural or man-made emergencies.  For this reason, it is essential
that police personnel make preparations to cope with any
eventuality which may develop in these situations.

Upon receiving notice that a severe storm is proceeding in the
direction of or is expected to affect, the City of Gary, the Gary
Police will take the following steps:

1.   Each commander will assure that their vehicles have a full
     supply of gasoline.

2.   Additional manpower will be activated, equipped, and placed
     into service in, or in proximity to, anticipated critical
     areas.

3.   The commanding officer on duty will coordinate all
     emergency/rescue operations and maintain appropriate records.

4.   Performing personnel will be alerted to the fact that they may
     have to perform extended tours.

5.   Critical areas will be continually monitored by officer who
     will keep the commanding officer appraised of changing
     conditions.

A summary of the problems which should be anticipated in situations
of this kind is as follows:

1.   Rescue and evacuation of persons from storm-lashed areas.

2.   Overtaxed ambulance services necessitating the possible use of
     police vehicles to transport the sick and injured.

3.   Flood related hazards causing:
     a.   Buildings to be undetermined and in danger of collapsing.
     b.   Vehicles with occupants to become stranded in roadways.

217

EXHIBIT 18

PAGE 2/GENERAL ORDER 43.6-92
DANGEROUS CONDITIONS

4.     Weakened signs, marquees, etc., in danger of falling.

5.     Fallen poles, trees, and overhead electrical wires.

6.     Loss of electrical power over a large area and the attendant loss of electrical power to vital institutions.

218

**EXHIBIT 18**

GENERAL ORDER 43.7-92
GAS LEAKS

The police action to be taken in cases where dangerous gases are involved would depend on the following conditions:

1.    Type of gas involved (poisonous, flammable, suffocating).

2.    Amount of gas released.

3.    Area involved (size - residential or commercial).

4.    Number of persons affected (overcome, dead, evacuation necessity).

5.    Wind direction and velocity.

6.    Police personnel responding to gas leak situations should initiate the following:

      a.    Contact appropriate department - NIPSCO will send personnel to turn off gas.

      b.    Contact the Fire Department, inform them of the gas leak.

7.    Officer should not enter into gas leak area except to save a human life and only if fire personnel has not arrived.

8.    If necessary to enter gas leak area police personnel should observe the following guidelines.

9.    Before entering the area:

      a.    Neutralize any possible static electricity on your body by touching a grounding surface.

      b.    Make a visual survey to determine an avenue of escape in the event such a necessity arises.

      c.    Should not wear gas masks. Remember, tear gas masks are ineffective.

      d.    Secure a life line to your person manned by another member outside the gaseous area. Set up signals, i.e.-- slack off; pull out.

219

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.7-92
GAS LEAKS

10. Use extreme caution when opening doors in the gassed area to avoid possible sparking. Do not ring the doorbell, light matches, or switch on flashlights or room lights. Be careful not to strike metal equipment against metal objects in the area.

11. Don not open metal-casement type windows; break the glass with a nightstick or other non-metallic object.

12. Establish a search pattern within the area to avoid search duplication. Ventilate as you search.

13. If drowsiness, difficulty in breathing, or a ringing sensation in the ears, is experienced, immediately signal to be pulled out. Additionally, leave the area if you experience any of the following early symptoms of gas poisoning--headache, vomiting, mental confusion, or loss of muscular coordination.

14. Immediately remove victims to a gas-free area and administer appropriate first aid measures.

It should be noted that if gas valves have been turned off, do not allow them to be turned on under any circumstances except by a representative of the appropriate utility company.

220

000225

**EXHIBIT 18**

GENERAL ORDER  43.8-92
DAMAGED LIVE WIRES

Serious hazards could result if overhead, live wires sag or fall as a result of icing, windstorm, lightning, broken poles, or other reasons.  If the wire falls on a conductive object such as a metal fence, railroad tracks, or the like, the electricity will be conducted to other points, creating additional hazards.

Upon arriving at a fallen wire incident, police personnel shall:

1.    Assure that NIPSCO power company has been notified.

2.    Park their vehicle a safe distance from the transmitted location, particularly at night and during storms when vision is impaired.

3.    Exercise care when exiting the vehicle.  A live wire may be nearby, or the vehicle may be energized through contact with the wire or a conductor.  Do not exit the vehicle before examining the area.

4.    If there is any chance that the vehicle has become electrically energized, do not attempt to leave it or drive out from under a wire.  The wire may become grounded, electrocuting the occupants or causing the vehicle to burn. Remain in the vehicle until rescued.  (A weighted rope can be utilized to remove live wires from vehicles).

5.    If the situation dictates that you leave the vehicle (fire, etc.), do not step out--jump clear and make sure that both hands and feet are free of the vehicle when contact is made with the ground.

Police personnel shall assist Northern Indiana Public Service Company (NIPSCO) in guarding fallen wires, or objects which may be in contact with the wires, until the arrival of a power company representative.  In the performance of this function, officers shall:

1.    Treat all fallen wires as live wires. Remember, the fact that wires do not sputter or spark is no indication that they are dead.

2.    Rope off the area and prevent unauthorized encroachment.

3.    Unless a life is at stake, do not go within six (6) feet of any fallen wire.

221

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.8-92
DAMAGED LIVE WIRES

If the situation dictates immediate action, officers shall -- prior to handling wires -- don insulated electrical gloves (rubber inserts covered by leather gloves) and insulate themselves against the ground by standing on a spare time, backboard, or dry cardboard or newspaper. If the victim is in contact with the energized wire or object, the fundamental requirement for his safe removal is to avoid touching the victim or wire with any tool which could conduct electricity to the rescuer.

If it is imperative that wires be cut, the following procedures will be observed:

1.   Only cut wires to minimize the hazard to any victim or bystander or to gain access to a disaster area.

2.   Use only approved cutting equipment, i.e. -- insulated cutters, long handled axes, etc.

Do not touch any victim until he has been removed a distance of at least six feet from the wire. Then, administer appropriate first aid treatment and have victim immediately transported to a hospital.

**222**

**EXHIBIT 18**

GENERAL ORDER 43.9-92
WATER LEAKS


Basically, the water leak assignments to which police personnel
respond, fall into two (2) broad categories -- street water leaks
and building water leaks.

Street water leaks, which usually involve a broken water main or a
fire hydrant, are handled as follows:

1.　Upon arrival at the scene, the officers will assure the Gary
　　 Hobart Water Company has been notified.

2.　While awaiting the response of the Gary Hobart Water Company,
　　 personnel shall:

　　 a.　safeguard the immediate area of the leak.
　　 b.　divert vehicular and pedestrian traffic.
　　 c.　survey the immediate area of the leak, to ascertain
　　　　　locations affected.
　　 d.　evacuate buildings in which structural defects may
　　　　　develop as a result of the leak.
　　 e.　assure that all appropriate governmental departments and
　　　　　agencies have been notified.

3.　If a fire hydrant is leaking:

　　 a.　attempt to tighten the screw cap with a hydrant wrench.
　　 b.　if the gate valve of the hydrant is stripped, or the
　　　　　leak cannot be stopped by conventional means, notify the
　　　　　Gary Hobart Water Company.

If a combination of the leak and a clogged drain is causing
flooding conditions, NEVER ATTEMPT TO CLEAR THE DRAIN WITH YOUR
BARE HANDS.  The suction could pull you in.

Building water leaks, which usually involve broken water pipes or
sprinkler systems, are handled as follows:

1.　If the leak is a result of a broken pipe, locate the break
　　 (sometimes difficult because of flooding conditions) and close
　　 the shut-off valve between the break and the water supply
　　 source.  If a boiler is affected by the water shut-off, it too
　　 must be shut down to eliminate any chance of an explosion --
　　 particularly if the boiler is coal-fed.

223

**EXHIBIT 18**

2.  Leaks involving sprinkler systems sometimes present a problem due to the time expended in tracing shut off valves, particularly if an auxiliary water supply system, is involved. The Fire Department dispatcher will be notified whenever a sprinkler system has been shut off.

Building water leak hazards, for which officers should be prepared to encounter and overcome, include:

1.  Severe drops in the floor of a flooded basement.

2.  Structural defects which may cause floors, or even the building itself, to collapse.

3.  The electrical conducting capability of water, especially in flooded basements.

Every effort will be made to correct building water leaks by shutting off secondary valves. Only if the condition is not corrected in this manner, will the valve controlling the water supply into the building be closed.

224

000229

**EXHIBIT 18**

GENERAL ORDER 43.10-92
RADIOACTIVE/HAZARDOUS MATERIALS INCIDENTS

In emergency cases involving radiation, The Gary Police Department
will be among the first to arrive at a radiological incident. It
is, therefore, incumbent upon them to be familiar with the hazards
of radiation, the use of radiation detection instruments, and
procedures to reduce hazards.

The extent of radiation hazards depends upon several factors:

1.   The type of radiation emitted.

2.   Its energy.

3.   The physical and biological half-life of the material.

4.   The radiosensitivity of the organ where the material
     localizes.

The three (3) most common types of radiation are:

1.   Gama Radiation:  A long range, highly penetrating type of
     external radiation, similar to x-rays.  Heavy, dense
     substances (lead) are required as a shield or the radiation
     can be reduced by one half by using steel, concrete, hardwood
     or earth as a shield.

2.   Beta Radiation:  Of shorter range and less penetrating than
     Gama. It can be shielded by 1/3" aluminum or equivalent
     thickness in materials of lesser density.

3.   Alpha Radiation:  Only an internal hazard with extremely short
     range and little penetrating power.  It can be shielded by a
     thin sheet of paper and cannot penetrate the skin.

To prevent and control contamination caused by internal radiation,
protective garments and self contained breathing apparatus must be
worn.  Protection against external radiation can be accomplished by
one, or a combination, of three fundamental factors:

1.   Controlling the length of exposure time.

2.   Controlling the distance between the individual and the
     source.

3.   Shielding the individual from the source with radiation
     absorbing materials.

225

000230

EXHIBIT 18

PAGE 2/GENERAL ORDER 43.10-92
RADIOACTIVE/HAZARDOUS MATERIALS INCIDENTS

Repeated doses of radiation are accumulative. As a rule of thumb, the following should be kept in mind:

1. Exposure of 25r (25 roentgens) to 100r will result in no radiation sickness, although slight, temporary blood changes will occur.

2. Exposure of 100r to 200r will result in slight radiation sickness and blood changes, with delayed recovery. Delayed effects may shorten life expectancy by 1%.

The following equipment is used to measure radiation intensity:

1. Ion chamber: Designed for high radiation intensities, it measures the does rate of radiation in roentgens per hour.

2. Geiger-Mueller Counter: Measures does rate in Milliroentgens per hour.

3. Dosimeter: Shaped like a large fountain pen, it measures the total amount of radiation to which they are exposed in any time interval, in Milliroentgens.

4. Film Badge: Like the dosimeter, indicates cumulative dosage but cannot be read until the film has been developed.

Radiological surveys will be conducted by police personnel at the scene of the following incidents:

1. Airplane crashes.

2. Explosions.

3. Any incident in which radioactive material is or is presumed to be involved, i.e. truck accidents, train disasters, etc.

226

**EXHIBIT 18**

GENERAL ORDER 43.11-92
OPERATIONAL PROCEDURES/RADIATION INCIDENTS

The Radio Dispatcher shall dispatch patrol cars to a radioactive
incident. Additionally, they shall notify the Department of
Health, the Fire Department, Civil Defense and the Poison Control
Center. The Fire Department shall assume charge of all radiation
incidents, be responsible for decontaminating the area, and
personnel assigned thereto shall be the only persons authorized to
move suspected radioactive material.

Police personnel assisting at or involved in a radioactive
incident, shall:

1.    Park their vehicles so as to avoid contamination from dust,
      smoke, or flow off water (windward side of the accident of
      high ground).

2.    Assist in the establishment of a Frozen Area as follows:

      a. On the street: A five (5) foot radius, except in the
         following cases:

         1.   25 foot radius if the incident involves a fire. This
              distance will be increased, if necessary to avoid
              exposure of persons to smoke or fumes emanating from
              the fire.

         2.   300 feet radius if a military shipment is involved.
              However, if a courier is accompanying the shipment,
              the Frozen Area shall be established as per his/her
              instructions.

      b. In a building: The room in which the source is located.
         If fire is involved, all areas whereat one would be
         exposed to smoke or fumes.

3.    Measure the amount of radioactivity present, as follows;
      starting at an initial distance of 100 feet from the source:

      a.   Obtain a reading in Roentgens with the Ion chamber. If
           a positive reading registers, immediately withdraw to a
           point at which the reading is zero.

      b.   From point zero on the Ion chamber, approach the
           radioactive source with the Geiger Counter until a
           positive reading in Milliroentgens appears and
           reestablish the Frozen Area at this point. The readings
           at least every fifteen (15) minutes.

                                                            227

EXHIBIT 18

PAGE 2/GENERAL 43.11-92
OPERATIONAL PROCEDURES/RADIATION INCIDENTS

4. Report readings obtained, and the time and distance from the source, to the supervisor in charge for entry in the Command Post Log.

5. If necessary to enter the Frozen Area to effect rescues, don protective garments.

6. Refrain from smoking, eating and drinking in the contaminated area.

7. Request persons believed to have been exposed, to remain on the scene. If they refuse, obtain their names and addresses prior to their departure.

8. Render necessary assistance to the assisting agency representatives when they arrive at the scene.

9. Remove and monitor all protective clothing at the termination of the incident. All members shall be monitored for radioactivity before leaving the scene and shall abide by instructions received.

10. Monitor and, if necessary, decontaminate police equipment within the Frozen Area before attempting to remove it.

000233

**EXHIBIT 18**

GENERAL ORDER 43.12-92
TABLE OF ISOLATION AND EVACUATION DISTANCES

| NAME OF MATERIAL SPILLING OR LEAKING (ID No.) | INITIAL ISOLATION SPILL or LEAK FROM (drum, smaller container, or small leak from tank) ISOLATE in all Directions feet | INITIAL EVACUATION LARGE SPILL FROM A TANK (or from many containers, drums, etc.) | | |
|---|---|---|---|---|
| | | FIRST ISOLATE in all Directions feet | THEN EVACUATE IN A DOWNWIND DIRECTION Width miles | Length miles |
| Acrolein (1092) | 530 | 1140 | 3.0 | 4.7 |
| Acrylonitrile (1093) | 30 | 60 | 0.1 | 0.2 |
| Ammonia, anhydrous (1005) | 100 | 200 | 0.4 | 0.7 |
| Ammonia solution, not less than 44% (2073) | 100 | 200 | 0.4 | 0.7 |
| Boron trifluoride (1008) | 320 | 670 | 1.7 | 2.6 |
| Bromine (1744) | 300 | 620 | 1.3 | 2.4 |
| Carbon bisulfide (1131) Carbon disulfide (1131) | 30 | 70 | 0.2 | 0.3 |
| Chlorine (1017) | 250 | 530 | 1.3 | 2.0 |
| Dimethylamine, anhydrous (1032) | 80 | 170 | 0.4 | 0.6 |
| Dimethyl sulfate (1595) | 80 | 170 | 1.4 | 2.2 |
| Epichlorohydrin (2023) | 40 | 80 | 0.3 | 0.3 |
| Ethylene imine (1185) | 110 | 310 | 1.4 | 2.2 |
| Ethylene oxide (1040) | 40 | 70 | 0.2 | 0.3 |
| Fluorine, liquid (1045) | 460 | 880 | 2.5 | 3.9 |
| Hydrochloric acid, anhydrous (1050) Hydrogen chloride, anhydrous (1050) Hydrogen chloride, refrigerated liquid (2186) | 190 | 450 | 1.0 | 1.4 |
| Hydrocyanic acid (1051) Hydrogen cyanide, anhydrous (1051) | 90 | 190 | 0.5 | 0.7 |
| Hydrofluoric acid (1790) Hydrogen fluoride, anhydrous (1052) | 240 | 430 | 1.2 | 1.8 |

229

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 43.12-92
TABLE OF ISOLATION AND EVACUATION DISTANCES

| NAME OF MATERIAL SPILLING OR LEAKING (ID No.) | INITIAL ISOLATION SPILL or LEAK FROM (drum, smaller container, or small leak from tank) ISOLATE in all Directions feet | INITIAL EVACUATION LARGE SPILL FROM A TANK (or from many containers, drums, etc.) | | |
|---|---|---|---|---|
| | | FIRST ISOLATE in all Directions feet | THEN EVACUATE IN A DOWNWIND DIRECTION Width miles | Length miles |
| Hydrogen sulfide (1053) | 170 | 340 | 0.6 | 0.9 |
| Methylamine, anhydrous (1061) Monomethylamine, anhydrous (1061) | 110 | 330 | 0.5 | 0.8 |
| Methyl bromide (1062) | 30 | 90 | 0.2 | 0.3 |
| Methyl chloride (1063) | 30 | 40 | 0.1 | 0.2 |
| Methyl mercaptan (1064) | 370 | 770 | 1.9 | 3.0 |
| Methyl sulfate (1595) | 60 | 170 | 1.4 | 2.2 |
| Nitric acid, fuming Nitric acid, red fuming (2032) | 100 | 210 | 0.5 | 0.7 |
| Nitric oxide (1660) Nitrogen dioxide (1067) Nitrogen tetroxide, and mixtures (1067) | 110 | 220 | 0.5 | 0.8 |
| Oleum (1831) | 280 | 560 | 1.5 | 2.2 |
| Perchloromethyl-mercaptan (1670) | 230 | 450 | 1.1 | 1.6 |
| Phosgene (1076) | 600 | 1250 | 3.3 | 5.2 |
| Phosphorus trichloride (1809) | 110 | 220 | 0.5 | 0.8 |
| Pyrosulfuric acid (1831) | 280 | 560 | 1.5 | 2.2 |
| Sulfur dioxide (1079) | 100 | 220 | 0.5 | 0.8 |
| Sulfuric acid, fuming (1831) Sulfuric anhydride (1829) Sulfur trioxide (1829) | 280 | 560 | 1.5 | 2.2 |
| Titanium tetrachloride (1838) | 30 | 60 | 0.2 | 0.2 |
| Trimethylamine, anhydrous (1083) | 90 | 170 | 0.4 | 0.6 |

230

000235

**EXHIBIT 18**

GENERAL ORDER 44-92
CANINE PATROL

I.  POLICY

   A.  Use of a canine in effecting an arrest constitutes either
       an actual or implied use of force. Therefore, police
       canine handlers and their supervisors will be fully aware
       of all facts and circumstances surrounding an incident
       before the decision is made to use a canine for other
       than deterrent or control purposes.

   B.  Police dogs are tools that canine officers may use to
       effect an arrest when physical resistance to that arrest
       is met by the officer. Police officers may not use any
       more force than is necessary to overcome the resistance
       that is met.

   C.  All dogs will be kept on lead, per City Ordinance, except
       in the course of building or field searches, or when
       warranted and justified for the apprehension of a fleeing
       criminal suspect or to prevent injury to the officer or
       another person.

II.  USE OF CANINES

   A.  The use of canine patrol is authorized for the following:

       1.  To deter criminal activity and to assist in the
           prevention and detection of crime.

       2.  To effect the arrest or prevent the escape of a
           person whom the police officer has probable cause
           to believe has committed a felony.

       3.  To protect the officer or another person(s) from
           bodily injury.

   B.  Canine teams will be used for the following:

       1.  To search buildings where a possible unlawful entry
           is indicated or detected, or where a suspect may be
           hiding when such buildings are reasonably believed
           to be clear of innocent persons, and after clear of
           innocent persons and after clear warning by police
           is given prior to deployment of the dog. When the
           services of the K-9 team are anticipated for a
           search, every effort will be made by the first
           police officers on the scene to

231

000236

**EXHIBIT 18**

PAGE 2/GENERAL ORDER 44-92
CANINE PATROL

avoid contamination of the area with human scent by preventing any unnecessary persons from entering the area, including police officers.

    a.   Patrol Supervisors will respond to assignments of this nature. In the event a canine team is not available, and will not be available in a reasonable amount of time, the supervisor on the scene will ensure a building search is conducted by district patrol personnel.

   2.   To track suspects, lost or missing persons, hidden implements of crime (s) or other contraband, explosive devices, or narcotics.

C.   Use of canine patrol for deterrent purposes at specified events for crowd control or to control access to any facility will only be upon approval of Captain and above.

D.   Any use of canine teams not specifically authorized above will be effected only upon the approval of the Police Chief or designee.

III. RESPONSIBILITIES

A.   Canine Officer will:

   1.   Utilize his/her assigned dog in accordance with Section II of this directive.

   2.   Be fully responsible and accountable for all actions of the assigned dog while in the performance of duty and during off-duty hours.

   3.   When receiving an order from a superior to use the dog in a manner which would conflict with departmental policy or in a manner which would be unsafe for the dog, call such conflict to the attention of the superior and notify his/her immediate supervisor. A report will be prepared and submitted through channels to the Uniform Division, describing the incident.

232

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 44-92
CANINE PATROL

4. Maintain his/her assigned canine at a high level of proficiency and peak physical condition.

5. Immediately notify Uniform Division supervisor when his/her dog is involved in any incident on or off duty, and follow the procedures outline in Section IV.

6. Under the direction of the Uniform Division Supervisor or Shift Commander, return his/her dog to the Canine Unit when becoming ill or injured.

   a. Until certified capable of handling the dog by a competent authority, the handler will not be permitted to perform with the dog as a team.

   b. Upon returning to duty and being certified capable of handling the dog, the team will be reevaluated by a canine trainer and supervisor.

   c. Should a determination be made that the officer cannot perform the duties of a handler without aggravating a past injury or illness, he/she will be excluded from the position of canine handler.

7. Report all injuries and illnesses suffered by the canine dog to the Commanding Officer, Canine Unit, and the departmental veterinarian as soon as possible.

   a. All illnesses or injuries of an emergency nature will be immediately reported to the department veterinarian at the Canine Unit.

8. On foot patrol, the canine officer will not leave his/her dog unattended in a public place.

9. Whenever a canine officer leaves his/her dog unattended in a public place.

10. While on foot patrol, the canine officer will request Police Radio to send a non-canine officer to enforce minor offenses unless immediate action is necessary. For example: intoxication, smoking on the transit system, fare-jumping, sleeping in

233

EXHIBIT 18

PAGE 4/GENERAL ORDER 44-92
CANINE PATROL

the concourse or on the transit system, or other similar offenses.

B. Patrol Supervisor will:

1. Supervise and deploy canine teams.

2. Be available to respond to serious situations involving canine teams to ensure that no directive procedures are violated and to instruct the individual handler.

3. Make recommendations to the Commanding Officer, Uniform Division of any discrepancies.

4. Upon responding to a canine incident, confer with the district patrol supervisor, if one is present.

5. Be responsible for evaluating the performance of canine teams in the field.

6. Ensure that required canine incident reports are submitted to the Commanding Officer, Uniform Division.

7. When a canine handler becomes injured or ill, follow directions in Section III-A.6. The dog is then held at a Kennel until handler has been certified as being capable of handling the dog.

8. Canine Sergeant will not be accompanied by a dog.

C. The first supervisor (canine or non-canine) on the scene of the incident where a building search will be conducted and where a canine team has been requested will:

1. Inform canine handler as to point of entry, known hazards within the building, etc.

2. Ensure that possible routes of escape from building are covered until search is completed.

3. Ensure that no person, including police, enter the building during the search.

4. Resume all unnecessary manpower and equipment.

239

EXHIBIT 18

PAGE 5/GENERAL ORDER 44-92
CANINE PATROL

D.    Uniform Division Commander will:

1.    Evaluate each incident and submit recommendations Deputy Chief, Training Unit. (See Section IV, page 5)

2.    Ensure that assigned canine teams are properly supervised, deployed, and utilized.

3.    Ensure that all canine incident reports are forwarded through the chain of command to the Training Unit, within 48 hours of the incident.

4.    Ensure that all ACTIVE canine teams receive a minimum of three (3) days in-service training four (4) times each year. Evaluation of the officer and the canine as to performance, dependability, stability, and expertise will be made during each session.

5.    Ensure that all dogs are inspected on a regular basis to maintain fitness, health, and capability to function in a patrol status.

6.    Evaluate the fitness of handler and/or canine, and evaluate the need for training, if any.    ·

7.    Direct the canine officer to return his/her dog to the Canine Unit when he/she becomes ill or injured and cannot perform with the dog as a team.

E.    All canine incidents involving a bit or damage to property will be investigated by the Internal Affairs Division. The assigned investigator will:

1.    Conduct a complete investigation and prepare all required reports.

2.    Forward a copy of the Investigation Report to the Commanding Officer, Training.

235

000240

**EXHIBIT 18**

PAGE 6/GENERAL ORDER 44-92
CANINE PATROL

3. Include in the report a description of the use of the canine and circumstances surrounding such use. The report will be specific and detailed, with all facts relative to the incident included in the report.

4. Include photographs of the damage/injury which will remain a part of the investigative record.

F. The investigating division supervisor will ensure compliance with provisions outlined in Section III-E.

IV. REPORTING OF INCIDENTS

A. Anytime, on or off-duty, that a city-owned dog is involved in any incident resulting in injury or damage to property (including the handler and/or member of the handler's family), the handler must submit Incident Report (Case Number must be on all reports). Report will be submitted by the Commanding Officer, Uniform Division, and a copy forwarded by the commander to the Deputy Chief, Training Unit to arrive no later than 48 hours after the incident. Contents of the report must be specific. If the action of the bitten individual caused the reaction of the dog, so state, and describe.

1. Personnel of the district of occurrence will refer to Directive "Reporting Non-Vehicular Accidents When City May be Liable," and comply with its contents and the City Attorney where law suits are involved.

B. All incidents involving a bit or damage to property will be investigated by the Internal Affairs Division of occurrence, and an Investigation Report will be submitted, with a copy forwarded to the Commanding Officer, Training Division will include photographs of the damage/injury, which will remain part of the investigative record.

236

000241

**EXHIBIT 18**

PAGE 7/GENERAL ORDER 44-92
CANINE PATROL

    C.  Further, on all assignments when the canine is used or has had any effect on a specific situation, the handler must submit a separate report, with the same case number, through channels, to Uniform Division, Training Division. The report must be complete, thorough and describe in as much detail as possible the nature of the assignment, to what use the dog was put, and the results. (Those situations which demand reports include, but are not limited to: arrests, apprehensions, building searches, tracking, disorderly crowds, disturbances, pursuits, narcotic detection, exit/entrance control, explosive device detection).

    D.  Radio Room Supervisor will notify the Canine Unit by telephone as soon as the facts are available regarding any canine incident. This information will be noted on the daily bulletin.

V.  EVALUATION OF CANINE INCIDENTS

    A.  The Commanding Officer, Training Division will:

        1.  Maintain records of all incidents involving canine teams.

        2.  Evaluate all incidents to ensure compliance with departmental policies and procedures, and submit a monthly report to the police Commissioner, through channels, regarding any such violations.

    B.  These reports will be reviewed by a panel appointed by the Police Commissioner, who will recommend to him appropriate action, if necessary.

VI.  REQUEST FOR USE OF CANINES BY OUTSIDE POLICE DEPARTMENT OR AGENCIES

    A.  Outside requests by other police departments of agencies for canine services will be upon the authorization of the Chief of Police or Deputy Chief.

VIII. RESPONSIBILITY

    A.  It will be the responsibility of all canine patrol officers as well as their Unit Supervisors and Commanders, to be familiar with this directive, and to comply with its provisions.

237

000242

**EXHIBIT 18**

GENERAL ORDER 45-92
SEXUAL HARASSMENT

PURPOSE:

It is the purpose of this policy to affirmatively raise the subject of sexual harassment, to express strong disapproval against such actions, to identify a disclosure system whereby employees have the right to raise sexual harassment issues, to establish an investigative procedure for such alleged misconduct, to provide appropriate sanctions, and to identify some of the procedures that will be used to sensitize all concerned.

POLICY:

Sexual harassment is a form of employee misconduct which undermines the integrity of the employee relationship. All employees must be allowed to work in an environment free unsolicited and unwelcome sexual overtones. Sexual harassment for purposes of this policy is defined unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when submission to such conduct is made either explicitly or implicitly a term or condition of the individual's employment; submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or such conduct has the purpose or effect of unreasonably interfering with an individual work performance or creating an intimidating, hostile, or offensive working environment.

Sexual harassment would include, but not be limited to actions by either gender such as: sex oriented verbal kidding or abuse, subtle pressure for sexual activity, physical conduct such as patting, pinching; or constant brushing against another's body, and explicit demands for sexual favors, whether or not accompanied by implied or overt promises of preferential treatment or threats concerning an individual's employment status.

Examples of potentially sexually harassing behavior which may constitute sexual harassment, by either gender, depending upon the circumstances and context, and the perspective of the victim would include but not be limited to referring to an adult as a girl, doll, hunk, babe, baby, broad or bitch; demanding or implying that sexual favors could be exchanged for promotions, favorable reviews or ratings continued employment or favorable assignments; whistling at someone, cat-calls; making sexual comments about a person's body; making sexual comments or innuendos; turning work discussion to sexual topics without necessity to do so; telling sexual jokes or stories; asking about sexual fantasies, preferences or history; asking personal questions about social or sexual life; making

238

000243

**EXHIBIT 18**

PAGE 2
GENERAL ORDER 45-92
SEXUAL HARASSMENT

sexual comments about a person's clothing or body, etc.

The Department through the office of the Chief of Police shall investigate complaints, or allegations, from employees of the department concerning any violations of Civil Rights laws on employment, assignment and promotion practices; included in such violative practices is sexual harassment.

Any employee who believes they are the subject of sexual harassment and wishes to file a complaint shall contact the Department's Internal Affairs Officer in person, by telephone or in writing. The Internal Affairs Officer and/or any command or supervisory personnel shall be responsible to insure that all incidents of sexual harassment are reported to the office of the Chief of Police.

Persons submitting complaints of sexual harassment are assured that thorough investigation of such complaints will be conducted. Information collected during such an investigation will be considered confidential and will not be disclosed to persons not involved directly in conducting the investigation and determining what action, if any to take in response to the complaint.

If, following a complaint of sexual harassment, an investigation reveals that some act of sexual harassment has occurred the person who has violated the above-described prohibition of sexual harassment will be subject to sanctions or penalties. The sanction or penalty administered under this policy will depend on all circumstances, including the offending employee's prior work record and specifics regarding the nature of the violation. It should be understood that reprimand, fine suspension and/or termination of employment may very well be the penalty administered to persons who violate this policy.

No adverse employment action or retaliation will be taken against any employee who reports any act of sexual harassment, or who gives information during the course of an investigation by the Office of the Chief or the Internal Affairs Division.

The officer charged with the responsibility of investigating any complaint of sexual harassment shall reduce the findings and recommendations for resolving the complaint to writing, and submit such report to the Chief of Police for final disposition within thirty (30) calendar days following the completion of the investigation.

239

**EXHIBIT 18**

PAGE 3/GENERAL ORDER 45-92
SEXUAL HARASSMENT

To assure that all employees of this Department are aware of this
policy and the Department's commitment to the establishment and
maintenance of a working environment free from sexual harassment,
copies of this policy will be placed permanently on all appropriate
bulletin boards.

240

000245

**EXHIBIT 18**

**GENERAL ORDER 46-92**
**STRIP SEARCHES**

**PURPOSE:**

To establish policies and procedures to minimize the risk of introduction of contraband into the Gary Police Department on the person of any prisoner or inmate.

**STATEMENT OF POLICY:**

It is the policy of the Gary Police Department to conduct strip searches of persons only when police or correctional officers have reason to believe that an inmate or prisoner may have secreted any item of contraband on his person.

**PROCEDURE:**

I.   The Turn Commander shall authorize all strip searches with particular sensitivity to circumstances in which inmates or prisoners may be within the proximity of persons or articles from outside of the institution, e.g., upon receipt from court, from other institutions, when apprehended from an escape attempt, as well as after participation in any kind of internal disturbances.

II.  When a strip search is conducted the following will be observed:

   a.   Police or Correctional Officers shall conduct all strip searches in a private area, whenever possible. Strip searches shall not be conducted within the view of other inmates or the public in the absence of an emergency.

   b.   Strip searching should only be performed by two (2) officers of the same sex as the subject. One (1) officer will observe while the other conducts the search.

   c.   The prisoner or inmate will remove all articles from the pockets of his/her clothing and place them in a receptacle, on a table, or on the floor.

341

000246

**EXHIBIT 18**



GENERAL ORDER 46-92
PAGE 2
DEPARTMENTAL POLICY/STRIP SEARCHES

d.   The prisoner or inmate will be instructed to move a few paces away.

   1.   The prisoner or inmate shall be placed in a position such that he/she cannot palm articles from retrieval after search.

   2.   The search will include running the fingers through the hair or the use of a large toothed comb.

   3.   The entire body should be checked thoroughly including around the inside the ears, inside the nose, inside the mouth (tongue raised and dentures removed), hand (between fingers), arms, armpits, trunk, the pubic area (males should be asked to lift genitals), the buttocks, the rectal area (inmates will turn around, bend over and spread the buttocks for comprehensive examination), the inner and outer parts of the legs, and the feet (between the toes and soles).

   4.   After completion of the body search, every article of clothing and personal property must be thoroughly examined.

   5.   Prisoners or inmates shall not be strip searched by Police or Correctional Officers of the opposite sex. All strip searches shall be conducted with dignity and the search shall only be to the extent necessary to mitigate against the threat of concealed contraband.

III. Records shall be maintained of each strip search conducted:

   a.   The Turn Commander shall designate one officer who participated in the strip search to compile an Incident Report.

   b.   The Warden or Correctional Officer in charge shall record the strip search in an appropriate log book. This entry shall include a minimum of the following information: the time inmate or prisoner was searched, the identity of the inmate or prisoner searched, and the identity of the officers who conducted the search.

263

000247

**EXHIBIT 18**

GENERAL ORDER 46-92
PAGE 3
DEPARTMENTAL POLICY/STRIP SEARCHES

c.  Police or Correctional Officers shall initiate any appropriate disciplinary action or prosecution against an inmate or prisoner upon arrival of the Turn Commander for any contraband found on any prisoner or inmate by preparing a Gary Police Uniform Offense Report.  In all such cases, contraband found during the conduct of the search shall be treated as evidence.

243

**EXHIBIT 18**